# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHIGAN GAMBLING OPPOSITION
("MichGO"), a Michigan non-profit
corporation, P.O. Box 67, Moline,
MI,

                    Plaintiff,

v.

GALE A. NORTON, in her official
capacity as SECRETARY OF THE
UNITED STATES DEPARTMENT
OF THE INTERIOR, 1849 C Street, N.W.,
Washington, D.C. 20240,

and

NEAL A. McCALEB, in his official
capacity as ASSISTANT
SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE INTERIOR,
BUREAU OF INDIAN AFFAIRS,
1849 C Street, N.W.,
Washington, D.C. 20240,

                    Defendants.

**COMPLAINT**

Civil Action No. _____

Plaintiff, Michigan Gambling Opposition ("MichGO"), brings this action against Defendants Gale A. Norton, Secretary of the United States Department of the Interior, and Neal A. McCaleb, Assistant Secretary of the United States Department of the Interior, Bureau of Indian Affairs, and states for its Complaint:

## INTRODUCTION

1.     The United States Department of the Interior ("Department") and the Bureau of Indian Affairs ("BIA") ( collectively, "Defendants") have unlawfully approved placing 146 acres of land ("casino site") into trust under the federal Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq.* and 18 U.S.C. § 1166, for use by the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Gun Lake Band"). The Gun Lake Band intends to use the land, which is located in the vicinity of many of MichGO's members in Wayland Township, Michigan, for the construction and operation of a nearly 200,000-square-foot gambling casino. Without the prospect of a casino, there would be no reason for the trust acquisition.

2.     Defendants gave notice on May 13, 2005, of their plan to place the casino site into trust after thirty days. (*See* 70 Fed. Reg. 25596 (2005), attached as Exhibit A). Such action would disregard Congress' mandate for the preparation of an environmental impact statement under NEPA; violate federal law establishing parameters for gambling on newly acquired Indian lands; disregard the Gun Lake Band's lack of a legally required gambling compact for the conduct of Class III gambling; and disregard the Constitution's limitation on delegated legislative power.

3.     The Defendants' decision to proceed rests on a Finding of No Significant Impact ("FONSI") under the National Environmental Policy Act ("NEPA"). A copy of the February 27, 2004, FONSI is attached as Exhibit B. The FONSI was based on an environmental assessment

("EA") that was finalized in December 2003, approximately 1 ½ years before Defendants made the decision to take the land into trust. Defendants issued their FONSI despite admitting in the EA that the casino would attract more than 3,000,000 visitors a year (8,500 a day) to a township of only 3,000 residents, and could siphon off as much as $92 million a year in consumer expenditures from the nearby core cities of Grand Rapids and Kalamazoo.

4.    MichGO brings this action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 551, *et seq.*; NEPA, 42 U.S.C. § 4321, *et seq.*; and the non-delegation doctrine of the United States Constitution to stop the unlawful casino. Once the land is placed in trust, legal and practical hurdles will make it virtually impossible to challenge the casino's legality. Accordingly, it is essential to preserve the status quo and prevent irreparable harm to MichGO's members by preventing the taking of any land into trust pending adjudication of MichGO's claims.

5.    Defendants failed to discharge their legal duties under NEPA when they issued a FONSI permitting the casino to go forward, ignoring significant environmental impacts that require a full environmental impact statement ("EIS"). Because BIA had clear evidence that the proposed casino would significantly affect the quality of the human environment, its decision to forgo preparation of an EIS was arbitrary and capricious. Indeed, the EA concedes that the proposed casino would result in numerous significant impacts to area resources, but argues that these impacts will be offset by payments from the Gun Lake Band under a still non-existent gambling compact with the State of Michigan.

6.    Defendants' decision to place the proposed casino site into trust also violates strict statutory limitations placed on Indian gambling by IGRA. In its notice of intent to take the land into trust, BIA concluded that the Gun Lake Band would qualify for a narrow exception

3

permitting gambling on newly acquired Indian lands, since the casino site would allegedly be the

Band's "initial reservation" for purposes of IGRA, 25 U.S.C. § 2719(b)(1)(B)(ii). (Ex. A, at 1).

However, the casino site cannot be the tribe's initial reservation when the Gun Lake Band has no

intention of using the land for residential purposes as the law requires, and when the Gun Lake

Band has had three prior reservations at different points in its history, none of which included the

lands now proposed for acquisition. The Gun Lake Band's request for a casino is also directly

inconsistent with promises the Band made to its own members and to the federal government

that it did not plan to engage in casino gambling if it attained federal acknowledgment. (Exhibit

C, Gun Lake Trust Application, *BIA Historical Technical Report on the Match-E-Be-Nash-She-*

*Wish Band of Pottawatomi Indians of Michigan, Inc.*, at 79 ("The Gun Lake Band . . . is the only

Indian Tribe in the State of Michigan which has decided not to sacrifice the future of its

membership to gaming interests and the changes to traditions in the community that gaming

could bring.")).

  7.  Defendants also have no lawful authority to authorize Class III gambling at the

proposed site in the absence of a tribal-state gambling compact. Under IGRA, an Indian tribe

can operate a casino if, and only if, it does so in conformance with a tribal-state gambling

compact negotiated between the tribe and the state. *See* 25 U.S.C. § 2710(d)(1)(C). In this case,

despite repeated efforts, the Gun Lake Band has failed to obtain a gambling compact from the

State of Michigan. In the absence of a compact, any Class III gambling offered by the Band will

be illegal under state and federal law, including IGRA. *See* 18 U.S.C. § 1166. This includes any

"slot machines" or other Class III gambling disguised as a Class II device.

  8.  Defendants also lack constitutional authority to take land into trust for the Gun

Lake Band. The purported statutory basis for the land-acquisition process violates constitutional

4

limits on the delegation of legislative power. *See* U.S. Const., Art. I, § 1. Congress has failed to provide any standards to guide Defendants' discretion in taking land in trust for Indians.

9.    This Complaint seeks the following relief:

a.    A declaratory judgment that the FONSI issued by Defendants was arbitrary and capricious and based on deficient environmental documents, and a mandatory injunction requiring Defendants to comply with NEPA by preparing an EIS for the land-in-trust application before taking any land in trust;

b.    An injunction preventing Defendants from taking the proposed casino site into trust and preventing any construction or construction-related activities on the site until an adequate EIS has been prepared;

c.    A declaratory judgment that the Gun Lake Band does not satisfy any of the exceptions to IGRA's general prohibition of casino gambling on newly acquired lands and an injunction preventing Defendants from placing the casino site into trust;

d.    An injunction preventing Defendants from taking the proposed casino site into trust for the purpose of operating a Class III gambling facility, or any purported Class II facility that is actually offering prohibited Class III games and devices, absent a tribal-state gambling compact;

e.    A declaratory judgment that the statutory authority relied on by Defendants to place the proposed casino site into trust violates the nondelegation doctrine and an injunction preventing the site from being placed into trust;

f.    A temporary restraining order and preliminary injunction preventing Defendants from taking the casino site or any other land into trust for the operation of a casino pending litigation of the issues raised in this Complaint; and

5

g.    Any additional or other relief necessary or proper to achieve justice and equity.

10.    MichGO's remedies at law are inadequate. Injunctive relief, both preliminary and permanent, is necessary to prevent irreparable injury. In the absence of the relief requested in this action, the 146 acres of land will be irretrievably lost and an illegal casino allowed to open and operate in Wayland Township.

11.    The only practical window of review is before the government acts to take the land into trust. This is true for three reasons:

a.    First, in recent cases, the Department of Interior has successfully argued that the Quiet Title Act, 28 U.S.C. § 2409a(a), bars any suit to challenge a land-in-trust acquisition – or any other claim relating to Indian lands – once the land has been taken into trust. *See Neighbors for Rational Devel., Inc. v. Norton*, 379 F.3d 956, 961-62 (10th Cir. 2004). MichGO's claims will therefore be lost if an injunction is not issued to prevent the land from being taken into trust pending the outcome of the litigation.

b.    Next, once gambling operations begin, neither MichGO nor the State of Michigan will be able to sue the tribe directly because of tribal sovereign immunity. *See, e.g., Florida v. Seminole Tribe of Florida*, 181 F.3d 1237 (11th Cir. 1999). The Gun Lake Band has already successfully invoked sovereign immunity in state court to avoid the legal merits of a claim that it breached contractual promises to its former gaming management company. *See Sungold Gaming USA, Inc. v. United Nation of Chippewa, Ottawa, & Pottawatomi Indians of Michigan, Inc., et al.*, No. 226524 (Mich. Ct. App. April 5, 2002) (unpublished), attached as Exhibit D.

c.    Finally, once the casino site is taken into trust, it will be too late to order an EIS, and NEPA's purpose of requiring pre-decision review of environmental impacts will be undermined.

## PARTIES AND STANDING

12.    MichGO is a Michigan non-profit corporation that seeks to protect the citizenry and quality of life in its community by opposing the proliferation of gambling venues.

13.    MichGO's members and supporters include homeowners, business owners, clergy, retirees, and many others. Many of these people reside in West Michigan, including rural Wayland Township, the cities of Grand Rapids and Kalamazoo, and other areas within driving distance of the proposed casino. These areas will be disproportionately impacted if the casino site is placed in trust and an illegal casino built and operated there. A 200,000-square-foot casino would detract from the quiet, family atmosphere of the surrounding rural areas, and would siphon off an estimated $92 million a year from area cities.

14.    MichGO has standing to bring this action based on the interests of its individual members. Defendants' actions threaten to injure MichGO's members in a way that is different from the citizenry at large, since they will be exposed to and injured by the negative effects of building and operating a massive casino in their community. These effects include, among others, (a) an irreversible change in the rural character of the area; (b) loss of enjoyment of the aesthetic and environmental qualities of the agricultural land surrounding the casino site; (c) increased traffic; (d) increased light, noise, air, and storm water pollution; (e) increased crime; (f) loss of tax revenue currently generated by the agricultural land that comprises the casino site; (g) diversion of police, fire, and emergency medical resources; (h) decreased property values; (i) the loss of business and recreational opportunities, such as retail stores and restaurants, that will be

7

forced out by the casino; (j) loss of consumer spending at area businesses; (k) increased
bankruptcies; (l) diversion of community resources to the treatment of gambling addiction; (m)
weakening of the family atmosphere of the community; and (n) other aesthetic, socioeconomic,
and environmental problems associated with a gambling casino.

15.     MichGO's members include its president and vice president, Todd Boorsma and
James Stringham, who live in the vicinity of the proposed casino and are committed to stopping
the proliferation of casino gambling across Michigan. These members will be injured by the
addition of a 24th Michigan casino, which they believe is both economically and morally
repugnant and contrary to the best interests of the State and their individual communities.

16.     MichGO's members also include people who have lived in Wayland Township
for many years, such as Phil and Sue Henningson, Kenneth Blaauw, and Randy Bouwens, all of
whom make their homes from 1/8 to 3/4 of a mile from the proposed casino site. These MichGO
members value the quiet lives they lead in Wayland Township and fear what the construction
and operation of a huge casino would do to it. If the casino is built, they will be the ones who
have to deal with the visual impact of the casino every time they drive past or go for walks in the
vicinity of the casino, who will have to tolerate the increased traffic, noise, light, and air
pollution that will come from more than 3.1 million visitors a year, and who will have to deal
with the increase in gambling addiction, crime, and other social ills that come with the casino.
These changes would severely impact these residents' rural lifestyles and land uses. For some
MichGO members, these concerns are business-related as well as personal. For example,
Kenneth Blaauw is a farmer and is worried about the impact of increased traffic on his ability to
move farm equipment from one field to another on area streets, as well as the danger that
increased property taxes pose to preserving his farming business.

17.    The full extent of the impact to MichGO's members will not be known unless and until Defendants are ordered to prepare an adequate EIS, as required by NEPA.

18.    The injuries and grievances of MichGO's members were caused, facilitated, or made possible by the activities that form the basis of this Complaint, and will be redressed by a ruling in MichGO's favor.  MichGO's interests fall within the zone of interests protected by the laws sought to be enforced in this action.

## JURISDICTION AND VENUE

19.    MichGO brings this action under the APA, 5 U.S.C. § 551, *et seq.*; NEPA, 42 U.S.C. § 4321, *et seq.*; and Article I, Section 1 of the United States Constitution.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, and may issue declaratory relief and reverse, delay, or postpone Defendants' actions or otherwise issue an injunction under 28 U.S.C. § 2201 and 5 U.S.C. §§ 702, 705.

20.    Defendants' May 13, 2005 notice of intent states that Defendants will place the proposed casino site into trust after thirty days.  (Ex. A, 70 Fed. Reg. 25596 (2005)).  The thirty-day period "allows interested parties to seek judicial or other review under the Administrative Procedures Act and applicable regulations."  DOI, *Final Rule: Land Acquisitions,* 61 Fed. Reg. 18,082 (1996).  MichGO is filing this action for review within the thirty-day period.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## GENERAL ALLEGATIONS

**A.    The Gun Lake Band's Request for a Casino Site is a Classic Case of Reservation Shopping, and is Contrary to its Own Prior Commitment Not to Engage in Tribal Gambling.**

22.    On or about August 7, 2001, the Gun Lake Band submitted a trust application ("Trust Application") to Defendants for the proposed casino site. The Trust Application asks the Department to place the 146-acre site into trust for the Band.

23.    Defendants concluded that the Gun Lake Band would be entitled to gamble on the proposed casino site as its "initial reservation" under IGRA. (Ex. A, at 1). However, the proposed casino site would not be the Gun Lake Band's "reservation" in any sense of the word. The Band has no intention of using the site as a tribal residence as the law requires. Instead, the proposed use of the land, from the very beginning, has been to operate a gambling casino. (*See generally* Ex. C). The proposed casino site also would not be the Gun Lake Band's "initial" reservation within the meaning of IGRA. The Trust Application reveals that the Band has had three prior reservations in past years. Therefore, even assuming the proposed casino site could somehow be deemed a reservation, it could not possibly be the Gun Lake Band's first reservation. Instead, it would be its **fourth**, and therefore is not eligible for gambling as an "initial reservation" under IGRA.

24.    The Gun Lake Band's request for a casino site is a classic example of tribal reservation shopping. The Band chose the proposed site – located next to a major highway – not because it has ever been occupied as a tribal residence, but because of its economic value as a casino site.

25.    The Band's plan to open a casino is also in direct conflict with its earlier promises to its own members and the federal government not to engage in casino gambling. In 1993, the

Band's leadership, in a letter to the Assistant Secretary of Indian Affairs, admitted that the tribal council had agreed to pursue federal acknowledgement for the Band only on the condition that "there would **never** be casinos in our Tribe." (Ex. C, Trust App., *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc.*, at 79 (emphasis added)).

     26.    In fact, the tribal council agreed to pursue federal acknowledgement only by including the following prohibition on gambling in the tribe's constitution, which was attached to the Trust Application: "The Gun Lake Band . . . is the only Indian Tribe in the State of Michigan which has decided not to sacrifice the future of its membership to gaming interests and the changes to traditions in the community that gaming could bring." (*See id.*) The constitution also included the following more specific prohibition on gambling: "The Elder's Council may exercise such further powers as may in the future be delegated to it by members of the tribe, or by the Secretary of the Interior, or any other duly authorized official of the State or Federal Government, or any federal statute, or regulation, **except the development of casino gaming enterprises (class III)** in those counties where the population of [the Gun Lake] Band Tribal members exceeds (20) percent of the Tribe's total membership. The proviso limiting certain forms of Tribal casino gaming enterprises near the heart of the Tribal community **shall not be altered** by future Elder's Council decisions or subsequent Constitutional amendments." (*Id.* at 113 n.194 (emphasis added)). These commitments by the Band at the time it sought federal acknowledgement cannot be squared with its current request to have land taken into trust for a casino.

**B.   The Proposed Casino Would Be One of the Largest in the Midwest With a Correspondingly Large Impact on the Community.**

27.     The EA describes a proposed gambling complex of nearly 200,000 square feet, including 99,000 square feet of gaming space, two sit-down restaurants, a café-style restaurant, two fast-food outlets, four retail shops, a sports bar, entertainment lounge, office space, and parking for more than 3,300 cars, buses, and RVs. (Exhibit E, at 17-18, 453). All of this is to be built on a 146-acre piece of land in the middle of a rural, agricultural community.

28.     Together with its paid consultants, the Gun Lake Band prepared a draft environmental assessment ("EA") for the proposed casino and submitted it to Defendants, who circulated the draft for public comment. In the 75-day public comment period that followed, BIA received a flood of public comments opposed to taking the land into trust for the casino. The comments either opposed the Trust Application itself, believed further environmental study was necessary, or both. MichGO submitted voluminous and comprehensive comments pointing out the significant environmental impacts that will result if the Trust Application is granted, and expressing the need for Defendants to reject the application or, at the very least, conduct a full environmental impact study under NEPA. BIA also received comments opposed to the casino from members of the legislature, including U.S. Congressmen Vern Ehlers and Pete Hoekstra.

29.     Despite the strong opposition to the casino from MichGO's members and others, and despite the size and potential impact of the casino on rural Wayland Township, Defendants have treated the casino all along as though it were a *fait accompli.* They published a final draft of the EA, a copy of which is attached as Exhibit E, in December 2003, approximately 1 ½ years before deciding to take the land into trust. The final EA admits that construction of the casino would have a tremendous environmental and socioeconomic impact on Wayland Township and the surrounding areas, but nevertheless claims that the impacts are not significant for purposes of

12

NEPA. Following release of the final EA, BIA issued a finding of no significant impact ("FONSI") on February 27, 2004.

### C. In Issuing a FONSI, Defendants Failed to Adequately Consider and Analyze the Significant Impact That the Proposed Casino Will Have on the Human and Natural Environment.

30.    The FONSI issued by BIA is the culmination of a grossly deficient predecision review process. Contrary to the intent of NEPA, BIA acted not as an objective oversight agency, but as an advocate for the applicant and its proposed casino.

31.    NEPA requires that a federal agency prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Regulations promulgated by the Council on Environmental Quality ("CEQ") under NEPA govern the application of the statute to federal agencies generally. (*See* 40 C.F.R. §§ 1500-1508, attached as Exhibit F). In addition, BIA has published a NEPA Handbook which governs BIA's implementation of NEPA. (*See* 30 BIAM Supplement 1, attached as Exhibit G).

32.    The CEQ regulations set out the purpose of NEPA: "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." (Ex. F, 40 C.F.R. § 1500.1(c)). Federal agencies implementing NEPA are instructed to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." *Id.* § 1500.2(d).

33.    BIA's NEPA Handbook outlines the circumstances warranting preparation of an environmental assessment ("EA"): "The basic rule is that an EA will be prepared for all actions, except those covered by a categorical exclusion, covered sufficiently by an earlier environmental document, or for those actions for which a decision has already been made to prepare an EIS."

(Ex. G, 30 BIAM Supplement 1, § 3.4B; *accord* Ex. F, 40 C.F.R. § 1501.4). The purpose of an EA is to determine whether an EIS is required – if the EA indicates that significant impacts might occur, then an EIS must be prepared. (*See* Ex. G, 30 BIAM Supplement 1, § 3.4A(2), B; *accord* Ex. F, 40 C.F.R. § 1508.9).

34.    The CEQ regulations state that the phrase "human environment" in the context of NEPA "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." (Ex. F, 40 C.F.R. § 1508.14). In determining whether the impact of a proposed action might be significant, BIA is required to consider three different types of impacts: (1) direct impacts, (2) indirect impacts that are "reasonably foreseeable," and (3) cumulative impacts. (*See Id.* §§ 1508.7, .8, .27; Ex. G, 30 BIAM Supplement 1, § 5.3).

35.    In this case, the EA fails to fully or adequately consider or analyze numerous significant impacts that the massive casino would have on the quality of the human environment in West Michigan in general and Wayland Township in particular.

36.    The EA also fails to adequately consider reasonable alternatives to the proposed casino project, including the "no-action alternative," and the environmental impacts of those alternatives as required by NEPA. *See* 42 U.S.C. § 4332(2)(E); (Ex. F, 40 C.F.R. §§ 1502.14, 1508.9(b); Ex. G, 30 BIAM Supplement 1, § 4.3D). The EA spends only two pages discussing alternatives, and summarily dismisses each alternative without any genuine comparison of environmental consequences.

37.    The FONSI issued by BIA, which relied on a deficient EA, was arbitrary, capricious and an abuse of discretion.  BIA failed to "make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental

assessment," as the regulations require, (*see* Ex. F, 40 C.F.R. § 1506.5(b)), and instead adopted the conclusory, one-sided EA prepared by the Gun Lake Band. BIA failed to take a hard look at the relevant environmental concerns in preparing the relevant documents. To the contrary, BIA expressly relied on purported facts that are not true. *See infra* ¶¶ 52-54.

**D.    Gambling at the Proposed Casino Would be Illegal Absent a Valid Tribal-State Compact Entered Into Under IGRA.**

38.    In 1988, the United States Congress enacted IGRA, 25 U.S.C. § 2701, *et seq.*, which permits certain types of gambling on Indian land so long as the requirements of the statute are satisfied. Under IGRA, Indian tribes may conduct casino-style gambling (known as "Class III" gambling) if – and only if – they do so in conformance with a "tribal-state compact" entered into between the tribe and the state. *See* 25 U.S.C. § 2710(d)(1)(C).

39.    Absent a valid compact, state and federal laws regulating or prohibiting gambling apply in full force to Indian lands. *See* 18 U.S.C. § 1166(a), (c); *see, e.g., In re Indian Gaming Related Cases United States,* 2000 WL 1257265 (N.D. Cal. Aug. 22, 2000) (directing the seizure of Indian casino gambling devices under the Johnson Act because the tribe did not have a compact with the State of California). Because gambling is generally illegal under Michigan and federal law, casino gambling at the proposed site will be illegal absent a gambling compact. *See* M.C.L. § 750.301, *et seq.*; 15 U.S.C. § 1171, *et seq.*

40.    In this case, the EA states – erroneously – that the Gun Lake Band has a compact approved by the legislature and awaiting signature by the governor. (Ex. E, at 12). But this is not true. In fact, no governor has signed a compact with the Gun Lake Tribe. Moreover, the Michigan Senate recently rescinded its earlier resolution approving a compact.

41.    In short, the statements in the EA suggesting that the Gun Lake Band has a gambling compact are false. The tribe does not have – and never has had – a compact. Instead,

the Band has repeatedly tried, and failed, to obtain a compact from the State of Michigan.

Without a compact, any Class III gambling will be illegal under state and federal law.

## CLAIMS FOR RELIEF

### Count I

**Defendants' decision to forego preparation of an EIS in favor of a FONSI, and reliance on environmental documents that fail to consider the full range of environmental impacts and reasonable alternatives, was arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, in violation of NEPA.**

42.     Plaintiff incorporates all previous allegations.

43.     Section 102(2)(C) of NEPA requires a federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Separate and independent of this requirement, Section 102(2)(E) of the statute also requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C § 4332(2)(E).

44.     The CEQ regulations provide that an environmental assessment should be prepared and used as the basis for determining whether to prepare an EIS. (Ex. F, 40 C.F.R. § 1501.4(c)). The regulations define "environmental assessment" as,

> (a)     a concise public document for which a Federal agency is responsible that serves to:
>
> (1)     Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
>
> (2)     Aid an agency's compliance with the Act when no environmental impact statement is necessary.
>
> (3)     Facilitate preparation of a statement when one is necessary.

(*Id.* § 1508.9(a)).

45.   The regulations promulgated by the CEQ state that the phrase "human environment" in the context of NEPA Section 102(2)(C) "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." (Ex. F, 40 C.F.R. § 1508.14).

46.   "Effects" or "impacts" which must be considered include: (1) direct impacts, which are caused by the action and occur at the same time and place; (2) indirect impacts, that are caused by the action and are later in time or farther removed in distance, but are still "reasonably foreseeable," such as growth-inducing effects, impact on population density or growth rate, and related effects on air, water, and other natural systems; and (3) cumulative impacts that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency or person undertakes those actions. The "effects" of an action can include those related to ecology, aesthetics, history, or culture, or to economic, social, or personal well-being. The reviewing agency is required to consider both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial. (*See* Ex. F, 40 C.F.R. §§ 1508.7, .8, .27; Ex. G, 30 BIAM Supplement 1, § 5.3).

47.   A determination of significance requires consideration of both "context" and "intensity," meaning that the scope of the impact, the short and long term effects, and the severity of the impact must all be considered. Among the factors to be considered in evaluating the significance of a proposed action are: the degree to which the action affects public health or safety; the unique geographical characteristics of the surrounding area, such as the proximity to prime farmlands, wetlands, and ecologically critical areas; the potential for controversy; the possibility of unknown or uncertain risks; and the potential effect on endangered species.

Significance exists if it is reasonable to believe that **"any"** significant effect on the environment **"might"** occur. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

48.    The BIA Handbook cautions that, while there are no "hard-and-fast rules" that enable the agency to conclusively label an action as significant or not significant, "[i]t is important to be as objective as possible when making [the determination]." (*See* Ex. F, 40 C.F.R. § 1508.27; Ex. G, 30 BIAM Supp., §§ 5.2, 5.3).

49.    The Secretary's approval of the Gun Lake Band's Trust Application is a major federal action under NEPA.

50.    The EA is deficient in many respects. Many of these deficiencies – as well as the bias of the environmental documents – may be explained by the fact that the EA was prepared by the Gun Lake Band itself rather than BIA. Under the CEQ regulations, if an agency permits an applicant to prepare an EA, the agency is still required to "make its **own** evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment." (Ex. F, 40 C.F.R. § 1506.5(b) (emphasis added); *accord* Ex. G, 30 BIAM Supplement 1, § 4.2B).

51.    In this case, BIA has not objectively analyzed the potential environmental impacts of the Gun Lake Band's application. Instead, it has merely deferred to the Gun Lake Band's one-sided view of the issues addressed. BIA has failed to question the rose-colored perspective offered by the EA, which has led the agency to accept unsupportable assumptions and dismiss a multitude of potential concerns as insignificant.

A.    **Defendants Based Their Decision to Take the Land into Trust on Stale Decisional Documents Containing Patently False Statements of Fact.**

52.    The final EA was completed in December 2003. The FONSI was issued on February 27, 2004. The Notice of Intent, announcing Defendants' decision to take the land into

18

trust, was issued more than fifteen months later on May 13, 2005. During that time, actual facts occurred that contradicted Defendants assumptions. Defendants nevertheless relied on their stale and erroneous documents in issuing their notice of intent to take the land into trust.

53.    For example, the FONSI claims that the many admitted negative environmental impacts from the proposed casino will be offset by revenue sharing provisions in the tribal-state gambling compact. (Ex. B, at 2). But this statement is patently false because the Gun Lake Band does not have – and never has had – a gambling compact. The FONSI therefore relies on false information in deciding that the environmental impacts of the proposed casino will be adequately mitigated.

54.    Another example is the FONSI's treatment of air quality issues. The FONSI states that "the proposed action is in compliance with the Clean Air Act and the National Ambient Air Quality Standards (NAAQS). . . . Because the proposed action would be located in an attainment area for all of EPA's current priority pollutants, a general conformity determination is not required." (Ex. B, at 2 (internal citations omitted)). Here again, this statement is false. USEPA declared Allegan County, the site of the proposed casino, as an ozone nonattainment area on April 15, 2004, a designation which became effective in June 2004. *See Air Quality Designations and Classifications for the 8-Hour Ozone National Ambient Air Quality Standards; Early Action Compact Areas with Deferred Effective Dates,* 69 Fed. Reg. 23858 (USEPA April 30, 2004) (Final Rule). Thus, as with its statements about the gambling compact, the FONSI contains false statements about the county's status as an attainment area. The documents Defendants relied on in issuing their notice of intent have therefore been rendered demonstrably false by the passage of time.

19

**B.     Defendants Admit That the Casino Will Have Significant Environmental Impacts, And Rely on a Nonexistent Gambling Compact to Allegedly Mitigate Those Impacts.**

55.     By all measures, the proposed casino is a massive project, out of all proportion to the rural community in which it would be placed.  According to the EA, the casino would draw more than 8,500 visitors a day (over 3,000,000 a year) to Wayland Township, with a population of only 3,000 people.  (Ex. E, at 89).

56.     In issuing their FONSI for this massive project, Defendants admitted that, without mitigation, the casino would result in significant environmental impacts.  For example, the EA admits that:  (a) the impact to wetlands could be significant, (Ex. E, at 85); (b) the casino will likely compete with the state lottery for gaming revenues, thus resulting in a loss of revenue to the State School Aid Fund, (*Id.* at 90); (c) the casino will create additional demands on local governments and government services, and the loss of $85,000 in property taxes to local governments, (*Id.* at 90-91); and (d) the casino will cause a significant increase in traffic at southbound US-131 intersections, (*Id.* at 110, 184).

57.     The EA and FONSI assume that these impacts, though otherwise significant, will be mitigated below the level of significance by money paid by the Gun Lake Band under a gambling compact with the State of Michigan.  But that assumption has proven to be false.  As discussed above, the Gun Lake Band has repeatedly failed to obtain a gambling compact from the State of Michigan.  Without mitigation, the environmental impacts to these resources are significant, as admitted by Defendants themselves in the EA and FONSI.

### C.    The EA Glosses Over the Casino's Impact on the Surrounding Areas.

#### 1.    Impact on Rural Community.

58.    The EA is inadequate in its treatment of the casino's expected impact on the rural character of the community. The farmland that makes up the surrounding area is a defining feature of the community. The people who live in the area, including MichGO's members, did not move to the country so they could be down the road from a massive casino. They appreciate the simplicity and beauty of the farmland and are determined to see it preserved.

59.    The proposed casino is inconsistent with these members' use and enjoyment of their property. The casino would be situated on 146 acres of land, which is more than five times larger than the parcel that holds the Pentagon building in Washington, D.C., and almost twice as big as the parcel that holds the Mall of America, the world's largest shopping mall, in Minneapolis, Minnesota. The proposed site is bordered by agricultural and residential lands to the north and east, and agricultural property to the south. (Ex. E, at 33). Construction of the casino would result in the destruction of 45 acres of agricultural land, including 21 acres of designated "locally important" farmlands. (*Id.* at 121).

60.    But the true impact of the casino goes far beyond the size of the parcel itself. The EA states that the casino would be surrounded by a series of paved parking areas with parking for more than 3,300 cars, buses, and RVs. (Ex. E, at 17-18). The EA estimates that the casino would attract an average of 8,500 visitors per day, which translates to more than **3.1 million** visitors a year. (*Id.* at 89). 1,800 workers would be employed by the casino. When this is added to the 8,500 visitors, it brings total daily visits to 10,300 people, or **three and a half times** the population of Wayland Township.

61.    Additionally, the casino itself is just the tip of the iceberg. Defendants' concede the casino would attract other development to the area. The casino would bring in approximately $170 million in revenues each year, and generate $32 million in annual off-site sales. (Ex. E, at 152, 164). The EA estimates that the casino would generate 4,900 total new jobs, and that 1,420 new residents would be attracted to Wayland Township and surrounding areas. (*Id.* at 164, 170). Demand for housing for these residents would spur the construction of 526 new housing units within five years. (*Id.* at 145). In addition, the EA assumes the casino would result in the construction of two restaurants, a 100-room hotel, and a gas station with a convenience store, all within short distance of the casino. (*Id.* at 154-156).

62.    All of this expected growth will have significant impacts on the rural character of the area. Confirming the fears of MichGO's members, the EA concedes that "[c]onstruction of the [proposed casino] would result in the loss of open space, [and] contribute to the urbanization of the area . . . ." (Ex. E, at 125). Indeed, according to the EA, indirect growth induced by the casino would result in the destruction of 13 acres of wetlands and 23 acres of federally recognized "prime farmlands." (*Id.* at 162, 174). Increased traffic from employees and visitors "would increase nighttime light impacts in the vicinity of the affected roadways." (*Id.* at 125).

63.    The EA concedes that the proposed casino will generate a "significant amount of traffic" during afternoon peak hours. (Ex. E, at 505). Indeed, it estimates that traffic to the casino would be approximately **1,100 cars per hour** during those times of the day. (*Id.* at 456). Moreover, the EA concedes that the increased traffic would cause two local intersections to operate at "F" levels of service once the casino is in operation, even if all-way stops were to be added. (*Id.* at 106, 110, 184, 461). An "F" grade is the poorest service grade possible.

64.    The casino will also have significant socioeconomic impacts. The EA estimates that induced growth from the casino will add 326 to 434 new students to area schools over five years. (*Id.* at 168). And the EA concedes that the casino will impose additional demands on local services, such as police and fire protection. (*Id.* at 90).

65.    Importantly, the EA also admits that the casino will cause an increase in rates of compulsive gambling. (Ex. E, at 129). Despite this, the EA devotes not a single word to discussing the implications of such an increase. There is no mention – let alone analysis – of any of the well-known impacts of compulsive gambling on individuals and families, including increased rates of alcoholism, drug abuse, divorce, crime, and bankruptcy. Rather than analyze these impacts, the EA simply states that they are not expected to be significant because the Gun Lake Band has agreed to spend money to treat compulsive gamblers. To say the least, this response of throwing money at the problem is of no comfort to local residents. It is somewhat akin to Defendants concluding that an industrial operation emitting known carcinogens is not significant because the operator has agreed to build a hospital to treat those who might develop cancer.

66.    The need for an EIS in this case is also demonstrated by the length and complexity of the EA. The Council on Environmental Quality advises that an EA should be no more than 10 to 15 pages in length, and that "[i]n most cases, . . . a lengthy EA indicates that an EIS is needed." (*See* Exhibit H, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* 40 Fed. Reg. 18026 (question 36a) (Council on Environmental Quality, March 16, 1981)).

67.    In this case, Defendants and the Gun Lake Band have compiled an EA with **208 pages** of text plus almost 1,000 pages of attachments. Defendants cannot claim that the

environmental consequences of the proposed casino do not warrant an EIS when it has taken

them nearly 1,200 pages to try to explain why not. *See Curry v. United States Forest Service,*

988 F. Supp. 541, 551-552 (W.D. Pa. 1997) (ordering EIS based in part on length of 49-page

EA); *Hoffman,* 917 F. Supp. at 287 (65 pages); *Puerto Rico Conservation Foundation v. Larson,*

797 F. Supp. 1074, 1080 (D.P.R. 1992) (45 pages).

68.    In short, NEPA requires that an agency perform an EIS as long as the expected

impacts even "might" be significant.  Given the massive scale of the proposed casino and the

intense commercial development it will admittedly generate, Defendants' decision to forego an

EIS was arbitrary and capricious.

### 2.    Impact on West Michigan.

69.    The EA also gives short shrift to the expected impact of the proposed casino on

the broader West Michigan community.  The proposed casino is located only 25 and 30 miles,

respectively, from the core population and business centers of Kalamazoo and Grand Rapids.

Despite this, the EA contains no real discussion of any impacts to these communities.

70.    Throughout the EA is the underlying assumption that money spent at the casino

somehow appears from the sky.  There is no recognition of how a casino operation cannibalizes

other businesses by siphoning away spending.  The cities of Grand Rapids and Kalamazoo have

been actively working to revitalize their downtown areas, including attracting residents and

providing entertainment venues.  For example, in Grand Rapids, public and private efforts have

combined to complete construction of a long-awaited quarter-billion dollar downtown

convention center.

71.    The proposed casino has the potential to marginalize these efforts to improve the

quality of life in Grand Rapids and Kalamazoo.  The Grand Rapids Chamber of Commerce,

which opposes the casino and submitted exhaustive comments on the draft EA, hired Anderson Economic Group ("AEG") to study the impact of the casino on the area's cities. (*See* AEG Report, attached as Exhibit I). The report criticizes the EA for touting the casino's expected financial gains while completely ignoring where the money would come from: "By shifting expenditures away from previous activities in the surrounding communities, the proposed casino will likely decrease the economic well being of the neighboring economies. This is because a significant portion of the casino's revenues would otherwise be spent in the retail and commercial centers that share part of the proposed casino's trade areas. These expenditures may be directed to goods and services, activities, or investment." (*Id.* at 17).

72.    The AEG report concludes that over **$92 million a year** will be diverted away from other consumer expenditures as a result of the proposed casino. (*Id.* at 18, 20). And "most of that expenditure will come from within one hour of the casino," which means the cities of Grand Rapids and Kalamazoo will be hit the hardest.

73.    The EA acknowledges that this tremendous impact to local economies could in fact occur. (Ex. E, at 1109 ("We concur with that possibility.")). Incredibly, however, the EA still concludes that this $92 million impact is somehow not even potentially significant for purposes of triggering an EIS. (*Id.*)

D.    **The EA's Reliance on Alleged Mitigation Measures is Unfounded.**

74.    The EA is also deficient in its treatment of proposed "mitigation" measures to reduce or eliminate the expected negative impacts of the proposed casino. NEPA requires consideration of such measures as part of an environmental assessment. Where mitigation measures are integrated as part of a proposal and are used to justify a FONSI, the BIA Handbook emphasizes that the measures are "subject to more stringent judicial review than those used in an

EIS." (Ex. G, 30 BIAM Supplement 1, § 4.3F(2); *accord* Ex. H, *Forty Most Asked Questions*, 46 Fed. Reg. 18026, Questions 37b and 40; Ex. F, 40 C.F.R. §§ 1501.4(e)(2), .20). In this case, because mitigation measures are integrated as part of the EA and are used to justify the FONSI, the measures are subject to heightened scrutiny by the Court.

75.    There are two primary problems with the mitigation measures discussed in the EA. To begin with, many of the measures are illusory since they rely on naked promises by the Gun Lake Band. For instance, the EA says impacts to public safety will be less than significant because the Band says it will adopt tribal ordinances and codes as rigorous as existing state and federal regulations for health and safety, including fire, electrical, and other standards. (Ex. E, at 127). The EA assumes that these measures will actually be adopted and that they can and will be enforced by the Band. However, once the land is taken into trust, the Gun Lake Band is under no obligation to enforce the ordinances or even to keep them on its books. If it fails to do so, there will be no recourse for Wayland Township, MichGO, or any other party.

76.    The same is true of the EA's treatment of the risks posed by second-hand tobacco smoke. The EA acknowledges that "patrons of the proposed gaming facility will be exposed to toxics and carcinogens from indoor tobacco use . . . ." (Ex. E, at 115). Despite this, there is no analysis of the expected health impacts of such exposure to casino patrons, let alone employees who will be exposed to these hazards on ongoing basis. Instead, the EA simply states that the tribe will "evaluate" mitigation measures for indoor tobacco smoke "at the time that detailed plans and specifications are prepared for the HVAC system in order to remain in compliance with ordinances that the Gun Lake Tribe might implement to be consistent with state and local indoor air requirements." (*Id.* 185). But this statement is obviously inadequate. An agency cannot satisfy its obligation to provide pre-decision review by stating that important issues, like

admitted "toxics and carcinogens," might be evaluated at some undisclosed future time and place.

77.    The second, and equally troubling, issue related to mitigation measures is how the Gun Lake Band proposes to pay for them. The EA includes a long list of environmental impacts that allegedly will be mitigated by revenue sharing funds paid by the Band under the now-defunct gambling compact. For example, the EA says money from the compact would be used to mitigate the destruction of wetlands (Ex. E, at 85), increased traffic on area roads (*Id.* at 25), runoff from parking lots (*Id.* at 85), indirect impacts to state and federally protected species (*Id.* at 163), loss of revenue to the state lottery (*Id.* at 90), and costs to local governments from lost property tax revenue and from increased demand for public services, like police and fire (*Id.* at 91), to name only a few.

78.    The EA fails to address what will become of these many alleged mitigation measures now that the Gun Lake Band has no gambling compact. Will the cost be shifted to taxpayers in Wayland Township or elsewhere? The EA does not say, because it was written on the false assumption that the Gun Lake Band would have a compact.

79.    In response to concerns from MichGO and others about this issue, the Gun Lake Band included a statement in the EA saying it is "willing to provide a resolution pledging to contribute two percent of electronic gambling revenues annually to local government units" in the event the tribe does not have a gambling compact and the Secretary of Interior authorizes Class III gambling by some other means. (Ex. E, at 166-67). This is a hollow and unenforceable commitment. The Gun Lake Band has already reneged on its fundamental original promise not to seek a casino of any kind. It has also invoked its sovereign immunity to duck the merits of a contract claim brought against it in state court by its former casino development partner. (Ex.

D).  The Band was also recently involved in litigation over charges that it unilaterally canceled its contract with a second casino management company.  *See Match-E-Be-Hash-She-Wish Band of Pottawatomi Indians v. Kean-Argovitz Resorts*, 383 F.3d 51 (6th Cir. 2004).  The community has no way to enforce this latest commitment if the Gun Lake Band decides to renege on it also.

### E.    The EA Fails to Adequately Analyze a Number of Other Impacts From the Proposed Casino.

#### 1.    Air Quality

80.    Defendants fail to consider a potentially critical impact of the casino on air quality:  namely, the casino's ability to exacerbate the already unhealthy levels of ozone in Allegan County.  The EA states that "Allegan County is in attainment of all present national criteria air pollutant standards."  (Ex. E, at 66, 112).  But this statement is no longer true.  USEPA formally designated Allegan County as an ozone nonattainment area on April 15, 2004.  *See Air Quality Designations and Classifications for the 8-Hour Ozone National Ambient Air Quality Standards; Early Action Compact Areas with Deferred Effective Dates*, 69 Fed. Reg. 23858 (USEPA April 30, 2004) (Final Rule).  The designation became legally effective two months later on June 15, 2004.  *Id.*

81.    In the EA, Defendants admit that additional analysis would be required if Allegan County were to be designated as a nonattainment area prior to construction of the casino.  (Ex. E, at 113 ("In that case, if the Preferred Alternative has not been implemented, additional analysis may be necessary to re-examine the impacts of the Preferred Alternative on compliance with the new standards.")).  But Defendants have not kept this promise.  They have not revised or supplemented the EA to include any analysis of Allegan County's status as an ozone nonattainment area.  Nor have they performed a conformity analysis under the Clean Air Act to assess the proposed casino's impact on the nonattainment status.

28

82.    NEPA does not allow the government to put on "blinders to adverse environmental effects" simply because initial approvals have been made or initial studies have been done. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). "A patently inaccurate factual contention can never support an agency's determination that a project will have 'no significant impact' on the environment." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1126 (9th Cir. 2004). In order to take the hard look required by NEPA, Defendants must consider the impact of the casino on the County's ozone problem. Given the implications of non-attainment status on future projects in the County, the casino's impact on air quality is at least potentially significant and should have led Defendants to perform an EIS. Their failure to do so was arbitrary and capricious.

## 2.    Alternatives

83.    The EA is deficient in its treatment of alternatives for placement of the proposed casino. The CEQ regulations require an agency to discuss reasonable alternatives to a proposed action, as mandated by Section 102(2)(E) of NEPA, and to evaluate the environmental impacts of the action and its alternatives. (Ex. F, 40 C.F.R. § 1508.9(b)). To satisfy this obligation, an agency must "rigorously explore and objectively evaluate" all reasonable alternatives, including "no action." (*Id.* § 1502.14; *see also* 42 U.S.C. § 4332(2)(E)). The BIA Handbook counsels that consideration of alternatives should "not be merely exercises done to fulfill th[e] requirement; they should be honest attempts to find other ways to meet the identified need or achieve the identified purpose while reducing or eliminating harmful environmental impacts." (Ex. G, 30 BIAM Supplement 1, § 4.3D; *see also* 42 U.S.C § 4332(2)(E)). Finally, "alternatives should be described in detail sufficient to permit comparison of their merits . . . ." (Ex. G, 30 BIAM Supplement 1, § 4.3D; *accord* Ex. F, 40 C.F.R. § 1502.14(b)).

84.    In this case, the EA's treatment of alternatives is inadequate. Out of 208 pages of text, the EA devotes less than **two** to the discussion of alternatives. (Ex. E, at 26, 28). In that brief space, **five** alternatives are considered and rejected, including the so-called "preferred alternative," the no-action alternative, and three other alternative sites. The result is a complete lack of analysis of the comparative impacts of choosing one site over another.

85.    The EA's dismissive approach to alternatives is visible in two ways. First, the EA is lacking in any detail about the expected environmental impacts of the rejected alternatives. Two of the alternatives are rejected due to alleged "environmental concerns unique to th[e] particular site." (Ex. E, at 28). However, no explanation is offered about the nature of these "concerns." All we are told is that they are "unique" and "environmental." (*Id.*) Without more detail about the nature of the impacts at the rejected sites, it is impossible to objectively evaluate the EA's rejection of the sites. Would the environmental impacts of building at those sites be comparable to, or even less significant than, the impacts of building at the proposed site? We will never know because the EA does not say.

86.    The EA also takes a dismissive approach to the so-called "no action" alternative. NEPA requires Defendants to compare the environmental impacts of going forward with the project at the proposed site to the alternative of doing nothing. The EA "assumes" that if the proposed casino site is not developed for use as a casino, it would remain in use as a light industrial area. (Ex. E, at 26). However, the EA makes no effort to answer the all-important question of how the environmental impacts of such a use would compare to those of the proposed casino. Is there any reason to believe that a light industrial use would have the same extensive growth-inducing and urbanizing influences as the proposed casino development? Here

again, the EA does not say.  Defendants have not offered any realistic appraisal of the comparative environmental impacts of not building the casino.

### 3.    Crime

87.    Defendants have also superficially treated the issue of crime. The EA contains an all-too simplistic discussion of crime statistics in casino communities, (Ex. E, at 95), focusing on an alleged reduction in crime when in fact crime rates have gone down throughout the country. It is disingenuous to suggest that crime is lessened by casinos, and there is certainly no data to support such a conclusion.  Casinos deal in money and tend to attract, in addition to law abiding citizens, those looking for easy targets for crimes of theft.  The EA erroneously places its emphasis on personal injury crimes, which are the least likely to occur in and around casinos. There is no discussion of the types of crime that are actually associated with large crowds and parking areas, including pickpocketing, purse snatching, and theft of items left in vehicles.  The crimes taking place on or near casino grounds put a strain on local police forces, particularly with 24-hour, 365-day operations like the proposed casino.  The EA makes no attempt to quantify these types of crimes or to analyze the community's ability to deal with them.

88.    And the issue of crime is important for another reason as well.  The Gun Lake Band has partnered with a Las Vegas-based casino management company, Station Casinos, Inc. – the Band's third management company after it spurned two earlier partners.  Station Casinos was recently fined $2.2 million by the Nevada Gaming Commission for its ongoing failure to comply with state anti-money laundering requirements.  In addition to the concerns over crime discussed above, MichGO's members are justly concerned about the impact of this new potential source of crime on their community.

### 4.    Indirect and Cumulative Impacts

89.    A final, and very serious, deficiency in the EA is found in its treatment of indirect and cumulative impacts.    The CEQ Regulations state that a proper EA must consider the "indirect effects" of the proposed agency action, meaning those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." (Ex. F, 40 C.F.R. § 1508.8).    Indirect effects may include "growth inducing effects and other effects related to induced changes in the pattern of land us, population density or growth rate, and related effects on air, water and other natural resources, including ecosystems." (*Id.*)

90.    Indirect effects are sometimes confused with "cumulative impacts," but the two have distinct meanings under NEPA.    While indirect effects refer to the tendency of a project to induce growth and other secondary effects, cumulative impacts are those "which result from the incremental impact of the action **when added to** other past, present, and reasonably foreseeable future actions, regardless of what agency . . . or person undertakes such other actions." (Ex. F, 40 C.F.R. §§ 1508.7; *accord* Ex. G, 30 BIAM Supplement 1, § 5.3).    Cumulative impacts can result from "individually minor but collectively significant actions taking place over a period of time." (Ex. F, 40 C.F.R. § 1508.7; *see also id.* § 1508.27(b)(7)).

91.    In this case, the EA fails to satisfy either of these requirements.    There are a number of indirect impacts that the EA fails to address.    For example, there is no proper discussion of induced growth as it relates to traffic from the casino. (Ex. E, at 467).    The EA's traffic study analyzes traffic as it existed in 2003 and how it will exist in 2011 using ordinary population growth figures.    It does not analyze the increased traffic from the casino together with all of the other induced growth that will admittedly be generated by the casino, including hotels, gas stations, new restaurants, and new employment opportunities. (*Id.*)

92.    A related problem with the EA's traffic study is its reliance on data regarding traffic volumes at Turtle Creek Casino. (Ex. E, at 104). The study uses Turtle Creek as a source of data and increases the traffic at that casino by 25% to arrive at the expected traffic levels for the Gun Lake casino. The EA relies on this very modest 25% increase despite the fact that, as the EA admits, the Gun Lake casino would be **three times larger** than Turtle Creek; closer to large population centers; visibly located adjacent to a more highly traveled highway; and located in southwest Michigan, which has fewer casinos than the part of Michigan where Turtle Creek is located. (*Id.*)

93.    Another example of the EA's lack of rigor for indirect impacts is in its discussion of the expected impacts from induced housing growth in the area. Although the EA offers some indication of what localities the 526 new housing units might be built in, there is no discussion as to what effects those developments will have in terms of land use patterns, population density and growth, and effects on air, water, and other natural resources, as the CEQ Regulations require. (Ex. E, at 145).

94.    And this is only the beginning of the problems with the EA's treatment of indirect impacts. Time and time again in the EA, Defendants assert that the casino's indirect impacts can be controlled through local planning and zoning. For example, the EA admits that "reasonably foreseeable indirect development . . . . is anticipated to occur" but that the impacts will be minimized because any such development will take place "in compliance with local planning and zoning ordinances and other mandates." (Ex. E, at 130, 141). The EA states that no impacts to area land resources are expected because "proper design for site conditions will avoid potential impacts . . . ." (*Id.* at 130) The EA dismisses any significant impact to agriculture and prime farmlands because "any future development would need to conform to local government plans

for development . . . ." (*Id.* at 140). And the EA states that no significant socioeconomic impacts are expected because "any additional development within the project vicinity would be required to conform to existing township zoning . . . ." (*Id.* at 132). In short, the EA's approach to off-site growth induced by the casino is simple: it is not under Defendants' control; therefore it does not matter. This amounts to a total abdication of Defendants' responsibility to analyze environmental impacts.

95.    Defendants' treatment of indirect growth is plainly unsatisfactory for purposes of NEPA. Courts have held that a reviewing agency cannot write off the significance of potential future development by simply pretending that local authorities will be able to contain the development once it is out of the bag. *See Mullin v. Skinner,* 756 F. Supp. 904, 921 (E.D.N.C. 1990) ("Defendants' . . . point is so utterly devoid of common sense and inconsistent with NEPA that it cannot be taken seriously . . . ."); *CETAC v. Norton, et al.,* Case No. 1:02-CV-1754 (TPJ), at 16 (D.D.C. Apr. 23, 2004) (unpublished) ("[L]ocal authorities' willingness and ability to closely control the course of future development is notoriously far from assured."); *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975). In this case, because the EA admits that the proposed casino is the first step toward the urbanization of Wayland Township, Defendants cannot sit back and rubber stamp the proposal while turning a blind eye to its true significance.

96.    The EA is equally deficient in its treatment of cumulative impacts. Nowhere in the EA is there any discussion of whether the many expected impacts from the casino might be significant **when added together** as NEPA requires. This is true even though the EA devotes an entire section to allegedly addressing cumulative impacts. (Ex. E, at 130-41). The discussion of impacts in that section consists of nothing more than acknowledging expected impacts to things like air quality, land use, and traffic, and then stating dismissively for each one that no

cumulative impact will occur. The "analysis" is therefore nothing more than a repetition of what the EA already concludes in other sections.

97.    Courts hold that the requirement for an EIS is triggered if **any** significant impact **might** occur from the proposed action. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983). In this case, had the EA considered the cumulative impact of all the expected impacts when added together, there is no question that the total impact would be – let alone "might" be – significant for the human environment. This conclusion is inescapable even if based solely on the impacts that the EA **admits** will occur – for example, if the admitted increase in urbanization is added to the destruction of wetlands, prime farmlands, and other agricultural resources; increased population; increased traffic; increased compulsive gambling; increased need for police and fire services; and the negative impacts of lighting, to name just a few. BIA cannot claim that all of these impacts, when added together, are so insubstantial that they do not rise to the level of even possibly being significant.

98.    Under the CEQ regulations, preparation of an EIS is **mandatory** in this case because: 1) the proposed action will have significant short and long term effects on public health and safety and ecologically critical resources, including air, wetlands, and farmlands; 2) the possible effects of the proposed action on the human environment are highly uncertain and/or involve unknown risks; and 3) the effects of the proposed action on the quality of the human environment are highly controversial. (Ex. F, 40 C.F.R. § 1508.27(b)).

99.    In sum, BIA's decision to issue a FONSI violates NEPA §§ 102(2)(C) and (E), the CEQ regulations, and BIA's own NEPA Handbook, and is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

## Count II

**Defendants have violated the statutory procedures mandated by IGRA § 2719 for gambling on Indian lands acquired after October 17, 1988**

100.    Plaintiff incorporates all previous allegations.

101.    Section 2719 of IGRA creates a broad prohibition against gambling on land taken into trust after October 17, 1988.  *See* 25 U.S.C. § 2719(a) ("Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988 . . . .").

102.    Under IGRA, gambling on lands taken into trust after 1988 ("newly acquired lands") is permitted only pursuant to certain narrowly defined exceptions.  First, the statute provides that gambling on newly acquired lands is permissible if "such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988." 25 U.S.C. § 2719(a)(1).  Next, the statute says such gambling is also permissible if the Secretary, after consultation with the tribe and state and local officials, determines that "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination." 25 U.S.C. § 2719(b)(1)(A).  Finally, the statute permits gambling on newly acquired lands where the lands are taken into trust as part of "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process . . . ." 25 U.S.C. § 2719(b)(1)(B)(ii).

103.    In this case, none of the exceptions to IGRA's general ban on using new land for casino gambling is applicable.  Subsection (a)(1), referring to land within or contiguous to the tribe's reservation, is inapplicable here since the proposed casino site is clearly not within or

36

contiguous to any tribal reservation existing in 1988. Subsection (b)(1)(A) is likewise inapplicable, since the Secretary has made no finding that the casino "would not be detrimental to the surrounding community," nor obtained the concurrence of the state's governor.

104.    The final exception created by subsection (b)(1)(B)(ii) is also inapplicable. The proposed casino site is not being taken into trust as part of the Gun Lake Tribe's "initial reservation," as required by the statute. This is true for two reasons. First, to qualify as a "reservation" for purposes of IGRA, the land must be used to provide housing for tribe members. *See Sac and Fox Nation of Missouri v. Norton, et al.*, 240 F.3d 1250, 1264-67 (10th Cir. 2001). The Gun Lake Band has never indicated that it plans to use the land for anything other than a gambling casino.

105.    In any case, even assuming the casino site was going to be used as a reservation, it could not possibly be the Gun Lake Band's "initial" reservation. The Trust Application, prepared by the Gun Lake Band itself, states that the Band has already had two federally recognized Indian reservations at different points in its history. (Ex. C, Trust App, at 2; *see also id., BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc.*, at 6). In addition, the Band very recently had a third reservation – Pine Creek Indian Reservation in Athens Township, Michigan – by virtue of its merger with and into the Huron Band of Pottawatomi Indians ("Huron Band") in 1987. (Ex. C, Trust App., *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc.*, at 74). The Gun Lake Band was merged with the Huron Band until 1992, when it split off to pursue its own federal acknowledgment. (*Id.*)

106.    Several years ago, the Huron Band submitted its own application to have land taken into trust for a casino. The trust application describes Pine Creek Reservation as having

been taken into trust by the State of Michigan in 1845, and as being the Huron Band's "social core" and the "center of [the tribe's] religious, spiritual, and cultural existence." *See* Huron Band Trust App., at 4. Moreover, the trust application states that Pine Creek Reservation, unlike the proposed casino site, **is** used for tribal housing. *See id.* Pine Creek Reservation is therefore not only a "reservation" for purposes of IGRA, it was the reservation that the Gun Lake Band shared during its merger with the Huron Band.

107.    In light of these facts, the Gun Lake Band cannot claim that the proposed casino site would be its "initial" reservation as IGRA requires. Instead, it would be the Band's **fourth** reservation, assuming for the sake of argument that it could even qualify as a reservation. The proposed site therefore does not satisfy the requirements for the exception laid out in section 2719(b)(1)(B)(ii) of IGRA – an exception that was carefully crafted by Congress in order to avoid the very reservation shopping the Gun Lake Band is now pursuing.

108.    The Gun Lake Band's application to take land into trust for the proposed casino is also in direct conflict with the Band's earlier promises to its own members and the federal government not to engage in gambling. In 1993, the Band's leadership admitted that the tribal council had agreed to pursue federal acknowledgement only on the condition that "there would never be casinos in our Tribe." (Ex. C, Trust App., *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc.*, at 79). Indeed, the tribal council agreed to pursue federal acknowledgement only by including the following prohibition on gambling in the tribe's constitution: "The Gun Lake Band . . . is the only Indian Tribe in the State of Michigan which has decided not to sacrifice the future of its membership to gaming interests and the changes to traditions in the community that gaming could bring." (*Id.*)

109.    The constitution also included the following more specific prohibition on gambling: "The Elder's Council may exercise such further powers as may in the future be delegated to it by members of the tribe, or by the Secretary of the Interior, or any other duly authorized official of the State or Federal Government, or any federal statute, or regulation, **except the development of casino gaming enterprises (class III)** in those counties where the population of [the Gun Lake] Band Tribal members exceeds (20) percent of the Tribe's total membership. The proviso limiting certain forms of Tribal casino gaming enterprises near the heart of the Tribal community **shall not be altered** by future Elder's Council decisions or subsequent Constitutional amendments." (Ex. C, Trust App. *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc.*, at 113 n.194 (emphasis added)). Therefore, the Band's current land-in-trust application for the proposed casino is in direct conflict with promises the Band made at the time it sought federal acknowledgement.

110.    In short, none of the exceptions provided by IGRA for gambling on newly acquired Indian lands is available here. In the absence of such an exception, the Gun Lake Band cannot legally operate a casino on the proposed site. Under the APA, Defendants have therefore acted "without observance of procedure required by law" or otherwise "not in accordance with the law." *See* 5 U.S.C. § 706(2)(A) and (D). The land in trust decision must therefore be set aside.

## Count III

**In the absence of a tribal-state gambling compact, any Class III gambling by the Gun Lake Band would violate IGRA, and any decision by Defendants to place the casino site into trust for such a purpose is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.**

111.    Plaintiff incorporates all previous allegations.

112.    The Gun Lake Band has asked for the proposed casino site to be taken into trust for both Class II and III gambling.

113.    Under IGRA, an Indian tribe may conduct Class III (sometimes called "Las Vegas" or "casino-style" gambling) if – and only if – it does so in conformance with a "tribal-state compact" entered into between the tribe and the state. *See* 25 U.S.C. § 2710(d)(1)(C). Absent a compact, gambling is illegal under Michigan and federal law. *See* M.C.L. § 750.301 *et seq.*; 15 U.S.C. § 1171 *et seq.*  A tribe may conduct Class II gambling without a compact, but IGRA limits class II gaming to bingo and other similar games.  Some tribes have attempted to achieve the functional equivalent of Class III casino gambling without a compact by stretching Class II bingo beyond all recognized bounds.  The Gun Lake Band has suggested it will pursue this Class II strategy in the absence of a compact.

114.    The text of IGRA, and applicable IGRA regulations spell out the distinction between Class II and Class III gambling.  Class II gaming is generally confined to bingo and similar games.  *See* 25 C.F.R. § 502.3.  In particular, IGRA and its regulations explicitly exclude "slot machines of any kind" from Class II bingo.  25 U.S.C. § 2703(7)(B)(ii); 25 C.F.R. § 502.4. Thus, IGRA expressly prohibits any sort of "slot machines" at a Class II bingo facility.

115.    In this case, the Gun Lake Band has no gambling compact with the State of Michigan, and therefore cannot offer Class III gambling, including purported Class II

bingo games that are in reality Class III games, even if it obtains land in trust for other purposes.

116.    On information and belief, the Gun Lake Band, even if it has no gambling compact, intends to offer allegedly Class II gambling in the form of machines indistinguishable from "slot machines" and other Class III gambling devices. Such action would subject the MichGO members and others in the host community to Class III gambling unauthorized by IGRA and a gambling compact.

117.    Defendants have nonetheless proceeded with their plans to take land into trust for Class II and Class III gambling without addressing this legal problem. A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review under the APA. *See* 5 U.S.C. § 702.

118.    The APA empowers this court to "hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law; . . . ." 5 U.S.C. § 706.

119.    Defendants' decision to take land into trust without ensuring that there will never be Class II gaming that amounts to the functional equivalent of Class III gambling at the site violates the law and the applicable standard of review under the APA.

## Count IV

**25 U.S.C. § 465 violates the nondelegation doctrine of the United States Constitution**

120.    Plaintiff incorporates all previous allegations.

121.   The first sentence of the body of the United States Constitution provides that, "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." U.S. Const. Art. I, § 1.

122.   According to the nondelegation doctrine, "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States,* 500 U.S. 160, 165 (1991).

123.   The Indian Reorganization Act states that, "[t]he Secretary of the Interior is hereby authorized, in his discretion, to acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians." 25 U.S.C. § 465.

124.   A delegation of power to an agency is overbroad if "there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States,* 321 U.S. 414, 426 (1944).

125.   In the present case, the statute authorizing the Secretary to take land into trust provides no standards to guide the agency's actions, stating little more than that the Secretary shall take land for Indians. Under the statute as written, the Secretary could take any amount of land into trust at any time and for any purpose – for instance, to provide a summer cottage in Wayland Township for a politically faithful tribal officer. Therefore, as at least one court has held, the statute violates the nondelegation doctrine and must be deemed void. *See South Dakota v. United States Dep't of the Interior*, 69 F.3d 878 (8th Cir. 1995), *vacated and remanded on other grds.* 519 U.S. 919 (1996).

126.   The only limitation on the Secretary's authority as delegated by IRA is the Secretary's own good judgment. But the Supreme Court has made it clear that an agency's self-

imposed limitations cannot operate to save an otherwise impermissible delegation of power. *See Whitman v. American Trucking Ass'n, Inc.*, 531 U.S. 457, 473 (2001). The focus is on what **Congress** did to limit the agency's power, not what the agency has done to limit itself through regulations or otherwise. *See id.* In this case, because Congress failed to abide by these strictures when it passed IRA, the delegation of power under Section 465 is unconstitutionally overbroad.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant it the following relief:

A)     A temporary restraining order and preliminary injunction preventing Defendants from taking the proposed casino site or any other land into trust for operation of a casino, pending litigation of the issues raised in this Complaint.

B)     A declaratory judgment that:

1)     BIA violated NEPA by failing to prepare an EIS and by issuing a FONSI in reliance on environmental documents that failed to fully and adequately consider and analyze the many environmental impacts stemming from the proposed casino project or the reasonable alternatives to the placing the casino on the proposed site.

2)     The Gun Lake Band does not qualify for any of the exceptions to IGRA's general ban on gambling on newly acquired Indian lands,

including the exception that permits gambling on a tribe's "initial reservation."

3) BIA cannot take land into trust for gambling without ensuring that Class II games that are the functional equivalent of Class III gambling will never be played on the site without a proper gambling compact in effect.

4) The statutory authority relied upon by BIA to take the land into trust violates the nondelegation doctrine.

C) A mandatory injunction requiring Defendants to prepare and complete an EIS on the Gun Lake Band's trust application.

D) An injunction precluding Defendants from taking any further action on the Gun Lake Band's trust application until BIA prepares and completes an EIS.

E) An injunction prohibiting Defendants from taking the casino site into trust for the purpose of operating a gaming facility absent a finding that one of the exceptions to IGRA's ban on gambling on newly acquired Indian lands is applicable here.

F) An injunction prohibiting Defendants from taking the casino site into trust for the purpose of offering Class III gaming, including any class II gaming that is the functional equivalent of Class III gambling, absent a tribal-state gambling compact.

G) An award to MichGO of its costs and reasonable attorney fees.

H) An award of such other relief as this Court deems proper.

Dated: June 13, 2005

Respectfully submitted,

Rebecca A. Womeldorf (452034)
SPRIGGS & HOLLINGSWORTH
Attorneys for Plaintiff
1350 I Street, NW Suite 900
Washington, District of Columbia 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Of Counsel to Plaintiff:

William C. Fulkerson
Robert J. Jonker
Daniel P. Ettinger
Joseph A. Kuiper
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, NW
Grand Rapids, Michigan 49503