IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHIGAN GAMBLING OPPOSITION ("MichGO"), a Michigan non-profit corporation,<br><br>           Plaintiff,<br><br>vs.<br><br>GALE NORTON, in her official Capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>and<br><br>NEAL A. McCALEB, in his official capacity as ASSISTANT SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS,<br><br>           Defendants.<br><br>MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS, a federally recognized Indian Tribe, c/o Hon. D.K. Sprague, Chairman, Tribal Headquarters, P.O. Box 218, Dorr, MI 49323,<br><br>           Intervenor. | Case No. 1:05-cv-01181-JGP<br><br><br>**DECLARATION OF CHAIRMAN D.K. SPRAGUE IN SUPPORT OF MOTION TO INTERVENE** |

1. The information contained herein is based upon my personal knowledge, and I am competent to testify to the matters herein if called to do so in any proceeding.

2. I am the duly elected Chairman of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, commonly known as the "Gun Lake Tribe" (hereinafter "Tribe" or "Gun Lake Tribe"), a federally-recognized Indian tribe, and have served in this capacity for thirteen years.

3. I reside at 1642 Parker Drive, Wayland, Michigan 49348, and have resided there for four years. My residence is located approximately five miles from the 147-acre parcel at issue in this case.

4. Prior to becoming Chairman, I was employed by CSX Railroad for twenty-five years. I also have served as a Sergeant in the United States Army.

5. In my capacity as Chairman, I am the primary representative of the Tribe and preside over the Tribe's governing body, the elected Tribal Council.

6. As a member of the Tribe and as the Tribe's Chairman, I have knowledge of the Tribe's history, which is accurately set forth in the document entitled "Gun Lake Fee-To-Trust Application," attached hereto as "Exhibit 1."

7. The Tribe descends primarily from a Pottawatomi Band of Indians that was led by Chief Match-E-Be-Nash-She-Wish during the late 1700s and the first half of the 1800s. During that time, the Tribe lived in villages located along the Kalamazoo River, where the City of Kalamazoo, Michigan is now located.

8. In 1821, Chief Match-E-Be-Nash-She-Wish signed the Treaty of Chicago of August 29, 1821, along with several other chiefs of Indian tribes located in Michigan, with the United States. Through the Treaty, nearly all the Indian land located south of Michigan's Grand

2

River was ceded to the United States by the Michigan Indian tribes. However, the Treaty reserved three square miles of land at Kalamazoo for the Gun Lake Tribe, where many of the Tribe's members lived.

9. The reservation at Kalamazoo was thereafter ceded to the United States by the Treaty with the Pottawatomi of 1827. However, some of the Tribe's members remained in the Kalamazoo area until at least 1838.

10. Between 1827 and 1839, the federal government attempted to remove the Tribe from Michigan to "Indian Territory," which meant lands further west, away from white settlements (which were also moving further west). However, the Gun Lake Tribe did not leave the State of Michigan.

11. The Gun Lake Tribe left Kalamazoo and settled in Bradley, Michigan, around 1839. The Tribe was under the protection of an Episcopalian mission, and lived on lands provided by the mission. These lands were known as the "Griswold Colony" or "Bradley Settlement." The Bradley Settlement is located three miles from the 147-acre parcel at issue in this case.

12. The Episcopalian mission received funds based on the Ottawa Treaty of 1836, but these funds were no longer available after 1855. Nevertheless, many families stayed on the mission land in Bradley, which at the time was held in trust by Bishop Samuel A. McCrosky. Some members of the Tribe left the mission for a time, but almost all of them returned by about 1870.

13. After Bishop McCrosky resigned from the trust around the turn of the century, the mission land was divided into parcels and deeded to nineteen descendants of the Match-E-Be-Nash-She-Wish Band. Most of the mission land was soon lost for failure to pay state and local

taxes. However, most of the members of the Tribe remained in the area around the former Griswold Colony, in and around the City of Bradley and in Allegan County.

14. The Tribe has no reservation or trust lands, and since 1999 when the Tribe became federally recognized, the Tribe has sought to acquire federal trust land for its initial reservation. The Tribe's members subsequently determined that the Tribe should seek to establish a gaming and entertainment facility on its initial reservation, in order to provide an economic base for the Tribe and its members. To this end, the Tribe evaluated several potential sites located throughout Allegan County, Michigan.

15. Specifically, the Tribe evaluated four sites in Allegan County. One of those sites is the 147-acre tract at issue in this case, which is comprised of two adjacent parcels of land equaling 147.48 acres. Both parcels are located in the Township of Wayland, County of Allegan in the State of Michigan. One of the parcels is commonly known as "1123 129th Avenue, Bradley, Michigan." Both parcels are collectively referred to as "the Bradley Tract."

16. The three other sites were examined and considered in depth. Initially, it appeared that these sites could meet the Tribe's purpose and need. However, after more thorough analysis, including conducting Phase I environmental site assessments on the sites in January of 2001, and evaluating development compatibility with surrounding uses, the Tribe eliminated these alternative sites from further consideration and analysis. The Tribe and the EA consultants discussed these alternative sites and the supplemental information contained herein with the BIA, and acted in accordance with the guidance received from the BIA in terms of the contents of the EA. These sites are discussed in detail below.

   a. **Site 1 – 108 acre Site**: The first site the Tribe selected for more thorough examination was a 108-acre parcel of land located in Dorr Township. The site is bordered on the east

by 12th Street, on the west by US-131, on north by the Jablonski property, and on the south by 142nd Avenue. The Tribe rejected this site for a number of reasons, as described below.

    i. The site is located near local schools and the town of Moline. The school is considered to be incompatible with a casino and would increase the controversy and opposition surrounding the proposed casino.

    ii. The site contains a water tower. The existing owners operate a private water supply system that supplies water to local municipalities, including nearby Moline. The tower would need to be demolished or water appropriated to support the casino activities, impacting a source of water for neighboring municipalities.

    iii. Sewer service in the quantity required for the casino would not be readily available at the site, and due to the limited size of the site and the lack of a nearby water river, it would be difficult or impossible to construct an on-site wastewater treatment and disposal system.

    iv. Site 1 appeared to be biologically sensitive, and included the presence of wetlands.

    v. Current on-site development is minimal and could not be retrofitted to support a large commercial facility such as a casino. The site would have to be cleared and prepared for development. Any biological or cultural resources on the site would be impacted.

    vi. The introduction of new impervious surfaces on the site (e.g. buildings and parking areas) would increase stormwater runoff, which could cause downstream flooding and water quality problems.

    vii. Access to the property was not conducive to large-scale commercial development. Access is from the east along 12th Street, a dirt road.

A Phase I Environmental Site Assessment (ESA) was conducted on Site 1. Although the Phase I ESA did not reveal evidence of toxic contaminants associated with Site 1, it did identify several barns, a residence, and a veal waste lagoon, which according to the Phase 1 ESA, "… may have consisted of manure." The walkover of Site 1 was conducted in January after a snowfall. Thus, a thorough inspection of the site's soils was not possible. Although the veal waste lagoon was not clearly visible due to snow cover, an interview with the previous landowner confirmed that the lagoon was used for above

ground dumping of veal waste. The liquid waste was then pumped underground to two vertical irrigation sprinklers, which irrigated the pasture with the waste liquid. Although the lagoon is not considered in the Phase I ESA to be hazardous, it would require some level of remediation prior to preparing the site for commercial use.

b. **Site 2 – 242 acre Site**: The second potential gaming site is located in Dorr Township. The parcel of land is triangular in shape, consists of 242 acres, and is located just south of the first site. It is bordered on the east by US-131, on the south by 140th Avenue, and on the west by the Potter Bros. and Damstra properties. The Tribe rejected this second site for a number of reasons, which are listed below.

   i. Ingress and egress was a concern because only two access points were available on either side of an existing residence, which was not for sale. Thus, traffic access would be difficult and would heavily impact the adjacent residence.
   ii. Site 2 also appeared to be biologically sensitive, and included the presence of wetlands.
   iii. Current on-site development is minimal and could not be retrofitted to support a large commercial facility. The site would have to be cleared and prepared for development. Any biological or cultural resources on the site would be impacted.
   iv. The introduction of new impervious surfaces on the site (e.g. buildings and parking areas) would increase stormwater runoff, which could cause downstream flooding and water quality problems.
   v. Most of the site is zoned for rural estates, a land use designation that is not consistent with commercial development.
   vi. A Phase I ESA indicated the likely presence of asbestos in one of the on-site structures. This asbestos is hazardous and would need to be remediated and disposed of properly prior to commercial development.

c. **Site 3 – 129 acre Site**: The third site is approximately 129 acres located in Hopkins Township, just to the west of US-131 and bisected by 132nd Avenue. The Tribe rejected this site for a number of reasons, which are listed below.

6

      i. The site lacks water and sewer infrastructure.

      ii. The site is irregularly shaped. Constructing a large casino with parking and associated facilities would be difficult on the long, narrow, rectangular site.

      iii. The site is served only by an unpaved road and is not readily accessible from a highway interchange.

      iv. Traffic accessing the site would pass many neighboring residences, potentially resulting in associated nuisance impacts, such as noise and visual impacts.

      v. Adjacent construction equipment sales operations raised concerns about potential present or future contamination from leaking vehicles.

      vi. Site 3 also appeared to be biologically sensitive, and included the presence of two waterways with associated riparian vegetation.

      vii. The site is zoned for agriculture, a land use designation that is not consistent with commercial development.

A Phase I ESA was conducted on Site 3. Although the Phase I ESA did not reveal evidence of toxic contamination associated with Site 3, it did chronicle a residence, barn, and several outbuildings. The walkover of Site 3 was conducted in December with a snow cover present. Thus, a thorough inspection of the site's soils was not possible.

17. Alternative uses of the Bradley Tract were also considered by the Tribe, but rejected as infeasible. The Tribe first considered industrial uses. Similarly, the Tribe looked at other economic uses such as retail, but did not pursue them since the low density of the surrounding population did not provide a market that would make such an endeavor a success.

18. The proposed project site currently contains an industrial building associated with the past operation of Ampro Industries, Inc. A true and correct depiction of the proposed project site is attached hereto as "Exhibit 2." Ampro Industries manufactured lawn products such as mulch and hydroseed mix. The continuation of a similar manufacturing business on the site was considered by the Tribe. The existing modern warehouse-style industrial building with

a connected office is well suited for a manufacturing business. Truck loading docks, employee parking, and large indoor work and storage space, and good highway access characterizes the existing physical facilities. As stated in the EA, the site is currently zoned industrial, and there are no sensitive land uses nearby, and therefore it is well suited to a manufacturing business.

19. Unfortunately, manufacturing businesses have not fared well in Michigan due to high labor costs and other competitive pressures. Ampro Industries, the former owner of the site, first downsized and then ceased all manufacturing operations on the site. Given that the Tribe has no particular experience or track record in manufacturing, and that no investors or management companies were identified that would finance and assist the Tribe with the operation of such a business on this site or any other site, the use of the site for manufacturing use was determined to be infeasible.

20. On August 8, 2001, the Tribe requested that the Secretary of Interior accept the Bradley Tract into trust for the benefit of the Tribe. The Tribe also requested that the Secretary proclaim that the Bradley Tract is the Tribe's initial reservation for purposes of the Indian Gaming Regulatory Act, 25 U.S.C. § 2719(b)(1)(ii).

21. The Bradley Tract is located less than three miles from the Griswold Colony, which consists of lands that the Tribe has historically occupied. The Griswold Colony and the Bradley Trust are located within the exterior boundaries of the land ceded to the United States in the Treaty of Chicago of August 29, 1821. The majority of the Tribe has remained in the Bradley area to the present day. Most members of the Tribe live within ten to twenty-five miles of the Griswold Colony, which is less than three miles from the "Bradley Tract"—the land at issue in this lawsuit.

22. Hundreds of comments were received from the general public, local organizations, governments, and government officials (including supporters and opponents of the project).

23. Many local governments and organizations have voiced their support for the project, including: the Dorr Business Association; Hopkins Superintendent of Schools; Kalamazoo Convention and Visitors Bureau, along with many Kalamazoo Unions and organizations; the Barry County Area Chamber of Commerce; the City of Wayland, to name a few.

24. Throughout the EA process, the BIA closely supervised, reviewed and independently evaluated the information submitted by the Tribe and its consultants, and assumed responsibility for the content and accuracy of the EA. In December 2003, the BIA issued a final EA.

25. On February 27, 2004, the Secretary issued a "Finding of No Significant Impact" ("FONSI").

26. On May 13, 2005, the BIA published notice of the Secretary's decision to accept the Bradley Tract into trust.

27. On Friday, June 10, 2005, I received a press release, attached hereto as "Exhibit 3," wherein the Plaintiff MichGO announced its intention to file this lawsuit. Over the past few months, I have also viewed similar press releases from MichGO, wherein MichGO's members have announced that their intent is to delay the United States' acceptance of the Bradley Tract into trust indefinitely. A sample of these news clippings are attached hereto as "Exhibit 4."

28. Prior to the June 10, 2005 press release, on June 7, 2005, I received a copy of a correspondence from the Department of Justice to MichGO's legal counsel stating that the United States would not take the Bradley Tract into trust for the Tribe's benefit before June 27, 2005. (Letter from Patti Miller to Dan Ettinger dated June 7, 2005, attached hereto as

"Exhibit 5") Thereafter, I received a copy of a letter dated June 24, 2005 from the Department of Justice to Plaintiff's legal counsel, stating that the United States will not accept the Bradley Tract into trust while this case is pending in the district court without first giving MichGO and the Court thirty days' notice of its intention to do so. (Letter from Patti Miller to Dan Ettinger, dated June 24, 2005, attached hereto as "Exhibit 6")

29. I have reviewed MichGO's complaint in this case and MichGO's characterization of the area surrounding the casino as "farmland" and "rural" is inaccurate. First, the Bradley Tract has not been used for farming purposes for many years. There is an existing building, which is almost 200,000 square feet, located on the Bradley Tract that was used to house a manufacturing plant. See Ex. 2. Also, there were, or are, other business located in the area. For example, MichGO members Phil and Sue Henningson presently operate, or previously operated, a craft store less than a mile from the Bradley Tract. Also, a hair salon is being operated, or was operated, on MichGO member Kenneth Blaauw's property. In fact, much of the land surrounding the Bradley Tract is currently zoned commercial/industrial or is slated to be re-zoned commercial/industrial under Wayland and Hopkins Township Master Plans. (See Wayland and Hopkins Township maps and zoning plans attached hereto as "Exhibit 7.")

30. Also in the above news clippings, and in this lawsuit, MichGO has asserted that the Tribe's intent to operate a gaming facility on the Bradley Tract is in contravention of the Tribe's constitution. MichGO is severely mistaken. The Tribe's duly adopted constitution does not contain any prohibition on gambling. The document to which MichGO refers was a draft constitution that was never adopted by the Tribe or its members.

31. Each day that the Bradley Tract is not in trust postpones the Tribe's plans to develop that Tract and perpetuates the Tribe's lack of an economic base. The delay also perpetuates the cycle of poverty and unemployment for the Tribal members. As of April 2005, the Tribe's unemployment rate was approximately 27%, which is six times higher than that of non-Tribal members in the surrounding area for this time period. Only 26% of Tribal members own their residences, which is well below the home ownership rate of 83% for the surrounding areas.

32. The Tribe has expended considerable time and effort in its endeavor to place the Bradley Tract into trust, and this endeavor is the Tribe's highest priority. This acquisition is critical to the Tribe's plans for economic development and self-sufficiency.

33. The Tribe seeks to place the Bradley Tract into trust to enable the Tribe to be eligible for benefits and services that are only available to federally-recognized tribes with trust or restricted lands, including those specified in the Tribe's Fee-to Trust Application. See Ex. 1.

34. The Tribe also seeks to place the Bradley Tract into trust to enable the Tribe to invoke its congressionally-conferred right to operate gaming on the parcel in accordance with the Indian Gaming Regulatory Act. The Tribe determined that a gaming and entertainment facility, developed on trust land, would provide an economic base to enable the Tribe to provide governmental services related to housing and health care as well as provide jobs both for Tribe members and for other residents of the community.

35. The Tribe intends to utilize an already-existing structure—the Ampro Building—on the Bradley Tract, which is a 192,945 square foot industrial building to house its gaming facility. The building consists of a concrete foundation, slab concrete floors, with settle

truss and metal siding, and there are offices located throughout the warehouse area of the building. See Ex. 2.

36. The external areas of the Ampro Buildings consist of asphalt parking areas, driveways, concrete loading areas, gravel and grass areas. Utilities available to the Ampro Buildings include three private water wells, two septic tanks, drain field systems, electrical and gas.

37. The Bradley Tract is zoned as industrial, and the proposed land use is consistent with the Wayland Township, Michigan's land use plan. See Ex. 7.

38. The Tribe seeks to operate a gaming facility on the Bradley Tract in order to improve the economic well-being of the Tribe and its members, and to provide for greater self-determination and self-sufficiency. The gaming facility that the Tribe intends to operate will significantly contribute to the Tribe's ability to promote the health, welfare and economic self-sufficiency of its members.

39. Without trust land, the Tribe lacks an economic base to provide essential governmental services, employment and housing for its members.

40. The gaming facility also will assist the Tribe by providing it with the financial resources needed to support Tribal programs essential to fostering and preserving the health and well-being of its members.

41. The local community appears to overwhelmingly support the Tribe, as evidenced by the number of attendees at a press conference that the Tribe held on Monday, June 13, 2005 where Representatives of the Friends of Gun Lake Indians, Barry County Chamber of Commerce, Wayland Chamber of Commerce and Dorr Chamber made statements in support of the Gun Lake Casino.

I swear under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

_____
Dated

_____
Chairman D.K. Sprague