# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

MICHIGAN GAMBLING
OPPOSITION ("MichGO"), a
Michigan non-profit corporation,

        Plaintiff,

vs.

GALE NORTON, in her official
Capacity as SECRETARY OF THE
UNITED STATES DEPARTMENT
OF THE INTERIOR,

and

NEAL A. McCALEB, in his official
capacity as ASSISTANT
SECRETARY OF THE UNITED
STATES DEPARTMENT OF THE
INTERIOR, BUREAU OF
INDIAN AFFAIRS,

        Defendants.

---

MATCH-E-BE-NASH-SHE-WISH
BAND OF POTTAWATOMI
INDIANS, a federally recognized
Indian Tribe, c/o Hon. D.K. Sprague,
Chairman, Tribal Headquarters, P.O.
Box 218, Dorr, MI 49323,

        Intervenor.

---

Case No. 1:05-cv-01181-JGP


**PROPOSED
ANSWER OF INTERVENOR
MATCH-E-BE-NASH-SHE-WISH
BAND OF POTTAWATOMI INDIANS**

Proposed Intervenor Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Tribe"), a federally-recognized Indian Tribe, submits this Answer to Plaintiff MichGO's Complaint. The Tribe specifically denies each and every allegation of the Complaint not otherwise expressly admitted, qualified or denied in this Answer.

## INTRODUCTION

1.    The Tribe admits that the United States Department of the Interior ("DOI") and the Bureau of Indian Affairs ("BIA") (collectively termed "Defendants") have approved taking a 147-acre parcel of land into trust for the benefit of the Tribe and that the Tribe intends to operate a gambling casino in pre-existing buildings located on the parcel. The Tribe denies that the above actions are in any way unlawful, and the remaining allegations constitute Plaintiff's description and characterization of the law to which no substantive response is required. However, the Tribe denies that the Defendant Neal A. McCaleb is a proper party because there is no case or controversy as to Mr. McCaleb under Article III of the United States Constitution, as Mr. McCaleb has not held the position of Assistant Secretary since December of 2002. Mr. McCaleb has caused no injury to the Plaintiff, so a remedy against him will not relieve the Plaintiff of the injury alleged in this lawsuit and Mr. McCaleb must be dismissed. To the extent any further response is required, the Tribe is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1 and therefore denies them.

2.    The Tribe admits that on May 13, 2005 the Defendants gave notice in the Federal Register of the Secretary's determination to place the 147-acre parcel of land into trust. To the extent that Plaintiff has interpreted the Indian Gaming Regulatory Act ("IGRA"), the National Environmental Policy Act ("NEPA"), or the United States Constitution for its own purposes, the

Tribe denies Plaintiff's interpretation thereof. The Tribe respectfully refers the Court to the cited Acts, which speak for themselves and are the best evidence of their respective contents.

3.    The Tribe admits Defendants' decision to proceed rests, in part, on a Finding of No Significant Impact ("FONSI") prepared in accordance with the National Environmental Policy Act and based on an Environmental Assessment ("EA") published in December 2003. The Tribe also admits the decision to take the land into trust was finally approved and published in the Federal Register on May 13, 2005. The EA is a document that speaks for itself, and the Tribe denies any allegations in paragraph 3 inconsistent with that document. The Tribe denies the allegation that the project will "siphon off" money from the nearby core cities of Grand Rapids and Kalamazoo. Rather, the Tribe affirmatively alleges the project is expected to generate over $32 million in annual off-site sales in the Allegan County area, create 4,904 new jobs (3,380 of which are expected to be in Allegan County), and positively impact the local economy. To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 3.

4.    The Tribe admits that this action purports to be an action for review pursuant to the Administrative Procedure Act ("APA"), NEPA, and the United States Constitution, but denies that Plaintiff is entitled to the relief requested and the balance of the allegations contained in paragraph 4 are denied.

5.    The Tribe denies the allegations in paragraph 5. The Tribe affirmatively alleges the proposed project, as mitigated, will pose no significant environmental impact. The Tribe denies the EA assumed the Tribe would possess a compact with the State, and further denies the BIA's FONSI rested on that assumption. In fact, as the EA correctly made clear, the Tribe possesses a compact approved by the legislature, but that compact had not been signed by the

governor.  The Tribe further alleges the EA never used the tribal-state compact to, by itself, mitigate an impact to the level of insignificance.  To the contrary, the EA evaluated both scenarios, considering project impacts with and without a compact.  The EA specifically evaluated the project's potential impacts in the event the Tribe possessed no compact providing for revenue sharing with local governments, identifying specific mitigation measures that would render any impact environmentally insignificant, including the Tribe's commitment to share revenues with local governments irrespective of a compact.

6.    The Tribe admits that the NIGC has concluded that gaming will be permitted on the land once it is taken into trust as the Tribe's initial reservation under IGRA.  The Tribe denies the remaining allegations in paragraph 6.

7.    The Tribe avers that paragraph 7 is a conclusion of law and therefore requires no response.  To the extent that a response is required, the Tribe denies paragraph 7.

8.    The Tribe avers that paragraph 8 is a conclusion of law and therefore requires no response.  To the extent that a response is required, the Tribe denies paragraph 8.

9.    Paragraphs 9.a. through 9.g. are calls for relief.  The Tribe denies that Plaintiff is entitled to any of the relief requested.

10.    Paragraph 10 calls for relief.  The Tribe denies that Plaintiff is entitled to any of the relief requested.

11.    The Tribe avers that Paragraphs 11.a. and 11.b are conclusions of law and therefore require no response.

## PARTIES AND STANDING

12.    The allegation in paragraph 12 constitutes Plaintiff's description and characterization of itself to which no substantive response is required.

13. The Tribe denies the Plaintiff's assertion that "areas will be disproportionately impacted if the casino site is placed in trust and an illegal casino built and operated there," and that the "casino would detract from the quiet, family atmosphere of the surrounding rural areas, and would siphon off an estimated $92 million a year from area cities." As to the remaining allegation contained in paragraph 13, the Tribe is without information or belief sufficient to form a belief as to the truth of the allegations and therefore denies them.

14. The Tribe avers that paragraph 14 contains a conclusion of law insofar as Plaintiff's assertion of standing and therefore no response is required. As to the remaining assertions in paragraph 14, the Tribe denies them.

15. The Tribe lacks information or knowledge sufficient to form a belief as to the truth of Plaintiff's assertion as to its membership and where the members reside and therefore denies that allegation. The Tribe alleges, on information and belief, that Mr. Boorsma resides over fifteen miles away from the proposed gaming site. As to the remaining allegations contained in paragraph 15, the Tribe denies them.

16. The Tribe is without information or belief sufficient to form a belief as to the allegations concerning the Plaintiff's membership and where the members reside and therefore denies these allegations. As to the remaining allegations contained in paragraph 16, the Tribe denies them. The land owned by Kenneth Blaauw in Wayland Township (where the tract at issue is located) lies contiguous to land currently zoned for "light industrial" use. Mr. Blaauw's land in Wayland Township is slated to be rezoned for a mixture of light industrial and retail/service uses under the Wayland Township Master Plan approved in 2002. The land owned by Mr. Blaauw, located in Hopkins Township that lies closest to the tract at issue, is contiguous to land currently zoned for general business use, and, on information and belief, such land owned

by Mr. Blaauw is slated to be re-zoned for business and light industrial use under the Hopkins Township Master Plan. On information and belief, Mr. Blaauw currently utilizes a portion of his land for non-agricultural business purposes. The land owned by Phil and Sue Henningson is not used for agricultural purposes, and, on information and belief, the Henningsons operate or have operated a retail business on said land. The land owned by Randy Bouwens is slated to be re-zoned for commercial use in the Wayland Township Master Plan adopted in 2002.

17.    The Tribe denies the allegations in paragraph 17. The Tribe affirmatively alleges that "the full extent of the impact to MichGO's members" is known because the EA thoroughly evaluated the project's potential impacts, and found none were significant with identified mitigation, which means no EIS is required under NEPA.

18.    The Tribe denies the allegations contained in paragraph 18, and denies that the Plaintiff is entitled to any relief requested.

### JURISDICTION AND VENUE

19.    The Tribe admits that the Complaint appears to be an action for review pursuant to the APA, NEPA, and the United States Constitution, but denies that Plaintiff is entitled to the relief requested. The Tribe denies that the Plaintiff is entitled to relief against Defendant Neal McCaleb because there is no case or controversy against Mr. McCaleb under Article III of the United States Constitution, as Mr. McCaleb is not a proper party and not the real party in interest.

20.    The Tribe admits that the May 13, 2005 Notice of Intent states that Defendants will place a 147-acre parcel of land into trust no sooner than thirty days from that date. The remaining assertions in paragraph 20 are conclusions of law and therefore require no response.

21.    The Tribe admits the allegation contained in paragraph 21.

## GENERAL ALLEGATIONS

22.    The Tribe admits that it submitted a trust application to Defendants for the purpose of accepting a 147-acre parcel of land into trust for the Tribe.

23.    The Tribe admits that Defendants concluded that the 147-acre parcel will constitute its initial reservation and that gaming will be permitted thereon, but denies the remaining allegations in paragraph 23.

24.    The Tribe denies the allegations in paragraph 24.  The Tribe affirmatively alleges the site is located within the Tribe's aboriginal territory, and is also located less than three miles from an area termed the "Griswold Colony" or "Brady Colony," where many of the Tribe's members have resided since the 1800s.

25.    The Tribe denies the allegations in paragraph 25.

26.    The Tribe denies the allegation in paragraph 26.  The language the Plaintiff quotes is contained in a draft of a constitution the Tribe did not adopt.

27.    The Tribe admits the proposed gaming complex is "nearly 200,000 square feet," affirmatively alleging the precise footage of the existing warehouse and factory building that will be converted to the proposed gaming complex is 193,424 square feet.  The Tribe also admits the facility includes gaming space, two casual dining restaurants, a buffet-style restaurant, two fast food outlets, some retail space, a sports bar, an entertainment lounge, office space, and parking space.  The Tribe affirmatively alleges the specific size of the gaming area is 98,879 square feet, and the actual number of parking spaces will total 3,352, including 17 spaces for buses and 26 for Recreational Vehicles.  The Tribe further admits the facility will be located on a 147-acre site, but denies the characterization of the area as "the middle of a rural, agricultural community."  The Tribe affirmatively alleges its project will be developed on land zoned for

industrial uses, which is located between a railroad track and federal highway, and further alleges that an existing warehouse and factory building on the site will be converted to house the gaming facility. The Tribe denies the remaining allegations in paragraph 27 to the extent they conflict with the project's actual characteristics, as set forth in the EA and above.

28.    The Tribe admits it hired consultants to assist the Tribe in preparing a draft EA for the environmental review of the proposed project under NEPA, as the applicable Council on Environmental Quality ("CEQ") NEPA regulations authorize and as the BIA explicitly requires be done for all "externally initiated proposals" under its NEPA Handbook. (40 C.F.R. § 1506.5(b); BIA NEPA Handbook, § 4.2.B.) As required by law, the BIA supervised and reviewed the EA's preparation, made its own evaluation of the environmental issues, and took responsibility for the EA's scope and content. The Tribe further admits such EA was submitted to the BIA and NIGC and circulated for public comment. The Tribe affirmatively alleges Defendants actively participated in the preparation of the EA, providing comments, revisions, and input as to its contents. The Tribe further admits Defendants received comments from the public during its 75-day comment period, and affirmatively alleges thousands of local residents support the project, as do numerous local governments (including the host community and the two largest cities in the area), public service agencies (including the Deputy Sheriff's Association and the Wayland City Police), business and tourist organizations, and trade unions. The Tribe admits the identified legislators submitted comments criticizing the project, however, the Tribe affirmatively alleges other elected officials commented favorably. To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 28.

29.    The Tribe denies the allegations in the first sentence in paragraph 29 and affirmatively alleges Defendants thoroughly reviewed the EA for the proposed project and made

their decisions based in part on the information contained in the EA. The Tribe admits the final EA was published in December 2003. The Tribe denies the allegations in the third sentence in paragraph 29, and affirmatively alleges the project as proposed with mitigation will pose no significant environmental impacts under NEPA. The Tribe admits the BIA issued a FONSI on February 27, 2004, and approved the requested trust acquisition on May 13, 2005. To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 29.

30.    The Tribe denies the allegations in paragraph 30 and affirmatively alleges the BIA independently evaluated the potential environmental impacts of the Tribe's project, in compliance with both the letter and spirit of NEPA, and further alleges the agency's FONSI was the result of that independent evaluation.

31.    The Tribe admits Plaintiff accurately quotes from NEPA. In addition, the Tribe admits the regulations promulgated by the CEQ under NEPA govern the application of the statute to federal agencies generally. Further, the Tribe admits the BIA has published a NEPA handbook which governs BIA's implementation of NEPA.

32.    The Tribe admits the Plaintiff accurately quotes from the CEQ NEPA regulations.

33.    The allegations in this paragraph purport to recount the requirements of the BIA's NEPA Handbook, which speaks for itself. Because the allegations constitute opinion, argument and legal conclusions, no response is required. To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with the BIA NEPA Handbook.

34.    The allegations in this paragraph purport to recount the requirements of NEPA and its regulations, which speak for themselves, requiring no response to the allegations in this paragraph. Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA and its regulations.

35.     The Tribe denies the allegations in paragraph 35.  The Tribe affirmatively alleges the BIA independently evaluated all potential environmental impacts, whether pertaining to Western Michigan in general or Wayland Township in particular.

36.     The Tribe denies the allegations in paragraph 36.  The Tribe affirmatively alleges that several other potential sites were considered for the project, but that such sites were rejected for various reasons set forth in the EA.  Three sites were identified for in-depth examination and consideration, but ultimately rejected because they presented environmental concerns the proposed site did not.  In fact, the "no action" alternative is analyzed throughout the EA and is compared to the preferred alternative in each category of potential impacts.  The Tribe affirmatively alleges the EA fully complied with NEPA's requirements governing the consideration of alternatives.

37.     The Tribe denies the allegations in paragraph 37 and affirmatively alleges the BIA did not act arbitrarily or capriciously or otherwise abuse its discretion in issuing a FONSI.  To the contrary, its decision was informed, well analyzed, and based on a thorough EA prepared by the Tribe and its consultant under the BIA's direction.  The BIA actively participated throughout in the process, giving direction and extensively adjusting the consultant's work product, before objectively and independently evaluating the project's potential impacts.

38.     The allegations in paragraph 38 purport to recount the requirements of IGRA, which speaks for itself.  Because the allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with IGRA.

39.     The allegations in paragraph 39 constitute opinion, argument and legal conclusions, requiring no response.    Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with the legal authorities cited therein.

40.     The Tribe denies the allegations in paragraph 40 as they misstate the EA's content, which nowhere assumed the Tribe possesses a compact signed by the State's governor as Plaintiff suggests.    In fact, the Tribe affirmatively alleges that while the EA noted the existence of a compact approved by the legislature, it made clear the compact had not been signed by the governor.    The Tribe further alleges the EA did not assume the existence of, and the FONSI was not contingent upon, a tribal-state compact.    To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 40.

41.     The Tribe denies the allegations in paragraph 41.    The allegations in the last sentence in paragraph 41 constitute legal conclusions, requiring no response.    Nonetheless, the Tribe denies any allegations in that sentence inconsistent with legal authority.

## CLAIMS FOR RELIEF

### Count I

42.     The Tribe avers that paragraph 42 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is required.

43.     The Tribe admits the Plaintiff accurately quotes from NEPA.

44.     The allegations in paragraph 44 purport to set forth the requirements of NEPA's regulations, which speak for themselves and which require no response.    Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA's regulations.

45.     The allegations in paragraph 45 purport to set forth the requirements of NEPA's regulations, which speak for themselves and which require no response.  Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA's regulations.

46.     The allegations in paragraph 46 purport to set forth the requirements of NEPA, its regulations, and the BIA's NEPA Handbook, which speak for themselves and which require no response.  Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA, its regulations, or the BIA's NEPA Handbook.

47.     The allegations in paragraph 47 constitute opinion, argument and legal conclusions, requiring no response.  Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with the legal authorities cited therein.

48.     The allegations in paragraph 48 purport to set forth the requirements of NEPA, its regulations, and the BIA's NEPA Handbook, which speak for themselves and which require no response.  Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA, its regulations, or the BIA's NEPA Handbook.

49.     The allegations in paragraph 49 constitute opinion, argument and legal conclusions, requiring no response.  To the extent a response is required, the Tribe denies the allegations in paragraph 49.

50.     The Tribe denies the allegations in the first and second sentences in paragraph 50, suggesting the agency somehow abdicated its responsibility under NEPA.  In fact, the BIA independently evaluated the project's potential impacts, commenting on and editing the environmental document, and taking responsibility for the EA's scope and content.  The Tribe affirmatively alleges the BIA acted appropriately by directing the Tribe to prepare the EA for the agency's review and comment, and denies the suggestion that its preparation of the EA for the

BIA is somehow unusual and nefarious, as such is explicitly required by the agency's NEPA Handbook for "externally initiated proposals." (BIA NEPA Handbook, section 4.2.B.) The remainder of the allegations in this paragraph purport to recount the requirements of NEPA and its regulations, which speak for themselves and which require no response. To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with NEPA or its regulations.

51.     The Tribe denies the allegations in paragraph 51, and affirmatively alleges the BIA was actively involved throughout the environmental review conducted for the project. The Tribe further notes the allegations in paragraph 51 are repetitive with prior allegations, and the Tribe incorporates by reference its responses to paragraphs 37 and 50.

52.     The Tribe admits the final EA was published in December 2003, the BIA's FONSI was issued February 27, 2004, and the BIA published notice of its intent to take the land into trust in the Federal Register on May 13, 2005. The Tribe denies the remaining allegations in paragraph 52.

53.     The Tribe denies the allegations in paragraph 53. The Tribe affirmatively alleges the proposed project, as mitigated, will pose no significant environmental impact. The Tribe denies the EA assumed the Tribe would possess a compact with the State, and further denies that the resulting FONSI rested on that assumption. In fact, the EA correctly stated, the Tribe possesses a compact approved by the legislature, but made clear the compact had not been signed by the governor. The EA further acknowledged the possibility that the terms of a compact ultimately signed could differ from that which the Michigan Legislature had approved. The Tribe further denies the subsequent action taken by the Michigan Senate has the impact of rescinding the compact. The Tribe further alleges the tribal-state compact was never used in the

EA to, by itself, mitigate an impact to the level of insignificance.  To the contrary, the EA evaluated both scenarios, considering project impacts with and without a compact.  In particular, the EA specifically evaluated the project's potential impacts in the event the Tribe possessed no compact providing for revenue sharing with local governments, identifying specific mitigation measures that would render any impact environmentally insignificant, including the Tribe's pledge to share revenues with local governments irrespective of a compact.  (EA pp. 4-14, 4-87, 4-91, 5-5.)  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 53.

54.     The BIA's FONSI is a document that speaks for itself, and the Tribe denies all allegations in paragraph 54 inconsistent with the language and contents thereof.  The Tribe admits the U.S. EPA declared Allegan County a non-attainment area for ozone in April 2004, effective June 2004 (after execution of the FONSI).  The Tribe affirmatively alleges Allegan County was, in fact, designated as in attainment by the U.S. EPA for air quality standards when the BIA published the final EA and issued its FONSI.  The Tribe affirmatively alleges the EA considered the possibility that the County might be designated as in non-attainment in the future, and in the wake of that designation, in June 2004, the Tribe's air quality consultant re-evaluated the prior analysis, conducting additional air quality modeling to ascertain whether the EA's conclusions remained valid in light of the new standards.  The additional modeling conclusively established the project posed no significant impacts to air quality (including ozone) even under the new non-attainment standards.  Defendants considered this information, and they relied upon it in deciding to approve the trust acquisition.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 54.

55.     The Tribe denies the allegations in the first sentence in paragraph 55.  The Tribe admits the gaming facility in an industrial-zoned area of Wayland Township is expected to attract an average of approximately 8,500 visitors per day, and that more than five years ago, in 2000, the population of Wayland Township was approximately 3,000 people.  The Tribe lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations and on that basis denies them.

56.     The Tribe denies the characterization of the project as "massive," and admits mitigation is required to reduce certain identified project impacts to a level of insignificance. NEPA specifically allows agencies to issue "mitigated FONSIs," and the Tribe affirmatively alleges the proposed project, as mitigated, is expected to pose no potentially significant impacts to the environment, including the specific areas Plaintiff identifies in paragraph 56.  With respect to wetlands, for example, the Tribe alleges the final EA identified a small fill of wetlands (.44 acres) in the drainage ditches from widening the roadway near the project, beyond the proposed trust land; however, the State's Environmental Protection Agency has determined no permit is required, having itself concluded no jurisdictional wetlands are present.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 56.

57.     The Tribe admits the EA and FONSI concluded the Tribe's revenue sharing with area governments (which was provided for in the compact that Michigan's legislature had approved) would mitigate any potential impacts below the level of significance.  The Tribe denies the allegations to the extent they suggest the FONSI is contingent upon the existence of a tribal-state compact providing for revenue-sharing, since the EA also considered potential impacts in the absence of such a compact.  In particular, the EA identified specific mitigation measures that would render environmentally insignificant any project impacts in the event the

Tribe possessed no compact with the State, including a commitment by the Tribe to share revenues with the local governments in the event no compact is negotiated. (EA pp. 4-14, 4-87, 4-91, 5-5.) The Tribe notes the allegations in paragraph 57 are redundant with prior paragraphs, and incorporates its responses to paragraphs 37, 50 and 51. To the extent necessary, the Tribe denies the remaining allegations in paragraph 57.

58.    The Tribe denies that its project will adversely affect the character of the community in which it will be built, including the "simplicity and beauty of the farmland [that plaintiffs] are determined to … preserve[]." The Tribe affirmatively alleges the project is to be constructed on land that currently houses three large, empty warehouse or factory buildings in an area that is zoned for light industrial uses. These large warehouse or factory buildings will be renovated to house the proposed gaming facility. The Tribe further alleges the land is situated between a freeway and railroad track, and that thousands of local community members and numerous local governments support its project. The Tribe further alleges the EA fully analyzed impacts to farmland and visual resources. (EA, §§ 4.6.4, 4.6.6, 4.8.6, 4.9.8.) The Tribe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 58 and on that basis denies them.

59.    The Tribe lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences in paragraph 59 and on that basis denies them. The Tribe admits there is agricultural and residential land to the north and east of the property, and agricultural land to the south. The Tribe affirmatively alleges, however, that there also exist industrial type businesses to the east and south of the property (*e.g*., a small lumber company, RCT Transportation Services, and a seed and landscaping company). The Tribe further alleges that most of the proposed trust land would remain undeveloped trust space, and

that a federal highway and railroad tracks border the site, which is located in an area that is zoned for light industrial uses.  The Tribe further alleges three empty warehouse or factory buildings sit on the property at issue, which will be converted to house the gaming facility.  The Tribe admits the project will result in the conversion of forty-five acres of farmland to non-agricultural uses, including twenty-one acres of "locally important" farmland; however, the Tribe affirmatively alleges that such represents only .011 percent of Allegan County's "important" farmlands.  In addition, the parcel proposed for trust acquisition is not now, and has not been, farmed for several years; in fact, the township in which the land is situated (Wayland Township) has zoned the land at issue for development, designating it appropriate for light industrial development.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 59.

60.    The Tribe admits the project will include parking spaces for approximately 3,300 vehicles, that the facility is expected to attract an average of approximately 8,500 visitors per day, and that approximately 1,800 people will be employed at the facility.  The Tribe further alleges most patrons visiting the facility will travel along U.S. Highway 131, and then only a few hundred yards along 129th Avenue to the project site.  No residents are located along this stretch of roadway.  The Tribe denies all other allegations in paragraph 60.

61.    The Tribe admits the project is estimated to generate $32 million in annual off-site sales, a fact that undermines Plaintiff's allegation that the project will harm the local economy.  The Tribe denies that the EA shows the facility will produce revenues of $170 million each year; such revenues are not expected until the gaming facility is within its third year of operation.  The Tribe admits the project is expected to generate 4,900 total new jobs but denies the remainder of the third sentence, as well as the fourth sentence in paragraph 61.  The Tribe

affirmatively alleges the project is expected to attract 609 new employees to the area, and that the EA assumed an average 1.1 employees will reside within each housing unit, resulting in a demand for 526 new housing units. The EA further reasonably assumed that each of these new housing units would house an average of 2.7 people, resulting in a total population increase of 1,420 individuals. The Tribe admits the EA concludes it is reasonably foreseeable that the project will result in the off-site construction of a 100-room hotel, two new restaurants, and a gas station with a convenience store.

62.     The Tribe denies that the expected growth will adversely affect the area in which the Tribe's project will be constructed, and further denies the Plaintiff's characterization of the EA, which is a document that speaks for itself. The Tribe denies any allegations in this paragraph inconsistent with the language and contents of the final EA. The Tribe admits the EA assumes indirect development would potentially impact thirteen acres of wetlands and 22.8 acres of prime farmland (representing .015 percent of the County's prime farmland). The Tribe affirmatively alleges, however, that on July 21, 2004 the U.S. Corps of Engineers confirmed that no wetlands will be impacted directly from the project, and on August 10, 2004, the Michigan Department of Environmental Quality confirmed no wetland permit from the State was required. The Tribe admits traffic entering and departing the proposed project site "would increase nighttime light impacts" of the affected roadways. However, the Tribe affirmatively alleges the largely industrial, agricultural area is already subject to nighttime lighting from traffic along US-131 and 129th Avenue and from the Ampro manufacturing facility on the project site. To the extent a further response is required, the Tribe denies the remaining allegations in paragraph 62.

63.     The Tribe admits traffic to the project's gaming and restaurant facilities during a typical afternoon peak hour is estimated to be approximately 1,100. The Tribe denies the

allegation suggesting peak traffic will occur for more than a single hour during the peak traffic period. In fact, there is only one peak hour that will experience that level of trip generation; all other hours of the day will involve less traffic. The Tribe admits two intersections could operate at LOS F condition during this peak traffic period without mitigation. However, the Tribe affirmatively alleges the Tribe has agreed to implement particular mitigation measures— including the construction of a four-way stop at one intersection and the construction of a right turn lane at the other—which the Michigan Department of Transportation has confirmed will improve traffic flow and conditions, such that both intersections would operate acceptably during this peak period. To the extent a further response is required, the Tribe denies the remaining allegations in paragraph 63.

64.    The Tribe admits the EA predicts an increase of 326 new students will seek admission at Allegan County schools over an extended period of approximately five years after the Tribe's gaming facility opens, which the Tribe alleges equals an increase of only 2.1 percent. Moreover, as the EA found, many local schools have been experiencing decreasing enrollment over the past few years; accordingly, new students generated by the Tribe's project would serve largely to stabilize school enrollment. In addition, any off-site development induced by the project would be subject to property tax levies that would help fund local schools. The Tribe further denies the project will impose additional demands on local services, such as police and fire, and it affirmatively alleges the Tribe's execution of service agreements with both the Allegan County Sheriff's Office and the City of Wayland will minimize or otherwise eliminate impacts to such services. The Tribe denies the remaining allegations in paragraph 64.

65.    The Tribe denies the EA "admits that the casino will cause an increase in rates of compulsive gambling," and affirmatively alleges the EA provides that the project "might" result

in an increased demand for services addressing gambling obsessions.  The Tribe denies the EA failed to evaluate potential impacts on gambling addiction, and further alleges that the EA specifically acknowledged the Tribe's agreement to financially support compulsive gambling treatment programs within the local area, in addition to taking other steps to prevent significant compulsive gambling impacts.  To the extent the remaining allegations in paragraph 65 do not constitute opinion or argument, which themselves require no response, the Tribe denies them.

66.    The Tribe denies the need for an EIS is demonstrated by the length of the EA, and alleges, to the contrary, that the EA's length and level of detail evidences the thoroughness of the environmental review.  That level of completeness means there is nothing further for an EIS to cover.  The remaining allegations in this paragraph purport to recount the content of the CEQ's NEPA guidance document, and constitute opinion, argument and legal conclusions, requiring no response.  To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with the cited guidance document.

67.    The Tribe lacks knowledge or information sufficient to form a belief as to the truth of the first sentence in paragraph 67.  The Tribe further denies the length of the EA bears any relevance to the Defendants' FONSI under NEPA.  The Tribe denies the remaining allegations in this paragraph, but affirmatively alleges that, as evidenced by the EA's analysis and conclusions, no EIS is required because the project poses no potential for significant environmental impacts.

68.    The allegations in paragraph 68 constitute opinion, argument and legal conclusions, requiring no response.  Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA.

69.     The Tribe admits the proposed project site is located approximately 25 miles from Kalamazoo and approximately 30 miles from the City of Grand Rapids, both of which are considered to be in the "Outer Area" in relation to the project, as described in the EA.  The Tribe affirmatively alleges the EA evaluated all potential impacts to this area, where meaningfully possible given their relative distance to the site.  Plaintiff's allegations notwithstanding, the BIA and the consultant retained to evaluate socioeconomic impacts evaluated potential impacts to these cities, finding nothing significant.  The Tribe denies the remaining allegations in paragraph 69.

70.     The Tribe denies the allegations in the first and second sentences in paragraph 70.  The Tribe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 70 and on that basis denies them.  The Tribe affirmatively alleges the project is expected to generate over $32 million in annual off-site sales in the Allegan area, create 4,904 new jobs (3,380 of which are expected to be Allegan County), and have a positive impact on the local economy.

71.     The Tribe admits the Grand Rapids Chamber of Commerce hired a consultant ("Anderson Economic Group" or "AEG") that prepared a report containing the statements quoted within paragraph 71.  However, the Tribe affirmatively alleges AEG's conclusions contradict the conclusions of others, including, the BIA's consultant who fully evaluated the project's socioeconomic impacts (and came to conclusions that contradict those of AEG) and who specifically responded to AEG's analysis.  The Tribe further alleges AEG's conclusions are countered by several local Chambers of Commerce, the Wayland Township Supervisor, and the Allegan County Chairman—all of whom predict the project will increase employment and revenues for nearby businesses.  In addition, the BIA received many other comments from

parties, including local governments and agencies, finding the project would positively impact the local economy.   Finally, Plaintiff's assertions contradict the EA's conclusions that local businesses will likely experience increased revenues from gaming patrons, not a loss of economic viability.   To the extent any further response is required, the Tribe denies the allegations in paragraph 71.

72.    The Tribe does not deny that the AEG report states what the complaint says it states, but the Tribe denies the accuracy of those conclusions as set forth in paragraph 72.   The Tribe affirmatively alleges the BIA and the consultant retained to analyze the project's potential socioeconomic impacts ("Michigan Consultants") specifically considered the AEG study and explained why the findings of that AEG study lacked credibility.

73.    The Tribe denies the allegations in paragraph 73, and notes Plaintiff grossly mischaracterizes the agency's response.   On information and belief, the Tribe affirmatively alleges the language Plaintiff quotes is a portion of one sentence from a very detailed response to a comment included in Appendix Q of the final EA.   (*See* Response to Comment LL9.)   The BIA actually stated that it concurred such an impact was a theoretical possibility but went on to explain, in part, that "we do not agree that the competition for revenues would be a significant impact.   Further, we do not agree with the notion put forth by the [commenter] that only a fixed amount of revenues are available in the area to be split up in some proportion between the Preferred Alternative and businesses in the area that may have their revenues impacted by the proposed casino."   In addition, the Tribe affirmatively alleges that as a matter of law "economic or social effects are not intended by themselves to require the preparation of an [EIS]."   (40 C.F.R. § 1508.14.)   To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 73.

74.    The allegations in paragraph 74 purport to recount the requirements of NEPA, its regulations, and the BIA's NEPA Handbook, which speak for themselves.  Because the allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with NEPA, its regulations, and the BIA Handbook.

75.    The Tribe denies the allegations in paragraph 75, both to the extent they mischaracterize the nature of the Tribe's commitment to implement identified mitigation measures, and to the extent they constitute anything other than opinion, argument and legal conclusions, which require no response.  The Tribe affirmatively alleges the mitigation measures in the EA are enforceable.  To the extent any further response is required, the Tribe denies any remaining allegations.

76.    The Tribe admits that some patrons of the proposed gaming facility could be exposed to tobacco smoke *if* such is permitted by Tribal ordinance.  The Tribe denies the remaining allegations in this paragraph and affirmatively alleges the EA found the health effects posed to patrons by second-hand smoke will be minimized at the project site through the Tribe's use of ventilation installed in public areas in accordance with the American Society of Heating Refrigeration and Air Conditioning Engineers Standard 62-2001, *Ventilation for Acceptable Indoor Air Quality*.  The Tribe also affirmatively alleges that smoking is generally permitted in places of public accommodation in Michigan, and therefore, if smoking is permitted at the casino, its patrons would not be exposed to any greater risk than they would be at other public places in Michigan.  To the extent any further response is required, the Tribe denies any remaining allegations.

77.     The Tribe denies the allegations in paragraph 77.  In addition, the Tribe notes that the pages of the EA Plaintiff cites regarding wetlands and traffic impacts do not include discussions of the compact as Plaintiff suggests.  The Tribe affirmatively alleges that, as the EA expressly states in Chapter 5.5, if the Tribe is "unable to negotiate a Class III gaming compact and the Secretary of the Interior issues Class III gaming procedures pursuant to 25 C.F.R. Part 291," the Tribe will pass a resolution contributing two percent of electronic gaming revenues annually to local governments.  In addition, the Tribe already has entered into agreements with local government service providers to ensure public services are provided to the facility.

78.     The Tribe denies the allegations in paragraph 78, to the extent they constitute anything other than argument, opinion or rhetoric, which require no response.

79.     The Tribe denies the allegations in paragraph 79, both to the extent they mischaracterize the nature of the Tribe's commitment to implement identified mitigation measures, and to the extent they constitute anything other than legal argument and opinion, which require no response.  The Tribe notes the allegations in paragraph 79 are largely redundant with prior allegations, and the Tribe incorporates its response to paragraph 75.  The Tribe also affirmatively alleges that it will adopt any measures it states it will adopt in the EA, and further alleges such measures are enforceable.  To the extent any further response is required, the Tribe denies any remaining allegations.

80.     The final EA is a document that speaks for itself, and the Tribe denies all allegations in paragraph 80 inconsistent with the language and contents thereof.  The Tribe admits the U.S. EPA declared Allegan County a non-attainment area for ozone in April 2004, effective June 2004.  The Tribe affirmatively alleges Allegan County was, in fact, designated as in attainment by the U.S. EPA for air quality standards when the BIA published the final EA and

issued its FONSI.  The Tribe affirmatively alleges the EA considered the possibility that the County might be designated as in non-attainment, and in the wake of such, the Tribe's air quality expert re-evaluated the EA and conducted additional air quality modeling under the new air quality standards for areas designated non-attainment.  The additional modeling conclusively established the project posed no significant impacts to air quality (including ozone), even under the new standards.  The emissions projected were found to be well below conformity thresholds. (40 C.F.R. § 93.153.)  Defendants considered this information and relied upon it in deciding to approve the requested trust acquisition.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 80.

81.    The final EA is a document that speaks for itself, and the Tribe denies all allegations in paragraph 81 inconsistent with the language and contents thereof.  The Tribe denies that supplementing the EA is required.  The Tribe affirmatively alleges that not only did the EA consider the prospect that Allegan County might be designated as in non-attainment, the Tribe's air quality consultant re-examined the EA's air quality analysis to confirm that its earlier conclusions remained valid under the new standards.  As part of this effort, the expert conducted additional modeling in June 2004 that conclusively established that even given these new standards, the project posed no potential significant impact to air quality and no conformity analysis was required.  Defendants received and considered this information before approving the requested trust acquisition.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 81.

82.    The allegations in paragraph 82 constitute opinion, argument and legal conclusions, requiring no response.  Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with legal authorities.  The Tribe affirmatively alleges that it conducted

the necessary analysis to determine the project posed no potential significant impact to air quality, and denies all remaining allegations in this paragraph.

83.     The Tribe denies the final EA is deficient in its treatment of alternatives concerning the placement of the proposed gaming facility.  The remaining allegations purport to recount the requirements of NEPA, NEPA's regulations, and the BIA NEPA Handbook, which speak for themselves.  Because the allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with NEPA, NEPA's regulations, and the BIA NEPA Handbook.

84.     The Tribe denies the allegations in paragraph 84.  The Tribe affirmatively alleges several other potential sites were considered for the project but that such were rejected for various reasons set forth in the EA.  Three sites were identified for in-depth exploration, but were ultimately rejected because they presented environmental concerns the proposed site did not. The Tribe affirmatively alleges the EA fully complied with NEPA's requirements governing the consideration of alternatives.  The Tribe notes the allegations are redundant with prior allegations, and incorporates its response to paragraph 36.

85.     The Tribe denies the allegations in paragraph 85, and Plaintiff's characterization of the EA, which speaks for itself.  The Tribe denies the EA's alternatives analysis provided no detail, and affirmatively alleges the preferred alternative was selected due to its comparatively minimal impact on the environment and its ability to satisfy the project's purpose and need, which is what NEPA contemplates.  The Tribe further alleges the EA listed the various alternatives that were considered and rejected, and contrary to Plaintiff's assertion, explained

why those alternatives were rejected, ranging from proximity to schools, environmental impacts unique to the sites, and the non-existence of infrastructure and adequate access.

86.    The Tribe denies Plaintiff's characterization of the EA, which speaks for itself. The Tribe denies that the EA "makes no effort" to compare how the environmental impacts of the no-action alternative compare to the impacts of the proposed project. The Tribe affirmatively alleges the EA contains a side-by-side description of the impacts of the "no action" alternative as compared to the "preferred" alternative. The Tribe admits the EA assumes the project site, which is zoned for light industrial use and on which three warehouse or factory buildings sit, could be used for light industrial activity if the Tribe's gaming facility is not constructed thereon. The Tribe alleges the EA acknowledged the remainder of the site could be used for additional light industrial activity, consistent with its zoning, in the future, and further alleges an attempt to determine precisely what that activity would be would constitute pure speculation. To the extent the remaining allegations in paragraph 86 constitute anything other than argument, rhetoric, opinion or legal conclusions, which require no response, the Tribe denies them.

87.    The Tribe denies the allegations in paragraph 87, which are extremely misleading. The Tribe affirmatively alleges the final EA did not try to prove that crime rates are lessened by casinos, but rather, that crime rates are not associated with casinos. The various studies conducted for the EA and considered by the agencies specifically contradict Plaintiff's assertions to the contrary. For example, and as the EA explicitly noted, the Deputy Sheriff's Association of Michigan has concluded there is no measurable increase in violent crimes, prostitution, or narcotics violations in counties that host gaming ventures. To the contrary, the EA found such ventures provide a boon to employment for both Tribal and non-Tribal members and there exists, in fact, a strong correlation between employment levels and lower crime rates. In addition, in

2002, the expert retained to evaluate the project's socioeconomic impacts ("Michigan Consultants") examined crime rates for four counties in Michigan in which major tribal casinos exist; the study showed the crime rate per 1,000 residents is lower within the counties that host casinos than in both the remainder of the state and the Grand Rapids-Muskegon-Holland Metropolitan Statistical Area. Accordingly, the Tribe affirmatively alleges studies underlying the EA contradict Plaintiff's assertion that there exists an association between gaming facilities and increased crime. To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 87.

88. The Tribe denies allegations in paragraph 88 to the extent they constitute anything other than opinion, argument and legal conclusions, requiring no response. The Tribe affirmatively alleges that it entered into development and management agreements with MPM Enterprises, LLC, fifty percent of which is owned by a subsidiary of Station Casinos, Inc. Station's subsidiary will be the manager of the casino facility. The Tribe lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 88 and on that basis denies them.

89. The Tribe denies the characterization of the EA's treatment of indirect and cumulative impacts to the extent it constitutes anything other than opinion, argument and legal conclusions, requiring no response. The remaining allegations purport to recount the requirements of NEPA's regulations, which speak for themselves and require no response. To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with NEPA's regulations.

90. The allegations in paragraph 90 purport to recount the requirements of NEPA, NEPA's regulations, and the BIA NEPA Handbook, which speak for themselves. Because the

allegations constitute opinion, argument and legal conclusions, no response is required.  To the extent any response is required, the Tribe denies any allegations in this paragraph inconsistent with NEPA, NEPA's regulations, and the BIA NEPA Handbook.

91.    The Tribe denies the allegations in paragraph 91 to the extent they constitute anything other than opinion, argument and legal conclusions, requiring no response.  The Tribe specifically denies the EA's traffic-related analysis of induced growth was in any way inadequate.  The Tribe affirmatively alleges the EA reasonably concluded the project posed no significant traffic impacts from induced growth, in part, because of the dispersed location of indirect housing units and because the incremental traffic growth that is expected will likely span a wide area, minimizing effects to particular roadways.  The EA also reasonably concluded the commercial development that is expected to flow from the project is likely to occur in areas that are served by US-131 interchanges, whose capacity and suitability for such development the EA fully evaluated.  On the basis of those analyses, no significant impacts are expected.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 91.

92.    The Tribe denies the allegations in paragraph 92.  The Tribe affirmatively alleges a highly qualified traffic-engineering firm conducted the traffic study for the project.  The Tribe further alleges the final EA specifically addressed Plaintiff's assertion that the trip generation rate was flawed, noting that the Pokagon Casino is expected to be twice as large as Gun Lake's and is located on a busier interstate, and Gun Lake's predicted traffic generation rate is more than twice that of Pokagon's.  As the final EA also noted, the Michigan Department of Transportation—the state agency responsible for ensuring adequate traffic flows and operation and identifying needed traffic-related improvements—specifically reviewed and approved the

consultant's traffic report.  To the extent any further response is required, the Tribe denies the allegations in paragraph 92.

93.    The Tribe denies the characterization of the EA with respect to its alleged "lack of rigor," and denies the remaining allegations to the extent they constitute anything other than opinion, argument or legal conclusions requiring no response.  The Tribe affirmatively alleges the EA considered the project's indirect impacts on air quality, land resources, water resources, biological resources, socioeconomic conditions and traffic.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 93.

94.    The Tribe denies the characterization of the final EA, from which Plaintiff quotes partial excerpts out of context.  The final EA is a document that speaks for itself, and the Tribe denies all allegations in paragraph 94 inconsistent with the language and contents thereof.  The Tribe denies Defendants engaged in a "total abdication" of their responsibility to analyze environmental impacts.  The Tribe affirmatively alleges that in no instance does the final EA rationalize potential effects of indirect growth by stating such growth can be controlled through local planning and zoning, as Plaintiff alleges.  Rather, the EA viewed the local role as one of many factors.  With one exception, every one of Plaintiff's supposed examples of improper analysis of indirect impacts were taken from the final EA's cumulative impacts section.  The Tribe further alleges that in order to make reasonably foreseeable assumptions as to the location of indirect growth, the EA assumed such growth would occur within areas zoned for development.  This is a reasonable assumption, because there is currently a surplus of vacant land with existing infrastructure, zoned for development.  The Tribe affirmatively alleges the EA fully analyzed the project's environmental impacts and as part of that analysis referenced local

planning and zoning restrictions.  To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 94.

95.    The Tribe denies the characterization of the EA's treatment of indirect growth as "plainly unsatisfactory," and further denies that Defendants "rubber stamped" the project or turned a "blind eye" to any potential impacts of the project.  The Tribe notes these allegations are redundant with prior allegations, and incorporates here its responses to paragraphs 30, 37, and 50.  The remaining allegations in paragraph 95 constitute opinion, argument and legal conclusions, requiring no response.  Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with the relied on legal authorities.

96.    The Tribe denies the characterization of the EA with respect to its treatment of cumulative impacts as "deficient."  The Tribe affirmatively alleges that no reasonably foreseeable development was planned in the project vicinity when the EA was prepared.  The Tribe further alleges that it contacted local governments (including, Allegan County, Wayland Township, Hopkins Township, and the City of Wayland) to identify actions and projects that would have the potential to affect the status of environmental resources in the region.  According to these jurisdictions, no other actions or projects are planned in the vicinity of the project site and only three developments are planned within Wayland Township, Hopkins Township, and the City of Wayland; specifically, a small road resurfacing/improvement project in the City of Wayland and two housing developments in Wayland Township (condominium projects located about ten miles southeast of the project site, which would be required to conform to existing township zoning, pay applicable fees, and operate according to township conditions).  Further, the Tribe affirmatively alleges that the EA determined that given the distance of these projects

from the proposed casino site, and the limited size of the projects, no significant cumulative effects would be attributable to these specific projects.

In addition, the Tribe alleges that absent specific projects that could cause cumulative impacts, the EA's analysis was primarily based on general growth and development trends in the area as guided by the Allegan County Comprehensive Growth Management Plan (1999), Wayland Township Land Use Plan (1991) and Wayland Township Zoning Ordinance. The Tribe further alleges the cumulative analysis included the effects on specific resources, ecosystems, and human communities (including, among others, water resources, biological resources, socioeconomic conditions, traffic, air quality, and land use) that occur incrementally in conjunction with other actions, projects and trends, and that such analysis included: 1) identifying past, present, and future actions and projects in association with the status of the resources, ecosystems, and human communities that may be affected, and 2) defining geographic borders and time frame of the analysis. The Tribe further alleges that the geographic boundaries of the cumulative effects area were determined by the nature of the resources affected and the distance the effects may travel. For example, increased sedimentation of waterways that result from a project are limited to the watershed in which they occur so it is only necessary to examine incremental effects within that watershed. Air quality emissions from a project, however, travel over far greater distances and therefore necessitate analysis on a county, air basin, or regional level. For this project, the geographic boundary of the cumulative effects area was generally that of Hopkins and Wayland Townships and Allegan County. In addition, the time frame of the cumulative effects analysis generally extended to 2011 (for those resources where information is available to provide a meaningful analysis to 2011). Finally, the Tribe affirmatively alleges that no cumulative development is reasonably foreseeable in the vicinity of the project site that would

present land use conflicts, thus, no significant cumulative land use impacts are anticipated and the EA's analysis of cumulative impacts complies with NEPA. To the extent any further response is required, the Tribe denies the remaining allegations in paragraph 96.

97. The allegations in paragraph 97 constitute opinion, argument and legal conclusions, requiring no response. To the extent the allegations constitute anything other than opinion, argument or legal conclusions, the Tribe denies them. The Tribe affirmatively alleges that each and every potential impact identified in the EA and evaluated by the BIA will be mitigated below the level of significance in accordance with NEPA. In addition, the Tribe affirmatively alleges Plaintiff misapplies NEPA by adding together all potential impacts, however related, and characterizing such impacts as a single, cumulative impact. Cumulative impacts refer to impacts of like, kind and quality, and the EA properly evaluated all impacts of like, kind and quality, finding no potentially significant cumulative impacts.

98. The allegations in paragraph 98 purport to recount the requirements of NEPA's regulations, which speak for themselves and which require no response. Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA's regulations.

99. The allegations in paragraph 99 purport to recount the requirements of NEPA, its regulations, and the BIA's own NEPA Handbook, which speak for themselves and which require no response. Nonetheless, the Tribe denies any allegations in this paragraph inconsistent with NEPA, its regulations, and the BIA's Handbook. The Tribe affirmatively alleges that by choosing existing buildings on an industrial site underutilized by the prior owner and proposing to recycle that site, which is adjacent to U.S. Highway 131 and served by an existing interchange, the Tribe selected a particularly environmentally benign location for its economic development project (the casino). In addition, while being a major north-south route, Highway

131 still has a considerable amount of available capacity so any additional traffic created by the project will not unduly burden the highway. The project will also bring jobs to the community and will effectuate IGRA's promise of economic betterment and self-sufficiency for the Tribe. To the extent any further response is required, the Tribe denies the remaining allegations.

### Count II

100.    The Tribe avers that paragraph 100 reasserts and incorporates the allegations contained in the previous allegations and therefore no response is required.

101.    The Tribe avers that paragraph 101 is a conclusion of law and therefore requires no response. To the extent that a response is required, the allegation contained in paragraph 101 is incomplete in that it fails to include numerous exceptions to the alleged broad prohibition against gaming on land taken into trust after October 17, 1988. See 25 U.S.C. § 2719.

102.    The allegations contained in paragraph 102 of the Complaint constitute Plaintiff's own characterization of IGRA. To the extent Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation. The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents. To the extent a response is required, the allegation in paragraph 102 is incomplete in that it omits several provisions of 25 U.S.C. § 2719 which also permit gaming on lands acquired in trust by an Indian tribe after October 17, 1988.

103.    The Tribe denies the allegations contained in paragraph 103. To the extent that paragraph 103 contains a characterization of IGRA and Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation. The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents.

104.    The Tribe denies the allegations contained in paragraph 104.  To the extent that paragraph 104 contains a characterization of IGRA and Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents.  The Tribe affirmatively alleges that IGRA, 25 U.S.C. § 2719(b)(1)(B)(ii), applies. To the extent a further response is required, the Tribe denies that the land must be used for housing to qualify as a reservation.  TOMAC v. Norton, 193 F. Supp.2d 182, 192-93 (D.D.C. 2002).

105.    The Tribe denies the allegations contained in paragraph 105.

106.    The Tribe denies the allegations contained in paragraph 106 and affirmatively alleges that this allegation has been rejected by the United States District Court for the District of Columbia in CETAC v. Norton, No. 02-1754 (D.D.C. Apr. 23, 2004).

107.    The Tribe denies the allegations contained in paragraph 107.  To the extent that paragraph 107 contains a characterization of IGRA and Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents.

108.    The Tribe denies the allegations contained in paragraph 108.  Paragraph 108 contains a quotation from a constitution that was in draft form and was never approved by the Tribe or its members.

109.    The Tribe denies the allegations contained in paragraph 109.  The quotation contained in paragraph 109 is from a draft constitution that was never approved or finalized.

110.    The Tribe denies the allegations contained in paragraph 110.

**Count III**

111.    The Tribe avers that paragraph 111 reasserts and incorporates the allegations contained in the previous paragraphs and therefore no response is necessary.

112.    The Tribe admits that it has asked for the proposed casino site to be taken into trust for Class II and III gambling.

113.    The Tribe denies the allegations contained in paragraph 113.  To the extent that paragraph 113 contains a characterization of IGRA and Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents.  Pursuant to regulations promulgated by the Secretary of the Interior and case law, the Tribe can operate Class III gaming without a compact.  25 C.F.R. Part 291; Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996); 25 U.S.C. § 2710(d)(7)(B)(vii).

114.    The allegations contained in paragraph 114 constitute Plaintiff's characterization of IGRA.  To the extent that Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents.

115.    The Tribe denies the allegations contained in paragraph 115.  To the extent that paragraph 115 contains a characterization of IGRA and Plaintiff has interpreted IGRA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents.  Pursuant to regulations promulgated by the Secretary of the Interior, the Tribe can operate Class III gaming without a compact.  25 C.F.R. Part 291; Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996); 25 U.S.C. § 2710(d)(7)(B)(vii).

116.    The Tribe denies the allegation contained in paragraph 116.

117.    The Tribe denies the allegation contained in paragraph 117.

118.    The allegation contained in paragraph 118 of the Complaint constitutes Plaintiff's characterization of the APA.  To the extent that Plaintiff has interpreted the APA in such a manner as to serve its own purposes, the Tribe denies Plaintiff's interpretation thereof.  The Tribe respectfully refers the Court to the cited Act, which speaks for itself and is the best evidence of its contents.

119.    The Tribe denies the allegation contained in paragraph 119.  The Tribe further alleges that the NIGC is the federal agency charged with enforcing IGRA's provisions on Class II and III gaming.  25 U.S.C. § 2704.

**Count IV**

120.    The Tribe avers that paragraph 120 reasserts and incorporates the allegations contained in the previous paragraphs and therefore no response is necessary.

121.    The Tribe admits that the Plaintiff has accurately quoted the United States Constitution.

122.    The allegation contained in paragraph 122 consists of a conclusion of law to which no response is required.  To the extent that a response is required, the Tribe admits that the Plaintiff has accurately quoted Touby v. United States, 500 U.S. 160, 165 (1991).

123.    The allegation contained in paragraph 123 consists of a conclusion of law to which no response is required.  To the extent that a response is required, the Tribe admits that the Plaintiff has accurately quoted an excerpt of the Indian Reorganization Act.

124.   The allegation contained in paragraph 124 consists of a conclusion of law to which no response is required.  To the extent that a response is required, the Tribe admits that the Plaintiff has accurately quoted <u>Yakus v. United States</u>, 321 U.S. 414, 426 (1944).

125.   The allegations contained in paragraph 125 are conclusions of law to which no response is required.  To the extent that a response is required, the Tribe denies the allegations in paragraph 125.

126.   The allegations contained in paragraph 126 are conclusions of law to which no response is required.  To the extent that a response is required, the Tribe denies the allegations in paragraph 126.

**PRAYER**

The remaining paragraphs are calls for relief.  The Tribe denies that Plaintiff is entitled to any of the relief, attorney's fees or costs requested.

**INTERVENOR'S AFFIRMATIVE DEFENSES**

**First Affirmative Defense**

The Complaint should be dismissed because the Plaintiff has failed to state a claim upon which relief may be granted.

**Second Affirmative Defense**

The Complaint should be dismissed because the Plaintiff lacks standing to bring this action.

**Third Affirmative Defense**

The Tribe asserts all other affirmative defenses that may be revealed subsequent to this filing.

WHEREFORE, the Tribe respectfully requests judgment dismissing the Plaintiff's Complaint herein, together with all costs and reimbursement for defense of this action and for such other relief as the Court deems just and proper.

Respectfully submitted this 27th day of July 2005.

                                              Match-E-Be-Nash-She-Wish Band of
                                              Pottawatomi Indians, Intervenor-Defendant,

                                              By _____

Nicholas C. Yost, CA Bar 35297                    Conly J. Schulte, NE Bar 20158
Paula M. Yost, CA Bar 156843                      Shilee T. Mullin, NE Bar 22286
Sonnenschein Nath & Rosenthal LLP                 Monteau & Peebles, LLP
685 Market Street, Sixth Floor                    12100 W. Center Road, Suite 202
San Francisco, CA  94105                          Omaha, NE  68144
Telephone (415) 882-5000                          Telephone (402) 333-4053
Fax (415) 543-5472                                Fax (402) 333-4761

Seth P. Waxman, DC Bar 257337                     Michael J. Anderson, DC Bar 417887
Edward C. DuMont, DC Bar 471443                   Monteau & Peebles, LLP
Wilmer Cutler Pickering Hale and Dorr LLP         300 Independence Ave, SE
2445 M Street, NW                                 Washington, DC  20003
Washington, DC 20037                              Telephone (202) 543-5000
Telephone (202) 663-6000                          Fax (202) 543-7716
Fax (202) 663-6363

## CERTIFICATE OF SERVICE

I certify that on July 27, 2005, I filed the above document via the Clerk of the Court's

Generic Email Box, which will send notice of electronic filing to the following:

Rebecca A. Womeldorf
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW, Suite 900
Washington, DC  20005
**202-682-1639**
*Attorney for Plaintiff*

William C. Fulkerson
Robert J. Jonker
Daniel P. Ettinger
Joseph A. Kuiper
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, NW
Grand Rapids, MI  49503
**616-222-2161**
*Attorneys for Plaintiff*

Patricia Miller
Department Of Justice
Environmental and Natural Resources Division
Indian Resources Section
601 D Street, NW, Third Floor
Washington DC  20004
**202-305-0271**
*Attorney for Defendants*

s/Carol Thompson