## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MICHIGAN GAMBLING OPPOSITION** ("MichGO"), a Michigan non-profit corporation, | ) ) ) ) | |
| **Plaintiff,** | ) ) | Case No. 1:05-CV-01181-JGP |
| **v.** | ) ) | |
| **GALE A. NORTON, in her official capacity as United States Secretary of Interior, Department of Interior, et al.,** | ) ) ) ) | |
| **Defendants,** | ) ) | |
| _____ | ) ) | |
| **MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS, a federally-recognized Indian Tribe,** | ) ) ) ) | |
| **Intervenor.** | ) ) | |
| _____ | ) | |

_____

## MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT
_____

<u>**Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians'**</u>
<u>**Motion for Judgment on the Pleadings or, in the Alternative**</u>
<u>**for Summary Judgment**</u>

Pursuant to Rules 12(c) and 56 of the Federal Rules of Civil Procedure, the Intervenor Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (the "Tribe") files this Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment.  For the reasons set forth in the accompanying Memorandum of Points and Authorities, Plaintiff's Complaint fails to state any claim against Defendants upon which relief can be granted.  Plaintiff's Complaint also raises no genuine issue of material fact and the Defendants are entitled to judgment as a matter of law.  The Tribe, therefore, respectfully requests that the Court grant its Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment.  The Tribe also respectfully requests oral argument on this Motion pursuant to LCvR 7(f).

Respectfully submitted this 6th day of January 2006.


Match-E-Be-Nash-She-Wish Band of
Pottawatomi Indians, Intervenor-Defendant,

By ____s/Conly J. Schulte_____

| | |
|---|---|
| Nicholas C. Yost, CA Bar 35297 | Conly J. Schulte, NE Bar 20158 |
| Paula M. Yost, CA Bar 156843 | Shilee T. Mullin, NE Bar 22286 |
| Sonnenschein Nath & Rosenthal LLP | Monteau & Peebles, LLP |
| 685 Market Street, Sixth Floor | 12100 W. Center Road, Suite 202 |
| San Francisco, CA  94105 | Omaha, NE  68144 |
| Telephone (415) 882-5000 | Telephone (402) 333-4053 |
| Fax (415) 543-5472 | Fax (402) 333-4761 |
| | |
| Seth P. Waxman, DC Bar 257337 | Michael J. Anderson, DC Bar 417887 |
| Edward C. DuMont, DC Bar 471443 | Monteau & Peebles, LLP |
| Wilmer Cutler Pickering Hale and Dorr LLP | 300 Independence Ave. SE |
| 2445 M Street, NW | Washington, DC  20003 |
| Washington, DC 20037 | Telephone (202) 543-5000 |
| Telephone (202) 663-6000 | Fax (202) 543-7716 |
| Fax (202) 663-6363 | |

2

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 6, 2006, I electronically filed the above document with the Court, which will send notice of electronic filing to the following:

Rebecca A. Womeldorf
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW, Suite 900
Washington, DC  20005
202-682-1639
*Attorney for Plaintiff*

William C. Fulkerson
Robert J. Jonker
Daniel P. Ettinger
Joseph A. Kuiper
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, NW
Grand Rapids, MI  49503
616-222-2161
*Attorneys for Plaintiff*

Patricia Miller
Gina L. Allery
Department Of Justice
Environmental and Natural Resources Division
Indian Resources Section
601 D Street, NW, Third Floor
Washington DC  20004
202-305-0271
*Attorney for Defendants*

s/Conly J. Schulte

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MICHIGAN GAMBLING OPPOSITION** ("MichGO"), a Michigan non-profit corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:05-CV-01181-JGP |
| v. | ) ) | |
| **GALE A. NORTON**, in her official capacity as United States Secretary of Interior, Department of Interior, et al., | ) ) ) ) | |
| Defendants, | ) ) | |
| _____ | ) ) | |
| **MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS**, a federally-recognized Indian Tribe, | ) ) ) ) | |
| Intervenor. | ) ) | |
| _____ | ) | |

---

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF THE INTERVENOR'S MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

---

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iv

INTRODUCTION ........................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND....................................................2

   I.   HISTORY OF THE MATCH-E-BE-NASH-SHE-WISH BAND.....................2

   II.   THE TRIBE'S PROPOSED DEVELOPMENT AND THE NEPA PROCESS ...............3

      A.   The Tribe's Proposed Project......................................................... 4

      B.   The NEPA Evaluation Process ....................................................... 6

      C.   The Secretary's Decision ................................................................ 8

STANDARD OF REVIEW ........................................................................................ 9

ARGUMENT .......................................................................................................... 10

   I.   THE SECRETARY COMPLIED WITH NEPA BY TAKING A "HARD LOOK" AT THE ENVIRONMENTAL CONSEQUENCES OF HER ACTION. ............................. 10

      A.   Judicial Review Under NEPA And The APA ............................... 12

      B.   The BIA's FONSI Reflects Its Active Participation Throughout The NEPA Process. ................................................................................................. 14

      C.   As The Record Shows, The BIA Properly Concluded The Tribe's Proposed Gaming Facility Will Have No Significant Environmental Effects. ........................................... 16

         i.   The EA Identified And Evaluated Every "Relevant Area of Environmental Concern" ................................................................................ 17

         ii.   The Agency Reasonably Found The Conversion Of Empty Buildings Into A Gaming Facility, On A 146-Acre Site Zoned For Industrial Use, To Be Compatible With The Area's Land Use................................................... 17

         iii.   The EA Evaluated Biological Resources, Including Wetlands, And Reasonably Found No Significant Impacts With Identified Mitigation....................... 19

    iv.   Contrary to Plaintiff's Assertions, The EA Reasonably Found The Project Would Not Cause Significant Nighttime Lighting Impacts ..................................... 21

    v.   The EA Evaluated The Project's Potential Traffic Impacts, Under Existing And Cumulative Conditions, And Found No Significant Impacts With Identified Road Improvements ....................................................................................... 21

    vi.   The EA Reasonably Concluded The Project Would Not Significantly Affect Air Quality Under Existing Or Future Conditions ......................................................... 26

    vii.   The EA Evaluated Socioeconomic Impacts, And Properly Concluded That The Project Would Economically Benefit The Area And The Tribe, But Would Not Have Significant Environmental Impacts ................................................................ 29

    viii.  The EA Considered Whether The Proposed Action Would Lead To Cumulatively Significant Impacts, And Concluded It Would Not ...................................... 34

    ix.   The EA Considered The Indirect Effects Of The Proposed Action, Including Growth Inducement, And Found Nothing Significant ............................................. 35

    x.   The EA Considered A Reasonable Range Of Alternatives, And Plaintiff  Waived The Right To Allege Otherwise ...................................................................... 38

  D.   The Agency Properly Considered The Mitigation Described In The EA .................... 40

  E.   Plaintiff's Argument That An EA's Length Alone Militates The Need An EIS Is Nonsensical ............................................................................................................ 41

II.   THE SECRETARY'S INTERPRETATION OF IGRA IS NOT ARBITRARY, CAPRICIOUS, OR INCONSISTENT WITH THE LAW ................................................. 44

  A.   IGRA Must Be Construed Liberally In Favor Of The Tribe, And The Secretary's Interpretations Are Entitled To Deference ...................................................... 44

  B.   The Secretary Reasonably Concluded That The Land To Be Taken Into Trust Here Would Be The Tribe's "Initial Reservation" Under IGRA ......................................... 45

    i.   The Secretary Properly Focused On The Tribe's Current Landless Status ............. 45

    ii.   There Is No Requirement That Land Be Used For Housing In Order To Qualify As An "Initial Reservation" Under IGRA ............................................................... 47

  C.   There is No Requirement That The Tribe Conclude A Compact With The State Before the Secretary takes Land into Trust ................................................................. 48

III.  SECTION 5 OF THE INDIAN REORGANIZATION ACT OF 1934 DOES
      VIOLATE THE NONDELEGATION DOCTRINE ........................................ 50

      A.   The Statute Does Not Delegate Any Legislative Powers ............................... 52

      B.   Section 465 Establishes Constitutionally Adequate Standards.................................... 53

CONCLUSION........................................................................................................ 55

CERTIFICATE OF SERVICE ........................................................................ 57

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Shechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ........................................ 53

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937).................................................. 49

*Akiak Native Community v. United States Postal Service*, 213 F.3d 1140 (9th Cir. 2000) .......... 15

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001).............................................. 9

*Andrus v. Sierra Club*, 442 U.S. 347 (1979)................................................................. 13

*Border Power Plant Working Group v. Department of Energy*, 260 F. Supp. 2d 997 (S.D. Cal. 2003) .............................................................................. 27

*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982) ........................ 12, 16

*Calvetti v. Antcliff*, 346 F. Supp. 2d 92 (D.D.C. 2004)................................................ 10

*Carcieri v. Norton*, 423 F.3d 45 (1st Cir. 2005) ..................................................... 51, 53

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 10

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ........... 44

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937)........................................... 52

*Citizens Advisory Comm. On Private Prisons, Inc. v. United States Dep't of Justice,* 197 F. Supp. 2d 226 (W.D. Pa. 2001) ................................................................... 42

*Citizens Exposing Truth About Casinos (CETAC) v. Norton*, No. 02-1754 (TPJ), 2004 U.S. Dist. LEXIS 27498 (D.D.C. Apr. 23, 2004) ........................................ 44, 46, 47, 50

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........................ 13, 15, 44

*City of Alexandria v. Virginia*, 198 F.3d 862 (D.C. Cir. 1999) .................................... 23

*City of Auburn v. United States*, 154 F. 3d 1025 (9th Cir. 1998) .................................... 9

*City of Lincoln City v. Dep't of Interior*, 229 F. Supp. 2d 1109 (D. Ore. 2002).................... 51, 53

*City of Olmstead Falls, Ohio v. Federal Aviation Administration*, 292 F.3d 261 (D.C. Cir. 2002) ............................................................................. 13

*City of Roseville v. Norton*, 219 F. Supp. 2d 130 (D.D.C. 2002) ........................................ passim

*City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465 (D.D.C. 1978) ..................................... 51, 53

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........................................................................ 52

*Coalition on Sensible Transportation, Inc. v. Dole*, 642 F. Supp. 573 (D.D.C. 1986) ................ 39

*Confederated Tribes of Coos, Lower Umpqua & Siusiaw Indians v. Babbitt*,
    116 F. Supp. 2d 155 (D.D.C. 2000) ........................................................................................ 46

*Conservation Law Foundation v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001) ............................ 13

*County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251
    (1992) ...................................................................................................................................... 44

*Curry v. United States Forest Service*, 988 F. Supp. 541 (W.D. Pa. 1997) ................................ 43

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004) ............................................................ 38

*Florida v. Seminole Tribe of Florida*, 181 F.3d 1237 (11th Cir. 1999) ................................. 48, 49

*Friends of the Bow v. Thompson*, 124 F.3d 1210 (10th Cir. 1997) ............................................. 28

*Fund for Animals v. Williams*, 246 F. Supp. 2d 27 (D.D.C. 2003) .............................................. 33

*Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney*, 46 F. Supp. 2d
    689 (W.D. Mich. 1999) ....................................................................................................... 45, 46

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1993) ................................................... 38

*Haynesworth v. Miller*, 820 F.2d 1245.11 (D.C. Cir. 1987) ....................................................... 10

*Hoosier Envtl. Council, Inc. v. United States Army Corps of Eng'rs*, 105 F. Supp. 2d 953
    (S.D. Ind. 2000) ...................................................................................................................... 43

*Ind. Forest Alliance, Inc. v. United States Forest Serv.*, No. NA99-214-C-H/G,
    2001 WL 912751 (S.D. Ind. July 5, 2001) ............................................................................. 43

*Lewis v. Cont'l Bank Corp.*, 494 U.S. 472 (1990) ...................................................................... 49

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) ............................... 12, 23, 28

*Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.*,
    487 F.2d 1029 (D.C. Cir. 1973) .............................................................................................. 28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 173 F. Supp. 2d 725
    (W.D. Mich. 2001), *aff'd* 304 F.3d 616 (6th Cir. 2002) ......................................................... 49

*Mistretta v. United States*, 488 U.S. 361 (1989) ................................................ 53

*Modern Muzzleloading, Inc. v. Magaw*, 18 F. Supp. 2d 29 (D.D.C. 1998) ................................. 44

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) ........................................ 43

*Nat'l Wildlife Fed'n v. Gorsuch*, 639 F.2d 156 (D.C. Cir. 1982) ................................. 44

*National Audubon Society v. Hoffman*, 917 F. Supp. 280 (D. Vt. 1995),
    *aff'd in relevant part*, 132 F.3d 7 (2d Cir. 1997) ....................................... 43

*New York Central Securities Corp. v. United States*, 287 U.S. 12 (1932) .................................. 54

*Olmsted Citizens for A Better Community v. United States,* 793 F.2d 201
    (8th Cir. 1986) ................................................................ 28, 31, 32

*Panama Refining Co. v. Amazon Petroleum Corp.*, 293 U.S. 388 (1935) ................................. 53

*Road River Alliance, Inc. v. Corps of Engineers of United States Army*, 764 F.2d 445
    (4th Cir. 1985) ...................................................................... 33

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ........................................... 12

*Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001) .............................. 47

*Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966 (10th Cir. 2005) ................................... 51

*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974) ................................................ 14

*Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985) ............................................. 42, 43

*Sierra Club v. Watkins*, 808 F. Supp. 852 (D.D.C. 1991) ............................................... 12

*Small Refinery Lead Phase-Down Task Force v. United States EPA,* 705 F.2d 506
    (D.C. Cir. 1983) ..................................................................... 13

*South Dakota v. Dep't of Interior*, 519 U.S. 919 (1996) ............................................... 53

*South Dakota v. U.S. Dep't of Interior*, 423 F.3 790 (8th Cir. 2005) ........................ 51, 52, 53, 54

*Spiller v. White*, 352 F.3d 235 (5th Cir. 2003) ....................................................... 42

*State of Idaho v. Interstate Commerce Commission*, 35 F.3d 585 (D.C. Cir. 1994) ................... 14

*Sumner Peck Ranch v. Bureau of Reclam.*, 823 F. Supp. 715 (E.D. Cal. 1993) ........................... 9

*TOMAC v. Norton*, 193 F. Supp. 2d 182 (D.D.C. 2002) ....................................... 49, 50

*TOMAC v. Norton*, No. Civ.A. 01-0398, 2005 U.S. Dist. LEXIS (D.D.C. Mar. 24, 2005), *aff'd*, No. 05-5206 (D.C. Cir. Jan. 6, 2006) ................................. 25, 27, 28, 33

*Touby v. United States*, 500 U.S. 160 (1991) ............................................................ 53

*Town of Cave Creek v. FAA*, 325 F.3d 320 (D.C. Cir. 2003) ...................................... 34

*United States v. Allen*, 160 F.3d 1096 (6th Cir. 1998) .................................................. 51

*United States v. Batchelder*, 442 U.S. 114 (1979) ...................................................... 51

*United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999) ................................. 51, 53, 54

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................... 51

*Vermont Yankee Nuclear Power Corp v. NRDC*, 435 U.S. 519 (1978) ....................... 38

*Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457 (2001) .................... 51

*Yakus v. United States*, 321 U.S. 414 (1944) ............................................................. 54

*Young v. General Services Admin.*, 99 F. Supp. 2d 59 (D.D.C. 2000), *aff'd*, No. 00-5240, 2000 U.S. App. LEXIS 38685 (D.C. Cir. Dec. 14, 2000) ........................ 13

**Statutes**

5 U.S.C. § 706 ........................................................................................................ 1

25 U.S.C. § 461 .................................................................................................. 1, 52

25 U.S.C. §§ 462-464 ............................................................................................ 52

25 U.S.C. § 465 ........................................................................................... passim

25 U.S.C. § 467 ...................................................................................................... 3

25 U.S.C. § 2702 ...................................................................................... 3, 5, 44, 47

25 U.S.C. § 2703 .................................................................................................. 48

25 U.S.C. §§ 2704-2706 ........................................................................................ 49

25 U.S.C. § 2710 .............................................................................................. 48, 49

25 U.S.C. § 2719 ............................................................................................. 1, 3, 44, 45

40 U.S.C. §§ 4321-4370 ............................................................................................. 27

42 U.S.C. § 7509 ............................................................................................. 26

63 Fed. Reg. 56,936 (Oct. 23, 1998) ............................................................................................. 3

70 Fed. Reg. 25,596-597 (May 13, 2005) ............................................................................................. 8

Energy Policy Act, Pub. L. No. 109-58, § 996, 119 Stat. 594 (2005) ............................................. 27

Department of Interior and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63, § 134, 115 Stat. 414 (2001) ............................................................................................. 47

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................................. 1, 9, 10, 55

Fed. R. Civ. P. 56 ............................................................................................. 1, 55

Fed. R. Evid. 201 ............................................................................................. 8, 14, 29

**Articles and Amendments of the Constitution of the United States**

U.S. Const. Art. I, § 1 ............................................................................................. 51

**Regulations**

25 C.F.R. § 83 ............................................................................................. 3, 46

25 C.F.R. § 151 ............................................................................................. 3

25 C.F.R. Part 291 ............................................................................................. 48, 49

25 C.F.R. § 502 ............................................................................................. 48, 49

40 C.F.R. § 51.853 ............................................................................................. 27

40 C.F.R. § 93.153 ............................................................................................. 27

40 C.F.R. § 853 ............................................................................................. 27

40 CFR §§ 1500.1-1518.4 ............................................................................................. passim

**Miscellaneous**

30 BIAM Supplement 1, NEPA Handbook, § 4.2.B (1993)........................................................ 14

30 BIAM Supplement 1, NEPA Handbook, § 4.3(E)(b) ............................................................ 29

NIGC NEPA Manual, § 3.1(D)(11) ......................................................................................... 29

The Ottawa Treaty of 1836, 7 Stat. 491 ................................................................................... 2

Treaty of Chicago of August 29, 1821, 7 Stat. 288 .................................................................. 2

Treaty of September 26, 1833, 7 Stat. 431 ............................................................................... 2

Treaty with Pottawatomi, 1827, 7 Stat. 305.............................................................................. 2

## INTRODUCTION

This Court granted the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (hereinafter the "Tribe" or "Gun Lake Tribe") leave to intervene in this case, to support the decision of the Secretary of the Interior ("Secretary") to take a parcel of land into trust for the Tribe pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461, *et seq*. The Tribe now moves under Fed. R. Civ. P. 12(c) for judgment on the pleadings of Plaintiff MichGO's Complaint or, in the alternative, under Fed. R. Civ. P. 56 for summary judgment. The Tribe also respectfully requests oral argument on its Motion pursuant to LCvR 7(f).

Plaintiff bears the heavy burden of showing that the Secretary's decision is arbitrary, capricious, or not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. It cannot do so. As to Count I, the Administrative Record demonstrates the Secretary's compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*. While Plaintiff disingenuously characterizes the Tribe's efforts at economic development as a threat to a pristine rural environment, the record shows the Tribe proposes to create its casino by redeveloping existing (but currently vacant) factory and warehouse buildings, on a site lying between a highway and a railroad line that is already zoned for, and surrounded by, light industrial and commercial uses. The record amply supports the Secretary's determination, under NEPA, that the Tribe's project will not significantly impact the environment. As to Counts II-IV of the Complaint, it is clear as a matter of law that the land at issue can be taken into trust as part of the Tribe's "initial reservation" within the meaning of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b); that nothing in IGRA requires the execution of a state gaming compact *before* the Secretary may take the land into trust; and

that the statute authorizing the Secretary to take land into trust does not violate the nondelegation doctrine.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    HISTORY OF THE MATCH-E-BE-NASH-SHE-WISH BAND**

The Gun Lake Tribe has a long history in what is now the western portion of the State of Michigan.  The Tribe descends from a band of Pottawatomi Indians led by Chief Match-E-Be-Nash-She-Wish, which, in the late 1700s, lived in a village near the present-day City of Kalamazoo, Michigan.  Declaration of D.K. Sprague ("Sprague Decl.") at ¶ 7, attached to Intervenor Tribe's Memorandum in Support of Motion to Intervene.  In 1821, the Indian tribes located in Michigan ceded all Michigan lands south of the Grand River to the United States in the Treaty of Chicago.  Treaty of Chicago of August 29, 1821, 7 Stat. 288.  Chief Match-E-Be-Nash-She-Wish signed that treaty on the Tribe's behalf, securing three square miles of land at Kalamazoo.  *Id.*  However, the Pottawatomi ceded that tract to the United States in the Treaty of 1827, in return for lands that enlarged the Pottawatomi's "Nottawaseppi Reserve."  Treaty with Pottawatomi, 1827, 7 Stat. 305.  By 1836, through treaties to which the Gun Lake Tribe was not a signatory, all of the Tribe's land was ceded to the United States, leaving the Tribe landless.  Treaty of September 26, 1833, 7 Stat. 431; The Ottawa Treaty of 1836, 7 Stat. 491.

In the ensuing years, the Tribe moved north of the Kalamazoo River.  In 1839, it placed itself under the protection of an Episcopalian Mission and occupied lands known as the "Griswold Colony" or the "Bradley Property/Settlement," located in Bradley, Michigan.  Sprague Decl. at ¶ 11 and Ex. 1 at 3-4.  Most of this land was lost through tax foreclosures in the late 1800s, but a majority of the Tribe's approximately 300 members have remained in the

immediate vicinity of the Griswold Colony, which lies less than three miles from the tract of land that is the subject of this litigation—the Bradley Tract.  Sprague Decl. at ¶¶ 11-13, 21.

The Tribe has maintained its identity throughout recorded history.  However, for well over a century, it was unjustly denied both federal recognition and reservation lands on which it could pursue communal self-determination and self-sufficiency.  On August 23, 1999, after a four-year administrative process, the Secretary addressed the first injustice—lack of recognition—by formally recognizing the Tribe under federal law.  Notice of Final Determination, 63 Fed. Reg. 56,936 (Oct. 23, 1998).  Federal recognition means the "tribe shall be considered a historic tribe and shall be entitled to the privileges and immunities available to other federally-recognized historic tribes by virtue of their government-to-government relationship with the United States."  25 C.F.R. § 83.12(a).

## II.    THE TRIBE'S PROPOSED DEVELOPMENT AND THE NEPA PROCESS

After achieving federal recognition, the Tribe sought to pursue economic development and governmental self-sufficiency through the operation of a gaming enterprise, as specifically contemplated by IGRA and the Secretary's regulations.  *See, e.g.*, 25 U.S.C. § 2702(1); 25 C.F.R. Parts 151, 501.  The Tribe examined several potential sites in its local area, and in 2001 identified the Bradley Tract as land that was available and appropriate for redevelopment as a gaming and entertainment complex.  To give the land sovereign status and allow the development of an IGRA gaming operation, the Tribe, in August 2001, filed a "fee-to-trust" application, asking the Secretary to accept the tract into trust for the Tribe's benefit in connection with the Tribe's restoration to federally-recognized status and as part of its initial reservation. *See* 25 U.S.C. §§ 467, 2719; Sprague Decl. at ¶¶ 15-20; Administrative Record ("AR") 1438.

**A.    The Tribe's Proposed Project**

The Secretary's Bureau of Indian Affairs ("BIA") considered the Tribe's fee-to-trust application.  Because the Tribe expected to redevelop the Bradley Tract into an IGRA gaming enterprise if the Secretary took it into trust, the proposed Trust action was considered a "federal action" under NEPA.  Pursuant to NEPA, the BIA oversaw the development of an extensive Environmental Assessment ("EA") of the Tribe's proposed project.  AR 6 to 231.  The actions evaluated under NEPA, referenced collectively in the EA as the "preferred alternative" or the "proposed action," consisted of (1) the Secretary's trust acquisition of a 146-acre parcel for the Tribe's construction and operation of a 193,500-square foot gaming facility, and (2) the approval of a gaming management contract by the National Indian Gaming Commission ("NIGC").  AR 8.  The NIGC participated as a cooperating agency in the NEPA review.

As the EA explains, the project's "main purpose" is to alleviate the Tribe's serious economic hardships, providing an economic base through which the Tribe can support its members and become economically self-sufficient.  AR 18.  The record documents the need for such an economic base.  Currently, the Tribe struggles to provide essential governmental services, infrastructure, administrative facilities, and housing for its members.  AR 18.  Its unemployment rate is around 27% (six times higher than that of surrounding Allegan County generally),[1] and only 26% of Tribal members own their own home (compared to 82.9% for Allegan County generally).  *Id.*  Economic hardship has also eroded the Tribe's collective identity.  The lack of local opportunities forces members to leave the area, creating a "brain drain" and making it difficult for members to preserve a common culture.

---

[1]  As stated in the EA, Allegan County's unemployment rate was 4.1% when the EA was issued (December 2003).  AR 18.

The acquisition of trust lands and development of a gaming facility will enable the Tribe to decrease its dependence on federal and state funds while improving living and working conditions for its members. AR 18. In addition to providing revenue for housing, education and other needs, the facility will create jobs for Tribal members (and for others in the local community). *Id.*; *see also* AR 833; 834; 841-42; 884; 886; 892; 893; 894; 985; 904-05; 906; 923; 924-26; 928; 937-38; 941; 1024-29; 1055-56. The project will thus serve the purpose of IGRA, as declared by Congress, to establish "gaming by Indian Tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal government." 25 U.S.C. § 2702(1).

To pursue those ends, the Tribe proposes to redevelop a site in Wayland Township, in Allegan County in southwest Michigan, primarily using an existing single-story, light industrial building. AR 22-25. It will convert this 193,500-square foot building into a gaming and entertainment facility, including both Class II gaming (*i.e.*, bingo, pulltabs, and on-banking card games) and Class III gaming (*i.e.*, slot machines, table games, and banking card games such as blackjack).[2] AR 22. The facility will include two casual dining restaurants (totaling approximately 10,902 square feet), a buffet-style restaurant (approximately 12,980 square feet), two fast-food restaurants (approximately 2,118 square feet), and an entertainment lounge and a sports bar (approximately 10,012 square feet). AR 22. It will have space for administrative offices, building services, and employee services. AR 23. There will be three entrances from an existing thoroughfare offering easy access to and from a four-lane federal highway, and on-site parking will be provided for up to 3,352 cars, RVs, and buses. *Id.*

---

[2] The State of Michigan permits a substantial amount of Class III casino gaming, including three large State-regulated casinos. The State has also entered into compacts with eleven other Indian Tribes for the operation of Class III casino gaming. AR 4386; 10,518.

B.        The NEPA Evaluation Process

The BIA and the Tribe's experienced environmental consultant, Analytical Environ-
mental Services ("AES"), undertook an intensive review of the project's potential environmental
effects.  The first phase, during which the BIA reviewed and revised multiple drafts of the EA,
lasted from December 2001 to November 26, 2002, when a draft was published for public
comment.  AR 2935-3549.  The usual public comment period of thirty (30) days was extended to
seventy-five (75) days, until February 10, 2003.  *See* AR 804-12; 1062.  After reviewing the
comments it received, the BIA issued its final EA in December 2003.  AR 6 to 231.

The EA explains that the Tribe's proposed facility was designed specifically to minimize
any environmental effects.  For example, the preferred alterative would not directly affect any
wetlands, AR 90; no state or federally listed sensitive plants or wildlife species have been, or are
expected to be, found at the site, AR 92-93; and no significant historical resources will be
affected.  AR 93-94.  (Relevant portions of the EA are described in greater detail in the argument
section, in response to Plaintiff's specific contentions.)  The EA also considers in detail how
necessary resources and services will be obtained.  For example, the water supply will come
from on-site wells (existing or newly constructed), a water storage tank, and associated pipelines,
AR 24; wastewater service will be provided through an on-site treatment plant, *id*.; and fire,
police, and emergency response services will be supplied under service agreements with the
Allegan County Sheriff's Office, the City of Wayland, and the Wayland Area Emergency
Medical Services.  AR 17.

As the EA explains, the Bradley Tract is located in an area that is already zoned for light
industrial and commercial use, and the Tribe's project is consistent with past, present, and
projected future land uses.  The project site itself, along with its existing buildings, was

previously used to manufacture lawn products such as mulch and hydroseed mix.  AR 31.  The site is bordered by railroad tracks to the east and US Highway 131 to the west.  AR 36; 40.  East of the railroad tracks sits a seed and landscape supply company, and across 129th Avenue to the south are a small timber company and a transportation/freight operation.  *Id.*  Not surprisingly, local government officials have determined the facility satisfies Wayland Township's Zoning Ordinances and the Wayland Township Land Use Plan.  AR 834.  In short, the site is perfect for the Tribe's proposed use.

That conclusion was reinforced during the extensive public comment period, during which the BIA received comments on the EA and the proposed project from regulatory agencies, local governments, and members of the general public.  Naturally, some commenters, such as Plaintiff MichGO, opposed the project.  However, many commenters, including local governments, area residents, and local civic organizations, concluded the project will benefit the community.  AR 833; 834; 840; 841-42; 884; 886; 892; 893; 894; 895; 904-05; 906; 923; 924-26; 928; 937-38; 941-42; 1024-29; 1055-56.  For example, local unions (such as the International Electrical Brotherhood of Workers and the Plumbers, Pipefitters & HVAC's Local Union 357) and business organizations (such as the Barry County Economic Development Alliance and the Gun Lake Area, Wayland Area, and Barry County Area Chambers of Commerce) supported the project because of its anticipated economic benefits.  *See, e.g.*, AR 840; 894; 895; 906; 923; 928.  Local law enforcement organizations likewise supported the project.  AR 941; 942.

Wayland Township (which currently has jurisdiction over the land) and the adjacent Dorr Township commented that the "site chosen is well-suited for a casino," and praised the EA's "continued respect for the natural characteristics of the location."  AR 834; 886; 884; 926.  The Allegan County Public Schools and Allegan County Health Department also voiced their

support, based in part on the community's "dire need of increased employment opportunities" and the evidence that both neighboring property and the surrounding environment will be "adequately protect[ed]."  AR 893; 904.  At the state level, the Majority Floor Leader of the Michigan House of Representatives and the State Senator for the 4th District submitted letters of support.  AR 1023; 1055-56.  In December 2002, the State House of Representatives and Senate overwhelmingly approved resolutions approving, and urging the governor to sign, a compact with the Tribe for the operation of gaming at the Bradley Tract.  AR 841-43; 1023; 1055-56.

The BIA carefully considered and responded to all the comments it received.  The agency provided individual responses to forty-three comments which raised distinct substantive issues.  See AR 1062-1145.  For the remaining comments, it identified common themes (e.g., concerns about gambling addictions, economic impacts, etc.) and responded to each category of concerns.  AR 1146-1203.  Where appropriate, the BIA refined and modified the EA in light of these comments.  Id.; AR 1105-06.  As noted above, the BIA issued its final EA in December 2003, approximately eight months after the end of the public comment period.

C.    The Secretary's Decision

After this intensive review, and taking into account various mitigation measures designed to minimize environmental effects and described in the EA, the BIA concluded the Tribe's project would not significantly impact the environment.  On February 27, 2004, the Deputy Assistant Secretary for Indian Affairs signed a formal Finding of No Significant Impact, or "FONSI."[3]  AR 1461-63.  In light of that finding, the EA prepared by the BIA and the Tribe

_____

[3]  As noted above, the NIGC participated as a cooperating agency in the BIA's NEPA review.  Relying on the same EA, the NIGC issued its own FONSI (see 40 C.F.R. § 1508.13) on September 21, 2005, attached hereto as "Exhibit A."  As a matter of longstanding practice, however, the NIGC will not take final action on the Tribe's request for approval of its gaming management contract until the Secretary has actually taken land into trust for the Tribe.  Because

satisfied NEPA, and the agency was not required to prepare an Environmental Impact Statement ("EIS") before deciding whether to take the Bradley Tract into trust for the Tribe.  On April 18, 2005, the Secretary formally decided to take the land into trust.  That decision was published in the Federal Register on May 13, 2005.  70 Fed. Reg. 25,596-597 (May 13, 2005).  This lawsuit, however, followed soon thereafter.  Although Plaintiff has neither sought nor been granted a preliminary injunction, the Department of Justice has, to date, voluntarily agreed, on behalf of the United States, not to implement the Secretary's decision pending the outcome of this litigation.  Accordingly, the lawsuit has had, and continues to have, the effect desired by Plaintiff:  delaying, and thereby jeopardizing, the Tribe's ability to move forward with its plans to achieve economic self-sufficiency, stability, and self-determination as intended by IGRA.

## STANDARD OF REVIEW

In cases challenging an agency's action under the APA, judicial review is properly based upon the administrative record, and the issues to be resolved are questions of law.  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001); *City of Auburn v. United States*, 154 F. 3d 1025, 1032 n.8, 1032-33 (9th Cir. 1998).  In the context of NEPA in particular, whether an agency's FONSI should be upheld, on the basis of a fixed record, can and should be decided by dispositive motion, because there is no genuine issue of material fact.  Courts dispose of such claims pursuant to motions brought under Federal Rules of Civil Procedure 12(c).  *See*, *e.g.*, *Sumner Peck Ranch v. Bureau of Reclam.*, 823 F. Supp. 715, 737 (E.D. Cal. 1993) ("judgment on the pleadings [Rule 12(c)] must be granted as against Plaintiffs' claims regarding alleged NEPA violations"); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 138, 171 (D.D.C.

---

the NIGC was a cooperating agency and assisted in preparing the EA at issue in this litigation, 40 C.F.R. §§ 1501.6, 1508.5, the Tribe respectfully requests that the Court take judicial notice of the NIGC FONSI pursuant to Fed. R. Evid. 201.

2002) (disposing of NEPA claim under Fed. R. Civ. P. 56), *aff'd,* 348 F.3d 1020 (D.C. Cir. 2003), *cert. denied,* 514 U.S. 974 (2004).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) "requires that the movant show, at the close of the pleadings, that no material issue of fact remains to be solved, and that he or she is clearly entitled to judgment as a matter of law." *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987). Judgment on the pleadings is appropriate where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 99 (D.D.C. 2004).

## ARGUMENT

### I.    THE SECRETARY COMPLIED WITH NEPA BY TAKING A "HARD LOOK" AT THE ENVIRONMENTAL CONSEQUENCES OF HER ACTION.

Plaintiff challenges the Secretary's determination that the Tribe's project will not have "significant environmental impacts" within the meaning of NEPA. Compl. ¶¶ 30; 35; 37. The administrative record amply supports the Secretary's conclusion. As it shows, the BIA identified the areas of possible environmental concern raised by the conversion of an existing light industrial site into a gaming facility; it took a "hard look" at the potential effects in each area; and after conducting that evaluation, it concluded the proposed action would have no significant

environmental impact.    Plaintiff cannot show there was anything arbitrary, capricious, or unlawful about the Secretary's process or her decision, and Defendants are entitled to judgment on Plaintiff's NEPA claim.

As the record shows, the Secretary's decision to take land into trust for the Tribe's gaming project is remarkable for its *utter lack* of significant environmental impacts.  The land selected—an industrially-zoned tract with existing unused factory and warehouse buildings, located between a railroad line and a highway interchange—is particularly suitable for the proposed use.  In addition, the Tribe has demonstrated its commitment to minimizing impacts, both by carefully selecting the site and by partnering with the local community to address any possible effects, whether environmental or socioeconomic, and whether actual or merely perceived.  While Plaintiff alleges the project will harm the local economy, the record shows otherwise:  by creating jobs and infusing the area with millions of dollars of new revenue every year, the Tribe's venture will be an economic boon for a community suffering from high unemployment and governmental budget crises.  Unsurprisingly, there is support for the project at every level of local government—from the Township, nearby municipalities, and the County (including the local school district and sheriff's department).  In fact, not a single unit of government with jurisdiction in the area—local, state or federal—has opposed the project.

Moreover, far from violating NEPA, the BIA's balancing of competing concerns in this case is a classic example of NEPA at work.  Without losing sight of the purpose of the proposed action, which is to foster the economic welfare and self-sufficiency of a historically-deprived Indian tribe, the BIA considered various ways in which development of a 194,000-square foot gaming and entertainment facility at the 146-acre site could impact the surrounding environment. Among other issues, the BIA considered the facility's potential effects on "biological resources,"

11

analyzing possible impacts on wetlands on and beyond the site; it considered the project's potential effects on "traffic and transportation," considering whether a facility designed to attract 8,500 patrons per day could burden surrounding roads and highways; and it analyzed the project's growth-inducing effects, evaluating whether the casino's infusion of jobs and revenues could lead to new residential and growth that the area could not readily accommodate. On the basis of an Environmental Assessment ("EA") evaluating these and other issues, and the Tribe's commitment to responsible development, the BIA ultimately concluded the project would have no potentially significant effect on the environment. It did so only after consulting local governments and relevant regulatory agencies; soliciting and considering input from the public and outside agencies; evaluating possible alternatives; and requiring specific measures to mitigate particular possible effects. Because the agency's conclusion was carefully and reasonably reached, its decision must be upheld.

### A.    Judicial Review Under NEPA And The APA

NEPA is a "procedural statute that mandates no substantive results." *Sierra Club v. Watkins*, 808 F. Supp. 852, 859 (D.D.C. 1991) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)). It requires agencies to take a "hard look" at the environmental consequences of actions before taking or approving them. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The statutory procedures include preparation of an EA analyzing whether a particular action could significantly affect the environment. 40 C.F.R. §§ 1508.9, 1508.13. If the EA finds the project, either as initially proposed or as modified with mitigation measures, will not affect the environment to a significant degree, the

agency may issue a Finding of No Significant Impact ("FONSI"), as the BIA did here. *Id.*; *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682-83 (D.C. Cir. 1982).[4]

"[S]o long as the agency has taken a 'hard look' at an action and has followed NEPA's procedures, its substantive decision will not be overturned by a court unless it is arbitrary, capricious, or an abuse of discretion." *Sierra Club v. Watkins*, 808 F. Supp. at 859 (citing *Marsh,* 490 U.S. at 377). The party challenging agency action bears the burden of proof. *City of Olmstead Falls, Ohio v. Federal Aviation Administration*, 292 F.3d 261, 271 (D.C. Cir. 2002). A reviewing court "is deferential to the administrative agency," "presumes the agency action to be valid," and will respect the agency's decision absent a "clear error of judgment." *Young v. General Services Admin.*, 99 F. Supp. 2d 59, 66 (D.D.C. 2000), *aff'd*, No. 00-5240, 2000 U.S. App. LEXIS 38685 (D.C. Cir. Dec. 14, 2000). Stated otherwise, the court may not substitute its judgment for that of the agency. *Conservation Law Foundation v. Mineta*, 131 F. Supp. 2d 19, 25 (D.D.C. 2001) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Even if "the Court itself might have made different choices," so long as the agency follows proper procedures and its "reasons and policy choices . . . conform to 'certain minimal standards of rationality,'" its action "must be upheld." *Mineta*, 131 F. Supp. 2d at 25 (quoting *Small Refinery Lead Phase-Down Task Force v. United States EPA,* 705 F.2d 506, 521 (D.C. Cir. 1983)).

---

[4] Plaintiff takes particular issue with the agency's issuance of a FONSI dependant upon mitigation, however, NEPA specifically contemplates "mitigated FONSIs." *See Cabinet Mountains*, 685 F.2d at 682. As shown below, Plaintiff mischaracterizes the EA's analysis of that mitigation, which is fully enforceable vis-à-vis the Tribe. *See infra* Argument Part II.D.

B.    **The BIA's FONSI Reflects Its Active Participation Throughout The NEPA Process.**

Plaintiff claims the BIA, the lead federal agency in the environmental review, abdicated its responsibility to independently evaluate the project's effects.  Compl. ¶ 30.  This allegation is apparently based on the fact that the Tribe engaged an outside environmental consultant to prepare the EA.  Compl. ¶¶ 37; 50-51.  It is, however, normal and appropriate for an applicant seeking federal action to prepare the environmental assessment relating to that action.  Indeed, the NEPA regulations promulgated by the Council on Environmental Quality ("CEQ")— regulations to which the courts owe substantial deference, *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979) ("CEQ's interpretation of NEPA is entitled to substantial deference.")—specifically contemplate preparation of the assessment by the applicant, so long as the agency independently evaluates the document and takes final responsibility for its scope and content.  40 C.F.R. § 1506.5(b); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 165-167 (D.D.C. 2002), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003), *cert. denied* 514 U.S. 974 (2004).  And the BIA's NEPA procedures actually *require* project applicants to prepare the environmental documentation.  *See* 30 BIAM Supplement 1, NEPA Handbook, § 4.2.B (1993) ("When the proposed Bureau action is a response to an externally initiated proposal . . . the applicant will normally be required to prepare the EA . . . ."), attached hereto as "Exhibit B."[5]

A federal agency satisfies NEPA so long as it "participates actively and significantly in the preparation and drafting process" and "bear[s] the responsibility for the ultimate work product." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974); *see also City of Roseville v. Norton*, 219 F. Supp. 2d 130, 165-67 (D.D.C. 2002); *State of Idaho v. Interstate Commerce Commission*,

---

[5]  The Tribe respectfully requests that the Court take judicial notice of 30 BIAM Supplement 1, NEPA Handbook, § 4.2.B (1993), pursuant to Fed. R. Evid. 201.

35 F.3d 585, 595-96 (D.C. Cir. 1994) (agency must itself weigh economic and technical benefits of proposed action against environmental costs); 40 C.F.R. § 1506.5(b). That is precisely what occurred here. *See, e.g.*, AR 1102; 1931-59.[6]

Herb Nelson, Environmental Specialist for the BIA's Midwest Region, along with other members of his office and staff from the BIA's Central Office, spent approximately three years defining the proposed action, evaluating the conditions at the proposed site, and analyzing the potential effects of a gaming facility there. *See infra* Argument Parts I.C-D and note 6. The effort included "repeated[]" consultations with the Gun Lake Tribe and its lead environmental consultant in the form of meetings, visits, countless telephone calls, the provision of written comments, and the exchange of marked-up draft documents. AR 1111-12; 7281-7318; 7490-7521; 7867; 8278-8310; 8516-17; 8569-8601; 8602-8754. Preliminary drafts of the EA were repeatedly prepared, circulated, and marked-up by the BIA's Midwest Regional Office and its Central (Headquarters) Office (as well by the NIGC, which was cooperating in the review). *See infra* note 6; AR 1111-12. After reviewing and approving the draft EA and releasing it for public comment, the BIA considered the comments received and, as a consequence, directed that the EA be expanded, corrected and refined. AR 1111-12; 1120. The agency conducted a final review of the EA to ensure all necessary changes were, in fact, made, and then prepared a FONSI. AR 3-5; 1372-73; 8602-03; 8761-63; *see* 1461-63.

Far from constituting a "rubber stamp" of the Tribe's environmental review, the FONSI was the culmination of the BIA's pervasive involvement in that review. Notably, while the BIA

---

[6] *See also* AR 1110-12; 1331; 1465; 1466-70; 1935; 1936; 1938; 1939; 1940; 1947-48; 1955; 7159; 7281-7319; 7490-7521; 7867; 7882; 7883; 7908; 7915-37; 7944; 7955-56; 8213-76; 8278-8310; 8516-17; 8518; 8569-8601; 8602-8754; 8755; 8756; 8866; 8932;-64; 8966; 1104 ("EA belongs to the BIA, not the Tribe."); 1107-08 (BIA made "its own evaluation of the environmental issues and take[s] responsibility for the scope and content of the EA . . . [and] in fact rigorously reviewed the EA throughout the NEPA process").

solicited input on the draft EA from nearby tribal governments, federal, state and local agencies, and other entities with jurisdiction over a specific resource, AR 192-98, none contended the EA "lacked objectivity," as Plaintiff claims here.  AR 1112.  In sum, there was nothing nefarious about the NEPA process here.  Plaintiff's speculation and innuendo is insufficient to defeat the well-established presumption of regularity to which the agency and the record are entitled.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Akiak Native Community v. United States Postal Service*, 213 F.3d 1140, 1146 (9th Cir. 2000).

> **C.    As The Record Shows, The BIA Properly Concluded The Tribe's Proposed Gaming Facility Will Have No Significant Environmental Effects.**

Plaintiff contends the EA and its supporting documentation do not support the agency's conclusion that the Tribe's casino project will not significantly affect the environment.  Compl. ¶¶ 42-99.  That contention fails.  The EA thoroughly examined the potential impacts of the facility, concluded the project would not have significant environmental impacts under NEPA, and the document fully supports the FONSI.

The D.C. Circuit has articulated a four-part framework to facilitate the judicial review of a FONSI under the arbitrary-and-capricious standard.  The court should consider:  1) whether the agency identified the relevant areas of environmental concern; 2) whether the agency took a "hard look" at the potential environmental effects; 3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and 4) if there was an impact of true significance, whether the agency identified any changes to the project (or mitigation measures) that would eliminate any identified impacts or reduce them to insignificance.  *Cabinet Mountains*, 685 F.2d at 682-683.  The EA here easily satisfies this test.

### i.    The EA Identified And Evaluated Every "Relevant Area of Environmental Concern"

The EA identified seven broad categories of possible concern, and evaluated potential environmental threats in each area. The categories included "land resources," "water resources," "biological resources," "historic properties and religious freedom," "socioeconomic/environ-mental justice," "resource use patterns" (including land use, air quality and traffic impacts) and "other values" (which included an evaluation of noise and public health and safety). AR 36-83. As shown below, the EA also evaluated the indirect impacts of the proposed project, its cumulative impacts, and alternatives to it. AR 135-83. On the basis of this analysis, the BIA reasonably concluded the proposed gaming facility would not significantly affect the environment. Plaintiff identifies no additional area of "environmental concern" the agency failed to analyze. As shown below, the BIA took a "hard look" at every area of concern, including the impacts alleged by Plaintiff.

### ii.    The Agency Reasonably Found The Conversion Of Empty Buildings Into A Gaming Facility, On A 146-Acre Site Zoned For Industrial Use, To Be Compatible With The Area's Land Use.

Plaintiff distorts the record to suggest the proposed project is "out of all proportion" to the local community, Compl. ¶ 55, and that a gaming facility constructed on the 146-acre site would consume vital farmland. *Id.* at ¶¶ 58; 59. In truth, the Bradley Tract could not be more appropriate for the Tribe's proposed gaming facility. The site is zoned for light industrial use, and, having previously been used to manufacture lawn products, contains a large, empty warehouse and factory building that will be converted to house the gaming facility. AR 36-38; 78-124; 124-25; 1086-87. The proposed site is located between a railroad track and a four-lane federal highway and interchange that will facilitate the movement of traffic to and from the facility. AR 22; 73-75; 834; 1068; 1082-83; 1150-51; 1171 (three entrances to the casino would

17

be located along 129th Avenue between adjacent highway and railroad tracks). None of the land

is currently farmed. AR 36-37; 76. It would be difficult, therefore, to imagine a location *more*

*appropriately suited* to the Tribe's venture. Wayland Township, the local government with

responsibility for regulating land use in the area, agrees, AR 126, and has notified the BIA it

believes the project is entirely consistent with local zoning and land use plans. AR 124-25; 834;

1068; 1079; *see also* 1115.[7]

To the east and south of the property, there exist industrial-type businesses, including a

small lumber company, a trucking company, and a seed and landscaping supply business. AR

36. Moreover, the proposed facility would leave most of the site undeveloped, AR 125, belying

Plaintiff's allegation that the project will cause the significant "loss of open space" and

"urbanization of the area." Compl. ¶ 62. While there is one residence north of the site, it is

shielded by vegetation, and in any event has already been subject to the preexisting industrial

uses of the tract. AR 125. Construction of the project would not create any new conflicting land

use. *Id*. And, as noted, the project would leave more than two-thirds (or 100 acres) of the 146-

acre site in its current state, providing a buffer between the gaming venture and surrounding land

uses. This includes a line of trees between the casino site and the one residence to the north,

which will remain undisturbed. AR 40; 125-26.

The fact that the project will leave 68% of the site undeveloped also reveals the fallacy of

Plaintiff's argument that the casino will be "massive" and "inconsistent" with area residents'

"use and enjoyment of their property." Compl. ¶¶ 58, 59. The facility itself will be 194,000

square feet, AR 23, consuming just 4.5 acres of the 146-acre trust site. That the site—which is,

---

[7]  Several members of the commenting public noted the construction of a gaming facility on the
industrial site was a far better land use than an industrial-type factory. *See* AR 1171; 1172;
1176-77.

in Plaintiff's words, "more than five times larger than the parcel holding the Pentagon"—will remain largely undeveloped only shows that the proposed project will minimally affect the character of the surrounding community. Compared to trust lands that Plaintiff characterizes as large, the comparatively small gaming facility—taking up less than 4% of the tract, or 32% when parking and the wastewater plant are taken into account—could not possibly have the deleterious impact Plaintiff imagines.

Finally, and contrary to Plaintiff's assertion, Compl. ¶ 59, the EA specifically considered the project's impact on surrounding farmland, including farmland identified as "prime and unique" or "locally important." AR 75-76; 125-26. The EA concluded the project would convert forty-five acres of farmland to non-agricultural use (the bulk of it for parking), but would affect no federally-designated "prime" or "unique" farmland, and only twenty-one acres, or .011% of the Allegan County farmland designated as "locally important." AR 126. The BIA reasonably concluded such a conversion is "relatively small," and thus not significant. *Id*. The site has not been farmed for years, and the area is already used and zoned for light industrial development. *Id*. Accordingly, BIA reasonably found the proposed project would neither interfere with existing land use nor significantly impact the community's farmland. *See* AR 126; 1461 at ¶ 4.

### iii. The EA Evaluated Biological Resources, Including Wetlands, And Reasonably Found No Significant Impacts With Identified Mitigation.

Plaintiff alleges the casino will adversely affect wetlands, Compl. ¶ 56, but it cannot meet its burden of proving that the Secretary's contrary conclusion was arbitrary or capricious. The EA thoroughly considered the project's potential effects on "waters of the United States," including wetlands—both on and beyond the proposed trust land—and found those impacts

would be avoided or rendered insignificant with specifically identified mitigation measures.  AR 50-52; 90-92; 187-88; 318-440.

After noting the existence of 6.25 acres of wetlands and other "jurisdictional waters" on the 146-acre site, the EA concluded that any possible impact to the protected wetlands and waters would be minimal.  AR 90; *see also* AR 1087-88 (describing wetlands impact as "very small").  It found the Tribe's casino project would not "directly disturb" the creek that runs through the site or the wetlands that exist there.  AR 90; 1091-92; 1093; 1099-1101.  That is because "no development is proposed within these 'environmentally sensitive' areas."  AR 1086.

The parking lot would come close to certain wetlands.  However, the Tribe specifically designed the lot to avoid them, and it also committed to specific mitigation measures, described in the EA, to prevent the lot's construction and operation from even *indirectly* impacting such wetlands.  AR 187-88; 345-48.  Such mitigation included, in part, (1) the use of a sediment erosion control plan, "enforceable under a NPDES permit issued by the EPA"; (2) the sitting of all construction staging areas away from all waterways and wetlands; and (3) the construction of a 120-foot long retaining wall on the parking lot to prevent disturbance of the nearby wetland area.  AR 187-88; 1125-26; *see also* 1136.  The BIA conditioned its FONSI, and consequent approval of the project, on the implementation of these and other measures.  AR 1461.

The EA also considered the project's potential impacts on wetlands beyond the proposed reservation's borders.  It concluded that road improvements on 129th Avenue (recommended by the State's DOT to facilitate the movement of casino-generated traffic) would directly impact .44 acres of wetlands in ditches just north and south of the roadway—wetlands that are within the State's jurisdiction.  AR 90; 1124.  As described in the EA, the Tribe is committed to undertake appropriate protective measures, under the authority of the Michigan Department of Environ-

20

mental Quality ("MDEQ"), which possesses direct jurisdiction over the identified wetlands.  AR

187-88.  The EA expressly indicates that all wetland mitigation "is enforceable by the MDEQ or

the [United States Army] Corps [of Engineers.]"  AR 188; *see also* 1123; 1125-27.

> **iv.    Contrary to Plaintiff's Assertions, The EA Reasonably Found The Project
> Would Not Cause Significant Nighttime Lighting Impacts.**

The EA evaluated the project's potential visual effects, with particular focus on the

"nighttime light impacts" the casino might pose for the area.  AR 78-79; 130.  While the EA

found the increased traffic attributable to the casino would "increase nighttime light impacts in

the vicinity of the affected roadways," AR 130, it reasonably concluded such impacts would not

be significant because most of the traffic would converge "in the vicinity of the project site," and

the few residences that do exist in the area "are set back from the roadway."  AR 130.  In

addition, the EA noted that the area is already subject to nighttime lighting from traffic along the

federal highway and 129th Avenue, not to mention the recent operation of the industrial facility

on the proposed trust site.  *Id*.  Finally, as described in the EA, the Tribe will design the facility

consistent with Wayland Township's design standards, and, to further minimize lighting impacts,

it will direct lights in parking areas toward the ground.  *Id.*

> **v.    The EA Evaluated The Project's Potential Traffic Impacts, Under Existing
> And Cumulative Conditions, And Found No Significant Impacts With
> Identified Road Improvements.**

Plaintiff suggests the project would create significant, adverse traffic impacts, Compl. ¶

63, but again it cannot meet its burden of proving that the Secretary's conclusions regarding

traffic impacts were arbitrary and capricious.  The BIA specifically evaluated whether the

gaming facility would adversely affect traffic flows and—with the imprimatur of a traffic

engineering consultant and the state transportation agency—concluded that none would be

significant, particularly in view of the Tribe's commitment to mitigation measures.  The EA

analyzed the project's potential effects on "transportation networks," and in particular questioned whether a gaming facility projected to draw 8,500 patrons per day could adversely affect the flow of traffic on surrounding roads.  AR 64-70; 103-17.  To answer this question, the Tribe retained a respected traffic engineering firm (URS Corporation ("URS")) to develop and conduct a traffic study.  URS conducted the requisite analyses with input from the relevant regulatory agencies, including the Michigan Department of Transportation ("MDOT") and the Allegan County Board of County Road Commission (which together possess both particular traffic expertise and jurisdiction over the roads surrounding the project).  AR 441-517; 585-90; 1077; 1082-83.

URS' study (Gun Lake Casino Traffic Study, dated November 2, 2001) evaluated the potential impacts of casino-related traffic under existing and future conditions on surrounding intersections and roads, taking into account cumulative increases in traffic.  AR 472; *see also* AR 585-90.  The study identified the traffic that would likely be generated by the Tribe's casino, AR 109, and concluded there would be increases in traffic, but also found that such traffic would be sufficiently distributed on surrounding roads so as to allow the free flow of traffic in all direc-tions during the morning peak traffic period, under existing and future conditions.  AR 115.  The study did find that the infusion of casino traffic could affect the flow of afternoon rush hour traffic in two directions at two intersections near the project site.[8]  *Id*.  With continued input from the state and local government agencies with the relevant traffic expertise (and MDOT in

---

[8]  In particular, the study found that casino-generated traffic would operate at acceptable levels of service in all directions at nearby intersections during the morning peak period.  AR 115.  As for the afternoon peak period, it found the traffic would flow acceptably in four of six directions, but that traffic would be adversely affected in the remaining directions (southbound at the US-131/129th Avenue ramp and northbound at the US-131 Avenue ramp).  *Id*.  As discussed below, the Tribe is committed to mitigating these adverse impacts at its own expense.  *See infra* Argument Part II.D.

particular), URS identified road improvements that would either eliminate the projected traffic congestion at the identified intersections or alleviate it to the satisfaction of the MDOT, which retains continuing jurisdiction and permitting authority over the roadway. As the EA explained, the MDOT could impose additional road improvements should it determine they were necessary. AR 189-90; 475; 1078; 1082-83; 1462 at ¶ 6.

Consistent with the traffic consultant's recommendations, the Tribe is committed to implementing the following improvements, which the MDOT and Allegan County have concluded will alleviate the anticipated impacts:

- Install a four-way stop at the US-131 southbound ramps/129th Avenue intersection in which most of the traffic is expected to traverse. (As the EA notes, the MDOT may require the Tribe to install a traffic signal if it concludes such is necessary based upon actual (as opposed to estimated) traffic volumes);

- Construct a right turn lane from the northbound US-131 off-ramp turning eastbound onto 129th Avenue, which will facilitate traffic flow;

- Construct a continuous, and exclusive bi-directional center turn lane on 129th Avenue at all three casino driveways;

- Construct westbound-to-northbound right turn flares on the 129th Avenue at all three casino driveways.

AR 189-90; 475; 585-90; 1102-03; 1126-27; 1135; 1136. The BIA's FONSI was made contingent upon the above mitigation and MDOT's permitting process. AR 1461 at ¶ 3.

Traffic congestion appeared to be a concern among those who commented on the EA, with a few commentators questioning the assumptions underlying URS' study. AR 836-37; 1069-90; 1103; 1133-36. Of course, the mere existence of disagreement regarding an agency's findings does not render them arbitrary and capricious, *City of Alexandria v. Virginia*, 198 F.3d 862, 867 (D.C. Cir. 1999), and agencies are free to rely upon the experts of their choice. *Marsh*, 490 U.S. 360, 378 (1989). Moreover, URS' methodology made sense. To conduct the study, and with input from local government officials (including state and county transportation

agencies, AR 585-90), URS first identified the existing "level of service"[9] during the "AM peak" and "PM peak" hour[10] for the surrounding intersections and roadways potentially affected by traffic drawn to and from the casino.  AR 65-66; 447-48.  As to those intersections, it then evaluated whether the level of service would deteriorate to an unacceptable degree with the addition of casino-related traffic (under existing traffic conditions and under cumulative, future conditions).  AR 447-72.

With respect to the study's underlying assumptions, the EA explained the procedures used to calculate the "trip generation rate," which is the estimated number of vehicles calculated to arrive at, and leave, the casino during peak travel periods.  AR 108-10.  As the EA explained, the projected trip generation rate was primarily based upon data collected from another Indian gaming facility in Michigan, the Turtle Creek Casino, in light of nearby population centers.  AR 109; 1135.  That casino was selected because of its similarity to the Tribe's proposed casino; specifically, like Gun Lake's planned facility, it abuts a state highway, it is situated in a similar setting with tourism in the area, and its casino features two restaurants.  AR 109.

In evaluating the facility's overall trip generation rate, the EA reasonably assumed that most restaurant patrons would be casino patrons as well, meaning the restaurant would draw fewer customers (and possess a lower trip generation rate) than the casino itself.  AR 109-10.

---

[9]  "Level of service" ("LOS") is a qualitative measure that refers to the average delay drivers experience at intersections.  AR 66.  An intersection is assigned a particular LOS—ranging from A to F (with A representing the best)—depending upon the time it takes to navigate it.  Although Allegan County has no LOS standards for its roadways, the Federal Highway Administration typically considers LOS "C" to constitute acceptable performance.  Accordingly, the EA concluded a particular intersection or roadway would operate acceptably if the performance satisfied the MDOT or Allegan County Road Commission, or it operated at an LOS "C" or better.  AR 66.

[10]  As the EA explained, "peak [travel] hours are analyzed because they depict the worst-case scenarios of traffic each day."  AR 109.

24

However, in order to proceed conservatively (from the standpoint of overestimating impacts), AR 1135, the trip generation rate derived from Turtle Creek's casino was adjusted upwards by 25%, to account for the Gun Lake casino's larger size and its closer proximity to population centers. AR 109. In the end, it was concluded the casino would generate 1,110 vehicle trips (685 entering, and 425 exiting) during a typical PM peak hour of casino traffic (6 p.m. to 7 p.m.) on a typical weekday.[11] AR 109-10.

After estimating the traffic the casino would generate during peak travel hours, and with input from the relevant state and local traffic agencies, the EA evaluated the most likely distribution of the new traffic on surrounding roadways, with consideration of population centers and the likely origin/destination points. AR 111. Minor adjustments to trip distribution were made to account for the nearby competing casinos. Based on this analysis, the EA concluded, with the agreement of MDOT and the County, that most patrons visiting the facility would travel along U.S. Highway 131 and then only a few hundred yards along 129th Avenue to the project site, off of which no residents are located. AR 37-38; 109-11. That traffic flow would lead to congestion at two intersections, but BIA concluded, with the endorsement of MDOT and County, that such impacts would be eliminated with mitigation.

Despite the conclusion that there would not be any unmitigable traffic impacts of any significance near the proposed casino—the point where all casino-generated traffic would necessarily converge—the BIA again decided to proceed conservatively, and expanded the scope

---

[11]   Further underscoring the conservative nature of the Gun Lake trip generation rate (from the standpoint of overestimating casino-generated traffic), the trip rate for another Indian casino nearly double the size of Gun Lake's, which is also located on an interstate in Michigan, was predicted to generate less than half the cars as Gun Lake, with 492, as compared to Gun Lake's anticipated trip rate of 1,110 cars per afternoon peak hour. AR 1103*; see TOMAC v. Norton*, No. Civ.A. 01-0398, 2005 U.S. Dist. LEXIS, at *16 (D.D.C. Mar. 24, 2005), *aff'd*, No. 05-5206 (D.C. Cir. Jan. 6, 2005) (upholding entire BIA analysis).

of the traffic analysis (at the request of one town) to evaluate potential casino-related traffic impacts in Hopkins, Michigan. AR 115-16; 509-17; 1090; 2435-43. This expanded study, with the input and concurrence of the MDOT and the Allegan County Road Commission, concluded that the Hopkins area would suffer no significant traffic impacts. AR 115-16; 509-17; 1090.

In sum, the BIA proceeded conservatively when evaluating casino-generated traffic flows, and reasonably found no significant impacts would result with the implementation of specific mitigation under the authority of the relevant local and state agencies. Its conclusion was not arbitrary or capricious.

###### vi.    The EA Reasonably Concluded The Project Would Not Significantly Affect Air Quality Under Existing Or Future Conditions.

Plaintiff finds no fault with the manner in which the air quality analysis was conducted for the EA.[12]  Rather, Plaintiff argues the EA and FONSI are somehow retroactively defective because, under attainment standards adopted after the FONSI issued, Allegan County was deemed "non-attainment" for eight-hour ozone.[13]  Compl. ¶¶ 54, 80. In essence, Plaintiff seeks to saddle the BIA with special restrictions that did not apply when the agency issued its FONSI (and may never apply to the area under consideration). This argument fails for two reasons. First, NEPA does not require agencies to consider regulatory standards that have not been (and

---

[12]   The EA evaluated whether the project's construction and operation could significantly affect Allegan County's air quality, and reasonably concluded it could not. AR 71-73; 117-24. The Tribe retained a respected consultant, SME, with the necessary air-quality expertise to conduct the study. AR 718-84; 8826-47.

[13]   Pursuant to the federal Clean Air Act, the U.S. Environmental Protection Agency ("EPA") has established National Ambient Air Quality Standards ("NAAQS") reflecting the maximum concentration levels of particular pollutants ("criteria pollutants") allowable to protect public health. 42 U.S.C. § 7509 (Supp. III 1991). A region that fails to attain the NAAQS for a certain criteria pollutant is deemed a "non-attainment area" for that pollutant. Allegan County was an attainment area for all six criteria pollutants when the EA was prepared and FONSI was issued. AR 118; 1462 at ¶ 6.

26

may never be) adopted. Second, the BIA diligently considered whether the new standard significantly affected the FONSI, and properly concluded that it did not. Accordingly, Plaintiff cannot meet its burden to prove that the Secretary's conclusions regarding air quality were arbitrary and capricious.

The consultant's air quality analysis adhered to the procedures outlined by the EPA and Federal Highway Administration for purposes of evaluating the air impacts of such projects. Accordingly, the EA considered all state and federal air quality standards that applied at the time the analysis was conducted. Nothing in NEPA or the regulations required speculative analyses concerning standards that did not apply at the time; and "[e]specially in drawn-out cases such as this, reassessments must end at some point." *See TOMAC v. Norton*, No. Civ.A 01-0398, 2005 U.S. Dist. LEXIS 4633, at **11-13 (D.D.C. Mar. 24, 2005), *aff'd*, No. 05-5206 (D.C. Cir. Jan. 6, 2006);[14] 40 U.S.C. §§ 4321-4370f; 40 CFR §§ 1500.1-1518.4. Moreover, even though Allegan County was designated as a non-attainment area (again, two months after the FONSI), these new standards still do not apply to Allegan County. Congress amended the Clean Air Act to clarify that the new ozone standard will not apply to southwestern Michigan until at least 2007. Energy Policy Act, Pub. L. No. 109-58, § 996, 119 Stat. 594 (2005). This moratorium was enacted to allow the EPA to further evaluate whether the new standards should ever be imposed in southwestern Michigan. Thus, even with hindsight, the EA cannot be deemed "arbitrary and capricious" merely because it did not consider standards that did not apply when the analysis was conducted, and that, depending on the EPA's evaluation, may never apply at all.

---

[14]   On the date of this filing, the United States Court of Appeals for the District of Columbia issued its decision in *TOMAC v. Norton,* No. 05-5206 (D.C. Cir. Jan. 6, 2006), wherein the Court of Appeals affirmed the district court's decision, thereby upholding the Secretary's decision to take land in southern Michigan into trust for the Pokagon Band Of Potawatomi Indians for the purpose of operating a casino. Given the late notice, the Tribe will discuss this decision in further detail in a subsequent filing.

Moreover, even assuming the EPA ultimately decides to apply the new standards to Allegan County, the BIA conducted appropriate supplemental analyses to consider the new standard and confirm that its FONSI remained valid in light of that standard. AR 1282-84; 8866-68. Specifically, SME conducted additional modeling for the ozone precursors attributable to the casino project (VOCs and NOX), under existing and cumulative conditions, AR 8826-47, and found the direct and indirect emissions were well below the federal threshold of 100 tons/year. AR 8827; *see* 40 C.F.R. § 51.853(b)(1); 40 C.F.R. § 93.153. Obviously, if the thresholds are not exceeded, the action is presumed to comport with the State's plan for attaining the NAAQS (called the State Implementation Plan (or SIP)), evidencing a less than significant impact. 40 C.F.R. § 51.853; *Border Power Plant Working Group v. Department of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003). Based on this supplemental analysis, the BIA took a "hard look" at the non-attainment designation, reaffirmed that "the air quality analysis conducted as part of the Gun Lake EA was appropriate and fully supports the BIA's Finding Of No Significant Impact" and determined that there was no need to prepare a supplemental EA. AR 8866; 8867-68.

In sum, the EA's air analysis supported the FONSI, having properly evaluated the project's potential air impacts under the standards that then applied. The BIA thereafter diligently re-evaluated its FONSI under the eight-hour ozone standard—a standard that does not now apply and that may never apply to Allegan County—confirming its FONSI would remain valid under that standard. Consequently, Plaintiff cannot show the Secretary acted arbitrarily and capriciously by adhering to the FONSI without preparing a supplemental EA. *TOMAC*, 2005 U.S. Dist. LEXIS, at *11 (supplemental EA is only required under "seriously different" circumstances, and the decision to supplement is reviewed under the "arbitrary and capricious" standard); *see also Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218 (10th Cir. 1997)

("decisions not to supplement an . . . EA will only be reversed if the agency decision is found to have been arbitrary and capricious"); *cf. Marsh*, 490 U.S. at 376 (decision whether to prepare supplemental EIS is subject to arbitrary and capricious review).

>  vii.  **The EA Evaluated Socioeconomic Impacts, And Properly Concluded That The Project Would Economically Benefit The Area And The Tribe, But Would Not Have Significant Environmental Impacts.**

Social and economic issues ranked as a key concern among the private citizens and local governments commenting upon the EA.  AR 1149-59; 1167-69; 1191-92; 1193-95.  Although NEPA does not require consideration of socioeconomic impacts in an EA, 40 C.F.R. § 1508.14; *Olmsted Citizens for A Better Community v. United States,* 793 F.2d 201, 205 (8th Cir. 1986); *see Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.,* 487 F.2d 1029, 1037 (D.C. Cir. 1973), the BIA and NIGC nevertheless go beyond NEPA's requirements and do so under their own internal guidelines.  30 BIAM Supplement 1, NEPA Handbook, § 4.3(E)(b) (1993), attached hereto as "Exhibit C;" NIGC NEPA Manual, § 3.1(D)(11), attached hereto as "Exhibit D."[15]  Accordingly, the EA evaluated such impacts here. AR 57-64; 94-103; 188-89; 1462-63 at ¶ 9.

To that end, the Tribe retained an outside consulting firm to evaluate the potential social and economic effects of the casino, addressing, among other issues, concerns that the casino would create "problem gamblers," resulting in lost jobs, increased crime, and higher divorce rates in the community.  AR 593-711.  Based on that study, the EA detailed the demographics and socioeconomic status of Allegan County and its residents (including members of the Tribe,

---

[15]  The Tribe respectfully requests that the Court take judicial notice of Exhibits C and D pursuant to Fed. R. Evid. 201.

who are far poorer than their non-Indian counterparts), AR 57-61,[16] and then comprehensively analyzed the local economy, Allegan County's employment picture, the local demographics, the availability of housing and its values, the effects of the casino project on such values, and the possibility that the casino would trigger increased crime and other problems.  AR 57; 94-103.

Ultimately, the EA concluded the Tribe's project would be an economic boon for the County, creating 4,900 sorely-needed jobs in an area in which unemployment is on the rise, and generating $2.8 million for local governments (and $32 million in off-site sales) in an area that faces an "unsustainable" economic situation in which the "demand for [government] services [] is increasing while revenue to Allegan County is decreasing."  AR 94-97; 624; 937-38.  The EA reached this conclusion with the enthusiastic endorsement of labor unions, various chambers of commerce in Allegan County, and local governments.  *See* AR 834; 840; 842; 884-86; 893; 894; 895; 937-38; 941; 942; 1023; 1055-56.   The EA further concluded the project would substantially benefit the socioeconomic status of Gun Lake's members, by enabling the Tribe to provide its members much needed jobs, housing, education, health care and other basic services. AR 97-98; 1130.

However, approaching the issue even-handedly, the EA considered the possibility that the project could have economic drawbacks for the County and area residents.  Specifically, the EA noted local governments would lose tax revenues by virtue of the proposed action, since property taxes would no longer be paid if the 146 acres is taken into trust.  AR 95-96; 907-08; 1079-80; 1094.  It also concluded that local government agencies (such as those providing fire protection and law enforcement) would face higher costs from having to provide increased services for the

---

[16]  Twenty-seven percent of the Tribe's labor force is unemployed, compared to an average of 6.5% for Allegan County.  AR 58; 61.  Twenty-six percent of the Tribe's members own their own home and 37% are in the process of trying to buy a home; comparatively speaking, Allegan County's homeownership rate is far higher, at 83%.  AR 61.

Tribe's venture.   AR 95-96; 129; 1088.   The EA then quite reasonably concluded the lost

revenues and other economic impacts could not be significant, since they would be more than

offset by the Tribe's commitment to share two percent of its net gaming revenues—an estimated

$2.8 million per year—with local governments.  AR 96; 1122.

    Finally, even though the EA found the Tribe's revenue sharing will more than offset any

loss in government revenues, the Tribe has proactively contracted (or agreed to contract) with

local agencies to compensate for the possible loss of revenues and increased costs.  AR 129; 191;

1079.  For example:

- In response to concern that a facility projected to attract as many as 3 million patrons per year would increase local governmental costs for fire protection, the Tribe committed itself to pay the City of Wayland for all labor costs associated with each firefighting or rescue response to the facility.  AR 217-18 at ¶ 3.

- In response to public fears the casino could cause more crime, requiring more police protection, the Tribe contracted with Allegan County to pay for the cost of four deputies and one sergeant, so as to ensure the stationing of one full-time deputy sheriff at the gaming facility, 24 hours a day, every day.   The agreement translates into a commitment to pay $250,000 for new equipment, and all annual operating costs associated with the new officers, ranging from approximately $400,000 the first year to more than $450,000 in the fifth year.  AR 234-35 at § 4.3; 1118-19.

- In the face of concern the project would need emergency services, the Tribe committed itself to contract with a local ambulance service to cover costs associated with emergency responses to its facility.  AR 191.

    The Tribe is committed to take other concrete steps to alleviate public concerns, even

though the EA found the asserted problems to be less real than imagined.  For example, in the

face of concern that the casino's existence would spur compulsive gambling in the community,

AR 885; 1101; 1142; 1146; 1147-48, the Tribe will establish programs to discourage problem

gambling (including employee training designed to recognize and report compulsive gamblers

and refuse entrance to same), and will also fund compulsive treatment programs within the area,

including, but not limited to compulsive gambling.  AR 134-35.  The Tribe is committed to these projects out of concern for the community and to demonstrate its good faith, even though the EA found the project would not lead to "significant compulsive gambling impacts."   AR 135. Similarly, because one anecdotal study showed an increase in DUI arrests in *one* of the five Michigan counties in which a casino was located, AR 100, the Tribe agreed to employ particular training for its employees to minimize alcohol sales to underage youth and intoxicated patrons. AR 188-89.

In sum, the Tribe is committed to all of the above steps even though gambling, crime and other socioeconomic impacts are not strictly "environmental" issues requiring mitigation under NEPA, *Olmsted*, 793 F.2d at 205; even though the Deputy Sheriff's Association of Michigan finds that crime is not likely to increase because of a casino, AR 99-100; 942; 1109; and even while respected studies reveal no "association with gaming facilities and increased levels of crime."  AR 100; 1088-89; 1119-20.[17]  Given the clear economic benefits the Tribe's project poses for the Allegan County area, and the Tribe's demonstrated commitment to partnering with local authorities to ensure the public's health and safety, it is no wonder that every local agency with jurisdictional authority in the area—including Allegan County, the Allegan County Sheriff's Department, Allegan County School District, Wayland Township, and the City of Wayland—heartily support the Tribe's project, finding it "will be positive for Allegan County

---

[17]   These studies include one prepared by the U.S. Department of Justice entitled "Effects of Casino Gambling on Crime and Quality of Life in New Casino Jurisdictions," which states research results "indicate that there can be no conclusive statement regarding the effect that casinos have on crime."  AR 99; 641-42; 7531.  Other studies (prepared by the National Gaming Impact Study Commission in 1999 and the General Accounting Office thereafter) upon which the EA relied are consistent, concluding there is "insufficient data" to show a relationship between crime and casinos.  *Id.*; *see also* AR 1162-63.  As the EA further noted, anecdotal experience in Michigan and Indiana "suggest that an increase in crime rates is not associated with casinos."  AR 99 (emphasis added).

with minimal environmental impact."  AR 937; 1105; *see also* AR 215-49 (service agreements);

834; 884; 886; 892; 893; 904-05; 907-08; 924; 937-38; 941; *and see* 840; 894; 895; 906; 923;

928 (reflecting support from various chambers of commerce and unions).

In sum, Plaintiff's suggestion that the Tribe's venture will somehow harm the local

economy falls seriously flat in the face of the actual record.  Even Plaintiff concedes the project

will create jobs and infuse millions of dollars (as much as $32 million) into the economy via off-

site or secondary sales.  Compl. ¶ 61.  At bottom, Plaintiff's grievance appears to be that the

Tribe's venture, and any new or existing Allegan County businesses, will capture tourist dollars

and business that otherwise would have gone to Grand Rapids or Kalamazoo.  Compl. ¶ 70; *see*

*also* AR 831; 836-37; 943; 955-56.  But the EA specifically considered the alleged economic

effects cited by Plaintiff.  AR 94-103; 169-75.  Moreover, a desire to derail a project to avoid fair

competition provides no justification for invoking NEPA.  *Olmsted*, 793 F.2d at 204 ("NEPA [is]

not a vehicle for the airing of general policy objections to federal action but was addressed to the

end of protecting human health and welfare only through the means of protecting the physical

environment."); *Fund for Animals v. Williams*, 246 F. Supp. 2d 27, 45 (D.D.C. 2003)

("Controversy in the context of NEPA does not exist merely because some are highly agitated

about, vigorously oppose, or have raised questions about the action"); *Road River Alliance, Inc.*

*v. Corps of Engineers of United States Army*, 764 F.2d 445, 451 (4th Cir. 1985) (allowing mere

opposition to require an EIS "would be the environmental counterpart to the 'heckler's veto' of

First Amendment law").  Consequently, Plaintiff cannot meet its burden to prove that the EA's

conclusions regarding the socioeconomic effects of the project were arbitrary and capricious.

### viii. The EA Considered Whether The Proposed Action Would Lead To Cumulatively Significant Impacts, And Concluded It Would Not.

Plaintiff alleges the EA failed to consider certain "cumulative" impacts of the project. Compl. ¶¶ 96-99. This allegation fails for two reasons. First, Plaintiff relies upon an erroneous application of the law on cumulative impacts, one this District has previously rejected. Second, the EA did, in fact, consider the project's potential cumulative effects upon the environment, and the Secretary properly found none were significant. Consequently, Plaintiff cannot meet its burden of proving the Secretary's conclusions regarding cumulative impacts were arbitrary and capricious.

Plaintiff alleges the EA failed to consider "the cumulative impact of all of the expected impacts [of this casino project] when added together." Compl. ¶ 96. This misconstrues the meaning of "cumulative impacts" under NEPA. As this Court recently explained, the definition of cumulative impacts "does not include aggregated impacts from the same project." *TOMAC*, 2005 U.S. Dist. LEXIS 4633, at *15*; see also* 40 CFR § 1508.7 (cumulative impacts are those which result from the incremental effect of "the action" when added to other past, present, and reasonably foreseeable future actions). Thus, the alleged impacts cited by Plaintiff (all of which relate to the casino project), cannot constitute "cumulative impacts" under NEPA.

Moreover, the alleged impacts Plaintiff cites are not susceptible to cumulative analysis. Cumulative impacts must be "like" impacts, because only like impacts can be added together. Thus, noise impacts can be cumulative with other noise impacts, but noise cannot be cumulative with air quality. *See, e.g., Town of Cave Creek v. FAA*, 325 F.3d 320, 328-29 (D.C. Cir. 2003) (agency properly evaluated cumulative impacts by calculating baseline of ambient noise, determining increased noise from proposed action, and adding such to total amount of future

projected noise to ascertain overall noise level). Consequently, the alleged impacts cited by Plaintiff cannot constitute cumulative impacts under NEPA.

Moreover, the EA specifically evaluated the potential cumulative impacts of the project. The EA specifically conducted a cumulative impacts analysis that considered comparative impacts of the foreseeable projects, while also taking into account the general growth and development trends in the area (as guided by area growth and land use plans). AR 135. The EA then evaluated whether, given the above, the project could create cumulatively significant impacts in each of the categories of environmental concern identified by the EA, and found none. AR 135-46. For example, in the context of "water resources," the EA found no cumulative impacts to the availability of groundwater, since the Tribe's project would use "a relatively small increment of the available groundwater," and since "no other new major uses of groundwater will be located in the area in the reasonably foreseeable future." AR 136. Similar analyses were conducted with respect to each potential type of environmental impact. AR 135-46. Because the alleged impacts Plaintiff cites cannot constitute cumulative impacts under NEPA, and because the EA thoroughly examined potential cumulative impacts, as properly defined, Plaintiff cannot meet its burden of showing the Secretary's conclusions were arbitrary and capricious.

### ix. The EA Considered The Indirect Effects Of The Proposed Action, Including Growth Inducement, And Found Nothing Significant.

Contrary to Plaintiff's allegations, Compl. ¶¶ 89-91; 93-95, the EA adequately considered the project's "indirect" environmental effects, which "are caused by the action and are later in time or further removed in distance, but still reasonably foreseeable." 40 C.F.R. § 1508.8(b). To evaluate such effects, the EA identified the geographic area where indirect effects would most likely occur, evaluated the nature of those impacts, and assessed the extent to which they would be adverse. AR 146-64; 593-711. Of particular concern was whether the project would induce

growth and, if so, the extent to which the surrounding environment has capacity for such growth. As the record shows, the EA concluded the project could spur some new residential and commercial development, and further found the surrounding area could easily accommodate it. AR 150; 155; 162-64. The record readily supports those conclusions.

To evaluate the project's potential ripple effect, the Tribe's consultant studied the extent to which the casino's predicted infusion of jobs and revenues would induce growth. Because indirect impacts are less likely to occur as distance from the project increases, AR 146-48, the EA logically divided the "indirect effects area" geographically, as follows: (1) the "Core Area," which is defined as the area within Allegan County that is within a 15-minute drive from the proposed casino; (2) the "Outer Core Area," which is the area beyond a 15-minute drive but within the County or outside the County or outside the County but within a 30-minute drive; and (3) the "Outer Area," which is beyond a 30-minute drive from the casino. Nearly all of the reasonably foreseeable growth is likely to occur in the Core and Outer Core Areas. AR 146-47.

As the EA explains, while the project will create new employment and business opportunities, it is not likely to spur significant increases in population or residential construction. Over 1.5 million people live within a 30-minute drive of the site, and there exists 12,000 vacant housing units within that same 30-minute radius. AR 147. Accordingly, even assuming every one of the casino's 1,800 employees is new to the area (an unlikely assumption in the face of the County's population and relatively high unemployment rate), a large housing supply currently exists to accommodate them. *Id.* Nonetheless, the analysis conservatively assumed that 609 new employees would move into the County because of the casino (either to work there, or elsewhere). Despite the County's relatively high vacancy rate (over 5,000 housing units are vacant), the study further assumed that 95% of those new employees would

require new housing, translating into a demand for 526 new residential units (in each of which 1.1 employees would live). AR 150. The EA then allocated the assumed development to the respective "indirect effects area," reasonably assuming that most would be built within the Core Area and Outer Core Areas (*i.e.*, within 30 minutes of the casino), and that all would be built in areas with existing infrastructure and compatible zoning. AR 150-51; 154; 155.

The study revealed that each area could readily accommodate the potential residential growth. The Core Area, for example, included 1,800 acres that is undeveloped, residentially-zoned and connected to the necessary water/sewer infrastructure—and thus, is readily available to absorb the 123 acres that would be needed for the 342 new housing units assigned to the Core Area. AR 150-52; 605-11; 660-64. A similar analysis was applied to the Outer Core Area, in which it was assumed 210 new housing units would be built, requiring 56 acres in an area in which 3,800 acres are readily available. AR 155-56; 667-71. In short, the study concluded that the housing supply far exceeds the number of units built by casino-influenced demand. AR 155; 593-711.

The EA also considered the extent to which incremental spending by casino patrons could spur the creation of new commercial establishments. Again, the study proceeded conservatively. Even though the EA concluded the existing 19 motels—or 1,900 hotel rooms—would be more than sufficient to accommodate the casino's patrons, it nonetheless assumed that a new 100-room hotel/motel would be constructed. AR 159. Similarly, even though the study showed the casino's own restaurants—when combined with the 84 restaurants within 12.5 miles of the casino—could accommodate casino patrons, it nonetheless assumed that casino-induced, off-site spending would cause two new restaurants to be constructed. AR 160. It further assumed that a gasoline station with a convenience store would be built, even though it

37

concluded the new housing would not create the demand for it. AR 161. In the end, the study found the amount of space and land available for commercial development "far exceeds the needs" resulting from any reasonably assumed casino-induced growth in the area. AR 162. In view of the thorough consideration given to the potential indirect impacts of the project, Plaintiff cannot meet its burden of proving the Secretary's conclusions were arbitrary and capricious.

> **x.    The EA Considered A Reasonable Range Of Alternatives, And Plaintiff Waived The Right To Allege Otherwise.**

Plaintiff alleges the BIA failed to adequately consider a reasonable range of alternatives to the proposed project. Compl. ¶¶ 36; 83-86. This allegation fails for two reasons. First, Plaintiff waived this argument by failing to raise it during the administrative process. Second, the record shows the Tribe and the BIA examined an appropriate range of alternatives. Consequently, Plaintiff cannot meet its burden of proving the agency's examination of the alternatives was arbitrary and capricious. *Cf. Vermont Yankee Nuclear Power Corp v. NRDC*, 435 U.S. 519, 554-55 (1978) (upholding agency decision regarding which alternatives to examine, because the decision was not arbitrary and capricious).

Plaintiff failed to advance this argument during the environmental review process. AR 831; 836-37. Consequently, Plaintiff waived the issue. As the U.S. Supreme Court has explained, a project opponent may not take a hang-back approach, fail to comment on the agency's alternatives analysis when the record is open, only to challenge it in litigation. Rather, "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give it meaningful consideration." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004). Thus, where a party fails to criticize an agency's alternatives analysis during the review process, it necessarily "forfeit[s] any objection to the EA on the ground that it failed

adequately to discuss potential alternatives to the proposed action . . . ."  *Id*. at 753; *cf.*
*Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 n.13 (9th Cir. 1993) ("we cannot
characterize the agency's action as 'arbitrary' for failing to consider views that were never
presented to it.").

Second, even assuming Plaintiff did not waive this aspect of its NEPA challenge, the BIA
adequately considered alternatives before issuing its FONSI.  The regulations merely require an
EA to "include brief discussions of . . . alternatives" to the proposed action.  40 C.F.R. §
1508.9(b).[18]  This Court has previously explained that, under this standard, "the agency need
only set forth those alternatives sufficient to present a reasoned choice."  *Coalition on Sensible
Transportation, Inc. v. Dole*, 642 F. Supp. 573 (D.D.C. 1986).  The EA amply satisfies this
standard.  First, it discussed the relative merits of the proposed alternative, the no action
alternative, and several other alternatives (including a redesigned casino at the proposed site and
casino ventures at other sites).  AR 21-34.  Moreover, the EA discussed the comparative
environmental impacts of both the no-action alternative and the preferred alternative throughout
the body of the document.  *See* AR 85-135.  Thus, contrary to Plaintiff's assertions, the EA
provides specific detail as to the location of various alternative sites that were evaluated in-depth,
and explains why they were rejected.  AR 33.  Consequently, the EA discussed alternatives

---

[18]   The "brief discussion" standard for environmental assessments starkly contrasts with the
"rigorously explore . . . all reasonable alternatives" standard for environmental impact
statements.  *Compare* 40 CFR § 1508.9 *with* 40 CFR § 1502.14.  Consequently, case law
regarding the requirements for alternatives in environmental impact statements has little
precedential value in the environmental assessment context.

"sufficient to present a reasoned choice," and Plaintiff cannot meet its burden to prove that the agency's consideration of alternatives was arbitrary and capricious.[19]

### D.    The Agency Properly Considered The Mitigation Described In The EA.

Plaintiff alleges the mitigation described in the EA is "deficient" because it relies on commitments by the Tribe.  First, the Tribe has every intention of fulfilling its commitments to its own members, its future customers, and its community.  Second, as discussed below, the Tribe' s commitments are in fact enforceable.  Third, there is absolutely no evidence (other than Plaintiff's bald-faced innuendo) the Tribe will dishonor its commitments.  Finally, the Complaint does not allege, and Plaintiff cannot meet its burden of proving, that reliance on mitigation rendered the Secretary' s FONSI arbitrary and capricious.

The Tribe has committed itself to undertake the mitigation necessary to ensuring the project poses no significant impact to the environment.  AR 216-42.  The Tribe itself identified many of these mitigation measures.  Moreover, the Tribe has a direct stake in the mitigation, which will benefit the community (in which many members reside), facilitate access for future casino customers, and protect the Tribe's investment in the casino itself.  For example, the Tribe has every incentive to follow the fire, electrical and other safety standards cited by Plaintiff.  Similarly, Plaintiff has every incentive to ensure the local police and fire departments (which will serve the casino itself) are adequately compensated.  For that reason, the Tribe entered into enforceable service agreements—voluntarily waiving its sovereign immunity—with each of the

---

[19]  Based on the same administrative proceeding, the NIGC, which was a cooperating agency in preparing the EA, elaborated upon the scrutiny given alternative sites.  *See* Exhibit A.  The Tribe evaluated several potential sites throughout Allegan County.  *Id.* Most lacked necessary infrastructure, were not commercially viable, contained unique environmental resources, and/or were inconsistent with local zoning and surrounding land uses.  *Id.*  The Tribe then conducted an in-depth evaluation of the three remaining sites.  *Id.*  After detailed analysis, all three were rejected for environmental and economic reasons.  *Id.*  The Tribe discussed alternative sites with the BIA, and acted in accordance with BIA guidance in evaluating them.  *Id.*

local departments.   AR 216-26; 230-42.   Thus, not only has the Tribe committed itself to mitigation, and not only does the evidence show it will in fact undertake the necessary measures, but the service agreements are enforceable.  It simply cannot be "arbitrary and capricious" for the agency to consider such mitigation in its analysis.

Plaintiff takes particular issue with the Tribe's promise to share its gaming revenues with local governments, calling it a "false assumption" on which the FONSI rests since the Tribe currently possesses no compact with the State.  Compl. ¶ 57.  While it is true the Tribe does not *currently* possess a compact ratified by the Legislature and signed by the Governor, the Tribe has made, and will make, every effort to obtain an enforceable compact.   Moreover, the Tribe believes the State will honor its obligation under IGRA to negotiate a compact in good faith, as it has done with eleven other federally-recognized Indian tribes.  *See* AR 4386; 10518.  In any event, as the record shows, the Tribe has pledged to give two percent of its gaming revenues annually to the local governments—in the unlikely event the State refuses to approve a gaming compact that would otherwise provide the local governments the same revenues.  AR 189.

The Tribe has every incentive to obtain an agreement with the State of Michigan. Moreover, the Tribe has made, and will continue to make, every effort to obtain a fully enforceable compact.   Finally, there is absolutely no evidence to suggest the Tribe will fail to meet its commitments.   For all of these reasons, the agency properly considered the mitigation proposed in the EA, and any reliance upon them cannot be deemed arbitrary and capricious.

E.    **Plaintiff's Argument That An EA's Length Alone Militates The Need For An EIS Is Nonsensical.**

Finally, Plaintiff finds itself in the awkward position of simultaneously arguing the EA should have contained more detail, Compl. ¶¶ 58-65, and also arguing that the EA is too long. *See id.* at ¶¶ 66-67 (quoting regulatory advice that EAs be 10-15 pages while this one is "<u>208</u>

pages of text plus at least 1,000 pages of attachments.").  Plaintiff then tries to escape the horns

of its dilemma by arguing an EIS should have been prepared, Compl. ¶¶ 67, 68, conveniently

ignoring that NEPA's regulations advise that even EISs should generally be "less than 150

pages."  40 C.F.R. § 1502.7 (EIS "shall normally be less than 150 pages and for proposals of

unusual scope or complexity shall normally be less than 300 pages.")  In sum, the NEPA

document prepared in this matter, however denominated, contains far more analysis (one and a

half times, or almost six times if the attachments are included) than would be expected of an EIS.

AR 6-1203.

More  fundamentally,  the  argument  that  the  very  effort  and  detailed  study  the  BIA

devoted to the analysis of Gun Lake's project means there can be no conclusion of that analytical

process, and that an EIS must then be prepared, is counterintuitive.  To quote the Fifth Circuit's

recent response to the same argument in a similar context:

> [I]n many ways, this EA is more akin to a full-blown EIS; it is unclear exactly
> what more the Lead Agencies could have done to evaluate the significance of this
> pipeline's impact.
>      . . . .
>      As we noted earlier, NEPA does not guarantee any substantive results; all
> it ensures is that a particular process will be followed.  Herein lies the problem for
> the [] plaintiffs.  They really don't want more process.  Indeed, considering the
> extensive  and  comprehensive  nature  of  the  EA  conducted  here,  it  is  unclear
> exactly what more process would involve [fn 6]. . . . [fn 6] The Lead Agencies []
> have argued that requiring the preparation of an EIS here would be a waste of
> time and resources, given the fact that the EA prepared here contains all the
> functional elements of an EIS.  We find this argument persuasive.

*Spiller v. White*, 352 F.3d 235, 241, 245 n.6 (5th Cir. 2003).  As was true for the plaintiffs in

*Spiller*, Plaintiff does not really "want more process," but rather, simply more delay.

The argument that a more detailed EA means an EIS is necessary is also simplistic.  As

the First Circuit has observed, one may plausibly argue that a detailed EA itself means that there

should have been an EIS or may equally plausibly argue that if an EA looks like an EIS, there is

42

no point in preparing an EIS. *Sierra Club v. Marsh*, 769 F.2d 868, 874-875 (1st Cir. 1985). The

real question is whether there is a significant impact. *Id.* Another court put it as follows:

> [L]ength and complexity tell us nothing about the ultimate question that we must
> answer in the present case: whether the project will have a significant effect on
> the environment. Indeed, just as length and complexity might suggest that an EIS
> is required, they might also bolster the Bureau's conclusion that no EIS is
> required.

*Citizens Advisory Comm. On Private Prisons, Inc. v. United States Dep't of Justice,* 197 F. Supp.

2d 226, 261-262 (W.D. Pa. 2001) (citing *Sierra Club v. Marsh*, 769 F.2d at 874). The court

rejected the relevance of an EA's length argument, and "turn[ed] to what [was] the ultimate issue

in this case: whether the project . . . will have a significant impact on the environment." *Id*. at

262. That question has been addressed and answered in the present case in the EA, and by the

FONSI—the project <u>will</u> <u>not</u> have a significant impact on the environment.[20]

---

[20] Plaintiff's citations do not affect the analysis, Compl. ¶ 67, as none held "an EIS was required solely because of the length of the environmental assessment." *Ind. Forest Alliance, Inc. v. United States Forest Serv.*, No. NA99-214-C-H/G, 2001 WL 912751, at *16 (S.D. Ind. July 5, 2001). Rather, it was the *nature of the projects themselves*, when compared to the document's length, which drove the need for an EIS. For example, in *Curry v. United States Forest Service*, 988 F. Supp. 541, 551-52 (W.D. Pa. 1997), the project involved the management of forest and timber harvests on over 5,000 acres of land (with an estimated harvest of 31 million feet of lumber), and the court's decision to require an EIS was primarily due to the "magnitude of the project," not the length of the EA. Likewise in *National Audubon Society v. Hoffman*, 917 F. Supp. 280, 288 (D. Vt. 1995), *aff'd in relevant part*, 132 F.3d 7 (2d Cir. 1997), which was a case involving the "clearcutting of over 300 acres" of pristine forest, with an attendant affect on over 1,301 acres—or 24% of the forest at issue. It was the "magnitude of the instant proposals," when considered in the context of a long EA, that suggested an EIS was required. *Id.*, 287. At bottom, Plaintiff's argument is both meaningless and without clear precedent. *See Hoosier Envtl. Council, Inc. v. United States Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 998 (S.D. Ind. 2000) (finding that *Sierra Club v. Marsh* "does not stand for the proposition that a lengthy EA means an EIS was needed . . . .")

## II.    THE SECRETARY'S INTERPRETATION OF IGRA IS NOT ARBITRARY, CAPRICIOUS, OR INCONSISTENT WITH THE LAW

Counts II and III of the Complaint allege that the Secretary's decision to take land into trust for the Tribe was arbitrary, capricious, or not according to law because the Secretary misinterpreted IGRA when she concluded the Tribe could properly use the land to pursue its economic development goals by operating a gaming enterprise.  Those claims fail as a matter of law.

### A.    IGRA Must Be Construed Liberally In Favor Of The Tribe, And The Secretary's Interpretations Are Entitled To Deference

The Supreme Court has made clear that "statutes [relating to Indian affairs] are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their bene-fit."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see generally, e.g.*, *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992).  The D.C. Circuit recently applied that rule in a case very similar to this one.  *Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003).

The Indian canon reinforces the general principle that the Secretary's statutory interpreta-tions in areas within her responsibility and expertise are entitled to deference from the courts. *See, e.g.*, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-845 (1984); *Nat'l Wildlife Fed'n v. Gorsuch*, 639 F.2d 156, 166-67 (D.C. Cir. 1982).  The Secretary's construction of IGRA must be sustained unless it is contrary to an unambiguous expression of Congressional intent or is otherwise unreasonable.  *Citizens Exposing Truth About Casinos (CETAC) v. Norton*, No. 02-1754 (TPJ), 2004 U.S. Dist. LEXIS 27498, at *13-14 (D.D.C. Apr. 23, 2004).  And in APA review of the Secretary's determinations under IGRA, as in review of her application of NEPA, a court is not to substitute its judgment for that of the

agency, but examines only whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Modern Muzzleloading, Inc. v. Magaw*, 18 F. Supp. 2d 29, 35 (D.D.C. 1998) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971)).

**B.**     **The Secretary Reasonably Concluded That The Land To Be Taken Into Trust Here Would Be The Tribe's "Initial Reservation" Under IGRA**

Congress enacted IGRA to "provide a statutory basis for . . . gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal govern-ments."  25 U.S.C. § 2702(1).  Section 20 of the Act, 25 U.S.C. § 2719, generally prohibits gaming on Indian lands acquired after October 17, 1988.  There are, however, various exceptions designed to protect the interests of Tribes that were not federally recognized, or did not have suitable land, as of that date.  One such exception permits gaming on lands acquired by the Secretary in trust "as part of the initial reservation of an Indian tribe acknowledged by the Secretary under the federal acknowledgement process."  25 U.S.C. § 2719(b)(1)(B)(ii).  The Secretary determined that this exception applies to the parcel at issue here.  Count II of the Complaint challenges that conclusion, alleging that the Bradley Tract will not be the Tribe's "initial reservation" under IGRA (i) because the Tribe long ago had other lands and (ii) because the site will not be used for residential purposes.  Compl. ¶¶ 100-110.  Those allegations provide no basis for overturning the Secretary's decision.

**i.**     **The Secretary Properly Focused On The Tribe's Current Landless Status**

MichGO argues the Bradley Tract cannot be the Tribe's "initial reservation" for purposes of IGRA because the Tribe had other lands at the beginning of the 19th century.  As discussed above, however, by 1833 the Tribe had been forced to cede all of its sovereign territory to the United States, and since that time it has not had any reservation lands.  *See supra* Factual and

45

Procedural History Part.  Moreover, the Tribe was wrongfully denied any federal legal recognition for many years, until it successfully completed the federal administrative acknowledgment process in 1999.  *See id*.  The Secretary's determination that, for purposes of IGRA, the Bradley Tract will be "part of . . . the initial reservation of an Indian tribe *acknowledged by the Secretary under the Federal acknowledgment process*" is a straightforward application of the Act's literal terms.  25 U.S.C. § 2719(b)(1)(B)(ii) (emphasis added).

That reading also serves the purposes of the Act and the exception.  The initial reservation exception was enacted in order to "place tribes belatedly acknowledged or restored in the same or similar position as tribes recognized by the United States earlier in their history." *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney*, 46 F. Supp. 2d 689, 698 (W.D. Mich. 1999); *see Roseville*, 348 F.3d at 1030 (exceptions "ensur[e] that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones"). What matters for that purpose is not whether a Tribe was legally recognized and had land 150 or more years ago, but what its status was on October 17, 1988, when IGRA was enacted.  As the NIGC has explained, Congress's intent was to give newly recognized tribes, or those that had no land in 1988 but later were able to acquire it, an equal opportunity to pursue economic development through the operation of at least one gaming facility *in the present*:

> Clearly, one compelling reason for providing such exemptions is to provide all tribes with at least one opportunity for the economic advantages of gaming . . . . If Congress had limited gaming [to] lands within known reservation boundaries, then newly acknowledged tribes or tribes that settled land claims would have been denied the opportunities that IGRA provides.

NIGC Memorandum dated December 5, 2001, regarding *Confederated Tribes of Coos, Lower Umpqua & Siusiaw Indians v. Babbitt*, 116 F. Supp. 2d 155 (D.D.C. 2000), at 4-5 (attached hereto as "Exhibit E"); *see also* NIGC Memorandum dated December 13, 2000, regarding Trust

Acquisition for the Huron Potawatomi, Inc. (attached hereto as "Exhibit F");[21] *Grand Traverse*, 46 F. Supp. 2d at 698-99.

Here, the Gun Lake Tribe was not federally recognized and had no reservation when IGRA was enacted; it has no reservation now; and it has not had any reservation since it was first restored to recognition in 1999.[22]  As the Secretary properly concluded, these are precisely the circumstances in which the initial reservation provision was intended to apply.  Any other interpretation would perversely penalize many tribes, such as Gun Lake, and deny them any opportunity to engage in gaming under IGRA, based solely on the fact that the federal government unjustly terminated their legal recognition and took their land at some point in the past.  The Secretary's construction is far more consistent with both the language and the purpose of the Act, and it is entitled to deference from this Court.

> **ii.    There Is No Requirement That Land Be Used For Housing In Order To Qualify As An "Initial Reservation" Under IGRA**

Plaintiff also argues that land must be used for housing in order to be an "initial reservation" under IGRA.  This Court has already rejected that argument—in another case brought by the same counsel representing Plaintiff here.  In *Citizens Exposing Truth About Casinos (CETAC) v. Norton*, No. 02-1754, 2004 U.S. Dist. LEXIS 27498, at *1 (D.D.C. Apr. 23, 2004), the Court recognized that there is "no statutory or regulatory requirement that land must

---

[21]  The Tribe respectfully requests that the Court take judicial notice of Exhibits E and F pursuant to Fed. R. Evid. 201.

[22]  Plaintiff suggests the Tribe had a previous reservation by affiliation with the Huron Pottawatomi Tribe.  Compl. ¶ 105.  That is incorrect.  As part of her decision to acknowledge the legal status of the Gun Lake Tribe, the Secretary was required to conclude that the Gun Lake Tribe was separate from any other tribe.  *See* 25 C.F.R. § 83.3(a).  That determination is conclusive for purposes of the present proceedings.  In any event, this Court has previously rejected a claim that the Huron Tribe itself had any prior reservation for purposes of IGRA.  *Citizens Exposing Truth About Casinos (CETAC) v. Norton,* No. 02-1754, 2004 U.S. Dist. LEXIS 27498, at **12-13 (D.D.C. Apr. 23, 2004).  (Indeed, the same attorneys who presented the losing arguments in the *CETAC* case also represent MichGO in this matter.  *Id.* at *1.)

contain housing in order for the Secretary to proclaim it a reservation under the [Indian Reorganization Act] and for it to qualify as an initial reservation under IGRA." *Id.* at *13; *see also Roseville,* 348 F.3d at 1028 (describing the same argument, made with respect to a parallel IGRA exception, as "nonsensical").[23]

Any claim that a parcel must be used for housing in order to qualify for IGRA's "initial reservation" exception flies in the face of the Act itself.  Congress designed IGRA to promote "tribal economic development, self-sufficiency and strong tribal governments" *through* "*the operation of gaming*."  25 U.S.C. § 2702(1).  As the D.C. Circuit explained about a parallel IGRA exception, "[t]he point of the . . . exception is that such lands may be used *for commercial gaming*; it would make no sense if a tribe's use of land for gaming could defeat the land's eligibility for gaming."  *Roseville,* 348 F.3d at 1028 (emphasis added).  The Secretary's decision to take land into trust as the Tribe's initial federally-recognized reservation, for the specific purpose of allowing the Tribe to generate governmental revenue through a gaming business, accords precisely with the text and purposes of IGRA.

## C.    There is No Requirement That The Tribe Conclude A Compact With The State Before the Secretary takes Land into Trust

Count III of the Complaint challenges the Secretary's decision on the ground that the Tribe does not yet have a final gaming compact with the State of Michigan to regulate Class III, casino-style gaming.[24]  Compl. ¶ 115.  That allegation provides no basis for striking down the

---

[23]  MichGO cites *Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1264-67 (10th Cir. 2001).  Compl. ¶ 104  After *Sac and Fox* was decided, Congress specifically confirmed the Secretary's authority to determine whether a specific area of land is a "reservation" for purposes of IGRA.  Department of Interior and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63, § 134, 115 Stat. 414, 442-43 (2001); *see Roseville*, 348 F.3d at 1029.

[24]  Under IGRA, "Class II" gaming generally includes bingo and similar games and nonbanking card games.  25 U.S.C. § 2703(7); 25 C.F.R. § 502.3.  "Class III" gaming includes additional

Secretary's decision to take land into trust to allow the Tribe to operate a gaming enterprise under IGRA.

First, once the Secretary takes the Bradley Tract into trust, under IGRA the Tribe will be free to offer Class II gaming, as no compact with the State is required for the operation of Class II gaming.  25 U.S.C. §§ 2710(b), (c); 25 C.F.R. Part 291; *Florida v. Seminole Tribe of Florida*, 181 F.3d 1237, 1248-50 (11th Cir. 1999).

Second, once the land is taken into trust, should the State fail to negotiate with the Tribe in good faith to conclude a compact, IGRA will independently authorize the Tribe to conduct even Class III gaming on its land in the absence of any compact with the State.  25 C.F.R. Part 291; 25 U.S.C. §§ 2710(d)(7)(B)(vii), (d)(8)(A)-(D); *Florida*, 181 F.3d at 1248-50.[25]

Third, Plaintiff seeks to block the Tribe's efforts completely with an untenable "catch 22."  As Plaintiff well knows, the United States District Court for the Western District of Michigan has ruled that the Gun Lake Tribe cannot bring suit under IGRA to compel the State of

---

casino games such as roulette and banked card games such as blackjack.  25 U.S.C. § 2703(8); 25 C.F.R. § 502.4.

[25]  MichGO further suggests the Secretary should not have agreed to take land into trust in the absence of a compact without attempting to ensure that the Tribe would never engage in "the functional equivalent of Class III gambling."  Compl. ¶ 119.  It surely was not arbitrary or capricious for the Secretary to fail to take unspecified action to prevent a wholly speculative prospect that the Tribe, *after* acquiring land in trust and constructing its casino, *might* not have a tribal-state compact or alternative authorization for Class III gaming under IGRA, and then *might* nonetheless unlawfully operate games that should properly be treated as Class III games.  This case involves no ripe controversy concerning the line between Class II and Class III games.  *See generally, e.g., Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (discussing actual injury requirement); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937) (federal courts will not issue advisory opinions on hypothetical facts).  Moreover, administrative authority to define and police that line rests with the National Indian Gaming Commission.  *See* 25 U.S.C. §§ 2704-2706; 25 C.F.R. § 502.2-502.4 (defining classes).  Judicial review of any such question would properly be had in a challenge to an NIGC decision specifically addressing a disputed classi-fication—not in a challenge to a decision by the Secretary to take land into trust.

Michigan to negotiate a gaming compact *unless and until the Secretary has accepted into trust land on which the Tribe could conduct gaming*. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 173 F. Supp. 2d 725, 727-28 (W.D. Mich. 2001), *aff'd* 304 F.3d 616 (6th Cir. 2002). Plaintiff now seeks to have this Court deny the Tribe its rights completely by holding that the Tribe must secure a compact *before the Secretary can take land into trust* for the Tribe to pursue its venture. This Court should not tolerate such manipulative gamesmanship.

Finally, this District has already twice rejected the precise arguments raised by MichGO. In *TOMAC v. Norton*, 193 F. Supp. 2d 182 (D.D.C. 2002), TOMAC likewise argued that the Secretary violated the APA by accepting a parcel of land into trust before the tribe in question had a compact with the State of Michigan. *TOMAC*, 193 F. Supp. 2d at 192. The Court disagreed, squarely holding that "there is no requirement that a compact be secured before a tribe may obtain a casino site." *Id.* at 192-93. The Court specifically noted that, as just discussed, a tribe cannot even compel a state to *negotiate* toward a Class III compact *until* the tribe has land that could be used as a casino site. *Id.* at 193. In *CETAC* the Court confirmed *TOMAC*'s holding, recognizing that "federal law does not require that a valid tribal-state compact be in place before the Secretary can take land into trust for [a] tribe." *CETAC,* 2004 U.S. Dist. LEXIS 27498, at *8 (order granting in part motions to dismiss or for summary judgment). There is no reason for a different result here.

## III.  SECTION 5 OF THE INDIAN REORGANIZATION ACT OF 1934 DOES VIOLATE THE NONDELEGATION DOCTRINE

Count IV of the Complaint alleges that Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. § 465, is an unconstitutional delegation of congressional power because it is "overbroad," Compl. ¶ 126, and "provides no standards to guide the agency's action," *id.* at ¶

125.[26]  That claim amounts to a facial challenge to the validity of the statute.  Plaintiff cannot

meet the "heavy burden" imposed by such a challenge of establishing that "no set of

circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S.

739, 745 (1987).  Indeed, Plaintiff cannot show that the statute is infirm in any respect.  First,

Section 465 cannot violate the constitutional prohibition on delegating legislative power because

the statutory authority Congress grants the Secretary is executive and not legislative in nature.

Second, as this Court and numerous others already have held, any delegation in Section 465 is

constitutionally sound because Congress established adequate standards to guide the agency's

exercise of discretion.  *City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465, 473 (D.D.C. 1978);

*Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 972-74 (10th Cir. 2005); *South Dakota v.*

*United States Dep't of Interior*, 423 F.3d 790, 795-799 (8th Cir. 2005); *Carcieri v. Norton*, 423

F.3d 45, 56-58 (1st Cir. 2005); *United States v. Roberts*, 185 F.3d 1125, 1136-37 (10th Cir.

1999); *City of Lincoln City v. Dep't  of Interior*, 229 F. Supp. 2d 1109, 1128, 1132-33 (D. Ore.

2002).

---

[26]  Section 465 provides in relevant part:

> The Secretary of the Interior is authorized in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians.

> For the acquisition of such lands . . . there is authorized to be appropriated out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year:  *Provided*, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico . . . becomes law.

25 U.S.C. § 465.

### A.    The Statute Does Not Delegate Any Legislative Powers

Section 465 cannot violate the nondelegation doctrine because it does not grant any *legislative* power.  The Constitution vests "all legislative powers" in the Congress.  U.S. Const. Art. I, § 1.    The nondelegation doctrine recognizes that Congress cannot abdicate this responsibility by authorizing others to legislate on its behalf.  As the Supreme Court has explained, the crux of "the constitutional question is whether the statute has delegated *legislative power* to the agency."  *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 472 (2001) (emphasis added).  The doctrine is not implicated, however, where, as here, Congress merely authorizes the Secretary to carry out an executive function.[27]

With the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461, *et seq.*, Congress established a federal policy "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism."  *South Dakota v. Dep't of Interior*, 423 F.3d 790, 798 (8th Cir. 2005).  Acquisition of land for Indians was an important means of implementing that policy.  In Section 465, Congress authorized the Secretary to exercise the executive authority to acquire land—for a particular purpose, by consensual means, and subject to the regular and rigorous oversight of the appropriations process.[28]  Congress did not authorize the Secretary to promulgate any rule, prohibit any conduct, compel any act, or impose any tax.  History and precedent demonstrate that this type of authority—

---

[27]    For example, prosecutorial discretion, though nearly absolute, does not raise nondelegation concerns.  *See United States v. Allen*, 160 F.3d 1096, 1108 n.16 (6th Cir. 1998) ("the 'intelligible principle' language . . . is not relevant to" prosecutorial discretion); *cf. United States v. Batchelder*, 442 U.S. 114, 125-26 (1979).

[28]    Congress also prohibited allotting Indian land in severalty, extended existing restrictions on alienation, authorized the Secretary to return to tribal ownership any "surplus" lands opened to disposition by federal law or Presidential proclamation, and prohibited the sale or transfer of restricted Indian lands, except, with approval by the Secretary, to the Indian tribe in which the lands are located.  *See* 25 U.S.C. §§ 461-464.

spending funds, if appropriated—is a peculiarly executive function, not subject to the nondelegation doctrine. *See, e.g., Cincinnati Soap Co. v. United States*, 301 U.S. 308, 322 (1937) ("Appropriation and other acts of Congress are replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies. . . . The constitutionality of this delegation of authority has never been seriously questioned."); *cf. Clinton v. City of New York*, 524 U.S. 417, 466-467 (1998) (Scalia, J., dissenting) ("From a very early date Congress also made permissive individual appropriations, leaving the decision whether to spend the money to the President's unfettered discretion. . . . The constitutionality of such appropriations has never been seriously questioned."). Section 465's provisional grant of executive discretion to spend any funds that may be appropriated to carry out a legislatively-chosen act does not even implicate—and certainly cannot violate—the nondelegation doctrine.

### B.    Section 465 Establishes Constitutionally Adequate Standards

Even if Section 465 contained a delegation of legislative power, the guidance provided by the statute would satisfy the nondelegation doctrine. A delegation of legislative power is valid "if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (internal citation omitted). The Supreme Court has made clear that even a very broad delegation is proper so long as Congress sets forth an "intelligible principle" to guide the agency's discretion. *Touby v. United States*, 500 U.S. 160, 165 (1991). Not surprisingly, the Supreme Court has invalidated legislation on nondelegation grounds only twice, and not since 1935.[29]

---

[29]    Both cases involved the power to regulate private conduct, which is not at issue here. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (power to adopt codes of

This Court has already determined that, with respect to Section 465, the "legislative history and the Act itself . . . do provide adequate standards for the exercise of [the Secretary's] discretion." *City of Sault Ste. Marie*, 458 F. Supp. at 473. A number of other courts have reached the same result, and there is no precedent to the contrary. *See Carcieri*, 423 F.3d at 56-58; *Roberts*, 185 F.3d at 1136-37; *City of Lincoln City*, 229 F. Supp. 2d at 1128, 1132-33.[30]

Contrary to Plaintiff's suggestion that Section 465 contains "no standards," Compl. ¶ 125, and that the "only limitation on the Secretary's authority . . . is the Secretary's own good judgment," *Id.* ¶ 126, the statute itself imposes at least three substantive restrictions on the agency's discretion. First, the statute mandates that land acquisitions must serve a particular purpose—"providing land for Indians." 25 U.S.C. § 465. This purposive standard satisfies the "intelligible principle" test, particularly in light of the federal government's special role with respect to Indians and the specific legislative and historical context in which this statute was enacted.[31] *See Roberts*, 185 F.3d at 1137. The Indian Reorganization Act, and Section 465 in particular, were enacted to redress the historical failure of the federal government's allotment policy, under which tribal lands were allotted to individual Indians and "surplus" land was sold to non-Indians, resulting in the decimation of Indian land holdings. Section 465 was designed to

---

fair competition); *Panama Refining Co. v. Amazon Petroleum Corp.*, 293 U.S. 388 (1935) (power to prohibit interstate trade in oil).

[30] The Complaint cites *South Dakota v. Dep't of Interior*, 69 F.3d 878 (8th Cir. 1995). Compl. ¶ 125. That decision was vacated by the Supreme Court, *South Dakota v. Dep't of Interior*, 519 U.S. 919 (1996), and has no precedential authority. After administrative proceedings on remand the District Court upheld the constitutionality of Section 465, and the Eighth Circuit recently affirmed. *South Dakota v. Dep't of Interior*, 314 F. Supp. 2d 935 (D.S.D. 2004), *aff'd,* 423 F.3 790, 795-799 (8th Cir. 2005).

[31] The Supreme Court has sustained delegations with significantly less rigorous "purposive" standards. *See, e.g.*, *New York Central Securities Corp. v. United States*, 287 U.S. 12, 24 (1932) (sustaining "the public interest" standard, relying on a purposive interpretation of the statute).

facilitate the re-acquisition and consolidation of lands for Indian tribes as an essential means of achieving tribal economic development and self-sufficiency. *See South Dakota*, 423 F.3d at 798. The requirement that land be acquired solely "for the purpose of providing land to Indians" makes it possible to "ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944).

Second, the statute restricts the means the Secretary may use to procure the land for Indians. It authorizes only consensual means of acquisition: "purchase, relinquishment, gift, exchange or assignment." 25 U.S.C. § 465.

Third, the statute subjects the Secretary's authority to the appropriations process. It provides that "[f]or the acquisition of such lands . . . and for expenses incident to such acquisition . . . there is authorized to be appropriated . . . a sum not to exceed $2,000,000 in any one fiscal year" from funds not otherwise appropriated. *Id.*[32] Authorization, by itself, does not make funds available for expenditure, and the annual appropriations process provides ample opportunity for congressional oversight of the Secretary's past actions and future plans in carrying out the policies underlying Section 465.

## CONCLUSION

For the reasons set forth herein, the Gun Lake Tribe respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety pursuant to Fed. R. Civ. P. 12(c), as Plaintiff can prove no set of facts that would entitle it to relief on any of its claims. Alternatively, the Court should grant summary judgment in favor of the Defendants and the Tribe pursuant to Fed. R. Civ. P. 56 because there is no genuine dispute regarding any material fact and Defendants are entitled to judgment as a matter of law.

---

[32]  In addition, the statute prohibits use of these funds to acquire land for Navajo Indians outside of their established reservations in Arizona and New Mexico. *See id.*

Respectfully submitted this 6th day of January 2006.

Match-E-Be-Nash-She-Wish Band of
Pottawatomi Indians, Intervenor-Defendant

By    s/Conly J. Schulte

| | |
|---|---|
| Nicholas C. Yost, CA Bar 35297 | Conly J. Schulte, NE Bar 20158 |
| Paula M. Yost, CA Bar 156843 | Shilee T. Mullin, NE Bar 22286 |
| Sonnenschein Nath & Rosenthal LLP | Monteau & Peebles, LLP |
| 685 Market Street, Sixth Floor | 12100 W. Center Road, Suite 202 |
| San Francisco, CA  94105 | Omaha, NE  68144 |
| Telephone (415) 882-5000 | Telephone (402) 333-4053 |
| Fax (415) 543-5472 | Fax (402) 333-4761 |
| | |
| Seth P. Waxman, DC Bar 257337 | Michael J. Anderson, DC Bar 417887 |
| Edward C. DuMont, DC Bar 471443 | Monteau & Peebles, LLP |
| Wilmer Cutler Pickering Hale and Dorr LLP | 300 Independence Ave. SE |
| 2445 M Street, NW | Washington, DC  20003 |
| Washington, DC 20037 | Telephone (202) 543-5000 |
| Telephone (202) 663-6000 | Fax (202) 543-7716 |
| Fax (202) 663-6363 | |

## CERTIFICATE OF SERVICE

I certify that on January 6, 2006, I electronically filed the above document with the Court, which will send notice of electronic filing to the following:

Rebecca A. Womeldorf
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW, Suite 900
Washington, DC  20005
202-682-1639
*Attorney for Plaintiff*

William C. Fulkerson
Robert J. Jonker
Daniel P. Ettinger
Joseph A. Kuiper
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street, NW
Grand Rapids, MI  49503
616-222-2161
*Attorneys for Plaintiff*

Patricia Miller
Gina L. Allery
Department Of Justice
Environmental and Natural Resources Division
Indian Resources Section
601 D Street, NW, Third Floor
Washington DC  20004
202-305-0271
*Attorney for Defendants*

s/Conly J. Schulte