# Finding of No Significant Impact and Notice

### Proposed Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians Gaming and Entertainment Facility In Wayland Township, Allegan County, Michigan

AGENCY:    National Indian Gaming Commission

ACTION:    Finding of No Significant Impact

SUMMARY:

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Tribe) has submitted a request to the National Indian Gaming Commission (NIGC) for the approval of a management agreement between the Tribe and MPM Enterprises, LLC to manage a gaming facility on tribal trust land.

The proposed 193,500 square foot Class II and Class III gaming facility is to be developed on an approximately 146-acre site located at the northeastern corner of 129th Avenue and U.S. Highway 131 in Wayland Township, Allegan County, Michigan.

A Draft Environmental Assessment (EA), dated November 2002, was prepared for the fee-to-trust acquisition and approval of a Class II and/or Class III gaming operation project to meet the requirements of the National Environmental Policy Act of 1969, as amended (NEPA). The Draft EA was published and circulated for public comment for 75 days. A Final EA, dated December 2003, was prepared and made available for public review. The Final EA includes representative public comments, responses to public comments, and revisions and updates to the EA. The Bureau of Indian Affairs (BIA), the lead agency, made a Finding of No Significant Impact (FONSI) on February 27, 2004 based on the December 2003 Final EA. On April 18, 2005 the BIA made a final agency determination to acquire the 146-acre site into trust for the Tribe. Public notice of this determination was published in the federal register on May 13, 2005.

The NIGC participated as a cooperating agency (40 CFR 1501.6) during the NEPA process and has independently evaluated the environmental issues, taken responsibility for the scope and content of the EA and reviewed and evaluated supplemental information that has become available since the completion of the Final EA. The NIGC's proposed federal action is the approval of a management agreement. Approval of this agreement will allow the Tribe to operate Class II gaming devices in addition to Class III gaming devices, subject to the conditions of a pending Tribal/State Gaming Compact. In concurrence with the BIA's FONSI and based on the December 2003 Final EA and all additional information received since that date, the NIGC has determined that approval of the proposed management contract, a federal action, will have no significant impact on the quality of the human environment. Therefore, in accordance with NEPA Section 102(2)(C), an Environmental Impact Statement will not be required.



EXHIBIT

A

FOR FURTHER INFORMATION CONTACT:

National Indian Gaming Commission
NEPA Coordinator
1441 L Street NW, Suite 9100
Washington D.C. 20005
(202) 632-7003

PUBLIC AVAILABILITY:

This FONSI and the EA and additional information on which the FONSI is based will be available to
all interested persons and agencies at the following locations:

Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians
1743 142nd Avenue
Dorr, Michigan 49323

National Indian Gaming Commission
1441 L Street NW, Suite 9100
Washington D.C. 20005

BACKGROUND:

Gaming is a unique opportunity for the Tribe to develop an economic base. This opportunity is
afforded the Tribe under the Indian Gaming Regulatory Act (25 USC 2701 et seq.).

DESCRIPTION OF THE PROPOSED PROJECT:

The proposed project, the Gun Lake Gaming and Entertainment Facility, will result in a 193,500
square foot Class II and/or Class III facility on a 146-acre site located at the northeastern corner of
129th Avenue and U.S. Highway 131 in Wayland Township, Allegan County, Michigan. The
proposed project will include approximately 3,350 parking spaces and 193,500 square feet of area for
a casino, restaurants, support and administrative services, and a lounge.

The proposed project will have a beneficial economic impact for the Tribe. Benefits to the Tribe and
its individual members would result from employment opportunities at the proposed facility and an
improved quantity and quality of social services offered by the Tribal government.

PUBLIC REVIEW AND COMMENT

See EA Section 6 Consultation and Coordination for a list of agencies and individuals contacted.
Preparation of the EA included consultation with the BIA, NIGC, U.S. Fish & Wildlife Service, U.S.
Army Corps of Engineers, Michigan Department of Environmental Quality, Michigan Department of
Transportation, Allegan County, City of Wayland, Wayland Township, and many other agencies. The
draft EA was published for a 75-day public comment period from November 2002 to February 10,

2003. Representative comment letters and responses are attached to the Final EA in Appendices P and Q. Consultation occurred with eight other Michigan Native American Tribes. No tribe objected, and three tribes responded stating that no problems exist in regards to the American Indian Religious Freedom Act.

## SUMMARY OF MITIGATION MEASURES

The NIGC hereby adopts the mitigation measures as described in Chapter 5.0 of the Final EA. The following is a summary of these measures:

## LAND RESOURCES

All site clearing, removal of all unsuitable soil, proper moisture conditioning, review of imported fill material, fill placement, observation of foundation excavations, and other site grading shall be verified by a Registered Civil Engineer during construction. Standard engineering, design, and construction practices, and erosion control best management practices (BMPs) will be employed. BMPs would also be enforceable under the Clean Water Act.

These mitigation measures apply to the Preferred Alternative.

## WATER RESOURCES

### FLOODING

The project is located outside the floodplain and two on-site detention areas are part of the intrinsic design of the Preferred Alternative. These detention basins will help delay water runoff from the site that would otherwise intensify downstream flooding risk. Therefore, no further mitigation is required.

### WATER QUALITY

As required by the EPA under the federal Clean Water Act, (33 U.S.C. § 1342), a Storm Water Pollution Prevention Plan will be prepared that will control erosion of exposed soils to address water quality impacts associated with construction and operation of the project. Temporary and permanent water quality maintenance features shall be incorporated into the project design, construction, and operation. Water quality control measures identified in the Storm Water Pollution Prevention Plan shall include a number of specific features that will be enforceable by the EPA under the terms and conditions of the storm water permit. Features may include but are not limited to the following:

### CONSTRUCTION ACTIVITIES

- Existing vegetation will be retained where possible. To the extent feasible, grading activities will be limited to the immediate area required for construction.
- Temporary erosion control measures, such as silt fences, staked straw bales, and temporary revegetation, will be employed in disturbed areas.
- No disturbed surfaces will be left without erosion control measures in place.
- Reseeding and revegetation will occur as quickly as possible.
- Sediment will be retained on-site by a system of sediment basins, traps, or other appropriate measures.

- A spill prevention and countermeasure plan will be developed, if necessary, which will identify proper storage, collection, and disposal measures for potential pollutants (such as fuel storage tanks) used on-site.

*OPERATION MEASURES*

- Storm drain inlets will be labeled "No Dumping--Drains to Streams and Rivers."
- The parking lot will be designed to direct stormwater runoff to detention basins that will serve to filter sediment.
- Per the recommendation of Mooney & Associates, oil/grease/sediment traps shall be installed at storm drain inlets to minimize the transport of sediments, debris, and pollutants into the on-site drainages, wetland areas, and detention basins.
- The project site drainage basins, if necessary, will be designed to provide effective water quality control measures. Design and operational features of the drainage basins will include the following:
  - The drainage basins shall be designed to provide the maximum detention time for settling of fine particles.
  - Maximize the distance between basin inlets and outlets to reduce velocities.
  - Establish maintenance schedules for periodic removal of sedimentation, excessive vegetation, and debris that may clog basin inlets and outlets.
  - Surround detention basin outlet risers with stone filters.

These mitigation measures apply to the Preferred Alternative.

*WASTEWATER TREATMENT PLANT DISCHARGE*

The Tribe shall obtain an NPDES permit in compliance with the Clean Water Act (33 U.S.C. § 1311) from the EPA for any discharge to Buskirk Creek. The NPDES permit will include water quality limits to protect the beneficial uses of Buskirk Creek. Anticipated NPDES discharge limits are provided in the *Gun Lake Gaming Facility Water and Wastewater Feasibility Study*. Obtaining and complying with the NPDES permit will ensure that the wastewater treatment plant discharges do not significantly affect water quality. The terms and conditions of the NPDES permit will be enforceable by EPA.

These mitigation measures apply to the Preferred Alternative.

BIOLOGICAL RESOURCES

Because no special status species habitat was found on-site, no mitigation measures are required to mitigate effects to wildlife. Nonetheless, to ensure that potential impacts to migratory bird species are avoided, the Tribe will implement the following recommendations from Mooney & Associates (2001). The Tribe will ensure that clearing of all vegetation on-site will only be conducted outside of the nesting season, which includes March through September. Exceptions to this rule will only be permitted in the event a qualified biologist conducts a survey for nesting birds within 200 feet of the edge of the project impact area within three days prior to the vegetation removal, and ensures no nesting birds shall be impacted by the project. Should the qualified biologist detect nesting birds, fenced buffer areas shall be created at a minimum distance of 50 feet around active nests to ensure

4

birds are not directly or indirectly impacted by construction activity. No habitat removal or any other work shall occur within the fenced zone even if the nest continues active beyond September, until the young have fledged, are no longer being fed by the parents, have left the nest, and will no longer be impacted by the project.

To ensure water quality impacts are minimized, the Tribe will comply with the Clean Water Act, including the solicitation of a Section 401 certification, if required.

Measures designed to reduce or eliminate impacts to wetlands include the following:

- A sediment erosion control plan, focusing on measures to eliminate migration of sediment-laden runoff to "waters of the U.S." shall be prepared. This could include the use of silt fences, straw bales, and other appropriate best management practices. This will be enforceable under a NPDES permit issued by the EPA.
- Staging areas shall be located away from "waters of the U.S." Temporary stockpiling of excavated or imported material should occur only in approved construction staging areas. Excess excavated soil should be used on-site for fill or be disposed of at a regional landfill or at another approved and/or properly permitted location. Stockpiles that are to remain on the site through the wet season shall be protected to prevent erosion.
- Standard precaution shall be employed by the construction contractor to prevent the accidental release of fuels or other hazardous material associated with construction equipment.
- A MDEQ Part 303 permit for impacts to wetlands along 129th Avenue shall be obtained. The proposed project is anticipated to qualify for a MDEQ Part 303 General Permit. The project meets all requirements for the road maintenance project General Permit category. According to Section 281.925(3)(b) of MDEQ Wetland Protection Regulations, "If an activity is authorized and permitted under the authority of a general permit issued under section 303.12(1) of the act, then the department shall not require mitigation." Therefore, no wetland mitigation will be conducted unless MDEQ determines that the project cannot be processed under a General Permit and that mitigation is required. If MDEQ determines that mitigation will be required, the Tribe shall mitigate impacts to wetlands as required by MDEQ. Wetland mitigation is enforceable by the MDEQ or the Corps.
- In order to prevent disturbance of the wetland area located at the northwest corner of the west parking lot on the site, a 120-feet long retaining wall shall be constructed. This wall is part of the Preferred Alternative and shall be built as recommended in the Preliminary Grading and Stormwater Management Plan.

These mitigation measures apply to the Preferred Alternative.

## HISTORIC PROPERTIES AND RELIGIOUS FREEDOM

The Tribe shall include the following requirement in construction contract specifications for construction activities on the project site:

*In the event that any prehistoric, historic, or paleontological resources are discovered during construction-related earth-moving activities, all work within 50 feet of the resources shall be halted and the Gun Lake Tribe shall consult with a qualified archaeologist or paleontologist to assess the*

5

*significance of the find. If any find is determined to be significant by the qualified archaeologist, then representatives from the Tribe and the qualified archaeologist and/or paleontologist would meet to determine the appropriate course for action. All significant cultural materials recovered shall be subject to scientific analysis, professional museum curation, and a report prepared by the qualified archaeologist according to current professional standards.*

These mitigation measures apply to the Preferred Alternative.

## SOCIOECONOMIC CONDITIONS/ENVIRONMENTAL JUSTICE

The Tribe must pass an ordinance creating a standard policy encouraging responsible drinking and designated driver programs. As part of this policy, the gaming and entertainment facility employees serving alcohol must undergo Responsible Beverage Service Training (RBST) also known as "server training." RBST educates mangers, servers and sellers at alcohol establishments about strategies to avoid illegally selling alcohol to underage youth or intoxicated patrons. The goal of RBST is to decrease the number of illegal alcohol sales to underage youth and intoxicated patrons through education programs. Information to be included in server training must at a minimum include:

- The importance of checking age identification of customers who appear under age 30.
- How to identify fake IDs and what to do once a fake ID is confiscated.
- How to recognize situations in which adults are buying alcohol for underage youth.
- How to refuse sales to individuals who may supply alcohol to underage youth.
- How to identify intoxicated customers.
- How to refuse service to underage youth and intoxicated customers.

Research has shown that RBST training reduces the likelihood of sales to intoxicated persons by as much as 46% (University of Minnesota, 2003).

A compact between the State and the Tribe that includes terms for payments similar to recent compacts between other tribes and the State, will ensure that governmental financial effects and effects to public safety services are mitigated. The Michigan Legislature previously approved such a compact between the Tribe and the State. This compact has not been signed by Governor Jennifer Granholm or approved by the Secretary of the Interior. The Tribe is entering into agreements with local agencies to compensate for loss of revenue and to ensure that no loss of services will occur as a result of operation of the gaming facility. In the event the Tribe and State are unable to negotiate a Class III gaming compact and the Secretary of the Interior issues Class III gaming procedures pursuant to 25 C.F.R. Part 291, the Tribe will pass a resolution promising to contribute two percent of electronic gaming revenues annually to local governments. The resolution should specifically state that at least $150,000 of the two percent revenues would be set aside for local government general administrative expenses. No additional mitigation is required.

## RESOURCE USE PATTERNS

### TRANSPORTATION NETWORKS

Transportation-related mitigation measures for the Preferred Alternative are described below. The

following roadway improvements are recommended and enforceable through the MDOT permitting process for use of the state trunkline right-of-way to mitigate casino-generated traffic. They apply to both the 2003 and 2011 scenarios with casino traffic.

*INTERSECTION LEVELS OF SERVICE*

Acceptable levels of service are projected at all but two of the study intersections under Opening Year Plus Project conditions, resulting in significant impacts at those intersections. The measures needed to mitigate those impacts and other traffic-related mitigation measures are described below.

- Install all-way stop control at the US-131 southbound ramps/129th Avenue intersection. A traffic signal may be required if all-way stop control does not provide acceptable intersection operations. Based on the capacity analysis for an all-way stop, the intersection operation will be improved, and the southbound-to-eastbound left-turn movement will operate at its capacity limit (utilization ratio of 1). However, the left-turn movement will continue to operate at Level of Service (LOS) F. MDOT typically performs the traffic study that determines the need for a traffic signal based on actual traffic volumes, rather than estimated traffic volumes. MDOT has stated in a letter dated September 25, 2001, that it believes all-way stop traffic control at this intersection will provide acceptable intersection operations.
- Construct right turn lane from the northbound US-131 off-ramp turning onto 129th Avenue, eastbound. According to MDOT, this will improve traffic volumes at this off-ramp from LOS F during peak afternoon hours to an "adequate" level of service.

*ACCESS SYSTEM RECOMMENDATIONS*

The Tribe will implement the following improvements to facilitate access to the site:

- Provide a continuous and exclusive bi-directional center turn lane on 129th Avenue at all three casino driveways. The continuous center turn lane will extend the full distance between the west driveway and the main driveway.
- Provide westbound-to-northbound right-turn flares on 129th Avenue at all three casino driveways.

AIR QUALITY

A General Conformity Rule analysis was conducted for the Preferred Alternative. Based on the estimated emissions of criteria pollutants, in comparison to the thresholds of the General Conformity Rule, the Preferred Alternative is in compliance with the federal Clean Air Act and a formal Conformity Determination is not required.

In order to minimize health effects on casino patrons, ventilation for public areas shall be designed, installed, operated, and maintained in accordance with the American Society of Heating Refrigeration and Air Conditioning Engineers Standard 62-2001, *Ventilation for Acceptable Indoor Air Quality*. Such mitigation will be evaluated at the time that detailed plans and specifications are prepared for the HVAC system in order to remain in compliance with ordinances that the Gun Lake Tribe might implement to be consistent with state and local indoor air requirements.

PUBLIC SERVICES

To mitigate impacts to public services, the Tribe has offered to enter into agreements with local government service providers to ensure public services are provided to the facility. Options for providing public services to the casino are described in EA Chapter 4.1.7. By either providing its own utility services, or entering into mutually acceptable agreements with public or private service providers, impacts to public services will be fully mitigated. Police service for the facility will be provided by Allegan County consistent with State and federal law and consistent with the service agreement between the Sheriff's Office and the Tribe. Fire service to the facility will be provided by the City of Wayland consistent with State and federal law and the service agreement between the City of Wayland and the Tribe. Wayland Area Emergency Medical Service would provide ambulance service to the facility. Wayland Area Emergency Medical Service has issued a letter of intent to provide ambulance services to the casino. Agreements will be completed for ambulance services prior to the opening of the casino to the public. To further minimize effects to emergency medical services, all on-site security staff will be trained in emergency medical response.

OTHER VALUES

NOISE

During construction, sound levels shall be minimized by the use of mufflers and appropriate construction equipment. Construction shall be limited to daylight hours when most residents are typically not home.

FINDINGS

The NIGC concurs with the BIA in making the following findings, which support this FONSI:

1.    Federal and state agencies and the public were involved in identifying environmental issues related to the proposed action. *See* Final EA Appendices A, C, F, G, I, K, L, N and P. The Final EA contains a list of agencies, tribal governments and individuals that were contacted. *See* Final EA Chapter 6, Consultation and Coordination. The Final EA also contains responses to specific comments and describes revisions to the Draft EA in response to comments. *See* Final EA Appendix Q.

2.    Alternative courses of action were developed in response to environmental concerns and issues related to the proposed action. *See* Final EA Chapter 2, Alternatives and May 18, 2005 Alternatives Letter Report. The EA discloses the environmental consequences of the proposed action and the no-action alternative. *See* Final EA Chapter 4, Environmental Consequences. The EA assesses compliance of the alternatives with applicable environmental mandates, and includes information that supports a finding of no significant impact.

3.    The EA describes protective mitigation measures that will be levied to protect the human environment, particularly public safety and water quality. These measures are summarized above. *Also see* Final EA Chapter 5, Mitigation Measures. The EA describes permitting processes and other enforceable mechanisms that are in place to ensure that the Tribe completes mitigation measures to protect key resources. *See* Final EA Chapters 1, 4 , and 5.

4.    The EA finds that the proposed action will not jeopardize federal or state-listed threatened and

8

endangered species because such species do not occur on the proposed site. *See* Final EA Chapter 4.3.3 and Appendix C. The U.S. Fish and Wildlife Service and the Michigan Department of Natural Resources concur with this finding. *See* Final EA Appendix I. The proposed action is in compliance with the Farmland Protection Policy Act, and will not result in the conversion of federally delegated Prime and Unique Farmland. *See* Final EA Chapter 4.6.4 and Appendix G.

5.      The EA finds that the proposed action is in compliance with the National Historic Preservation Act, and that no historic properties will be affected under the proposed action. *See* Final EA Chapter 4.4. The State Historic Preservation Officer concurs with this finding. *See* Final EA Appendix L. Should undiscovered archeological remains be encountered during project ground-disturbing activities, work shall be halted in the area of discovery and the artifact shall be professionally evaluated. *See* Final EA Chapter 5.4.

6.      The EA finds that impacts to public health and safety will not be significant. *See* Final EA Chapters 4.5, 4.6, and 4.7. The EA contains agreements that commit the Tribe to pay for law enforcement and fire protection services that would be required under the proposed action. *See* Final EA Appendix A. Further, the Tribal-State Gaming Compact contains revenue sharing provisions that will be used as mitigation to help fund governmental infrastructure and services that would be impacted by the proposed action. *See* Final EA Appendix P (Comment Letter NN). The EA describes enforceable mitigation that will sufficiently reduce traffic impacts to a minimum. *See* Final EA Chapters 4.6.1, 5.6.1, and Appendix D. The EA also finds that the proposed action is in compliance with the Clean Air Act and the National Ambient Air Quality Standards (NAAQS). *See* Final EA Chapter 4.6.2. The proposed action would be located in an attainment area for all of the EPA's current priority pollutants except for the new 8-hour ozone standard. Additional modeling was performed for the ozone precursors indirectly caused by the casino project. These emissions were projected to be well below the conformity thresholds (40 CFR § 93.153). *See* June 25, 2004 memorandum from D.K. Sprague to Herb Nelson. Thus, a general conformity determination is not required. The EA also describes mitigation of water quality impacts made enforceable through the EPA permitting process. *See* Final EA Chapters 4.2 and 5.2.2.

7.      The EA finds that the proposed action will not be located in a floodplain, and will not intensify downstream flooding risk in compliance with Exec. Order No. 11988 (Floodplain Management). *See* Final EA Chapter 4.2.2. The EA also finds that the proposed action will not adversely impact wetlands, and that the proposed action will be in compliance with Exec. Order No. 11990 (Protection of Wetlands) and Section 404 of the Clean Water Act. *See* Final EA Chapter 4.3.1. A Part 303 permit from the Michigan Department of Environmental Quality, if necessary, will ensure that impacts to wetlands located adjacent to the proposed trust acquisition site along 129th Avenue are minimized and are in compliance with state wetlands statutes. *See* Final EA Chapter 5.3. Discharge limitations contained in a National Pollution Discharge Elimination System permit will ensure that wastewater impacts to water quality from the on-site wastewater management system will not be significant. *See* Final EA Chapters 4.2.3 and 5.2.2.

8.      The EA analyzes the cumulative impacts of the proposed action and finds that they will not be significant. *See* Final EA Chapter 4.8 and May 23, 2005 Cumulative Impacts Letter Report. The EA categorizes three geographic areas where indirect growth is reasonably foreseeable and finds that induced growth will occur, but that its effects will not be significant. *See* Final EA Chapter 4.9.

9.      The EA finds that the proposed action would improve the economic and social conditions of the Tribe by meeting the purpose and need for the action identified in Final EA Chapter 1.3. *See* Final EA Chapter 4.5. The EA also finds that the proposed action will benefit the local economy by creating jobs and increasing local

spending. *See* Final EA Chapter 4.5.1 and Appendix H. The EA finds that the proposed action is in compliance with Exec. Order No. 12898 (Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations) because the proposed action will cause no disproportionately high adverse impacts specific to minority or low-income populations. *See* Final EA Section 4.5.5.

The NIGC has independently evaluated the information and analysis in the BIA's EA, in the preparation of which it was a cooperating agency, and the NIGC has further updated the information and analysis to ensure its continuing validity.

## ADDITIONAL INFORMATION SUBMITTED

Following the February 27, 2004 FONSI, additional information has been submitted to the BIA and reviewed by the NIGC. This additional information supplements and updates the information in the EA. The NIGC has independently evaluated it and takes responsibility for the information. Nothing in the new submissions alters the analysis that was undertaken in the EA. This information includes the following and is attached:

* A memorandum, dated June 25, 2004, from Tribal Chairman D.K. Sprague to Herb Nelson, Regional Environmental Scientist for the BIA, Midwest Region. This memorandum provides additional information on the basis for the conclusion of no significant air quality impact in the EA.
* A memorandum, dated July 6, 2004, from Analytical Environmental Services Principal David Zweig to Herb Nelson, Regional Environmental Scientist for the BIA, Midwest Region. This memorandum summarizes a phone conversation between David Zweig and Mike Leslie, Air Quality Specialist at the U.S. Environmental Protection Agency regarding the methodology of the air quality assessment completed for the EA.
* A letter report, dated May 18, 2005, which provides additional information on project alternatives.
* A letter report, dated May 23, 2005, which provides additional information on cumulative analysis.

## DETERMINATION

The December 2003 Final EA, upon which the BIA based its decision to issue a FONSI, provides a sound basis for evaluating the environmental impact of the Tribe's operation of a gaming facility on the proposed site. The additional information received since the date of the Final EA is consistent with and reinforces the Final EA's analysis and conclusions. The NIGC adopts the Final EA as its own, and based on that document, as well as the supplemental information considered by the agency, approves the management agreement.

## RECOMMENDATIONS/APPROVALS

After careful and thorough consideration of the facts contained herein, the undersigned finds that the proposed Federal action is consistent with existing national environmental policies and objectives as set forth in Section 101 of the NEPA and other applicable environmental requirements and will not

significantly affect the quality of the human environment or otherwise include any condition requiring consultation pursuant to Section 102(2)(c) of NEPA.

*Environmental Assessment and FONSI reviewed and recommended by:*

Bradley A. Mehaffy
NIGC NEPA Compliance Officer

*FONSI Approved by:*

Philip N. Hogen
NIGC Chairman

9/7/05
Date

9/21/05
Date

11



**ANALYTICAL ENVIRONMENTAL SERVICES**
2021 "N" Street, Suite 200
Sacramento, CA 95814
(916) 447-3479 • Fax (916) 447-1665

# MEMO

| To: | Herb Nelson | From: | David Zweig |
|---|---|---|---|
| Fax: | (612) 713-4440 | Date: | July 6, 2004 |
| Re: | Gun Lake Air Quality | CC: | D.K. Sprague, fax: (616) 681-8836<br>Susan Schaeffer/Maria Wiseman,<br>fax: (202) 219-1791 |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☒ For Your Information

I spoke with Mike Leslie, Air Quality Specialist at the U.S. EPA Region 5, earlier today regarding the air quality analysis completed in the EA for the Gun Lake casino project, which the BIA relied upon in issuing its FONSI dated February 27, 2004. Mr. Leslie, who is listed on page 6-1 of the EA as a "person consulted", was familiar with the project and mentioned that he had spoken to you previously about air quality issues.

In our conversation, I described the basic assumptions made by our subconsultant, SME, in conducting the air quality analysis for the project. Specifically, I cited page 5 of the September 11, 2002 SME report which states:

> "To evaluate the vehicle emissions impacts, SME utilized general procedures outlined in the US Environmental Protection Agency (USEPA) and Federal Highway Administration (FHWA) "conformity rules" for transportation projects….. Carbon Monoxide is the most likely contaminant to impact air quality; therefore, screening of carbon monoxide impacts is conducted to evaluate compliance with the NAAQS. By demonstrating carbon monoxide emissions are in compliance with the NAAQS, it is predicted the other criteria air pollutants will also be in compliance."

July 15, 2004

Mr. Leslie confirmed that this is the standard methodology used in evaluating traffic-generating projects. With other projects, he said that further site-specific studies are sometimes needed depending on the specific location of the project and the attainment status of the region. He said that Allegan County is in "Subpart 1" or "basic" non-attainment status for ozone, and was pleased to hear that the September 11, 2004 SME report examined the potential for the area to be designated non-attainment for ozone.

To document that the approach of modeling carbon monoxide was appropriate methodology for the analysis, Mr. Leslie referred me to a FHWA document titled: "*Guidance for Preparing and Processing Environmental and Section 4(F) Documents, T 6640.8A, October 30, 1987*". This document provides the following guidance for evaluating air quality impacts:

> "The draft EIS should contain a brief discussion of the transportation-related air quality concerns in the project area and a summary of the project- related carbon monoxide (CO) analysis if such analysis is performed. The following information should be presented, as appropriate.
>
> Mesoscale Concerns: Ozone ($O_3$), Hydrocarbons (HC), and Nitrogen Oxide ($NO_x$) air quality concerns are regional in nature and as such meaningful evaluation on a project-by-project basis is not possible. Where these pollutants are an issue, the air quality emissions inventories in the State Implementation Plan (SIP) should be referenced and briefly summarized in the draft EIS....
>
> Microscale Concerns: Carbon monoxide is a project- related concern and as such should be evaluated in the draft EIS. A microscale CO analysis is unnecessary where such impacts (project CO contribution plus background) can be judged to be well below the 1- and 8-hour National Ambient Air Quality Standards (or other applicable State or local standards)...."

After speaking with Mr. Leslie and reviewing the FHWA document cited above, I have reconfirmed that the air quality analysis conducted as part of the Gun Lake EA was appropriate and fully supports the BIA's Finding Of No Significant Impact, and that the Tribe's casino and its indirect effects do not individually or cumulatively cause a significant impact to air quality.

Please call me if you have any further questions regarding this issue.

## MEMORANDUM

TO:      Herb Nelson, Regional Environmental Scientist, Midwest Region, Bureau of
         Indian Affairs

FROM:    Chairman D.K. Sprague, Match-E-Be-Nash-She-Wish Band of Pottawatomi
         Indians

RE:      Basis for Concluding No Significant Impact on Air Quality

DATE:    June 25, 2004

---

### Introduction

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Gun Lake Tribe" or "Tribe") seeks to acquire in trust 146 acres of land in Allegan County, Michigan, on land known as the "Bradley site." Toward that goal, on December 2, 2003, the Tribe submitted its revised final Environmental Assessment ("EA") to the Minneapolis Regional office of the Bureau of Indian Affairs ("BIA"). The final EA represented the culmination of ten working months of collaboration between the Tribe and the BIA, and followed a seventy-five day public comment period. On February 27, 2004, Department of the Interior Deputy Assistant Secretary for Indian Affairs, Aurene Martin, issued a Finding of No Significant Impact ("FONSI").

On April 14, 2004, the Environmental Protection Agency ("EPA") designated Allegan County, Michigan as a nonattainment area for ozone air quality standards. In light of this development, and in accordance with the Tribe's government-to-government relationship and the duties pursuant to applicable federal law, the Tribe submits the additional analysis contained herein for the administrative record.

As this document will show, although Allegan County's attainment status has changed, the analysis and conclusions in the EA and FONSI remain valid. First, when the EA was conducted and the FONSI was issued, there was only the possibility that an ozone nonattainment status would be granted; thus, any reliance in the EA on attainment designation was proper at the time it was issued. Second, notwithstanding the mere possibility of a nonattainment designation, the EA did address the potential effects of a change in attainment status. Third, the nonattainment designation is irrelevant, in any event, because regardless of attainment status, the EA includes that the Tribe's casino and its indirect effects do not individually or cumulatively cause a potentially significant impact on air quality.

### A. Allegan County Was Not Designated A Nonattainment Area When The EA Was Conducted And When The FONSI Was Issued

The Gun Lake Tribe submitted its revised final EA on December 2, 2003, and the Department of Interior ("DOI" or "Interior Department") issued a FONSI on February 27, 2004. At the time of both of these events, Allegan County was designated in attainment for air quality standards. The EPA did not issue its final designation of nonattainment until April 14, 2004, seven months after submission of the final EA and almost two months after issuance of the FONSI.

Although it was possible that Allegan County might be designated a nonattainment area due to ozone from across Lake Michigan, it was certainly not a foregone conclusion that Allegan County would be designated as nonattainment for ozone for the eight-hour ozone standard. As noted in the EA, the EPA issued the eight-hour ozone standard in 1997. The EPA's decision was challenged in court and, after a lengthy legal battle, the courts upheld the new ozone standard in March 2002. In June 2003, the EPA proposed an implementation rule, which proposed requirements for eight-hour ozone nonattainment areas and asked states and tribes to submit recommendations on the boundaries of the nonattainment areas.

On July 15, 2003, the State of Michigan, acting through the Michigan Department of Environmental Quality ("MDEQ"), submitted its recommendations to the EPA. Although the State of Michigan recommended that Allegan County be classified as a nonattainment area, the State clearly believed it had no choice but to base this recommendation on what the State argues is the EPA's erroneous interpretation of a required designation of nonattainment. Specifically, the State, on page five of its July 15, 2003 recommendations document, noted that: "Although the EPA has long recognized that air quality in west Michigan is impacted by overwhelming ozone transport and local emission reductions cannot bring about attainment with the ozone standard, the EPA maintains that nonattainment designations for these counties are appropriate." The State also noted the EPA's rationale for this interpretation: "designations provide the public with important information on the air quality in their area." The State then argued that designations are "legal distinctions that drive emission reduction requirements, not public information tools." The State argued further on page six that, "[t]he MDEQ believes that the overwhelming ozone transport phenomenon occurring in the Lake Michigan region should be differentiated from the regional ozone transport that is experienced elsewhere in the country."

On October 15, 2003, the EPA reopened the comment period on the nonattainment designations. In a December 3, 2003 letter, the EPA notified the Gun Lake Tribe of the potential nonattainment designation and requested comments from the Tribe as to its recommendations for designation. This letter constituted notice of a proposed action, not of a final action. A principal purpose of the letter was to ask for additional information and comment on the EPA's proposed action. In fact, in the letter, the EPA noted that it was also continuing to generate data that might "support a change in the proposed designation of nonattainment . ." Specifically, the EPA had been tracking 2003 ozone monitoring data and their impact on the potential nonattainment designation. Thus, the EPA indicated that the proposed nonattainment designation could change based on 2003 data.

Indeed, many proposed nonattainment designations changed before final publication in the Federal Register on April 14, 2004. For example, Lawrence County, Ohio and Houston County, Georgia were recommended nonattainment by the EPA, but were listed as attainment in the April 14, 2004 Federal Register publication. These are just two examples of many that demonstrate that the EPA can and has changed proposed designations in the final days before publication. Therefore, to the degree that the EA continued in the analysis the existing attainment status of Allegan County, it was proper under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 – 4347.

## B. The Tribe Considered A Nonattainment Designation In Its Analysis

Despite the fact that at the time of the submission of the EA, Allegan County was designated in attainment for air quality standards, the EA included consideration of the casino's potential effects on ozone in a county designated as nonattainment. For example, "Criteria Air Pollutant Attainment Status" on pages three through thirty-six of the EA addresses the June 1997

new standards for ambient air quality standards for pollutants, and the possible implementation of such standards.

Because new standards became available before the Preferred Alternative was implemented, the Tribe reexamined its analysis to verify that its conclusions in the EA remained valid.[1] As explained in detail in Section C of this document, the additional analysis shows that casino activities are well below the conformity determination thresholds.

C.    As Concluded In The EA / FONSI, The Tribal Casino Development Poses No Individually Or Cumulatively Significant Impact On Air Quality

As concluded in the EA / FONSI, the Tribal casino development poses no individually or cumulatively significant impact on air quality. Federal Clean Air Act regulations require a conformity determination for all federal actions where the total of direct and indirect emissions in a nonattainment or maintenance area caused by a Federal action would equal or exceed certain thresholds. See 40 C.F.R. § 93.153. If the thresholds are not exceeded, the Federal action is presumed to conform to the State Implementation Plan ("SIP"), evidencing a less than significant impact. See 40 C.F.R. § 51.853.

The Tribe's casino complex will employ natural gas-fired boilers. Natural gas is one of the cleanest commonly used fossil fuels, since most emissions from natural gas boilers and furnaces are nitrogen oxides. According to Soil and Materials Engineers, Inc. ("SME"): "Stationary sources at the casino complex (e.g. HVAC equipment and kitchen equipment) are not significant sources of air pollution." See Appendix J of the EA. Thus, emission from the casino and entertainment complex will not exceed thresholds.

An indirect effect of the project that might affect air quality is the exhaust from automobiles and trucks. However, the EA considered the effect of exhaust on ozone problems in Chapter 4, on pages thirty-three through thirty-five, and, regardless of attainment designation, the proposed project and its indirect effects do not pose a potentially significant impact on ozone.

Given Allegan County's recent nonattainment designation for eight-hour ozone, additional modeling[2] was performed for the ozone precursors indirectly caused by the casino project by SME. See attached SME Letter Report, dated June 25, 2004. Specifically, SME evaluated vehicle emissions for volatile organic compounds (VOCs) and nitrogen oxides (NOx) associated with traffic conditions predicted for the proposed project.

According to SME, base year emissions from employee trips (2003) would be seven tons/year VOCs and eight tons/year NOx. Future year (2011) emissions from employee trips would be three tons/year VOCs and four tons/year NOx. Base year employee/patron trip emissions would total forty-four tons/year VOCs and fifty-five tons/year NOx. Future year

---

[1] The reexamination of the EA was conducted to assess whether the designation caused new conditions that would warrant a supplemental analysis. The analysis produced from the reexamination of the EA may properly be considered at this time because it does not result in a finding of significant environmental impact or uncertain impacts. See 40 C.F.R. § 1502.9(c); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 373-374 (1989) ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized."); Price Road Neighborhood Ass'n, Inc. v. United States Dept. of Transp., 113 F.3d 1505, 1509 (9th Cir. 1997) ("[S]upplemental documentation is only required when the environmental impacts reach a certain threshold – i.e. significant (defined at 40 C.F.R. § 1508.27) or uncertain."); Highway J. Citizens Group v. Mineta, 349 F.3d 938, 958-960 (7th Cir. 2003) (stating that if an agency takes a "hard look" at the environmental effects and finds that the previous EA/FONSI remains valid, then no supplemental document is necessary).

[2] Again, the Tribe only conducted a reexamination of the EA to assess whether the designation caused new conditions that would warrant a supplemental analysis.

employee/patron trip emissions would total twenty-two tons/year VOCs and twenty-seven tons/year NOx. The foregoing indicates that the cumulative employee and patron trip emissions are well below the conformity threshold of one hundred tons/year. See 40 C.F.R. § 853(b)(1).

Therefore, as the additional modeling shows, attainment status does not affect the analysis because it does not alter the conclusion that the proposed casino does not have an individually or cumulatively significant impact on air quality.

### D. The Source Behind Allegan County's Nonattainment Status is Ozone Transport from across Lake Michigan

It has been well documented that Allegan County's eight-hour ozone nonattainment designation is caused not by regional emissions, but by ozone transport from across Lake Michigan. Page one of the Air Quality Report in Appendix J of the EA explains:

> Ozone close to ground level (tropospheric) can be transported long distances, under certain meteorological conditions, impacting air quality downwind of the area of formation. USEPA reports that most of the ozone in western Michigan (including Allegan County) is attributed to transportation from the upwind Gary-Chicago-Milwaukee severe ozone non-attainment areas. In fact, urban air shed modeling has demonstrated there is little to no change in ozone concentrations in western Michigan, even when the VOC and NOx emissions are eliminated (Federal Register, November 24, 2000).

Additionally, the State of Michigan's response to the EPA on July 15, 2003 supports the Air Quality Report's conclusions regarding ozone transport in western Michigan. Specifically, on page two of its letter to the EPA, the State notes that: "Local emission reductions do not reduce ozone concentrations at shoreline monitors even in counties with urbanized areas." The State elaborates further on page six of the recommendations document, noting that, "The degree of ozone transport impact on coastal monitors a few miles from the water's edge is truly overwhelming." In addition, the State concludes, "[l]ocal emission reductions occurring downwind from the violating monitors in West Michigan have been shown to be ineffective in reducing the design values." Thus, the operation of the proposed casino and entertainment project, which is located in eastern Allegan County, well downwind of the aforementioned "shoreline monitors," would not affect the nonattainment designation or result in a significant ozone impact.

### Conclusion

As demonstrated above, although Allegan County's attainment status has changed, it does not alter the conclusion that the proposed casino does not have an individually or cumulatively significant impact on air quality. The EA and FONSI remain valid and therefore any additional environmental impact analysis would not yield a different conclusion.

Gun Lake Casino Environmental Assessment
Additional Information on Project Alternatives

May 18, 2005

ALTERNATIVE SITES

Before proposing the project site, the Gun Lake Tribe evaluated several other potential sites throughout Allegan County. The sites were not pursued for one or more of the following reasons:

* Lack of water and sewer infrastructure or capacity for onsite water supply and wastewater disposal.
* Inconsistency with zoning.
* Incompatibility with adjacent land uses.
* Lack of adequate roadway access, or potential for traffic disruption to adjacent areas.
* Environmental effects unique to the alternative sites
* Poorer location with respect to commercial viability of project

The Tribe selected three other sites for in-depth examination and consideration (EA Figure 2-7). Initially, it appeared that these sites could meet the Tribe's purpose and need. However, after more thorough analysis, including conducting Phase I environmental site assessments on the sites in January of 2001, and evaluating development compatibility with surrounding uses, the Tribe eliminated these alternative sites from further consideration and analysis. The Tribe and the EA consultants discussed these alternative sites and the supplemental information contained herein with the BIA, and acted in accordance with the guidance received from the BIA in terms of the contents of the EA. These sites are discussed in detail below.

*Site 1 – 108 acre Site*

The first site the Tribe selected for more thorough examination is 108 acres (Site 1 in EA Figure 2-7). It is located in Dorr Township. It is bordered on the east by 12th Street, on the west by US-131, on north by the Jablonski property, and on the south by 142nd Avenue. The Tribe rejected this site for a number of reasons, as described below.

1. The site is located near local schools and the town of Moline. The school is considered to be incompatible with a casino and would increase the controversy and opposition surrounding the proposed casino.
2. The site contains a water tower. The existing owners operate a private water supply system that supplies water to local municipalities, including nearby Moline. The tower

1

would need to be demolished or water appropriated to support the casino activities, impacting a source of water for neighboring municipalities.

3. Sewer service in the quantity required for the casino would not be readily available at the site, and due to the limited size of the site and the lack of a nearby river or creek, it would be difficult or impossible to construct an on-site wastewater treatment and disposal system.

4. Site 1 appeared to be biologically sensitive, and included the presence of wetlands.

5. Current on-site development is minimal and could not be retrofitted to support a large commercial facility such as a casino. The site would have to be cleared and prepared for development. Any biological or cultural resources on the site would be impacted.

6. The introduction of new impervious surfaces on the site (e.g. buildings and parking areas) would increase stormwater runoff, which could cause downstream flooding and water quality problems.

7. Access to the property was not conducive to large-scale commercial development. Access is from the east along 12th Street, a dirt road.

A Phase I Environmental Site Assessment (ESA) was conducted on Site 1 (see attachment). Although the Phase I ESA did not reveal evidence of toxic contaminants associated with Site 1, it did identify several barns, a residence, and a veal waste lagoon, which according to the Phase 1 ESA, "… may have consisted of manure." The walkover of Site 1 was conducted in January after a snowfall. Thus, a thorough inspection of the site's soils was not possible. Although the veal waste lagoon was not clearly visible due to snow cover, an interview with the previous landowner confirmed that the lagoon was used for above ground dumping of veal waste. The liquid waste was then pumped underground to two vertical irrigation sprinklers, which irrigated the pasture with the waste liquid. Although the lagoon is not considered in the Phase I ESA to be hazardous, it would require some level of remediation prior to preparing the site for commercial use.

*Site 2 – 242 acre Site*

The second potential gaming site is located in Dorr Township (Site 2 in EA Figure 2-7). It is triangular in shape, 242 acres, and located just south of the first site. It is bordered on the east by US-131, on the south by 140th Avenue, and on the west by the Potter Bros. and Damstra properties. The Tribe rejected this second site for a number of reasons, which are listed below.

1. Ingress and egress was a concern because only two access points were available on either side of an existing residence, which was not for sale. Thus, traffic access would be difficult and would heavily impact the adjacent residence.

2. Site 2 also appeared to be biologically sensitive, and included the presence of wetlands.

2

3. Current on-site development is minimal and could not be retrofitted to support a large commercial facility. The site would have to be cleared and prepared for development. Any biological or cultural resources on the site would be impacted.

4. The introduction of new impervious surfaces on the site (e.g. buildings and parking areas) would increase stormwater runoff, which could cause downstream flooding and water quality problems.

5. Most of the site is zoned for rural estates, a land use designation that is not consistent with commercial development.

6. A Phase I ESA indicated the likely presence of asbestos in one of the on-site structures. This asbestos is hazardous and would need to be remediated and disposed of properly prior to commercial development.

*Site 3 – 129 acre Site*

The third site is approximately 129 acres located in Hopkins Township, just to the west of US-131 and bisected by 132nd Avenue (site 3 in EA Figure 2-7). The Tribe rejected this site for a number of reasons, which are listed below.

1. The site lacks water and sewer infrastructure.

2. The site is irregularly shaped. Constructing a large casino with parking and associated facilities would be difficult on the long, narrow, rectangular site.

3. The site is served only by an unpaved road and is not readily accessible from a highway interchange.

4. Traffic accessing the site would pass many neighboring residences, potentially resulting in associated nuisance impacts, such as noise and visual impacts.

5. Adjacent construction equipment sales operations raised concerns about potential present or future contamination from leaking vehicles.

6. Site 3 also appeared to be biologically sensitive, and included the presence of two waterways with associated riparian vegetation.

7. The site is zoned for agriculture, a land use designation that is not consistent with commercial development.

A Phase I ESA was conducted on Site 3 (see attachment). Although the Phase I ESA did not reveal evidence of toxic contamination associated with Site 3, it did chronicle a residence, barn, and several outbuildings. The walkover of Site 3 was conducted in December with a snow cover present. Thus, a thorough inspection of the site's soils was not possible.

3

## ALTERNATIVE USES OF PROPOSED PROJECT SITE

Alternative uses of the proposed project site were also considered by the Tribe but rejected as infeasible. The Tribe first considered industrial uses. Similarly, the Tribe looked at other economic uses such as retail, but did not pursue them since the low density of the surrounding population did not provide a market that would make such an endeavor a success.

The proposed project site currently contains an industrial building associated with the past operation of Ampro Industries, Inc. Ampro Industries manufactured lawn products such as mulch and hydroseed mix. The continuation of a similar manufacturing business on the site was considered by the Tribe. The existing modern warehouse style industrial building with a connected office is well suited for a manufacturing business. Truck loading docks, employee parking, and large indoor work and storage space, and good highway access characterizes the existing physical facilities. As stated in the EA, the site is currently zoned industrial, and there are no sensitive land uses nearby, and therefore it is well suited to a manufacturing business.

Unfortunately, manufacturing businesses have not fared well in Michigan due to high labor costs and other competitive pressures. Ampro Industries, the former owner of the site, first downsized and then ceased all manufacturing operations on the site. Given that the Tribe has no particular experience or track record in manufacturing, and that no investors or management companies were identified that would finance and assist the Tribe with the operation of such a business on this site or any other site, the use of the site for manufacturing use was determined to be infeasible.

4

Gun Lake Casino Environmental Assessment
Supplemental Information on Cumulative Impacts

May 23, 2005

Potential cumulative impacts were discussed in depth with the BIA during EA preparation. EA Section 4.8 (Final EA page 4-51 through 4-62) documents this cumulative analysis. The cumulative analysis included the effects on specific resources, ecosystems, and human communities that occur incrementally in conjunction with other actions, projects and trends. The cumulative analysis included: 1) identifying past, present, and future actions and projects in association with the status of the resources, ecosystems, and human communities that may be affected, and 2) defining geographic borders and time frame of the analysis. The status of affected resources was confirmed based upon the information provided in EA Chapter 3.0, from specific resource studies that have been undertaken for the alternatives, as well as further information developed since the completion of the EA. As recommended by the Council on Environmental Quality (CEQ), only those cumulative impacts that are considered to be relevant or consequential have been discussed in depth. The Tribe and the EA consultants discussed cumulative issues and the supplemental information contained herein with the BIA at the time of the preparation of the EA, and acted in accordance with the guidance received from the BIA in terms of the contents of the EA. Since that time, the continuing validity of the cumulative analysis has been confirmed for the NIGC through continued contacts with neighboring local governments. The following discussion provides more detail regarding the cumulative analysis conducted for the EA, and updates the information in the EA. Nothing is being submitted now which alters the analysis which was undertaken in the EA.

The geographic boundaries of the cumulative effects area were determined by the nature of the resources affected and the distance that effects may travel. As an example, increased sedimentation of waterways that result from a project are limited to the watershed in which they occur, as a result, it is only necessary to examine incremental effects within that watershed. Air quality emissions from a project, however, travel over far greater distances and therefore necessitate analysis on a county, air basin, or regional level. For the Gun Lake casino analysis, the geographic boundary of the cumulative effects area was generally that of Hopkins and Wayland Townships where a relatively narrow cumulative analysis is appropriate and Allegan County where a broader cumulative analysis is appropriate. The time frame of the cumulative effects analysis generally extended to 2011. For many resources, information is unavailable to extend meaningful analysis to 2011; however attempts have been made to provide all relevant information.

To address cumulative effects that may occur in the region, local governments were contacted to identify actions and projects that have the potential to affect the status of environmental resources

1

in the region. Specifically, the following jurisdictions were contacted several times throughout the NEPA process, most recently, in May 2005: Allegan County, Wayland Township, Hopkins Township, and the City of Wayland. According to these jurisdictions, no other actions or projects are planned in the vicinity of the project site and only three developments are planned within Wayland Township, Hopkins Township, and the City of Wayland. Specifically, a small road resurfacing/improvement project is planned in the City of Wayland and two housing developments are planned in Wayland Township. The Wayland Township developments are condominium projects located approximately ten miles southeast of the project site (Figure 4A). The condominium developments would be required to conform to existing township zoning, pay applicable fees, and operate according to township conditions. Due to the distance of these projects from the proposed casino site, and the limited size of the projects, no significant cumulative effects are attributable to these specific projects in conjunction with the proposed casino project. Absent specific projects that could cause cumulative impacts, the EA analysis was primarily based on general growth and development trends in the area as guided by the Allegan County Comprehensive Growth Management Plan (1999), Wayland Township Land Use Plan (1991) and Wayland Township Zoning Ordinance.

As stated in the Final EA, no cumulative development is reasonably foreseeable in the vicinity of the project site that would present land use conflicts (Marklevitz, 2003). Thus, no significant cumulative land use impacts are anticipated.

2