NIGC

# NATIONAL

# ENVIRONMENTAL POLICY ACT

# PROCEDURES MANUAL



EXHIBIT

D

# National Environmental Policy Act Procedures Manual

## Table of Contents

I. Introduction and Background .................................................... 1

1.1 Introduction: ................................................................. 1

1.2 NEPA and Council for Environmental Quality Requirements: .................. 1

1.3 The NIGC: .................................................................... 2

II. Preliminary Compliance With NEPA ............................................ 4

2.1 Introduction: ................................................................. 4

2.2 Congressional Exemptions: ................................................... 4

2.3 Responses to Emergencies: ................................................... 4

2.4 Using Existing NEPA Documents and Information: ............................. 4

2.4 (A) Analyzing An Existing Document: ........................................ 5

2.4 (B) Tiering: ................................................................. 5

2.4 (C) Supplementing: .......................................................... 6

2.4 (D) Using Another Agency's Environmental Document: ......................... 6

2.4 (E) Incorporating Existing Documents and Information: ....................... 6

2.5 Determining Categorical Exclusions: ......................................... 7

III. Preparation of an Environmental Assessment ................................. 8

3.1 Introduction: ................................................................. 8

3.1 (A) Preparing an Environmental Assessment: .................................. 9

3.2 (B) Reviewing an EA: ......................................................... 9

3.1 (C) Scoping: ................................................................. 10

3.1 (D) Conducting the Assessment and Preparing the EA: ......................... 10

3.1 (E) Identifying the Affected Environment and Analyzing Existing Conditions: . . . . . . . . . . 11

3.1 (F) Analyzing Direct and Indirect Impacts: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3.1 (G) Analyzing Cumulative Impacts: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.1 (H) Identifying Alternatives to the Proposed Action: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.2 Determining Significance: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.3 Issuing a Finding of No Significant Impact: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3.4 Publishing Notice: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3.5 Monitoring the Results: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV. Preparation of an Environmental Impact Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.1 Introduction: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.2 Scoping the EIS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.2 (A) Publishing Notice: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.2 (B) Preparing a Plan: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.2 (C) Public Involvement, Coordination, and Consultation: . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.2 (D) Defining the Proposed Action: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.3 Identify Cooperating Agencies: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.4 Contracting: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.5 Formatting the EIS: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.6 Selecting the Preferred Alternative: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.7 Preparing a Preliminary Draft EIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.7 (A) Completing and Distributing the Draft EIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.8 Responding to Comments: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.9 Preparing the Preliminary Final EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.10  Issuing the Final EIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4.11 Issuing and Recording the Decision: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4.12  Monitoring: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# Appendices

Appendix A: 40 C.F.R. Parts 1500 to 1508

Appendix B:  Draft Categorical Exclusion Language

Appendix C:  Recommended Environmental Assessment Format

Appendix D:  CEQ Guidance

Prepared By:  Thompson Associates
2307 Thornknoll Drive
Suite 100
Fort Washington, MD  20744
301-248-6480

9.  Monitor Class II Gaming

10. Inspection of books, records, and facilities

11. Issuance of certificates of self-regulation

12. Approval of Class II & Class III gaming ordinances & resolutions and amendments thereto

13. Enforcement Actions and Fine Levy

14. Suitability Determinations

15. Issuance of Advisory Opinions

16. Jurisdictional Determinations

17. Environment, Health and Safety Inspections

## III. Preparation of an Environmental Assessment

**3.1 Introduction:** An Environmental Assessment shall be prepared for proposed actions which are neither categorically excluded, covered in existing environmental documents, nor readily identified as having significant enough impacts to require the immediate preparation of an EIS. The EA serves as an agency decision-making document which assists the NIGC in determining whether the impacts of the proposed project are significant enough to require the preparation of an EIS or whether a Finding of No Significant Impact (FONSI) can be issued on a proposed project. The NIGC will require the preparation of an EA for any proposed action within the NIGC's jurisdiction that involves the construction or development of a gaming facility; a major modification to an existing gaming facility; significant changes in gaming facility operations; or any proposed action the NIGC believes may have a significant impact on the human environment. If it is determined that the proposed action will have significant impacts necessitating the preparation for an EIS, a decision can be made not to prepare an EA in those circumstances, but to proceed with drafting an EIS.

Under 40 C.F.R. § 1508.9, an EA is defined as:

(a) a concise public document for which a Federal agency is responsible that serves to:

(1) briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact;

(2) suffice as agency compliance with NEPA when no environmental impact statement is necessary;

(3) facilitate the preparation of an EIS when one is necessary; and

(b) shall include a brief discussion of alternatives as required by section 102(2)(E) (of NEPA) of the environmental impacts to the proposed action, and a listing of agencies and persons consulted.

The requirement to comply with NEPA is an NIGC requirement. However, from a programmatic standpoint, the NIGC will allow Tribes and management contractors to prepare an EA for a project which involves NIGC approval. Tribes and management companies must understand that all information developed in preparation of those documents becomes part of the Administrative Record for the agency decision regarding the approval of a particular proposed project and compliance with NEPA. In that regard, Tribes and management contractors must be prepared to turn over any and all information regarding the development of an EA.

3.1 (A) **Preparing an Environmental Assessment:** The CEQ regulations provide limited guidance as to when an EA should be prepared. Under 40 C.F.R. § 1501.3:

(a) Agencies shall prepare an [EA] when necessary under the procedures adopted by the individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an [EIS].

(b) Agencies may prepare an [EA] on any action at any time in order to assist agency planning and decision-making. The most important factor in preparing an environmental assessment is evaluating the impacts the proposed action will have on the immediate and surrounding environment.

3.2 (B) **Reviewing an EA:** In reviewing an EA, the NIGC will look to determine:

(1) Whether the EA meets the requirements of NEPA and the CEQ regulations;

(2) Whether the EA takes a "hard look" at the direct, indirect and cumulative impacts of the proposed action;

(3) Whether the EA makes a convincing case for its determination as to the significance of the potential impacts;

(4) Whether the EA convincingly identifies and analyzes proposed mitigation measures;

(5) Whether the conclusions reached in the EA are supported by reliable information;

(6) Whether the EA provides a thorough analysis of the significant

aspects of the proposed action;

(7) Whether the EA includes a detailed analysis of the area affected by the proposed action;

(8) Whether the impacts in the affected area are identified and addressed;

(9) Whether the relative past, present or reasonably foreseeable future actions affecting the area are also identified and analyzed;

(10) Whether the impacts and mitigation measures are adequately addressed; and

(11) Whether the EA is sufficiently documented and contains a reasonably thorough discussion of the significant aspects of the probable impacts of a proposed project to ensure that the agency's decision not to prepare an EIS is not viewed as arbitrary, capricious, or an abuse of agency discretion.

3.1 (C) Scope: Although Scoping is not part of the formal process for preparing an EA, it is still an extremely important aspect in the development of an EA. CEQ regulations at 40 C.F.R. § 1508.25 define "scope" as "the range of actions, alternatives, and impacts to be considered." Scoping should be performed prior to the initial stages of preparing an EA. The Scoping process should identify all aspects of the proposed action including off-reservation impacts. As a general guide, the Scoping process should focus on the existing condition in the affected area; anticipated impacts of past, present, or reasonably foreseeable future actions; actual and anticipated impacts caused by the other actions; and the overall impact that would probably result from the cumulative impacts associated with the proposed action.

3.1 (D) Conducting the Assessment and Preparing the EA: Neither NEPA nor the CEQ regulations provide much detail as to how to conduct and draft an EA. A proposed format in Appendix C should assist in drafting an EA. EA's involving Indian gaming should, at a minimum, address the following areas:

1. Geology, Soils, and Topography

2. Vegetation, Wetlands, and Wildlife

3. Land Use and Aesthetics

4. Historical and Archeological Resources

5. Ground and Surface Water Issues

6. Water and Sewage Issues

7.    Traffic, Transportation, and Parking

8.    Air and Noise Quality

9.    Utilities

10.   Fire and Emergency Services

11.   Socioeconomic Conditions

12.   Mitigation

**3.1 (E) Identifying the Affected Environment and Analyzing the Existing Conditions:** The affected environment includes both the natural and human area where the proposed action will take place. The affected environment should be identified during the scoping process. The scope of the analysis begins with the identification and analysis of the affected environment, prior to the implementation of the proposed action. Once that is completed, the next step is to analyze the existing condition in the affected environment to help determine the potential impacts the proposed action may have on the affected environment. The proposed EA format set out in Appendix C provides further guidance on the identification and analysis of the existing conditions in the affected environment. However, if it is determined that the affected environment includes other areas and values not included in the draft format, these areas and/or values must be addressed in the EA.

**3.1 (F) Analyzing Direct and Indirect Impacts:** Proposed actions involving Indian gaming facilities generally have numerous direct and indirect impacts upon the human environment. Under 40 C.F.R. § 1508.8(a), direct effects (impacts) "are caused by the action and occur at the same time and place." A noninclusive list of direct impacts includes the construction of casinos, support buildings, parking lots, roads, motels, hotels, shops, and recreational facilities. Indirect effects (impacts), as discussed in 40 C.F.R. § 1508.8(b) "are caused by the action and are later in time or further removed in distance, but are still reasonably foreseeable." Indirect effects may include growth induced impacts such as the construction of support facilities, service stations, and shops and other impacts related to changes in land use patterns, population density or growth rate, and related effects on air and water and other natural systems. Some of the indirect impacts of Indian gaming include changes in surface water drainage patterns; increased traffic, noise and air pollution; impacts on local plant and wildlife species; additional sewage outflows; and impacts on municipal services such as water usage, electricity usage, emergency and fire services. Direct and indirect socioeconomic impacts may include the increase in criminal activity, employment, population and tax payments, along with economic benefits to the Tribes and tribal members.

**3.1 (G) Analyzing Cumulative Impacts:** Cumulative impacts are defined in 40 C.F.R. § 1508.7 as the impacts:

> on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant

actions taking place over a period of time.

Cumulative impacts from Indian gaming can include the development of other facilities in the project area by tribes or others individuals; the impact of additional gaming revenues on tribal and local economies; associated growth in the project area; and the impact on resources and services resulting from the development of gaming and other reasonably foreseeable development. It should be noted that in analyzing cumulative impact, the analysis of highly speculative or indefinite impacts is not required. The test is the reasonable foreseeability of such impacts.

3.1 (H) Identifying Alternatives to the Proposed Action: The consideration of alternatives is an essential part of NEPA. CEQ regulations at 40 C.F.R. §§ 1508.13 and 1508.27 require the discussion and analysis of alternatives in an EA. However, the analysis of alternatives should be limited to only those "reasonable" alternatives. The analysis of remote and speculative alternatives or alternatives whose effects cannot be readily ascertained are not necessary. Alternatives can include developing an activity in another location; the employment of another form of economic development to meet stated goals; and/or taking no-action. If the alternatives are not feasible or will not meet the proposed goals, this should be outlined so that there is no need to give them further consideration in the document.

3.2 Determining Significance: The CEQ regulations at 40 C.F.R. § 1501.4 recommend that agencies prepare EA's to make determinations as to whether proposed actions "significantly affect human health and the environment" thereby requiring the preparation of an EIS. The CEQ goes on to add at 40 C.F.R. § 1508.9(c)(1) that, if it is determined after the preparation of an EA that the proposed action will not "significantly affect the human environment," the agency may prepare a FONSI outlining the reasons for its determination. If the impacts are found to have a significant impact on the human environment, then NEPA will require the preparation of an EIS.

When determining whether a proposed action significantly impacts the human environment, the agency shall rely upon the guidance presented by the CEQ at 40 C.F.R. § 1508.27, which requires a consideration of both the context and the intensity of the proposed action. Within section 1508.27, the CEQ provides the following guidance in examining context and intensity:

(a) Context: This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short and long-term effects are relevant.

(b) Intensity: This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.