National Indian Gaming Commission

About Us   Regional Offices   Tribal Data   Laws & Regulations   Resources   FOIA   Contact Us



# MEMORAMDUM

To: Assistant Secretary – Indian Affairs

From: Associate Solicitor, Division of Indian Affairs

Date: December 5, 2001

Subject: <u>Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt</u>, 116 F.Supp.2d 155 (D.D.C. 2000) in regard to proposed gaming on the Hatch Tract in Lane County, Oregon.

## Introduction

This memorandum is in response to the above referenced decision in <u>Confederated Tribes</u> in which the court remanded this case to the Department for further consideration of the Department's interpretation of 25 U.S.C. § 2719(b)(1)(B)(iii). Section 2719(b)(1)(B)(iii) exempts land taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." This section is part of an overall statutory scheme set forth in the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et. seq. (IGRA), that prohibits gaming on land acquired into trust after October 17, 1988 unless certain exemptions are met.

We have carefully reviewed the Administrative Record in <u>Confederated Tribes</u>, the court's opinion, and additional materials submitted by counsel for the Tribes. In addition, we have taken into consideration the decision issued on August 31, 2001 by the National Indian Gaming Commission (NIGC) to Judge Hillman entitled "Whether the Turtle Creek Casino site that is held in trust by the United States for the benefit of the Grand Traverse Band of Ottawa and Chippewa Indians is exempt from the Indian Gaming Regulatory Act's general prohibition on lands acquired after October 17, 1988." (GTB Decision).

After careful consideration, we conclude that the Hatch Tract falls within the requirements of § 2719(b)(1)(B)(iii), the restored lands exception to the prohibition to gaming on lands acquired after October 17, 1988. It must be noted, however, that this opinion will only address the unique factual and legal circumstances related to the Confederated Tribes.

## Background

On October 19, 1999, Solicitor John Leshy issued an opinion regarding whether the "Hatch Tract is exempt from the general prohibition against gaming on land acquired into trust after October 17, 1988, as set forth in the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2702 et. seq. (IGRA)." At issue here are two tracts of land – the Hatch Tract and the Peterman Tract. The Peterman tract is a contiguous driveway to the Hatch tract. [1] Congress, in 1998, added the Peterman tract to the Tribe's statutory reservation. The Department took the Hatch tract into trust for the tribes in 1998.

In the 1999 opinion, we examined two exceptions to IGRA's requirement for a two-part determination and the Governor's concurrence for off-reservation gaming.

EXHIBIT E

The two exceptions were analyzed were the restored lands of a restored tribe and the contiguous land exception.[2] We found that the Hatch Tract met neither exception. In the opinion the Solicitor concluded:

We believe that "restored lands" under section 20(b)(1)(B)(iii) include only those lands that are available to a restored tribe as part of its restoration to federal recognition. The statue that restores the Tribe's Federal recognition status must also provided for the restoration of land, and the particular parcel in question must fall within the terms of the land restoration provision. Here, the Confederated Tribes were restored to Federal recognition pursuant to their Restoration Act of 1984 and Congress specifically described the parcels to be acquired. The only lands which constitute :restored: lands for the Confederate Tribes are those parcels in section 7.

October 19, 1999 Memorandum from the Solicitor to the Assistant Secretary – Indian Affairs at 3.

On September 24, 1999, the Tribes filed suit in the U.S. District Court for the District of Columbia challenging the Department's decision to deny certification for the Hatch Tract.[3] The parties thereafter filed cross-motions for summary judgment.

On September 29, 2000, the court ruled in the Department's favor on three of four claims. However, the district court also ruled that the Department had adopted an unduly narrow interpretation of the "restored lands" exception in § 2719(b)(1)(B)(iii) and remanded that single issue for further administrative review. Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt, 116 F.Supp.2d 155 (D.D.C. 2000).

In pertinent part, the court disagreed that the technical meaning of the term "restoration of lands" included only those lands were available to a restored tribe as part of its legislative restoration to Federal recognition by Congress. Instead, the court found that the plain meaning of "restoration of lands" could be construed as those lands that place a tribe back its position prior to termination. Id. at 163. The court also found that the Department's requirement for specific legislative direction regarding restored lands sought "to graft procedural and temporal limitation onto section 2719(b)(1)(B)(iii)." Id. The court also rejected our argument that giving the statutory language this plain, broad, reading would result in opening the door to permitting gaming on any after-acquired tribal lands. Id. Given the various possible meanings of the section, the court concluded that we had applied "an unduly restrictive analysis" and that we should consider on remand the application of the Indian-favoring canons of construction and the particular factual circumstances surrounding the Hatch Tract. Id. However, the court did agree with Judge Hillman in Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney, 46 F. Supp.2d 689 (W.D. Mich. 1999) that "the term 'restoration' may be read in numerous ways to place belatedly restored tribes in a comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion." Id. at 164, quoting Grand Traverse at 700.

## Legal Analysis

Lands that are taken into trust as part of the "restoration of lands for an Indian tribe that is restored to Federal recognition" are exempt from the prohibition against gaming on lands acquired into trust after October 17, 1988. 25 U.S.C. § 2719(b)(1)(B)(iii). This section requires a two-pronged analysis. First, the tribe must be "restored" within the meaning of IGRA. Second, the land to be acquired must be "restored" within the meaning of IGRA.

At issue here is the Department's interpretation of "restored" as applied to land in the context of 25 U.S.C. § 2719(b)(1)(B)(iii). Two district courts have opined that the Department's interpretation of this subsection is too narrow. The court in Confederated Tribes found that the Department failed to apply the canons of construction that "statutes are to be construed liberally in favor of the Indians, with

casting a cloud upon the property's right." Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439, 1444-45 (D.C. Cir. 1988) (further internal citations omitted.)

The Department has issued several opinions regarding the application of § 2719(b)(1)(B)(iii) to specific facts.[4] Since that time two courts and the NIGC have issued decisions analyzing the restored lands exception. In addition, none of the Department's previous opinions have included an analysis of the Indian canons of construction. In this opinion, we will re-examine our interpretation of IGRA in light of the foregoing. By applying the Indian canons of construction along with the Department's expertise in interpreting the statute it is charged with implementing, we find that the Hatch Tract constitutes restored lands.

1. **The restored lands exception within § 2719(b)(1)(B)(iii) is ambiguous.**

Before reaching any of the canons of construction, we must decide whether "the restoration of lands for an Indian tribe that is restored to Federal recognition" is ambiguous. If "Congress has directly spoken to the precise question at issue," then the Department must yield to the plain meaning of the text. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984). However, if the provision is ambiguous, then the Department can apply the Indian canons of construction as well as our expertise in interpreting IGRA, to determine the proper application of the restored lands provision.[5]

In Confederated Tribes the court found that § 2719(b)(1)(B)(iii) is ambiguous. [6] The court found that "part of the ambiguity of the provision stems from the use of the phrase: "that is restored to federal recognition." Id. at 162. The court opined that the question boils down to whether the word "restored" in the phrase "Indian tribe that is restored" is intended as a verb (that is, the activity of restoring, in which case the timing should be limited to the congressional action) or as a noun (sic.) (that is, the state of being restored, in which case the timing should extend to completion of the land restoration process whether through later legislative or administrative action). Id. Thus the court found that "the varying possibilities highlight the ambiguity of § 2719(b) (1)(B)(iii)." Id.

The courts in both Confederated Tribes and Grand Traverse Band found that the terms "restore" has no independent legal significance in either IGRA or in other Acts. Confederated at 162-163 and Grand Traverse at 696. Nor does the plain meaning resolve the matter. Merriam-Webster's Collegiate Dictionary at 999 (10th ed. 1999) (the word restored is generally understood as "to bring back to or put back into a former or original state"). The Grand Traverse court held that the language of the "restoration of lands" exception "implies a process rather than a specific transaction, and most assuredly does not limit restoration to a single event." Id. at 701. As explained by the court: "Congressional use of the words appears to have occurred in a descriptive sense only, in conjunction with action taken by Congress to accomplish a purpose consistent with the ordinary meaning of the words. In no sense has a proprietary use of 'restore' or 'restoration' been shown to have occurred." Id. at 698.

Thus, we believe that § 2719(b)(1)(B)(iii) is ambiguous and has no independent specific legal significance.[7]

2. **Indian Canon of Construction**

The Indian canons of construction provide that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit …" Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985). This cannon is rooted in the unique trust relationship between the United States and Indian tribes, and Congress's obligation to act on behalf of these "dependent and sometimes exploited Indian nations." Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 58 (D.C. Cir. 1991) (citing Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942).[8] In the D.C. Circuit, where this case is being litigated, the Court in Coos cited Muscogee (Creek)

are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Id. at 1444-45, Coos at 116 F.Supp.2d 155, 157.

### 3. Department's interpretation of § 2719(b)(1)(B)(iii)

Both the court in Confederated Tribes and Grand Traverse applied the dictionary definition to "restored." Confederated Tribes at 162, Grand Traverse at 696. The dictionary definition of "restore" is: (1) to give back (as something lost or taken away):return . . . 2: to put or bring back (as into existence or use) . . . 3: to bring back or put back into former or original state . . . . Webster's Third New International Dictionary, p. 1936 (G. & C. Merriam Co. 1976).

We believe, however, that to apply dictionary definition to the restored land provision without temporal or geographic limitations would give restored tribes an unintended advantage over tribes who are bound to the limitations in IGRA that prohibit gaming on lands acquired after October 17, 1988. Moreover, we believe that, in examining the overall statutory scheme of IGRA, Congress intended some limitations on gaming on restored lands.

Because there is no legislative history regarding § 2719, one must look elsewhere to glean some indication of the Congress' view regarding off-reservation gaming. IGRA was enacted in the wake of California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987) which held that the State of California had no authority under Public Law 280 to enforce its bingo and card game statues on Indian reservations because such laws are regulatory and not prohibitory. For three years prior to that decision, bills had been introduced in Congress aimed at regulating gaming on Indian reservations. None of these bills passed because no agreement could be reached on the kinds of games tribes should be permitted to operate.

Congress did hear testimony as part of the previously failed bills. Rep. Bereuter of Nebraska, who had introduced one of the failed bills, testified that he did not believe that it was "good public policy" to establish Indian gaming operations on lands that were not contiguous to a reservation against the wishes of the directly affected political subdivisions. Indian Gambling Control Act, Part II, Hearings before the House Interior and Insular Affairs Committee, 99th Cong., 1st Sess. 20, 21 (1985) (H.R. 3130 Testimony.) Rep. Bereuter considered it inappropriate for the Secretary to put new lands into trust for gaming because to do so would circumvent State law enforcement and result in lost revenues to State and local governments. Id. Thus, when IGRA was introduced, it was with a backdrop of political pressure to limit off-reservation gambling without the concurrence of directly affected political subdivisions. It must be noted, however, that as enacted IGRA differed from previous bills.

As one compelling manifestation of the prevailing congressional will, the enacted § 2719 includes a requirement that gaming on most off-reservation, newly acquired lands must be subjected to the two-part determination if § 2719(b)(1)(A), i.e., the Department must find that gaming on newly acquired land is in the best interest of the tribe and its members and not detrimental to the surrounding community, and then the tribe must receive the Governor's concurrence. As with the previous failed bills, Congress intended to give the Department and the local political community a voice in deciding whether to allow gaming. More importantly, it gave the Governor of the State a veto. However, unlike the failed Indian gaming bills, IGRA contains exceptions to this provision.

Section 2719(b)(1)(B) contains three exceptions to the high political hurdle of a Governor's veto.[9] These three exceptions are: (i) the settlement of a land claim; (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process;[10] and (iii) the restoration of lands for and Indian tribe that is restored to Federal recognition. Clearly, one compelling reason for providing such exemptions is to provide all tribes with at least one opportunity for the economic advantages of gaming without having to seek the Governor's concurrence. If Congress had limited gaming on lands within known reservation boundaries, then

newly-acknowledged tribes or tribes that settled land claims would have been denied the opportunities that IGRA provides.

In enacting the restored lands for restored tribes exception, Congress could have enacted an exception for tribes that had been congressionally or legislatively recognized. Moreover, it could have limited the definition of restored lands to former reservation boundaries as it did in § 2719(a)(2)(A)(ii). Congress did neither. Instead it enacted a broad, albeit ambiguous section, that exempts restored lands for restored tribes.

However, because IGRA provides certain temporal (i.e., the October 17, 1988 limitation for reservation boundaries) and geographic limitations (i.e., land within or contiguous to the tribe's reservation) we cannot view § 2719(b)(1)(B)(iii) to allow gaming on after-acquired lands with no limitations. Consequently, we do not use a dictionary definition of restored to include all land "restored." It also seems clear that restored land does not mean any aboriginal land that the restored tribe ever occupied. Tribes that were not terminated and thereby not capable of being "restored," lost vast amount of land and were forced to move all over the country such that their reservations on October 17, 1988, are vastly different than their aboriginal land.

We agree with Judge Hillman's finding in Grand Traverse that § 2719(b)(1)(B)(iii) could be read "in numerous ways to place belatedly restored tribes in a comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion." Grand Traverse at 700. However, because this opinion is related solely to the Confederated Tribes, we will not opine as to the possible temporal or geographic or other limitations of the restored land subsection.[11]

Further, applying the Indian canons of construction to assist us in determining the scope of § 2719(b)(1)(B)(iii) means not only that we may draw all applicable inferences in favor of the Tribes, but also that we should not apply the canon such that it benefits a certain group of tribes to the disadvantage of other tribes. Confederated Tribes of Chehalis v. State of Washington, 96 F.2d 334 (9th Cir. 1996).[12]

# Analysis of Hatch Tract

The Tribes of Coos, Lower Umpqua & Siuslaw Indians (now the "Confederated Tribes") were terminated by the Western Oregon Termination Act of 1954. Congress restored the Confederated Tribes on October 17, 1984, 25 U.S.C. § 714 et seq. (1998).

1.  **Background of the acquisition of the Hatch Tract**

The Department took the Hatch Tract into trust in January 1998.[13] The tract is about 98 acres and is the site of a former Siuslaw village and its adjacent to an important Indian cemetery which contains the remains of tribal ancestors.

After the court's ruling, the Tribes supplemented the record with "The Hatch Tract: A Traditional Siuslaw Village Within the Siletz Reservation, 1855-75." December 4, 2000, Dr. Stephen Dow Beckham ("Beckham Supplemental Report"). In his report, Dr. Beckham writes:

The Hatch tract was first identified as a "Suislaw Village" by Capt. John F. Reynolds of the U.S. Army in July 1856. The site, known as Ka'aich, was the location of the ceremonial lodge of the Earth Lodge Cult, a version of the Ghost Dance, in 1877. A part of the Ka'aich was issued to Jesse Martin, a Coos Indian, as an allotment in 1892, pursuant to the allotment agreement with the Indians of the Siletz Reservation resolved that year. Another portion of the Ka'aich, the site of the tribal cemetery, was allotted to Tom Johnson, a Lower Umpqua India. These are non-taxed Indian properties. The heirs Jesse Martin's granddaughter, Hattie (Martin) Hatch, sold that allotment to the Confederated Tribes in 1995. The heir of Tom Johnson, Elizabeth Anne (Macy) Campbell, a tribal member, retains a portion of that non-taxed allotment,

including the tribal cemetery. The Peterman tract, an the portion of the Tom Johnson allotment, was deeded to the United States in 1947 to provide a right-of-way into the tribal cemetery. The Bureau of Indian Affairs affirmed the trust status of the Peterman tract in 1997.

Id. at page "i"

Dr. Beckham's report finds that in 1859 the Coos and Lower Umpqua wanted to remain where they were located instead of moving to the newly created Siletz Reservation. Id. at 9-13.

In March 1998, the attorney for the Confederated tribes wrote to the Portland Area Director discussing the history of the acquisition of the Hatch Tract and the tract itself.

According to counsel for the Confederated Tribes, sometime in 1996 the Tribes began to search for a site for a gaming operation with the assistance of its counsel, Mr. Whittlesey, and tribal historian Dr. Beckham. Dr. Beckham and Mr. Whittlesey considered on-reservation gaming in the Empire section of Coos Bay, Oregon. However, the Coquille Tribe operated a close-by casino in North Bend. In March 1998 counsel for the Confederated Tribes wrote of the Hatch Tract:

Independent of the project being handled by Dr. Beckham and me, the Confederated Tribes were given the opportunity to acquire the Hatch Tract approximately two years ago. This tract was a public domain allotment which was deeded to the ancestor of a tribal member and which had never been on the Oregon or Lane County tax rolls. The tract was adjacent to the old Indian cemetery just east of Florence in Lane County, and more importantly, was known to encompass the site of an old Siuslaw Indian village.

The land was owned by the heirs of Hattie Hatch and had been occupied until only a few years ago by a tribal member who had recently died. The family had a desire to see the site transferred to tribal ownership and the price agreed upon was considered very attractive from the Confederated Tribes' viewpoint. (The land was acquired and accepted into trust for the Confederated Tribes in early March 1998.)

March 23, 1998 Letter to Stan Speaks, Portland Area Director, BIA from Dennis J. Whittlesey.

The Hatch Tract was taken into trust for historical, cultural, and economic self-sufficiency. At the time of the land being taken into trust, the tribes were not considering it for gaming purposes.[14] The Tribes decided to focus on the Hatch tract for its planned gaming operation because they were concerned that two casinos could not be operated at a profit in the Coos Bay area and the Coquille casino was already established. The Confederated Tribes wanted to maximize their economic development opportunities.

2.   **Historical significance of the Hatch Tract to the Confederated Tribes**

As part of the previous litigation, the Tribes submitted an affidavit from its historian, Dr. Stephen Dow Beckham. Dr. Beckham is a Professor of History at Lewis & Clark College in Portland, Oregon. In addition, as previously noted, the Tribes supplemented the record with the Beckham Supplemental Report.

According to Dr. Beckham's Affidavit, the Hatch tract is historically significant to the Confederated Tribes. Dr. Beckham testifies in his affidavit:

I have also researched the Hatch Tract at the western side of the confluence of the North Fork with the main Siuslaw River, land lying in Sections 25 and 26. This property was confirmed in July 1856, by Captain John F. Reynolds of the U.S. Army as the site of a large Indian village and was so denominated on his map of a reconnaissance from Umpqua River to Cape Perpetua. In 1892, Jesse Martin, a Coos

Indians received this property, Frank Johnson Allotment No. 206, under provisions of the General Allotment Act of 1887. The land passed successively to his son, Ike Martin, and his granddaughter, Hattie (Martin) Hatch. In 1997 the heirs of Hattie Hatch own (ed) the allotment. The land is deemed "non-taxed Indian land" by Lane County and there is no record that his land has ever left Indian tenure or been subject of taxation.

December 17, 1997 Affidavit of Stephen Dow Beckman.

The Beckham Supplemental Report reinforces that the Hatch Tract was the site of an aboriginal village. In addition, the report shows that the Hatch Tract was within the boundaries of the Siletz reservation created on November 5, 1855 by President Franklin Pierce. Also, the Hatch Tract remained within the reservation boundaries when it was reduced by Executive Order in December 20, 1865. Id. (Recall that in 1862 the Coos, Lower, Umpqua, and Siuslaw Indians were removed to the Siletz Reservation. Id. at 9-13.)

Also, the Peterman Tract is contiguous to the Hatch Tract. While the court agreed with the Department's view that the Peterman Tract was not part of the reservation as of October 17, 1988, the history of the Peterman tract sheds light on the history of the Hatch Tract. In the Administrative Record is the Bill of Sale dated June 24, 1944. A.R. 00128. This Bill of Sale for Allotment No. 113 which was owned by Mr. Johnson. This bill of sale reserves 12 acres of the Allotment for use as "Indian burial and cemetery ground." Id. In 1945 the Superintendent wrote to the Commissioner of Indian Affairs that "we do not see how we can keep faith with the Indians of the area, who from time immemorial have used this land for burial grounds, if we do not see that an instrument is executed at the time of the sale to insure them of the continued use of their cemetery." A.R. 00138. The remaining portions of the Allotment were sold. Id.

Thus, near the time of termination, the BIA recognized the significance of the cemetery site and reserved it and a right-of-way to it. In addition, in 1943, the Grand Ronde-Siletz Agency reported in its fiscal year report that "a second community building should be built for the Indian people centered around the town of Florence. There are about fifteen families in this area. However, suitable land for the construction of such a community building must first be made available." Id. at 00121.

In addition, on October 14, 1998, Congress amended the Restoration Act through a technical correction bill. Pub. L. No. 105-256. This bill added the Peterman tract to section 7, the Establishment of the Reservation. Id. § 5. However, this bill did not add the Hatch Tract.

3.   **Hatch Tract is restored land**

At issue is whether the Hatch Tract meets the exception found in § 2719(b)(1 (B)(iii) for restored lands for restored tribes. There is no question that the Confederated Tribes are a restored tribe. The only question here is whether the Hatch Tract constitutes "restored lands."

We agree with NIGC's interpretation in its GTB Decision that:

Congress likely did not intend to substantially undercut the general prohibition on gaming on lands acquired after IGRA's passage. Although Congress did not limit the definition of restored lands to former reservation boundaries as it did, for example, in section 2719(a)(2)(B), we believe the phrase "restoration of lands" is a difficult hurdle and may not necessarily be extended, for example, to any lands that the tribe conceivably once occupied throughout its history.

Id. at 15.

The Confederated Tribes were restored by Congress to Federal recognition in 1984, well before IGRA was enacted. The Restoration Act established a reservation for the Tribes, see § 713f and § 714e. However, since this was prior to the passage of IGRA, the Tribes and Congress had no reason to believe that this could limit the

Tribes' future economic development. The court in the Confederation found that Department's requirement for specific legislative direction regarding restored lands sought "to graft a procedural and temporal limitation onto section 2719(b)(1)(B)(iii)." Id. Thus, we believe that it is a reasonable interpretation that since the Restoration Act was passed prior to the passage of IGRA, that the land identified in the Restoration Act may not be the only land that meets the restored lands provision.[15]

Congress, in restoring the Tribes, also wanted to make sure that the boundaries of the reservation did not limit who would receive Federal services. The Restoration Act included a provision for services for members of the Confederated Tribes located in several counties. The Act provides that:

Notwithstanding any provision to the contrary in any law establishing such services and benefits, eligibility of the Tribe and its members for such Federal services and benefits shall become effective upon passage of this subchapter without regard to the existence of a reservation for the Tribe or the residence of the members of the Tribe on a reservation for such members who reside in the following counties or Oregon: Coos, Lane, Lincoln, Douglas, and Curry.

25 U.S.C. § 714a. Thus members living on the Hatch tract, located in Lane County, were eligible for Federal services.

The next question is whether there is a temporal and/or a geographic nexus between the restoration of the Confederated Tribes and the Hatch Tract. We believe that the land has a geographic nexus to the Tribes. We do not believe that the Tribes are seeking to game on far-flung land. Another consideration is that the tract was a public domain allotment which was deeded to the ancestor of a tribal member and which has never been on Oregon or Lane County tax rolls. The local community has known for years that this land is closely tied to the Tribes. There is also a modern nexus under the Restoration Act because the member, Hattie Hatch who occupied the land until her death, was eligible for services since she lived in the "service area" defined by 25 U.S.C. § 714a.

Moreover, Congress believes that land contiguous to the Hatch Tract, the Peterson Tract, should be part of the Tribes' reservation. While it could be argued that since Congress only restored the Peterson Tract, it suggests that Congress did not intend the Hatch Tract to be considered restored lands we have no indication that Congress ever considered and decided against the Hatch Tract as part of its technical amendments. Therefore, even if the technical amendment was intended only as a clear indication of Congressional intent that the Federal government should view the Peterson Tract as restored lands, it does not preclude the conclusion that the Hatch Tract is restored land especially when viewed in light of weight of the other significant evidence.

Also, we find it significant that near the time of termination the Tribes had a presence in the area and the BIA was considering building community buildings. While we cannot say that this land would have been part of the Tribes' land base had it not been terminated, it does appear that it meets the geographic limitations we believe are implicit in a reasonable interpretation of § 2719(b)(1)(B)(iii).

For the temporal nexus, the Tribes were restored in 1984 and the Hatch Tract was taken into trust in 1998. The acquisition of the lands into trust 14 years after the Tribes' restoration is a significant period of time. In considering whether this is a sufficient temporal nexus, however, several factors must be considered.

One consideration is that Congress allowed 14 years to elapse before restoring the Peterson Tract o the Tribe. Thus, in this particular instance, without some relevant attenuation, the mere passage of time should not be determinative. Also, it is not improper for the Department to take account of the practical effect of the passage of the restored lands exception. For instance, it will often be the case that newly restored tribes will, out of practical necessity, take some time to acquire land.[16] The Department recognizes, as Congress surely did, that newly restored tribes do not have

process of land acquisition is time consuming. Another consideration is that the Tribes acquired the land as soon as it was available upon the death of the owner. Thus, the Tribes quickly acquired the land as soon as it was available and within a reasonable amount of time after being restored.[17]

Based on all of the foregoing, we believe that it is a reasonable interpretation of 25 U.S.C. § 2719(b)(1)(B)(iii) that the Hatch Tract constitutes restored lands for a restored tribe.

## Conclusion

We have considered the fact that the Confederated Tribes were recognized before IGRA was enacted and that it is seeking to game on land which has been historically tied to the Tribes and has a close geographic proximity to the Tribes. Thus, applying the Indian canons of construction and our expertise in IGRA we find that the Hatch Tract is restored land.

---

[1] See attached map.

[2] The court rejected Confederated Tribes' alternative argument that the Hatch Tract qualified for the exception for lands contiguous to the boundaries of the reservation on October 17, 1988. The court did not remand this issue to the Department; therefore, we have no need to address it in this opinion.

[3] The Tribes' complaint raised four claims for relief under the APA: (1) the Hatch Tract qualifies for gaming under § 2719(a)(1) (contiguous lands); (2) the Hatch Tract qualifies for gaming under § 2719(b)(1)(B)(iii) (restored lands for restored tribes); (3) the Assistant Secretary's decision deviated from prior agency practice without reasoned explanation; and (4) the Assistant Secretary's decision was arbitrary and capricious because it was made without considering certain pertinent materials relating to the relevant history of the Hatch Tract.

[4] See Memorandum dated August 5, 1999, from Associate Solicitor – Indian Affairs to Director, Indian Gaming Management Staff concerning the Little Traverse Bay Bands of Odawa Indians; Letter dated August 3, 1998, from the Solicitor, U.S. Department of the Interior, to the Congressman Vic Fazio concerning the Mechoopda Tribe of the Chino Rancheria; Memorandum dated March 16, 1998, from Associate Solicitor – Indian affairs to Acting Director, Indian Gaming Management Staff concerning the Little River Bank of Ottawa Indians; Memorandum dated November 12, 1997, from Associate Solicitor – Indian Affairs to Deputy Commission for Indian Affairs concerning the Little Traverse Bay Bands of Odawa Indians; Memorandum dated September 19, 1997, from Solicitor, U.S. Department of the Interior to the Secretary, U.S. Department of the Interior concerning the Okagon Band of Potawatomi Indians; Letter dated March 14, 1995, from Assistant Secretary – Indian Affairs to Delores Pigsley, Chairman of the Confederated Tribe of Siletz Indians concerning "restored land" and Tribal-State Compact approval' Memorandum dated March 6, 1995, from the Regional Solicitor, Pacific Northwest Region, to Director, Indian Gaming Management Staff, concerning the Confederated Tribe of Siletz Indians: Memorandum dated February 1, 1994, from Associate Solicitor – Indian Affairs to Deputy Director for Legislative and Intergovernmental Affairs concerning the "restored land" exception for the Confederated Tribes of the Grand Ronde Community of Indians; Letter dated October 15, 1993, from Assistant Secretary – Indian Affairs to Mark Mercier, Chairman of the Confederated Tribes of the Grand Ronde Community of Indians, concerning "restored land" and the Tribal-State Company disapproval; Memorandum dated September 27, 1993, from the Associated Solicitor – Indian Affairs to Pacific Northwest Region Assistant Regional Director. Confederated Tribes Administrative Record at 00178-00214.

[5] In its analysis in the GTB decision, the NIGC found § 2719(b)(1)(B)(iii) to be ambiguous. Id. at 12.

plain, dictionary meaning. Id. at 696. However, the court said that even if the "government's definition could be considered plausible, a conclusion I reject, the Band's construction should be given preference. Id. at 700. The court then cited Bryant v. Itasca County, 426 U.S. 373 (1976) holding that ambiguities in a statute dealing with Indians should be construed to their benefit.

[7] The Department recognizes, as the NIGC recognized in its GTB Decision, that since we are not proceeding through formal administrative adjudication or formal rulemaking, this opinion is not entitled to the fullest measure of deference. See United States v. Mead Corp. 121 U.S. 2164 (2001). GTB Decision at 7. Nevertheless, we have tried to exercise care, experience and informed judgment, including reviewing materials submitted by the Tribes and the NIGC. Moreover, the Department has used it expertise in the area of Indian lands and Indian gaming in reviewing this question.

[8] The circuits are in conflict regarding the application of the canons of construction. In the 9th Circuit the court has declined to apply the Indian canons of construction in light of the competing deference given to an agency charged with the statute's administration pursuant to Chevron USA, Inc., 47 U.S. at 842-44. Chugach Alaska Corp. v. Lujan, 915 F.2d 454 (9th Cir. 1990), Seldovia Native Ass'n v. Lujan, 904 F.2d 1335, 1342 (9th Cir. 1990) and Haynes v. United States, 891 F.2d 235, 238-39 (1989). However, the 10th Circuit, takes a different view finding that the canon of construction trumps the agency's interpretation of a statute. See, Ramah Navajo Chapter of the Navajo Nation v. Lujan, 112 F.3d 1455 (10th Cir. 1997).

[9] We should not ignore that the Department's regulations for taking land into trust, 25 C.F.R. Part 151, provide for notice to the state and local government. Thus, while the Governor does not have a veto, the local community still has an opportunity for involvement while the land is being considered for trust status.

[10] However, as Judge Hillman points out, there can be situations like Grand Traverse in which a tribe restored through the acknowledgment process can still be considered restored for purposes of § 2719(b)(1)(B)(iii). Grand Traverse at 699.

[11] We believe that the better approach is for the Department to engage in Notice and Comment Rulemaking to determine the factors it will consider in determining whether other parcels of land meets the restored land exception.

[12] We also note that the court in Confederated Tribes and the court in Grand Traverse recognize that the more expansive interpretation of § 2719(b)(1)(B)(iii) would benefit restored tribes vis-à-vis other tribes. Confederated at 164, Grand Traverse at 700.

[13] As noted by the court, the Hatch Tract is formally described as two portions of Government Lots 1 and 2 in Section 25 and portions of the E1/2NE1/4 and Lot 1 in Section 26, township 18 South, Range 12, West, Willamette Meridian, contain 98.165 acres more or less.

[14] In Mr. Whittlesey's letter of March 23, 1998, he says that while he and Dr. Beckham were considering it, they had not provided their report to the tribal council until after the land was taken into trust. Id. at 2-4.

[15] Since we only have before us a tribe who was restored prior to IGRA, we are not opining whether a tribe restored after the enactment of IGRA is limited to the land identified in the legislation restoring the tribe.

[16] In the proposed revisions to the regulations governing the Acquisition of Title to Land into Trust, 25 C.F.R. § 151, the Department considered 25 years as a reasonable period of time to acquire land in the proposed Tribal Land Acquisition Area. While the Department withdrew these regulations on unrelated grounds, this is an indication of a reasonable time to acquire restored lands.

1725 rule were to require, we would very narrowly limit the exception to a tribe which already has a gaming establishment and is seeking to expand.

About Us | Regional Offices | Tribal Data | Laws & Regulations | Resources | FOIA | Contact Us | Search | Text Only | Employee Login

1441 L. Street NW Suite 9100, Washington DC 20005 Tel.: (202) 632-7003  Fax: (202) 632-7066
E-mail with Questions, Comments, or Suggestions    Privacy Statement