## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

MichGO, Michigan Gambling Opposition    )
    )
       Plaintiff,    )
    )
v.    )    **Case No. 1:05-cv-01181-JGP**
    )    Judge John G. Penn
NORTON, et al.,    )
    )
       Defendants.    )
_____)
    )
MATCH-E-BE-NASH-SHE-WISH    )
BAND OF POTTAWATOMI INDIANS,    )
    )
       Intervenor    )
_____)

## STATEMENT OF POINTS AND AUTHORITIES
## IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

GINA L. ALLERY
D.C. Bar No. 485903
Trial Attorney
Environment & Natural Resources Division
OF COUNSEL:    Indian Resources Section
    United States Department of Justice
MARIA WISEMAN    P.O. Box 44378
Department of the Interior    L'Enfant Plaza Station
Office of the Solicitor    Washington, D.C.  20026-4378
1849 C Street    (202) 305-0269
Washington, DC 20240    (202) 305-0271

# TABLE OF CONTENTS

I.    Statement of Undisputed Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians . . . . . . . . . . . . 3

    B.    The Allegan County Parcels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Indian Reorganization Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    The Indian Gaming Regulatory Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    E.    The Tribal State Compact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    F.    The Challenged Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    G.    NEPA Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.    Taking the Allegan County Property Into Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.    Applicable Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Standard for Dismissal under Rules 12(b)(6) and 12(b)(1) . . . . . . . . . . . . . . . . 15

    B.    Conversion of Motion for Dismissal to Motion for Summary Judgment . . . . . . 16

    C.    The Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D.    Review of Agency Action Under the APA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    E.    The Canons of Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.    The Secretary's decision to issue a FONSI was not arbitrary and capricious . . . 22

        1.    The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.    Legal Standard for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        3.    The Secretary took a "hard look" at the potential environmental

consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    a.    The EA adequately considered the Tribal-State Compact validity issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    b.    The EA adequately considered any potential impact on the Rural Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    c.    The EA adequately considered any potential impact to West Michigan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    d.    The EA adequately analyzed any air quality issues . . . . . . . . . . 32

    e.    The EA adequately considered reasonable alternatives . . . . . . . 33

    f.    The EA adequately considered crime rates . . . . . . . . . . . . . . . . 35

    g.    The EA considered reasonably foreseeable indirect and cumulative impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    h.    Safeguards in the project sufficiently reduced the impacts to a minimum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B.    The Secretary's determination that the Property would qualify as the Gun Lake Band's "initial reservation" under IGRA and the IRA is reasonable . . . . . . . . . . 40

    1.    IGRA does not require that land used for gaming also be used for housing

        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    2.    The Property is the Tribe's "initial reservation" under IGRA . . . . . . . . 46

C.    The Secretary did not abuse her discretion by deciding to accept the Property into trust regardless of whether the Tribal-State Class III gaming compact is valid . . 47

D.    Section 5 of the Indian Reorganization Act does not violate the non-delegation doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

VI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

## CASES

A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935) . . . . . . . . . . . . . . . . . . . 52

Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . 16

Am. Power & Light Co. v. SEC, 329 U.S. 90 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

American Farm Bureau v. EPA, 121 F. Supp. 2d 84 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . 16

ANR Pipeline Co. v. F.E.R.C., 205 F.3d 403 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 31

*Auer v. Robbins, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Bias v. Advantage Int'l, 905 F.2d 1558 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Black v. Arthur, 18 F. Supp. 2d 1127 (D.Or. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Browning v. Clinton, 292 F.3d 235 (D.C.Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bryan v. Itasca County, 426 U.S. 371 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Camp v. Pitts, 411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Carcieri v. Norton, 398 F.3d 22 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984) . . . . . . . . . . . . 41, 44, 48

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C.Cir. 1991) . . . . . . . . . . . . . . . 33

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . 18, 19

*City of Los Angeles v. Nat'l Highway Traffic Safety Admin, 912 F.2d 478 (D.C. Cir. 1990) . 37

*City of Roseville v. Norton, 219 F. Supp. 2d 130 (D.D.C. 2002) . . . 22, 24, 26, 33, 34, 38, 51, 52

City of Roseville v. Norton, 348 F.3d 1020 (D.C.Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

\*City of Sault Ste. Marie v. Andrus, 458 F. Supp. 465 (D.D.C. 1978) . . . . . . . . . . . . . . . . 50, 51

\*Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt, 116 F. Supp. 2d 155 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 41, 42

Confederated Tribes of Siletz Indians of Oregon v. U.S., 110 F.3d 688 (9th Cir.1997) . . . . . . . 51

Conley v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Cronin v. United States Dep't of Agric., 919 F.2d 439 (7th Cir. 1990) . . . . . . . . . . . . . . . 18, 19

EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fla. Power & Light Co. v. Lorion, 470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fletcher v. Jones, 105 F.2d 58 (D.C. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Foundation on Econ. Trends v. Weinberger, 610 F. Supp. 829 (D.D.C. 1985) . . . . . . . . . . . . 38

Friends of the Earth v. U.S. Army Corps of Engineers, 109 F. Supp. 2d 30 (D.D.C. 2000) . . . . 35

Friends of the River v. FERC, 720 F.2d 93 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Gibbs v. Buck, 307 U.S. 66 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Glass Packing Institute v. Regan, 737 F.2d 1083 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . 33

Grand Canyon Trust v. FAA, 290 F.3d 339 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan, 198 F. Supp. 2d 920 (W.D. Mich. 2002) . . . . . . . . . . . . . . . . . . . . . . . 8, 41

Guam Industrial Services, Inc. v. Rumsfeld, -- F. Supp. 2d --, 2005 WL 3462749 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Harbury v. Deutch, 244 F.3d 956 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Hein v. Capitan Grande Band of Diegueno Mission Indians, 201 F.3d 1256 (9th Cir. 2000) . . . 21

Human Soc'y v. Hodel, 840 F.2d 45 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

In re Acknowledgment of Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, 33 IBIA 291 (May 5, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Kansas v. United States, 249 F.3d 1213 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 50

Kowal v. MCI Communications Corp.,16 F.3d 1271 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . 15

Loving v. United States, 517 U.S. 748 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lyng v. Payne, 476 U.S. 926 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 18

Marshall County Health Care Authority, 988 F.2d 1221 (D.C. Cir. 1993) . . . . . . . . . . . . . . . 16

Massachusetts v. Andrus, 594 F.2d 872 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Match-E-Be-Nach-She-Wish Band of Pottawatomi Indians v. Engler, 173 F. Supp. 2d 725 (W.D. Mich. 2001), aff'd 304 F.3d 616 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 50

McGarry v. Secretary of the Treasury, 656 F. Supp. 1034 (D.D.C. 1987) . . . . . . . . . . . . . . . . 17

Mistretta v. United States, 488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Montana v. Blackfeet Tribe, 471 U.S. 759 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Mountain States Legal Foundation v. Glickman, 92 F.3d 1228 (D.C. Cir. 1996) . . . . . . . . . . 31

Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . 20

Natural Resources Defense Council v. Herrington, 768 F.2d 1355 (D.C. Cir. 1985) . . . . . . . 23

Nat'l Wildlife Fed'n v. FERC, 912 F.2d 1471 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 37

Panama Ref. Co. v. Ryan, 293 U.S. 388 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Public Util. Comm'n of the State of California v. FERC, 900 F.2d 269 (D.C. Cir. 1990) . . . . . 38

Pueblo of Sandia v. Babbitt, 1996 WL 808067 (D.D.C. Dec. 10, 1996) . . . . . . . . . . . . . . . . . 17

Pueblo of Santa Ana v. Kelly, 932 F. Supp. 1284 (D. N.M. 1996), aff'd, 104 F.3d 1546 (10th Cir. 1997), cert. denied, 522 U.S. 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . 24

Rust v. Sullivan, 500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250 (10th Cir. 2001) . . . . . . . . . . . 44-46

Shakopee Mdewakanton Sioux (Dakota) Community v. Babbitt, 107 F.3d 667 (8th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Shivwits Band of Paiute Indians v. Utah, 428 F.3d 966 (10th Cir. 2005) . . . . . . . . . . . . . . . . . 51

Sierra Club v. Marsh, 769 F.2d 868 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Sierra Club v. Marsh, 976 F.2d 763 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

South Dakota v. U.S. Dept. of Interior, 423 F.3d 790 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . 51

State of South Dakota v. Interior, 69 F.3d 878 (8th Cir. 1995), *vacated*, 519 U.S. 919, *mandate recalled and vacated*, 106 F.3d 247 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Tamiami Partners. v. Miccosukee Tribe of Indians of Florida, 63 F.3d 1030 (11th Cir.1995) . . 21

*TOMAC v. Norton, 193 F. Supp. 2d 182 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . 18, 41, 48-52

Town of Norfolk v. United States Army Corps of Eng'rs, 968 F.2d 1438 (1st Cir. 1992) . . . . . 18

Tripp v. Dep't of Defense, 193 F. Supp.2d 229 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Mead Corp., 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

United States v. Roberts, 185 F3d 1125 (10th Cir. 1999), *cert denied*, 120 S. Ct. 1960 . . . . . . . 51

Warren v. District of Columbia, 353 F.3d 36 (D.C.Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Weinberger v. Catholic Action of Hawaii, 454 U.S. 139 (1981) . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Whitman v. American Trucking Ass'ns, 531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . 51-53

Workplace Health & Safety Council v. Reich, 56 F.3d 1465 (D.C. Cir. 1995) . . . . . . . . . . . . . 19

Yakus v. United States, 321 U.S. 414 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Yamaha Motor Corp. v. United States, 779 F. Supp. 610 (D.D.C. 1991) . . . . . . . . . . . . . . . . . 15

## STATUTES

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* . . . . . . . . . . . . . . . . . . . . . 2, 18

Farmland Protection Policy Act (FPPA), 7 U.S.C. § 4201 *et seq.* . . . . . . . . . . . . . . . . . . . 29

*Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721   1, 2, 8-10, 20, 21, 27, 28, 41, 43-47, 49

*Indian Reorganization Act (IRA), 25 U.S.C. §§ 461-479 . . 1, 2, 4, 6, 7, 9, 10, 20, 40, 43, 46, 47

*National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* . . . . . . . . . . . 2, 12, 22

Ottawa Treaty, September 20, 1836, 7 Stat. 513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

The Clean Water Act, 33 U.S.C. § 1251 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 39, 40

The Quiet Title Act, 28 U.S.C. § 2409a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Treaty of Chicago, August 29, 1821, 7 Stat. 288 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Treaty of Chicago, September 26, 1833, 7 Stat. 431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Treaty with the Pottawatomi, September 19, 1827, 7 Stat. 305 . . . . . . . . . . . . . . . . . . . . . . 3

## FEDERAL REGULATIONS

25 C.F.R. Part 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 10-12, 14, 43, 47, 48

25 C.F.R. Part 291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

25 C.F.R. § 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

40 C.F.R. § 1501.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

40 C.F.R. § 1506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 36, 37

40 C.F.R. § 51.853(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 17

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15-17

Fed. R. Civ. P. 25(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

## UNITED STATES CONSTITUTION

Article I, Section 1 of the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## FEDERAL REGISTER

62 Fed. Reg. 38,113 (July 16, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

63 Fed. Reg. 56936 (Oct. 3, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

70 Fed. Reg. 25596 (May 13, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

62 Fed. Reg. 38,113 (July 16, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

63 Fed. Reg. 56936 (Oct. 3, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

70 Fed. Reg. 25596 (May 13, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## OTHER AUTHORITIES

BIA NEPA Handbook, 30 BIAM Supplement 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Department of the Interior and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63, sec. 134 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

The Energy Policy Act of 2005, Pub. L. No. 109-58 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Statement of Points and Authorities in Support of**
**Defendants' Motion to Dismiss or in the Alternative For Summary Judgment**

Pursuant to Rules 12(b)(1), (b)(6), and 56 of the Federal Rules of Civil Procedure, Defendants, Gale A. Norton and James E. Cason (the "United States"),[1] by undersigned counsel, hereby respectfully submit this Statement of Points and Authorities in support of their Motion to Dismiss or in the Alternative for Summary Judgment. For the reasons described below, Plaintiff's Verified Complaint fails to state any claim against Defendants upon which relief can be granted. The United States therefore respectfully requests that the Court dismiss the Complaint, or in the alternative grant the Motion for Summary Judgment.

Plaintiff challenges the Secretary of the Interior's ("Secretary's") decision to acquire trust land for the benefit of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Gun Lake Band") for economic development purposes pursuant to the Indian Reorganization Act (IRA), 25 U.S.C. §§ 461-479. The land at issue is two parcels equaling approximately 147 acres located in Wayland Township, Allegan County, Michigan ("the Bradley Property") on which the Gun Lake Band plans to construct and operate a gaming facility under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721. The Gun Lake Band was acknowledged as a federally recognized tribe in 1999 pursuant to the IRA and its implementing regulations, 25 C.F.R. § 83. The Bradley Property will be the first parcels of land held in trust by the United States for the Band. The Bradley Property, however, will be eligible for gaming only if the Tribe applies for

---

[1]The Associate Deputy Secretary of the Department of Interior, James E. Cason, is automatically substituted for his predecessor in office pursuant to Fed. R. Civ. P. 25(d)(1). This Stipulation is entered into on behalf of the DOI and the individually named defendants acting in their official capacity.

and receives a proclamation under 25 U.S.C. § 467 that the Bradley Property, once taken into trust, is eligible for gaming as part of the Gun Lake Band's "initial reservation." That determination would then enable the Tribe to conduct gaming under IGRA.[2]

As Plaintiff's name and Complaint indicate, their goal is to bar the Gun Lake Band from operating a lawful gaming facility as a means of economic development. In pursuit of its goal, Plaintiff relies on two arguments that repeatedly have been rejected by this Court and others: (1) that the non-delegation doctrine bars the Secretary from acquiring land into trust on behalf of the Gun Lake Band; and (2) that the Secretary violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by proposing to acquire land into trust without a valid Class III gaming compact already in existence. See Complaint ¶¶ 4 - 8. Plaintiff also alleges that the Secretary's determination that the parcel could be characterized as the Gun Lake Band's "initial reservation" under IGRA and the Department of the Interior's ("DOI's") decision to issue a Finding of No Significant Impact (FONSI) under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, were arbitrary and capricious. Id. As shown below, all of Plaintiff's arguments can be disposed of as a matter of law. We therefore respectfully request that the Court dismiss this case, or in the alternative, grant summary judgment in favor of the United States.

## I.    Statement of Undisputed Material Facts

The United States does not dispute many of the Plaintiff's background allegations, and adopts certain of them in presenting this Statement of Undisputed Facts.

### A.    The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians

---

[2]The Band has also sought the approval of the National Indian Gaming Commission ("NIGC") to engage in Class III gaming. Without such approval the Band may not engage in such activities.

The Gun Lake Band descends from a Band of Pottawatomi Indians led by Chief Match-E-Be-Nash-She-Wish, which resided near present-day Kalamazoo, Michigan. Under the terms of the Treaty of Chicago of 1821, signed by Chief Match-E-Be-Nash-E-Wish, the Gun Lake Band secured a three square mile tract of land at Kalamazoo, Michigan. Treaty of Chicago, August 29, 1821, 7 Stat. 288; see Administrative Record ("GUN LAKE") at AR001985. However, this parcel was ceded by the Pottawatomi in the Treaty of 1827, (Treaty with Pottawatomi, September 19, 1827, 7 Stat. 305), in return for enlargement of the Nottawaseppi Reserve. Pursuant to the 1833 Treaty of Chicago and the Ottawa Treaty of 1836, to which the Band was not a signatory, all of the Tribe's land was eventually ceded to the United States, leaving the Tribe landless. Treaty of Chicago, September 26, 1833, 7 Stat. 431; Ottawa Treaty, September 20, 1836, 7 Stat. 513; GUN LAKE AR001986.

During the period from 1828 to 1838, the Gun Lake Band moved north of the Kalamazoo River and in 1839 placed itself under the protection of an Episcopalian Mission, funded under the Treaty of 1836, in Allegan County, Michigan. This Episcopalian Mission was known as the "Griswold Colony" or the "Bradley Colony/Settlement," located in Bradley, Michigan. GUN LAKE AR001988. In 1894, the mission land was divided into parcels and deeded to nineteen descendants of the original Match-E-Be-Nash-She-Wish Band, but within a few years all of this land was lost through tax foreclosures. Id. AR001989.

Despite the loss of the land, a majority of the Band's members remained in Allegan County, Michigan. However, the Band was ineligible to organize under the IRA because it had no commonly owned reservation land. The 1940 decision by the Commissioner of Indian Affairs, John Collier, not to extend federal services to the Indians of Michigan's lower peninsula

3

ended the Band's government-to-government relationship with the federal government. GUN LAKE AR001989-90.

Prior to 1992, the Gun Lake Band's membership was included on the rolls of the Huron Band of Potawatomi. On June 24, 1992, the Band began pursuing federal acknowledgment by submitting to the Branch of Acknowledgment and Research, Bureau of Indian Affairs ("BIA") a letter of intent requesting acknowledgment that it exists as an Indian Tribe, in accordance with 25 C.F.R. Part 83.[3] The Band then submitted a documented petition for federal acknowledgment on May 14, 1994. GUN LAKE AR002013. In accordance with 25 C.F.R. § 83.10(d), the Band's petition was placed on active consideration on December 24, 1996. On July 16, 1997, the Assistant Secretary published notice of his proposed finding to acknowledge that the Band exists as an Indian Tribe within the meaning of federal law. 62 Fed. Reg. 38,113 (July 16, 1997). The Assistant Secretary published notice of the final determination to acknowledge the Band on October 23, 1998. 63 Fed. Reg. 56936 (Oct. 3, 1998); see In re Acknowledgment of Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, 33 IBIA 291, 292 (May 5, 1999). The final determination became effective on August 23, 1999. On August 8, 2001, the Gun Lake Band submitted its application to the United States to acquire the two Allegan County parcels of land into trust on its behalf under the IRA, 25 U.S.C. § 465. GUN LAKE AR001976 - 006064.

**B.     The Allegan County Parcels**

The Gun Lake Band seeks to have the Bradley Property, consisting of the two Allegan

---

[3]Currently recognized tribes are not eligible to seek acknowledgment pursuant to the regulatory process. 25 C.F.R. § 83.3.

County parcels, taken into trust by the United States.[4]  The Bradley Property is located in

Wayland Township, Allegan County, Michigan.  GUN LAKE AR000001.  Two maps of the

property's location are included in the EA at Figures 1-1 and 2-1.  The Gun Lake Band has been

centered around the town of Bradley in Allegan County since the founding of the Griswold

Colony in 1838 and has long historical, geographical and cultural ties to the area in which the

two parcels are located.  GUN LAKE AR001261.  The Property at issue was purchased on the

Band's behalf by MPM Enterprises, LLC, a Michigan Limited Liability Company.  GUN LAKE

AR001441-42.  The western boundary of the Property is US Highway 131, and eastern the

_____

[4]Parcel 1 is described as: That part of the Northwest quarter of Section 19, Town 3 North, Range 11 West, Wayland Township, Allegan County, Michigan, described as: Beginning at a point on the East-West quarter line of said Section which is N86°57'24"E 481.98 feet from the West line of said Section, said point being on the Easterly line of Highway US - 131 on ramp; thence N17°29'59"W 862.94 feet along said Easterly line; thence N02°23'15"W 1806.10 feet along the Easterly line of Highway US-131, Easterly said line being 125 feet Easterly of, measured at right angles to and parallel with the survey line of said Highway US-131; thence N87°07'54"E 2470.95 feet along the North line of said Section; thence S03°27'58"E 1448.14 feet along the Westerly Right of Way line of the Conrail Railroad (being 50.00 feet Westerly of, measured at right angles to and parallel with the North-South 1/4 line of said Section) to a point which is N03°27'58"W 1186.00 feet from the East-West 1/4 line of said Section; thence S86°57'24"W 926.00 feet; thence S03°27'58"E 430.00 feet; thence S86°57'24"W 194.00 feet; thence S03°27'58"E 431.00 feet; thence N86°57'24"E 240.00 feet; thence S03°27'58"E 325.00 feet; thence S86°57'24"W 1425.62 feet along the East-West 1/4 line of said Section to the Point of Beginning.

Parcel 2 is described as: That part of the Northwest 1/4 of Section 19, Town 3 North, Range 11 West, Wayland Township, Allegan County, Michigan, described as: Commencing at the West 1/4 corner of said Section; thence N86°57'24"E 1897.60 feet along the East-West 1/4 line to a point which is S86°57'24"W 930.00 feet from the center of Section , said point also being the Point of Beginning of this description; thence continuing N86°57'24"E 682.00 feet along 1/4 line; thence N03°27'58"W 330.00 feet parallel with the North-South 1/4 line; thence N86°57'24"E 198.00 feet; thence N03°27'58"W 856.00 feet along the Westerly right of way line of the Conrail Railroad (being 50.00 feet Westerly of measured at right angles and parallel with the North-South 1/4 line of said Section) thence S86°57'24"W 926.00 feet; thence S03°27'58"E 430.00 feet; thence S86°57'24"W 194.00 feet; thence S03°27'58"E 431.00 feet; thence N86°57'24"E 240.00 feet; thence S03°27'58"E 325.00 feet to the point of beginning.  See GUN LAKE AR001441.  It consists of approximately 147 acres.  Id.

Norfolk Southern Railroad tracks.   Wooded land and the Rhino Seed & Landscape Supply

facility are located east of the railroad tracks.  The northern boundary is 130th Avenue, a gravel

road, with farmland and a residence located north of 130th Avenue.  The southern boundary is

129th Avenue.  Vacant land, RCT Transportation Services, Inc., and a small lumber company are

present south of 129th Avenue.  The proposed parcels are zoned light industrial.  The southeast

segment of the parcel is developed and supports an industrial building associated with the past

operation of Ampro Industries, Inc.  Ampro manufactured lawn products, such as mulch and

hyrdoseed mix.  A farmhouse and a barn that were used to support agricultural operations are

located in the southeast corner of the site.  See GUN LAKE AR001439.

####  C.    The Indian Reorganization Act

In deciding to accept the Property into trust, the Secretary acted pursuant to the IRA.

Section 5 of the IRA provides in pertinent part that:

> [t]he Secretary of the Interior is hereby authorized, in his
> discretion, to acquire, through purchase, relinquishment, gift,
> exchange, or assignment, any interest in land, water rights, or
> surface rights to lands, within or without existing reservations,
> including trust or otherwise restricted allotments, whether the
> allottee be living or deceased, for the purpose of providing land for
> Indians.
>
> $* * *$
>
> Title to any lands or rights acquired pursuant to sections 461, 462,
> 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and
> 479 of this title shall be taken in the name of the United States in
> trust for the Indian tribe or individual Indian for which the land is
> acquired, and such lands or rights shall be exempt from state and
> local taxation.

25 U.S.C. § 465.

The regulations implementing section 5 of the IRA are set forth in 25 C.F.R. Part 151.

They provide that the Secretary may acquire land into trust "when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 C.F.R. § 151.3(a)(3). Section 151.10 requires the Secretary to notify the state and local governments having regulatory jurisdiction over the proposed land of the proposed trust acquisition so that they can provide written comments on the potential impacts on jurisdiction, taxes and assessments. Id. The provision also obligates the Secretary to consider factors such as: the need of the tribe for the land, the purposes for which the land will be used, the impact on the state and its political subdivisions resulting from the removal of the land from its tax rolls, jurisdictional problems and potential conflicts of land use, whether the BIA is equipped to discharge any additional responsibilities resulting from the trust status, and compliance with NEPA. See id. § 151.10(b)-(d), (f)-(h). Here, the Secretary made the required notifications and considered the appropriate factors.[5]

In addition to providing the Secretary with authority to accept land into trust, the IRA also authorizes the Secretary to consider such lands as part of a tribe's reservation. Specifically, the IRA provides:

> The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on land acquired pursuant to any authority conferred by sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title, or to add such lands to existing reservations; provided, That lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservation.

Id. at § 467. The BIA has internal guidelines outlining the reservation proclamation provision.

---

[5]The Secretary's summary of her consideration of these factors is included in the administrative record at GUN LAKE AR001254-1267.

See GUN LAKE AR001517.  The guidelines state that the land must already be held in trust by the United States before a reservation proclamation can be made.  Id. ("The only relevant limitation on the Secretary's authority to proclaim a reservation is that she first take the land into trust.").

### D.    The Indian Gaming Regulatory Act

IGRA was enacted "to provide express statutory authority for the operation of such tribal gaming facilities as a means of promoting tribal economic development, and to provide regulatory protections for tribal interests in the conduct of such gaming."  Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan, 198 F. Supp. 2d 920, 933 (W.D. Mich. 2002); see 25 U.S.C. § 2702.

In general, IGRA prohibits gaming activities on land acquired into trust by the United States on behalf of a tribe after October 17, 1988.  25 U.S.C. § 2719(a)(1).  There are several exceptions to this general prohibition, including when:

> (A)    the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; *or*
>
> (B)    lands are taken into trust as part of -
>
> * * *
>
> (ii)    the initial reservation of an Indian tribe acknowledged by the Secretary under the federal acknowledgment process.

25 U.S.C. § 2719(b)(1) (emphasis added).

Here, the Office of the Solicitor of the DOI opined that the Property qualifies as the Gun

Lake Band's "initial reservation" under section (B)(ii) if it is declared a reservation under 25 U.S.C. § 467, and would be eligible for gaming. The BIA adopted the opinion in its final determination to accept the land into trust. See GUN LAKE AR001254-56, 001260-61, 001382-84.[6]

### E.    The Tribal State Compact

Under IGRA, Class II gaming activity can be conducted on "Indian lands within such tribe's jurisdiction" if gaming is permitted in the State in which the land is located and if the tribe adopts a resolution or ordinance to conduct gaming which is approved by the National Indian Gaming Commission (NIGC).[7] 25 U.S.C. § 2710(b). Class III gaming can be conducted on Indian lands if the tribe meets the Class II requirements and conducts the gaming in conformance with a Tribal-State compact. 25 U.S.C. § 2710(d). A compact is not required for Class II gaming.

The Gun Lake Band currently does not have a Tribal-State compact with the State of

---

[6]As MichGO points out, the other exceptions in IGRA to the general prohibition on gaming on lands acquired after October 17, 1988, are inapplicable to this case. See Complaint ¶ 103. The Bradley Property is not contiguous to any reservation for the Gun Lake Band that existed on October 17, 1988. See 25 U.S.C. § 2719(a)(1). Under the statute, the Secretary either makes a two-part determination "or" the land qualifies under an exception. Id. § 2719(B)(1)(a). The Secretary did not make a determination that the gaming would be in the Gun Lake Band's and its members' best interest and would not be detrimental to the surrounding community, with the Governor of Michigan's concurrence. Id. (commonly called the "two-part determination.").

[7]Class I gaming includes social games for minimal prizes and traditional forms of gaming in connection with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive jurisdiction of the tribe and not regulated under IGRA. Id. § 2710(a). Class II gaming includes games of chance commonly known as bingo, including pull-tabs, lotto, punch boards, tip jars, and instant bingo, and card games with are not banked such as baccarat, chemin de fer and blackjack. Id. § 2703(7). Class III gaming includes all forms of gaming that are not Class I or II, such as banked card games and slot machines. Id. § 2703(8). Class II and Class III gaming are subject to IGRA.

Michigan because the Michigan Senate voted to rescind the resolution that awarded a compact to

the Gun Lake Band before the Governor was able to sign the compact.  GUN LAKE AR007067.

However, the Gun Lake Band may operate a Class II facility on the site even if a Tribal-State

compact is not negotiated and signed with the State of Michigan.  Id. at AR001262.

  **F.**  **The Challenged Decision**

  By a notice published in the Federal Register, the Secretary announced her final

determination of intent to acquire the Bradley Property into trust for the Gun Lake Band.  70 Fed.

Reg. 25596 (May 13, 2005); GUN LAKE AR000001.  In deciding to take the Property into trust,

the Associate Deputy Secretary, by adopting recommendations from the Indian Gaming

Management Staff and the Midwest Regional Office, concluded that the acquisition complied

with the IRA, IGRA, and trust acquisition regulations set forth in 25 C.F.R. Part 151.  See GUN

LAKE AR001254-1267.

  The Associate Deputy Secretary explained that title to the Bradley Property contains no

significant title deficiencies.  GUN LAKE AR001260.  In adopting a legal opinion written by the

Office of the Solicitor, the Associate Deputy Secretary determined that the Bradley Property is

within the geographical region that is part of the Band's land base, and would qualify as the

Band's "initial reservation" if a reservation proclamation is sought and granted under 25 U.S.C. §

467.  Id.  Thus, the Property would be eligible for gaming under IGRA.  GUN LAKE AR000001-

2, 001255-56, 001260-61, 001380-84.  The Associate Deputy Secretary determined that the

Bradley Property acquisition satisfies 25 C.F.R. § 151.3(a)(3) because "the land is needed by the

Band to facilitate economic development."  GUN LAKE AR001261.

  The Associate Deputy Secretary also analyzed the impact on the state and political

subdivisions pursuant to 25 C.F.R. § 151.10(e).  The Associate Deputy Secretary concluded that although Allegan County will lose approximately $85,000 in taxes per year from the parcels, local governments will also benefit from the trust status for several reasons.  Under the terms of several local agreements for services, the local governments will receive economic benefits. Also, a Firefighter Services Agreement between the Band and the City of Wayland and a Deputization and Service Agreement with Allegan County will further reduce any impact of removing the parcels from the tax rolls.  GUN LAKE AR001262.  The Associate Deputy Secretary also found that any jurisdictional problems involving the property have been resolved under 25 C.F.R. § 151.10(f) because police services will be provided by Allegan County consistent with state and federal law in accordance with a service agreement between the Sheriff's Office and the Band and the Wayland Area Emergency Medical Service will provide ambulance services to the casino.  GUN LAKE AR001262.

The Associate Deputy Secretary further determined, according to 25 C.F.R. § 151.10(g), that the BIA would be equipped to discharge any additional obligations because the responsibility resulting from the acquisition will be limited to the maintenance of land records.  Also, he concluded that the Gun Lake Band's Business Plan was properly included as required under 25 C.F.R. § 151.11(c).  GUN LAKE AR001264.

As part of the trust acquisition regulations, the BIA solicited and received comments from Allegan County, (GUN LAKE AR001722-38), Wayland Township, (GUN LAKE AR001748-50), City of Wayland, (GUN LAKE AR001754-57), and the State of Michigan, (GUN LAKE AR001761).  The Department also received and responded to comments from the public, including comments from Plaintiff.  GUN LAKE AR000826, 000831, 000836-37, 10464-73.

11

The BIA's summary of the State and local government responses are found at GUN LAKE AR001264-67. The record shows that the BIA and the Gun Lake Band responded to concerns and worked cooperatively with the public, local governments, and the State to craft agreements on a range of issues including wastewater management, traffic, law enforcement, fire, and rescue services. Accordingly, the Associate Deputy Secretary concluded that the process complied with 25 C.F.R. § 151.10(h)'s NEPA requirement and included proper consultation pursuant to 25 C.F.R. § 151.11(d). GUN LAKE AR001263-67.

The Gun Lake Band plans to use the parcels to construct and operate a Class II and Class III gaming facility. GUN LAKE AR001264. The Band plans to develop a 193,500 square foot gaming and entertainment facility that will include restaurants, a sports bar, and an entertainment lounge. GUN LAKE AR000022.

### G.    NEPA Compliance

As part of the acquisition process, Interior conducted an environmental review pursuant to NEPA, 42 U.S.C. § 4321, 4331-4335, 4341-4347. 25 C.F.R. Part 151; Final EA, (December 2003), GUN LAKE AR000006. BIA was the lead agency, with the National Indian Gaming Commission ("NIGC") as the cooperative agency. GUN LAKE AR000008. An Environmental Assessment ("EA") was prepared by an environmental consulting firm, with the BIA taking responsibility for its scope and content. Id. The EA went through several drafts. GUN LAKE AR002342-2913, 002935-3549, 003571-4825, 004829-6041. It was published for notice and comment on November 26, 2002. GUN LAKE AR002933. The public comment period closed on February 10, 2003. GUN LAKE AR000008. Numerous public comments – including those

from Plaintiff – were received and considered and incorporated into the Final EA.  GUN LAKE

AR009066-11656, Final EA, Appendix P, GUN LAKE AR000829-001060.

Based upon the EA, its supporting materials and public comments, the Principal Deputy

Assistant Secretary - Indian Affairs determined that the fee-to-trust acquisition by the BIA for the

Gun Lake Band would not have a significant impact on the quality of the human environment,

and accordingly issued a FONSI on February 27, 2004.  GUN LAKE AR000003-5.  The FONSI

lists the following pertinent findings:

1.    Agency and public involvement was conducted and environmental issues were
      identified.
2.    Alternative courses of action were developed in response to environmental
      concerns and issues related to the proposed action.
3.    Protective mitigation measures will be levied to protect the human environment,
      particularly public safety and water quality.
4.    The proposed action will not jeopardize federal or state-listed threatened and
      endangered species because such species do not occur on the proposed site.
5.    The proposed action is in compliance with the Farmland Protection Policy Act,
      and will not result in the conversion of federally designated Prime and Unique
      Farmland.
6.    The proposed action is in compliance with the National Historic Preservation Act,
      and that no historic properties will be affected under the proposed action.
7.    Impacts to the public health and safety will not be significant.  The Tribe is
      committed to paying for law enforcement and fire protection services.  Traffic
      impacts will be reduced to a minimum through enforceable mitigation.  The
      proposed action is in compliance with the Clean Air Act and the National
      Ambient Air Quality Standards and through the EPA permitting process water
      quality impacts will be mitigated.
8.    The proposed action will not be located in a flood plain and will not intensify
      downstream flooding risk.  It will also not adversely impact wetlands and the
      Michigan state permitting process will ensure that impacts to wetlands located
      adjacent to the proposed trust acquisition site are minimized.  Wastewater impacts
      to water quality from the on-site wastewater management system will also not be
      significant.
9.    The cumulative impacts of the proposed action will not be significant.  There are
      three geographic areas where indirect growth is reasonably foreseeable, and
      induced growth will occur, but its effects will not be significant.
10.   The proposed action will improve the economic and social conditions of the Tribe

and benefit the local economy by creating jobs and increasing local spending.

11.    The proposed action will cause no disproportionately high adverse impacts
       specific to minority or low-income populations.

GUN LAKE AR000003-5.

In order to address some of the issues that were raised during the review process, the Gun

Lake Band entered into a series of agreements.  Final EA, Appendix A, GUN LAKE AR000215-

49.  It executed an agreement with Allegan County for deputization and law enforcement services

for the casino.  GUN LAKE AR000230-42.  Tribal sovereign immunity was waived for purposes

of enforcing the agreement.  Id. AR000239.  The Band also reached an agreement with the City

of Wayland for the provision of firefighting services for the casino.  GUN LAKE AR000216-29.

Tribal sovereign immunity was likewise waived for enforcement.  Id. AR000221-22.  Similarly,

the Wayland Area Emergency Medical Services has signed a letter of intent to enter into an

agreement with the Gun Lake Band once the land is taken into trust for the provision of

emergency medical services to the casino.  GUN LAKE AR000243-45.

## II.    Taking the Allegan County Property Into Trust

As the regulations require, the Notice published in the Federal Register on May 13, 2005,

stated that the Secretary would not take the land into trust until 30 days after publication.  25

C.F.R. 151.12; GUN LAKE AR000001.  Plaintiff filed this action within the 30-day time period.

After the land is accepted into trust by the Secretary, the Quiet Title Act, 28 U.S.C. § 2409a, bars

any challenge to the status of the land as trust lands.

By Letter of June 25, 2005, the United States notified Plaintiff that the Secretary

voluntarily agreed not to take the land into trust during the pendency of this litigation, in order to

allow Plaintiff ample time to seek judicial review of the Secretary's decision.  See Ex. A.

## III.    Applicable Standards

### A.    Standard for Dismissal under Rules 12(b)(6) and 12(b)(1)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the Court to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Generally, under this standard, the Court accepts the allegations within the complaint as true and resolves ambiguities in favor of the pleader.  See Harbury v. Deutch, 244 F.3d 956, 958 (D.C. Cir. 2001); Tripp v. Dep't of Defense, 193 F. Supp.2d 229, 234 (D.D.C. 2002).

However, there are several exceptions to the general rule of construction.  "The Court is not required to draw argumentative inferences in favor of the Plaintiffs."  Yamaha Motor Corp. v. United States, 779 F. Supp. 610, 611 (D.D.C. 1991).  Facts that are internally inconsistent within the pleadings need not be accepted as true.  See Gibbs v. Buck, 307 U.S. 66, 72 (1938).  The Court also need not accept facts that run counter to facts of which the Court can take judicial notice.  Fletcher v. Jones, 105 F.2d 58, 61 (D.C. 1939).  Further, the Court "need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast in the form of factual allegations."  Guam Industrial Services, Inc. v. Rumsfeld, -- F. Supp. 2d --, 2005 WL 3462749, *2 (D.D.C. 2005) (citing Warren v. District of Columbia, 353 F.3d 36, 39 (D.C.Cir. 2004); Browning v. Clinton, 292 F.3d 235, 242 (D.C.Cir. 2002)); see also Kowal v. MCI Communications Corp.,16 F.3d 1271, 1276 (D.C. Cir. 1994).

15

**B.      Conversion of Motion for Dismissal to Motion for Summary Judgment**

Rule 12(b) of the Federal Rules of Civil Procedure provides for the conversion of a

motion to dismiss pursuant to Rule 12(b)(6) to a motion for summary judgment where "matters

outside the pleading are presented to and not excluded by the court" after there has been a

"reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

Fed. R. Civ. P. 12(b).  However, a court may take judicial notice of matters in the general public

record, including records and reports of administrative agencies, without converting a motion to

dismiss into a motion for summary judgement.  See American Farm Bureau v. EPA, 121 F. Supp.

2d 84, 106 (D.D.C. 2000) (citing Black v. Arthur, 18 F. Supp. 2d 1127, 1131 (D.Or. 1998)).

Further, where a challenge to an agency decision presents only legal questions concerning, for

example, "whether the agency adhered to the standards of decisionmaking required [by law]," the

court may "consult the record to answer the legal question before the court" without converting a

12(b)(6) motion into one for summary judgment.  Marshall County Health Care Authority, 988

F.2d 1221,1226 (D.C. Cir. 1993); see also Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077,

1083 (D.C. Cir. 2001) ("As we have repeatedly recognized, however, when a party seeks review

of agency action under the APA . . . [t]he 'entire case' on review is a question of law.").  Finally,

conversion of a motion to dismiss to one for summary judgment does not entitle a plaintiff to

discovery: "Challengers to agency action are not . . . ordinarily entitled to augment the agency's

record with either discovery or testimony presented in the district court."  Marshall County

Health Care Authority, 988 F.2d at 1226; see also Am. Bioscience, Inc., 269 F.3d at 1083

16

("Absent very unusual circumstances, the district court does not take testimony.").[8]

### C.    The Standard for Summary Judgment

In the event the Court finds it necessary to convert the United States' motion to a summary judgment motion, Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   Rule 56 is "an integral part of the Federal Rules as a whole" insofar as it allows for the dismissal of "factually insufficient claims" before trial, and thereby prevents the "unwarranted consumption of public and private resources" required by a trial of such meritless claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The initial burden of production under Rule 56 rests with the moving party who must make a prima facie showing that it is entitled to summary judgment.  See id. at 323.  The moving party may satisfy this burden by demonstrating to the court "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  However, the moving party need not "negate the elements of the nonmoving party's case."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990).  Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  The burden then shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal

---

[8]A court is not required to convert a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgement, as it might be for a 12(b)(6) motion.  Because the factual allegations surrounding the subject matter may require closer examination in order to determine if the court has subject matter jurisdiction, a court may consider material outside the pleadings without converting the motion to dismiss to a motion for summary judgment.  See McGarry v. Secretary of the Treasury, 656 F. Supp. 1034, 1037 (D.D.C. 1987); Pueblo of Sandia v. Babbitt, 1996 WL 808067 at *3 (D.D.C. Dec. 10, 1996).

quotations omitted).  See also Bias v. Advantage Int'l, 905 F.2d 1558, 1560-61 (D.C. Cir. 1990).

### D. Review of Agency Action Under the APA

Section 706(2)(A) of the APA provides that a court may set aside agency action only where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  This standard encompasses a presumption in favor of the validity of agency action.  Thus, "[t]he ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971); see also Town of Norfolk v. United States Army Corps of Eng'rs, 968 F.2d 1438, 1445-46 (1st Cir. 1992); Massachusetts v. Andrus, 594 F.2d 872, 888 (1st Cir. 1979).  The reviewing court's task is to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Overton Park, 401 U.S. at 416; see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).  "In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706; see also Camp v. Pitts, 411 U.S. 138, 142 (1973); Overton Park, 401 U.S. at 420; Cronin v. United States Dep't of Agric., 919 F.2d 439, 443 (7th Cir. 1990).  Thus, the Court's review is limited to the administrative record.  See TOMAC v. Norton, 193 F. Supp. 2d 182, 194 (D.D.C. 2002) (citing Overton Park, 401 U.S. at 420).

Under the APA and relevant case law, the Secretary's decision to approve the Gun Lake Band's trust application is entitled to the deference normally accorded agencies.  Lyng v. Payne, 476 U.S. 926, 939 (1986) (agency's construction of its own regulations is entitled to substantial deference); EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64, 83 (1980); Sierra Club v. Marsh,

18

976 F.2d 763, 769 (1st Cir. 1992) ("This standard of review is highly deferential; the court must presume the agency action to be valid.") (citing Overton Park, 401 U.S. at 415). The courts will grant an agency's interpretation of its own regulations considerable legal leeway. See Auer v. Robbins, 519 U.S. 452, 461 (1997) (Secretary's interpretation of own regulations are controlling unless "plainly erroneous or inconsistent with the regulation.").

"[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). These limitations on judicial review of agency decisionmaking are grounded in the separation of powers doctrine and the recognition that Congress has conferred certain discretionary decisionmaking powers to federal agencies equipped with special expertise. Cronin, 919 F.2d at 444.

The APA also provides the standard of review for Plaintiffs' statutory claims. The APA is the sole mechanism for challenging federal agency action unless a party challenges agency action as violating a federal law that has been interpreted to confer a private right of action or where a regulatory scheme contains a specific provision for obtaining judicial review. Workplace Health & Safety Council v. Reich, 56 F.3d 1465, 1467 (D.C. Cir. 1995) ("Except where a statute provides otherwise or where 'agency action is committed to agency discretion by law,' judicial review of agency procedure is governed by the APA.") (citation omitted).

E.      The Canons of Construction

Ambiguous statutes and ambiguous statutory provisions enacted for the benefit of Indians are to be construed liberally in their favor. See Bryan v. Itasca County, 426 U.S. 371 (1976);

19

Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439, 1444-45 (D.C. Cir. 1988) (quoting Montana

v. Blackfeet Tribe, 471 U.S. 759, 766 (1985); Confederated Tribes of Coos, Lower Umpqua &

Siuslaw Indians v. Babbitt, 116 F. Supp. 2d 155, 158-59 (D.D.C. 2000).  The IRA and Section 20

of IGRA were enacted for the benefit of Indian tribes.

The D.C. Circuit has concluded that Section 20 of IGRA is ambiguous, requiring its

provisions to be interpreted in the tribe's favor.  City of Roseville v. Norton, 348 F.3d 1020,

1031-32 (D.C.Cir. 2003) (IGRA is designed to promote the economic viability of Indian Tribes

and in this context, the canons of construction require the court to resolve any doubt in favor of

the tribe); see also Coos, 116 F. Supp. 2d at 162.

## IV.    Summary of Argument

Plaintiff alleges four counts in its effort to bar the United States from accepting land into

trust on behalf of the Gun Lake Band for the purpose of economic development.  Plaintiff's First

Count alleges that the Secretary was arbitrary and capricious by issuing a FONSI in violation of

NEPA. Specifically, Plaintiff alleges that the EA did not consider properly the following: the

validity of the Tribal-State compact; the impact on the rural community; the impact on West

Michigan; and reasonable alternatives.  Plaintiff also alleges the EA did not sufficiently consider:

the treatment of mitigation measures; air quality issues; the types of crimes associated with

casinos; and indirect and cumulative impacts.

Plaintiff's Second Count alleges that the Secretary failed to comply with IGRA because

she determined that the Bradley Property would qualify as an "initial reservation for an Indian

tribe acknowledged by the Secretary under the Federal acknowledgment process."[9]  Plaintiff

claims that in order to be a "reservation," the land must be used for housing.  Plaintiff further

alleges that the Gun Lake Band's trust application is in direct conflict with promises made by the

Band at the time it sought federal acknowledgment.

Plaintiff's Third Count alleges that the Secretary violated IGRA by deciding to take the

Bradley Property into trust in the absence of a Tribal-State Class III compact.

Plaintiff's Fourth Count alleges that the IRA provision authorizing the Secretary to take

land into trust for tribes is unconstitutional because it violates the non-delegation doctrine.

All of Plaintiff's counts should be dismissed as a matter of law.  Counts three and four

should be summarily dismissed based upon precedent established by this Court.  This Court has

ruled that a Tribal-State Class III compact need not exist before land can be taken into trust, and

the weight of authority supports this Court's position as well.  This Court also decided over 24

years ago that the IRA does not violate the constitution's non-delegation doctrine, and there is no

valid case law to the contrary.  Furthermore, Plaintiff's claim that IGRA bars gaming on the

Bradley Property and that the land must be used for housing is contrary to the plain language of

the statutes.  Nothing in IGRA, the IRA or accompanying regulations requires a reservation to be

used for housing.  The Secretary properly found the Bradley Property to qualify as the Band's

"initial reservation."  Lastly, despite MichGO's attempt to turn NEPA into a statute that requires

---

[9]MichGO  brings this action under the APA, NEPA, and the United States Constitution.  See V.
Complaint ¶ 4.  Therefore, even though Count IV does not allege that the Secretary's decision
under IGRA was arbitrary and capricious, it is in fact the appropriate standard.  There is no
private right of action under IGRA for MichGO's claim, and MichGO does not allege one.  See
25 U.S.C. §§ 2710(d)(7)(A), 2714; see also Hein v. Capitan Grande Band of Diegueno Mission
Indians, 201 F.3d 1256, 1260 (9th Cir. 2000); Tamiami Partners. v. Miccosukee Tribe of Indians
of Florida, 63 F.3d 1030, 1049 (11th Cir.1995).

specific substantive outcomes, the detailed, thorough and complete record shows that the

Secretary's decision to issue a FONSI complied with NEPA procedures and was not arbitrary or

capricious.

## V.    Argument

### A.    The Secretary's decision to issue a FONSI was not arbitrary and capricious

The record shows that the Secretary's decision to issue a FONSI for the trust acquisition

of the Bradley Property was not arbitrary or capricious, or otherwise not in accordance with the

law.  Plaintiff must show much more than a disagreement with the Secretary's determination in

order for the Court to find the determination arbitrary and capricious.  See Human Soc'y v.

Hodel, 840 F.2d 45, 62 (D.C. Cir. 1988) (although Fish & Wildlife Service could have addressed

with greater specificity the five factors urged by plaintiff, in the context of the overall assessment

filed by the Service, the Service's treatment of these factors is not fatal to the finding of no

significant impacts); City of Roseville v. Norton, 219 F. Supp. 2d 130, 170 (D.D.C. 2002)

(rejecting mere allegations of insufficient EA provision without presentation of genuine issues

that dispute the reasoning or thoroughness of the BIA's consideration).  As the record shows, all

of Plaintiff's alleged deficiencies are without basis.

### 1.    The National Environmental Policy Act

NEPA requires preparation of an Environmental Impact Statement (EIS) whenever a

proposed major federal action will significantly affect the quality of the human environment.  See

42 U.S.C. § 4332(2)©.  To determine the nature of the environmental impacts from a proposed

action and whether an EIS is required, agencies prepare an EA.  See 40 C.F.R. § 1501.4(b), ©.

An EA is a public document that serves to:

> (1)    Briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact ("FONSI");
>
> (2)    Aid an agency's compliance with the Act when no EIS is necessary; and
>
> (3)    Facilitate preparation of a statement when one is necessary.

See 40 C.F.R. § 1508.9(a).  An EA shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.  See 40 C.F.R. § 1508.9(b); see also Natural Resources Defense Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) ("The environmental assessment must briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.") (internal quotations and brackets omitted).  If, on the basis of the EA, the agency finds that the proposed action will produce "no significant impact" on the environment (FONSI), then an EIS need not be prepared.  See 40 C.F.R. § 1501.4(e).  Whether a project will "significantly" affect the human environment depends upon intensity and context.  See 40 C.F.R. § 1508.27; see also BIA NEPA Handbook, 30 BIAM Supplement 1, § 5 (Exhibit G to the Complaint), GUN LAKE AR 001066-67.

    The agency may permit an applicant to prepare an EA.  See 40 C.F.R. § 1506.5(b).  In such cases, the agency shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the EA.  See id.  The agency does not need to redo acceptable work, but must verify the work which has been submitted.  See id. § 1506.5(a).

    **2.    Legal Standard for Review**

    It is well-settled that "NEPA itself does not mandate particular results, but simply

23

prescribes the necessary process." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Id.

The D.C. Circuit employs a four-part test to review an agency's FONSI:

1)    whether the agency has accurately identified the relevant environmental concern;
2)    whether the agency has taken a "hard look" at the identified concern;
3)    if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding;
4)    if the agency does find an impact of true significance, preparation of an EIS can be avoided if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

See City of Roseville, 219 F. Supp. 2d at 164, citing Grand Canyon Trust v. FAA, 290 F.3d 339, 340-41 (D.C. Cir. 2001).

### 3.    The Secretary took a "hard look" at the potential environmental consequences

As the record shows, the Secretary, in cooperation with the NIGC, took a hard look at the potential environmental consequences of the Bradley Property acquisition. The record shows that the BIA followed NEPA, the Council on Environmental Quality ("CEQ") regulations interpreting NEPA, and its own NEPA guidelines. BIA NEPA Handbook, 30 BIAM Supplement 1, GUN LAKE AR 000008, 001111-12. The record shows that the BIA took responsibility for the scope of the EA, and made an independent evaluation of the environmental impacts of the proposed project.

The Midwest Regional Office ("MRO") of the BIA handled the initial stages of the trust acquisition and associated NEPA work. GUN LAKE AR007320-9062. The MRO reviewed the comments received on the draft EAs, communicated with the contractor in the preparation of the

24

EA, and worked with the Gun Lake Band to address any problems and concerns.  Id.  After the

MRO addressed all of the concerns and issues, it sent a recommendation to the Principal Deputy

Assistant Secretary - Indian Affairs that she issue a FONSI and approve the land acquisition.

GUN LAKE AR001365.  The recommendation was referred to the Office of Indian Gaming

Management (OIGM) staff in Washington, D.C., for review.  GUN LAKE ARE001258.  The

OIGM then independently reviewed the MRO's recommendations, and subsequently made a

recommendation to the Principal Deputy Assistant Secretary - Indian Affairs to issue a FONSI

and to approve the trust acquisition.  GUN LAKE AR001267.  The Principal Deputy Assistant

Secretary - Indian Affairs issued the FONSI on February 27, 2004, see GUN LAKE AR000003,

and authorized the MRO to acquire the Bradley Property into trust status on April 18, 2005.[10]

GUN LAKE AR001254-56.

As the record shows, the BIA engaged in a three-year process of deliberating, analyzing,

commenting and refining the EA, including responding to numerous comments from Plaintiff,

the State, the public, local communities, other federal agencies and from within DOI itself.  See

Final EA, Responses to Public Comments, GUN LAKE AR001061-1203; GUN LAKE

AR002342-6041 (Draft EAs with comments); GUN LAKE AR007320-8970 (regional office

emails and correspondence); GUN LAKE AR0006935-7319 (central office emails and

correspondence).  Chapter 4 of the Final EA contains detailed discussions on Land Resources

(4.1), Water Resources (4.2), Biological Resources (4.3), Historic Properties and Religious

Freedom (4.4), Socioeconomic/Environmental Justice (4.5), and Resource Use Patterns (4.6).

All of these sections contain analyses on the affected environment, the environmental

---

[10]As noted above, the land has not been taken into trust pending resolution of this litigation.

consequences, safeguard measures, and the "no action" alternative.  The EA includes charts,

studies, maps, and consultation correspondence that support its analyses and conclusions.

Plaintiff's allegations are simply reiterations of the comments it submitted to the

Secretary during the trust acquisition and EA comment processes, concerns which the DOI

thoroughly addressed.  See GUN LAKE AR001065-66, 001070-72.  Instead of pleading that the

Secretary's responses were inadequate, MichGO simply restates its comments in its attempt to

persuade this Court to alter Interior's substantive decisions.  As long as the Agency clearly

considered MichGO's and other information, even if it elected not to rely on it, the Court's

review is limited to whether the decision is adequately supported and reasonable.  See City of

Roseville, 219 F. Supp. 2d 130, 168 (D.D.C. 2002).

> **a.    The EA adequately considered the Tribal-State Compact
>        validity issue**

It is simply not true, as Plaintiff argues, that the DOI failed to consider the fact that there

may be no tribal-state compact.[11/]  The EA states that:

> In the event that the Tribe and the State are unable to negotiate a Class III
> gaming compact and the Secretary of the Interior issues Class III gaming
> procedures pursuant to 25 C.F.R Part 291, impacts to the local government
> would be less than significant only after the implementation of mitigation
> measures described in Chapter 5.5.

Final EA, Chapter 4.5.1, Economy and Employment, GUN LAKE AR000097.  Chapter 5.5 of

the Final EA, in turn, states:

---

[11/]It is questionable whether NEPA mandates a discussion of the validity of a tribal-state compact.
Generally, however, EAs prepared for fee-to-trust acquisitions for gaming purposes assume Class
III gaming will occur in order to assess environmental impacts, even if no compact has been
negotiated.

> The Tribe is entering into agreements with local agencies to compensate for loss of revenue and to ensure that no loss of services will occur as a result of operation of the gaming facility. In the event the Tribe and State are unable to negotiate a Class III gaming compact and the Secretary of the Interior issues Class III gaming procedures pursuant to 25 C.F.R. Part 291, the Tribe will pass a resolution promising to contribute two percent of electronic gaming revenues annually to local governments. The resolution should specifically state that at least $150,000 of the two percent revenues would be set aside for local government general administrative expenses. No additional mitigation is required.

Final EA, Chapter 5.5, Socioeconomic Conditions/Environmental Justice, AR000189.  As discussed earlier, the Tribe has also mitigated the impact on the local governmental units through the form of local agreements.  Final EA, Appendix A, Agreements, Resolutions, and Correspondence with Local Agencies.  These agreements and the additional gaming revenues provided by the Gun Lake Band to the local governments will more than offset tax revenues.  See GUN LAKE AR001095.

The DOI explained in the Responses to Comments portion of the Final EA that IGRA does not confer authority on the Secretary to judge the appropriate means and manner for a state to enter into a tribal-state compact.  Final EA, Appendix Q, Responses to Comments, Response B2, AR001065.  This is in large part a matter of state law.  See Pueblo of Santa Ana v. Kelly, 932 F. Supp. 1284 (D. N.M. 1996), *aff'd,* 104 F.3d 1546 (10th Cir. 1997), *cert. denied*, 522 U.S. 807.  Nor does the Secretary have authorization to permit the Band to game in violation of IGRA. However, if a tribe and state are unable to reach agreement on a compact, IGRA provides a statutory procedure that can result in the issuance of Class III gaming procedures by the Secretary.  See 25 U.S.C. § 2710(d)(7)(B); 25 C.F.R. Part 291.  Additionally, there is no procedural requirement in the fee-to-trust acquisition process that a gaming compact be in place prior to reviewing and approving an acquisition.  See infra Part V.C; Final EA, Appendix Q,

27

Responses to Comments, Response B2, AR001065.  The DOI correctly stated that a compact

need not exist before Class II gaming can commence, see 25 U.S.C. § 2170(b), and since the Gun

Lake Band intends to conduct Class II gaming, DOI could proceed with the trust acquisition

application.

It is abundantly clear, therefore, that the Secretary adequately considered the tribal-state

compact validity issue.  The Department ultimately concluded that basing the EA on the

assumptions associated with a Class III operation necessarily incorporates those for the lesser-

impact of Class II gaming, and that any mitigation measures imposed on a Class III facility would

adequately mitigate for a Class II facility.  That decision is not arbitrary or capricious.

> **b.     The EA adequately considered any potential impact on the Rural Community**

Plaintiff claims that the EA was inadequate in its treatment of potential impacts on the

rural community.  Plaintiff states that the farmland that makes up the area is a defining feature of

the community and that a casino that will attract numerous visitors each day is inconsistent with

the Plaintiff's members enjoyment and use of their property.  See Complaint ¶¶ 58-62.  Plaintiff

also claims there will be increased traffic and that the indirect growth induced by the project will

result in the destruction of wetlands.  Complaint ¶¶ 62-63.  Plaintiff fails, however, to identify

what specific impacts the Secretary did not consider.   In any event, contrary to these assertions,

the EA adequately considered potential impacts to the community in a number of ways.

As an initial matter, Plaintiff's own community – Wayland Township – has zoned the

land as light industrial.  See GUN LAKE AR000124.  Thus, it will not be farmland irrespective

of the acquisition, and development of the project site will be consistent with the Wayland

Zoning Ordinance and the Wayland Township Land Use Plan.  The light industrial zoning

28

designation allows for land uses similar to a gaming facility.  Id.  Only the existing residential uses present potential land use conflicts, but the residence north of the site has been subject to nearby industrial activity through Ampro Industries' operation on the project site.[12]  Also, much of the site will remain in its current undeveloped state in order to buffer surrounding land uses from the proposed development.  Id. AR000125.

The EA likewise considered the potential impact on agricultural and prime farmland pursuant to the Farmland Protection Policy Act (FPPA), 7 U.S.C. § 4201 *et seq.*  See GUN LAKE AR000125-26.  The project would result in the conversion of approximately 45 acres of farmland to non-agricultural use, primarily for parking.  The converted farmland would not include federally-designated Prime and Unique farmland, but would include 21 acres of locally important farmland.  Id.  However, this acreage represents only 0.011 percent of Allegan County's important farmlands.  The remainder of the site, approximately 100 acres, would remain open space.  Id. AR000126.

The EA included a detailed analysis and study on traffic, examining both the cumulative and indirect impacts.  See GUN LAKE AR000103-117, AR000137-144, AR000177-78.  It lists mitigation measures to assure an adequate flow of traffic and the provision of services.  See GUN LAKE AR000189-90.  The Michigan Department of Transportation and the Allegan County Board of County Road Commissioners reviewed the analysis and concurred with the proposed mitigation measures.  See GUN LAKE AR000109, Final EA, Appendix F, AR000585.  Therefore, the BIA adequately considered the impact of traffic on the community.

---

[12]The buildings on the site were used by Ampro Industries to manufacture lawn products, such as mulch and hydroseed mix.

The EA also considered indirect effects to wetlands.  See GUN LAKE AR000166-67.  The percentage of wetlands in each sewer and water district in the Core Area ranges from 6 to 17 percent, but the area in which indirect development is expected to occur is much less than the percentage of wetlands because other land exists for such development.  However, in order to assess the indirect impacts to wetlands, the EA assumed that the indirect development would equal the percentage of wetlands found within the sewer and water district.  Id. AR000167.[13] Development that affects wetlands is comprehensively regulated at both the state and federal level.  The Clean Water Act, 33 U.S.C. § 1251 et seq., implementing regulations, Michigan law, and federal guidelines provide a comprehensive scheme that protects wetlands by restricting impacting activities and requiring or promoting mitigation measures to achieve the goal of no overall net loss.  The comprehensive state and federal regulatory schemes protecting wetlands make it very difficult to obtain permits to develop when alternative non-wetland locations are available.  Therefore a significant indirect effect to wetlands is not expected.  GUN LAKE AR000167.

The EA also considered the possibility that the project could lead to an increase in compulsive gambling in the community.  GUN LAKE AR000134-35.  While significant compulsive gambling impacts are not expected,  public messages and signage will be utilized to support responsible gambling, the Gun Lake Band will make payments to support compulsive treatment programs in the local area, and casino employees will be trained to recognize and refuse service to problem gamblers.  Id.

---

[13] The references to Part 303 of the Clean Water Act in the second full paragraph on page AR000167 should read Part 303 of the Michigan Natural Resources and Environmental Protection Act.

        c.        **The EA adequately considered any potential impact to West Michigan**

Plaintiff asserts that the EA failed to consider the impact of the proposed casino on the broader West Michigan community.  Specifically, the plaintiff alleges that the EA neglected to consider the effect that the proposed casino would have on the local cities of Kalamazoo and Grand Rapids and the recent revitalization efforts of those cities.  This concern, however, does not fall within the zone of interests that NEPA was enacted to protect.  See ANR Pipeline Co. v. F.E.R.C., 205 F.3d 403, 408 (D.C. Cir. 2000) (the economic interest of suppressing competition is not within the zone of interests protected by NEPA); Mountain States Legal Foundation v. Glickman, 92 F.3d 1228, 1236 (D.C. Cir. 1996) (NEPA's list of interests intended to be served do not include monetary interests).

The EA adequately considered the effects on the community – including West Michigan.  Chapter 4.9.7 of the Final EA assesses the economic competition related impacts of the proposed casino on other gaming-based businesses and other businesses in the area, including those in Kalamazoo and Grand Rapids.  GUN LAKE AR000169.  This chapter was specifically modified in response to the comments received from the Grand Rapids Chamber of Commerce during the public comment period.  GUN LAKE AR001114, see also GUN LAKE AR001110-23.  Chapter 4.5 was also revised to include predictions of the socioeconomic impacts to the Grand Rapids area based on information provided by the Chamber of Commerce.  GUN LAKE AR001099.  The BIA did not receive comments from either the City of Kalamazoo or the Kalamazoo Area Chamber of Commerce.  GUN LAKE AR001114.  Finally, the Draft EA was revised to respond to comments included in the critique, cited by Plaintiff, that was submitted by AEG.  Final EA,

Appendix H, GUN LAKE AR000688-711.  The Gun Lake Area Chamber of Commerce, the

Wayland Area Chamber of Commerce, the Barry County Area Chamber of Commerce, and the

Barry County Economic Development Alliance, all situated closer than downtown Grand Rapids,

predicted that the revenue impacts of the casino will be beneficial for nearby businesses.  GUN

LAKE AR000170, 001073.  In short, the EA's treatment of the potential impacts on the West

Michigan community was adequate and reasonable.

### d.    The EA adequately analyzed any air quality issues

Plaintiff claims that the DOI failed to analyze any air quality issues because Allegan

County was deemed a non-attainment area for ozone under the recently-adopted "eight hour"

standard for ozone two months after the FONSI was issued.[14]  Complaint ¶ 80.  At the time that

the FONSI was issued based on the Final EA, Allegan County was in attainment with all present

national criteria for air pollutant standards.  GUN LAKE AR000118.

As stated in the EA, the possibility that new standards could become effective and that

Allegan County may become part of a non-attainment area for one or more pollutants based on

these new standard was considered.  GUN LAKE AR000118.  In the event that this happened,

the EA indicated that additional analysis may be necessary to examine compliance with the new

standards.  Id.  The nonattainment designation simply shows that without the gaming facility,

Allegan County is not meeting the NAAQS for ozone based on other pollution sources.  The

relevant question for the potential impact of the project, however, remains the same whether the

---

[14]On August 8, 2005, the President signed H.R.6, the Energy Policy Act of 2005, Pub. L. No.
109-58.  Section 996 of the Act under certain conditions suspends Clean Air Act requirements
and sanctions for counties in Southwestern Michigan, raising a serious question as to the effect of
the new standards and whether the new standards apply to Allegan County.

area is an attainment or nonattainment area: whether the net change in air impacts from the addition of pollutants related to the project (as compared to the pollutant levels without the project) is significant.

The BIA conducted additional analysis to determine whether the new standard for ozone affected the issuance of the FONSI and concluded that it did not.  GUN LAKE AR001237-46.  Specifically, the additional analysis found that the anticipated direct and indirect emissions would be well below the federal threshold of 100 tons/year.  GUN LAKE AR001241-42; 40 C.F.R. § 51.853(b)(1).  Therefore, it was concluded that the attainment status does not affect the analysis because it does not alter the conclusion that the proposed casino does not have an individually or cumulatively significant impact on air quality.  GUN LAKE AR001241-42.  The BIA took a "hard look" at the non-attainment designation and reaffirmed the FONSI and determined there was no need to prepare a supplemental EA.  See Friends of the River v. FERC, 720 F.2d 93, 109 (D.C. Cir. 1983) ("the initial decision whether to supplement under NEPA should be made by the agency, not by a reviewing court."); Glass Packing Institute v. Regan, 737 F.2d 1083, 1094 (D.C. Cir. 1984) (duty to supplement NEPA document triggered only when new information is significant enough to effect the agency's original conclusions).

### e.     The EA adequately considered reasonable alternatives

Courts uphold an agency's discussion of alternatives "so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  City of Roseville, 219 F. Supp. 2d at 170 (citing Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 194 (D.C.Cir. 1991)).  The fact that the EA does not consider an alternative that Plaintiff would prefer "is simply not grounds for finding that the agency failed to meet its obligations in preparing that EA, or that the

33

agency's decision was arbitrary and capricious." Id.

Chapter 2.0 of the Final EA discusses proposed alternatives, including alternate locations, a redesign alternative and a "no action" alternative. See GUN LAKE AR000021-34. The other potential sites are shown on maps contained in the EA at GUN LAKE AR000034. The EA explains that the first alternative, a 108 acre-parcel located in Dorr Township, was ultimately rejected because of concerns regarding environmental concerns unique to this particular site. The site is also located near schools. GUN LAKE AR000033. The second alternative, 242 acres in Dorr Township, was also rejected because of environmental concerns. Moreover, the development of the site was also not financially feasible. GUN LAKE AR000033. A third alternative, located in Hopkins Township, was rejected because it lacks water and sewer infrastructure. The site is also irregularly shaped and served only by an unpaved road. GUN LAKE AR000033. The redesign alternative, which would involve the re-arranging of facilities on the site instead of renovating the existing buildings, would not significantly reduce environmental impacts, and was also rejected. GUN LAKE AR000033.

The "no action" alternative was considered in Chapter 2.2 of the Final EA. GUN LAKE AR000031. The EA stated that a portion of the Bradley Property could be used for agricultural purposes. The site could also be developed consistent with Wayland Township zoning (light industrial) by a private party or the Tribe. For purposes of the EA, it was assumed that the portion of the site with the existing buildings would be developed for light industrial use under the no-action alternative. The remainder of the site would either be developed to support light industrial operations, used for agricultural purposes, or remain open space. See GUN LAKE AR000031. The "no action" alternative is discussed further throughout the body of the document

34

in each of the following sections: Land Resources (4.1) (GUN LAKE AR000085); Water

Resources (4.2) (GUN LAKE AR000086); Biological Resources (4.3) (GUN LAKE AR000089);

Historic Properties and Religious Freedom (4.4) (GUN LAKE AR000093);

Socioeconomic/Environmental Justice (4.5) (GUN LAKE AR000094); Resource Use Patterns

(4.6) (GUN LAKE AR000103); Other Values (4.7) (GUN LAKE AR000131); and Cumulative

Impacts (4.8) (GUN LAKE AR000135).

### f.  The EA adequately considered crime rates

Chapter 4.5.4 of the EA discussed the potential increase in crime that might be associated

with the preferred alternative.  GUN LAKE AR000099.  In concluding that there is not expected

to be a significant increase in crime rates, the EA relied upon a number of studies, including

national studies conducted by the National Gambling Impact Study Commission, the

Governmental Accounting Office, the U.S. Department of Justice's National Institute of Justice,

and local studies done in Indiana and Michigan.  Id. AR000099-100.  The EA also considered the

possibility that local public safety agencies would experience an increased workload in relation

to traffic management in the area, noting that the Tribe's agreement with the Allegan County

Sheriff's Office would minimize this impact.  Id. AR000101.

### g.  The EA considered reasonably foreseeable indirect and cumulative impacts

Under NEPA, an EA is adequate if it provides the necessary information and evaluation

for an agency to make a determination as to whether impacts may or may not be significant.  See

Friends of the Earth v. U.S. Army Corps of Engineers, 109 F. Supp. 2d 30, 39 (D.D.C. 2000).

Here, the record shows that the BIA reviewed the impacts  -- direct, indirect and cumulative -- as

identified and analyzed in the EA and determined that they do not "significantly affect the human environment" as defined under the law.

Chapter 4.8 of the EA discussed the cumulative impacts on all of the environmental categories discussed individually.  See GUN LAKE AR000135.  "Cumulative impacts" are defined as the impacts:

> on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless what agency (Federal or non-federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

See 40 C.F.R. § 1508.7.  Chapter 4.9 of the EA discusses the indirect impacts of the proposed casino.  "Indirect impacts" are defined as those impacts that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).  The EA examined for example, the cumulative impacts and indirect effects on land resources.  See GUN LAKE AR000135, AR000164-65.  Other examples of cumulative and indirect impacts that were analyzed in the EA  include those concerning water resources (GUN LAKE AR000135-36, AR000165-66), biological resources (GUN LAKE AR000136, AR000166-68), historic properties and religious freedom (GUN LAKE AR000137, AR000168-69),socioeconomic conditions/environmental justice (GUN LAKE AR000137, AR000169-77), and resource use patterns (GUN LAKE AR000137-45, AR000177-83), to name a few.

Plaintiff incorrectly asserts that the EA failed to address the indirect impacts of traffic and housing growth and simply relied upon local planning and zoning to control the impacts.  Complaint ¶¶ 89-94.  First, the EA does not rely upon local planning and zoning ordinances to control indirect development, but does correctly assume that all reasonably foreseeable indirect

36

development will be in compliance with local planning and zoning laws.  GUN LAKE AR

000146.  The EA identified geographic areas in which indirect effects are most likely to occur;

(labeled as the Core Area, the Outer Core Area, and the Outer Area).  The EA then analyzed the

reasonably foreseeable indirect impacts to each of these areas, including indirect impacts related

to housing growth and increased traffic.  GUN LAKE AR000147-156, AR000177-78.  The

Secretary's decision was not arbitrary or capricious because the EA reflects that the agency took

a "hard look" at the impacts including indirect and cumulative impacts.

Instead of alleging specifically how the Final EA was deficient in its cumulative impacts

analysis, Plaintiff merely states that it was deficient.  In  City of Los Angeles v. Nat'l Highway

Traffic Safety Admin, 912 F.2d 478 (D.C. Cir. 1990), the D.C. Circuit expressly rejected

plaintiff's challenge to the agency's cumulative impacts analysis because it "discern[ed] no more

from petitioners' argument than that they disagree with [the agency's] judgment."  Id. at 488.

The court noted that the "Petitioners call for more 'analysis,' but do not specify what they see as

lacking or how 'analysis' could supply the want."  Id.  Thus, the court concluded that, "[e]ven

were we to share their view of the matter, that would not be a sufficient basis for overturning the

agency's decision."  Id.  This is precisely the situation here: This Court similarly should reject

MichGO's sweeping but meritless challenge to the Secretary's cumulative impacts analysis.

Moreover, for cumulative impacts, the law is clear that the Secretary is not required to

predict every conceivable speculative consequence of the proposed facility.  Rather, she is

required to consider effects of reasonably foreseeable projects.  See 40 C.F.R. § 1508.7; see also

Weinberger v. Catholic Action of Hawaii, 454 U.S. 139, 146 (1981); Nat'l Wildlife Fed'n v.

FERC, 912 F.2d 1471 (D.C. Cir. 1990) (agency need not delve into possible effects of

hypothetical projects); <u>Public Util. Comm'n of the State of California v. FERC</u>, 900 F.2d 269, 270 (D.C. Cir. 1990) (agency issuing permit for pipeline construction not required to do cumulative impacts analysis on successive similar pipelines because they were "not reasonably foreseeable" and because permit issued to company included mitigation conditions for additional pipelines); <u>Foundation on Econ. Trends v. Weinberger</u>, 610 F. Supp. 829, 840 (D.D.C. 1985) (mere contemplation of an action is not a sufficient basis for requiring the preparation of an EIS.). There is no requirement in NEPA that the Secretary invent and prepare a "Hypothetical Environmental Impact Statement," as Plaintiff wants. <u>See</u> <u>Catholic Action</u>, 545 U.S. at 144.

### h.    Safeguards in the project sufficiently reduced the impacts to a minimum

Plaintiff claims the EA's mitigation measures are "deficient." <u>See</u> Complaint ¶ 74. It alleges that the mitigation measures are "illusory" since they rely on the Gun Lake Band for enforcement and the Band may not be able to pay for the measures. Plaintiff also alleges the mitigation measures regarding indoor tobacco smoke are insufficient because the EA states that the HVAC system which will be installed will address the concerns. <u>Id.</u> ¶ 76. Once again, these issues are "red herrings" and are factually inaccurate. A court will uphold the EA so long as the mitigation measures sufficiently reduce the impacts to a minimum. <u>See</u> <u>City of Roseville</u>, 219 F. Supp. 2d at 164.

The EA includes an entire chapter describing mitigation measures. <u>See</u> Final EA, Chapter 5, GUN LAKE AR000184-191. Included is a discussion of measures related to land resources, water resources, biological resources, historic properties and religious freedom, socioeconomic conditions/environmental justice, resource use patterns, and other values. <u>Id.</u> In response to Plaintiff's assertions, the mitigation measure agreements are not illusory. The

agreement with the City of Wayland for firefighting services and the deputization and service

agreement with Allegan County regarding law enforcement services are legally enforceable

against and by the Gun Lake Band.  The parties waived their sovereign immunity for

enforcement of the agreements.  See GUN LAKE AR000221-22, AR000239.  Second, since

these agreements are legally enforceable, the parties can seek relief if the Gun Lake Band

defaults on payment for some reason.  Additionally, the Gun Lake Band has agreed to pass a

resolution for the sharing of gaming revenues with local governments in the absence of a tribal-

state gaming compact.  GUN LAKE AR000189.  Although the mitigation measures to assist with

firefighting services and law enforcement do not impact the physical environment which is the

interest to be protected under NEPA, such mitigation measures outlined in the EA demonstrate

that the Secretary both complied with and went beyond what NEPA requires.

With regard to indoor air quality, tobacco smoke is specifically addressed.  See GUN

LAKE AR000190.  The EA provides that a HVAC system will be installed, and that the details

and specifications of that system will address the potential tobacco smoke issues.  Id.  Moreover,

the project facility will comply with the Clean Air Act and the applicable National Ambient Air

Quality Standards.  See GUN LAKE AR000190, AR001239-46.  The EA's mitigation measures

on air quality thus reduce any potential impacts to a minimum.

Indeed, many of the mitigation measures discussed in Chapter 5 of the EA are required

and enforceable under state and federal law.  For example, the transportation-related mitigation

measures are enforceable through the Michigan Department of Transportation permitting

process.  In addition, the Tribe will need to obtain a National Pollutant Discharge Elimination

System (NPDES) permit in compliance with the Clean Water Act, 33 U.S.C. § 1311.  The Tribe

will also be required by the EPA to prepare a Storm Water Pollution Prevention Plan under the Clean Water Act, 33 U.S.C. § 1342, which shall include specific terms and conditions that the project must follow. These binding measures will ensure that any potential impacts will not be significant. GUN LAKE AR000185-91.

While Plaintiff alleges throughout the Complaint that the EA does not contain enough analysis in it, Plaintiff also alleges that the length of the EA alone calls for an EIS. Complaint ¶¶ 66-67. The legal issue before this court is not the length of the EA, but whether there is a significant impact as a result of the project. See Sierra Club v. Marsh, 769 F.2d 868, 875-76 (1st Cir. 1985). Despite MichGO's opposition to casinos, nothing in its Complaint demonstrates that the Secretary's decision to issue a FONSI for the Bradley Property acquisition was arbitrary and capricious.

>   **B.    The Secretary's determination that the Property would qualify as the Gun Lake Band's "initial reservation" under IGRA and the IRA is reasonable**

The "initial reservation" determination may not be ripe for review. The Secretary determined that the Bradley property would qualify as an initial reservation if the Gun Lake Band sought and received a reservation proclamation under 25 U.S.C. § 467. The Gun Lake Band has not yet sought a proclamation, and cannot until the land is held in trust. Accordingly, the Secretary has not proclaimed the Bradley Property a "reservation." GUN LAKE AR001262.

Plaintiff also challenges the Secretary's determination that the Bradley Property would qualify as the Gun Lake Band's "initial reservation" under IGRA if it is proclaimed its reservation under 25 U.S.C. § 467. Plaintiff contends that the Bradley Property cannot be the Gun Lake band's "initial reservation" under IGRA because: 1) a reservation must be used to

provide housing; and 2) the Gun Lake Band already had two federal reservations at different

points in history and by virtue of its brief merger with the Huron Band of Pottawatomi, a third.

Neither of these assertions is true as a matter of law.  Moreover, the well-established deference

articulated in Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984), and the

Indian canons of construction necessitate that the Secretary's interpretation of "initial

reservation" be upheld.

As explained above, IGRA places a general prohibition on gaming on lands acquired in

trust after October 17, 1988.  See 25 U.S.C. § 2719(a).   However, the statute IGRA creates

several exceptions in order to permit newly acknowledged or restored tribes which lacked a

reservation as of October 17, 1988, to engage in gaming as a means of economic development on

par with existing tribes that had reservation prior to that date.  See Grand Traverse Band of

Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan, 46

F. Supp. at 698 (W.D. Mich. 1999); accord Coos, 116 F. Supp. 2d at 164; TOMAC, 193 F. Supp.

2d at 194 n.8.[15]   Here, the relevant exception applies to lands taken into trust as part of the

"initial reservation of an Indian tribe acknowledged by the Secretary under the Federal

acknowledgment process."  25 U.S.C. § 2719(b)(1)(B)(ii).

In deciding that the "initial reservation" exception applied here, the Secretary relied on a

memorandum from the Acting Associate Solicitor for the Division of Indian Affairs.  That

---

[15]On the day this Motion was filed, the DC Circuit issued its opinion in TOMAC v. Norton, No.
01cv00398 (Jan. 6, 2006), rejecting TOMAC's challenge to the Secretary's decision to take land
in Michigan in trust for the Pokagon Band of Potawatomi Indians, "conclud[ing] that TOMAC's
claims have no merit and affirm[ing] the District Court's grant of summary judgment."  Id. slip
op. at 3.  Due to the timing of the issuance of the TOMAC decision, the implications of that
decision will be addressed in the United States' subsequent brief in support of this Motion.

memorandum concluded:

> If the Secretary acts to take the Wayland County parcels into trust
> and to proclaim them to be the Tribe's reservation, the tribe's land
> would be eligible for development of Class II or Class III gaming
> under the initial reservation exception of the IGRA because the land
> would be the Tribe's first reservation land.

GUN LAKE AR001384.  The Memorandum stated that if the Secretary ultimately proclaims the

Bradley parcel to be part of the Tribe's reservation in the initial proclamation of the Tribe's

reservation (which can only occur after the parcel is accepted into trust), "the Tribe can conduct

gaming activities on the land under the 'initial reservations exception' in Section 20 of the Indian

Gaming Regulatory Act."  Id. at AR001380.

The Memorandum's analysis rests upon the natural and plain reading of the phrase

"initial reservation" in IGRA, as meaning the first land reserved for the tribe under federal law.

See Coos, 116 F. Supp. 2d at 162 (applying "natural (and broad) reading" of section 20

provision) (parenthetical in original).  In light of the deference to which it is entitled and the

canons of Indian construction which must be applied, this Court should reject Plaintiff's

challenge.

Plaintiff raises two arguments, both of which should be dismissed summarily.  First, it

argues that the "initial reservation" exception is intended only to apply where the Tribe intends to

allow housing, ignoring the fact that the statute which invokes this exception is the Indian

*Gaming* Regulatory Act -- a statute that makes no mention of housing in its treatment of the term

"initial reservation."  Second, Plaintiff contends that because the Band already had an initial

reservation and therefore cannot invoke this exception.  This argument ignores the fact that the

Bradley Property will be the first land held in trust by the United States since the Gun Lake Band

was federally recognized in 1999, and the property will be the first land over which the tribe will exercise its sovereign governmental jurisdiction since its federal recognition.

### 1. IGRA does not require that land used for gaming also be used for housing

Plaintiff, whose announced goal is to oppose gaming, proposes a strained reading of IGRA that would require casinos to be built only where housing is located on the same parcel. Plaintiff is essentially asking this Court to invent and impose additional restrictive language in IGRA that can neither be reconciled with the statute's plain language nor be supported by common sense.

Although IGRA does not define "initial reservation," the section 20 exception certainly is not restricted to: "the initial reservation of an Indian tribe acknowledged by the Secretary under the federal acknowledgment process" *that has housing on it*.  See 25 U.S.C. 2719(b)(1)(B)(ii).  If Congress meant to restrict the IGRA exception in such a way, it would have done so.  There is simply no statutory or regulatory requirement that land must contain housing in order for the Secretary to proclaim it a reservation under the IRA and for it to qualify as an initial reservation under IGRA.  Not even the IRA, which has a broader focus than gaming, limits an Indian reservation to housing.  See 25 U.S.C. § 467.  Instead, the IRA regulations define "reservation" as "that area of land over which the tribe is recognized by the United States as having governmental jurisdiction...."  25 C.F.R. § 151.2(f).  The BIA guidelines for reservation

proclamations provide a similar definition.  See GUN LAKE AR001517.[16]

Plaintiff seeks to rely on Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250 (10th Cir. 2001), for the proposition that the Bradley Property cannot be a "reservation" because the term as used in IGRA must be used to provide housing.  See Complaint ¶ 104.  Plaintiff's reliance on Sac and Fox is unconvincing for several reasons.

At the outset, even if Sac and Fox were relevant here--which it is not--Congress has overruled the legal premise on which the Court relied to fashion its holding.  In Sac and Fox, the Tenth Circuit held that the Secretary's interpretation of "reservation" under section 2719(a)(1) did not deserve Chevron deference because it found that Congress delegated authority to the NIGC -- not the Secretary of the Interior – to interpret ambiguous phrases in IGRA.  See Sac and Fox, 240 F.3d at 1265-66.   The court therefore concluded: "[W]e proceed to decide for ourselves the meaning of the term 'reservation.'"  Id. at 1266.   After noting that IGRA does not define the term, the court held a cemetery held in trust was not a reservation because: 1) the land was reserved as a burial ground; 2) it was not used by the tribe as its residence; and 3) because the tribe's primary reservation was located over 200 miles away in another state.  See id. at 1267.

Congress promptly overruled the Tenth Circuit's basis for its decision.  It clarified that it had, in fact, delegated to the Secretary of the Interior authority to interpret section 20 of IGRA when it enacted the statute in 1988.  See Department of the Interior and Related Agencies

---

[16] In fact, many tribes, such as Pit River, Capitan Grande Band of Diegueno Mission Indians, Red Lake Band, Mille Lacs Band, and the Zia Pueblo, have reservation land that is not used for residential purposes.  In contrast, Plaintiff's view suggests that, unlike the rest of society, Indian tribes should not be able to engage in economic enterprise on property unless a portion of the parcel is provided for housing.  The Court should not condone such an unsubstantiated policy by effectively amending IGRA as Plaintiff proposes.

Appropriations Act, 2002, Pub. L. No. 107-63, sec. 134 (2001).[17] Thus, the entire legal premise

on which the court relied to fashion its own definition of section 2719(a)(1) is erroneous. Its

resulting conclusion, therefore, is neither persuasive nor applicable to this case.

Second, Sac and Fox involved an entirely different provision of IGRA from the one at

issue here. The Tenth Circuit was trying to discern what constitutes a "reservation of the Indian

tribe on October 17, 1988" under section 2719(a)(1). See Sac and Fox, 240 F.3d at 1256, 1267.

This provision is not at issue in this case, and has no bearing on whether the Bradley Property

qualifies as an initial reservation of a newly acknowledged tribe under 2719(b)(2)(B)(ii). Again,

nothing in the "initial reservation" exception even hints that it is intended to apply only to lands

on which there is housing.

Lastly, the facts in Sac and Fox are readily distinguishable from this case. As mentioned

above, the land in question was a cemetery. The cemetery had been reserved by the Tribe under

the 1855 Treaty as a burial ground. Moreover, the Tribe had not exercised sovereign jurisdiction

or control over the land, such as land use, building codes, zoning, law enforcement, fire services,

education, or judicial activity. See id. at 1264.

Here, the Secretary is taking land into trust for the Gun Lake Band and declaring it a

---

[17]Section 134 of the Department of the Interior's 2002 Appropriations Act states in pertinent
part:

> CLARIFICATION OF THE SECRETARY OF THE INTERIOR'S
> AUTHORITY UNDER SECTIONS 2701-2721 OF TITLE 25,
> UNITED STATES CODE. The authority to determine whether a
> specific area of land is a "reservation" for purposes of sections
> 2701-2721 of title 25, United States Code, was delegated to the
> Secretary of the Interior on October 17, 1988.

Pub. L. No. 107-63, sec. 134 (2001).

reservation pursuant to her delegated authority and discretion under the IRA. The Bradley Property has not been reserved under a treaty for a specific purpose. Moreover, the Bradley Property is within the geographical region anticipated as part of the Gun Lake Band's land base. GUN LAKE AR001261, AR001264. In short, Plaintiff's claim that a reservation must include housing finds no support in the IRA, IGRA or Sac and Fox and is at odds with the plain meaning of the statute.

### 2.    The Property is the Tribe's "initial reservation" under IGRA

There is no dispute that the Gun Lake Band does not have a Federal Indian reservation. Therefore, as explained in the Acting Associate Solicitor's Memorandum, the first reservation declared for the tribe necessarily would be the Gun Lake Band's initial reservation.

The definition of "Indian lands" under IGRA and the IRA includes only those lands which the United States recognizes as the tribe exercising its governmental jurisdiction. The definition of Indian lands in IGRA is:

> (A) all lands within the limits of any Indian reservation; **and**
> (B) any lands to which title is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation **and** over which an Indian tribe exercises governmental jurisdiction.

25 U.S.C. § 2703(4) (emphasis added). Thus, the provisions of IGRA apply *only to lands over which the tribe exercises governmental jurisdiction*. See also 25 U.S.C. § 2710(a)(2) (regulation of Class II gaming continues to be within jurisdiction of tribe); id.§ 2710(b)(1) (tribe may engage in class II gaming on Indian lands "within such tribe's jurisdiction"); id. §§ 2710(b)(2), (d)(1) (NIGC can approve class II and III gaming ordinance concerning gaming "on the Indian lands within the tribe's jurisdiction"); id. § 2710(d)(1) (tribe may engage in Class III gaming "having

jurisdiction over such lands"); id. § 2710(d)(3) (tribe "having jurisdiction over Indian lands" may request to negotiate with the State a Class III Tribal-State gaming compact).   IGRA's definition is consistent with the IRA's definition of "reservation."  As mentioned above, the definition under the IRA is "that area of land over which the tribe is recognized by the United States as having governmental jurisdiction."  25 C.F.R. § 151.2(f).

The Gun Lake Band currently  does not exercise governmental jurisdiction over any land, such as for land use, law enforcement, building codes, zoning, education, fire services, or the judiciary.  For example, Wayland County has jurisdiction over land use and zoning.  GUN LAKE AR000073.   As such, the Gun Lake Band currently does not possess land that meets the definition of reservation under IGRA or the IRA.

Additionally, the Secretary has the statutory authority – and discretion –  to proclaim an Indian reservation.  See 25 U.S.C. § 467.  Plaintiff has no legal basis to deprive the Secretary of this authority.  If the Gun Lake Band applies for a reservation proclamation, and the Secretary in her discretion approves it according to the guidelines, the Bradley Property properly becomes part of the Gun Lake Band's reservation and properly qualifies as the Band's "initial reservation" under IGRA.

**C.    The Secretary did not abuse her discretion by deciding to accept the Property into trust regardless of whether the Tribal-State Class III gaming compact is valid**

Plaintiff, in essence, challenges two decisions of the Secretary of the Interior.  The first was the Secretary's approval of acceptance of the Bradley Property into trust pursuant to the IRA and implementing regulations at 25 C.F.R. § 151.  The second decision was the determination that the Bradley Property qualifies as the Gun Lake Band's initial reservation.

At the outset, the Secretary's decision is subject to Chevron deference; see Shakopee Mdewakanton Sioux (Dakota) Community v. Babbitt, 107 F.3d 667 (8th Cir.1997) (agency interpretation under IRA deserves Chevron deference). Under Chevron, the first question is whether the statute is silent or ambiguous on the matter. See Chevron, 467 U.S. at 843. If so, the courts will defer to the agency's interpretation so long as it is reasonable. See United States v. Mead Corp., 533 U.S. 218, 229 (2001), citing Chevron, 467 U.S. at 842-845. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding," but only that the agency's interpretation is reasonable and is not contrary to congressional intent. Chevron, 467 U.S. at 843 n.11 (1984) (citations omitted). The Secretary promulgated regulations to implement the IRA's directive and to provide detailed criteria and procedures for trust land acquisitions. 25 C.F.R. Part 151. Because the Secretary's decision to acquire the Bradley property was made according to formally promulgated regulations pursuant to an express delegation of authority, the Secretary's interpretation of the IRA and implementing regulations qualify for Chevron deference. See Mead, 533 U.S. at 226-27.

Plaintiff argues that there must be a valid Class III gaming compact in place *before* the Secretary may acquire trust land for the tribe. This argument has been rejected repeatedly by numerous courts, including a recent decision by this Court rejecting the exact same argument set forth by the exact same counsel in another case. See TOMAC, 193 F. Supp. 2d at 192-193; see also Kansas v. United States, 249 F.3d 1213,1223-24 (10th Cir. 2001); accord Match-E-Be-Nach-She-Wish Band of Pottawatomi Indians v. Engler, 173 F. Supp. 2d 725, 727-28 (W.D.

Mich. 2001), aff'd 304 F.3d 616 (6th Cir. 2002).

On its surface, Plaintiff's argument ignores that a Class III gaming compact is not a prerequisite to having land taken into trust, or even to engaging in certain types of gaming on Indian land. The Secretary's decision at issue was to take the land into trust. She did not decide that the Band may engage in illegal gaming on the land. The Band's ability to engage in Class III gaming is conditional upon its compliance with IGRA. Further, even though IGRA permits Class III gaming only if, among other things, there is a tribal-state compact, see 25 U.S.C. § 2710(d)(1)©, Class II gaming can be conducted without a compact. See 25 U.S.C. § 2710b)(1). IGRA also provides:

> Any Indian tribe *having jurisdiction over the Indian lands* upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of the gaming activities. Upon receiving such request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

25 U.S.C. § 2710(d)(3)(A) (emphasis added). Thus, a state is only obligated to negotiate a Class III gaming compact with an Indian tribe after the tribe has acquired jurisdiction over the proposed casino site, i.e., after the land has been taken in trust by the Secretary. See TOMAC, 193 F. Supp. 2d at 192-93.

Despite the clear statutory language, counsel in TOMAC – the same counsel for MichGO – argued that the Secretary violated the APA by taking land into trust for an illegal purpose since there was no valid Class III compact. Id. at 193. In rejecting this identical argument, Judge Robertson granted summary judgment for the United States, ruling:

> [A] gaming compact is not required for bingo and other class II gambling. 25 U.S.C. § 2710(b)(1). And even for slot machines

49

and other Class III gaming, there is no requirement that a compact
be secured before a tribe may obtain a casino site. *Id*. § 2710(d)(1).

Id., citing Kansas, 249 F.3d at 1223-24; accord Match-E-Be-Nash-She-Wish Band of

Pottawatomi Indians, 173 F. Supp. 2d at 727, affirmed, 304 F.3d 616 (6th Cir. 2002).  Judge

Robertson further noted:

> In fact, a tribe gains authority to compel a state to negotiate
> concerning Class III gaming only *after* it has obtained "Indian
> lands" suitable for a casino site.

TOMAC at 194 (emphasis in original).

Here, as in TOMAC, the Gun Lake Band plans to conduct Class II gaming if no Tribal-

State compact is in effect.  See GUN LAKE AR001262.  The Secretary noted this fact in the

record, and expressly concluded that the validity of the Tribal-State compact did not affect the

decision whether to take the land into trust because the tribe could conduct Class II gaming

nevertheless.  Id.

IGRA, and the case law interpreting it, are clear:  The Secretary may acquire land into

trust for gaming purposes without a tribal-state compact in existence.  Accordingly, the Third

Count should be rejected as a matter of law.

**D.    Section 5 of the Indian Reorganization Act does not violate the non-delegation doctrine**

In their Complaint, Plaintiff asserts the repeatedly rejected argument that Congress'

delegation of authority to the Secretary of the Interior in the IRA to accept land into trust violates

the non-delegation doctrine.  The United States District Court for the District of Columbia first

rejected a non-delegation challenge to the IRA long ago.   In 1978, this Court ruled that section 5

of the IRA was not an unconstitutional delegation of legislative power.   City of Sault Ste. Marie

50

v. Andrus, 458 F. Supp. 465, 473 (D.D.C. 1978).  Other courts have followed this ruling.

Accord, United States v. Roberts, 185 F3d 1125, 1136-37 (10th Cir. 1999), *cert denied*, 120 S.

Ct. 1960; Confederated Tribes of Siletz Indians of Oregon v. U.S., 110 F.3d 688, 694 (9th

Cir.1997); Shivwits Band of Paiute Indians v. Utah, 428 F.3d 966 (10th Cir. 2005); Carcieri v.

Norton, 398 F.3d 22 (1st Cir. 2005); South Dakota v. U.S. Dept. of Interior, 423 F.3d 790 (8th

Cir. 2005).  This Court stated that the non-delegation challenge to the IRA was "easily disposed

of" and "lack[ed] merit."  City of Sault Ste. Marie, 458 F. Supp. at 473.   It held:

> The delegation claim fails because, even though the acquisition of
> lands in trust is discretionary with the Secretary, *see* 25 U.S.C. §
> 465, the legislative history and the Act itself, providing as it does a
> definition of an Indian tribe, do provide adequate standards for the
> exercise of this discretion.

Id.  Just as this Court rejected the non-delegation challenge to the IRA 24 years ago, it should

similarly reject it now.  Indeed, in the year 2002 alone, this Court twice has rejected non-

delegation challenges to analogous statutes authorizing the Secretary of the Interior to acquire

land into trust for tribes.  See City of Roseville v. Norton, 219 F. Supp. 2d 130, 154-56 (D.D.C.

2002) (tribe's restoration act), aff'd, 384 F.3d 1020 (D.C. Cir. 2003); TOMAC, 193 F. Supp. 2d

182, 191-92 (D.D.C. 2002) (tribe's restoration act).

Article I, Section 1 of the United States Constitution, from which the non-delegation

doctrine derives, provides that, "[a]ll legislative powers herein granted shall be vested in a

Congress of the United States, which shall consist of a Senate and House of Representatives."

Courts must accord acts of Congress the presumption of constitutionality.  See City of Roseville,

219 F. Supp. 2d at 154, (citing Rust v. Sullivan, 500 U.S. 173 (1991)).  While Congress may not

delegate its legislative powers, see Whitman v. American Trucking Ass'ns, 531 U.S. 457, 472

(2001) (citing Loving v. United States, 517 U.S. 748, 771 (1996)), it may confer decisionmaking authority so long as it "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." Mistretta v. United States, 488 U.S. 361, 372-373 (1989) (quoting Am. Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946)). A court may find a statute in violation of the non-delegation doctrine *only if there are no intelligible standards* such that "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." Mistretta, 488 U.S. at 379 (quoting Yakus v. United States, 321 U.S. 414, 425-26 (1944)).

Only twice in its history, and not since 1935, has the Supreme Court invalidated a statute on the ground of excessive delegation of legislative authority: In one of these cases, the statute "provided literally no guidance for the exercise of discretion, and the other . . . conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" American Trucking, 531 U.S. at 474 (quoting Panama Ref. Co. v. Ryan, 293 U.S. 388 (1935); A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935)). Since 1935, the Court has narrowly construed the non-delegation doctrine and has consistently upheld congressional enactments containing broad conferrals of decision-making authority.

There is only one decision in which the IRA was found to violate the non-delegation doctrine, and it was vacated by the United States Supreme Court. State of South Dakota v. Interior, 69 F.3d 878 (8th Cir. 1995), *vacated*, 519 U.S. 919, *mandate recalled and vacated*, 106 F.3d 247. This Court has expressly rejected placing any precedential or persuasive value on the Eighth Circuit's vacated decision. See TOMAC, 193 F. Supp. 2d at191; City of Roseville, 219

F. Supp. 2d at 155.  Since that time, the Eighth Circuit has rejected its earlier vacated reasoning.

South Dakota, 69 F.3d at 796-98.

Term after term, and most recently again in 2001 in Whitman, 531 U.S. 457, the Supreme

Court has upheld Congressional delegations of legislative power to another branch of

government.  As noted in Whitman: "[W]e have found the requisite 'intelligible principle'

lacking in only two statutes" (in two decisions rendered in 1935) in contrast to numerous

examples where it has upheld the validity of statutes – even those with broad delegations of

authority.  Id. at 474.  In Whitman, the Court explained that it has "'almost never felt qualified to

second-guess Congress regarding the permissible degree of policy judgment that can be left to

those executing or applying the law.'"  Whitman, 531 U.S. at 474 (quoting Mistretta v. United

States, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)).  This Court should follow its prior

decisions and the weight of precedent, and reject Plaintiffs' non-delegation attack on the IRA as

set forth in the Fourth Count.

### VI.    Conclusion

For the foregoing reasons, all of Plaintiff's claims should be dismissed as a matter of law.

<div style="margin-left:40%">

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
/s/
</div>

OF COUNSEL:            GINA L. ALLERY
MARIA WISEMAN        D.C. Bar No. 485903
United States Department of the Interior    Attorney for Defendants
Office of the Solicitor         United States Department of Justice
                           Environment and Natural Resources Div.
                           Indian Resources Section
                           P.O. Box 44378, L'Enfant Plaza Station
                           Washington, DC 20026
Dated: January 6, 2006        (202) 305-0261