**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MICHIGAN GAMBLING OPPOSITION
("MichGO"), a Michigan non-profit
corporation,

Case No. 1:05-CV-01181-JGP

           Plaintiff,

v.

**ORAL ARGUMENT REQUESTED**

GALE A. NORTON, in her official
capacity as SECRETARY OF THE
UNITED STATES DEPARTMENT
OF THE INTERIOR, *et al*.,

           Defendants,

MATCH-E-BE-NASH-SHE-WISH BAND
OF POTTAWATOMI INDIANS, a
federally recognized Indian tribe,

           Intervenor.

_____

**MICHGO'S COMBINED STATEMENT OF POINTS AND AUTHORITIES IN
OPPOSITION TO FEDERAL DEFENDANTS' AND THE GUN LAKE BAND'S
MOTIONS TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

FACTS .................................................................................................................................. 3

I.    DEFENDANTS APPROVE THE PROPOSED CASINO SITE FOR GAMBLING IN DISREGARD OF IGRA ............................................................................... 3

II.   DEFENDANTS ISSUE A FINDING OF NO SIGNIFICANT IMPACT DESPITE OVERWHELMING EVIDENCE – INCLUDING RECORD ADMISSIONS – THAT THE PROPOSED CASINO WILL HAVE A SIGNIFICANT ENVIRONMENTAL IMPACT ..................................................................... 5

III.  MICHGO'S MEMBERS OPPOSE DEFENDANTS' DECISION TO TAKE LAND INTO TRUST FOR THE CASINO ................................................................. 6

ARGUMENT ....................................................................................................................... 7

I.    THE PROPOSED CASINO SITE CANNOT QUALIFY AS AN "INITIAL RESERVATION" UNDER IGRA WHEN IT IS NEITHER A "RESERVATION" NOR THE TRIBE'S FIRST RESERVATION ......................................................... 7

    A.   The Proposed Casino Site Does Not Qualify as a "Reservation" for Purposes of IGRA ...................................................................................... 9

        1.   The Term "Reservation" Has a Well-Established Meaning Requiring Residential Occupation by a Tribe .......................................... 9

        2.   The Established Meaning of "Reservation" is Consistent with the Congressional Design Underlying IGRA ........................................ 12

        3.   Defendants' Proposed Definition is Unsupported by Authority and Inconsistent with IGRA ................................................................ 14

            a.   Defendants' position is inconsistent with DOI's own official Indian law treatise ........................................................... 14

            b.   Defendants' definition confuses the difference between trust lands and reservation lands .............................................. 14

            c.   Defendants' definition would undermine IGRA in other ways as well . 16

        4.   This Court Owes No Deference to DOI's Interpretation of IGRA, Since DOI Has No Authority to Administer the Act, and Since the Statute is Not Ambiguous in Any Case ............................................................. 17

i

        5.    Defendants' Efforts to Distinguish *Sac and Fox* are Unavailing ................. 20

              a.    *Sac and Fox* remains good law ............................................. 21

              b.    *Sac and Fox* involved the same section of IGRA ................................. 24

              c.    *Sac and Fox* cannot be distinguished on its facts................................... 25

    B.    Assuming *Arguendo* that the Proposed Casino Site Qualified as a
          "Reservation," it Still Would Not Be the Gun Lake Band's "Initial"
          Reservation When the Gun Lake Band Has Already Had Three Prior
          Reservations During its History ........................................................................ 25

II.    NEPA REQUIRES AN EIS BECAUSE DEFENDANTS HAVE FAILED –
       DESPITE MULTIPLE EFFORTS, SEVERAL YEARS, AND MORE THAN
       1,200 PAGES – TO EXPLAIN AWAY THE OBVIOUS POTENTIAL
       SIGNIFICANCE OF A MASSIVE NEW CASINO COMPLEX IN A RURAL
       TOWNSHIP OF 3,000 PEOPLE ............................................................................... 27

    A.    NEPA Plays A Unique And Critical Role In National Environmental Policy...... 27

    B.    Defendants Misconstrue The Intended Function Of An EA ................................. 30

    C.    The Court Should Set Aside Defendants' FONSI Because it is Based on
          Materially Inaccurate Factual Claims .................................................................. 33

    D.    The EA Glosses Over the Casino's Impact on the Surrounding Areas................. 35

        1.    Impact on Rural Community .......................................................................... 35

        2.    Impact on Traffic ........................................................................................... 39

        3.    Impact on West Michigan............................................................................... 43

        4.    The EA Fails to Adequately Analyze Indirect Impacts ................................. 45

IV.   SECTION 465 OF IRA IS A STANDARDLESS DELEGATION OF
      LEGISLATIVE AUTHORITY BY CONGRESS, AND THEREFORE
      VIOLATES THE NON-DELEGATION DOCTRINE ................................................ 49

    A.    The Non-Delegation Doctrine Remains a Viable Constitutional Requirement.... 49

    B.    The Delegation of Power to the Secretary Under IRA is Overbroad.................... 50

CONCLUSION ........................................................................................................... 54

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
 295 U.S. 495 (1935) ................................................................ 49, 51

*Adams* Fruit *Co. v. Barrett,*
 494 U.S. 638 (1990) ....................................................................... 18

*Am. Power & Light Co. v. SEC,*
 329 U.S. 90 (1946) ......................................................................... 52

*Anderson v. Evans,*
 350 F.3d 815 (9th Cir. 2002) ......................................................... 30

*Brown v. Marquette Sav. & Loan Ass'n,*
 686 F.2d 608 (7th Cir. 1982) ......................................................... 22

*Califano v. Sanders,*
 430 U.S. 99 (1977) ................................................................... 29, 30

*California v. Cabazon Band of Mission Indians,*
 480 U.S. 202 (1987) ................................................................. 13, 20

*Callejas v. McMahon,*
 750 F.2d 729 (9th Cir. 1984) ......................................................... 22

*Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,*
 449 F.2d 1109 (D.C. Cir. 1971) ..................................................... 28

*CETAC v. Norton,*
 2004 U.S. Dist. LEXIS 27498 (D.D.C. 2004) ........................... 30, 45

*Chevron U.S.A., Inc. v. NRDC,*
 467 U.S. 837 (1984) ......................................................... 18, 19, 20

*Chicksaw Nation v. United States,*
 534 U.S. 84, 122 S. Ct. 528 (2001) ........................................ 20, 21

*Citizens to Preserve Overton Park v. Volpe,*
 401 U.S. 402 (1971), *abrogated on other grds.* ......................... 29, 30

*City of Davis v. Coleman,*
 521 F.2d 661 (9th Cir. 1975) .................................................... 38, 49

*City of Roseville v. Norton,*
 219 F. Supp. 2d 130 (D.D.C. 2002) .......................................... 38, 50

*City of Sault Ste. Marie v. Andrus,*
      458 F. Supp. 465 (D.D.C. 1978) ...................................................................... 53

*Commissioner of IRS v. Estate of Ridgeway,*
      291 F.2d 257 (3rd Cir. 1961).......................................................................... 25

*Community for Creative Non-Violence v. Reid,*
      490 U.S. 730 (1989) ........................................................................................ 10

*Curry v. United States Forest Service,*
      988 F. Supp. 541 (W.D. Pa. 1997) ................................................................ 32

*Evans v. United States,*
      504 U.S. 225 (1992) ........................................................................................ 10

*Foundation for N. Amer. Wild Sheep v. United States Dep't of Agric.,*
      681 F.2d 1172 (9th Cir. 1982 ........................................................................ 28

*Foundation on Economic Trends v. Heckler,*
      756 F.2d 143 (D.C. Cir. 1985) ....................................................................... 28

*Fowler v. Unified Sch. Dist.,*
      128 F.3d 1431 (10th Cur, 1997).................................................................22, 23

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,*
      109 F. Supp. 2d 30 (D.D.C. 2000) ................................................................ 30

*Gardner v. Brown,*
      513 U.S. 115 (1994) ...................................................................................10, 19

*Grand Canyon,*
      290 F.3d 339 (D.C. Cir. 2002) ....................................................................... 30

*Hawkins v. United States,*
      30 F.3d 1077 (9th Cir. 1994)......................................................................22, 24

*J.W. Hampton, Jr., & Co. v. United States,*
      276 U.S. 394 (1928) ...................................................................................49, 50

*Kleppe v. Sierra Club,*
      427 U.S. 390 (1976)........................................................................................ 29

*Marsh v. Oregon Natural Resources Council,*
      490 U.S. 360 (1989) ........................................................................................ 29

*Match-E-Be-Hash-She-Wish Band of Pottawatomi Indians v. Kean-Argovitz Resorts,*
      383 F.3d 51 (6th Cir. 2004).......................................................................... 34

*Metcalf v. Daley,*
     214 F.3d 1135 (9th Cir. 2000) ............................................................................ 30

*Morongo Band v. FAA,*
     161 F.3d 569 (9th Cir. 1998) ............................................................................ 20

*Mullin v. Skinner,*
     756 F. Supp. 904 (E.D.N.C. 1990) ..................................................................... 49

*National Audubon Soc'y v. Hoffman,*
     132 F.3d 7 (2d Cir. 1997). ........................................................................ 29, 30, 32

*Neighbors for Rational Development, Inc. v. Norton,*
     379 F.3d 956 (10th Cir. 2004) .......................................................................... 9, 48

*New York Cent. Sec. Corp. v. United States,*
     287 U.S. 12 (1937) ............................................................................................. 52

*Newsom v. Friedman,*
     76 F.3d 813 (7th Cir. 1996) ............................................................................. 10

*Nuclear Information Resource Service v. NRC,*
     969 F2d 1169 (D.D. Cir. 1992) ........................................................................... 20

*O'Gilvie v. United States,*
     519 U.S. 79 (1996) ................................................................................. 22, 23, 24

*Panama Refining Co. v. Ryan,*
     293 U.S. 388 (1935) ...................................................................................... 50, 51

*Passamaquoddy Tribe v. Maine,*
     75 F,3d 784 (1st Cir, 1996) ............................................................................. 21

*Penobscot Indian Nation v. Key Bank of Maine,*
     112 F.3d 538 (1st Cir, 1997) ........................................................................... 12

*Preferred Sites, LLC v. Troup County,*
     296 F.3d 1210 (11th Cir. 2002) ........................................................................ 10

*Puerto Rico Conservation Foundation v. Larson,*
     797 F. Supp. 1074 (D.P.R. 1992) ....................................................................... 32

*Rainwater v. United States,*
     356 U.S. 590 (1958) ........................................................................................... 24

*Robertson v. Methow Valley Citizens Council,*
     490 U.S. 332 (1989) ........................................................................................... 28

*Sac and Fox Nation v. Nortion*,
240 F.3d 1250 (10th Cir. 2001) ............................................... 12, 15, 16, 19, 21, 24, 25, 26

*Santa Clara Pueble v. Martinez*,
436 U.S. 49 (1978) ........................................................................................... 12

*SEC v. Sloan*,
436 U.S. 103 (1978) ......................................................................................... 20

*Sierra Club v. Marsh*,
769 F.2d 868 (1st Cir. 1985) ..................................................................... 30,37

*Sierra Club v. Peterson*,
717 F.2d 1409 (D.C. Cir. 1983) ................................................................ 28,30

*Sierra Club v. United States Army Corps. of Eng'rs*,
772 F.2d 1043 (2d Cir. 1985) ........................................................................ 28

*Smith v. United States*,
508 U.S. 223 (1993) ......................................................................................... 25

*Sorenson v. Department of Treasury*,
475 U.S. 851 (1986) ......................................................................................... 25

*South Caroline v. Catawba Indian Tribe*,
476 U.S. 498 (1986) ......................................................................................... 21

*South Dakota v. United States Dep't of the Interior*
519 U.S. 919 (1996) ......................................................................................... 52

*TOMAC v. Norton*,
2005 WL 2375171 (D.D.C. 2005) .................................................................. 39

*TOMAC v. Norton*,
240 F. Supp. 2d 45 (D.D.C. 2003) ............................................................ 38, 45

*TOMAC v. Norton*,
433 F.3d 852 (2006) ..................................................................................... 38, 50

*United States v. 27.09 Acres of Land*,
760 F. Supp. 345 (S.D.N.Y. 1991) ................................................................. 37

*United States v. Northeastern Pharm & Chem Co.*,
810 F2d, 726 (8th Cir. 1986) ........................................................................ 22

*United States v. Papia*,
910 F.2d 1357 (7th Cir. 1990) ...................................................................... 23

iv

Page

*United States v. Price*,
 361 U.S. 304 (1960) ................................................................. 23

*United States v. Roberts*,
 185 F.3d 1125 (10th Cir. 1999) .............................................. 53

*United States v. Ron Pair Enters, Inc.*,
 489 U.S. 235 (1989) ................................................................. 12

*United States v. Turley*,
 352 U.S. 407 (1957) ................................................................. 11

*United States v. Waste Indus., Inc.*,
 734 F.2d 159 (4th Cir. 1984) ................................................... 23

*W.C. & A.N. Miller Cos. v. United States*,
 173 F.R.D. 1 (D.D.C. 1997) ........................................................ 3

*Whitman v. Am. Trucking Ass'n, Inc.*,
 531 U.S. 457 (2001) ..................................................... 50, 52, 53

*Yakus v. United States*,
 321 U.S. 414 (1944) ......................................................... 49, 52


**Statutes**

5 U.S.C. § 706 ......................................................................... 29

15 U.S.C. § 1171 ..................................................................... 49

18 U.S.C. § 1166 ....................................................................... 2

25 U.S.C. § 465 ....................................................................... 51

25 U.S.C. § 2701. ................................................................... 22

25 U.S.C. § 2702 ..................................................................... 13

25 U.S.C. § 2703 ..................................................................... 48

25 U.S.C. § 2706 ............................................................... 19, 24

25 U.S.C. § 2709 ..................................................................... 19

25 U.S.C. § 2710 ............................................................... 2, 47

Page

25 U.S.C. § 2719 ..................................................................................................*passim*

28 U.S.C. 2409 .................................................................................................... 9, 48

42 U.S.C. §§ 4321 ............................................................................................. 2, 5, 30

M.C.L. § 750.301 ...................................................................................................... 47

## Regulations

25 C.F.R. §§ 502.3-.4 .............................................................................................. 48

40 C.F.R. §§ 1500-1518 ....................................................................................*passim*

70 Fed. Reg. 25596 (2005)............................................................................... 5, 8, 33

61 Fed, Reg. 18,082 (1996)........................................................................................ 8

## Other Authorities

*Air Quality Designations and Classifications for the 8-Hour Ozone National Ambient
Air Quality Standards; Early Action Compact Areas with Deferred Effective Dates,*
    69 Fed. Reg. 23858 (USEPA April 30, 2004) ..................................................... 33

Felix S. Cohen, *Federal Indian Law 34* (1982 ed.).......................................... 11, 12, 19

*Forty Most Asked Questions Concerning CEQ's NEPA Regulations,*
    40 Fed. Reg. 18026 (question 36a) (CEQ, March 16, 1981)............................... 32

# INTRODUCTION

MichGO brings this action to prevent Defendants from taking land into trust in Wayland Township, Michigan for the construction of a massive casino complex by the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Gun Lake Band").  The proposed casino would permanently and dramatically alter MichGO's community by thrusting a 24-hour-a-day, 365-day-a-year operation into an existing rural and residential setting.  The proposed casino would be situated on 146 acres of land bordering agricultural and residential properties, would be surrounded by a series of paved parking areas with parking for more than 3,300 cars, buses, and RVs, and would attract 3.1 million visitors annually to a Township of only 3,000.

Defendants' proposed actions violate federal law in several ways.

First, under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, casino gambling is permitted only if the proposed casino site were the Gun Lake Band's "initial reservation."  Because the land in this case is neither a "reservation" nor the Tribe's "initial," or first, reservation, it does not qualify for gambling within the meaning of IGRA.

Second, Defendants have violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, by issuing a finding of no significant impact ("FONSI") to avoid a more thorough investigation of the project in an environmental impact statement ("EIS").  Defendants issued the FONSI even though they concede that the casino would generate 4,900 new jobs, attract almost 1,500 new residents, spur the construction of 526 new housing units, and create significant traffic problems.  Worse yet, the primary source of alleged mitigation for these impacts is funding from tribal-state gambling compact the Gun Lake Band has never obtained.  No agency properly exercising its obligations under NEPA could find that the impacts associated with the proposed casino are insignificant under these circumstances.

Third, Defendants have no lawful authority to authorize Class III gambling at the proposed site in the absence of a tribal-state gambling compact.  Under IGRA, an Indian tribe can operate a casino if, and only if, it does so in conformance with a tribal-state gambling compact negotiated between the tribe and the state.  *See* 25 U.S.C. § 2710(d)(1)(C).  In the absence of a compact, any Class III gambling offered by the Band will be illegal under state and federal law, including IGRA.  *See* 18 U.S.C. § 1166.  In this case, the Gun Lake Band has failed to obtain a gambling compact from the State of Michigan, and therefore is only authorized to engage in so-called Class II gambling.  Despite this, Defendants have announced their intention to place the casino site into trust for both Class II and Class III gambling.  Defendants have therefore authorized the land to be taken into trust for an admittedly illegal purpose.

Finally, Defendants have no constitutionally valid authority on which to acquire land in trust for the Tribe.  The statute under which Defendants have acted, the Indian Reorganization Act ("IRA"), is an overbroad delegation of legislative authority by Congress.  The Act is devoid of intelligible principles by which courts can evaluate the legality of Defendants' actions.  The statute is therefore void under the non-delegation clause of the United States Constitution.

Defendants and the Gun Lake Band have filed motions to dismiss or in the alternative for summary judgment.  The Court should reject these motions and, instead, enter summary judgment in favor of MichGO.  *See W.C. & A.N. Miller Cos. v. United States*, 173 F.R.D. 1, 3 (D.D.C. 1997) ("A court may enter summary judgment, *sua sponte*, in favor of a party opposing summary judgment, . . . even if that party has not made a formal cross-motion.").

# FACTS

## I.    DEFENDANTS APPROVE THE PROPOSED CASINO SITE FOR GAMBLING IN DISREGARD OF IGRA.

On August 7, 2001, the Gun Lake Band submitted a trust application ("Trust Application") to Defendants for the proposed casino site.  (Trust App, AR001985-2333).  The exclusive proposed use of the land, from the very beginning, has been to build and operate a gambling casino.  (*See generally id.*).  The Gun Lake Band asks that the land be taken into trust for both Class II and Class III gambling, (*see* AR001994), even though the Band has no gambling compact with the State of Michigan to permit Class III gambling.

IGRA imposes a general ban on casino gambling on Indian lands acquired in trust for a tribe after October 1988.  One exception to this ban permits gambling on such lands if they constitute the "initial reservation" of an Indian tribe that has been recognized through the federal acknowledgment process.  *See* 25 U.S.C. § 2719(b)(1)(B)(ii).  This means the land must be both a "reservation" and the tribe's "initial," or first, reservation.  In this case, the Gun Lake Band has no intention of using the land for a tribal reservation, but for the operation of a gambling casino.  The Trust Application also reveals that the Gun Lake Band has had three prior reservations in past years.  Therefore, the proposed casino site would be neither a reservation nor the Band's first reservation.

The Gun Lake Band's plan to open a casino is also in direct conflict with promises it made to its members and the federal government not to engage in casino gambling.  In 1993, the Band's leadership, in a letter to the Assistant Secretary of Indian Affairs, explained that the tribal council had agreed to pursue federal acknowledgement for the Band only on the condition that "there would **never** be casinos in our Tribe."  (Trust App., *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan,*

*Inc.*, AR002106 (emphasis added)).   Indeed, the tribal council agreed to pursue federal acknowledgement only by including the following prohibition on gambling in the tribe's constitution, which was attached to the Trust Application:  "The Gun Lake Band . . . is the only Indian Tribe in the State of Michigan which has decided not to sacrifice the future of its membership to gaming interests and the changes to traditions in the community that gaming could bring."  (*See id.*)  The constitution also included the following more specific prohibition on gambling:

> The Elder's Council may exercise such further powers as may in the future be delegated to it by members of the tribe, or by the Secretary of the Interior, or any other duly authorized official of the State or Federal Government, or any federal statute, or regulation, **except the development of casino gaming enterprises (class III)** in those counties where the population of [the Gun Lake] Band Tribal members exceeds (20) percent of the Tribe's total membership.  The proviso limiting certain forms of Tribal casino gaming enterprises near the heart of the Tribal community **shall not be altered** by future Elder's Council decisions or subsequent Constitutional amendments.

(*Id.* at AR002140 n.194 (emphasis added)).  These commitments by the Gun Lake Band at the time it sought federal acknowledgement cannot be squared with its current request to have land taken into trust for a casino.  The Band's broken commitments, at a minimum, raise serious questions about the validity of its promises to spend money to mitigate the environmental impacts of the casino.

Despite all of this, Defendants issued a notice on May 13, 2005 of their intent to take the proposed casino site into trust for the Gun Lake Band.  *See* 70 Fed. Reg. 25596 (2005). Relying on an opinion by the DOI's solicitor, the notice states that the land will be taken into trust in 30 days and will be eligible for gambling as the Gun Lake Band's "initial reservation." *Id.*  The opinion concludes that the land would qualify as an "initial reservation" because it would be the first land set aside for the Gun Lake Band since its federal acknowledgment.  *Id.*

The opinion does not address whether the Band has had any prior reservation lands or whether it plans to use the land as a "reservation" as that term is understood in federal Indian law.

## II.    DEFENDANTS ISSUE A FINDING OF NO SIGNIFICANT IMPACT DESPITE OVERWHELMING EVIDENCE – INCLUDING RECORD ADMISSIONS – THAT THE PROPOSED CASINO WILL HAVE A SIGNIFICANT ENVIRONMENTAL IMPACT.

Under NEPA, 42 U.S.C. § 4321 *et seq.*, Defendants were required to prepare an environmental assessment ("EA") to analyze the potential environmental impacts of the proposed casino.  Together with its paid consultants, the Gun Lake Band prepared a proposed EA and submitted it to Defendants.  The EA describes a proposed gambling complex of nearly 200,000 square feet, including 99,000 square feet of gaming space, two sit-down restaurants, a café-style restaurant, two fast-food outlets, four retail shops, a sports bar, entertainment lounge, office space, and parking for more than 3,30 cars, buses, and RVs.  (EA, AR000022-23, 458).  All of this is to be built on a 146-acre piece of land in the middle of a rural, agricultural community of only 3,000 residents.

In the 75-day public comment period that followed, BIA received a flood of public comments opposed to taking the land into trust for the casino.  The comments either opposed the Trust Application itself, believed further environmental study was necessary, or both.  MichGO submitted voluminous and comprehensive comments pointing out the significant environmental impacts that will result if the Trust Application is granted, and expressing the need for Defendants to reject the application or, at the very least, conduct a full environmental impact study under NEPA.  BIA also received comments opposed to the casino from members of the legislature, including local U.S. Congressmen Vern Ehlers and Pete Hoekstra.

Despite the strong opposition to the casino from MichGO's members and others, Defendants have treated the casino all along as though it were a *fait accompli.*  They published a

final draft of the EA in December 2003, approximately 1 ½ years before deciding to take the land into trust. (EA, AR000006-1246). The final EA admits that construction of the casino would have a tremendous environmental and socioeconomic impact on Wayland Township and surrounding areas, but nevertheless claims that the impacts are not "significant" for purposes of NEPA. Accordingly, following release of the final EA, BIA issued a finding of no significant impact ("FONSI") on February 27, 2004. (FONSI, AR000003-5).

III. **MICHGO'S MEMBERS OPPOSE DEFENDANTS' DECISION TO TAKE LAND INTO TRUST FOR THE CASINO.**

MichGO is a Michigan non-profit corporation that seeks to protect the citizenry and quality of life in its community by opposing the proliferation of gambling venues. MichGO's members and supporters include homeowners, business owners, clergy, retirees, and many others. Many of these people reside in West Michigan, including rural Wayland Township, the cities of Grand Rapids and Kalamazoo, and other areas within driving distance of the proposed casino. These areas will be disproportionately impacted if the casino site is placed into trust and an illegal casino built and operated there. A 200,000-square-foot casino would detract from the quiet, family atmosphere of the surrounding rural areas, and would siphon off an estimated $92 million a year from area cities. Accordingly, MichGO has filed comments opposing Defendants' actions and now brings this suit to have those actions set aside.

MichGO's members include people who have lived in Wayland Township for many years, such as Phil and Sue Henningson, Kenneth Blaauw, and Randy Bouwens, all of whom make their homes within 1/8 to 3/4 of a mile from the proposed casino site. These MichGO members value the quiet lives they lead in Wayland Township and fear what the construction and operation of a huge casino would do to it. If the casino is built, they will be the ones who have to deal with the visual impact of the casino every time they drive past or go for

walks in the vicinity of the casino, who will have to tolerate the increased traffic, noise, light, and air pollution that will come from more than 3.1 million visitors a year, and who will have to deal with the increase in gambling addiction, crime, and other social ills that come with the casino.  These changes would severely impact these residents' rural lifestyles and land uses.

For some MichGO members, these concerns are business-related as well as personal.  For example, Kenneth Blaauw, a farmer, is worried about the impact of increased traffic on his ability to move farm equipment from one field to another on area streets, as well as the danger that increased property taxes will pose to preserving his farming business.  The full extent of the impact to these members will not be known unless and until Defendants are ordered to prepare an EIS, as required by NEPA.

Defendants' May 13, 2005 Notice of Intent states that they plan to place the proposed casino site into trust after thirty days.  *See* 70 Fed. Reg. 25596 (2005).  The thirty-day period "allows interested parties to seek judicial or other review under the Administrative Procedures Act and applicable regulations."  DOI, *Final Rule: Land Acquisitions,* 61 Fed. Reg. 18,082 (1996).  MichGO filed this action for review within the thirty-day period.  Defendants agreed to stay the proposed trust acquisition pending the outcome of this case.

## ARGUMENT

## I.    THE PROPOSED CASINO SITE CANNOT QUALIFY AS AN "INITIAL RESERVATION" UNDER IGRA WHEN IT IS NEITHER A "RESERVATION" NOR THE TRIBE'S FIRST RESERVATION.

Congress' purpose in passing IGRA in 1988 was to balance the economic interests of Indian tribes in operating casinos with the interests of state and local communities in minimizing the ill effects of gambling operations.  Section 2719 accomplishes this purpose by outlawing Indian gambling on lands acquired in trust for a tribe after October 1988.  *See* 27 U.S.C. § 2719(a)(1).  The statute contains several narrow exceptions to permit gambling on a

tribe's reservation lands, *see* 25 U.S.C. §§ 2719(a)-(b), including its "initial reservation," *see* 2719(b)(1)(B)(ii).  Where none of these exceptions is available, gambling is permitted on off-reservation sites **only** by way of a two-step approval process in which DOI and the State's governor concur that the casino "would not be detrimental to the surrounding community."  27 U.S.C. § 2719(b)(1)(A).  This protects members of the public from the impacts of gambling by confining the activity, except in rare cases, to a tribe's reservation land base.

In this case, Defendants have unlawfully circumvented the intended operation of the statute by authorizing gambling on the proposed casino site pursuant to the "initial reservation" exception.  The proposed site is not a "reservation" within the established meaning of the term, but a purely commercial parcel that would be used for the operation of a casino.  In any case, even if it were a "reservation," the land could never be the Gun Lake Band's "initial" reservation, since the Band has already had three prior reservations in its history.  Both of these reasons are central to the statutory framework established by Congress.  By ignoring either or both, Defendants would permit a proliferation of casinos that Congress never intended and circumvent the interests of host communities that Congress expressly sought to protect.  Accordingly, the decision to take the land into trust violates IGRA and must be set aside.[1]

_____

[1] Defendants suggest this issue might not be ripe for review because the Secretary of Interior has not yet proclaimed the land a reservation.  (Defendants' Opening Br, at 40).  However, the decision challenged by MichGO has already been made by DOI – namely, its determination that the Gun Lake Band is entitled to operate a casino under the "initial reservation" exception in section 2719 of IGRA.  (AR001260-61 (memo from Associate Deputy Secretary for Indian Affairs, adopting recommendations from DOI's Solicitor, Indian Gaming Management staff, and BIA's Midwest Regional Office, and concluding that the proposed casino site qualifies as an "initial reservation").  Thus, no further decisions are left to be made by DOI with respect to the specific issue challenged here.  MichGO faces imminent harm because Defendants announced their intent to take the land into trust for gaming in 30 days, and the only thing stopping them from doing so is this lawsuit.  Moreover, once the land is taken into trust, MichGO may be barred by the Quiet Title Act from bringing any suit to challenge the decision.  *See* 28 U.S.C. § 2409a(a) (creating an exception to federal courts' subject matter jurisdiction by barring suits

**A.    The Proposed Casino Site Does Not Qualify as a "Reservation" for Purposes of IGRA.**

   **1.    The Term "Reservation" Has a Well-Established Meaning Requiring Residential Occupation by a Tribe.**

The word "reservation" is not defined in IGRA.   Contrary to Defendants' argument, this does not mean the statute is ambiguous.   *See Gardner v. Brown*, 5 F.3d 1456, 1459 (Fed. Cir. 1993), *aff'd Brown v. Gardner*, 513 U.S. 115 (1994); *Newsom v. Friedman*, 76 F.3d 813, 817 (7th Cir. 1996); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1217 (11th Cir. 2002).   As one court has explained, "Congress is not required to define each and every word in a piece of legislation in order to clearly express its will."   *Newsom*, 76 F.3d at 817.   Instead, where a word is not defined, the court must assume that Congress was aware of and intended to adopt its established meaning.   *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) ("Where Congress uses terms that have accumulated settled meaning under the common law, a court **must** infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."); *Neder v. United States*, 527 U.S. 1, 21-22 (1999) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense.').

In searching for the established meaning of an undefined statutory term, the United States Supreme Court frequently looks to the historic understanding of the term as reported in scholarly writings.   *See, e.g.*, *Neder*, at 22-23 (quoting J. Story, *Commentaries on*

---

against the United States relating to "trust or restricted Indian lands"); *Neighbors for Rational Development, Inc. v. Norton*, 379 F.3d 956, 961-62 (10th Cir. 2004) (holding that because the land had already been placed in trust for an Indian tribe, the plaintiff's request for an injunction undoing the acquisition until DOI had complied with NEPA and other federal laws was barred by the Quiet Title Act).

*Equity Jurisprudence*, as authority that the common law understanding of "misrepresentation" requires materiality); *Evans v. United States*, 504 U.S. 255, 260 (1992) (relying on Blackstone for the common law definition of the undefined term "extortion" in Hobbs Act); *United States v. Turley*, 352 U.S. 407 (1957) (citing Blackstone as authority that undefined terms "stolen" and "stealing" in the National Motor Vehicle Theft Act had no established common law meaning).

   In this case, similar sources show that the term "reservation" has had an established meaning since the late-1800s. As the nation's leading Indian law scholar, Felix S. Cohen, explains in his treatise on American Indian law, "although the term 'Indian reservation' originally had meant **any** land reserved from an Indian cession to the federal government . . . , [d]uring the 1850's the modern meaning of [the term] emerged, referring to land set aside under federal protection **for the residence** of tribal Indians, regardless of origin." Felix S. Cohen, *Federal Indian Law* 34 (1982 ed.) (emphasis added). "By 1885," Cohen notes, "**this meaning was firmly established in the law. . . .**" *Id.* at 34-35 (emphasis added). Because the term had a settled meaning for more than a hundred years before Congress passed IGRA in 1988, it must be presumed in the absence of contrary evidence that this is the meaning Congress intended to adopt.

   The established meaning of "reservation" as reported in Cohen's treatise is entitled to great weight. The preface of the treatise describes Cohen as an Associate Solicitor at DOI and "the Blackstone of American Indian law." *Federal Indian Law*, at vii, viii. The preface also states that, although the treatise was authored by Cohen, it was "**published under the auspices of the Department of the Interior**" and is "**the official government treatise**" on

10

American Indian law.[2]  *See id.* at viii, ix.  Since its original publication, the book has been cited in more than 50 United States Supreme Court decisions and in close to 250 decisions of the United States Courts of Appeals dealing with Indian law issues, including the definitions of un-defined statutory terms.  *See, e.g., Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (cit-ing Cohen for the definition of "Indian tribe"); *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 547, n. 12 (1st Cir. 1997) (citing Cohen for the definition of "Indian country").

Case law interpreting IGRA has adopted the definition of "reservation" as reported by Cohen.  In the only Circuit Court case to consider the issue to date, *Sac and Fox Nation v. Norton*, 240 F.3d 1250 (10th Cir. 2001), the Tenth Circuit rejected the efforts of an Indian tribe to gamble on land contiguous to a Kansas cemetery that the tribe and the Department of Interior claimed was a "reservation" within the meaning of IGRA § 2719(a)(1).  *See id.* at 1266-67.  The tribe and DOI argued that the cemetery was a reservation simply because it had been set aside by the government for the tribe's use.  *Id.*  Rejecting that argument, the court held that in passing IGRA Congress intended to incorporate the established meaning of "reservation" as land set aside for the **residential** occupation of an Indian tribe.  *See id.* at 1266-67 (quoting Cohen, *Federal Indian Law*, at 34)).  The court found this definition to be consistent with the intent of Congress as evidenced by the language and structure of the Act.  *See id.* at 1267.  It refused to defer to the contrary definition advocated by DOI since, the court found, DOI had no statutory authority to administer IGRA.[3]  *See id.* at 1265.

---

[2] The treatise was re-published by DOI in 1982 under act of Congress.  *See id.* at ix, x.  The revision was accomplished by a team of authors/editors hired by DOI.  *See id.* at iv, v.

[3] Another judge of this Court ruled against a citizens' group on this issue in *Citizens Exposing Truth About Casinos v. Norton*, 2004 U.S. LEXIS 27498 (D.D.C. 2004).  The litigation in that case is temporarily on hold while Defendants prepare an EIS for the proposed casino project, so the adverse decision on the "initial reservation" question may yet be the subject of an appeal.

It is well-established that "[t]he plain meaning of legislation should be conclusive, except in rare cases [in which] the literal application . . . will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (internal quotations omitted).   Here, as the court in *Sac and Fox* recognized, Congress spoke clearly in IGRA by leaving the term "reservation" to be defined according to its established meaning.   If any other meaning had been intended, Congress would have added a definition making that intention clear.

### 2.     The Established Meaning of "Reservation" is Consistent with the Congressional Design Underlying IGRA.

Congress' intent in adopting the established meaning of "reservation" is visible in the purpose and design of the statute.   Congress enacted IGRA in 1988 following the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).   In *Cabazon*, the Court held that Indian tribes located in states that permit *any* type of gambling have the right to gamble on tribal lands unhindered by state regulation.   *See id.* at 221.   The effect of *Cabazon* was to permit unregulated gambling by Indian tribes in any state where bingo, lotto, or similar gambling was permitted as a matter of state law.   Unhappy with the balance struck by *Cabazon*, Congress overruled the decision by enacting IGRA, which seeks to balance the financial interests of tribes with the interests of the public and the States in minimizing the ill-effects of gambling.   *See* 25 U.S.C. § 2702 (Declaration of Policy).

Section 2719 of IGRA is set up to carry out this legislative purpose.   *See* 25 U.S.C. § 2719.   It begins by outlawing Indian gambling on any lands acquired in trust for a tribe after October 1988, the effective date of IGRA.   *See* 25 U.S.C. § 2719(a).   It then creates several narrow exceptions permitting gambling on tribal reservation lands.   *See* 25 U.S.C. § 2719(a)-(b). First, the statute allows a tribe to gamble on land taken into trust after 1988 if the parcel is

"within or contiguous to" the boundaries of the tribe's "reservation" as it existed in 1988.  *Id.* § 2719(a)(1).  Second, for tribes that had no reservation as of 1988, the statute permits a tribe to gamble on lands within the limits of the tribe's "last recognized reservation."  *Id.* § 2719(a)(2)(B).  Next, and also for tribes that had no reservation as of 1988, the statute permits gambling on "the initial reservation" of a tribe acknowledged by DOI through the federal acknowledgment process.[4]  *Id.* § 2719(b)(1)(B)(ii).

Finally, for tribes that do not wish to gamble on their reservation or are not eligible for any of the above exceptions, IGRA permits gambling on off-reservation lands in very limited circumstances.  The statute states that a tribe may gamble on off-reservation lands only by going through a two-step process in which DOI concludes, and the state's governor concurs, that gambling on the site would be in the best interests of the tribe and "**would not be detrimental to the surrounding community**."  25 U.S.C. § 2719(b)(1)(A) (emphasis added).  This gives potential host communities a voice in deciding whether to permit gambling on off-reservation lands.

Congress' intent in structuring IGRA with a focus on **reservation**-based gambling is grounded in the policies sought to be promoted by the statute.  As discussed above, Congress intended IGRA to minimize the negative impacts of Indian gambling while still permitting tribes to benefit economically.  On-reservation gambling serves these interests to the fullest extent possible by providing employment and economic opportunity for those residing on the reservation, and by locating the impacts of gambling – including things like crime and traffic – where they can best be managed by tribal authorities.  For all of these reasons, Congress

---

[4] Two other exceptions, not relevant here, permit gambling on the lands of a tribe "restored to Federal recognition" or on lands taken into trust as part of the settlement of a land claim.  *See* 25 U.S.C. § 2719(b)(1)(B)(i), (iii).

fashioned IGRA to limit gambling in the first instance to a tribe's "reservation" – whether "existing," "last recognized," or "initial" – and to permit gambling on off-reservation property only when the interests of the neighboring community has been considered by way of the two-step approval process.

### 3.  Defendants' Proposed Definition is Unsupported by Authority and Inconsistent with IGRA.

Despite the established meaning of "reservation," Defendants propose a different definition with no requirement of residential occupation.  They argue that a "reservation" is any piece of land over which a tribe exercises "governmental jurisdiction."  (Defendants' Opening Br, at 43, 46).  This definition is untenable for several reasons.

### a.  Defendants' position is inconsistent with DOI's own official Indian law treatise.

Defendants have failed to cite any authority for the definition they advocate.  As discussed above, a "reservation" is not just any piece of land taken into trust for a tribe, but by the 1880s had become "firmly established in the law" as meaning land set aside for the specific purpose of providing "for the residence of tribal Indians."  Cohen, *Federal Indian Law*, at 34-35 (emphasis added); *accord Sac and Fox*, 240 F.3d at 1266-67.  Defendants have pointed to no case law, treatise, or legislative history to support the idea that Congress intended to deviate from this meaning when it passed IGRA.

### b.  Defendants' definition confuses the difference between trust lands and reservation lands.

Defendants' definition is also illogical when applied to the statute.  A tribe has "governmental jurisdiction" over any lands taken into trust on its behalf.  But IGRA makes it clear that merely being taken into trust by DOI is not sufficient to qualify land as a "reservation." The words "land taken into trust" and "lands acquired in trust" appear in two places in section

14

2719.  *See* 25 U.S.C. §§ 2719(a); (b)(1)(B).  Each time these words are used, they appear in the **same sentence** as the word "reservation."  For example, section 2719(a)(1) says gambling is prohibited on "lands acquired in trust" after 1988 unless the land is on or contiguous to the tribe's existing "reservation."  Likewise, section 2719(b)(1)(B)(ii) says gambling is permitted on "lands . . . taken into trust" as long as the land is the tribe's initial "reservation."  This clearly shows that merely taking land into trust is not sufficient to make the land a "reservation."

Indeed, if Defendants' argument were adopted, the statutory distinction between trust lands and reservation lands would be eliminated.  A tribe would be free to gamble on **any** piece of land taken into trust for the tribe, without any requirement that the land also be a "reservation" within the established meaning of the term.  Such a result would undermine the statutory scheme in at least two ways.  First, Defendants' definition would cut IGRA loose from the reservation-based focus intended by Congress.   If any piece of trust land were a "reservation," a tribe could gamble on such land under sections 2719(a)(1) or 2719(b)(1)(B)(ii) without concern for whether it is truly a reservation in the traditional sense of the word.  This would undermine Congress' intent in focusing the benefits and detriments of gambling to a tribe's residential land base, and would permit gambling on off-reservation lands (which would masquerade as "reservations" under Defendants' definition) without the consideration of community impact that is supposed to be required by the two-step approval process.  Defendants' definition would also permit the proliferation of gambling in numbers and locations Congress never intended.  Under Defendants' definition, literally any piece of land acquired in trust would constitute a "reservation" – including the purely commercial casino site at issue in this case.

These concerns were central to the court's holding in *Sac and Fox*. *See* 240 F.3d at 1267. In that case, DOI made the exact same argument it is making in this case – namely, that a "reservation" is any piece of land set aside for a tribe's use by the federal government. *See id.* at 1266. Rejecting that argument, the court emphasized that "IGRA specifically distinguishes between the 'reservation' of an Indian tribe and lands held in trust for the tribe by the federal government." *Id.* (citing 25 U.S.C. § 2719(a)(1)-(2), (b)(1)(B)). The court believed DOI's interpretation would improperly "muddy" the lines between trust land and reservation land: "[I]f the term 'reservation' were to encompass all land held in trust by the government for Indian use (but not necessarily Indian residence), then presumably most, if not all, trust lands would qualify as 'reservations.'" *Id.* Congress could not have intended such a result when it crafted IGRA.

### c. Defendants' definition would undermine IGRA in other ways as well.

Defendants' position is also contrary to the careful parity intended by IGRA. The "initial reservation" exception was intended to place recently acknowledged tribes without a reservation on more equal footing with established tribes that already have a reservation on which they can gamble under section 2719(a)(1). However, under Defendants' understanding of "reservation," a newly acknowledged tribe would be in a far better position than existing tribes from the standpoint of selecting a casino site. Rather than being confined to gambling on or next to its residential land base – as an existing tribe is under section 2719(a)(1) – a newly acknowledged tribe could select literally any piece of land for its casino. And, while the existing tribe would be required to go through the two-step approval process if it wished to gamble on an off-reservation parcel, *see* 25 U.S.C. § 2719(b)(1)(A), the newly acknowledged tribe would avoid that requirement by treating its selected site as its "initial reservation." There is no reason

to believe Congress intended such a windfall for newly acknowledged tribes when it enacted IGRA.

Defendants argue that giving the definition of "reservation" its established meaning will deny the Gun Lake Band the ability to pursue economic opportunity via gambling. (Defendants' Opening Br, at 44 n.16; Gun Lake Band's Opening Br, at 47). But this argument is groundless. If the Gun Lake Band is not permitted to gamble on the proposed site as its "initial reservation," it can still gamble on **any piece of land** – including the proposed casino site – for which it gains approval through the two-step process. *See* 25 U.S.C. § 2719(b)(1)(A). Therefore, contrary to Defendants' assertions, this is not a case about the Gun Lake Band being denied economic opportunity – it is about whether the Band will be permitted to circumvent the usual two-step process by exploiting a definition that was never intended to permit gambling outside of a tribe's reservation lands.[5]

### 4. This Court Owes No Deference to DOI's Interpretation of IGRA, Since DOI Has No Authority to Administer the Act, and Since the Statute is Not Ambiguous in Any Case.

Defendants argue that this Court must defer to the opinion of DOI's Solicitor as to the alleged meaning of "initial reservation." (Defendants' Opening Br, at 41 (citing *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)). In the opinion in question, the Solicitor concludes, in circular fashion, that the first time a reservation is proclaimed for the Band, it constitutes an "initial reservation" under IGRA. (Solicitor's Memorandum, AR001380-84). Importantly, the opinion does **not** address what characteristics a piece of land must have to qualify as a

---

[5] Defendants assert, without record support, that other tribes allegedly have reservations that are not being used for housing. (Defendants' Opening Br, at 44 n.16). But this is irrelevant. Defendants do not claim that these alleged tribes use their reservations for gambling purposes – let alone that they do so under IGRA's "initial reservation" exception.

"reservation." Instead, it concludes, essentially, that a reservation is whatever the Secretary wants it to be. This opinion is not entitled to deference for several reasons.

First, *Chevron* deference is appropriate only where an agency is regulating under a statute it administers. *See Chevron*, 467 U.S. at 842. As the Supreme Court has explained, "[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority . . . . **[A]n agency may not bootstrap itself into an area in which it has no jurisdiction.**" *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-650 (1990) (emphasis added) (refusing to give deference to an agency rule enacted without delegated authority). DOI and its Solicitors are not charged with administering IGRA. Instead, the statute expressly grants that responsibility to **NIGC**.[6] *See* 25 U.S.C. § 2706(b)(10). In case there were any doubt about this, the statute provides for the "orderly transition" of all powers to NIGC after the passage of IGRA, and states that "the Secretary [of DOI] shall continue to exercise those authorities vested in [it] on the day before [IGRA was passed], relating to supervision of Indian gaming, **until such time as [NIGC] is organized and prescribes regulations**." 25 U.S.C. § 2709 (emphasis added). It is because of this that the court in *Sac and Fox* refused to defer to DOI's Solicitor as to the alleged meaning of "reservation." *See* 240 F.3d at 1265.

Next, *Chevron* deference is appropriate only where a statute is ambiguous as to Congress' intended meaning. *See Chevron*, 467 U.S. at 843, n.9; *Gardner v. Brown*, 5 F.3d 1456, 1463 (Fed. Cir. 1993) (refusing to defer to agency regulations where "Congress has not left any gap in the statutory language that might give the [agency] discretion . . ."). Of course, as already demonstrated, a statute is not ambiguous simply because it leaves a term undefined. (*See*

---

[6] DOI conceded in the *Sac and Fox* case that, "[a]lthough [NIGC] is nominally part of the Department of the Interior, . . . [NIGC] functions as an independent entity." *See* 240 F.3d at 1265, n. 12.

*supra*, at 9-10).   Instead, the presumption is that Congress intended to adopt the established

meaning of the term, which in this case has been settled since the 1880s.   *See Sac and Fox*, 240

F.3d at 1266-67; Cohen, *Federal Indian Law*, at 34.   Defendants cannot argue that the statute

reasonably admits of more than one meaning when, as discussed above, the definition they

propose is contrary to the statutory scheme established by Congress.   *See Brown v. Gardner*, 513

U.S. 115, 118 (1994) (emphasizing that "[a]mbiguity is a creature not of possibilities but of

statutory context," and holding that no ambiguity was established where the meaning of an

undefined term was revealed by its context).   The necessary element of ambiguity is therefore

not present here.

           As a final point, *Chevron* deference is appropriate only for agency interpretations

that are "reasonable and consistent with the statute's purpose."   *Nuclear Information Resource

Service v. NRC*, 969 F.2d 1169, 1173 (D.C. Cir. 1992); *accord SEC v. Sloan*, 436 U.S. 103, 118-

19 (1978).   Here, the Solicitor's opinion is anything but reasonable – it concludes that an "initial

reservation" is nothing more than the first reservation proclaimed for a tribe following federal

acknowledgment.   (Defendants' Opening Br, at 31).   But that definition merely begs the

question.   While it is obvious that the first land acquired for a tribe is properly characterized as

"initial," the more important question – which the Solicitor did not address – is whether the land

has the characteristics necessary to qualify as a "reservation."   The opinion makes no effort to

determine what Congress intended when it used the word "reservation" in IGRA. There is no

discussion of statutory language, legislative history, or any other indicator of legislative intent.

In fact, the opinion does not even address the fundamental question at issue in this case –

whether a "reservation" can exist in the absence of residential occupation by a tribe.   Under these

circumstances, no deference would be due even assuming that the other prerequisites for deference could be satisfied.[7]

        **5.**        **Defendants' Efforts to Distinguish *Sac and Fox* are Unavailing.**

Defendants raise several arguments in hopes of escaping the holding in *Sac and Fox*. (Defendants' Opening Br, at 44-46). They argue that the decision has been "overruled" by Congress, that it involved a different provision of IGRA, and that it is factually distinguishable. (*Id.*). None of these arguments are persuasive.

---

[7] Defendants also assert that their interpretation of IGRA is entitled to deference under the so-called "Indian canon," requiring ambiguous statutes enacted for the benefit of Indians to be construed in the Indians' favor. (Defendants' Opening Br, at 19-20, 41). This argument is unpersuasive for several reasons. To begin with, the Indian canon applies only to statutes enacted for the "benefit" of Indians. *See Chickasaw Nation v. United States*, 534 U.S. 84, 122 S. Ct. 528, 535 (2001); *Morongo Band v. FAA*, 161 F.3d 569, 573-74 (9th Cir. 1998) (refusing to apply canon where statute was not enacted for Indians' benefit). The purpose of IGRA, as its name implies, is to **regulate** Indian gambling. Before the Act was passed, Indians had the unfettered right to gamble in states where any form of gambling was permitted, under the Supreme Court's decision in *California v. Cabazon Band*, 480 U.S. 202 (1987). IGRA was enacted to place limits on the time, place, and manner in which such gambling could be conducted. Section 2719 imposes a general ban on all gambling on newly acquired lands, subject only to narrow exceptions, and generally requires a finding of no significant community impact for off-reservation gambling. *See* 25 U.S.C. § 2719(b)(1)(A). It thus exists for the benefit the public at large rather than Indian tribes. In any event, for the Indian canon to apply, the Court would have to find IGRA to be ambiguous, since it is well-settled that the Indian canon "does not permit reliance on ambiguities that do not exist." *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 505-06 (1986); *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 793 (1st Cir. 1996) ("When Congress has unambiguously expressed its intent…, the [Indian canon] is not triggered."). As discussed above, IGRA is not ambiguous – Congress made a conscious decision to leave the term "reservation" undefined in order to incorporate its established meaning. Finally, the Indian canon is not applicable where the interpretation advocated by the tribe is inconsistent with the language or intent of the statute. *See Chickasaw Nation*, 122 S. Ct. at 535 (2001) (refusing to apply canon where to do so "would produce an interpretation that we conclude would conflict with the intent embodied in the statute"). As discussed in detail above, the interpretation put forth by Defendants and the Gun Lake Band is patently inconsistent with IGRA's plain language and legislative scheme.

a.    *Sac and Fox* **remains good law.**

Defendants argue that *Sac and Fox* is no longer viable because Congress has allegedly "overruled" the decision by "clarifying" the alleged legislative intent behind IRGA. (Defendants' Opening Br, at 44-45). In support of that argument, they point to a brief provision inserted in the 2002 DOI Appropriations Act, which states in relevant part: "Sec. 134 CLARIFICATION OF THE SECRETARY OF THE INTERIOR'S AUTHORITY UNDER [IGRA]. The authority to determine whether a specific area of land is a 'reservation' for purposes of [IGRA] was delegated to the Secretary of the Interior on October 17, 1988." DOI Appropriations Act of 2002, § 134, Pub. L. No. 107-63, 115 Stat. 414, 442-43 (2001). According to Defendants, this provision was intended to clarify that DOI – rather than NIGC as the statute plainly says – has the authority to administer IGRA and therefore define the meaning of "reservation."

This argument is unavailing. Congress' authority to "clarify" the intent of an earlier enacted statute is limited to **amending** the language of the statute. *See Fowler v. Unified Sch. Dist.*, 128 F.3d 1431, 1435-36 (10th Cir. 1997) (explaining that "Congress may amend a statute . . . to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases"); *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994) (same). Such amendments are considered "clarifying" because Congress' intent is not to change the original *meaning* of the statute, but to make that meaning *clearer* by changing the language of the statute. An example of a clarifying amendment is found in *United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726 (8th Cir. 1986). In that case, the court found that Congress' intent in altering the language of the Resource Conservation and Recovery Act by way of a 1984 amendment was to clarify its original meaning. *See id.* at 739, 741; *see also O'Gilvie v. United States*, 519 U.S. 79,

89 (1996) (noting that Congress' intent in amending the language of the Internal Revenue Code in 1989 was to clarify the intended meaning of the Code); *Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir. 1984) (holding that amendment to statute's language was intended to clarify statute's original meaning); *Brown v. Marquette Sav. & Loan Ass'n*, 686 F.2d 608, 615 (7th Cir. 1982) (same). As these examples show, the defining characteristic of a clarifying amendment is a **change** in the language of a statute in order to make its intended meaning clearer.

In this case, the DOI Appropriations provision does not follow these examples – it is not an "amendment" in any sense of the word. By its own terms, the provision does not change, or even purport to change, the language of IGRA. IGRA, as codified at 25 U.S.C. § 2701, *et seq.*, remains unchanged from what Congress passed in 1988. The statute still says, as it always has, that **only NIGC** has the authority to administer IGRA. Defendants have pointed to no authority permitting Congress to "clarify" the intent of a statute without amending its language. The Appropriations provision is thus entitled to no more persuasive weight than any other piece of legislative history – it cannot override what Congress said when it passed IGRA in 1988.

In any case, even assuming for the sake of argument that the Appropriations provision had been a true clarifying amendment in the sense of changing the words of the statute, it is well-established that such amendments "form a hazardous basis for inferring the intent of an earlier [Congress]." *United States v. Price*, 361 U.S. 304, 313 (1960). As one court has explained: "It is important to emphasize that the later Congress' intent to clarify rather than to change the statute – which is really just evidence of the later Congress' view of the original statute's meaning – is only **persuasive** authority on the original statute's meaning . . . ." *United States v. Papia*, 910 F.2d 1357, 1362 (7th Cir. 1990) (emphasis in original). The court continued:

"[L]ike any persuasive authority [it] is entitled only to the weight that the force of its reasoning commands. The later Congress' view is certainly not binding; we must still interpret the original statute ourselves." *Id.* Thus, not surprisingly, the cardinal rule for such amendments is that **"the views of subsequent Congresses cannot override the unmistakable intent of the enacting one."** *Northeastern Pharm. & Chem. Co.*, 810 F.2d at 741 (citation omitted) (emphasis added); *accord O'Gilvie*, 519 U.S. at 90 ("[T]he view of a later Congress cannot control the interpretation of an earlier enacted statute[.]"); *Fowler*, 128 F.3d at 1436 (10th Cir. 1997); *United States v. Waste Indus., Inc.*, 734 F.2d 159 (4th Cir. 1984).

The Appropriations provision is not entitled to persuasive weight under these standards. Rather than "clarify" IGRA's intended meaning, the provision is contrary to both the words and the meaning of the statute. As discussed above, IGRA states in unequivocal terms that the power to administer the statute is vested in NIGC. *See* 25 U.S.C. § 2706(b)(10); 2709. The Appropriations provision flies in the face of this language by stating that Congress actually intended **DOI** to retain authority over the definition of "reservation." But if the original Congress had had such an intent it would have said so in the statute. Because the Appropriations provision is directly contrary to IGRA itself, it is entitled to no weight from this Court.[8] To hold

---

[8] Courts also hold that the persuasive force of a later expression of Congress is negatively affected by the passage of time. As one court has noted, the "interpretive value" of such action is "particularly dubious where, as here, [it] was enacted long after the original provision." *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994); *accord Rainwater v. United States*, 356 U.S. 590, 593 (1958) ("At most, the 1918 amendment is merely an expression of how the 1918 Congress interpreted a statute passed by [the earlier] Congress more than a half century before. **Under these circumstances such interpretation has very little, if any, significance** . . . .") (emphasis added); *O'Gilvie v. United States*, 66 F.3d 1550, 1559 (10th Cir. 1995), *aff'd*, 519 U.S. 79 (1996) ("We believe that using the amendment to interpret Congress' intent in 1954 (or 1918) is a questionable practice, particularly because of the long lapse of time…."). In one case the court found that the 22-year span between the original statute and the clarifying amendment was "long enough to make us reluctant to presume that Congress in 1997 was authoritatively interpreting and clarifying what Congress in 1975 intended." *Fowler v. Unified School Dist.*,

otherwise would be to allow the views of a subsequent Congress to override the "unmistakable intent" of the enacting one.  *See Northeastern Pharm.*, 810 F.2d at 741.

### b.  *Sac and Fox* involved the same section of IGRA.

Defendants also argue that *Sac and Fox* is not persuasive because it allegedly involved "an entirely different provision of IGRA" from the one at issue here.  (Defendants' Opening Br, at 45).  This argument fails for two reasons.  First, it is factually inaccurate – the provision at issue in *Sac and Fox* is from the **precise** section of IGRA that is at issue in this case, namely section 2719.  Second, it is legally unsound:  "The normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'"  *Sorenson v. Department of Treasury*, 475 U.S. 851, 860 (1986) (citations omitted); *accord Smith v. United States*, 508 U.S. 223, 235 (1993) (holding that the term "using a firearm" should not have a different meaning in one subsection than it does in another).  Applying these principles here, there is no reason to believe Congress intended "reservation" to mean one thing for subsection (a) of section 2719 and another thing for subsection (b).[9]  This is especially true since both subsections address the same subject matter, namely, what lands are eligible for tribal gambling after 1988, and what lands can avoid the two-step approval process normally required by section 2719(b)(1)(B).  *See Commissioner of IRS v. Estate of Ridgeway*, 291 F.2d  257, 259 (3rd Cir. 1961) ("The need for uniformity becomes more imperative where the

---

128 F.3d 1431, 1436 (10th Cir. 1997).  The same is true here.  It is hardly persuasive to suggest that Congress acting in 2002 is entitled to deference for its assessment of the legislative intent behind IGRA, a statute enacted 14 years earlier.

[9] Defendants also argue that the term "reservation" in section 2719(a) must have been intended to have a different meaning than the term "initial reservation" in section 2719(b), but this is nonsensical.  The word "initial" does not change the meaning of the word "reservation" – it merely modifies it to mean a tribe's "first" reservation.  A reservation, whether first or otherwise, is still a place where a tribe's members reside.

same word or term is used in different statutory sections that are similar in purpose and content."). Defendants' argument fails accordingly.

### c. *Sac and Fox* cannot be distinguished on its facts.

Finally, Defendants argue that *Sac and Fox* is factually distinguishable because it involved a public cemetery reserved for the tribe's use as a burial ground and thus, Defendants allege, was not a reservation in any event. (Defendants' Opening Br, at 45). However, even a casual reading of the opinion shows that the land's status as a cemetery was not a factor in the court's decision. *See Sac and Fox*, 240 F.3d at 1266-67. Instead, the court based its decision on one, and only one, conclusion: that, given the intended meaning of "reservation" under IGRA, the land could not be a reservation when it had never been set aside or occupied by the tribe as a residence. *Id.* at 1267. Because the same is true of the proposed casino site in this case, Defendants' efforts to distinguish *Sac and Fox* are unavailing.[10]

### B. Assuming *Arguendo* that the Proposed Casino Site Qualified as a "Reservation," it Still Would Not Be the Gun Lake Band's "Initial" Reservation When the Gun Lake Band Has Already Had Three Prior Reservations During its History.

The proposed casino site could not possibly be the Gun Lake Band's "initial" reservation. The Trust Application, prepared by the Gun Lake Band itself, states that the Band

---

[10]In support of its argument on this issue, the Gun Lake Band points to the decisions in *CETAC*, 2004 U.S. Dist. LEXIS 27498, at *1, and *City of Roseville,* 348 F.3d at 1028. (Gun Lake Band's Opening Br, at 47-48). However, *City of Roseville* dealt with a different IGRA exception that permits gambling on lands obtained through the "restoration of lands for an Indian tribe that is restored to federal recognition." *City of Roseville*, 348 F.3d at 1024 (quoting 25 U.S.C. § 2719(b)(1)(B)(iii)). The case did not involve the "initial reservation" exception, and therefore did not analyze or reach a holding regarding that exception. *See id.* at 1026-30). *CETAC*, in contrast, did involve the "initial reservation" exception, although the decision has not yet been appealed. *See* 2004 U.S. Dist. LEXIS, **11-16. As discussed above, the litigation is currently on hold while Defendants perform an EIS for the proposed casino project.

has already had two federally recognized Indian reservations at different points in its history. (Trust App, AR001986; *see also id.*, *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc.*, AR002033). In addition, the Band very recently had a **third** reservation – Pine Creek Indian Reservation in Athens Township, Michigan – by virtue of its merger with and into the Huron Band of Pottawatomi Indians ("Huron Band") in 1987. (Trust App, *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc.,* AR002101). The Gun Lake Band was merged with the Huron Band until 1992, when it split off to pursue its own federal acknowledgment.[11]  (*Id.*)

In light of these facts, the Gun Lake Band cannot claim that the proposed casino site would be its "initial" reservation. Instead, it would be the Band's **fourth** reservation. The Band may therefore gamble on the site only by going through the two-step approval process.

The Gun Lake Band's request to take land into trust for a casino is directly contrary to its earlier promises to the government and its own members not to engage in gambling. As discussed above, the Band's tribal council agreed to pursue federal acknowledgement only on the condition that "there would never be casinos in our Tribe." (Trust App, *BIA Historical Technical Report on the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan, Inc*., at AR002106). The tribal council stated that it was "the only Indian Tribe in the State of Michigan which has decided not to sacrifice the future of its membership to

---

[11] Several years ago, the Huron Band submitted its own application to have land taken into trust for a casino. The trust application describes Pine Creek Reservation as having been taken into trust by the State of Michigan in 1845, and as being the Huron Band's "social core" and the "center of [the tribe's] religious, spiritual, and cultural existence." (*See* Huron Band Trust App., at 4, attached as Exhibit A). Moreover, the trust application states that Pine Creek Reservation, unlike the proposed casino site, is used for tribal housing. (*See id*.). Pine Creek Reservation is therefore not only a "reservation" for purposes of IGRA, it was the reservation that the Gun Lake Band shared during its merger with the Huron Band.

gaming interests," (*id.*), and placed an express, allegedly permanent ban on Class III gambling in the Band's constitution, (*id.*, AR002140 ("The proviso limiting certain forms of Tribal casino gaming enterprises near the heart of the Tribal community **shall not be altered** by future Elder's Council decisions or subsequent Constitutional amendments.")).  Therefore, not only is the Gun Lake Band attempting to gamble on a piece of land that is not its "initial reservation," it has also reneged on the promises it made at the time it sought federal acknowledgement.

In conclusion, IGRA's "initial reservation" exception was intended for tribes who, unlike the Gun Lake Band, have never had a reservation at the time of their federal acknowledgment.  The purpose of the exception is to put those tribes on parity with tribes that already have reservations and can therefore already take advantage of gambling under the statute. It was never intended to permit a tribe to gamble on a purely commercial, off-reservation site by pretending that the site is a "reservation."  Nor was it intended to permit a tribe that has already had a reservation to acquire another alleged "reservation" for use as a casino.  Defendants' approval of the casino site for gambling as an "initial reservation" is contrary to all this and must be set aside.

## II.    NEPA REQUIRES AN EIS BECAUSE DEFENDANTS HAVE FAILED – DESPITE MULTIPLE EFFORTS, SEVERAL YEARS, AND MORE THAN 1,200 PAGES – TO EXPLAIN AWAY THE OBVIOUS POTENTIAL SIGNIFICANCE OF A MASSIVE NEW CASINO COMPLEX IN A RURAL TOWNSHIP OF 3,000 PEOPLE.

### A.    NEPA Plays A Unique And Critical Role In National Environmental Policy.

The National Environmental Policy Act ("NEPA") is "our basic national charter for protection of the environment."  Council on Environmental Quality Regulations, 40 C.F.R. § 1500.1(a); *accord* 42 U.S.C. § 4331(a) (2004).  NEPA requires a federal agency to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the

quality of the human environment." 42 U.S.C. § 4331(2)(C); *accord,* 40 C.F.R. § 1502.3. The purpose of NEPA is twofold. The Act ensures the integrity of the agency process by "forcing [agencies] to face stubborn, difficult-to-answer [environmental] objections without ignoring them or sweeping them under the rug." *Sierra Club v. United States Army Corps. of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). It also serves as "an environmental full disclosure law," giving the public, the President, and Congress the information they need to comment on and evaluate an agency's judgments. *Id.*; *accord Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983).

Under NEPA, administrative agencies have the "initial and primary responsibility" for determining whether a project warrants the preparation of an EIS. *See Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 151, 154 (D.C. Cir. 1985). The exercise of this responsibility is guided by the procedural requirements of the statute, which "establish a strict standard of compliance." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1112 (D.C. Cir. 1971). To satisfy these obligations, an agency must perform an environmental assessment ("EA") to evaluate the proposed project's environmental consequences. *See* BIA NEPA Handbook, 30 BIAM Supplement 1, ¶ 3.4B, attached as Exhibit B; *accord* 40 C.F.R. § 1501.4. Under the law of this Circuit, if the EA indicates that **any** significant impacts **might** occur, then an EIS must be prepared.[12] *See Sierra Club*, 717 F.2d at 1415; *accord* 40 C.F.R. § 1508.9; *see* Ex. B, BIAM Supplement 1, ¶ 3.4A(2), B. Thus, as one court has noted, "when it is a close call whether there

---

[12] *See also Foundation for N. Amer. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (stating that if the EA establishes that the agency's action "**may** have a significant effect upon the . . . environment, an EIS must be prepared") (emphasis added).

will be a significant environmental impact . . . , an EIS should be prepared." *National Audubon Soc'y v. Hoffman*, 132 F.3d 7, 18 (2d Cir. 1997).

Agency compliance under NEPA is guided by regulations passed by the President's Council on Environmental Quality ("CEQ"). *See* 40 C.F.R. §§ 1500-1518. The regulations state that the phrase "human environment" in the context of NEPA "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." *Id.* § 1508.14. According to the regulations, a proper EA must consider a broad range of environmental components, including: air, light, and water resources; living resources, such as wildlife, vegetation, ecosystems, and agriculture; cultural resources; socioeconomic conditions, including employment, income, demographic trends, attitudes, expectations, lifestyle, cultural values, and community infrastructure; recreation, transportation, and land use resource patterns; and other components, such as noise, wilderness, and public health and safety. *See id.* §§ 1508.8, .27. In determining whether the impact of a proposed action might be significant, an agency must consider three distinct types of impacts, including direct, indirect, and cumulative impacts. *See id.* §§ 1508.7, .8, .27; *accord* Ex. B, 30 BIAM Supplement 1, ¶ 5.3.

An agency's decision to issue a FONSI, and therefore not to prepare an EIS, is reviewed under the arbitrary and capricious standard. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375-76 (1989); 5 U.S.C. § 706(2)(A). The purpose of court review is to assure that the agency has taken a "hard look" at the environmental consequences of the proposed action. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21 (1976). A reviewing court is far more than just a "rubber stamp" in these circumstances. Instead, the cases require a "thorough, probing, in-depth review" of the agency's decision. *See Citizens to Preserve Overton*

*Park v. Volpe*, 401 U.S. 402, 415-16 (1971), *abrogated on other grds.*, *Califano v. Sanders*, 430

U.S. 99, 105 (1977).  The hard look mandated by Congress must be taken objectively and in

good faith, "not as an exercise in form over substance, and not as a subterfuge designed to

rationalize a decision already made."  *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

The D.C. Circuit employs a four-part test to examine agency decision making

under NEPA:

> First, the agency must have accurately identified the relevant environmental
> concerns.  Second, once the agency has identified the problem, it must have
> taken a "hard look" at the problem in preparing the EA.  Third, if a finding of no
> significant impact is made, the agency must be able to make a convincing case for
> its finding.  Last, if the agency does find an impact of true significance,
> preparation of an EIS can be avoided only if the agency finds that changes or
> safeguards in the project sufficiently reduce the impact to a minimum.

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 35 (D.D.C. 2000)

(citation omitted); *accord Grand Canyon*, 290 F.3d 339, 340-41 (D.C. Cir. 2002); *CETAC v.

Norton*, 2004 U.S. Dist. LEXIS 27498, *18 (D.D.C. 2004).  Defendants' decision here fails the

test.

**B.       Defendants Misconstrue The Intended Function Of An EA.**

Defendants and the Gun Lake Band argue that the EA is so complete that it would

be a waste of time to perform an EIS.  (*See, e.g.*, Gun Lake Band's Opening Br, at 42).  But this

argument confuses the distinct functions of an EA and an EIS for purposes of NEPA.  The

purpose of an EA is to assess whether the proposed action could potentially result in significant

environmental impacts.  *See Anderson v. Evans*, 350 F.3d 815, 836 (9th Cir. 2002); *accord

Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985).  An EA is not supposed to take the

place of an EIS; it is supposed to be "a rough-cut, low-budget" screening device to decide if an

EIS is necessary.  *Nat'l Audubon Soc'y v. Hoffman*, 917 F. Supp. 280, 286 (D. Vt. 1995), *aff'd in*

*part, rev'd in part on other grounds*, 132 F.3d 7 (2d Cir. 1997). If the EA shows that significant impacts are even **possible**, the agency must perform an EIS. *See National Audubon Soc'y v. Hoffman*, 132 F.3d 7, 13 (2d Cir. 1997) (stating that it is only when the proposed action clearly "will **not** have a significant effect on the human environment that an EIS is not required").

An EIS serves an entirely different function. The purpose of an EIS is to analyze and weigh the expected environmental impacts of an action in order to decide, **as a substantive matter**, whether the proposed action is desirable in light of its consequences. *See* 40 C.F.R. § 1502.1; *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983); *Hoffman*, 917 F. Supp. at 287. According to the CEQ regulations, an EIS must provide "full and fair discussion of significant environmental impacts," and must inform decision makers and the public of reasonable solutions for avoiding or minimizing the environmental impacts of the action. *See* 40 C.F.R. § 1502.1. As a result, the EIS must contain a host of information and analysis that is not required of an EA. *See* 42 U.S.C. § 4321. It must also pass through a long series of unique procedural requirements aimed at maximizing scrutiny of expected environmental impacts.[13]

In light of these differences, courts have consistently rejected the notion that an EA can take the place of an EIS. *See, e.g.*, *Anderson*, 350 F.3d at 836; *Sierra Club*, 769 F.2d at 875. In *Anderson*, the court found the agency's EA inadequate and ordered preparation of an EIS. *See* 350 F.3d at 836. In doing so, the court emphasized that an EA can never substitute for preparation of an EIS: "There is no doubt that the government put much effort into preparing the

---

[13] This includes publishing notice in the Federal Register, *see* 40 C.F.R. § 1501.7; undertaking a formal "scoping" process and inviting participation from interested parties, including those who oppose the action, *see id.* § 1501.7; publishing a draft EIS and accepting public comments for a minimum of 45 days, *see id.* §§ 1503.1(a)(4), 1506.10(c); 30 BIAM Supplement 1, § 6.3(H); responding to all public comments received on the draft EIS, *see id.* § 1503.4; holding public hearings whenever appropriate, *see id.* § 1506.6; and publishing notice of the final EIS in the Federal Register, *see id.* § 1506.10.

lengthy environmental assessment now before us . . . . [However,] girth is not a measure of the analytical soundness of an environmental assessment. **No matter how thorough, an EA can never substitute for preparation of an EIS**, if the proposed action could significantly affect the environment." *Id.* emphasis added).

In this case, the length and complexity of Defendants' EA militates in favor preparing an EIS. CEQ advises that an EA should be no more than 10-15 pages in length.[14] *See Forty Most Asked Questions Concerning CEQ's NEPA Regulations,* 40 Fed. Reg. 18026 (question 36a) (CEQ, March 16, 1981). According to CEQ, "[a]gencies should avoid preparing lengthy EAs except in unusual cases, where a proposal is so complex that a concise document cannot meet the goals of Section 1508.9 and where it is extremely difficult to determine whether the proposal could have significant environmental effects." *Id.* (question 36b). Thus, "**[i]n most cases, . . . a lengthy EA indicates that an EIS is needed**." *Id.* (emphasis added).

Here, Defendants and the Gun Lake Band have compiled an EA with **208 pages** of text plus almost **1,000 pages** of attachments. Defendants cannot claim that the environmental consequences of the proposed casino do not warrant an EIS when it has taken them nearly 1,200 pages to try to explain why not.[15] *See Curry v. United States Forest Service*, 988 F. Supp. 541, 551-552 (W.D. Pa. 1997) (ordering EIS based in part on length of 49-page EA); *Hoffman*, 917 F. Supp. at 287 (same, 65 pages); *Puerto Rico Conservation Foundation v. Larson,* 797 F. Supp. 1074, 1080 (D.P.R. 1992) (same, 45 pages).

---

[14] BIA's own NEPA Handbook echoes this requirement. *See* 30 BIAM Supplement 1, § 4.3.

[15] Defendants and the Gun Lake Band falsely portray MichGO's argument as being that a lengthy EA *requires* preparation of an EIS in all cases. (Defendants' Opening Br, at 40; Gun Lake Band's Opening Br, at 42-43). Instead, MichGO argues that the length and complexity of the EA are but one more indication that thrusting a massive casino into a rural community of only 3,000 residents at the very least *might* have significant environmental impacts.

C.    **The Court Should Set Aside Defendants' FONSI Because it is Based on Materially Inaccurate Factual Claims.**

Defendants' FONSI does not stand up to scrutiny.  At least two of the factual predicates of the FONSI are patently false.  First, the FONSI states that "the proposed action would be located in an attainment area for all of EPA's current priority pollutants," (*see* FONSI, AR000004), when in fact USEPA declared Allegan County, the site of the proposed casino, an ozone nonattainment area on April 15, 2004, *see Air Quality Designations and Classifications for the 8-Hour Ozone National Ambient Air Quality Standards; Early Action Compact Areas with Deferred Effective Dates,* 69 Fed. Reg. 23858 (USEPA April 30, 2004) (Final Rule).  This was over a year before the Defendants, relying on the inaccurate FONSI, published their Notice of Intent to take the land into trust for gaming.  *See* 70 Fed. Reg. 25596 (2005).  Second, the FONSI assumes that many of the admitted environmental impacts from the proposed casino would be mitigated by revenue sharing under a tribal-state gambling compact. (*See* FONSI, AR000004).  But this too is inaccurate because the Gun Lake Band has never obtained such a compact.  Thus, two of the pillars of Defendants' own decisional document are materially false.

Defendants' false assumption about the existence of a gambling compact is particularly troubling.  The EA includes a long list of environmental impacts that allegedly were to be mitigated by funds paid by the Band under the compact.  Among other things, the EA says money from the compact would be used to mitigate the destruction of wetlands (EA, AR000090), increased traffic on area roads (*id.* AR000030), runoff from casino parking lots (*id.* AR000090), indirect impacts to state and federally protected species (*id.* AR000167), loss of revenue to the state lottery (*id.* AR000095), and costs to local governments from lost property tax revenue and from increased demand for public services, like police and fire (*id.* AR000095-96), to name only a few.  The EA fails to address what becomes of these measures now that the

Gun Lake Band has no compact.  Will they simply be abandoned?  If not, how will they be paid for?  The EA does not say, because it was written on the false assumption that the Gun Lake Band would have a compact.

In response to concerns from MichGO and others about this issue, the Gun Lake Band added a statement to the EA saying it is "willing to provide a resolution pledging to contribute two percent of electronic gambling revenues annually to local government units" in the event the tribe does not have a gambling compact and the Secretary of Interior authorizes **Class III** gambling by some other means.  (EA, AR000171-172).  But this is a hollow and unenforceable commitment.  IGRA does not permit the Secretary to authorize Class III gambling in the absence of a gambling compact, so the one of the key conditions the Band has placed on its promise will never be met.  The Gun Lake Band makes **no** commitment to pay for mitigation measures if it is forced to engage in only Class II gambling.  Moreover, it is well settled that mitigation measures, to be properly considered under NEPA, must be **legally enforceable** against the applicant.  *See* Ex. B, 30 BIAM Supplement 1, § 4.3F(2).

In this case, the Gun Lake Band has already reneged on its original promise not to seek a casino of any kind.  It has also invoked its sovereign immunity to duck the merits of a contract claim brought against it in state court by its former casino development partner, (*see* Exhibit C, attached), and was recently involved in litigation over charges that it unilaterally canceled its contract with a second casino management company, *see Match-E-Be-Hash-She-Wish Band of Pottawatomi Indians v. Kean-Argovitz Resorts*, 383 F.3d 51 (6th Cir. 2004).  The community has no way to enforce this latest "commitment" if the Gun Lake Band decides to renege on it also.

In short, Defendants issued their FONSI on the false assumption that the Gun Lake Band would have a gambling compact, and that revenue sharing from the compact would be used to minimize admitted environmental impacts. In the absence of a gambling compact, there is no revenue sharing agreement to support the alleged mitigation measures, or any enforceable commitment by the Gun Lake Band to pay for such measures.

**D.    The EA Glosses Over the Casino's Impact on the Surrounding Areas.**

**1.    Impact on Rural Community.**

Defendants' EA is inadequate in its treatment of the casino's expected impact on the surrounding rural area. The farmland that makes up the area is a defining feature of the community. Those who live in the area, including MichGO's members, did not move to the country so they could be down the road from a massive casino. They appreciate the simplicity and beauty of the farmland and are determined to see it preserved.

The proposed casino is inconsistent with these members' use and enjoyment of their property. The casino would be situated on 146 acres of land, which is more than five times larger than the parcel that holds the Pentagon building in Washington, D.C. The proposed site is bordered by agricultural and residential lands to the north and east, and agricultural property to the south. (EA, AR000038). Construction of the casino would result in the destruction of 45 acres of agricultural land, including 21 acres of designated "locally important" farmlands. (*Id.* AR000126).

But the true impact of the casino goes far beyond the size of the parcel itself. The EA states that the casino would be surrounded by a series of paved parking areas with parking for more than 3,300 cars, buses, and RVs. (EA, AR000022-23). The EA estimates that the casino would attract an average of 8,500 visitors per day, which translates to more than **3.1**

**million** visitors a year.  (*Id.* AR000094).  1,800 workers would be employed by the casino.  When this is added to the 8,500 visitors, it brings total daily visits to 10,300 people, or **three and a half times** the population of Wayland Township.

Additionally, the casino itself is just the tip of the iceberg.  Defendants' concede the casino would attract other development to the area.  The casino would bring in approximately $170 million in revenues each year, and generate $32 million in annual off-site sales.  (EA, AR000157, 169).  The EA estimates that the casino would generate 4,900 total new jobs, and that 1,420 new residents would be attracted to Wayland Township and surrounding areas, (*id.* AR000169, 175), and add 326 to 434 new students to area schools over five years, (*id.* AR000173).  Demand for housing for all these new residents would spur the construction of 526 new housing units within five years.  (*Id.* AR000150).  In addition, the EA assumes the casino would result in the construction of two restaurants, a 100-room hotel, and a gas station with a convenience store, all within a short distance of the casino.  (*Id.* AR000159-160).

All of this expected growth will have significant impacts on the rural character of the area.  Confirming the fears of MichGO's members, the EA concedes that "[c]onstruction of the [proposed casino] would result in the loss of open space, [and] contribute to the urbanization of the area . . . ."  (EA, AR000130).  Indeed, according to the EA, indirect growth induced by the casino would result in the destruction of 13 acres of wetlands and 23 acres of federally recognized "prime farmlands."  (*Id.* AR000167, 179).  Increased traffic from employees and visitors "would increase nighttime light impacts in the vicinity of the affected roadways."  (*Id.* AR000130).

The EA also admits that the casino will cause an increase in rates of compulsive gambling.  (*Id.* AR000134).  Despite this, the EA devotes not a single word to discussing the

implications of such an increase.  There is no mention – let alone analysis – of any of the well-known impacts of compulsive gambling on individuals and families, including increased rates of alcoholism, drug abuse, divorce, crime, and bankruptcy.  Rather than analyze these impacts, the EA simply states that they are not expected to be significant because the Gun Lake Band has agreed to spend money to treat compulsive gamblers.  To say the least, this response of throwing money at the problem is of no comfort to local residents.  It is somewhat akin to Defendants concluding that an industrial operation emitting known carcinogens is not significant because the operator has agreed to build a hospital to treat those who might develop cancer.

Courts have rejected the attempts of federal agencies to authorize large-scale projects in rural communities without performing an EIS.  For example, in *Sierra Club v. Marsh,* 769 F.2d 868 (1st Cir. 1985), the First Circuit held that the Army Corps of Engineers violated NEPA by issuing a FONSI for a cargo port and causeway that the State of Maine planned to build on Sears Island.  The court stated:

> We do not see how the agencies could [reasonably conclude that the project (including the likely further development) would have no significant impact on the environment] given the town's report and other record items that show that industrial development of the island would add . . . 2,750 new jobs in a town with a population of under 2,500; that show increased traffic on Route 1 (the town's principal artery) by 50-71 percent; that show additional lost scallop beds and clam flats, more soil erosion and aesthetic harm, a need for additional waste disposal and water supply, an added threat to water quality, and … a loss of at least 23 percent of the island's upland animal habitat.

769 F.2d at 880.

The court reached the same conclusion in *United States v. 27.09 Acres of Land*, 760 F. Supp. 345 (S.D.N.Y. 1991).  In that case, the Postal Service issued a FONSI for the construction of a mail and vehicle maintenance facility which, like the casino project here, would operate 24 hours a day, seven days a week.  *Id*. at 347.  The court held that the FONSI was

improper because it failed to consider the project's massive scope and incompatibility with the surrounding area:

> [T]he EA acknowledges that the facility violates numerous zoning restrictions in the Towns of New Castle and Harrison . . . , but states that because "the building has been designed and landscaped to soften its visual impact," the violations "will not result in significant impacts." **That amounts to putting a tutu on an elephant and calling it a ballerina. It is undisputed that the facility is of unprecedented magnitude for the Harrison area.** While the result may be the same after an EIS has been filed, the intention of NEPA is to better inform agency decision-makers and to allow accommodations to be made as a result of completing the required study. . . .

*Id.* at 353-54 (emphasis added); *accord City of Davis v. Coleman*, 521 F.2d 661, 675-76 (9th Cir. 1975). The same is true here. A 200,000 square-foot casino operating 24 hours a day and attracting 3.1 million visitors a year could not be more out of place with a rural community like Wayland Township.

In support of their decision not to perform an EIS, Defendants point to the decisions in *City of Roseville v. Norton*, 219 F. Supp. 2d 130 (D.D.C. 2002) and *TOMAC v. Norton*, 433 F.3d 852 (2006). (Defendants' Opening Br. at 22, 24, 33, 38). But those cases are readily distinguishable. The plaintiffs in *City of Roseville* made only four substantive arguments in support of their claim that an EIS should be prepared. *See* 219 F. Supp. 2d at 167 (alleging undisclosed data, failure to consider alternatives, inadequate surface water plans, and impact on rare and endangered species). Those arguments are not at issue here. *TOMAC* also dealt with substantially different arguments. *See* 433 F.3d at 861-64 (discussing, *inter alia*, lack of public comment, impact on air quality, and cumulative impacts).

Defendants also fail to mention that the district court in *TOMAC* rejected Defendants' original EA for the proposed casino project. *See TOMAC v. Norton*, 240 F. Supp. 2d 45, 51-52 (D.D.C. 2003). The court held that the EA failed to adequately address the growth-

inducing impacts of the casino and failed to "clearly explain the Bureau's conclusion that an increase of 5,600 new jobs, 800 new employees and their families, and related changes in physical development and natural resources use will not have a significant effect on a community of 4,600." *Id*. at 51-52. The court remanded the EA and FONSI "for such further evaluation and elaboration of its reasoning as BIA desires to submit concerning secondary growth issues."[16] *Id*. Defendants' reliance on these cases is therefore misplaced.

In short, NEPA requires that an agency perform an EIS as long as the expected environmental impacts even "might" be significant. Given the massive scale of the proposed casino and the intense commercial development it will admittedly generate, Defendants' decision to forego an EIS was arbitrary and capricious.

## 2.    Impact on Traffic.

Defendants have failed to address a number of significant impacts from increased traffic generated by the casino. Their own data shows that several intersections will operate at unacceptable levels of congestion once the casino is in operation, yet they still conclude that this is not potentially significant for purposes of NEPA. As we show below, this conclusion defies logic and is not supported by the record.

As an initial matter, the EA's discussion of traffic impacts relies on unsupportable data about expected traffic from the casino. The traffic study explains that its conclusions about traffic volume are based on data gathered at another Michigan casino called Turtle Creek. (EA AR000109). The study uses traffic volumes at Turtle Creek as a starting point and increases them by 25% to arrive at the expected traffic levels for the Gun Lake casino.

---

[16] The court allowed the project to go ahead only after Defendants produced a supplemental EA that the court believed adequately addressed its concerns. *See TOMAC v. Norton*, 2005 WL 2375171 (D.D.C. 2005).

(*Id.*)  The EA relies on this very modest 25% increase despite the fact that, as the EA **admits**, the Gun Lake casino would be **three times larger** than Turtle Creek, closer to larger population centers than Turtle Creek, visibly located next to a highway with nearly **twice** the daily traffic of Turtle Creek, and located in southwest Michigan, which has fewer casinos than the area where Turtle Creek is located.  (*Id.*)  The EA does not explain why the assumed increase of only 25% over Turtle Creek is reasonable under these circumstances.  (*Id.*)  It is clear that the Gun Lake casino, with all of its relative advantages, would attract far more than this very modest volume of traffic.

Even with its overly optimistic traffic figures, the EA still concedes that there would be serious traffic problems as a result of the proposed casino.  The EA explains that all intersections in the vicinity of the casino site currently operate at levels of service ("LOS") of A or B, except one that operates at LOS C during peak hours.[17]  (EA, AR000104).  Using its modest traffic volume estimates, the EA concedes that, once built, the casino would attract approximately **1,100 cars per hour** during peak hours.  (*Id.* AR000110).  The EA concedes that this heavy volume will cause significant impacts at intersections close to the casino.[18]  The EA states that "[t]he operation at the northbound US-131 ramps at 129th Avenue . . . will operate at LOS **F** during the afternoon peak hour."  (AR000111-12 (emphasis added)).  Likewise, "[t]he southbound US-131 ramp's southbound to eastbound left turn movement will also operate at LOS **F** during the afternoon peak hour."  (AR000115 (emphasis added)).  Of course, these are the worst possible traffic ratings an intersection can receive.

---

[17] An "A" is the highest LOS rating available, followed by B, C, D, E, and F.

[18] Table 4-6 and Figure 4-5 show the peak-hour LOS at each study intersection after the casino is in operation.  (AR000114-15).

Defendants' proposed mitigation measures for these traffic problems are discussed in Chapter 5.6.1.  (*See* AR000189-90).  That section admits that "[a]cceptable levels of service are projected at all but two of the study intersections under Opening Year Plus Project conditions, **resulting in significant impacts at those intersections.**"  (AR000189 (emphasis added)).  To mitigate the impact to the southbound traffic movement, the EA first recommends installing an "all-way stop control at the US-131 southbound ramps/129[th] Avenue intersection." (*Id.*).  However, the EA admits that this measure would not solve the problem, and that "**the left-turn movement will continue to operate at LOS F**" during peak hours.  (*Id.*)  The EA states that this mitigation was approved by MDOT in a September 25, 2001 letter attached at Appendix F.  (AR000189 (citing MDOT Letter, AR000586-87)).  However, the referenced letter from MDOT was written **before** Defendants' traffic study was completed on November 2, 2001. (AR000442).  This means MDOT was not aware of the significant traffic problems identified by Defendants in their study.  Moreover, the letter from MDOT does not mention **anything** about the proposed "all-way stop control" at the US-131 southbound ramps recommended by the EA, or offer any opinion as to whether it would solve the problem.  (AR000586-87).  Thus, although the EA concedes there will be a significant impact to southbound traffic as a result of the casino, it incorrectly suggests that MDOT has approved of the proposed mitigation.

The same is true of the EA's treatment of northbound traffic problems.   To mitigate the admitted impact to northbound traffic movement, the EA recommends the construction of a "right turn lane from the northbound US-131 off-ramp turning onto 129th Avenue, eastbound."  (AR000190).  Once again, the EA states that this proposed mitigation measure was approved by MDOT in its September 25, 2001 letter.  (*Id.*)  However, as discussed above, the letter from MDOT was written before Defendants' traffic study was completed on

November 2, 2001.  (AR000442).  It is therefore inaccurate to suggest that MDOT understood the extent of the problem and agreed with Defendants' proposed solution.

The EA has similar shortcomings in its treatment of traffic impacts to the nearby Village of Hopkins.  In response to public comments about these impacts, Defendants performed a supplemental traffic study dated June 6, 2003.  (*See* AR000510-17).  The study estimates that 10% of the traffic to and from the proposed casino would travel through the Village of Hopkins on Highway A-42, which intersects with 22nd Street near Hopkins Elementary, Middle, and High Schools.  (AR000510).  After studying traffic levels at this intersection in 2003 and 2011 with the addition of expected casino traffic, the EA concedes that **"northbound traffic (mostly school-related) operates at LOS 'E' during the school PM peak-hour."**  (AR000511) (emphasis added); *see id.* 000512, Table 2).  The traffic study admits that LOS E is **below an acceptable level**, and is next to the worst rating possible for an intersection.  (*Id.*)  To mitigate this problem, the study states that a northbound left-tune lane could be added, and that doing so would increase the LOS to D during peak hours.  (*Id.*)

Despite all of this, Defendants do not recommend any such mitigation in the EA.  (AR000189-90).  Instead, they attempt to back-pedal from their own traffic study by stating that the impacts will be less than significant, allegedly due to the distance from Hopkins to the casino and the different peak hours of the casino and the schools.  (AR000116).  This is despite concluding in their own traffic study that 10% of casino traffic would travel through the Village of Hopkins, and that the key intersection would operate at LOS E during peak periods.

The EA suggests that the Allegan County Board of Road Commissioners agrees with Defendants' conclusion of no significant impact to the Village of Hopkins.  (AR000116).  But this is disingenuous.  The letter from the Board of Road Commissioners is dated **March 13,**

**2003**, which is **three months before** Defendants completed their traffic study on the Village of Hopkins on June 6, 2003, (*see* AR000590). This means, at the time it wrote its letter, the Board **could not have known** about the significant impacts that would be identified in the traffic study three months later. Thus, Defendants' suggestion that the Board agrees with its conclusion of no significant impact on the Village of Hopkins is patently false. Defendants' own traffic study shows that impacts at the key intersection in the Village of Hopkins will be significant, and the EA contains **no mitigation** measures to reduce those impacts below the level of significance. (AR000189-90). Therefore, as with other parts of the traffic study discussed above, Defendants cannot maintain that the EA's conclusion of no significant impacts is reasonable.

### 3. Impact on West Michigan.

The EA also gives short shrift to the expected impact of the proposed casino on the broader West Michigan community. The proposed casino is located only 25 and 30 miles, respectively, from the core population and business centers of Kalamazoo and Grand Rapids. Despite this, the EA contains no real discussion of any impacts to these communities.

Throughout the EA is the underlying assumption that money spent at the casino somehow appears from the sky. There is no recognition of how a casino operation cannibalizes other businesses by siphoning away spending. The cities of Grand Rapids and Kalamazoo have been actively working to revitalize their downtown areas, including attracting residents and providing entertainment venues. For example, in Grand Rapids, public and private efforts have combined to complete construction of a long-awaited quarter-billion dollar downtown convention center.

The proposed casino has the potential to marginalize these efforts to improve the quality of life in Grand Rapids and Kalamazoo. The Grand Rapids Chamber of Commerce,

which opposes the casino and submitted exhaustive comments on the draft EA, hired Anderson Economic Group ("AEG") to study the impact of the casino on the area's cities. (*See* AEG Report, AR000957-87). The report criticizes the EA for touting the casino's expected financial gains while completely ignoring where the money would come from: "[B]y shifting expenditures away from previous activities in the surrounding communities, the proposed casino will likely decrease the economic well being of the neighboring economies. This is because a significant portion of the casino's revenues would otherwise be spent in the retail and commercial centers that share part of the proposed casino's trade areas. These expenditures may be directed to goods and services, activities, or investment." (*Id.* AR000973).

The AEG report concludes that over **$92 million a year** will be diverted away from other consumer expenditures as a result of the proposed casino, and most of that expenditure will come from within one hour of the casino, which means the cities of Grand Rapids and Kalamazoo will be hit the hardest. (AR000974, 76). The EA **concedes** that this tremendous impact to local economies could in fact occur, (*see* EA, at AR001114 ("We concur with that possibility.")), but concludes that the impact is somehow not even potentially significant for purposes of triggering an EIS. (*Id.*) Incredibly, the EA offers **no** analysis to explain its conclusion in this regard. (*Id.*) It simply states that the impact will not be significant and leaves it to the imagination to figure out why.

Defendants and the Gun Lake Band attempt to dismiss complaints about the casino's expected impacts on Grand Rapids and Kalamazoo as allegedly being motivated by a desire to shield area businesses from competition by the casino. (Defendants' Opening Br, at 31; Gun Lake Band's Opening Br, at 33). However, the CEQ regulations expressly call for consideration of socioeconomic factors – including employment, income, demographic trends,

attitudes, expectations, lifestyle, cultural values, and community infrastructure – when weighing environmental impacts under NEPA.[19]  *See* 40 C.F.R. §§ 1508.8, .27.  The socioeconomic impacts raised by MichGO go far beyond the impact to a few businesses in Grand Rapids or Kalamazoo.  They are area-wide impacts to communities and residents throughout the West Michigan area, including those of MichGO's members who live in the surrounding area. Defendants cannot blithely dismiss these residents' complaints based on speculation about their alleged motivation.

### 4.    The EA Fails to Adequately Analyze Indirect Impacts.

A final, and very serious, deficiency in the EA is found in its treatment of indirect impacts.  The CEQ Regulations state that a proper EA must consider the "indirect effects" of the proposed agency action, meaning those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8.  Indirect effects may include "growth inducing effects and other effects related to induced changes in the pattern of land us, population density or growth rate, and related effects on air, water and other natural resources, including ecosystems."  *Id.*  In recent years, this Court has twice rejected EAs submitted by Defendants for proposed casino projects on the ground that the EAs failed to properly analyze indirect impacts to the surrounding rural communities.  *See TOMAC*, 240 F. Supp. 2d at 51-52 (D.D.C. 2003); *CETAC v. Norton,* 2004 U.S. Dist. LEXIS 27498, at **20-29 (D.D.C. 2004).

Defendants' EA is equally deficient in this case.  As in *TOMAC* and *CETAC*, there are a number of indirect impacts that the EA entirely fails to address.  For example, there is

---

[19] As the Gun Lake Band concedes, BIA also requires consideration of socioeconomic impacts as part of its NEPA guidelines.  (Gun Lake Band's Opening Br, at 29 (citing 30 BIAM Supplement 1, NEPA Handbook, § 4.3(E)(b) (1993)).

no proper discussion of induced growth as it relates to traffic from the casino. (EA, AR000472). The EA's traffic study analyzes traffic as it existed in 2003 and how it will exist in 2011 using ordinary population growth figures. It does **not** analyze the increased traffic from the casino together with all of the other induced growth that will admittedly be generated by the casino, including hotels, gas stations, new restaurants, and new employment opportunities. (*Id.*) The EA suffers the same shortcoming in its discussion of the expected impacts from induced housing growth in the area. (AR000145). Although the EA offers some indication of what localities the 526 new housing units might be built in, there is **no** discussion as to what effects those developments will have in terms of land use patterns, population density and growth, and effects on air, water, and other natural resources, as the CEQ Regulations require. (*Id.*)

The EA also attempts to downplay the potential for significant indirect impacts from the casino by pointing to the alleged ability of local planning and zoning to control the impacts once the casino is in place. This is a theme that appears time and time again. For example, the EA admits that "reasonably foreseeable indirect development . . . . is anticipated to occur" but that the impacts will be minimized because any such development will take place "in compliance with local planning and zoning ordinances and other mandates." (EA, AR000135, 146). The EA states that no impacts to area land resources are expected because "proper design for site conditions will avoid potential impacts . . . ." (*Id.* AR000135) The EA dismisses any significant impact to agriculture and prime farmlands because "any future development would need to conform to local government plans for development . . . ." (*Id.* AR000145). And the EA states that no significant socioeconomic impacts are expected because "any additional development within the project vicinity would be required to conform to existing township

zoning . . . ." (*Id.* AR000137).  In short, the EA's approach to off-site growth induced by the casino is simple:  it is not under Defendants' control; therefore it does not matter.

Defendants' treatment of indirect growth is plainly unsatisfactory for purposes of NEPA.  Courts hold that a reviewing agency cannot write off the significance of potential future development by simply pretending that local authorities will be able to contain the development once it is out of the bag.  *See Mullin v. Skinner,* 756 F. Supp. 904, 921 (E.D.N.C. 1990) ("Defendants' . . . point is so utterly devoid of common sense and inconsistent with NEPA that it cannot be taken seriously . . . ."); *CETAC,* 2004 U.S. Dist. LEXIS 27498, at *16 ("Defendants attempt to downplay the significance of the casino's influence by arguing that the local authorities can control the pace of future development.  However, local authorities' willingness and ability to closely control the course of future development is notoriously far from assured."); *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975).  In this case, because the EA admits that the proposed casino is the first step toward the urbanization of Wayland Township, Defendants cannot sit back and rubber stamp the proposal while turning a blind eye to its true significance.

In sum, BIA's decision to issue a FONSI violates NEPA §§ 102(2)(C) and (E), the CEQ regulations, and BIA's own NEPA Handbook, and is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

## III.    IN THE ABSENCE OF A TRIBAL-STATE GAMBLING COMPACT, ANY CLASS III GAMBLING BY THE GUN LAKE BAND WOULD VIOLATE IGRA, AND ANY DECISION BY DEFENDANTS TO PLACE THE CASINO INTO TRUST FOR SUCH A PURPOSE VIOLATES THE LAW.

Under IGRA, an Indian tribe may conduct Class III (sometimes called "Las Vegas" or "casino-style" gambling) if – and only if – it does so in conformance with a "tribal-state compact" entered into between the tribe and the state.  *See* 25 U.S.C. § 2710(d)(1)(C). Absent a compact, gambling is illegal under Michigan and federal law.  *See* M.C.L. § 750.301 *et*

*seq.*; 15 U.S.C. § 1171 *et seq.*  A tribe may conduct Class II gambling without a compact, but IGRA limits class II gambling to bingo and other similar games.[20]  *See* 25 U.S.C. § 2703(7)(B)(ii); 25 C.F.R. §§ 502.3-.4.

In this case, the Gun Lake Band has asked for the proposed casino site to be taken into trust for both Class II and III gambling.  (Trust Application, AR001985-2333).  In their Notice of Intent to take the land into trust, Defendants state that they will take the land into trust for the Band, without an limitation on the type of gambling the Band may conduct.  *See* 70 Fed. Reg. 25596 (2005).  But Class III gambling is strictly forbidden because the Gun Lake Band has no gambling compact with the State of Michigan.  Although Defendants now admit this fact in their brief, (Defendants' Opening Br, at 49 ("IGRA permits Class III gaming only if . . . there is a tribal-state compact"), their Notice of Intent to take the land into trust completely ignores the issue.  The Notice states that Defendants plan to take the land into trust for the Gun Lake Band without any language stating that it is only for Class II gambling since the Band does not have a compact.  Defendants' decisional document therefore approves the Band's application to take the land into trust for both Class II and Class III gambling, even though Defendants concede that Class III gambling on the site will be illegal without a compact.

MichGO respectfully requests that this Court issue an order stating that there can be no Class III gambling on the proposed casino site in the absence of a compact.  Once the land has been taken into trust, MichGO and others will have limited ability, if any, to challenge any unlawful gambling offered by the Band.  *See* Quiet Title Act, 28 U.S.C. § 2409a(a); *Neighbors for Rational Development, Inc. v. Norton*, 379 F.3d 956, 961-62 (10th Cir. 2004).

---

[20] Some tribes have attempted to achieve the functional equivalent of Class III casino gambling without a compact by stretching Class II bingo beyond all recognized bounds.  The Gun Lake Band has suggested it will pursue this Class II strategy in the absence of a compact.

IV.  **SECTION 465 OF IRA IS A STANDARDLESS DELEGATION OF LEGISLATIVE AUTHORITY BY CONGRESS, AND THEREFORE VIOLATES THE NON-DELEGATION DOCTRINE.**

Contrary to the conclusory analysis offered by Defendants in their briefs, DOI's authority to take land in trust for the Gun Lake Band is null and void because the statute upon which that authority is based, the Indian Reorganization Act ("IRA"), violates the non-delegation doctrine.  The statute directs the Secretary in neutral fashion to acquire lands "for Indians," without providing any direction to the Secretary on when, how, or for what purpose he or she should exercise that authority.  Indeed, the only limitation on the Secretary's authority under the statute is the Secretary's own good will, which the Supreme Court has repeatedly held is not enough.  For these reasons, the statute is an unconstitutional delegation of legislative authority by Congress and must be set aside.

A.  **The Non-Delegation Doctrine Remains a Viable Constitutional Requirement.**

The very first sentence of the body of the U.S. Constitution states that "All legislative powers herein granted shall be vested in a Congress of the United States . . . ."  U.S. Const. art. I, § 1.  The Supreme Court has held that this language prohibits Congress from abdicating or transferring to others any of Congress' "essential legislative functions."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  The provision is not, however, a total bar to delegations of authority by Congress.  Instead, Congress can delegate certain decision-making authority to the Executive branch as long as it provides "intelligible principles" to guide the agency's use of the authority.  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).  Without such standards, it is "impossible . . . to ascertain whether the will of Congress has been obeyed" when the agency acts under the statute.  *Yakus v. United States*, 321 U.S. 414, 426 (1944).

The Supreme Court recently reiterated the proper method of analysis a court must use when faced with a question of whether Congress has improperly delegated authority to the Executive branch.  *See Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457 (2001).  In *American Trucking,* the Court reaffirmed that Congress, when delegating its decision-making authority, must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Id.* at 472 (quoting *Hampton*, 276 U.S. at 409) (emphasis added). In determining the extent to which an "intelligible principle" must be present, courts must consider the scope of the authority Congress has conferred upon the agency.  *See id.* at 475.  The greater the power Congress seeks to confer, the more guidance Congress must provide in the statute.  *See id.*  Where Congress fails to provide any guidance whatsoever, or where the guidance is nebulous in relation to the power conferred, a court must find the delegation of authority unconstitutional.  *See Panama Refining Co. v. Ryan,* 293 U.S. 388, 406 (1935); *Schecter Poultry*, 293 U.S. at 541.

**B.    The Delegation of Power to the Secretary Under IRA is Overbroad.**

Defendants' authority for taking land into trust for the Gun Lake Band comes from § 465 of IRA.  *See* 25 U.S.C. § 465.  That statute states that "[t]he Secretary of the Interior is hereby authorized, in his discretion, to acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing lands for Indians."  *Id.*  As this shows, there is not a single principle or policy that constrains the statute's command to "acquire real property for the Band" in scope, end, or manner.  It is therefore impossible to determine whether any land-in-trust decision is in accord with congressional will.[21]

---

[21]Defendants and the Gun Lake Band point to the decisions in *TOMAC v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) and *City of Roseville v. Norton*, 219 F. Supp. 2d 130 (D.D.C. 2002), as alleged support for their claims.  However, neither of those cases involved a challenge to § 465 of IRA.

This is confirmed by two decisions by the Supreme Court invalidating depression-era statutes under the non-delegation doctrine.  *See Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935);  *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  In *Panama Refining*, the Court found unconstitutional section 9(c) of the National Industrial Recovery Act, which authorized the President to prohibit the transportation of petroleum or petroleum products produced in excess of a state's permission.  *See* 293 U.S. at 406.  The Court held that the statute failed to state "whether or in what circumstances or under what conditions the President is to prohibit the transportation of the amount of petroleum." *Id.*; *see also id.* at 415.  Similarly, in *A.L.A. Schecter*, the Court found unconstitutional section 3 of the Recovery Act, which gave the President authority to ensure "fair competition" by enacting administrative codes.  *See* 295 U.S. at 541.  Again, the statute had no standards for promulgating the codes, "aside from the statement of the general aims of rehabilitation, correction, and expansion described" in the preamble to the Act, standards that were too broad to guide executive decision making.  *Id.* at 541.

In this case, § 465 instructs the Secretary "to acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing lands for Indians."  *See* 25 U.S.C. § 465.  As articulated in the above cases, the relevant questions are (1) whether the Act declares a policy with respect to that subject, (2) whether the Act sets up standards for the Secretary's action, or (3) whether the Act requires any finding by the Secretary to take land for the Tribe.  *See Panama Ref.*, 293 U.S. at 415.  The answer to all three of these questions is "no."

---

Instead, both cases involved non-delegation challenges directed at tribe-specific "restoration acts" passed by Congress, each of which had unique language about the Secretary's authority to take land into trust for the tribe.  *See TOMAC*, 433 F.3d at 866-867; *City of Roseville*, 219 F. Supp. 2d at 154-156.  Thus, the Courts in those cases had no occasion to address the language of IRA.

The Secretary is free to acquire **any** interest in **any** lands and for **any** reason.  Indeed, nothing in the Act would prevent the Secretary from placing all of Allegan County into trust for the operation of a nuclear waste dump by the Gun Lake Band.  Would such an action violate Congress' will?  It is impossible to know.

This complete lack of policy direction is quite different than other statutes the Supreme Court has upheld over non-delegation challenges, each of which had at least some language directing how the agency should exercise its power.  *See, e.g., American Trucking*, 531 U.S. at 473-75 (air quality standards must be set not lower or higher than necessary to protect public health with an adequate margin of safety); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946) (holding company structures can be modified to ensure they are not "unduly or unnecessarily complicate[d]" and do not "unfairly or inequitably distribute voting power among security holders."); *Yakus*, 321 U.S. at 420 (power to fix commodity prices at a level that "will be generally fair and equitable and will effectuate the purposes of th[e] Act."); *New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 25 (1937) (power to approve public carrier acquisition that "has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities").  In contrast, there is no "test" by which to measure a land-in-trust decision under IRA.  It is this boundless discretion that makes the statute unconstitutional.

The unconstitutionality of § 465 is confirmed by the holding of the Eighth Circuit in *South Dakota v. United States Dep't of the Interior*, which also addressed § 465.  *See* 69 F.3d 878 (8th Cir. 1995), *vacated and remanded for reconsideration by the administrative agency*, 519 U.S. 919 (1996).  Because § 465 contains absolutely no boundaries to guide the Secretary in

acquiring land for Indians, the Eighth Circuit held the statute violates the non-delegation doctrine:

> By its literal terms, [Section 465] permits the Secretary to purchase a factory, an office building, a residential subdivision, or a golf course in trust for an Indian tribe . . . . Indeed, it would permit the Secretary to purchase the Empire State Building in trust for a tribal chieftain as a wedding present. **There are no perceptible "boundaries," no "intelligible principles" within the four corners of the statutory language that constrain this delegated authority** . . . . It delegates unrestricted power to acquire land from private citizens for the private use and benefit of Indian tribes or individual Indians. . . . [T]he nondelegation doctrine surely requires at a minimum that Congress, not the Executive, articulate and configure the underlying public use that justifies an acquisition.

*Id.* at 882-83 (emphasis added). *But see United States v. Roberts*, 185 F.3d 1125, 1136-37 (10th Cir. 1999) (upholding Section 465); *City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465, 473 (D.D.C. 1978) (same).

The same is true here. There is no limitation or direction in § 465 as to where the relevant Indian lands should be located, or how much land should be acquired. Instead, the only limitation on the Secretary's authority is his or her own good will. But the Supreme Court has held that is not enough. *See Am. Trucking*, 531 U.S. at 472 ("We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute."). If Congress has not included limitations on the agency's power in the statute, no amount of agency self-restraint is sufficient to cure it.

**CONCLUSION**

For the reasons discussed above, this Court should deny Defendants' motions to dismiss or in the alternative for summary judgment and grant summary judgment to MichGO.

Respectfully submitted,

_____/s/_____

OF COUNSEL:                          REBECCA A. WOMELDORF
WILLIAM C. FULKERSON                 D.C. Bar No. 452034
ROBERT J. JONKER                     Attorneys for Plaintiff
DANIEL P. ETTINGER                   Spriggs & Hollingsworth
JOSEPH A. KUIPER                     1350 I Street, N.W., Suite 900
Warner Norcross & Judd, LLP          Washington, DC 20005
900 Fifth Third Center               (202) 898-5800
111 Lyon Street, N.W.
Grand Rapids, MI 49503
(616) 752-2161

Dated: March 31, 2006