IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MichGO, Michigan Gambling Opposition** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:05-cv-01181-JGP** |
| | ) | Judge John G. Penn |
| **NORTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **MATCH-E-BE-NASH-SHE-WISH** | ) | |
| **BAND OF POTTAWATOMI INDIANS,** | ) | |
| | ) | |
| **Intervenor** | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

ORAL ARGUMENT REQUESTED

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

CAROLINE BLANCO
Trial Attorney
Natural Resources Section

OF COUNSEL:

MARIA WISEMAN                    GINA L. ALLERY
Department of the Interior       Trial Attorney
Office of the Solicitor          Indian Resources Section
1849 C Street                    Environment & Natural Resources Division
Washington, DC 20240             United States Department of Justice
                                 P.O. Box 44378
                                 L'Enfant Plaza Station
                                 Washington, D.C. 20026-4378

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    An Indian Reservation is Not Limited to Land with Housing . . . . . . . . . . . . . . . 2

        1.    The IRA and regulations govern the analysis of "Indian reservation" . . . . 2

        2.    IGRA's purpose is not to restrict gaming or limit it to residential reservations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        3.    The United States' position is consistent with IGRA . . . . . . . . . . . . . . . 6

            a.    Plaintiff's incorrect reliance on an Indian law treatise is unavailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            b.    The distinction between reservation and trust land . . . . . . . . . . . 8

        4.    The Secretary's interpretation of "initial reservation" should be upheld under Chevron deference and the canon of construction for Indian statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            a.    Congress delegated authority to interpret Section 20 to the Secretary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            b.    The definition of "initial reservation" in IGRA is ambiguous . . . 13

            c.    Section 20 of IGRA is to be construed liberally in favor of tribes. 14

        5.    The Sac and Fox decision is unpersuasive . . . . . . . . . . . . . . . . . . . . . . . 16

    B.    The Bradley Property is the Tribe's "initial reservation" . . . . . . . . . . . . . . . . . . . 17

    C.    The United States' Fully Complied with NEPA . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    A Tribal-State Compact is Not Required for Compliance with the IRA . . . . . . . 22

    E.    The IRA Does Not Violate the Non-delegation Doctrine . . . . . . . . . . . . . . . . . . 24

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

FEDERAL CASES

Arizona Public Service, 211 F.3d 1280 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 8, 13-15

AT&T v. Couer d'Alene Tribe, 295 F.3d 899 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 24

Auer v. Robbins, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Bancoult v. McNamara, 227 F. Supp. 2d 144 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 19

Bowen v. Am. Hospital Ass'n, 476 U.S. 610 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bryan v. Itasca County, 426 U.S. 371 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987) . . . . . . . . . . . . . . . . . . 3

Callejas v. McMahon, 750 F.2d 729 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CETAC v. Norton, No. 02-1754 (D.D.C.) (April 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984) . . . . . . . . . . . . . 10, 13, 14

City of Roseville v. Norton, 219 F. Supp. 2d 130 (D.D.C. 2002) . . . . . . . . . . . . . . . 3, 6, 13, 15

Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt,
116 F. Supp. 2d 155 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13, 15

County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation,
502 U.S. 251 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fowler v. Unified Sch. Dist., 128 F.3d 1431 (10th Cir 1997) . . . . . . . . . . . . . . . . . . . . . . . . 12

Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the W.
Dist. of Mich., 198 F. Supp. 2d 920 (W.D. Mich. 2002) . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 15

Hawkins v. United States, 30 F.3d 1077 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lance v. United Mine Workers of America 1974 Pension Trust, 355 F. Supp.2d 358
(D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lockhart v. U.S., 126 S. Ct. 699 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mail Order Ass'n of America v. United States Postal Service, 986 F.2d 509 (D.C. Cir 1993) . . 11

Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172 (1999) . . . . . . . . . . . . . . . . 8

Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe, 498 U.S. 505 (1991) . . . 8

Proffitt v. FDIC, 200 F.3d 855 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250 (10th Cir. 2001) . . . . . . . . . . . 16, 17

Salleh v. Christopher, 85 F.3d 689 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

South Dakota v. Dep't of the Interior, 69 F.3d 878 (8th Cir. 1995), vacated, 519 U.S. 919,
mandate recalled and vacated, 106 F.3d 247 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 24, 25

TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20-22

United Keetowah Band of Cherokee Indians v. Oklahoma ex. Rel. Moss, 927 F.2d 1170
(10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Borden, 308 U.S. 188 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Chase, 135 U.S. 255 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. John, 437 U.S. 634 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Northeastern Pharmacy & Chemical Co., 810 F.2d 726 (8th Cir. 1986) . . 11, 12

United States v. Price, 361 U.S. 304 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Whitman v. Am. Trucking Ass'n, 531 U.S. 457 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

FEDERAL STATUTES

18 U.S.C. § 1151(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . 1

Auburn Restoration Act, 25 U.S.C. § 1300l . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721 . . . . . . . . . . . . . . . . *passim*

Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 461-479 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* . . . . . . . . . . 1, 18, 20, 22

Pub. L. No. 107-63, 115 Stat. 414, sec. 134 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

## FEDERAL REGULATIONS

25 C.F.R. § 151.10(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24

25 C.F.R. § 151.11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

25 C.F.R. § 151.11(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

25 C.F.R. § 151.12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

25 C.F.R. § 151.2(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 C.F.R. § 151.2(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

25 C.F.R. § 151.3(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 51.853(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## OTHER AUTHORITIES

78 Congr. Rec. 11122 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Felix S. Cohen's Handbook on Federal Indian Law (1982 ed.) . . . . . . . . . . . . . . . . . . . . . . 6-8, 14

Webster's Third New Int'l Dictionary 1930 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    **INTRODUCTION**

On January 6, 2006, Defendants (the "United States") filed a Motion to Dismiss, or in the alternative, for Summary Judgment.  On March 31, 2006, Plaintiff filed its Opposition to the Motion.  Plaintiff's brief misinterprets the statutes at issue, exaggerates the facts, and complicates a straight-forward case and most importantly, fails to address the motion to dismiss this action. This Court should grant the United States' Motion.

II.    **ARGUMENT**

In its Opposition , Plaintiff contends that the United States cannot acquire lands or declare an Indian reservation for the Gun Lake Band ("Band") unless the Tribe uses the land for residential occupation.  Plaintiff also argues that the United States cannot acquire or declare a federal Indian reservation as an "initial reservation" for the  Band because the Tribe already had a reservation.  These arguments are specious and have been rejected by other courts.  Further, it argues the Secretary of the Department of the Interior ("Secretary" or "Interior") violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by issuing a Finding of No Significant Impact ("FONSI") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*  In doing so,  Plaintiff exaggerates the impacts identified in the Environmental Assessment ("EA") in order to portray them as significant.  Plaintiff also argues that the Secretary violated the APA by deciding to acquire land into trust for gaming purposes when no Tribal-State Compact exists.  Finally, it claims that the United States cannot acquire federal Indian reservations at all because the Indian Reorganization Act ("IRA"), 25 U.S.C. §§

461-479, violates the United States Constitution.[1]

All of these arguments fail as a matter of law and were discussed in the United States'
Motion to Dismiss. Nothing in the IRA or the Indian Gaming Regulatory Act ("IGRA"), 25
U.S.C. §§ 2701-2721, restricts reservation land to parcels containing housing developments.
Moreover, nothing in the IRA or IGRA bars a tribe from gaming on federal trust land just
because a tribe may have a prior non-federal reservation or allows a tribe to conduct gaming on
non-federal reservations. The record shows convincingly that the Secretary complied with NEPA
by accurately identifying and taking a "hard look" at the relevant environmental concerns. The
law is similarly well-settled that the Secretary does not violate the APA by acquiring land into
trust for a tribe under the IRA even though no gaming compact exists and that the IRA's land
acquisition authority does not violate the United States Constitution.

**A.     An Indian Reservation is Not Limited to Land with Housing**

Plaintiff's lead argument is that IGRA's allowance for gaming on an "initial reservation"
of an acknowledged tribe under 25 U.S.C. § 2719(b)(1)(B)(ii) applies only when Indians live on
the same parcel where the casino is located. In crafting this notion, which no court has accepted,
Plaintiff relies on an out of context quote taken from an Indian law book and a questionable
decision from another circuit in an attempt to persuade this Court that Indian tribes, unlike any
other sovereign, cannot possess sovereign land unless it has housing on it. See Opp'n to Mot. at
7-25.

**1.     The IRA and regulations govern the analysis of "Indian reservation"**

---

[1] Plaintiff's attorneys made many of these same arguments in TOMAC v. Norton, 433 F.3d 852
(D.C. Cir. 2006), and CETAC v. Norton, No. 02-1754 (D.D.C.).

The Secretary is acquiring the Property pursuant to the IRA, 25 U.S.C. § 465, not

pursuant to IGRA, which does not provide authority to acquire Indian land.  Plaintiff confuses

this point throughout its Opposition.  Opp'n to Mot. at 9-19.  The starting point, then, must be

the IRA.[2]  The Secretary's interpretation of the IRA and implementing regulations deserves

deference.  See Auer v. Robbins, 519 U.S. 452, 461 (1997) (Secretary's interpretation of own

regulations are controlling unless "plainly erroneous or inconsistent with the regulation.").

Section 5 of the IRA authorizes the Secretary to acquire land for the benefit of tribes.  25

U.S.C. § 465.  Section 7 authorizes the Secretary to "proclaim new Indian reservations on lands

acquired" pursuant to Section 5.  Id. § 467.  The implementing regulations define "Indian

reservation" as "that area of land over which the tribe is recognized by the United States as

having governmental jurisdiction."[3]  25 C.F.R. § 151.2(f).  There is nothing in either the statute

or the regulations that restricts Indian reservations to only those lands on which there is housing.[4]

In fact, the Secretary may acquire land when it is "necessary to facilitate tribal self-determination,

economic development, **or** Indian housing."  25 C.F.R. § 151.3(a)(3) (emphasis added).

---

[2] Additionally, because the "initial reservation" exception in IGRA applies to lands "taken into trust," the Secretary naturally looked to the definition of "reservation" under the statute which authorizes her to take land into trust: the IRA.  See City of Roseville v. Norton, 219 F. Supp. 2d 130, 161, 162 (D.D.C. 2002) (court looked to the tribe's restoration act to determine what lands qualified as "restored" under Section 20 of IGRA).

[3] Plaintiff argues that IGRA does not define the term.  However, the land is acquired pursuant to the IRA, and the IRA definition is consistent with IGRA.  IGRA only applies to lands over which the tribe has governmental jurisdiction, and is therefore completely consistent with the IRA definition.

[4] Moreover, there is no requirement that the Secretary declare trust lands to be a reservation prior to a tribe exercising jurisdiction over that land.  See 18 U.S.C. § 1151; see also California v. Cabazon Band of Mission Indians, 480 U.S. 202, 208 (1987) (Section 1151 also guides the scope of tribal jurisdiction).

**2.    IGRA's purpose is not to restrict gaming or limit it to residential reservations**

Plaintiff's next argument is that restricting a tribe to gaming on land on which there is housing is consistent with the purported "purpose and design" of IGRA to limit Indian gaming. See Opp'n to Mot. at 12-14. However, the express language of the statute and the case law refute this argument.

In Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the W. Dist. of Mich., 198 F. Supp. 2d 920, 933 (W.D. Mich. 2002) ("Grand Traverse II"), the court rejected the assertion that it should narrowly construe the Section 20 exceptions on the basis that the "intent of IGRA was to limit the proliferation of casinos." Id. at 933  The court looked to Section 3 of IGRA, which states that the statute's purpose is:

1)    to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

2)    to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

3)    to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands and the establishment of the National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenues.

25 U.S.C. § 2702.  Based on this, the court held:

As Congress clearly stated, the purpose of IGRA was not to limit the proliferation of Indian gaming facilities.  Instead, it was to provide express statutory authority for the operation of such tribal gaming facilities as a means of promoting tribal economic interests in the conduct of such gaming.

4

Grand Traverse II, 198 F. Supp. 2d at 933.  Similarly, this Court should reject Plaintiff's attempt

to "limit" Indian gaming by narrowly construing  "initial reservation" to mean land with housing.

Additionally, such a narrow interpretation would be flatly inconsistent with the

exceptions set forth in Section 20.[5]  The general prohibition to gaming on land acquired after

October 17, 1988, does not apply when:

> (B)    lands are taken into trust as part of –
>> (i)    a settlement of a land claim,
>> (ii)   the initial reservation of an Indian tribe acknowledged by the Secretary
>> under the Federal acknowledgment process, or
>> (iii)  the restoration of lands for an Indian tribe that is restored to
>> Federal recognition.

25 U.S.C. § 2719 (b)(1)(B).  Subsection (ii) suggests no basis for the restriction advocated by

Plaintiff.  Moreover, the structure of subsection B is at odds with Plaintiffs interpretation.  If the

"initial reservation" exception is limited to lands with residences on it, then a newly

acknowledged tribe has restrictions placed on it which other tribes do not.  Tribes that have lands

taken into trust as part of a land settlement do not have to have housing on the land.  Tribes

restored to federal recognition also do not have to have housing on the restored land.[6]  Thus,

Plaintiff's argument places newly acknowledged tribes in a different position than other tribes,[7]

---

[5] Plaintiff argues that the housing restriction is consistent with IGRA's purpose, but fails to
explain how it is consistent with the Section 20 exceptions.  See Opp'n to Mot. at 13 n.4.

[6] See, e.g., Auburn Restoration Act, 25 U.S.C. § 1300l (Tribe restored by Congressional act).

[7] Plaintiff claims that the United States' definition would disrupt the careful parity intended by
IGRA by allowing a newly acknowledged tribe to select any piece of land for its reservation.
Opp'n to Motion at 16-17.  Again, Plaintiff fails to recognize that the land is acquired pursuant to
the IRA, not IGRA.  The IRA and its regulations require both newly acknowledged and existing
tribes to follow the same land acquisition regulations.  Pursuant to 25 C.F.R. § 151.11(b), a
determination was made that the Bradley Property is within the Band's ancestral homeland.
GUN LAKE AR001264.

in direct contradiction to federal law and the purpose of Section 20 as interpreted by several

courts. See 25 U.S.C. § 476(f) ("Departments of agencies of the United States shall not

promulgate any regulation or make any decision or determination pursuant to ... any ... Act of

Congress, with respect to a federally recognized tribe that classifies, enhances, or diminishes the

privileges and immunities available to the Indian tribe relative to other federally recognized

tribes by virtue of their status as Indian tribes."); Confederated Tribes of Coos, Lower Umpqua &

Siuslaw Indians v. Babbitt, 116 F. Supp. 2d 155, 164 (D.D.C. 2000) (purpose of Section 20

exemptions is to allow belatedly recognized tribes to have lands exempted by way of other

exceptions to place them in the same or similar position as tribes recognized by the United States

earlier in their history); City of Roseville, 219 F. Supp. 2d at 160-161 (restored tribes are to be

put on parity with other tribes).

### 3. The United States' position is consistent with IGRA

#### a. Plaintiff's incorrect reliance on an Indian law treatise is unavailing

Plaintiff urges this Court to disregard the definition in the IRA and instead follow a

definition of reservation -- quoted out of context -- as set forth in Felix S. Cohen's Handbook on

Federal Indian Law (1982 ed.) ("Handbook").[8] See Opp'n to Mot. at 13-15, 26. Plaintiff's

position is that this Court should adopt the "well-established" meaning of reservation set forth in

the Handbook, which supposedly requires residential use. Id.

To support its contention, Plaintiff first claims that the Handbook is an "official

---

[8]A new edition of the Handbook was published at the end of 2005. For consistency purposes, all
references are to the 1982 edition that Plaintiff cites. The 2005 Handbook's Introduction and the
discussion of "Indian reservations" under the "The Indian Country Statute" section remain
essentially the same. Handbook at ix-xv, 189-91 (2005 ed.).

government treatise" that was "published under the auspices of the Department of the Interior" and therefore should be followed as if it were an admission by the United States.  Opp'n to Mot. at 14.  Even if this were accurate, Plaintiff quotes the phrases it uses out of context.

As the Introduction to the book explains, the *original 1942 Handbook* was prepared by Felix S. Cohen, who was then a Special Assistant to the Attorney General, and was published under the auspices of the Department of the Interior.  Handbook at vii -viii.  Cohen then left the government in 1948 and died in 1953.  Id. at vii.  In 1958, Interior published a revised Handbook that "did not reflect Felix Cohen's work."  Id. at ix.  In 1968, Congress directed Interior to publish a new revised version.  Id.  However, Interior moved slowly and ultimately contracted the function to the University of New Mexico School of Law, which used faculty from several schools with private funding and federal grants.  Id. at ix-x, xiii.  The resulting work, including the 1982 edition, is privately copyrighted and does not reflect the official positions of the United States, the Department of the Interior, or any other federal agency.

Plaintiff next claims that the Handbook supports the argument that a reservation is limited to lands used for residences.  In support of this contention, Plaintiff extracts a single sentence from the 1982 version which talks about reservations in the 1850's as "referring to lands set aside under federal protection for the residence of tribal Indians, regardless of origin." Handbook at 34; Opp'n to Mot. at 10-11.  This sentence is part of an historical discussion about the genesis of the term "Indian country" as used in Section 1151(a) of Title 18, which primarily governs criminal jurisdiction and in no way limits reservations to land with houses.  Handbook at 34-35.  As the Handbook explains, the term originally meant land a tribe "reserved" to itself under a treaty that ceded other Indian lands.  Id.; see also id. at 34-35 n.66.  The term was broadened to include

7

lands set aside by the United States from public lands that were not originally owned by the tribes, but who would use and occupy the reservation.  Id.  This resulted in the expansion of the term to include "land set aside under federal protection for the residence of tribal Indians."  Id.

As the Handbook explains, the term "reservation" is used in a variety of contexts and has also meant, among other things, "federally-protected Indian tribal lands."  Handbook at 34-35 n.66.  The term appears in numerous statutes and cases, with various definitions.  Id. at 37; see also Arizona Public Service, 211 F.3d 1280, at 1292-1294 (D.C. Cir. 2000) (surveying various definitions of "reservation" in the United States Code).  This Court should reject Plaintiff's argument that the Handbook language it cites out of context somehow establishes a uniformly applicable definition that is controlling here.  Instead, well-established principles of statutory construction require deference to the Secretary's interpretation of the applicable statutes.  See Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 202 (1999) (applying the canons of construction in the context of statutory interpretation).

### b.    The distinction between reservation and trust land

Plaintiff also incorrectly argues that the United States' position confuses reservation and trust land.  Opp'n to Mot. at 14-16.  Regulations under the IRA, for example, make precisely that distinction.[9]  That is why the Secretary determined that after the Department acquires the Bradley Property into trust status, the Gun Lake Band separately must apply for and receive a reservation

---

[9] Compare, e.g., 25 C.F.R. § 151.2(d) (defining trust land) with § 151.2(f) (defining Indian reservation).  However, in many circumstances there is no meaningful distinction between trust and reservation land.  See, e.g., United States v. John, 437 U.S. 634, 649 (1978) (trust land considered reservation land for purposes of 18 U.S.C. § 1151(a)); Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe, 498 U.S. 505 (1991) (trust land considered reservation land for purposes of tribal sovereign immunity and tribal jurisdiction).

proclamation under 25 U.S.C. § 467 to qualify the parcel as a reservation.  GUN LAKE AR001261.

4.      **The Secretary's interpretation of "initial reservation" should be upheld under <u>Chevron</u> deference and the canon of construction for Indian statutes**

Plaintiff's position is that the Secretary's interpretation of "initial reservation" under Section 20 of IGRA does not deserve deference because she has not been delegated authority to interpret IGRA and because the statute is not ambiguous.  Opp'n to Mot. at17-20.  Moreover, it asserts that Section 20 was not enacted for the benefit of tribes, so the "initial reservation" exception should not be construed liberally in their favor.  <u>Id</u>. at 20 n.7.  These contentions are wrong as a matter of law.

a.      **Congress delegated authority to interpret Section 20 to the Secretary**

Plaintiff argues that the Secretary's interpretation of "initial reservation" under IGRA does not deserve deference because the National Indian Gaming Commission ("NIGC") is the agency charged by Congress to carry out and interpret IGRA.  Opp'n to Mot. at 18, 21-23.  The face of the statute reveals otherwise.

IGRA uses the term "Chairman" when the NIGC is directed to perform certain functions and the term "Secretary" when the Secretary is directed to perform functions.[10]  For example, the Chairman approves tribal resolutions and ordinances for Class II and Class III gaming.  25 U.S.C. §§ 2710(b)(2), 2710(d)(1)(iii), 2710(e).  He  receives annual outside audits of tribal gaming.  <u>Id.</u> § 2710(b)(2)(c).  The Chairman also  approves management contracts.  <u>Id.</u> § 2711(a), (b); <u>see</u>

_____

[10] IGRA states: "the term 'Chairman' means the Chairman of the National Indian Gaming Commission" and "the term 'Secretary' means the Secretary of the Interior."  25 U.S.C. § 2703(2), (10).

also id. § 2705 ("Powers of Chairman").

However, the Secretary approves per capita revenue allocation plans.  Id. § 2710(b)(3)(B).

The Secretary approves the Tribal-State Class III gaming compacts.  Id. § 2710(d)(8)(A)-(D).

The Secretary prescribes procedures to negotiate a compact in the event the State and Tribes are

at an impasse.  Id. § 2710(d)(7)(B)(vii).  Importantly, Section 20 of IGRA applies to lands

acquired by the Secretary.  Id. § 2719(a), (b)(1).  Based upon the plain language of the statute, the

Secretary's delegated authority to interpret Section 20 is without doubt.[11]  Further, the Secretary

must determine whether a particular parcel qualifies for gaming under Section 20 in order to

comply with the IRA.  25 C.F.R. §§ 151.10(c), 151.11(a) (Secretary must take into account the

purpose for which land is being acquired).

Moreover, as stated in the Motion to Dismiss, Congress put the matter to rest in 2001.

See Mot. to Dismiss at 44-45.  Section 134 of the Department of the Interior and Related

Agencies Appropriations Act, 2002, states:

> CLARIFICATION OF THE SECRETARY OF THE INTERIOR'S
> AUTHORITY UNDER SECTIONS 2701-2721 OF TITLE 25, UNITED
> STATES CODE. The authority to determine whether a specific area of
> land is a "reservation" for purposes of sections 2701-2721 of title 25,
> United States Code, was delegated to the Secretary of the Interior on
> October 17, 1988.

Pub. L. No. 107-63, 115 Stat. 414, sec. 134 (2001).

---

[11] Courts will not defer to an agency's interpretation under Chevron v. Natural Resources
Defense Council, 467 U.S. 837 (1984), when multiple agencies are administering statutes of
general applicability or when agencies have conflicting interpretations under the same statute.
See Bowen v. Am. Hospital Ass'n, 476 U.S. 610, 643 n.30 (1986) (Rehabilitation Act); Proffitt
v. FDIC, 200 F.3d 855 (D.C. Cir. 2000) (general statute of limitations for enforcement of civil
penalties brought by the United States); Salleh v. Christopher, 85 F.3d 689 (D.C. Cir. 1996)
(conflicting interpretations by two agencies).  Neither is the case here.

Plaintiff argues that this Court should ignore or give little weight to this Congressional enactment.  Opp'n to Mot. at 21.  It states that Section 134 is not entitled to any weight because it does not "clarify" IGRA since it did not "change" the wording in IGRA.  Id. at 21-22.  In support of its position, Plaintiff concocts a novel legal proposition and cites irrelevant cases in an attempt to support this proposition.

First, Section 134 is a freestanding statute that is to be given effect, despite Plaintiff's efforts to equate it with post-enactment legislative history.  As the more specific statute governing this issue, it governs rather than IGRA's silence on this matter.  See Mail Order Ass'n of America v. United States Postal Service, 986 F.2d 509 (D.C. Cir 1993) (court must harmonize two statues on the same subject and must prefer more specific statute over general one), citing United States v. Borden, 308 U.S. 188, 198 (1939) and United States v. Chase, 135 U.S. 255, 260 (1890).  Plaintiff incorrectly cites United States v. Price, 361 U.S. 304 (1960), and United States v. Northeastern Pharmacy & Chemical Co., 810 F.2d 726 (8th Cir. 1986), for the proposition that this Court can downplay Section 134 because it emerged from a later Congress that was imposing its intent on an earlier one.  These cases merely state the obvious notion that *subsequent legislative history* is entitled to only some weight in ascertaining the original statute's meaning.[12]  Section 134 is not subsequent legislative history trying to explain the original intent

---

[12] Plaintiff also states that "the cardinal rule for such amendments is that 'the views of subsequent Congresses cannot override the unmistakable intent of the enacting one.'"  Opp'n to Mot. at 23, quoting Northeastern Pharm.  Here is what the court in Northeastern Pharmacy said, in full:

> Although this is not legislative history as such, the views of subsequent Congresses on the same or similar statutes are entitled to some weight in the construction of previous legislation. Although the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, this is not a problem in this case because there was no absolutely

of IGRA. A subsequent Congress is always free to enact a law that clarifies or alters an earlier

statute. In fact, one Congress cannot bar a subsequent Congress from doing this. See Lockhart

v. U.S., 126 S. Ct. 699, 703 (Scalia, J. concurring) (2005).

Second, there is no such legal principle that permits a court to ignore, or give little or no

weight, to a law on the grounds that it is a "clarifying" statute that does not "change" the original

statute's language. See Opp'n to Mot. at 21-22. The cases cited by Plaintiff do not stand for this

proposition, which no court has articulated. Rather, the cases concern whether a law should

apply retroactively or prospectively, and the courts look to the language of the statute to see if it

amends, changes, or clarifies an existing statute in order to ascertain when the law takes effect.

See Fowler v. Unified Sch. Dist., 128 F.3d 1431 (10th Cir 1997) (amendment changed the law

and thus applied prospectively); Hawkins v. United States, 30 F.3d 1077 (9th Cir. 1994)

(amendment did not apply retroactively to reflect original intent of statute); Callejas v.

McMahon, 750 F.2d 729 (9th Cir. 1984) (amendment which changed the language of the statute

applied retroactively to reflect or clarify the intention of original act); Northestern Pharm., 810

F.2d at 732 (amendment to CERCLA applied retroactively). These cases do not permit courts to

ignore or minimize statutes. They concern when – not if – to apply a law.

Retroactivity is not an issue in this case. The United States is not arguing that Section

134 should apply before its enactment. The Secretary's determination was made after Section

134's enactment on November 5, 2001. The final determination in this case was published on

---

> "unmistakable intent" of Congress concerning section 7003. To the extent
> that the precise intent of the enacting Congress may be obscure, the views
> of subsequent Congresses should be given greater deference than they
> would be otherwise entitled to receive.

The whole quote contradicts Plaintiff's so-called "cardinal rule."

May 13, 2005. GUN LAKE AR000001. Also, this case was not pending when Section 134 was passed. Nothing Plaintiff argues supports its position that this Court can disregard or give little weight to Section 134.

### b. The definition of "initial reservation" in IGRA is ambiguous

Plaintiff argues that the Secretary's determination is not entitled to deference because the "initial reservation" language in Section 20 of IGRA is unambiguous. Plaintiff fails to point out in its Opposition that this Court has already ruled that Section 20 of IGRA is ambiguous. <u>Coos</u>, 116 F. Supp. 2d at 162 (the "varying possibilities" in interpreting the Section 20 exception "highlight the ambiguity...."); <u>City of Roseville</u>, 219 F. Supp. 2d at 160 (although court found that plain meaning of "restored lands" in Section 20 encompassed agency's interpretation, construing ambiguities in favor of tribes leads to same result).

Additionally, the D.C. Circuit has held that the definition of Indian "reservation" is ambiguous when not defined by statute and accordingly has stressed that the agency's reasonable interpretation deserves deference under <u>Chevron v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984), principles. <u>Arizona Public Service</u>, 211 F.3d at 1294. In <u>Arizona Public Service</u>, the plaintiff argued, just as Plaintiff does here , that the term has only one well-established meaning.

The D.C. Circuit began its analysis by looking to the plain meaning of "reservation." <u>Id.</u> at 1292. It noted that "[s]ignificantly, the Act nowhere defines 'reservation.'" <u>Id.</u> The court then looked to the dictionary definition, which refers to a "tract of public land set aside for a particular purpose (as schools, forests, or the use of Indians)," and determined that it did not resolve the question. <u>Id.</u> at 1293 (quoting <u>Webster's Third New Int'l Dictionary 1930</u> (1993)). It then surveyed the United States Code and found that "the term 'reservation' has no rigid meaning as

13

suggested by petitioners." Id.  The court of appeals concluded that "[t]he varying definitions of 'reservation' lay to waste petitioners' argument." Id.  The court of appeals then found that the legislative history provided no insight. Id. at 1293-94.  Accordingly, it deferred to the agency's interpretation under Chevron as a reasonable construction. Id. at 1294.

Despite case precedent from the D.C. Circuit to the contrary, Plaintiff nevertheless argues that the Secretary's interpretation of "initial reservation" does not deserve deference because Congress supposedly meant to use the "well-established" meaning as quoted (out of context) from Cohen's Handbook. See Opp'n to Mot. at 10-11, 14.  As explained in the Motion to Dismiss, Congress did not define the term in IGRA, there is no legislative history on point, and, as the D.C. Circuit has found, there is no "well-established" or "rigid" meaning of "reservation." Arizona Pub. Serv., 211 F. 3d at 1293.  Therefore, the next step for this Court is to defer to the Secretary's reasonable interpretation under Chevron.  As demonstrated in the Motion to Dismiss and here, the Secretary's determination that the Bradley Property constitutes an "initial reservation" for an acknowledged tribe under IGRA is reasonable.  If the parcel is declared a reservation under 25 U.S.C. § 467, it will be the first reservation for the Band since its federal acknowledgment in 1999.

c.    <strong>Section 20 of IGRA is to be construed liberally in favor of tribes</strong>

Contrary to IGRA's stated purpose, Plaintiff alleges that Section 20 is not for the benefit of tribes and thus not subject to the canon of construction requiring statutes enacted for their benefit  to be construed liberally in their favor.  Opp'n to Mot. at 27 n.7; see Bryan v. Itasca County, 426 U.S. 371 (1976).  Without citing any authority, Plaintiff proclaims  that Section 20 "exists for the benefit [sic] the public at large rather than Indian tribes."  Opp'n to Mot. at 27 n.7.

14

However, this Court, and others, have consistently applied the Indian canon of construction to Section 20.  See Mot. to Dismiss at 19-20; Coos, 116 F. Supp. 2d at 162; City of Roseville, 219 F. Supp. 2d at 160 (canon of construction reinforces Secretary's interpretation); accord Grand Traverse II, 198 F. Supp. 2d at 934 (canons of construction require the application of a "plausible construction" of Section 20 of IGRA that is more favorable to the tribe); United Keetowah Band of Cherokee Indians v. Oklahoma ex. Rel. Moss, 927 F.2d 1170, 1179 (10th Cir. 1991).  Plaintiff cites no authority to the contrary.  See also Arizona Pub. Serv., 211 F.3d at 1294 (applying canon of construction to definition of "reservation" under the Clean Air Act).

Moreover, Plaintiff's argument is in direct contradiction to Congress' stated purpose as set forth in Section 2702 of IGRA.[13]  Congress enacted the legislation as a means to promote and regulate tribal economic development.  In light of Congress' explicitly stated purposes, Plaintiff's contention that the "real" purpose of IGRA was instead to benefit the public at large at the expense of tribal economic development is completely without support.  See Grand Traverse II, 198 F. Supp. 2d at 933 (rejecting argument that IGRA's purpose was to limit proliferation of Indian gaming in light of Congress' clear statement of purpose in Section 2702 to promote tribal economic development).

Even if this Court deems the term "initial reservation" to be unambiguous, the Secretary's interpretation is consistent with the plain and natural meaning.  The general prohibition against gaming on land acquired after October 17, 1988, does not apply when "lands are taken into trust as part of...the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process."  25 U.S.C. § 2719(b)(1)(B)(ii).  Since the Band was federally

---

[13] See page 5 for the full text of 25 U.S.C. § 2702.

acknowledged in 1999, see GUN LAKE AR001992, and the Band currently has no land held in

trust by the United States, see id., the Bradley Property will be the first – or initial – land taken

into trust since its federal acknowledgment.  If the Band applies for and receives a reservation

proclamation under the IRA, 25 U.S.C. § 467, the Bradley Property will be the Band's "initial

reservation" under federal law.

      **5.**      **The Sac and Fox decision is unpersuasive**

Plaintiff relies heavily on a case from the Tenth Circuit, Sac and Fox Nation of Missouri

v. Norton, 240 F.3d 1250 (10th Cir. 2001).  In particular, it argues that despite the absence of

restrictive language in either IGRA or the IRA, land must have houses on it to qualify as a

reservation.  As explained thoroughly in the Motion to Dismiss, the Tenth Circuit's decision is

tailored to a very unique factual situation and should not be extended to other circumstances.

Moreover, the basis for its holding is questionable.  See Mot. to Dismiss at 43-46.

Plaintiff claims that the differing facts in Sac and Fox do not matter.  However, the court

specifically stated that it was "[a]pplying what we believe to be the proper definition of the term

'reservation' for the purpose of IGRA *to the facts of this case*, it is apparent that the *Huron*

*Cemetery* does not fall within that definition."  Id. at 1267 (emphasis added).  It is clear the court

was concerned with the unique facts, including that the parcel was "permanently reserved" for

the purpose of a "burying-ground," id. at 1254, that it had always maintained its character as a

burial ground, id. at 1267, that it was in a different state than the Tribe's main location, id. at

1267, and that the tribe had not exercised governmental jurisdiction over it, id. at 1265.

In Sac and Fox, the court did not to defer to the Secretary's interpretation under IGRA

and decided on its own what constituted a "reservation" because the NIGC, rather than the

Secretary , had "regulatory authority" over Indian gaming. Id. at 1265, 1266. The court said, "[p]resumably, the Commission's authority also includes interpreting any ambiguous phrases of terms contained in IGRA." Id. at 1265. That conclusion is contrary to IGRA's text and Congress has clarified by statute that the Sac and Fox court was incorrect.

Congress has made it very clear that the Secretary in fact has been delegated authority to interpret Section 20 of IGRA. See Pub. L. No. 107-63, 115 Stat. 414, sec. 134 (2001). It is true that the NIGC has "regulatory authority" over Indian gaming in the sense that it is charged with enforcement and oversight. See 25 U.S.C. § 2709. However, as explained in detail below, IGRA clearly articulates when the NIGC "Chairman" has been delegated authority and when the "Secretary" has been delegated authority.[14] The Tenth Circuit did not survey these IGRA provisions and as a result "presumed" that the NIGC made Section 20 determinations.[15] Plainly, Sac and Fox does not control here.

**B.    The Bradley Property is the Tribe's "initial reservation"**

Plaintiff continues to argue that even if the Bradley Property qualified as a reservation, it would not be the Band's initial reservation. Opp. to Mot. at 25-27. Plaintiff first cites to the Trust Application and Historical Report of the Gun Lake Band, contained in the administrative record, for the proposition that the Tribe previously had two federally-recognized Indian

---

[14] Compare, e.g, 25 U.S.C. § 2711(a), (b) (Chairman approves management contracts) with id, § 2710(b)(3)(B) (Secretary approves per capita allocation plans). IGRA states the Section 20 exceptions apply to land taken into trust by the Secretary. 25 U.S.C. § 2719(a), (b)(1) (emphasis added).

[15] The Sac and Fox court was concerned that the NIGC did not take part in the Secretary's determination. Id. at 1265. Here the NIGC was a cooperating agency under NEPA for the trust acquisition and was therefore involved in the Bradley Property acquisition as an "initial reservation." GUN LAKE AR000008.

reservations.  Plaintiff then references the Huron Band's Pine Creek reservation.  First, the two

federal reservations that Plaintiff refers to are actually the same 3-mile parcel in Kalamazoo,

Michigan.  Plaintiff also fails to point out that this reservation was ceded by the Potawatomi to

the United States in the Treaty of 1827.  See GUN LAKE AR001986, AR002033.  Finally, the

Pine Creek Reservation that Plaintiff refers to is a state, not federal, reservation that belongs to

the Huron Band, not the Gun Lake Band.[16]  As explained in the Motion to Dismiss, the Gun Lake

Band does not have a Federal Indian reservation and necessarily did not have a *Federal* Indian

reservation prior to the point at which the Tribe was *federally* recognized.  See Mot. to Dismiss

at 46-47.

**C.**    **The United States' Fully Complied with NEPA**

In their opening brief, the United States provided a detailed account of their thorough

NEPA compliance process and responded to the allegations in the Complaint.  See Mot. to

Dismiss at 12-14, 20-40.  Plaintiff fails to respond with any specificity; instead, it simply

reiterates its Complaint allegations.  The United States has already addressed these allegations

and demonstrated that the United States took the requisite "hard look" at the environmental

impacts of the trust acquisition of the Bradley Property and reasonably concluded that there were

no significant impacts on the human environment.  While Plaintiff may not agree with the

outcome of that process, NEPA is procedural in nature, not outcome-determinative.

At the outset, the United States notes that MichGO completely failed to respond to

---

[16]This Court held in CETAC v. Norton, No. 02-1754, slip op. at 7 (April 23, 2004), that "it is undisputed that the [Pine Creek] property is not a reservation under federal law," in deferring to the Secretary's determination that property acquired by the Huron Band after federal recognition was its "initial reservation".

18

several arguments raised by The United States in their opening brief and, thus, those arguments should be deemed admitted.  See Lance v. United Mine Workers of America 1974 Pension Trust, 355 F. Supp.2d 358, 362 (D.D.C. 2005) (court may treat arguments not addressed in plaintiff's opposition to motion to dismiss as conceded); Bancoult v. McNamara, 227 F. Supp. 2d 144, 149-50 (D.D.C. 2002) (court deemed motion to dismiss conceded when plaintiff failed to oppose it).

Specifically, Plaintiff first ignores the United States' argument that they made their own, independent evaluation of the environmental consequences of the acquisition, and did not, as Plaintiff alleges, merely adopt the findings of the Gun Lake Band's contractor.  See Mot. to Dismiss at 24-25.  Plaintiff next ignores the United States' argument responding to MichGO's allegations that the United States failed to analyze a reasonable range of alternatives.  Id. at 33-35.  Finally, Plaintiff fails to respond to the United States' argument that their cumulative impacts analysis was, contrary to the assertions in the Complaint, legally sufficient.  Id. at 35-38. Since Plaintiff completely ignores these arguments, this Court should treat them as conceded.

Moreover, the arguments that Plaintiff makes are not responsive to the points raised in the United States' opening brief; rather, they simply recite the allegations contained in the Complaint.  These arguments include the following: 1) the EA is lengthy and complex, which "militates in favor of preparing an EIS" (Opp'n to Mot. at 32); 2) the FONSI is based on inaccurate factual claims (id. at 33-35); 3) the proposed mitigation is not enforceable (id. at 33-35); and 4) the United States did not adequately analyze impacts to the surrounding rural area (id. at 35-39), traffic impacts (id. at 39-43), impacts on West Michigan (id. at 43-45), and indirect impacts (id. at 45-47).  As mentioned earlier, the United States, in their opening brief, addressed the allegations in Plaintiff's Complaint and a reply to these same arguments raised anew in

19

MichGO's opposition brief would be redundant. Accordingly, rather than repeat the same arguments supporting compliance with NEPA in this Reply Memorandum, the United States refers the Court to the NEPA discussion in the opening brief.[17/]

The United States also offers this supplemental argument regarding NEPA. In its opposition brief (and also in its Complaint), MichGO raises two arguments that are identical to those its counsel recently raised and lost before the United States Court of Appeals for the District of Columbia. Specifically, in TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006), MichGO's counsel argued that, because the proposed casino project was large and the EA lengthy, preparation of an EIS was required. Id. at 862. The D.C. Circuit flatly rejected this argument:

> TOMAC offers no support for the proposition that an EIS is *required* when a project reaches a certain size. The relevant benchmark is whether the federal action "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(c). Large federal projects may, on the average, be more likely to meet this threshold. But, there is no categorical rule that sizable federal undertakings *always* have a significant effect on the quality of the human environment.

Id. (emphasis in original). The Court went on to state that "[t]he simple point here is that the length of an EA has no bearing on the necessity of an EIS." Id.

_____

[17/]In the opening brief, the United States addressed its analyses of impacts on: 1) the surrounding rural area (see Mot. to Dismiss at 28-29); 2) traffic (see id. at 29, 39); 3) the West Michigan community (see id. at 31-32); and 4) indirect impacts (see id. at 35-38). The United States also demonstrated that they did consider a scenario in which a tribal-state compact did not come to fruition; the result of that analysis was that a Class II, as opposed to a Class III gaming operation, would result in lesser included impacts and would not impact the United States' conclusion that there would be no significant impacts associated with the federal action. See id. at 26-28. Finally, the United States describes the mitigation measures associated with the federal action at issue and, contrary to the allegations in the Complaint and reiterated in Plaintiff's opposition brief, notes that those measures are enforceable. See id. at 38-40.

Plaintiff's counsel now makes the same argument here. Opp'n to Mot. at 32. While MichGO attempts to recast it by stating that its point is not that the length of the EA necessitates preparation of an EIS, but rather that "the length and complexity of the EA are but one more indication that thrusting a massive casino into a rural community of only 3,000 residents at the very least *might* have significant environmental impacts," id., n. 15, and that the United States "falsely portray[s] MichGO's argument as being that a lengthy EA *requires* preparation of an EIS in all cases" (Opp'n to Mot. at 32, n. 15, emphasis in original), it is clear that this is the very same argument that was advanced and rejected by the D.C. Circuit. Plaintiff argues that the proper legal standard to be applied here is that, "if the EA indicates that **any** significant impacts **might** occur, then an EIS must be prepared." Opp'n to Mot. at 28 (emphasis in original). Then, Plaintiff argues that the length and complexity of the United States' EA serve as an indicator that there *might* be significant environmental impacts. Despite Plaintiff's protests to the contrary, it is clear that adding these two propositions does not alter the argument, the very same one that Plaintiff's counsel unsuccessfully asserted in TOMAC – the size and complexity of the EA will end up dictating whether an EIS must be prepared.

The second argument that Plaintiff asserts here that was raised before and rejected by the D.C. Circuit in TOMAC concerns the United States' analysis of the impacts on air quality. Plaintiff argues that the United States' analysis is wrongly based on the assumption that the proposed casino will be located in an attainment area, when it actually will be located in one that was *subsequently* designated an ozone nonattainment area. Id. at 33. Not only did the United States respond to this contention in its opening brief, Mot. to Dismiss at 32-33, the D.C. Circuit rejected the notion that the United States are under an obligation to speculate about impacts

21

resulting from future regulations; the D.C. Circuit also made clear that at some point, the NEPA

process must end.  TOMAC, 433 F.3d at 863-64.  Provided that the United States took the

requisite hard look at the air quality impacts "based on the regime with which it was faced,"  they

have met their NEPA obligation.  Id. at 863.  Moreover, the D.C. Circuit explained that TOMAC

could not point to any authority suggesting that supplementation of an agency's EA or FONSI "is

required when new information *potentially* affecting the federal action in question is released."

Id. at 862-63.  Rather, the court of appeals stated that regulations provide that supplementation of

NEPA analysis is only required within the EIS context.  Id. at 863.  In any event, the United

States here did conduct a supplemental analysis to determine whether the new standard for ozone

warranted a revised NEPA analysis, and concluded that the anticipated direct and indirect

emissions would fall well below the regulatory threshold.  See Mot. to Dismiss at 32-33; GUN

LAKE AR001241-42; 40 C.F.R. § 51.853(b)(1).  Accordingly, Plaintiff's attack on the United

States' analysis of air impacts fails as well.

In their opening brief, the United States explained their NEPA compliance process and

responded to the allegations contained in the Complaint.  Plaintiff has simply reiterated the

allegations contained in its Complaint, ignored the TOMAC decision, and completely failed to

address arguments raised in the United States' opening brief.  The United States has met its

NEPA obligations.

**D.    A Tribal-State Compact is Not Required for Compliance with the IRA**

Plaintiff contends  that the Secretary cannot acquire the Bradley Property into trust

because the Band does not have a Class III Tribal-State gaming compact with the State of

Michigan.  Opp'n to Mot. at 47-49.  There is no requirement in the law, and Plaintiff cites to

22

none, that a compact must exist before land can be acquired under the IRA.  In fact, the relevant

IGRA section dealing with exceptions to the gaming prohibition states that "[n]othing in this

section shall affect or diminish the authority and responsibility of the Secretary to take land into

trust."  25 U.S.C. § 2719(c).  As discussed in the United States' Motion to Dismiss, several

courts have rejected this same argument, including a recent decision of this Court.  See Mot. to

Dismiss at 48-50.

Plaintiff also contends that the Secretary's Notice of Intent to take the land into trust

approves the Band's application to utilize the land for both Class II and Class III gaming and that

once the land is taken into trust it will have no ability to challenge unlawful gambling.  Opp'n to

Mot. at 48.  That is simply not true.  First, the Notice of Intent does not constitute approval of the

Band's ability to conduct Class III gaming without a compact.  It simply approves the placement

of the land into trust pursuant to the IRA.[18/]  In fact, there are many requirements in IGRA that

must be satisfied in order for a tribe to conduct gaming that are not required to be in place before

land is taken into trust under the IRA.[19/]

Second, the fact that IGRA has no private right of action to enforce Indian gaming laws

---

[18/]  The IRA regulations require the Secretary to consider "the purposes for which the land will be used" in evaluating fee-to-trust applications.  25 C.F.R. § 151.10(c).  The Secretary considered the intended use and noted:

> The Band intends to construct a 193,500 square foot Class III gaming and entertainment facility.  However, the Band may operate a Class II facility on the site if a Tribal-State compact is not negotiated with the State of Michigan.

Gun Lake AR001260-62.  For the tribe to conduct gaming on the parcel - even under Class II - the land first must be held in trust.  The Secretary noted that the Band's management contract was under review by the NIGC and that without a valid Class III compact, the Band would not be able to conduct Class III gaming on the property.  Id.

[19/] See 25 U.S.C. § 2710(b)(1)(B); § 2711; § 2710(d)(8); § 2710(b)(2)(F).

has no bearing on the issues in this case.  IGRA authorizes the NIGC and the United States

Attorney General -- not the citizens or a disgruntled anti-gambling group -- authority to cease

illegal Indian gaming.  See 25 U.S.C. §§ 2713, 2715, 2716; AT&T v. Couer d'Alene Tribe, 295

F.3d 899, 909 (9th Cir. 2002).  This Court should not be distracted by Plaintiff's assertion that

the Band might disregard federal Indian gaming laws if the Bradley Property is taken into trust in

the absence of  a Class III Tribal-State gaming Compact.

**E.      The IRA Does Not Violate the Non-delegation Doctrine**

Plaintiff again urges this Court to ignore the overwhelming weight of authority and

follow a decision subsequently vacated by the Supreme Court in order to declare Section 5 of the

IRA unconstitutional.  Every court to entertain this subject has rejected the argument that Section

5 of the IRA violates the Constitution's non-delegation doctrine, except the Eighth Circuit.[20/]  See

Mot. to Dismiss at 50-53.

The IRA authorizes the Secretary "in his discretion, to acquire" lands or interests therein

"for the purpose of providing land for Indians."  25 U.S.C. § 465.  The "general policy" and

"boundaries" of the statute are similarly clear.  By enacting the IRA in 1934, Congress wanted to

stem the loss of over 90 million acres of Indian lands which had resulted from the failed

allotment policies of the prior decades, and to assist the Indians in acquiring land adequate for

_____

[20/]The Eighth Circuit was primarily concerned that the Secretary's land acquisition authority was
unreviewable under the Quiet Title Act.  See South Dakota v. Dep't of the Interior, 69 F.3d 878,
878 (8th Cir. 1995), vacated, 519 U.S. 919, mandate recalled and vacated, 106 F.3d 247 (8th Cir.
1996).  This troubled the court because judicial review is one factor in the non-delegation
analysis.  Id. at 881.  Since the Eighth Circuit decision, the Department has revised its
regulations.  61 Fed. Reg. 18082 (April 24, 1996) (codified at 25 C.F.R. § 151.12(b) (2002)).
The regulations now assure that challenges to acquisition decisions may be brought before a
court before the lands are taken into trust.  Hence, the primary basis for the Eighth Circuit's
rationale no longer exists.

their self-support.  See County of Yakima v. Confederated Tribes & Bands of Yakima Indian

Nation, 502 U.S. 251, 255 (1992).  The legislative history states that the goal of the Act is "to

provide for the acquisition...of land for Indians...to make a living on such land."  78 Congr. Rec.

11122, 11123 (1934).  The IRA seeks "to give the Indians control of their own affairs and their

own property."  Id. at 11125.  The IRA provisions

> are safeguards to prevent further loss and wastage of Indian lands.  But we
> must go further and actually restore some of the lost lands to the Indians.
> Section 5 sets up a land acquisition program to provide land for Indians
> who have no land or insufficient land, and who can use land beneficially.

78 Cong. Rec. at 11730 (1934).  The general policy of Section 5 is definite and specific.  As

such, the Secretary's discretion to acquire lands is limited by the statutory purpose and by the

articulated policy of Congress in enacting the IRA.

Given the Supreme Court's consistent approval over the past seventy years of

substantially broader and more open-ended delegations of congressional authority than that found

in 25 U.S.C. § 465, Section 5 of the IRA is constitutional.  See Whitman v. Am. Trucking Ass'n,

531 U.S. 457, 474-75 (2002).  No post-New Deal Supreme Court decision has invalidated a

statute under the non-delegation doctrine, and a wide variety of provisions have been found to

supply intelligible principles.  This Court should reject Plaintiff's reliance on the vacated opinion

in South Dakota and instead follow the substantial weight of authority upholding the

constitutionality of the IRA.

## III.    CONCLUSION

For the foregoing reasons and those set forth in the United States' Motion to Dismiss, or

in the alternative, for Summary Judgment, this case should be dismissed as a matter of law.

25

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General


CAROLINE BLANCO
Trial Attorney
Natural Resources Section


        /s/
GINA L. ALLERY
Trial Attorney
Indian Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C. 20026-4378

OF COUNSEL:

MARIA WISEMAN
Department of the Interior
Office of the Solicitor
1849 C Street
Washington, DC 20240