# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHIGAN GAMBLING                )
OPPOSITION ("MichGO"), a         )
Michigan non-profit corporation, )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )        Case No.  1:05-CV-01181-JGP
                                 )
GALE NORTON, in her official     )
Capacity as SECRETARY OF THE     )
UNITED STATES DEPARTMENT         )
OF THE INTERIOR, et. al.         )
                                 )
          Defendants.            )
_____)
                                 )
MATCH-E-BE-NASH-SHE-WISH         )
BAND OF POTTAWATOMI              )
INDIANS, a federally-recognized  )
Indian Tribe,                    )
          Intervenor.            )
                                 )

---

## MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS'
### REPLY TO PLAINTIFF'S OPPOSITION TO MOTIONS
### FOR JUDGMENT ON THE PLEADINGS OR, ALTERNATIVELY
### TO DISMISS OR FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...................................................................................................... 1

RESPONSE TO MICHGO'S STATEMENT OF FACTS ......................................... 1

ARGUMENT ............................................................................................................. 4

I.     THE BRADLEY TRACT WILL BE THE TRIBE'S "INITIAL RESERVATION"
FOR PURPOSES OF IGRA ............................................................................. 4

   A.   IGRA Was Enacted For The Benefit Of Indian Tribes And, Accordingly, The
Indian Canons Of Construction Are Applicable ........................................ 4

   B.   Construction Of The "Initial Reservation" Exception .................................. 6

      1.   Definition Of The Term "Reservation" ................................................. 6

      2.   The Secretary Has The Authority To Determine What Constitutes A
"Reservation," And A Reservation Need Not Contain Housing In Order To
Qualify As An "Initial Reservation" Under IGRA ..................................... 7

      3.   The Secretary's Initial Reservation Determination Is Consistent With IGRA ....... 9

   C.   MichGO's Assertion That Alleged Prior Reservations Preclude Operation Of
The Initial Reservation Exception Is Contrary To IGRA ........................... 10

II.    NEPA DOES NOT REQUIRE AN EIS FOR THE PROPOSED ACTION ............. 11

   A.   MichGO's NEPA Argument Ignores Settled Law ...................................... 11

   B.   The FONSI Does Not Rest On "Materially Inaccurate Factual Claims," And
MichGO Can Only So Argue By Distorting The Record ............................. 14

      1.   MichGO Ignores Important Facts To Argue The Agency's Finding Of No
Significant Air Quality Impacts Was Defective ......................................... 14

      2.   MichGO Does Not Argue And Cannot Show That The Secretary's
Consideration Of Mitigation Was Arbitrary Or Capricious ...................... 15

   C.   MichGO Offers Simplistic Arguments — Arguments This Circuit Has Already
Rejected — To Suggest The Tribe's Project Requires An EIS ................... 18

i

**D.   MichGO Skews The Record To Suggest The Conversion Of An Industrial Site Into A Gaming Facility Adversely Impacts The Surrounding Area** ............................ 22

**E.   The EA Properly Evaluated And Mitigated Traffic Impacts** .................................... 24

   **1.   The EA Properly Calculated Expected Casino Traffic** ............................................. 24

   **2.   After Extensive Consultation With The Relevant Agencies, The BIA Mitigated Traffic Impacts To An Insignificant Level** ................ 25

**F.   The EA Evaluated The Project's Indirect Effects** ........................................ 28

**G.   The EA Evaluated Economic Impacts In West Michigan** ............................................ 30

**III.   THERE IS NO REQUIREMENT THAT THE TRIBE CONCLUDE A COMPACT BEFORE THE SECRETARY TAKES LAND INTO TRUST, AND MICHGO'S REQUEST FOR AN ORDER REGARDING CLASS III GAMING LIES BEYOND THE SCOPE OF THIS LITIGATION** ......................... 32

**IV.   SECTION 5 OF THE INDIAN REORGANIZATION ACT OF 1934 DOES NOT VIOLATE THE NONDELEGATION DOCTRINE** .................................... 34

**A.   The Statute Does Not Delegate Any Legislative Powers** ............................................ 34

**B.   Section 465 Establishes Constitutionally Adequate Standards** .................................... 35

**CONCLUSION** ........................................................ 36

## TABLE OF AUTHORITIES

**CASES**

*Aetna Life Ins. Co. v. Haworth¸* 300 U.S. 227 (1937) .................................................. 34

*Akiak Native Community v. United States Postal Serv.*, 213 F.3d 1140 (9th Cir. 2000)............. 26

*\*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982) ..................... 11, 12

*Calderon v. Ashmus*, 523 U.S. 740 (1998) ........................................................... 34

*\*Carcieri v. Norton*, 423 F.3d 45 (1st Cir. 2005) ..................................................... 36

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ............. 7

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ............................................... 5

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937)........................................... 36

*\*Citizens Exposing Truth About Casinos (CETAC) v. Norton*, No. 02-1754, 2004 U.S.
      Dist. LEXIS 27498 (D.D.C. Apr. 23, 2004) ................................................... passim

*City of Lincoln City v. Dep't of Interior*, 229 F. Supp. 2d 1109 (D. Ore. 2002) ........................ 37

*\*City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465 (D.D.C. 1978)........................................ 36

*City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106 (C.D. Cal. 1999) .................................. 17

*Coker v. Skidmore*, 941 F. 3d 1306 (5th Cir. 1991)..................................................... 15

*County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251
      (1992)............................................................................................. 5

*Florida Parapelegic Ass'n, Inc., v. Miccosukee Tribe*, 166 F.3d 1126 (11th Cir. 1999)............. 18

*Florida v. Seminole Tribe of Florida*, 181 F.3d 1237 (11th Cir. 1999)........................................ 34

*Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir. 1985) .................... 13, 23

*Friends of the Bow v. Thompson*, 124 F.3d 1210 (10th Cir. 1997) ............................................ 15

*Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the
      Western District of Michigan*, 369 F.3d 960 (6th Cir. 2004)...................................... 5

*Hawkins v. United States*, 30 F.3d 1077 (9th Cir. 1994) ................................................. 8

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)........................................... 25

*Maryland-National Capitol Park and Planning Comm'n v. United States Postal Service*,
487 F.2d 1029 (D.C. Cir. 1973) ....................................................................... 22, 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 173 F. Supp. 2d 725
(W.D. Mich. 2001) ........................................................................................... 16

*Mechoopda Indian Tribe of Chico Rancheria v. Schwarzenegger*, No. Civ. S-03-2327, 2004
WL 1103021 (E.D. Cal. Mar. 12, 2004) ............................................................. 8

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) ........................................ 5

*Nat'l Parks and Conservation Ass'n v. United States Dep't of Transp.*, 222 F.3d 677
(9th Cir. 2000)................................................................................................. 18

*Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S.
505 (1991) ....................................................................................................... 34

*Olmstead Citizens for a Better Community v. United States*, 793 F.2d 201 (8ᵗʰ Cir. 1986) ........ 30

*Oregon v. Norton*, 271 F. Supp. 2d 1270 (D. Ore. 2003) .............................................. 8

*Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851 (9ᵗʰ Cir. 1982) ............................ 17

*Price Road Neighborhood Ass'n, Inc. v. United States Dep't of Transp.*, 113 F.3d 1505
(9th Cir. 1997)................................................................................................. 15

*Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456 (9th Cir. 1994) .................................... 18

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).................................. 17, 26

*Roseville v. Norton*, 348 F.3d 1020 (D.C. Cir. 2003) ...................................... 5, 7, 8, 12

*Sac and Fox Nation v. Norton*, 240 F.3d 1250 (10th Cir. 2001) .............................. 5, 8, 9

*Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966 (10th Cir. 2005) ..................... 36

*Sierra Club v. Cavanaugh*, 447 F. Supp. 427 (D.S.D. 1978) ...................................... 30

*Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985)............................................. passim

*South Dakota v. Dep't of Interior*, 423 F.3d 790 (8th Cir. 2005) ............................... 37

*South Dakota v. Dep't of Interior*, 69 F.3d 878 (8th Cir. 1995) ................................ 37

*TOMAC v. Norton*, 193 F. Supp. 2d 182 (D.C.D. 2002) ......................................... 14

*TOMAC v. Norton*, 240 F. Supp. 2d 45 (D.C.D. 2003) ..................................... passim

*TOMAC v. Norton, No. 01-0398, 2005 WL 2375171 (D.D.C. March 24, 2005) ............... passim

*TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006) ................................................. 14, 19, 20, 28

Tyler v. Cisneros, 136 F.3d 603 (9th Cir. 1998) ........................................................ 17

*United States v. 27.09 Acres of Land, More or Less, 760 F. Supp. 345
    (S.D.N.Y. 1991) ............................................................................................. 21, 22, 23

United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999) ........................................ 36

Vermont Public Interest Research Group v. U.S. Fish & Wildlife Serv., 247 F. Supp. 2d 495
    (D. Vt. 2002) ................................................................................................. 18

Wetlands Action Network v. United States Army Corps of Engineers, 222 F.3d 1105
    (9th Cir. 2000) .............................................................................................. 17, 26

## STATUTES

5 U.S.C. § 706 ............................................................................................................. 1

25 U.S.C. § 2 ............................................................................................................... 16

25 U.S.C. § 9 ............................................................................................................... 16

*25 U.S.C. §§ 461-479 ................................................................................................ 10

25 U.S.C. § 465 ...................................................................................................... 9, 34, 35

25 U.S.C. § 467 ........................................................................................................ 4, 7, 9

*25 U.S.C. §§ 2701-2721 ....................................................................................... 8, 9, 10

25 U.S.C. § 2702 ......................................................................................................... 4

25 U.S.C. § 2710 ...................................................................................................... 16, 34

25 U.S.C. § 2719 ................................................................................................... passim

*42 U.S.C. § 4332 .................................................................................................... 13, 19

## FEDERAL REGISTER

63 Fed. Reg. 56,936 (Oct. 23, 1998) ......................................................................... 4

70 Fed. Reg. 25,596 (May 13, 2005) ..................................................................... 1, 4, 9

## RULES

Fed. R. Civ. P. 12 ................................................................................................ 1

Fed. R. Civ. P. 56 ................................................................................................ 1

## REGULATIONS

25 C.F.R. Part 83 ............................................................................................... 10

25 C.F.R. § 151 ................................................................................................. 16

25 C.F.R. § 291 ............................................................................................. 16, 34

40 C.F.R. §1500 ................................................................................................ 22

40 C.F.R. § 1501 ............................................................................................... 22

40 C.F.R. §1502 ................................................................................................ 22

40 C.F.R. § 1505 ............................................................................................... 17

40 C.F.R. § 1506 ........................................................................................... 12, 22

40 C.F.R. § 1508 ................................................................................. 12, 22, 23, 29

## OTHER AUTHORITIES

30 BIAM Supp. 1, NEPA Handbook, § 4.3(E)(b) (1993) ........................................... 30

CEQ's *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (Mar. 23, 1981) ........................................... 17, 20

*Considering Cumulative Effects Under the National Environmental Policy Act* at 4 Jan. 1997 ...................................................................................................... 12

Felix S. Cohen, <u>Handbook of Federal Indian Law</u> § 3.04[2][c][ii] (2005 ed.) ......................... 6, 7

Felix S. Cohen, <u>Handbook of Federal Indian Law</u> 34 (1982 ed.) .................................... 6

Pub. L No. 107-63, § 134, 115 Stat. 414 (2001) ..................................................... 8

## INTRODUCTION

Plaintiff MichGO challenges the Secretary of the Interior's final decision to acquire trust land for the benefit of Intervenor the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Gun Lake" or "Tribe"), a federally-recognized Indian tribe. *See* 70 Fed. Reg. 25,596-25,597 (May 13, 2005). Pursuant to Rule 12(c) and, in the alternative, Rule 56 of the Federal Rules of Civil Procedure, the Tribe and the federal defendants (collectively "the Secretary") have moved for judgment in favor of the Secretary. Docket 32, 33. MichGO's response to those motions ("Pl. Opp'n") confirms that there is no genuine issue of material fact and that the Secretary's decision was not arbitrary, capricious, or otherwise contrary to law. *See* 5 U.S.C. § 706(2)(A); Fed. R. Civ. P. 12(c), 56(c).[1]

## RESPONSE TO MICHGO'S STATEMENT OF FACTS

Three aspects of MichGO's statement of "facts" warrant brief response.

*First*, MichGO argues that the Tribe's decision to ask the Secretary to take lands into trust for gaming purposes is in "direct conflict" with promises previously made by tribal leaders to Tribe members and the federal government. Pl. Opp'n 3-4. That is not true. There is nothing in the administrative record to show that the Tribe ever promised the federal government that it would not engage in gaming. MichGO cites an isolated statement ("there would never be casinos in our Tribe") in a letter referenced in the Department of the Interior's record of the

---

[1] MichGO's response states that the Secretary, through the Department of Justice, "agreed to stay the Tribe's trust acquisition pending the outcome of this case." Pl. Opp'n 7. That is not entirely accurate. The Department of Justice has informed MichGO that the Secretary will not take the land into trust "unless or until the defendants first provide the court and the plaintiff's attorney of record with notice thereof by certified mail, return receipt required, and at least 30 days have passed since the receipt of such notice." 6/24/05 Letter from Patricia Miller to Daniel P. Ettinger, attached hereto as "Exhibit A."

Tribe's federal acknowledgement process. AR 2106. The Department's discussion specifically states that "[n]o minutes of discussions, or other documentation, was submitted to support the above statement." *Id*. Similarly, MichGO cites (Pl. Opp'n 4) an alleged tribal constitutional provision without apprising the Court that the record document it refers to specifically states that the quotation is from an "unratified, undated constitution" (which was *never* ratified). AR 2140 n.194.

In any event, even if the Tribe's Constitution or laws had ever contained such a provision (which they have not), that fact would be irrelevant to the issues before the Court. The Tribe would have the right to change its policies toward gaming. Indeed, even if the Tribe's Constitution contained such a provision *today* (which it does not, AR 1668-1684), any commitment it reflected would have been made to the Tribe's own members—not to the federal government, and certainly not to non-members such as MichGO. But all this is utterly hypothetical and beside the point. From the inception of the fee-to-trust process, the Tribe made clear to the Secretary that it requested that the Bradley Tract be taken into trust for purposes of construction and operation of a gaming facility. AR 6-231, 1438. The Secretary decided to take the land into trust on that basis, and the only question in this case is whether that decision was arbitrary, capricious, or not in accordance with federal law.

*Second*, MichGO asserts—without record citations—that the Secretary received a "flood of public comments opposed to taking the land into trust for the casino," including "voluminous and comprehensive comments" from MichGO itself. Pl. Opp'n 5. The Court can find MichGO's two short comment letters at pages 831 and 836-37 of the record. But what the record really demonstrates is that many commenters, including local governments, area residents, and local civic organizations, support the project. AR 833, 834, 840, 841-842, 884, 886, 892, 893,

894, 895, 904-905, 906, 923, 924-926, 928, 937-938, 941-942, 1024-1029, 1055-1056.  In fact, several governmental entities and organizations—Wayland Township, the Friends of Gun Lake Indians, the Barry County Chamber of Commerce, the Deputy Sheriff's Association of Michigan, the Kalamazoo Regional Chamber of Commerce, and the Allegan County Chamber of Commerce—have filed an *amicus curiae* brief in this litigation *in support of the Secretary's decision*.  Docket 42-43, 46, 48-49, 53.  One of the most notable things about this case is the absence of *any* governmental opposition to the Tribe's proposed project.

*Third*, MichGO's complaint that the Tribe's project will "detract from the quiet, family atmosphere of the surrounding rural area" (Pl. Opp'n 6) ignores several noteworthy details.  The land in question is already zoned for light industrial use, and indeed previously housed a manufacturing plant (the existing buildings of which will form the core of the casino).  AR 36-38, 78-124, 124-125, 1086-1087.  The site is located between a railroad track and a four-lane federal highway, and none of the land is currently farmed.  AR 22, 36-37, 73-75, 834-1068, 1082-1083, 1150-1151, 1171.   To the east and south of the property are industrial-type businesses, including a lumber company, a trucking company, and a seed and landscaping supply company.  AR 36.  And the project will leave sixty-eight percent (68%) of the site *undeveloped*.  AR 23.  In short, the picture MichGO tries to paint is inaccurate, at best.

## ARGUMENT

**I.     THE BRADLEY TRACT WILL BE THE TRIBE'S "INITIAL RESERVATION" FOR PURPOSES OF IGRA**

Section 20 of the Indian Gaming Regulatory Act ("IGRA") permits gaming on lands taken into trust for an Indian tribe after October 17, 1988, if the "lands are taken into trust as part of . . . the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process."  25 U.S.C. § 2719(b)(1)(B)(ii).  Here, there is no dispute that the Secretary formally acknowledged the Gun Lake Tribe on August 23, 1999.  63 Fed. Reg. 56,936 (Oct. 23, 1998).  There is also no dispute that the Tribe had no reservation lands on that date, and still has none.  In deciding to take the Bradley Tract at issue here into trust for the Tribe, the Secretary properly determined that if, as anticipated, the Secretary declares the land to be a reservation under 25 U.S.C. § 467, it will be Gun Lake's "initial reservation" for purposes of IGRA.  70 Fed. Reg. 25,596-25,597.

MichGO challenges that determination on the grounds that (1) a reservation must be used to provide housing; and (2) the Tribe has already had three reservations during its history.  Pl. Opp'n 7-27.  Those arguments fail as a matter of law, particularly in light of the canons of construction that must be applied in interpreting IGRA.

**A.     IGRA Was Enacted For The Benefit Of Indian Tribes And, Accordingly, The Indian Canons Of Construction Are Applicable**

Contrary to MichGO's assertion (Pl. Opp'n 7), IGRA was not enacted to "minimize[] the ill effects of gambling operations."  Rather, Congress's principal stated purpose was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  In reviewing an agency's interpretation of a statute designed to benefit Indian tribes, such as

IGRA, courts must consider special canons of construction. *Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003). "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see generally County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992). That principle applies with full force to the Secretary's construction of IGRA's "initial reservation" provision. MichGO's argument to the contrary (Pl. Opp'n 20 n.7) should be rejected.

Construing a closely related provision of IGRA, the D.C. Circuit specifically held that "the Indian canon requires the court to resolve any doubt in favor of the tribe." *Roseville*, 348 F.3d at 1032. Distinguishing *Chickasaw Nation v. United States*, 534 U.S. 84 (2001), on which MichGO seeks to rely (Pl. Opp'n 20 n.7), the *Roseville* court held:

> To the extent the Cities contend the canon is inappropriately applied to laws disfavoring Indians, pointing to IGRA § 20(a), the Cities continue to overlook the role that IGRA's exceptions in § 20(b)(1)(B) [25 U.S.C. § 2719(b)(1)(B)] play in the statutory scheme, namely to confer a benefit onto tribes that were landless when IGRA was enacted. Neither *Chickasaw Nation v. United States* . . . nor *Sac and Fox Nation v. Norton* . . . can assist the Cities here.

348 F.3d at 1032.

The Sixth Circuit has likewise determined that "the thrust of IGRA is to promote Indian gaming, not to limit it." *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the Western District of Michigan*, 369 F.3d 960, 971 (6th Cir. 2004). Also addressing Section 20's exceptions to the general bar on gaming on post-IGRA lands, it held: "Although § 2719 creates a presumptive bar against casino-style gaming on Indian lands acquired after the enactment of the IGRA, that bar should be construed narrowly (and the exceptions to the bar broadly) in order to be consistent with the purpose of IGRA, which is to

encourage gaming." *Id*.  MichGO's assertion that IGRA "exists for the public at large rather than Indian tribes," (Pl. Opp'n 20 n.7) is contrary to law.

### B.    Construction Of The "Initial Reservation" Exception

#### 1.    Definition Of The Term "Reservation"

MichGO contends that the Bradley Tract cannot be a "reservation" for purposes of IGRA because it will not be used for housing.  It rests that argument largely on a flawed analysis of the word "reservation."   Relying heavily on the 1982 edition of Felix Cohen's classic treatise, MichGO would limit the term to land "set aside under federal protection for the residence of tribal Indians . . . "  Pl. Opp'n 10 (quoting Felix S. Cohen, Handbook of Federal Indian Law 34 (1982 ed.)).

The Tribe agrees that Cohen's treatise is generally "entitled to great weight," (Pl. Opp'n 10).   Unfortunately for MichGO, the 2005 edition clarifies the passage on which MichGO relies—which, in any event, focuses on the *origin* of Indian lands, not on the use to which the Tribe puts particular lands at any given time:

> The term 'Indian reservation' originally meant any land reserved from an Indian cession to the federal government regardless of the form of tenure.  During the 1850s, the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence ***or use*** of tribal Indians, regardless of origin.  In the 1850s, the federal government began frequently to reserve public lands from entry for Indian use.  This use of the term 'reservation' from public land law soon merged with the treaty use of the word to form a single definition describing federally protected Indian tribal lands without depending on any particular source.  This definition of the term 'reservation' has since been generally used and accepted.

Felix S. Cohen, Handbook of Federal Indian Law § 3.04[2][c][ii] (2005 ed.) (emphasis added). The treatise also recognizes that IGRA itself addresses the question of what lands fall within its ambit:  "The Indian Gaming Regulatory Act . . . operates on 'Indian lands,' which are defined as lands within Indian reservations and any lands held in trust or restricted status by the United

States for the benefit of a tribe or individual Indians 'and over which an Indian tribe exercises governmental power.'" *Id*. at § 3.04[1] (quoting 25 U.S.C. § 2719(4)). Cohen's treatise thus supports the position that a reservation need *not* be used for housing in order to constitute a "reservation" for purposes of IGRA § 20. *Id*. at § 3.04[2][c][ii].

Not surprisingly, the same argument that MichGO makes here, advanced by the same attorneys, was rejected by this Court in *Citizens Exposing Truth About Casinos (CETAC) v. Norton*, No. 02-1754, 2004 U.S. Dist. LEXIS 27498, at **14-15 (D.D.C. Apr. 23, 2004) ("CETAC also cites to a text entitled Handbook of Federal Indian Law . . . for the proposition that the modern meaning of the term 'reservation' in context has been fixed since the 1800s and land set aside to provide a residence for Indians. . . . The Court disagrees. Contrary to CETAC's assertions, there appears to be no statutory or regulatory requirement that land must contain housing in order for the Secretary to proclaim it a reservation under the IRA [Indian Reorganization Act, 25 U.S.C. § 467] and for it to qualify as an initial reservation under IGRA."). There is no reason for a different result here.

> **2.    The Secretary Has The Authority To Determine What Constitutes A "Reservation," And A Reservation Need Not Contain Housing In Order To Qualify As An "Initial Reservation" Under IGRA**

This Court has previously held that the Secretary's interpretation of the term "reservation" is entitled to deference under the principles of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See CETAC*, 2004 U.S. Dist. LEXIS 27498, at **13-15. Likewise, the D.C. Circuit recognized that the Secretary has the authority to determine whether land is a "reservation." *Roseville*, 348 F.3d at 1029. And it is clear that land need not contain housing in order to be a "reservation" under IGRA. *CETAC*, 2004 U.S. Dist. LEXIS 27498, at *14; *accord Roseville*, 348 F.3d at 1028-29.

7

All but ignoring *CETAC* and *Roseville* (*see* Pl. Opp'n 11 n.3), MichGO seeks to rely on *Sac and Fox Nation v. Norton*, 240 F.3d 1250 (10th Cir. 2001)—just as its attorneys sought to do in *CETAC*, *see* 2004 U.S. Dist. LEXIS 24798, at **14-15, 15 n.6. But that decision has been repudiated by Congress. In the 2001 Department of Interior and Related Agencies Appropriations Act, Congress specifically declared: "The authority to determine whether a specific area of land is a 'reservation' for purposes of [25 U.S.C. §§ 2701-2721] was delegated to the Secretary of the Interior on October 17, 1998." Pub. L No. 107-63, § 134, 115 Stat. 414, 442-443 (2001).

The D.C. Circuit has expressly held that reliance on *Sac and Fox* is "largely misplaced" in light of the fact that "Congress rebuked the decision almost immediately, enacting legislation stating that the authority to determine whether land is a 'reservation' was delegated to the Secretary as of the effective date of IGRA." *Roseville*, 348 F.3d at 1029. Likewise, the court in *Oregon v. Norton*, 271 F. Supp. 2d 1270, 1277-78 (D. Ore. 2003), determined that the *Sac and Fox* opinion is no longer good law, and that the Secretary has the authority to interpret the term "reservation." *Accord CETAC*, 2004 U.S. Dist. LEXIS 27498, at *13 n.6; *Mechoopda Indian Tribe of Chico Rancheria v. Schwarzenegger*, No. Civ. S-03-2327, 2004 WL 1103021, at *11 n.9 (E.D. Cal. Mar. 12, 2004).

MichGO essentially contends that the 2001 legislation—passed by Congress and signed by the President—has no effect. Pl. Opp'n 21-24. This novel argument lacks merit. While MichGO cites a number of cases relating to the *retroactive* effect of legislation, *see, e.g.,* *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994) (1989 legislation did not control interpretation of prior statute as applied to 1988 tax returns), it cannot cite any authority limiting the *prospective* effect of an Act of Congress. This case, arising nearly four years after the

relevant legislation, involves no element of retroactivity.  Whatever the analysis might be with respect to a decision made by the Secretary before the 2001 Appropriations Act, by the time the Secretary acted in this case, Congress had unmistakably confirmed the Secretary's authority to interpret the term "reservation" as used in IGRA.[2]

### 3.    The Secretary's Initial Reservation Determination Is Consistent With IGRA

The Secretary reasonably concluded, 70 Fed. Reg. 25,596, that if she takes the Bradley Tract into trust for the Gun Lake Tribe and proclaims it a reservation, the land will be eligible for gaming under IGRA because it was "taken into trust as part of . . . the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgement process."  25 U.S.C. § 2719(b)(1)(B)(ii).  MichGO argues that the Secretary's interpretation would thwart the purposes of IGRA and leave tribes "free to gamble on **any** piece of land taken into trust."  Pl. Opp'n 15 (emphasis in original).  That is nothing but scare-mongering.

The IGRA provision at issue permits gaming only on lands taken into trust as part of (i) the "initial reservation" of (ii) a newly-acknowledged tribe.  That is not a common situation. Moreover, the Secretary must exercise independent discretion whether to take any given parcel of land into trust for a tribe.  *See* 25 U.S.C. § 465.  As this case amply demonstrates, the process is long and difficult and involves careful consideration of a wide variety of factors.  Here, the Secretary properly concluded that it would be appropriate to take into trust for Gun Lake a parcel

---

[2] It is also true, although not critical here, that *Sac and Fox* was wrongly decided in the first place.  Congress established the NIGC to regulate gaming, but it did not grant the Commission authority over land acquisitions or the proclamation of reservations.  25 U.S.C. §§ 2705-2706. That authority was reserved for the Secretary under 25 U.S.C. §§ 465 and 467 and was not modified by IGRA.  25 U.S.C. § 2719(c).  MichGO's argument that the Secretary lacks authority to interpret the term "reservation" would undermine both 25 U.S.C. §§ 465 and 2719(c) and would be flatly inconsistent with the Secretary's proclamation authority under  § 467.  The 2001 legislation only clarified all of this—but whether it was a clarification or a change in the law is immaterial for purposes of this litigation.

that both is well-suited for economic development *and* that lies in the heart of the Tribe's ancestral homelands.  *See* Docket 7, Sprague Decl. at ¶¶ 11-13, 21.  The Bradley Tract is not just "any piece of trust land" (Pl. Opp'n 15).

As this Court recognized in *CETAC*, IGRA's provisions addressing lands acquired after 1988 "were intended to ensure parity between newly acknowledged or restored tribes which lacked a reservation prior to 1988 and existing tribes that had reservations on which they could legally conduct gaming activities."  2004 U.S. Dist. LEXIS, at *12 n.5.  MichGO's narrow interpretation of Section 2719 would in effect require even newly-acknowledged or restored tribes to undertake the two-step approval process contained in 25 U.S.C. § 2719(b)(1)(A), which does permit IGRA gaming on *any* new trust land, but only subject to additional determinations by the Secretary and to an effective veto by the governor of the State in which the land is located.  That was not Congress's intent in enacting Section 20's carefully balanced provisions.  *See* 25 U.S.C. §§ 2701, 2702.

C.    **MichGO's Assertion That Alleged Prior Reservations Preclude Operation Of The Initial Reservation Exception Is Contrary To IGRA**

Finally, MichGO clings to its assertion that the IGRA's initial reservation provision does not apply here because the Bradley Tract "would be the Band's fourth reservation."  Pl. Opp'n 26; *see id*. at 25-27.  MichGO fails to address the substance of the Tribe's and the Secretary's contrary arguments, which are driven by logic, IGRA, and the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 461-479.  The fact that an Indian tribe may have had land at the beginning of the nineteenth century does not preclude the Secretary from declaring a parcel of land a tribe's "initial reservation" under IGRA.  The pertinent inquiry is whether the tribe had a reservation at or after the time it was "acknowledged by the Secretary under the Federal acknowledgement process."  25 U.S.C. § 2719(b)(1)(B)(ii); *see* 25 C.F.R. Part 83 (acknowledgment regulations).

10

There is no dispute that Gun Lake lacked a reservation when IGRA was enacted; that it lacks a reservation now; and that it has lacked a reservation since it was restored to recognition and formally acknowledged in 1999. That should be the end of the matter. Moreover, MichGO's assertion that the Tribe shared a reservation—the Pine Creek property—until 1992 with the Huron Band of Potawatomi Indians is belied by federal statutes and case law. This Court has already held that the Pine Creek property "is not a reservation under federal law." *CETAC*, 2004 U.S. Dist. LEXIS 27498, ** 12-13.[3] Moreover, as set forth in the Tribe's opening brief (at 47 n.22), the Secretary has previously determined that Gun Lake is separate from any other Indian tribe.

It is no surprise that most Indian tribes at one time had reservations or sovereign territories, which they were often forced to cede by the United States. If the test MichGO advocates were adopted, it is likely that *no* Indian tribe could ever satisfy IGRA's "initial reservation" provision.

## II.    NEPA DOES NOT REQUIRE AN EIS FOR THE PROPOSED ACTION

### A.    MichGO's NEPA Argument Ignores Settled Law

MichGO argues that an Environmental Impact Statement ("EIS") is required by law, but then fails to analyze—indeed, even to mention or cite—the District of Columbia Circuit decision that controls this case, *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982). Discussed in the Tribe's moving papers ("Tr. Br."), *Cabinet Mountains* held that no EIS is necessary when an agency mitigates an impact below the threshold of significance. Tr. Br. 12-13, 16. Here, in the few instances in which the BIA found a potentially significant impact, the

---

[3] In *CETAC*, MichGO's counsel also argued that the Pine Creek property was a "state reservation," a contention denied by the State of Michigan. 2004 U.S. Dist. LEXIS 27498, **12-13.

Tribe agreed to mitigation measures that reduce any potential impact below the threshold of significance.  AR 184-191, 1461-1463.  No EIS is necessary.[4]

In arguing the contrary, MichGO suggests that the sole purpose of an Environmental Assessment ("EA") is to identify the need for an EIS.  Pl. Opp'n 30.  Not so, and indeed, EAs possess three distinct purposes, one of which is to enable an agency to comply with NEPA when no EIS is necessary.  40 C.F.R. § 1508.9(a)(2).  MichGO correctly notes that NEPA imposes more procedural requirements for an EIS than it does for an EA (Pl. Opp'n 31) which is a reality driven by practical limitations given the comparative numbers of such documents that are actually prepared.  In a given year, approximately 450 EIS's are prepared (including both draft and final, involving about 225 individual projects), compared to approximately 45,000 EAs— 200 for every EIS.  *See* Council on Environmental Quality ("CEQ")*, Considering Cumulative Effects Under the National Environmental Policy Act* at 4, Jan. 1997 (also available at *http://ceq.egh.doe.gov/NEPA/ccnepa/exec.pdf* (last visited April 19, 2006)).  However, in this case, virtually every one of the procedural requirements that MichGO identifies as justifying an EIS was undertaken and satisfied.  *Compare* Pl. Opp'n 31 n.13 *with* AR 193-198 (consultation and coordination), 825-1060 (public comments on draft document), 1061-1203 (responses to public comments), 803-812 (compliance with 40 C.F.R. § 1506.6), 1-2 (Federal Register notice of final document).  It is difficult to understand what MichGO seeks to accomplish with an EIS, other than delaying the Tribe's project.

---

[4] *Cabinet Mountains* continues to be binding authority in this Circuit.  *See TOMAC v. Norton*, No. 01-0398, 2005 WL 2375171, *2   (D.D.C., March 24, 2005), ("mitigated FONSIs" have "long been appropriate under the laws of this Circuit," citing *Cabinet Mountains*) *aff'd*, 43 F.3d 852 (D.C. Cir. 2006); *Roseville v. Norton*, 219 F. Supp. 2d 130, 164 (D.D.C. 2002) (same), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003), *cert. denied*, 124 S. Ct. 1888 (2004).

In truth, great environmental values are not at stake here. Unlike many NEPA cases, no agency with "jurisdiction by law" or "special expertise with respect to any environmental impact involved" (*i.e.*, environmental agencies), 42 U.S.C. § 4332(2)(C), opposes the Tribe's project or has commented adversely. AR 825-1060. Also unlike many NEPA cases, no environmental organization opposes the project or has commented adversely. *Id*. There is a reason for this lack of opposition: The project is not environmentally harmful. This lack of opposition, combined with the broad governmental support it enjoys (AR 216-249, 586-590, 825-1060) further supports the BIA's decision not to prepare an EIS. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976-87 (9th Cir. 1985) (noting "virtual agreement" among the governmental agencies and environmentalists and that "[o]nly appellant and its two experts are critical" of the project, a factor "supporting the Service's decision not to prepare an [EIS].").

Plaintiff's very name—Michigan Gambling Opposition—reveals that its purpose is not driven by concern for the environment. NEPA is not well served when used not to promote environmental values, but as a tool to delay projects that serve other important values (here, the self-sufficiency of a dispossessed Indian tribe). MichGO has every right to fight casinos. It does not, however, advance the interests NEPA was designed to protect when it uses the statute to advance its own non-environmental agenda.[5]

---

[5] MichGO has abandoned several claims. It makes no argument to support allegations that the BIA failed to independently evaluate project impacts, cumulative impacts, or a reasonable range of alternatives. *See* Tr. Br. 14-16, discussing Compl. ¶¶ 30, 37, 50-51; Tr. Br. 34-35, discussing Compl. ¶¶ 96-99; Tr. Br. 38-40, discussing Compl. ¶¶ 36, 83-86. Having declined to defend these arguments, MichGO has waived them.

**B.** **The FONSI Does Not Rest On "Materially Inaccurate Factual Claims," And MichGO Can Only So Argue By Distorting The Record**

MichGO argues the BIA's FONSI rests upon "materially inaccurate" facts. The record shows otherwise, and it is MichGO that distorts the facts to suit its purpose.

**1.** **MichGO Ignores Important Facts To Argue The Agency's Finding Of No Significant Air Quality Impacts Was Defective**

As addressed in the Tribe's opening brief (at 26-28), MichGO claims the BIA violated NEPA when finding the Tribe's project created no significant air impacts—not because of anything the agency considered (or failed to consider) when issuing its FONSI, but because of events that transpired thereafter. Specifically, MichGO claims the agency violated NEPA because Allegan County was deemed non-attainment for ozone after the BIA issued a FONSI that correctly assumed the County was in attainment for ozone. Pl. Opp'n 33. Although it cannot dispute that the EA accurately reflected the facts at the time it was prepared, MichGO argues that the EA rests on "materially inaccurate factual claims." This misleading assertion ignores controlling law, cited in the Tribe's brief, holding that agencies are entitled to rely upon air quality standards that apply when they conduct their analysis. *See* Tr. Br. 27; *TOMAC v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006) (*TOMAC IV*) ("reassessments must end at some point, or NEPA simply becomes a tool to stall new projects indefinitely . . ." (internal quotation marks omitted).)[6]

---

[6] The *TOMAC* case resulted in four opinions. *See TOMAC v. Norton*, 193 F. Supp. 2d 182 (D.C.D. 2002) (*TOMAC I*) (rejecting IGRA-based challenges to tribal gaming project); *TOMAC v. Norton*, 240 F. Supp. 2d 45 (D.C.D. 2003) (*TOMAC II*) (BIA took requisite hard look at project's impacts on wetlands, but failed adequately to analyze impacts attributable to growth); *TOMAC v. Norton*, No. Civ. A. 01-0398, 2005 WL 2375171 (D.D.C. Mar. 24, 2005) (*TOMAC III*) (concluding EA's Supplement, evaluating air quality impacts, cumulative effects, and growth inducement, satisfied NEPA, and rejecting IGRA-based challenge); *and see TOMAC IV*, 433 F.3d at 861-664 (affirming *TOMAC III* and finding EA Supplement to be NEPA-compliant).

14

MichGO also completely ignores the supplemental analysis in which the BIA specifically considered whether the new ozone standard would affect its FONSI, and found it would not.  AR 1282-1284, 8866-8868.  BIA conducted this analysis *before* it made its final decision, to confirm the validity of its FONSI in light of the changed circumstances (*id*.; AR 1-2), as it was entitled to do under settled law.  *See Price Road Neighborhood Ass'n, Inc. v. United States Dep't of Transp*., 113 F.3d 1505, 1510 (9th Cir. 1997) ("If re-evaluation reveals that an EA/FONSI remains valid," no supplemental EA is required.); *Coker v. Skidmore*, 941 F.2d 1306, 1310 (5th Cir. 1991) (same).  Having failed to address this analysis, MichGO cannot meet its burden of demonstrating that the decision not to prepare a supplemental EA was arbitrary, capricious or otherwise contrary to law.  *See TOMAC III*, 2005 WL 2375171, at *3 (decision whether to supplement an EA is reviewed under the arbitrary and capricious standard); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218 (10th Cir. 1997) (same).  MichGO also overlooks the fact that the new ozone standard no longer applies to Allegan County—and may never apply if Congress deems it inapplicable to southwestern Michigan.  Tr. Br. 27 (Congress imposed moratorium on stricter ozone standard for southwestern Michigan to further evaluate whether standard should apply since source of pollutants causing non-attainment are from outside region).  The import of these omissions in MichGO's argument speaks for itself.

### 2.    MichGO Does Not Argue And Cannot Show That The Secretary's Consideration Of Mitigation Was Arbitrary Or Capricious

MichGO concedes the Tribe has agreed to mitigate environmental impacts associated with its planned casino, in part, by sharing part of its revenues with local governments.  Pl. Opp'n 33-34.  MichGO does not dispute that the Secretary carefully considered that mitigation, and does not argue that the Secretary's reliance on it was arbitrary or capricious.  Instead, MichGO suggests that the agency could not rely upon mitigation in issuing its FONSI because

there is no gaming compact in place with the State, somehow rendering the Tribe's commitment to share its revenues "hollow and unenforceable."  Pl. Opp'n 34.  That argument fails.

First, MichGO is simply wrong that the Tribe's commitment to share its gaming revenues with local governments would never be triggered without a compact, on the theory that "IGRA does not permit the Secretary to authorize Class III gambling in the absence of a compact."  Pl. Opp'n 34.  To the contrary, Congress expressly contemplated the Secretary would promulgate procedures "for the conduct of Class III gaming in the event that the State and Tribe are unable to voluntarily agree to a compact." 25 U.S.C. §§ 2, 9 & 2710; 25 C.F.R. §§ 291, *et seq*.  While such procedures are rarely necessary (AR 1065), they are available.  Furthermore, while the existence of a gaming compact is no prerequisite for the United States to take land into trust for an Indian tribe (25 C.F.R. § 151.10), a tribe cannot even seek to compel a State to negotiate a Class III gaming compact until after it has obtained "Indian lands" suitable for a casino site. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 173 F. Supp. 2d 725, 727 (W.D. Mich. 2001).[7]

More fundamentally, the Tribe's commitment to share revenues for mitigation purposes does not depend upon the existence of a compact.  As detailed in the Tribe's moving papers, the Tribe may operate Class II gaming without a compact, and has agreed to share its revenues with local governments irrespective of a compact's existence.  Tr. Br. 40-41.  It has agreed to do so for the purpose of eliminating or minimizing the various impacts MichGO pretends will go unmet without a compact.  Pl. Opp'n 33.  In addition, the Tribe has agreed to mitigate all other impacts by design changes, affirmative measures, and the execution of various agreements with

---

[7]  MichGO's theory, once distilled, reveals the Catch-22 situation in which MichGO would seek to place the Tribe:  The BIA may not acquire trust lands without a gaming compact, while the Tribe may not secure a compact without trust lands.

local agencies.  AR 184-191, 215-249.  Accordingly, the existence or non-existence of a gaming compact is irrelevant to the NEPA analysis.  *See TOMAC v. Norton*, 240 F. Supp. 2d 45, 48 n.3 (D.D.C. 2003) (rejecting relevance of compact's legality, stating "TOMAC has presented no authority for the proposition that the risk of project failure must be evaluated under NEPA.")

MichGO argues the identified mitigation is "hollow and unenforceable" without a binding compact.  NEPA requires only that agencies develop mitigation measures "to a reasonable degree."  *Wetlands Action Network v. United States Army Corps of Engineers*, 222 F.3d 1105, 1121-22 (9th Cir. 2000).  Indeed, "[i]t would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."  *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989)). While mitigation "must be more than vague statements of good intentions," it "need not be contractual."  *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir. 1982).   But when an agency hinges its FONSI on mitigation, the agency can enforce compliance with the required measures.  *See Tyler v. Cisneros*, 136 F.3d 603 (9th Cir. 1998) (agency can enforce mitigation upon which its decision rests, citing 40 C.F.R. § 1505.3); *City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1125 (C.D. Cal. 1999) (same); *see also* CEQ**,** "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," Question 39, 46 Fed. Reg. 18,026, 18,037-18,038 (Mar. 23, 1981) (EA and FONSI can be used to impose enforceable mitigation measures).

Here, the BIA conditioned its FONSI upon the identified mitigation, rendering it enforceable, as the EA explicitly states:

> All mitigation that is necessary to reduce significant impacts to a less than significant level will be binding on the Tribe because it is intrinsic to the project,

required by federal law, and/or required by agreements between the Tribe and the local agencies.

AR 185.  Notably, the Tribe expressly agreed to waive its sovereign immunity vis-à-vis the local agencies for purposes of enforcing those agreements (AR 221-222, 239), and it possesses no sovereign immunity vis-à-vis the federal government in any event.  *See Florida Parapalegic Ass'n, Inc., v. Miccosukee Tribe of Indians of Florida*, 166 F.3d 1126, 1134-35 (11th Cir. 1999) ("[t]ribal sovereign immunity does not bar suits by the United States"); *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1459-60 (9th Cir. 1994) ("tribal sovereignty does not extend to prevent the federal government from exercising its superior sovereign powers").  Accordingly, the BIA can enforce the mitigation upon which its FONSI rests, including the Tribe's commitment to share revenues.[8]

### C.    MichGO Offers Simplistic Arguments — Arguments This Circuit Has Already Rejected — To Suggest The Tribe's Project Requires An EIS

MichGO advances the rather simplistic argument that the sheer size of the Tribe's project—as well as the mere length of the Environmental Assessment—triggers the need for an EIS.  Pl. Opp'n 32, 35-39.  In so arguing, MichGO effectively eschews analysis of the project's specific impacts in favor of sweeping assertions that a "massive" project in a rural area must necessarily create a significant environmental impact somehow, somewhere.  Not surprisingly,

---

[8] While the mitigation measures are enforceable, the proper result here would not change even if they were not.  *See Vermont Public Interest Research Group v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d. 495, 525 (D. Vt. 2002) ("There is no substantive requirement that a complete mitigation plan be . . . legally enforceable.") (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)); *see also Nat'l Parks & Conservation Ass'n v. United States Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000).  The controlling issue is not whether mitigation is enforceable, but whether the Secretary's consideration of the Tribe's commitment to mitigation was arbitrary or capricious.  The Tribe has every incentive and intention to obtain a compact and complete the mitigation, and the Secretary had every reason to expect that it will do so.  MichGO offers no evidence to the contrary.

the courts—including this Circuit, in a case in which MichGO's counsel was involved—have rejected this simplistic approach. *See TOMAC IV*, 433 F.3d at 862.

In actuality, neither a project's size—nor an EA's length—is relevant to the need for an EIS, as the D.C. Circuit held in *TOMAC IV*. While MichGO dismisses *TOMAC IV* as "readily distinguishable," (Pl. Opp'n 38) the case is controlling. Indeed, rather than involving "substantially different arguments," *id*., MichGO's counsel made the very same arguments in *TOMAC* that are advanced here (albeit on behalf of another client opposing a different tribal gaming project). After summarizing those arguments, the D.C. Circuit proceeded to reject them:

> In contending that an EIS is in order, TOMAC first argues that the sheer magnitude of the proposed gaming resort, as well as the length and complexity of the resulting EA, indicates that an EIS is necessary. In terms of the project's size, TOMAC avers that the anticipated arrival of 4.5 million visitors a year to a rural community of less than 5,000 residents suggests that BIA should produce an EIS. Similarly, TOMAC claims that because BIA spent four-and-half years and generated almost 900 pages of data and analysis examining the potential environmental impacts of the proposed gaming resort, it is clear that an EIS is needed. These claims miss the mark.

*TOMAC IV*, 433 F.3d at 862.[9]

The Court noted the absence of authority "for the proposition that an EIS is *required* when a project reaches a certain size." *Id*. (emphasis in original). Rather, the relevant benchmark "is whether the federal action 'significantly affect[s] the quality of the human environment.'" 433 F.3d at 852 (quoting 42 U.S.C. § 4332(2)(C)). While "[l]arge federal projects may, on the average, be more likely to meet this threshold . . . there is no categorical rule that sizable federal undertakings always have a significant effect on the quality of the human environment." 433 F.3d at 862.

---

[9] *Compare* Pl. Opp'n 35 (arguing project's "massive" size, as demonstrated by attraction of 3.1 million visitors a year to a rural community of 3,000 residents, requires EIS); Pl. Opp'n 32 (arguing EA's length (208 pages, plus 1,000 pages of attachments) and complexity "militates in favor of preparing an EIS").

The Court went on to reject the related argument that an EA's size is relevant to whether an EIS is obligatory: "The simple point here is that the length of an EA has no bearing on the necessity of an EIS." 433 F.3d at 862; *see also* Tr. Br. 41-43 (citing additional authorities holding same). What ultimately determines the need for an EIS is the nature and scope of the project at issue, in the context in which it is proposed, and the extent to which that project physically affects the environment. 433 F.3d at 862. As shown below (pp. 30-33), and throughout the Tribe's moving papers (Tr. Br. 17-41) the nature, scope and context of the Tribe's project, as mitigated, poses no potentially significant environmental impacts, justifying the agency's FONSI under the settled law of this Circuit. *Cabinet Mountains,* 685 F.2d 678.[10]

By stark comparison to *TOMAC IV*, MichGO offers authorities from courts in other Circuits that could hardly be called analogous. For example, in *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985), the First Circuit set forth a litany of adverse environmental impacts posed by a port and causeway to be constructed at Sears Island off the State of Maine, including (but not limited to) the destruction of 1.5 to 2 acres of clam flats; the dredging and filling of 90 acres inhabited by lobsters, scallops and other marine animals, with 35 acres of the habitat permanently lost; adverse effects on birds and harbor seals; the run-off of contaminated water into the harbor; and the contamination of 40 acres of wooded upland habitat, representing a permanent loss of at least 23 percent of such habitat on the island. 769 F.2d at 876-877, 880.

---

[10] Notably, MichGO's counsel supported the argument in *TOMAC IV* with the same authority cited here, specifically, the CEQ's *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (Mar. 23, 1981). *Compare* 433 F.3d at 862 *with* Pl. Opp'n 32. The D.C. Circuit rejected the authority, stating the "guideline is not a binding regulation." 433 F.3d at 862. MichGO makes no mention of this holding, and instead, simply dismisses the case as "readily distinguishable" and calls Defendants' reliance upon it "misplaced." Pl. Opp'n 32, 38. Consistent with this same disingenuous theme, MichGO overstates the holdings of several cases from outside this Circuit (Pl. Opp'n 32), as it did in its complaint (Compl. ¶ 67), and which the Tribe's moving brief specifically addressed. Tr. Br. 43 n.20.

Despite the nature of the above identified impacts (some of which were disputed), the First Circuit held that "we doubt that we could say that the FONSI conclusions" were arbitrary and capricious merely on the basis of those identified impacts. *Id*. at 877. Rather, it was *the totality of those problems, when combined with the EA's failure to adequately consider the industrial growth flowing from the port's construction*, which required preparation of an EIS. *Id*. at 877-80. Of course, here, not only is there no litany of environmental horrors as there was in *Marsh*, the BIA found no significant impact after identified mitigation. AR 1-2, 1461-1463. Moreover, here, unlike in *Marsh*, the agency fully considered the growth-inducing effects associated with the Tribe's project. *See* AR 94-97, 135-183, 593-711; Tr. Br. 35-38; *infra* pp. 22-31. In short, nothing about *Sierra Club v. Marsh* is remotely similar to this case.

Similarly inapposite is MichGO's other authority, *United States v. 27.09 Acres of Land,* 760 F. Supp. 345 (S.D.N.Y. 1991), a case that did not hold (as MichGO suggests) that an EIS was required because the agency "failed to consider the project's massive scope and incompatibility with the surrounding area." Pl. Opp'n 38. While the project's "unprecedented magnitude" was one issue of concern, the court identified "three major weaknesses in the . . . EA" that justified an EIS. *27.09 Acres of Land*, 760 F. Supp. at 353. Specifically, the EA showed the project at issue "threatened [the] introduction of contaminants into drinking water;" the EA failed to evaluate the magnitude and consequences associated with chemical spills at the facility; and the project required the destruction of four wetlands (the replication of which was "predicated on optimistic projections about uncertain events"). *27.09 Acres of Land,* 760 F. Supp. at 353. Moreover, while the court noted the project's scope, it placed great import on the fact that the mail facility conflicted with local zoning, deeming that point "particularly relevant"

to its finding of significance.  *Id.* at 354.  Of course, here, the project *is compatible* with local zoning, as detailed below.[11]

### D.    MichGO Skews The Record To Suggest The Conversion Of An Industrial Site Into A Gaming Facility Adversely Impacts The Surrounding Area

In addition to ignoring controlling law, MichGO's argument glosses over the actual context in which the gaming facility will be built, never once mentioning that it will be housed in an existing but vacant warehouse and factory building on a parcel of land situated between a highway and railroad track.  Nor does MichGO acknowledge the site is zoned for industrial use and is already surrounded by other industrial and commercial businesses.  *Compare* Pl. Opp'n 35-39 *with* AR 36-38, 78-125, 1087.  Notably, the local government with jurisdiction over the area (Wayland Township) affirms the project is consistent with local zoning and land use (AR 124-126; 834, 1068, 1079) further undermining MichGO's argument that the Tribe's gaming facility will destroy the assertedly pristine character of the rural area in which they live.  *Maryland-National Capitol Park and Planning Comm'n v. United States Postal Service,* 487 F.2d 1029, 1036-37 (D.C. Cir. 1973) (finding compatibility with zoning, and local government's support, relevant to finding of environmental significance).

MichGO actually denigrates the attention the EA paid to the local government's land use plans.  Pl. Opp'n 46-47.  However, NEPA requires federal agencies to cooperate with local agencies, and to also address any possible conflict between the proposed action and the local land use.  *See* 40 C.F.R § 1502.16(c); *see also* 40 C.F.R. §§ 1500.4(n), 1500.5(h), 1501.2(d)(2), 1501.5(b), 1501.5(d), 1501.7(a)(1), 1501.8(c), 1502.25(a), 1506.6(b)(3), 1508.5.  Thus, despite

---

[11] Notably, both *Sierra Club v. Marsh* and *27.09 Acres of Land* are inconsistent with this Circuit's precedent concerning "mitigated FONSIs."  *See 27.09 Acres of Land*, 760 F. Supp. at 352 (rejecting FONSI "predicated on" mitigation measures); *Marsh*, 769 F.2d at 877, 880 (suggesting EIS may not be avoided under CEQ guideline by virtue of mitigation rendering impacts insignificant).

MichGO's criticism of the BIA's consideration of local governments' role, NEPA and the CEQ Regulations require it, specifically underscoring the relevance of local zoning and land use to a particular project's impacts. *See Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986-87 (9th Cir. 1985) (upholding agency action and noting agency "worked in concert with local officials and acted consistently with local policies on land use"); *see also* 40 C.F.R. § 1508.27(b) (one factor of significance is whether project would violate any "Federal, State or local law or requirements imposed for the protection of the environment"); *compare 27.09 Acres of Land*, 760 F. Supp. at 354 (project's "incompatibility with zoning requirements" supports finding of significance). Given the clear relevance of the industrial nature of the Bradley Tract and surrounding parcels, that may explain why MichGO never actually mentions it.

MichGO skews the record in other ways. Rather than placing the project's impacts in context—which is essential to evaluating their true significance—it offers statistics in a vacuum, in an apparent effort to suggest an impact is more momentous than it really is. For example, while it is true the facility will affect 21 acres of "locally important" farmland (Pl. Opp'n 35) this amounts to .011 percent of County farmland bearing that designation—a percentage the BIA reasonably deemed "relatively small." AR 126. Notably, neither the Bradley Tract nor the surrounding land is currently farmed. AR 76. Furthermore, while it may be true the parcel on which the gaming facility will be built is five times larger than the site holding the Pentagon (Pl. Opp'n 35) it is certainly true that the Tribe's project will leave most of the site—68%, or 100 of the 146 acres—undisturbed, in its original state, including the vegetative buffer between the site and the one residence to its north. AR 125-126. In sum, the fact that MichGO must skew the record to support its argument is revealing. However, rather than repeating the physical characteristics and context of the planned facility, all of which the Tribe detailed in its moving

papers, the Tribe refers the Court to the relevant pages, with concrete reference to the administrative record.  *See* Tr. Br. 17-19 (discussing project's characteristics and impacts in context of surrounding area); *id*. at 19-21 (impacts on wetlands, and mitigation measures to protect same); *id*. at 21 (nighttime lighting impacts).

**E.**     <u>The EA Properly Evaluated And Mitigated Traffic Impacts</u>

MichGO takes issue with the EA's traffic analysis as well, but as with its other claims, this one lacks merit too.

**1.**     **The EA Properly Calculated Expected Casino Traffic**

MichGO first argues the EA's discussion of traffic impacts "relies on unsupportable data about expected traffic from the casino."  Pl. Opp'n 39.  MichGO appears particularly concerned the BIA "uses traffic volumes at Turtle Creek [Casino] as a starting point" but does not explain "why the assumed [traffic] increase of only 25% over Turtle Creek is reasonable."  *Id*. Specifically, MichGO contends the BIA's trip generation rate failed to account for the fact that Gun Lake will be larger than Turtle Creek, that it will be closer to population centers than Turtle Creek, and that it will be located in a different part of the state.

The final EA specifically explains why traffic data from Turtle Creek was a reasonable starting point for the Gun Lake traffic analysis, given their similarities.  *See* AR 109.  It then notes the differences between the two casinos—differences justifying adjusting the trip generation rate generated from Turtle Creek.  *Id*. (listing differences).  Finally, the EA concludes the Turtle Creek trip generation rate should be adjusted upwards because (1) Gun Lake's facility "is about three times larger than the Turtle Creek casino;" (2) it "is nearer to larger population centers;" (3) it "is visibly located adjacent to a more highly traveled" highway; and (4)

24

southwestern Michigan possesses fewer casinos than does the upper portion of the state in which

Turtle Creek is located.  AR 109.

In other words, the final EA explicitly addresses the very issues MichGO claims remain

unaddressed.  Although MichGO disagrees with the expert conclusions upon which the BIA

relied, such disagreement does not render the EA inadequate.  *Marsh v. Oregon Natural

Resources Council*, 490 U.S. 360, 377-78 (1989) (agency entitled to rely upon experts of its

choice); *TOMAC II*, 240 F. Supp. 3d at 50 (same).

### 2.     After Extensive Consultation With The Relevant Agencies, The BIA Mitigated Traffic Impacts To An Insignificant Level

MichGO next claims the Tribe's project will adversely affect traffic flows in two places:

at the intersection between US-131 and M-179 and in the Village of Hopkins.  Pl. Opp'n 40-43.

However, as the record shows, the BIA fully evaluated the potential impacts of casino-related

traffic on nearby roads and intersections under both existing and future conditions.  *See* Tr. Br.

21-26; AR 103-117, 137-143, 177-178, 441-517.  As part of that analysis, the agency examined

traffic conditions at the intersection of US-131 and M-179 and in the Village of Hopkins, and

identified measures to mitigate those impacts.  AR 111-116, 189-190, 441-517.  Throughout the

process, the BIA worked closely with the Michigan Department of Transportation ("MDOT")

and the Board of County Road Commissioners of Allegan County, the agencies with jurisdiction

over traffic conditions and infrastructure improvements on state and local roadways.  AR 65,

448.

Both MDOT and the Board of County Road Commissioners of Allegan County reviewed

the project's impacts on the local roadway system and ultimately concluded the project, as

mitigated, would not adversely affect traffic flows.  AR 586-590.  MichGO nonetheless claims

the project, even after mitigation, will result in unacceptable operations.  MichGO ignores the

fact that MDOT and Allegan County are the agencies with jurisdiction over traffic operations, and are the only entities able to authorize improvements to the local roadway system. AR 189. MichGO also fails to account for the fact that MDOT authorizes roadway improvements based on actual traffic volumes (which can only be obtained after the casino opens), rather than estimated volumes (the only data available during the environmental review). AR 466. In contrast, the BIA's traffic study and EA recognize MDOT's authorization process for roadway improvements and explicitly provide for the possibility that additional mitigation measures may be necessary if actual traffic volumes exceed current projections. AR 189-190, 466. NEPA requires no more. *See Wetlands Action Network,* 222 F.3d. at 1121-22 (citing *Robertson,* 490 U.S. at 353 n.16 (NEPA does not require a "fully-developed mitigation plan")); *Akiak Native Community v. United States Postal Serv.,* 213 F.3d 1140, 1147 (9th Cir. 2000) (mitigation measures designed to ameliorate unexpected environmental impacts may be "generalized and non-self-executing").

MichGO also casts aspersions, suggesting the BIA misrepresented the involvement of state and local agencies in the traffic analysis. MichGO rests this theory on the fact that MDOT completed its "plan and field review" of the proposed casino on September 25, 2001, while the BIA's final traffic study is dated November 2, 2001. Pl. Opp'n 40-43. Apparently MichGO believes this to be conclusive evidence that MDOT was "not aware of the significant traffic problems identified by Defendants in their study." Pl. Opp'n 41. On the contrary, MDOT was involved throughout the course of the traffic study. AR 586-590. It reviewed the Tribe's preliminary development plans, approved concept plans for necessary driveways and road improvements, and reviewed the BIA's traffic impact study. AR 586-589. MDOT's plan and field review (and the September 2001 letter indicating that such review was complete) was just

26

one phase of an iterative and collaborative process. MDOT also reviewed the final traffic study—the study of which MichGO claims the state agency was unaware—and, in a letter dated February 12, 2002, approved the study's methods, data, and conclusions. AR 589.

Finally, Plaintiff contends the BIA gave short shrift to the potential impacts at a particular intersection in the Village of Hopkins. The record shows otherwise. The Allegan County Board of Road Commissioners evaluated both the project and BIA's traffic study, finding for itself that the project posed "no significant impact to the roadways under the jurisdiction of the Allegan County Road Commission," a category including the intersection in question, and in particular, A-42 and 22nd Street. AR 116, 590. During the public comment period, however, the Village of Hopkins commented the project might affect that intersection. Accordingly, despite a clear finding of insignificance by the local agency with jurisdiction over the intersection, the BIA commissioned another study. The study, conducted with the assistance of the Allegan County Road Commission, found the peak level of casino trips and the peak level of local trips would occur at different times of the day. AR 510-511. Nonetheless, in order to provide the most conservative analysis possible, the BIA added the peak level of casino trips to the peak level of local trips in the Village of Hopkins. AR 511.

Even under those worst-case conditions—which are not expected to occur—the only potential traffic problems at the intersection were those attributable to northbound traffic on 22nd Street. AR 511. The casino project, however, would only generate new trips on A-42, an east-west highway. AR 510-512. In other words, even on the most conservative assumptions, the project would not add vehicle trips to the only potentially problematic traffic lane. On this record, the Secretary's conclusion that the project poses no potentially significant impact to traffic within the Village of Hopkins (AR 115-116) was certainly not arbitrary or capricious.

27

### F.     The EA Evaluated The Project's Indirect Effects

MichGO challenges the BIA's analysis of the project's "indirect effects," taking particular aim at the agency's conclusions that no significant environmental effects would flow from residential and commercial growth it might induce. Pl. Opp'n 45-47. While the Tribe's moving papers provide great detail concerning the painstaking effort that was undertaken to study such issues (Tr. Br. 35-38) and the reasoning underlying the agency's conclusions, *id.*, MichGO nonetheless finds fault with the analysis.

MichGO rightly notes that the district court in *TOMAC II*, 240 F. Supp. 2d 45, rejected the EA at issue there, for failing to adequately address the project's growth-inducing effects. Pl. Opp'n 38-39, 45. That hardly helps MichGO's cause, however, since the BIA had the benefit of the court's decision in *TOMAC II* when conducting the growth inducement analysis for this project. Because *TOMAC II* constituted a primer of sorts, it is hardly surprising the analysis conducted here closely parallels the supplemental analysis prepared in response to *TOMAC II*— an analysis the district court held satisfied NEPA. *TOMAC III*, 2005 WL 2375171, at **4-5, *aff'd*, *TOMAC IV*, 433 F.3d 852. Specifically, as *TOMAC II* required, the EA in this case fully evaluated the project's growth-inducing impacts, identifying the total area affected by anticipated residential and commercial growth (AR 146-164) and then considering the effect of such growth in multiple contexts—namely, the effects on housing, commercial development, land resources, water resources (groundwater, flooding, water quality), biological resources (wetlands, wildlife and vegetation), socioeconomic effects (housing, public revenues, crime, schools), transportation/traffic, air quality, public services, and noise. AR 164-183. While MichGO suggests the analysis did not go far enough, the Secretary clearly did not act arbitrarily or capriciously by proceeding in a manner this Court has already approved. *Compare TOMAC III*

with *TOMAC II*, 240 F. Supp. 2d at 51-53. Furthermore, the agency's modeling and economic projections show new growth would be less than the development expected in *TOMAC*, with one 100-room motel, two new restaurants, and a gas station/convenience store, which the BIA concluded would not potentially affect the physical environment to a significant degree. AR 159-160; *see TOMAC III*, 2005 WL 2375171, at *5 (upholding FONSI where BIA concluded new casino-induced growth would be limited to one hotel, three new restaurants, one gas station/convenience store and one new multi-use commercial building, and noting "[w]hat constitutes 'significant' impact is left primarily to BIA's discretion").[12]

The courts also do not share MichGO's view that an agency acts arbitrarily by considering zoning and land use when evaluating the effects of induced growth. Pl. Opp'n 46. To the contrary, the courts find their existence to be directly relevant to an agency's conclusions about a project's growth inducing effects. *See TOMAC III,* 2005 WL 2375171, at *2 ("It was not unreasonable for the BIA to conclude that local zoning regulations will control growth-induced impact"); *see also Sierra Club v. Cavanaugh*, 447 F. Supp. 427, 432 (D.S.D. 1978) (finding no significant impact where zoning restrictions controlled development that would result from new water system).

In sum, MichGO's arguments about the supposed flaws in the agency's growth-inducement analysis falls flat when considering of the record and the law.

---

[12] Contrary to MichGO's assertion (Pl. Opp'n 45-46) the EA does evaluate traffic impacts from indirect growth, but concludes "the incremental increase in traffic is expected to occur over a wide area, minimizing effects to particular roadways . . . ." AR 177. MichGO is also wrong that the EA failed to evaluate the effects of residential growth on population, housing, land use, air, water and other natural resources. It actually did. *See* AR 149-156, 164-167, 175, 178-179.

G.      **The EA Evaluated Economic Impacts In West Michigan**

MichGO argues the EA fails to adequately evaluate the "expected impact of the proposed casino on the broader West Michigan community." Pl. Opp'n 43-45. Specifically, it claims the project "has the potential to marginalize" economic development efforts in Grand Rapids and Kalamazoo, and that the EA "contains no real discussion" of regional economic impacts. *Id.*

Of course, NEPA does not even require consideration of socioeconomic impacts in an EA. 40 C.F.R. § 1508.14; *Maryland-National Capitol Park*, 487 F.2d at 1037; *see also Olmstead Citizens for a Better Community v. United States*, 793 F.2d 201, 205 (8th Cir. 1986). Nonetheless, the BIA, under its own guidelines, evaluated a full range of economic and social factors related to the Gun Lake project, including impacts to Western Michigan. *See* 30 BIAM Supp. 1, NEPA Handbook, § 4.3(E)(b) (1993); AR 57-64, 94-103, 188-189, 1462-1463; *see also TOMAC II*, 240 F. Supp. 2d at 51 (agency evaluated "a number of socioeconomic effects" in growth-inducement context).

MichGO's argument to the contrary ignores approximately 181 pages of data, analysis, and agency responses concerning the project's economic impacts on the region. *See* AR 94-103, 169-175, 593-711, 1098-1099, 1102-1103, 1070-1072, 1075, 1077-1083, 1094-1095, 1106, 1110, 1113-1119, 1121, 1143-1144, 1146, 1148-1158, 1167, 1169, 1176-1179. The agency considered a detailed study evaluating potential economic impacts to the "Allegan area," which included the cities of Grand Rapids and Kalamazoo. *See* AR 623, 657; *see also* AR 608-609 (contribution of tourism to regional economy); 609-610, 655-656 (employment conditions in West Michigan), 623-624 (projected off-site spending by casino patrons in Grand Rapids and Kalamazoo). Moreover, in response to public comments, the BIA specifically discussed the

project's potential economic impacts on Grand Rapids, concluding, in the end, that none would be significant. AR 1072, 1099, 1113-1115, 1121-1122.[13]

MichGO's view that Kalamazoo's economy will suffer economically is clearly not shared by the Kalamazoo Regional Chamber of Commerce, which has joined several other local entities in an *amicus curiae* brief seeking dismissal of MichGO's claims. *See* Docket 46, 48. Like other *amici* from West Michigan, Kalamazoo's Chamber affirmatively supports the Tribe's casino because it believes it will positively, not negatively, affect the area's economy. Docket 43, 46 at 3-4, 48. That position is consistent with the record (and the BIA's conclusions) that the Tribe's project will not adversely affect the region's economy, but to the contrary, bring economic life to an area that is suffering and in dire need of the jobs and revenues the project would provide. AR 57-64, 62-79, 90-94, 169-175. MichGO's blind insistence otherwise lacks record support and is legally irrelevant in any event, since disagreement among experts does not mandate preparation of an EIS. *Marsh*, 490 U.S. at 377-78 (agency may rely on reasoned analysis of its own expert).

In addition to predicting economic ruin for Kalamazoo, MichGO suggests Grand Rapids will suffer, too. It rests this argument on comments and analysis submitted to the BIA by the Grand Rapids Chamber of Commerce. Pl. Opp'n 43-44. MichGO suggests those comments show the EA failed to evaluate whether the casino would "shift expenditures away from previous activities in the surrounding communities," and for that reason, BIA had to prepare an EIS. Pl. Opp'n 43-44.

---

[13] The EA evaluated not only purely economic impacts in West Michigan, but a variety of possible socioeconomic effects, including economic development, crime, and gambling addiction. While MichGO suggests the agency failed to fully evaluate such impacts, the record shows otherwise. *See* Tr. Br. 29-33 (citing, *inter alia*, AR 94-103, AR 134-135, AR 188-189, 593-611, 641-642). Moreover, while respected studies show no correlation between casinos and the string of societal ills MichGO lists (Pl. Opp'n 26-27), the Tribe nonetheless committed to undertake significant, particularized mitigation to alleviate local concerns. *See* Tr. Br. 31-32.

The argument is misplaced. First, the Grand Rapids Chamber of Commerce is not a party to this action. Furthermore, the BIA's response to the Grand Rapids Chamber's comments specifically addressed concerns about economic conditions in Grand Rapids. *See*, *e.g.*, AR 1113 (modifying EA chapter 4.9.7 to include additional economic analysis at Grand Rapids Chamber's request). Moreover, several of the comments—on which MichGO now relies—are factually or legally inaccurate. For example, the BIA has already addressed the Chamber's erroneous claim (which MichGO now adopts) that it failed to consider the possibility that the expected financial gains from the project would result from shifting expenditures within the regional economy. AR 625, 973, 1114. In fact, the economic study on which the EA is based explicitly notes that "[t]his analysis is careful to avoid inclusion [of] the impacts of shifted dollars." AR 625.[14] Finally, as noted, an EA is not rendered inadequate simply because MichGO disagrees with the expert conclusions upon which the BIA relied. *Marsh*, 490 U.S. at 377-78.

**III.    THERE IS NO REQUIREMENT THAT THE TRIBE CONCLUDE A COMPACT BEFORE THE SECRETARY TAKES LAND INTO TRUST, AND MICHGO'S REQUEST FOR AN ORDER REGARDING CLASS III GAMING LIES BEYOND THE SCOPE OF THIS LITIGATION**

Count III of the Complaint challenges the Secretary's decision to take land into trust on the ground that the Tribe does not yet have a final compact with the State of Michigan with respect to Class III gaming, and in the absence of a compact the Tribe might offer "Class II gaming that amounts to the functional equivalent of Class III gaming." Compl. ¶ 119. As this

---

[14] Portions of MichGO's brief repeat verbatim comments made by the Grand Rapids Chamber on the Draft EA. *Compare*, *e.g.*, AR 945 ("Throughout the EA is the underlying assumption that money spent at the casino somehow appears from the sky. There is no recognition of how a casino operation cannibalizes other businesses.") *with* Pl. Opp'n 43 ("Throughout the EA is the underlying assumption that money spent at the casino somehow appears from the sky. There is no recognition of how a casino operation cannibalizes other businesses."). This underscores the point that the BIA has already considered—and responded to—the concerns MichGO now seeks to raise again. *See* AR 1110-1141.

District has held, however, "there is no requirement that a compact be secured before a tribe may obtain a casino site." *TOMAC II,* 193 F. Supp. 2d at 192-193; *see also CETAC*, 2004 U.S. Dist. LEXIS 27498, at *8. MichGO cites no authority to the contrary, and seeks only "an order stating that there can be no Class III gaming on the proposed casino site in the absence of a compact." Pl. Opp'n 48; *see* Compl. 43-44. The Court should accept MichGO's implicit concession that nothing about the absence of a compact precludes the Secretary from taking the land into trust.

That should be the end of the matter for purposes of this litigation. MichGO's request raises questions that are not close to being ripe for adjudication. Even if they were, entry of an order running against the Tribe would be barred by the Tribe's sovereign immunity. And even if the claim were ripe and cognizable, it would lack legal merit.

This is an APA challenge to the Secretary's decision to take land into trust for the Tribe. It presents no ripe controversy regarding what gaming activities the Tribe *might* conduct, *after* acquiring land in trust, *if* the Tribe fails to obtain a compact or other authorization for Class III gaming, and while operating subject to IGRA and under the general supervision of the National Indian Gaming Commission. Federal courts have no power to render advisory opinions, and will not permit litigation of legal questions based on "a hypothetical state of facts." *E.g.*, *Calderon v. Ashmus*, 523 U.S. 740, 745 (1998) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)). MichGO's allegations do not reach even that level of specificity. The Court should reject the invitation to issue declaratory orders about matters not at issue.

Moreover, the defendant here is the Secretary of the Interior, who—as MichGO stresses (Pl. Opp'n 18)—does not supervise Indian gaming for compliance with IGRA. It would not be appropriate to enter a declaratory order of the sort MichGO seeks in litigation against the Secretary. And while the Tribe was permitted to intervene in this action to defend the

Secretary's decision to take land into trust, it did not thereby waive its sovereign immunity from suit.  Docket 18 at 2 n.2; *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991) (tribe does not waive immunity merely by engaging in litigation).  As the Eleventh Circuit held in *Florida v. Seminole Tribe of Florida*, 181 F.3d 1237 (11th Cir. 1999), tribal immunity bars any action by a State or a private party seeking declaratory, equitable or other relief against a Tribe itself for allegedly unlawful Class III gaming.  A complaint about alleged violations of IGRA may be made to the NIGC.

Finally, even if the issue were properly presented, MichGO's claim would fail on the merits.  Contrary to MichGO's contention (Pl. Opp'n 47-48), IGRA permits Class III gaming under certain circumstances even without a tribal-state compact.  25 U.S.C. § 2710(d)(7).  If a state refuses to negotiate in good faith, Section 2710(d)(7)(B) establishes a mechanism for judicial findings and compulsory mediation, and authorizes the Secretary to prescribe procedures for Class III gaming.  This procedure recently resulted in the Secretary's approval of Class III gaming for the Northern Arapaho Tribe of Wyoming, despite the absence of a compact.  9/21/05 Letter of Associate Deputy Secretary James E. Cason to Chairman Brannan, attached hereto as "Exhibit B."  If a State invokes its sovereign immunity from suit, the Secretary can issue Class III procedures even in the absence of any judicial finding.  25 C.F.R. Part 291.  Accordingly, MichGO's request for a declaratory order rests on a legally false premise.  For all these reasons, Count III should be dismissed and MichGO's request for a declaratory order should be denied.

IV.    **SECTION 5 OF THE INDIAN REORGANIZATION ACT OF 1934 DOES NOT VIOLATE THE NONDELEGATION DOCTRINE**

A.    **The Statute Does Not Delegate Any Legislative Powers**

As explained in the Tribe's opening brief (Tr. Br. 52-53), Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. § 465, cannot violate the nondelegation doctrine because

it does not delegate any *legislative* power.  The statute does not grant any rulemaking or other legislative authority.  It simply authorizes the Secretary to carry out a peculiarly executive function—acquiring land for a particular purpose, by consensual means—and, where federal funds are involved, subject to the appropriations process.  Authorizing this type of executive action does not even implicate the nondelegation doctrine, and cannot violate the separation of powers.  MichGO offers no response at all to this point.

Under MichGO's approach, the nondelegation doctrine would be violated if Congress authorized the Secretary of Defense to exercise discretion in acquiring land "for military needs."  Such authority cannot be, and has never been, a violation of the separation of powers.  History is "replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies.  . . .  The constitutionality of this delegation of authority has never been seriously questioned."  *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 322 (1937).

### B.    Section 465 Establishes Constitutionally Adequate Standards

Even if the nondelegation doctrine applied, this District has previously held that "even though the acquisition of lands in trust is discretionary with the Secretary, the legislative history and the Act itself . . . do provide adequate standards for the exercise of [the Secretary's] discretion."  *City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465, 473 (D.D.C. 1978).  A number of other courts have reached the same result.  *See, e.g., Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 972-74 (10th Cir. 2005); *Carcieri v. Norton*, 423 F.3d 45, 56-58 (1st Cir. 2005); *United States v. Roberts*, 185 F.3d 1125, 1136-37 (10th Cir. 1999); *City of Lincoln City v. Dep't of Interior*, 229 F. Supp. 2d 1109, 1128, 1132-33 (D. Ore. 2002).  On the other side MichGO cites only *South Dakota v. Dep't of Interior*, 69 F.3d 878 (8th Cir. 1995).  But that decision was

vacated by the Supreme Court, 519 U.S. 919 (1996), and later rejected by the Eighth Circuit itself. *South Dakota v. Dep't of Interior*, 423 F.3d 790, 795-799 (8th Cir. 2005). Count IV of the Complaint lacks any merit and should be dismissed.

## CONCLUSION

For these reasons and those set out in the Tribe's opening brief and in the papers submitted by the United States, the Court should dismiss MichGO's Complaint in its entirety or, in the alternative, grant summary judgment in favor of the Secretary and the Tribe.


Respectfully submitted this 28th day of April 2006.


<table>
<tr><td></td><td>Match-E-Be-Nash-She-Wish Band of<br>Pottawatomi Indians, Intervenor-Defendant,</td></tr>
<tr><td></td><td>By    /s/ Conly J. Schulte</td></tr>
<tr><td>Nicholas C. Yost, CA Bar 35297<br>Paula M. Yost, CA Bar 156843<br>Sonnenschein Nath & Rosenthal LLP<br>685 Market Street, Sixth Floor<br>San Francisco, CA  94105<br>Telephone (415) 882-5000<br>Fax (415) 543-5472</td><td>Conly J. Schulte, NE Bar 20158<br>Shilee T. Mullin, NE Bar 22286<br>Monteau & Peebles, LLP<br>12100 W. Center Road, Suite 202<br>Omaha, NE  68144<br>Telephone (402) 333-4053<br>Fax (402) 333-4761</td></tr>
<tr><td>Seth P. Waxman, DC Bar 257337<br>Edward C. DuMont, DC Bar 471443<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>2445 M Street, NW<br>Washington, DC 20037<br>Telephone (202) 663-6000<br>Fax (202) 663-6363</td><td>Michael J. Anderson, DC Bar 417887<br>Monteau & Peebles, LLP<br>300 Independence Ave. SE<br>Washington, DC  20003<br>Telephone (202) 543-5000<br>Fax (202) 543-7716</td></tr>
</table>