IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MichGO, Michigan Gambling Opposition, )<br>  )<br>Plaintiff, )<br>  )<br>v.  )<br>  )<br>KEMPTHORNE, et al., )<br>  )<br>Defendants. )<br>_____)<br>  )<br>MATCH-E-BE-NASH-SHE-WISH )<br>BAND OF POTTAWATOMI INDIANS, )<br>  )<br>Intervenor. )<br>_____) | Case No. 1:05-cv-01181-JGP<br>Judge John G. Penn |

**TRIBE'S RESPONSE TO MICHGO'S POST-HEARING STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO THE FEDERAL DEFENDANTS' AND THE GUN LAKE BAND'S MOTIONS TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Defendants' and Intervenor's motions to dismiss or for summary judgment were argued to the Court on November 29, 2006.  Plaintiff MichGO has now filed a "Post-Hearing Statement of Points and Authorities" ("Post-Hearing Statement") (Doc. # 68) submitting, as ostensibly "new" authority, the March 2005 revision of the Department of the Interior's internal Checklist for Gaming Acquisitions, Gaming Related-Acquisitions and Two-Part Determinations Under Section 20 of the Indian Gaming Regulatory Act ("March 2005 Checklist" or "Checklist").  The United States' response (Doc. # 69) demonstrates that the revised Checklist is irrelevant here. As the United States notes, however, even if it were applicable and authoritative, nothing in it would change the governing legal standards or the appropriate outcome of this case.  (Doc. # 69 at 4.)  While the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Tribe" or "Gun

1

Lake Tribe") fully endorses the United States' response, the Tribe believes a short elaboration on that point might be helpful to the Court.

MichGO points to language in the March 2005 Checklist stating that "[p]roposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS." (Doc. # 68 at 1, 4 (quoting Checklist at 10).) It portrays that language as a "change" in NEPA requirements, adopting "a written policy requiring EISs [Environmental Impact Statements]," as opposed to Environmental Assessments ("EAs"), for projects such as Gun Lake's. (See Doc. # 68 at 3.) Both parts of that claim are wrong.

I. **The Checklist Sets Out Existing NEPA Standards**

Nothing in the revised Checklist reflects any change in governing law. As the briefing in this case has already discussed, NEPA requires preparation of an EIS for "major federal actions" only if the EA, prepared first, determines that an action would "*significantly* affect[] the quality of the human environment." Natural Res. Def. Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (emphasis added) (citing NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C)); see also, e.g., Checklist at 9 ("[T]he EA is used to determine whether or not a Federal action would significantly affect the environment . . . . If it would not, the agency can then issue a Finding of No Significant Impact (FONSI)."). In making that determination, project size and the existence of genuine environmental "controversy" have long been among the many potential indicia of significance. See 40 C.F.R. § 1508.27(b); Handley v. Kleindienst, 471 F.2d 823, 830 (2d Cir. 1973) (discussing size and controversy); Coal. On Sensible Tranp., Inc. v. Dole, 642 F.Supp.

573, 587 (D.D.C. 1986) (same). The sentence added to the Checklist in 2005 merely calls specific attention to those factors.

## II.     The Tribe's Project is Neither "Large" nor "Controversial"

For the same reason, even if it applied here, the 2005 Checklist would add nothing to the NEPA analysis set out in the parties' previous briefs. Nothing in its specific reference to "large, and/or potentially controversial" projects calls into question the Interior Department's conclusion, based on the EA here, that the Gun Lake Tribe's project would cause no significant environmental impact. As the United States points out, the Tribe's project is neither "large" nor "controversial."

As to size, in recent years the Department has prepared—and courts have upheld—EAs and FONSIs on several casino projects of at least comparable scope. TOMAC v. Norton, No. 01-398, 2005 WL 2375171 (D.D.C. Mar. 24, 2005), *aff'd*, 433 F.3d 852 (D.C. Cir. 2006); El Dorado County v. Norton, No. 02-1818 (E.D. Cal. Jan. 10, 2005), *appeal dismissed*, No. 05-15224 (9th Cir.); Roseville v. Norton, 219 F.Supp.2d 130, 166-67 (D.D.C. 2002), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003), *cert. denied*, 541 U.S. 974 (2004). Indeed, as the United States notes, the Department very recently issued a FONSI for a casino project in the Catskills (which will be larger than Gun Lake's project). (Doc. # 69 at 4.) Accordingly, contrary to MichGO's assertion (Doc. # 68 at 2-3), counsel for DOI and the Tribe were plainly correct in stating during oral argument that the Department has no blanket policy of preparing EISs for all casinos, or for casinos of the size of Gun Lake's. As NEPA contemplates, the determination of significant impact is made case-by-case. And as the parties' previous briefing amply demonstrates, in *this*

case—which, among other things, involves using *existing buildings* on an *existing industrial site*—the Department's finding of no significant impact was plainly not arbitrary or capricious.

As to "controversy," MichGO perhaps misapprehends the meaning of "controversial" in the NEPA context. The D.C. Circuit has held that "[t]he term 'controversial' [in the CEQ's NEPA regulations] refers to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action *rather than to the existence of opposition to a use*." Town of Cave Creek v. Federal Aviation Administration, 325 F.3d 320, 331 (D.C. Cir. 2003) (emphasis changed). Neither the filing of a lawsuit nor "the fact that some people may be highly agitated" suffices to show "controversy" in the NEPA sense. Coalition on Sensible Transp., Inc. v. Dole, 642 F. Supp. 573, 587 (D.D.C. 1986). If the mere existence of opposition made a project "controversial" under NEPA, then "opposition, and not the reasoned analysis set forth in the environmental assessment, would determine whether an environmental impact statement would have to be prepared." North Carolina v. Federal Aviation Administration, 957 F.2d 1125, 1133-34 (4th Cir. 1992). The outcome "would be governed by a 'heckler's veto.'" Id. at 1134.

The "controversy" to which NEPA refers is, instead, "a substantial dispute" about "potential environmental consequences." Indiana Forest Alliance, Inc. v. United States Forest Service, 325 F.3d 851, 858 (7th Cir. 2003). As the previous briefing demonstrates, the administrative record in this case reflects careful consideration of and responses to all questions or comments received from MichGO and others during the EA process, and MichGO's arguments do not demonstrate any substantial dispute about the project's likely environmental

4

consequences (or, rather, lack of consequences). The project is not "controversial" in the NEPA sense.

Indeed, it is not "controversial" even in MichGO's sense. The casino will be built in a vacant, existing warehouse and factory building, on an industrial parcel located between a highway and railroad track. The local government with jurisdiction over the area—Wayland Township—supports the project. No local government with jurisdiction—and no recognized environmental group—opposes the project. (See the amicus curiae brief joined by several local governments and entities in support of the Secretary's decision at Doc. # 42-43, 46, 48-49 53.) The so-called "controversy" is nothing more than MichGO's opposition. That is not enough to require preparation of an EIS.

### III. Conclusion

MichGO's Post-Hearing Statement adds nothing to the record and arguments that were previously submitted to this Court on the pending dispositive motions. In particular, it provides no basis for MichGO to seek any further delay in implementation of the Secretary of the Interior's decision to take land into trust for the Tribe. In that regard, as the Court is aware, MichGO was advised well before the hearing on November 29, 2006, of the United States' intention to take the land into trust on or after March 5, 2007, unless previously enjoined. The Tribe notes that if MichGO contemplates seeking preliminary injunctive relief from this Court, it should do so promptly, so as to allow time for orderly briefing by the parties, oral argument, and unhurried consideration by the Court before March 5.

DATED:  January 24, 2007.

                                                      Match-E-Be-Nash-She-Wish Band of
                                                      Pottawatomi Indians, Intervenor-Defendant,

                                                      By     /s/ Conly J. Schulte

| | |
|---|---|
| Nicholas C. Yost, CA Bar 35297 | Conly J. Schulte, NE Bar 20158 |
| Paula M. Yost, CA Bar 156843 | Shilee T. Mullin, NE Bar 22286 |
| Sonnenschein Nath & Rosenthal LLP | Monteau & Peebles, LLP |
| 685 Market Street, Sixth Floor | 12100 W. Center Road, Suite 202 |
| San Francisco, CA  94105 | Omaha, NE  68144 |
| Telephone (415) 882-5000 | Telephone (402) 333-4053 |
| Fax (415) 543-5472 | Fax (402) 333-4761 |
| | |
| Seth P. Waxman, DC Bar 257337 | Michael J. Anderson, DC Bar 417887 |
| Edward C. DuMont, DC Bar 471443 | Monteau & Peebles, LLP |
| Demian Ahn, DC Bar 491109 | 300 Independence Ave. SE |
| Wilmer Cutler Pickering Hale and Dorr LLP | Washington, DC  20003 |
| 2445 M Street, NW | Telephone (202) 543-5000 |
| Washington, DC 20037 | Fax (202) 543-7716 |
| Telephone (202) 663-6000 | |
| Fax (202) 663-6363 | |