**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHIGAN GAMBLING OPPOSITION ("MichGO"), a Michigan non-profit corporation, | Case No. 1:05-CV-01181-JGP |
| Plaintiff, | |
| v. | Honorable John Garrett Penn |
| DIRK KEMPTHORNE, *et al.*, | |
| Defendants, | |
| MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS, a federally recognized Indian tribe, | |
| Intervenor. | |

___

**MICHGO'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR TRO/PRELIMINARY INJUNCTION**

**INTRODUCTION**

MichGO brings this motion to prevent Defendants from unilaterally preempting this Court's reasoned judicial review of their proposed agency action. Defendants originally agreed in this case not to act before receiving this Court's judgment – as they have done in other similar cases of proposed Michigan casinos – but they later retracted their agreement and published notice of their intention to act unilaterally on March 5, 2007, even without awaiting this Court's judgment. By letter dated February 2, 2007, MichGO asked Defendants to reconsider this precipitous position, especially in light of recent case developments. Defendants

have not yet responded. With Defendants' unilateral action clock ticking, MichGO has no choice but to burden the Court with this motion.

The balance of the equities strongly favors an injunction. Defendants have not prepared an Environmental Impact Statement ("EIS") for this proposed casino in rural Michigan even though their own newly disclosed internal checklist reveals that they themselves believe an EIS is normally necessary for proposed large and controversial casino projects such as this one. (*See* MichGO's Post-Hrg. Br. in Opp. to Summ. J. at 3-4). Indeed, Defendants' recent practice throughout the nation and in Michigan has been to prepare EISs for such casino projects. (*See* MichGO's Supp. Br. in Opp. to Summ. J. at 1-3). Such a study is especially necessary here, where Defendants' own studies indicate that the major highway interchange that would serve the casino flunks traffic ratings even with all proposed mitigation factors in effect. (*See* MichGO's Summ. J. Resp. Br. at 40-42). If Defendants are permitted to unilaterally preempt judicial review of these important questions under NEPA, they will trample the key statutory goal of ensuring environmental consideration BEFORE final agency action. It is an irony that if Defendants and the Band had spent their time and money preparing a proper EIS, rather than litigating this issue, they may well have been finished by now, and effectively mooted one of the issues in this case. Defendants and the Band are still in a position to do that at any time, and they have no one but themselves to blame for the alleged "delay" occasioned by completing environmental studies that comply with federal law.

Another key legal issue in this case involves whether the Band's proposed commercial gaming site qualifies as its "initial reservation" under IGRA, even though the Band admits it will use the site only for commercial gambling, and not for traditional residential purposes; and even though the Band further admits that it has enjoyed at least two other federal

reservations. As a practical matter, this Court need not wrestle with the issue now because the United States Court of Appeals for the District of Columbia Circuit is currently considering it on appeal from a decision of this Court in another proposed Michigan casino case.[1] *See CETAC v. Kempthorne, et al.*, Docket No. 06-5354 (D.C. Cir.). MichGO respectfully submits that, in the interest of conserving judicial resources, this Court may wish to stay its own consideration of the issue temporarily to await what will be the authoritative word from the Court of Appeals on this question.

For these reasons, MichGO respectfully requests entry of an order enjoining Defendants from unilaterally pre-empting judicial review by taking the proposed casino site into trust before the Court has ruled on the merits of MichGO's claims.

## FACTS

**I.    DEFENDANTS FAIL TO PREPARE AN EIS DESPITE RECORD ADMISSIONS OF SIGNIFICANT IMPACTS.**

On August 7, 2001, the Gun Lake Band submitted a trust application ("Trust Application") to Defendants for the proposed casino site. (*See* MichGO's Summ. J. Resp. Br. at 3). In the public comment period that followed, MichGO and its members submitted a flood of comments pointing out the casino's many environmental impacts and expressing the need for Defendants to reject the Trust Application or, at the very least, conduct a full EIS under NEPA. BIA also received comments opposing the casino from members of Congress, including local U.S. Congressmen Vern Ehlers and Pete Hoekstra, both of whom represent areas affected by the proposed casino. (*See id.* at 5).

---

[1] In that case, Defendants and the tribe agreed to prepare an Environmental Impact Statement after Judge Jackson of this Court rejected their original attempts to comply with NEPA without an EIS. *See CETAC v. Norton*, 2004 U.S. Dist. LEXIS 27498, at **20-29 (D.D.C. 2004).

MichGO's concerns about environmental impact are well supported by the agency record. (*See id.*) The EA describes a proposed gambling complex of nearly 200,000 square feet, including 99,000 square feet of gaming space, two sit-down restaurants, a café-style restaurant, two fast-food outlets, four retail shops, a sports bar, entertainment lounge, office space, and parking for more than 3,300 cars, buses, and RVs. (*See id.*) The casino would be open 24 hours a day, 365 days a year and attract over 3.1 million visitors a year to rural Wayland Township. (*See id.* at 5, 35-36). All of this is to be built on a 146-acre piece of land in the middle of a rural community of only 3,000 residents.[2]

Indeed, Defendants themselves admit that the proposed casino will cause critical intersections to flunk traffic rating tests even after all efforts to mitigate the traffic problems are in effect. The EA concedes that increased traffic from the casino will cause two local intersections to operate at level of service ("LOS") **F** during afternoon peak hours. (*See* MichGO's Summ. J. Resp. Br. at 40). These are the worst possible traffic ratings an intersection can receive, (*see id.*), and the EA concedes this will "result[] in significant impacts" at the affected intersections, (*id.* at 41). Although the EA proposes mitigation measures for these impacts, it concedes that the measures would not solve the problem, and that "the left-turn movement will continue to operate at LOS F" during peak hours.[3] (*Id.*) Defendants therefore

---

[2] The proposed casino is virtually the same size as the casino proposed for the Huron Band of Pottawatomi Indians in Emmett Township, Michigan – only 60 miles away from the proposed Gun Lake casino site – for which Defendants agreed to perform an EIS after Judge Jackson found their EA insufficient. *See CETAC v. Norton*, 2004 U.S. Dist. LEXIS 27498, at **20-29 (D.D.C. 2004).

[3] The EA has similar shortcomings in its treatment of traffic impacts to the nearby Village of Hopkins. (*See* MichGO's Summ. J. Resp. Br. at 42). The EA estimates that 10% of the traffic to and from the casino would travel through the Village of Hopkins and pass through an intersection near Hopkins Elementary, Middle, and High Schools. (*See id.*) After studying traffic levels at this intersection in 2003 and 2011 with the addition of expected casino traffic, the EA concedes that northbound traffic, "mostly school-related," will operate at LOS '**E**' during the

4

admit that the affected intersection will flunk traffic rating tests even after the alleged mitigation measures are in place.

Despite all this, Defendants decided not to prepare an EIS and instead issued a finding of no significant impact ("FONSI") in February 2004. (*See* MichGO's Summ. J. Resp. Br. at 3). This means that, in the absence of a court order, Defendants will not perform an EIS to fully evaluate the casino's environmental impacts.

II.   **DEFENDANTS' NEWLY DISCOSED INTERNAL GAMING ACQUISTION CHECKLIST REVEALS THAT EVEN DEFENDANTS BELIEVE AN EIS SHOULD BE DONE FOR LARGE AND CONTROVERSIAL CASINO PROPOSALS LIKE THIS ONE.**

Defendants are fighting against MichGO's demand for an EIS in this case, but over the past several years, Defendants have performed or announced their intent to perform an EIS for at least two dozen other proposed Indian casinos throughout the United States. (*See* MichGO's Supp. Br. in Opp. to Summ. J. at 1-3). One critical reason for this has just come to light: namely, Defendants' previously undisclosed internal checklist for gaming acquisitions. (*See* MichGO's Post-Hrg. Br. in Opp. to Summ. J. at 1-4). DOI issued the new checklist, entitled "Checklist for Gaming Acquisitions, Gaming Related Acquisitions and IGRA Section 20 Determinations," in March 2005 ("2005 Checklist"). (*See id.* at 1 & Ex. A thereto). That was before the agency's final decision to proceed with this gaming acquisition, and yet Defendants did not include the new checklist in the record and obviously did not follow it.

In the new Checklist, DOI flatly states: "Proposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts." (*Id.* at 4). What this newly

---

school's afternoon peak-hours. (*Id.*) Despite this, Defendants' EA does not recommend any mitigation measures for this intersection. (*See id.*)

disclosed document demonstrates is that DOI not only has a practice of requiring EISs for such projects (as recent experience indicates), but that it actually has a written policy, and that for some reason that policy was not followed in this case. This demonstrates that an EIS should be required for the Gun Lake Band's proposed casino project.

**III.  THE PIVOTAL QUESTION OF WHETHER THE PROPOSED SITE QUALIFIES FOR THE "INITIAL RESERVATION" EXCEPTION TO IGRA'S GENERAL BAN ON GAMING ON NEWLY ACQUIRED LAND WILL SHORTLY BE INFORMED BY AN AUTHORITATIVE DECISION OF THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.**

IGRA imposes a general ban on casino gambling on Indian lands acquired in trust for a tribe after October 1988, the effective date of IGRA. *See* 25 U.S.C. § 2719(a)(1). A tribe that wishes to gamble on such newly acquired lands may generally do so only by obtaining approval through a two-step process in which DOI and the state's governor concur that the casino "would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A) (emphasis added). That was not done here.

One of the narrow exceptions to this two-step process allows a tribe to gamble on newly acquired lands if they are the "initial reservation" of a tribe that has been recognized through the federal acknowledgment process. *See* 25 U.S.C. § 2719(b)(1)(B)(ii). In this case, the proposed casino site is not a reservation at all, and certainly not the Gun Lake Band's "initial" reservation. The Gun Lake Band concedes it has no intention of using the land for a tribal reservation but only for the commercial operation of a gambling casino. The record shows that the Gun Lake Band has had **three** prior reservations at different points in its history, none of which include the lands now proposed for acquisition, so the proposed casino site could not possibly be its "initial" reservation in any event. (*See* MichGO's Summ. J. Resp. Br. at 25-26).

Despite all of this, Defendants issued a notice on May 13, 2005 of their intent to take the proposed casino site into trust for the Gun Lake Band under the "initial reservation" exception. (*See id.* at 4). This finding, if sustained, would permit the Band to operate the casino without going through the two-step approval process – a process that requires a finding of "no detrimental impact" on the host community represented in this case by MichGO's members.[4] *See* 25 U.S.C. § 2719(b)(1)(A). Equally significant for purposes of this preliminary injunction motion, the scope of the "initial reservation" exception is about to be the subject of an authoritative decision of the D.C. Circuit in *CETAC v. Kempthorne, et al.*, Docket No. 06-5354 (D.C. Cir.). MichGO respectfully submits that the interests of judicial economy suggest that this Court consider staying its own decision until receiving the authoritative ruling of the D.C. Circuit.

## IV. DEFENDANTS PURSUE THEIR PLAN TO ACT UNILATERALLY AND PREEMPT THIS COURT'S JUDICIAL REVIEW OF THE PROPOSED ACTION.

MichGO filed its Complaint in June 2005. Defendants and the Gun Lake Ban waited seven months before filing Motions to Dismiss or in the Alternative for Summary Judgment in January 2006. The Court held a hearing on November 29, 2006, and has now had less than three months to consider the matter – less than half the time Defendants and the Band themselves took to file their original motion papers. The briefing and administrative record filled thousands of pages, and obviously demand time-intensive study and deliberation.

---

[4] The Gun Lake Band's request for a casino is directly inconsistent with promises the Band made to its own members and to the federal government that it did not plan to engage in casino gambling if it attained federal acknowledgment. (*See* MichGO's Summ. J. Resp. Br. at 3-4 (quoting tribal constitution submitted by the Band with its Trust Application: "The Gun Lake Band . . . is the only Indian Tribe in the State of Michigan which has decided not to sacrifice the future of its membership to gaming interests and the changes to traditions in the community that gaming could bring.")).

Defendants initially agreed to stay the proposed trust acquisition pending the outcome of the litigation, making it unnecessary for MichGO to bring a motion for a preliminary injunction. (*See* June 24, 2005 Letter, attached as Exhibit A). This is the same voluntary stay agreement Defendants made – and honored – in two prior cases MichGO's counsel had litigated involving proposed trust acquisitions for Indian casinos. In a letter dated October 2, 2006, Defendants informed MichGO that they were retracting their agreement and planned to take the land into trust immediately unless MichGO stipulated to have the parties' dispositive motions heard on an expedited schedule. (Exhibit B, attached). Later, at the summary judgment hearing on November 29, Defendants stated their intention to take the land into trust on March 5, 2007, regardless of the status of this Court's ruling on the merits, thus preempting the very judicial review that MichGO is seeking in this case.

As Defendants' March 5 ultimatum approached, MichGO asked Defendants to voluntarily extend the deadline to give the Court time to consider the merits of MichGO's claims. By letter dated February 2, 2007, MichGO stated that it continues "to believe the most appropriate course for the government is to await the Court's decision before unilaterally taking land into trust for a casino. By voluntarily waiting for the Court, the United States would avoid triggering the need for more motion practice, and would honor the normal process of judicial review of agency decisions." (Exhibit C, attached). MichGO noted that "[s]uch a voluntary stay is especially appropriate here given the recently disclosed internal BIA checklist, which . . . demonstrat[es] the need for an EIS in cases, such as this one, involving large and controversial casino projects." (*Id.* at 1). MichGO emphasized that, without a voluntary stay, it would be forced to seek appropriate relief from the Court, which would include seeking a stay of the trust acquisition pending this Court's ruling on the merits, as well as a stay of any further trial court

8

proceedings pending the outcome of the D.C. Circuit's review of the "initial reservation" question in *CETAC v. Kemphthorne*. (*See id.* at 1-2). Defendants have not responded to MichGO's request for an extension of the voluntary stay, and MichGO is therefore left with no choice but to seek relief from this Court.

## ARGUMENT

Defendants' decision to take land into trust for an illegal casino is arbitrary and capricious and violates federal law. Because the harm to MichGO from these actions is imminent and irreparable, this Court should enter a TRO/preliminary injunction to maintain the status quo pending a final resolution on the merits.

## I. PRELIMINARY INJUNCTION STANDARDS.

Under the law of this Circuit, a court considering a request for a preliminary injunction must examine whether (1) there is a substantial likelihood plaintiff will succeed on the merits, (2) plaintiff will be irreparably injured if an injunction is not granted, (3) an injunction will substantially injure the other party, and (4) the public interest will be furthered by the injunction. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998). No single factor is dispositive. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). Rather, "the[] factors interrelate on a sliding scale and must be balanced against each other." *Id.* Thus, "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). In this case, as the following sections demonstrate, all of the factors favoring issuance of an injunction are present.[5]

---

[5] Under the Administrative Procedure Act, a court must set aside agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *AT&T v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992) (quoting 5 U.S.C. § 706(2)(A)). An

9

**II. MICHGO WILL SUFFER SUBSTANTIAL AND IRREPARABLE INJURY IF THE WRONGFUL TRANSFER OF THE LAND INTO TRUST IS NOT ENJOINED, AS THE QUIET TITLE ACT AND TRIBAL SOVEREIGN IMMUNITY MAY EFFECTIVELY PRECLUDE REVIEW OF THE CASINO'S LEGALITY AFTER THAT DATE.**

An injunction is necessary now to prevent irreparable harm to MichGO's members. If Defendants are not enjoined before March 5, any review of their actions may well be impossible. This is true for three reasons.

First, in recent cases, DOI has successfully argued that the Quiet Title Act, 28 U.S.C. § 2409a(a), forecloses review of NEPA and other claims relating to Indian lands once the land has been taken into trust.[6]  *See, e.g.*, *Neighbors for Rational Development, Inc. v. Norton*, 379 F.3d 956, 961-62 (10th Cir. 2004) (holding that because land had already been placed in trust for the tribe, plaintiff's request for an injunction undoing the acquisition until DOI had complied with NEPA and other federal laws was barred by the Quiet Title Act). MichGO's claims may therefore be irreparably lost if an injunction is not issued to prevent the land from being taken into trust pending the outcome of the litigation.

Second, the nature of MichGO's NEPA injuries – combining procedural and environmental harm – presents unusually compelling reasons for an injunction. The policy underlying NEPA is to ensure that environmental impacts are considered before a project begins. Courts hold that an agency's failure to comply with this requirement constitutes irreparable injury: "[N]ow is the appropriate time for filing an adequate environmental assessment . . . . It is

---

agency must examine the relevant data and articulate a satisfactory explanation for its decision. *Id*. (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29 (1983)). A court will not uphold an agency's action where the agency "has failed to offer a reasoned explanation that is supported by the record." *Id*.

[6] The Quiet Title Act creates an exception to federal courts' subject matter jurisdiction by barring suits against the United States relating to "trust or restricted Indian lands."   *See* 28 U.S.C. § 2409a(a).

imperative that the public, and the defendants, know *before construction begins* whether or not an EIS must be prepared." *Foundation on Economic Trends v. Weinberger*, 610 F. Supp. 829, 843 (D.D.C. 1985) (emphasis in original); *accord Greater Yellowstone Coalition v. Bosworth*, 209 F. Supp. 2d 156, 163-64 (D.D.C. 2002); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998). The same is true here: once the property is cleared and construction begins, it will be too late for Defendants to provide the pre-decision review of environmental impacts that NEPA requires. As the Supreme Court has observed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Thus, if such injury "is sufficiently likely" – as it is in this case – "the balance of harms will usually favor issuance of [an] injunction to protect the environment." *Id.*

Recognizing all of this, courts in this Circuit routinely grant injunctive relief to prevent environmental injury in NEPA cases. *See National Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) (affirming preliminary injunction to prevent destruction of "wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests" threatened by land withdrawal program); *Greater Yellowstone Coalition*, 209 F. Supp. 2d at 163-64 (granting preliminary injunction against grazing permits); *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1 (D.D.C. 2000) (issuing preliminary injunction against amendments to fishery management plans); *Clark*, 27 F. Supp. 2d at 14 (issuing preliminary injunction against organized bison hunt); *Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) (granting preliminary injunction against slaughter of wild bison); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) (issuing stay to prevent destruction of mute swan population pending appeal); *Foundation on Economic Trends*, 610 F. Supp. at 843 (issuing injunction

against construction of aerosol test facilities).  As these cases recognized, MichGO's right to pre-decision review will be forever lost in the absence of a stay.

Finally, once the land is taken into trust, a suit by MichGO against the Gun Lake Band itself may well be impossible.  The tribe will no doubt claim that any such suit is barred by tribal sovereign immunity.  *See, e.g., Florida v. Seminole Tribe of Florida,* 181 F.3d 1237 (11th Cir. 1999).  In *Seminole Tribe*, the tribe sought to go ahead with casino gambling despite the absence of a valid gambling compact.  *See* 181 F.3d 1239.  The State of Florida sued to enjoin the tribe from operating the casino without a compact, but the Eleventh Circuit held that the suit was barred by the tribe's sovereign immunity.  *Id.* at 1241-45.  Although IGRA expressly waives tribal sovereign immunity when a tribe conducts casino gambling in violation of an existing tribal-state compact, the court held the exception inapplicable where the state and the tribe did not have a compact, as in this case.[7]  *See id.* at 1242.  For all of these reasons, an injunction is necessary now if there is ever going to be meaningful review of MichGO's claims.

### III.  MICHGO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

In the D.C. Circuit, an injunction "may be granted with either a high probability of success and some injury, or *vice versa*."  *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).  Under this standard, a party seeking an injunction need not establish an absolute certainty of success on the merits.  *See Population Institute v. McPherson*, 797 F.2d 1062, 1079 (D.C. Cir. 1986) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).  Instead, it is ordinarily sufficient if the moving party has raised questions "so serious, substantial, difficult, or doubtful

---

[7] The court dismissed the state's arguments that the tribe had waived its immunity by engaging in gambling subject to IGRA regulation, *see id.* at 1242-44, and that the tribe's sovereign immunity did not apply to the state's request for prospective, equitable relief, *see id.* at 1244-45.4

as to make them a fair ground of litigation and thus for more deliberative investigation." *Id.* In this case, MichGO is likely to succeed on the merits of its claims.

### A. Defendants' Decision to Forgo Preparation of an EIS Is Arbitrary and Capricious.

When Congress passed NEPA in 1969, it declared a "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). To advance this goal, NEPA requires federal agencies to prepare an EIS if the EA indicates that **any** significant impacts **might** occur from the proposed project. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983). In reviewing Defendants' decision to forgo preparation of an EIS, this Court applies a four-step analysis:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem, it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Friends of the Earth, Inc. v. United States Army Corps of Engineers*, 109 F. Supp. 2d 30, 35 (D.D.C. 2000) (quoting *Coalition on Sensible Transportation v. Dole*, 826 F.2d 60, 66-67 (D.C. Cir. 1987)). In this case, the EA falls far short of satisfying these standards for several reasons.

First, Defendants have failed to address the significant impacts from increased traffic generated by the casino. The EA concedes that increased traffic volume will cause significant impacts at intersections close to the casino, causing two of the intersections to operate at level of service ("LOS") F during afternoon peak hours. (*See* MichGO's Summ. J. Resp. Br. at 40). Though the EA proposes mitigation measures for one of these intersections, it concedes that the measures would not solve the problem, and that "the left-turn movement will continue to

13

operate at LOS F" during peak hours.[8] (*Id.* at 41). Thus, Defendants' own data shows that some intersections will operate at unacceptable levels of congestion once the casino is in operation – even after proposed mitigation.

Next, Defendants' own newly disclosed policy requires preparation of an EIS in this case. (*See* Statement of Facts at 5-6). The 2005 Checklist states: "Proposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts." (*Id.* at 5 (quoting 2005 Checklist at 10)). This articulated policy, which was in place before DOI decided to take the land into trust for the proposed casino, runs contrary to the contentions of DOI and the Gun Lake Band[9] and explains why DOI is now routinely performing EISs for gaming acquisitions around the country.[10] (*See* MichGO's Post-Hrg. Br at 3-4). The policy is significant because the NEPA regulations state that, in determining whether to perform an EIS, an agency's first step must be to determine whether the project is of a type that "[n]ormally requires an environmental impact statement." 40 C.F.R. § 1501.4(a)(1). As one court explained, "[a]n EIS *must* be

---

[8] The EA has similar problems with its treatment of traffic impacts to the Village of Hopkins. (*See* Statement of Facts at 4 & n.3).

[9] At oral argument, both DOI and the Gun Lake Band denied the existence of any policy requiring an EIS. (*See* MichGO's Post-Hrg. Br. at 2). The newly disclosed DOI document belies these claims and demonstrates that, contrary to the assertions of DOI and the Gun Lake Band, there is not only a practice, but also a written policy supporting the requirement of an EIS for projects such as this.

[10] DOI suggests that the 2005 Checklist does not apply here because it was issued after DOI issued its FONSI, even though the new Checklist was in place well before DOI's May 2005 final decision to take the land into trust. (*See* Defendants' Resp. to MichGO's Post-Hrg. Br. at 2 & Ex. A thereto). But this claim is belied by the memorandum attached to the copy of the 2005 Checklist attached to Defendants' own brief. (*See id.* at Ex. A). The memo states that the 2005 Checklist applies to "**[a]ll pending** and future acquisitions for gaming." (*See id.* at 1 (emphasis added)). Clearly, the acquisition for the Gun Lake Band was "pending" at the time DOI issued the 2005 Checklist, so the new Checklist should have been followed here and it should have been included in the Administrative Record.

prepared if the proposed agency action is one which 'normally requires an environmental impact statement . . . .'" *Seattle Community Council Fed. v. F.A.A.*, 961 F.2d 829, 832 (9th Cir. 1992) (emphasis in original).

The proposed casino project here falls squarely within DOI's policy. The project is both large and controversial. (*See* MichGO's Post-Hrg. Br. at 4). It contemplates a 200,000-square-foot casino and entertainment complex open 24 hours a day, 365 days a year, and which will draw 3.1 million visitors per year – 8,500 visitors per day – to a town of only 3,000 residents. It will attract 4,900 new jobs, 1,420 new residents, and induce the construction of more than 500 new residences. And by DOI's own admission, it will create an unacceptable traffic problem near the casino and in the Village of Hopkins. The project is opposed by ordinary citizens from the area who have joined groups like MichGO to voice their opposition, as well as by West Michigan members of the Michigan Legislature and the United States Congress. (*See id.*) Defendants concede that mitigation measures would be necessary to address certain significant impacts, such as traffic. Thus, DOI's own articulated policy, in existence when it decided to take land into trust for the Gun Lake Band, requires it to perform an EIS here. It is disingenuous for Defendants to claim that the proposed casino does not warrant an EIS when, just over the past few years, they have prepared EISs for more than two dozen other casinos of which MichGO is aware, including one located only 60 miles away in Emmett Township, Michigan. (*See* MichGO's Supp. Br. in Opp. to Summ. J. at 3).

In this Circuit, "when an action is undertaken which violates NEPA, there is a *presumption* that injunctive relief should be granted against the continuation of the action until the agency complies with the statute." *Natural Resources Defense Council v. Hughes*, 437 F. Supp. 981, 992 (D.D.C. 1977) (emphasis added) (citations omitted). Because Defendants have

violated NEPA in this case, this Court should enter an injunction to preserve the status quo pending the outcome of the litigation.

      **B.**      **The Land to be Taken in Trust is Not Eligible for Gambling Under IGRA as the Band's "Initial Reservation." Moreover, the D.C. Circuit Will Shortly Address the Scope of the "Initial Reservation" Exception.**

Defendants have moved to take the land into trust under the "initial reservation" exception to IGRA's general ban on casino gambling on newly acquired commercial gaming sites. But this provision is clearly inapplicable. To qualify as a "reservation" for purposes of IGRA, the land must be used as a residence for tribe members. *See Sac and Fox Nation v. Norton,* 240 F.3d 1250, 1266-67 (10th Cir. 2001) (holding that, in passing IGRA, Congress intended to incorporate the established meaning of "reservation" as land set aside for the residential occupation of an Indian tribe) (quoting Felix S. Cohen, *Federal Indian Law* at 34 (1982 ed.)). In this case, the Gun Lake Band has never indicated that it plans to use the proposed casino site for the residential occupation of its members. Instead, the site is a purely commercial parcel that would be used for the operation of a casino.

In any case, the proposed casino site could not possibly be the Gun Lake Band's "initial," or first, reservation. The Trust Application states that the Band has already had two federally recognized Indian reservations at different points in its history. (*See* MichGO's Summ. J. Resp. Br. at 25-26). In addition, the Band very recently had a **third** reservation – Pine Creek Indian Reservation in Athens Township, Michigan – by virtue of its merger with and into the Huron Band of Pottawatomi Indians in 1987. (*See id.* at 26). In light of all this, the Gun Lake Band cannot claim that the proposed casino site would be its "initial" reservation. Instead, it would be the Band's fourth reservation. The Band may therefore gamble on the site only by going through the two-step approval process under § 2719(b)(1)(A).

As a practical matter, this Court need not wrestle with the issue now because the "initial reservation" issue is currently before the D.C. Circuit in *CETAC v. Kempthorne*. The case has been partially briefed and the parties have agreed to fast-track the appeal for an expedited hearing by the court. It serves judicial economy for this Court to stay its review of the potentially dispositive "initial reservation" exception until the D.C. Circuit issues its decision in *CETAC*. For this additional reason, this Court should enjoin the trust acquisition accordingly.

## IV.    AN INJUNCTION WILL CAUSE NO HARM TO DEFENDANTS OR THE GUN LAKE BAND, AND IS CLEARLY IN THE PUBLIC INTEREST.

Although the injury to MichGO if injunctive relief is not granted is substantial and irreparable, an injunction poses no risk of injury to Defendants or the Gun Lake Band. Defendants and the Gun Lake Band have it within their power to continue the proposed casino project simply by performing an EIS and by engaging IGRA's two-step process. An injunction will not prevent Defendants from reauthorizing the land transfer once this Court has resolved the legal issues raised by MichGO. Moreover, the Gun Lake Band spent years promising they would not open a casino if they obtained federal acknowledgment. They cannot claim to be injured from a delay in opening a casino they said they would never open.

The final factor, the public interest, is also served by an injunction. The BIA's own recently disclosed 2005 Checklist says an EIS is supposed to be performed in this case. It is surely in the public interest to hold Defendants to their own internal standards. The balance of the harms therefore weighs heavily in MichGO's favor.

## CONCLUSION

Defendants originally agreed in this case not to act before receiving this Court's judgment, as they have done in other similar cases of proposed Michigan casinos. They later retracted their agreement and published notice of their intention to act unilaterally on March 5,

2007, thus preempting the very judicial review MichGO is seeking in this lawsuit. MichGO will be irreparably harmed if Defendants move ahead with their plan to unilaterally preempt this Court's judicial review of Defendants' actions. Because the balance of the equities strongly favors MichGO, this Court should enter an order enjoining the trust acquisition until the Court has ruled on the merits of MichGO's claims.

Respectfully submitted,

_____/s/_____

| | |
|---|---|
| ROBERT J. JONKER | REBECCA A. WOMELDORF |
| DANIEL P. ETTINGER | D.C. Bar No. 452034 |
| JOSEPH A. KUIPER | Attorneys for Plaintiff |
| Warner Norcross & Judd, LLP | Spriggs & Hollingsworth |
| 900 Fifth Third Center | 1350 I Street, N.W., Suite 900 |
| 111 Lyon Street, N.W. | Washington, DC 20005 |
| Grand Rapids, MI 49503 | (202) 898-5800 |
| (616) 752-2000 | |

Dated: February 22, 2007

**CERTIFICATE OF SERVICE**

  I certify that on February 22, 2007, I electronically filed the above document via the Clerk of the Court's Generic Email Box, which will send notice of electronic filing to the following:

Gina Allery
U.S. Department of Justice
601 D St., N.W.
Washington, DC 20026
*Attorney for Defendants*


Conly J. Schulte
Shilee T. Mullin
Monteau & Peebles, LLP
12100 W. Center Road, #202
Omaha, NE 68144
*Attorneys for Intervenor*
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*


Nicholas Yost
Sonnenschein Nath & Rosenthal, LLP
685 Market Street, 6th Floor
San Francisco, CA 94105
*Attorney for Intervenor*
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*


Edward C. Dumont
Demian S. Ahn
Wilmer Cutler Pickering Hale & Dorr
2445 M Street, Nw
Washington DC 20037
*Attorneys for Intervenor*
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*


Elizabeth Lohah Homer
Homer Law, Chartered
1730 Rhode Island Avenue, NW, Suite 501
Washington, DC 20036
*Attorney for Amici*
*Allegan Chamber of Commerce, Barry County Chamber of Commerce, Deputy Sheriff's Association of Michigan, Friends of the Gun Lake Indians, Wayland Township, and Kalamazoo Regional Chamber of Commerce*

                  /s/
                Rebecca A. Womeldorf