## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHIGAN GAMBLING OPPOSITION
("MichGO"), a Michigan non-profit
corporation,                                          Case No. 1:05-CV-01181-JGP

               Plaintiff,

v.                                                    Honorable John Garrett Penn

DIRK KEMPTHORNE, *et al*.,

               Defendants,

MATCH-E-BE-NASH-SHE-WISH BAND
OF POTTAWATOMI INDIANS, a
federally recognized Indian tribe,

               Intervenor.

_____

## MICHGO'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR STAY PENDING APPEAL

### INTRODUCTION

      MichGO brings this motion to prevent Defendants DOI and BIA from unilaterally preempting appellate review of MichGO's claims. That is what will happen in the absence of a stay because once Defendants act to take land in trust for a tribal casino, they will effectively preclude the practical value of further judicial review.

      Defendants have every intention of doing just that. Defendants originally agreed in this case not to act before receiving this Court's judgment – as they have done in other similar cases of proposed Michigan casinos – but they later retracted their agreement and published notice of their intention to act unilaterally on March 5, 2007. Just this week, in discussions with

MichGO's counsel, Defendants reiterated their intent to take the land into trust on March 5 regardless of any appeal.  MichGO respectfully submits that unilateral agency action should not be permitted to trump full judicial review in this case.

The balance of the equities strongly favors a stay.  Defendants have not prepared an Environmental Impact Statement ("EIS") for this proposed casino in rural Michigan even though their own newly disclosed internal checklist reveals that they themselves believe an EIS is normally necessary for proposed large and controversial casino projects such as this one.  (*See* MichGO's Post-Hrg. Br. in Opp. to Summ. J. at 3-4).  Indeed, Defendants' recent practice throughout the nation and in Michigan has been to prepare EISs for such casino projects.  (*See* MichGO's Supp. Br. in Opp. to Summ. J. at 1-3).  Such a study is especially necessary here, where Defendants' own documents indicate that the major highway interchange that would serve the casino flunks traffic ratings even with all proposed mitigation measures in effect.  (*See* MichGO's Summ. J. Resp. Br. at 40-42).  If Defendants are permitted to unilaterally preempt judicial review of these important questions under NEPA, they will trample the key statutory goal of ensuring environmental consideration BEFORE final agency action.

Another key legal issue in this case involves whether the Band's proposed commercial gaming site qualifies as its "initial reservation" under IGRA, even though the Band admits it will use the site only for commercial gambling, and not for traditional residential purposes; and even though the Band further admits that it has enjoyed at least two other federal reservations.  This issue is currently being considered by the United States Court of Appeals for the District of Columbia Circuit on appeal from a decision of this Court in another proposed

Michigan casino case.[1]  *See CETAC v. Kempthorne, et al.*, Docket No. 06-5354 (D.C. Cir.).  It serves judicial economy to stay the trust acquisition until the legality of Defendants' actions can be determined by the Court of Appeals.

For these reasons, MichGO respectfully requests entry of an order enjoining Defendants from pre-empting judicial review by taking the proposed casino site into trust before the Court of Appeals has ruled on the merits of MichGO's claims.

## FACTS

## I.     DEFENDANTS FAIL TO PREPARE AN EIS DESPITE RECORD ADMISSIONS OF SIGNIFICANT IMPACTS.

On August 7, 2001, the Gun Lake Band submitted a trust application ("Trust Application") to Defendants for the proposed casino site.  (*See* MichGO's Summ. J. Resp. Br. at 3).  In the public comment period that followed, MichGO and its members submitted a flood of comments pointing out the casino's many environmental impacts and expressing the need for Defendants to reject the Trust Application or, at the very least, conduct a full EIS under NEPA. BIA also received comments opposing the casino from members of Congress, including local U.S. Congressmen Vern Ehlers and Pete Hoekstra, both of whom represent areas affected by the proposed casino.  (*See id*. at 5).

MichGO's concerns about environmental impact are well supported by the agency record.  (*See id.*)  The EA describes a proposed gambling complex of nearly 200,000 square feet, including 99,000 square feet of gaming space, two sit-down restaurants, a café-style restaurant, two fast-food outlets, four retail shops, a sports bar, entertainment lounge, office space, and

---

[1] In that case, Defendants and the tribe agreed to prepare an Environmental Impact Statement after Judge Jackson of this Court rejected their original attempts to comply with NEPA without an EIS.  *See CETAC v. Norton*, 2004 U.S. Dist. LEXIS 27498, at **20-29 (D.D.C. 2004).

parking for more than 3,300 cars, buses, and RVs. (*See id.*) The casino would be open 24 hours a day, 365 days a year and attract over 3.1 million visitors a year to rural Wayland Township. (*See id.* at 5, 35-36). All of this is to be built on a 146-acre piece of land in the middle of a rural community of only 3,000 residents.[2]

Indeed, Defendants themselves admit that the proposed casino will cause critical intersections to flunk traffic rating tests even after all efforts to mitigate the traffic problems are in effect. The EA states that "[t]he operation at the northbound US-131 ramps at 129th Avenue . . . will operate at LOS **F** during the afternoon peak hour." (MichGO's Summ. J. Resp. Br. at 40). Likewise, "[t]he southbound US-131 ramp's southbound to eastbound left turn movement will also operate at LOS **F** during the afternoon peak hour." (*Id.*)

Defendants' proposed mitigation measures for these admitted traffic problems are discussed in Chapter 5.6.1 of the EA. (*See id.* at 41). That section admits that "[a]cceptable levels of service are projected at all but two of the study intersections under Opening Year Plus Project conditions, **resulting in significant impacts at those intersections.**" (*Id.* (emphasis added)). To mitigate the impact to the southbound traffic movement, the EA first recommends installing an "all-way stop control at the US-131 southbound ramps/129[th] Avenue intersection." (*Id.*). However, the EA admits that this measure would not solve the problem, and that "**the left-turn movement will continue to operate at LOS F**" during peak hours, even after the proposed mitigation measures are in place. (*Id.*) Defendants therefore admit that the southbound left-turn

---

[2] The proposed casino is virtually the same size as the casino proposed for the Huron Band of Pottawatomi Indians in Emmett Township, Michigan – only 60 miles away from the proposed Gun Lake casino site – for which Defendants agreed to perform an EIS after Judge Jackson found their EA insufficient. *See CETAC v. Norton*, 2004 U.S. Dist. LEXIS 27498, at **20-29 (D.D.C. 2004).

movement near the casino will flunk traffic rating tests regardless of any alleged mitigation measures they propose.[3]

Despite all this, Defendants decided not to prepare an EIS and instead issued a finding of no significant impact ("FONSI") in February 2004.  (*See* MichGO's Summ. J. Resp. Br. at 3).  This means that, in the absence of a court order, Defendants will not perform an EIS to fully evaluate the casino's environmental impacts.

## II.    DEFENDANTS' NEWLY DISCOSED INTERNAL GAMING ACQUISTION CHECKLIST REVEALS THAT EVEN DEFENDANTS BELIEVE AN EIS SHOULD BE DONE FOR LARGE AND CONTROVERSIAL CASINO PROPOSALS LIKE THIS ONE.

Defendants are fighting against MichGO's demand for an EIS in this case, but over the past several years, Defendants have performed or announced their intent to perform an EIS for at least two dozen other proposed Indian casinos throughout the United States.  (*See* MichGO's Supp. Br. in Opp. to Summ. J. at 1-3).  One critical reason for this has just come to light:  namely, Defendants' previously undisclosed internal checklist for gaming acquisitions.  (*See* MichGO's Post-Hrg. Br. in Opp. to Summ. J. at 1-4).  DOI issued the new checklist, entitled "Checklist for Gaming Acquisitions, Gaming Related Acquisitions and IGRA Section 20 Determinations," in March 2005 ("2005 Checklist").  (*See id.* at 1 & Ex. A thereto).  That was before the agencies' final decision to proceed with this gaming acquisition, and yet Defendants did not include the new checklist in the record and obviously did not follow it.

---

[3] The EA has similar shortcomings in its treatment of traffic impacts to the nearby Village of Hopkins.  (*See* MichGO's Summ. J. Resp. Br. at 42).  The EA estimates that 10% of the traffic to and from the casino would travel through the Village of Hopkins and pass through an intersection near Hopkins Elementary, Middle, and High Schools. (*See id.*)  After studying traffic levels at this intersection in 2003 and 2011 with the addition of expected casino traffic, the EA concedes that northbound traffic, "mostly school-related," will operate at LOS '**E**' during the school's afternoon peak-hours.  (*Id.*)  Despite this, Defendants' EA does not recommend any mitigation measures for this intersection.  (*See id.*)

5

In the new Checklist, DOI flatly states: "Proposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts." (*Id.* at 4). What this newly disclosed document demonstrates is that DOI not only has a practice of requiring EISs for such projects (as recent experience indicates), but that it actually has a new written policy that was put in place at the very same time DOI was making its decision regarding the Gun Lake Band's proposed casino. Yet, for some reason that policy was not followed in this case. This demonstrates that an EIS should be required for the Gun Lake Band's proposed casino project.

III.    **THE PIVOTAL QUESTION OF WHETHER THE PROPOSED SITE QUALIFIES FOR THE "INITIAL RESERVATION" EXCEPTION TO IGRA'S GENERAL BAN ON GAMING ON NEWLY ACQUIRED LAND WILL SHORTLY BE INFORMED BY AN AUTHORITATIVE DECISION OF THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.**

IGRA imposes a general ban on casino gambling on Indian lands acquired in trust for a tribe after October 1988, the effective date of IGRA. *See* 25 U.S.C. § 2719(a)(1). A tribe that wishes to gamble on such newly acquired lands may generally do so only by obtaining approval through a two-step process in which DOI and the state's governor concur that the casino "would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A) (emphasis added). That was not done here.

One of the narrow exceptions to this two-step process allows a tribe to gamble on newly acquired lands if they are the "initial reservation" of a tribe that has been recognized through the federal acknowledgment process. *See* 25 U.S.C. § 2719(b)(1)(B)(ii). In this case, the proposed casino site is not a reservation at all, and certainly not the Gun Lake Band's "initial" reservation. The Gun Lake Band concedes it has no intention of using the land for a tribal reservation but only for the commercial operation of a gambling casino. The record shows that

the Gun Lake Band has had **three** prior reservations at different points in its history, none of which include the lands now proposed for acquisition, so the proposed casino site could not possibly be its "initial" reservation in any event.  (*See* MichGO's Summ. J. Resp. Br. at 25-26).

Despite all of this, Defendants issued a notice on May 13, 2005 of their intent to take the proposed casino site into trust for the Gun Lake Band under the "initial reservation" exception.  (*See id.* at 4).  This finding, if sustained, would permit the Band to operate the casino without going through the two-step approval process – a process that requires a finding of "no detrimental impact" on the host community represented in this case by MichGO's members.[4]  *See* 25 U.S.C. § 2719(b)(1)(A).  Equally significant for purposes of this stay motion, the scope of the "initial reservation" exception is about to be the subject of an authoritative decision of the D.C. Circuit in *CETAC v. Kempthorne, et al.*, Docket No. 06-5354 (D.C. Cir.).  MichGO respectfully submits that the interests of judicial economy would best be served by staying the trust acquisition until the D.C. Circuit has ruled on this dispositive issue.

## IV.    DEFENDANTS PURSUE THEIR PLAN TO PREEMPT APPELLATE REVIEW OF THE PROPOSED AGENCY ACTION.

MichGO filed its Complaint in June 2005.  Defendants and the Gun Lake Ban waited seven months before filing Motions to Dismiss or in the Alternative for Summary Judgment in January 2006.  At the summary judgment hearing on November 29, 2006,

---

[4] The Gun Lake Band's request for a casino is directly inconsistent with promises the Band made to its own members and to the federal government that it did not plan to engage in casino gambling if it attained federal acknowledgment.  (*See* MichGO's Summ. J. Resp. Br. at 3-4 (quoting tribal constitution submitted by the Band with its Trust Application: "The Gun Lake Band  . . . is the only Indian Tribe in the State of Michigan which has decided not to sacrifice the future of its membership to gaming interests and the changes to traditions in the community that gaming could bring.")).

Defendants stated their intention to take the land into trust on March 5, 2007, regardless of the status of this Court's ruling on the merits.

This Court issued its opinion granting Defendants' and the Gun Lake Band's summary judgment motions on February 23, 2007. (*See* Docket Entry 72). The Court entered an order consistent with its opinion on February 27. (*See* Docket Entry 73). MichGO respectfully disagrees with the Court's opinion and plans to exercise its right to appeal. Following this Court's summary judgment ruling, MichGO asked Defendants to agree not to take the land into trust until the Court of Appeals has had an opportunity to consider MichGO's appeal. Defendants have not agreed to extend the stay, and instead continue to insist that they will take the land into trust on March 5. If Defendants do so, they will unilaterally preempt any appellate review by MichGO. MichGO is therefore left with no choice but to seek relief from this Court.

## ARGUMENT

## I.  STANDARDS FOR A STAY.

Under the law of this Circuit, a court considering a request for a stay must examine four factors: "(1) the likelihood that the party seeking the injunction will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent an injunction; (3) the prospect that others will be harmed if the court issues the injunction; and (4) the public interest." *Population Institute v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986). No single factor is dispositive. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). Rather, "the[] factors interrelate on a sliding scale and must be balanced against each other." *Id.* Thus, "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift*

*Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  In this case, as the following sections demonstrate, all of the factors favoring issuance of a stay are present.[5]

## II.    MICHGO WILL SUFFER SUBSTANTIAL AND IRREPARABLE INJURY IF THE WRONGFUL TRANSFER OF THE LAND INTO TRUST IS NOT STAYED, AS THE QUIET TITLE ACT AND TRIBAL SOVEREIGN IMMUNITY MAY EFFECTIVELY PRECLUDE REVIEW OF THE CASINO'S LEGALITY AFTER THAT DATE.

A stay is necessary now to prevent irreparable harm to MichGO's members.  If Defendants are permitted to take the land into trust on March 5, any further judicial review of their actions may well be impossible.  This is true for three reasons.

First, in recent cases, DOI has successfully argued that the Quiet Title Act, 28 U.S.C. § 2409a(a), forecloses review of NEPA and other claims relating to Indian lands once the land has been taken  into trust.[6]  *See, e.g.*, *Neighbors for Rational Development, Inc. v. Norton*, 379 F.3d 956, 961-62 (10th Cir. 2004) (holding that because land had already been placed in trust for the tribe, plaintiff's request for an injunction undoing the acquisition until DOI had complied with NEPA and other federal laws was barred by the Quiet Title Act).  MichGO's claims may

---

[5] Under the Administrative Procedure Act, a court must set aside agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *AT&T v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992) (quoting 5 U.S.C. § 706(2)(A)).  An agency must examine the relevant data and articulate a satisfactory explanation for its decision.  *Id.* (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)).  A court will not uphold an agency's action where the agency "has failed to offer a reasoned explanation that is supported by the record."  *Id.*

[6] The Quiet Title Act creates an exception to federal courts' subject matter jurisdiction by barring suits against the United States relating to "trust or restricted Indian lands."  *See* 28 U.S.C. § 2409a(a).

therefore be irreparably lost if a stay is not issued to prevent the land from being taken into trust pending the outcome of the appeal.[7]

Second, the nature of MichGO's NEPA injuries – combining procedural and environmental harm – presents unusually compelling reasons for a stay. The policy underlying NEPA is to ensure that environmental impacts are considered before a project begins. Courts hold that an agency's failure to comply with this requirement constitutes irreparable injury: "[N]ow is the appropriate time for filing an adequate environmental assessment . . . . It is imperative that the public, and the defendants, know *before construction begins* whether or not an EIS must be prepared." *Foundation on Economic Trends v. Weinberger*, 610 F. Supp. 829, 843 (D.D.C. 1985) (emphasis in original); *accord Greater Yellowstone Coalition v. Bosworth*, 209 F. Supp. 2d 156, 163-64 (D.D.C. 2002); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998). The same is true here: once the property is cleared and construction begins, it will be too late for Defendants to provide the pre-decision review of environmental impacts that NEPA requires. As the Supreme Court has observed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Thus,

---

[7] Additionally, once the land is taken into trust, a suit by MichGO against the Gun Lake Band itself may well be impossible. The Band will no doubt claim that any such suit is barred by tribal sovereign immunity. *See, e.g., Florida v. Seminole Tribe of Florida*, 181 F.3d 1237 (11th Cir. 1999). In *Seminole Tribe*, the tribe sought to go ahead with casino gambling despite the absence of a valid gambling compact. *See* 181 F.3d 1239. The State of Florida sued to enjoin the tribe from operating the casino without a compact, but the Eleventh Circuit held that the suit was barred by the tribe's sovereign immunity. *Id.* at 1241-45. Although IGRA expressly waives tribal sovereign immunity when a tribe conducts casino gambling in violation of an existing tribal-state compact, the court held the exception inapplicable where the state and the tribe did not have a compact, as in this case. *See id.* at 1242.

10

if such injury "is sufficiently likely" – as it is in this case – "the balance of harms will usually favor issuance of [an] injunction to protect the environment." *Id.*

Recognizing all of this, courts in this Circuit routinely grant injunctive relief to prevent environmental injury in NEPA cases. *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) (issuing stay to prevent destruction of mute swan population pending appeal); *National Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) (affirming preliminary injunction to prevent destruction of "wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests" threatened by land withdrawal program); *Greater Yellowstone Coalition*, 209 F. Supp. 2d at 163-64 (granting preliminary injunction against grazing permits); *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1 (D.D.C. 2000) (issuing preliminary injunction against amendments to fishery management plans); *Clark*, 27 F. Supp. 2d at 14 (issuing preliminary injunction against organized bison hunt); *Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) (granting preliminary injunction against slaughter of wild bison); *Foundation on Economic Trends*, 610 F. Supp. at 843 (issuing injunction against construction of aerosol test facilities). As these cases recognized, MichGO's right to pre-decision review will be forever lost in the absence of a stay.

Finally, MichGO will also be irreparably harmed by the loss of its right to appellate review. In the absence of a stay, the Gun Lake Band will be free to begin construction immediately, effectively preempting MichGO's right to have the merits of its claims heard on appeal. This unique factor weighs heavily in favor of a stay. *See Center for International Environmental Law v. Office of the U.S. Trade Rep.*, 240 F. Supp. 2d 21, 23 (D.D.C. 2003) ("[D]efendants have made a strong showing of irreparable harm because disclosure of the documents in question will . . . destroy appellants' rights to secure meaningful review.");

*Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986); *International Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 20 (D.D.C. 1996).  For all of these reasons, a stay is necessary now if there is ever going to be meaningful review of MichGO's claims.

### III.    MICHGO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

In the D.C. Circuit, "[a] stay may be granted with either a high probability of success and some injury, or *vice versa*."  *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).  Under this standard, a party seeking a stay need not establish an absolute certainty of success on the merits.  *See Population Institute v. McPherson*, 797 F.2d 1062, 1079 (D.C. Cir. 1986) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).  Instead, it is ordinarily sufficient if the moving party has raised questions "so serious, substantial, difficult, or doubtful as to make them a fair ground of litigation and thus for more deliberative investigation."  *Id.*  In this case, MichGO is likely to succeed on the merits of its claims.

### A.    Defendants' Decision to Forgo Preparation of an EIS Is Arbitrary and Capricious.

When Congress passed NEPA in 1969, it declared a "broad national commitment to protecting and promoting environmental quality."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).  To advance this goal, NEPA requires federal agencies to prepare an EIS if the EA indicates that **any** significant impacts **might** occur from the proposed project.  *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).  In reviewing Defendants' decision to forgo preparation of an EIS, this Court applies a four-step analysis:

> First, the agency must have accurately identified the relevant environmental concern.  Second, once the agency has identified the problem, it must have taken a "hard look" at the problem in preparing the EA.  Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding.  Last, if the agency does find an impact of true significance,

> preparation of an EIS can be avoided only if the agency finds that changes or
> safeguards in the project sufficiently reduce the impact to a minimum.

*Friends of the Earth, Inc. v. United States Army Corps of Engineers*, 109 F. Supp. 2d 30, 35

(D.D.C. 2000) (quoting *Coalition on Sensible Transportation v. Dole*, 826 F.2d 60, 66-67 (D.C.

Cir. 1987)).  In this case, Defendants acted arbitrarily by deciding that the proposed casino will

not have any significant impact on the human environment.

First, Defendants arbitrarily determined that the casino will not have significant

impacts on traffic.  Their own NEPA documents show that increased traffic volume from the

casino will cause significant impacts at intersections close to the casino, causing two of the

intersections to operate at level of service ("LOS") F during afternoon peak hours.[8]  (*See*

MichGO's Summ. J. Resp. Br. at 40).  Though the EA proposes some mitigation measures, it

concedes that the measures would not solve the problem, and that some intersections will

continue to operate at unacceptable levels of congestion (LOS F) during peak hours – even after

proposed mitigation.  (*Id.* at 41).

In its opinion granting Defendants' and the Gun Lake Band's summary judgment

motions, this Court held that Defendants had adequately addressed the issue of traffic in the EA.

(*See* Op. at 28-29).  After describing the mitigation measures Defendants have proposed to deal

with the northbound and southbound intersections they admit will operate at LOS F during peak

hours, the court says that "the EA concludes that such mitigation measures will reduce traffic

congestion to acceptable levels . . . ."  (Op. at 28).  But that is not what the EA says.  Instead, the

EA admits that the proposed mitigation measures for the southbound left-turn movement would

_____

[8] The EA has similar problems with its treatment of traffic impacts to the Village of Hopkins.
(*See* Statement of Facts at 5 & n.3).

not solve the problem, and that the movement "**will continue to operate at LOS F**" during peak hours, even after all efforts to mitigate the problem are in place – which the EA flatly admits is a "significant impact." (*See* Statement of Facts, at 4-5). Thus, contrary to the Court's holding, the EA does not conclude that the proposed mitigation measures will fix the admittedly significant traffic problem at the casino; it openly admits that the measures would **not** do so, and that the admittedly significant impacts will continue unabated.[9]

Next, Defendants' own newly disclosed policy requires preparation of an EIS in this case. (*See* Statement of Facts at 5-6). The 2005 Checklist states: "Proposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts." (*Id.* at 5 (quoting 2005 Checklist at 10)). This articulated policy, which was put in place a few months before DOI decided to take the land into trust for the proposed casino, runs contrary to the contentions of DOI

---

[9] MichGO also respectfully disagrees with the Court's conclusion that the traffic congestion is not significant because state and local road commissions allegedly agreed with the proposed mitigation measures. (*See* Op. at 28-29). Even assuming those agencies believed the proposed mitigation measures were sufficient, Defendants themselves admit the measures will not be sufficient for purposes of the southbound left-turn movement, and that the intersection will continue to flunk traffic rating tests even after all mitigation measures are in place. Thus, regardless the position taken by state and local agencies, it was arbitrary and capricious for Defendants to issue a FONSI while conceding that at least one intersection will experience admittedly significant traffic impacts even after alleged mitigation.

and the Gun Lake Band[10] and explains why DOI is now routinely performing EISs for gaming

acquisitions around the country.[11] (*See* MichGO's Post-Hrg. Br at 3-4).

   In its opinion, this Court minimized the importance of the 2005 Checklist. (Op. at

15 n.14). The Court noted that the court in *TOMAC v. Norton* held that the agency was not bound

to follow the "CEQ guidelines" advising that an EA should normally be no more than 10-15

pages in length. (*See id.*) The Court reasoned that, "if the CEQ guidelines do not bind the agency

to produce an EIS, *TOMAC*, 433 F.3d at 862, certainly the agency is not bound to produce one by

its own internal checklist." (*Id.*) But this reasoning is erroneous. The "CEQ guidelines" referred

to by the court in *TOMAC* – the document containing the guideline about how long an EA should

normally be – was the CEQ's Forty Most Asked Questions Concerning CEQ's NEPA

Regulations. *See TOMAC*, 433 F.3d at 862. As the court in *TOMAC* noted, courts have held that

the Forty Most Asked Questions is merely policy guidance and is not binding on courts. *See id.*

But MichGO's argument in this case does not rely on the Forty Most Asked Questions, but rather

on the CEQ Regulations. The CEQ Regulations were issued by CEQ following notice and

---

[10] At oral argument, both DOI and the Gun Lake Band denied the existence of any policy requiring an EIS. (*See* MichGO's Post-Hrg. Br. at 2). The newly disclosed DOI document belies these claims and demonstrates that, contrary to the assertions of DOI and the Gun Lake Band, there is not only a practice, but also a written policy supporting the requirement of an EIS for projects such as this.

[11] DOI suggests that the 2005 Checklist does not apply here because it was issued after DOI issued its FONSI, even though the new Checklist was in place well before DOI's May 2005 final decision to take the land into trust. (*See* Defendants' Resp. to MichGO's Post-Hrg. Br. at 2 & Ex. A thereto). But this claim is belied by the memorandum attached to the copy of the 2005 Checklist attached to Defendants' own brief. (*See id.* at Ex. A). The memo states that the 2005 Checklist applies to "**[a]ll pending** and future acquisitions for gaming." (*See id.* at 1 (emphasis added)). Clearly, the acquisition for the Gun Lake Band was "pending" at the time DOI issued the 2005 Checklist, so the new Checklist should have been followed here and it should have been included in the Administrative Record.

comment rulemaking, and the Supreme Court has held that they are entitled to "substantial deference." *See Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

As MichGO demonstrated in earlier briefing, the CEQ Regulations expressly state that, in determining whether to perform an EIS, an agency's first step must be to determine whether the project is of a type that "[n]ormally requires an environmental impact statement." (MichGO's Supp. Br. in Opp. to Summ. J. at 3 (quoting 40 C.F.R. § 1501.4(a)(1)).  As one court explained, this CEQ regulation means "[a]n EIS *must* be prepared if the proposed agency action is one which 'normally requires an environmental impact statement'" under the agency's internal guidelines.  *Seattle Community Council Fed. v. F.A.A.*, 961 F.2d 829, 832 (9th Cir. 1992) (emphasis in original) (citing 40 C.F.R. 1501.4(a)(1)).  In fact, both Defendants and the Gun Lake Band concede that this is the law.  In their briefs in response to MichGO's Supplemental Statement of Points and Authorities, they freely admit that the CEQ regulations require the agency to prepare an EIS when the agency's internal procedures call for one.  (*See* United States' Resp. to Supp. Statement, Docket Entry 62-1, at 2; Gun Lake Band's Resp. to Supp. Statement, Docket Entry 61, at 4 (stating that 40 C.F.R. § 1501.4(a) "mandates that federal agencies determine whether *their own NEPA regulations* categorize a proposed action as being of a type that normally requires an EIS.  If a proposed action does not fall within that category, the agency may prepare an EA") (emphasis in original)).  Thus, contrary to this Court's holding, the CEQ Regulations make it clear that an EIS is required if the project is of the type the agency has identified as normally requiring an EIS, as DOI has done in this case by issuing its 2005 Checklist requiring EISs for "large and/or potentially controversial" casino projects.

The proposed casino project here falls squarely within the 2005 Checklist.  The project is both large and controversial.  (*See* MichGO's Post-Hrg. Br. at 4).  It contemplates a

200,000 square-foot casino and entertainment complex open 24 hours a day, 365 days a year, and which will draw 3.1 million visitors per year – 8,500 visitors per day – to a town of only 3,000 residents.  It will attract 4,900 new jobs, 1,420 new residents, and induce the construction of more than 500 new residences.  And by DOI's own admission, it will create an unacceptable traffic problem near the casino and in the Village of Hopkins.  The project is opposed by ordinary citizens from the area who have joined groups like MichGO to voice their opposition, as well as by West Michigan members of the Michigan Legislature and the United States Congress.  (*See id.*)  Defendants concede that mitigation measures would be necessary to address certain significant impacts, such as traffic.  Thus, DOI's own articulated policy, in existence when it decided to take land into trust for the Gun Lake Band, requires it to perform an EIS here.  It is disingenuous for Defendants to claim that the proposed casino does not warrant an EIS when, just over the past few years, they have prepared EISs for more than two dozen other casinos of which MichGO is aware, including one of almost exactly the same size located only 60 miles away in Emmett Township, Michigan.  (*See* MichGO's Supp. Br. in Opp. to Summ. J. at 3.)

In this Circuit, "when an action is undertaken which violates NEPA, there is a presumption that injunctive relief should be granted against the continuation of the action until the agency complies with the statute."  *Natural Resources Defense Council v. Hughes*, 437 F. Supp. 981, 992 (D.D.C. 1977) (citations omitted).  Because Defendants have violated NEPA in this case, this Court should enter a stay to preserve the status quo pending the outcome of MichGO's appeal.

B.    **The Land to be Taken in Trust is Not Eligible for Gambling Under IGRA as the Band's "Initial Reservation."  Moreover, the D.C. Circuit Will Shortly Address the Scope of the "Initial Reservation" Exception.**

Defendants have moved to take the land into trust under the "initial reservation" exception to IGRA's general ban on casino gambling on newly acquired commercial gaming sites.  But this provision is clearly inapplicable.  To qualify as a "reservation" for purposes of IGRA, the land must be used as a residence for tribe members.  *See Sac and Fox Nation v. Norton,* 240 F.3d 1250, 1266-67 (10th Cir. 2001) (holding that, in passing IGRA, Congress intended to incorporate the established meaning of "reservation" as land set aside for the residential occupation of an Indian tribe) (quoting Felix S. Cohen, *Federal Indian Law* at 34 (1982 ed.)).  In this case, the Gun Lake Band has never indicated that it plans to use the proposed casino site for the residential occupation of its members.  Instead, the site is a purely commercial parcel that would be used for the operation of a casino.

In any case, the proposed casino site could not possibly be the Gun Lake Band's "initial," or first, reservation.  The Trust Application states that the Band has already had two federally recognized Indian reservations at different points in its history.  (*See* MichGO's Summ. J. Resp. Br. at 25-26).  In addition, the Band very recently had a **third** reservation – Pine Creek Indian Reservation in Athens Township, Michigan – by virtue of its merger with and into the Huron Band of Pottawatomi Indians in 1987.  (*See id.* at 26).  In light of all this, the Gun Lake Band cannot claim that the proposed casino site would be its "initial" reservation.  Instead, it would be the Band's fourth reservation.  The Band may therefore gamble on the site only by going through the two-step approval process under § 2719(b)(1)(A).

In its opinion granting summary judgment to Defendants and the Gun Lake Band, this Court held that the proposed casino site would be the Band's "initial" reservation.  The Court

reasoned that, "[t]o meet the 'initial reservation' exception as a matter of law, a tribe must be recognized by the U.S. Government."  (Op. at 12 (citations omitted)).  The Court held that the Gun Lake Band's earlier federal reservations do not qualify as its "initial" reservation "because intervenor only gained official governmental recognition on August 23, 1999, and has thus never exercised jurisdiction over any land."  (*Id.*).  But this is incorrect.  In the Summary Under the Criteria and Evidence for Proposed Finding prepared by BIA to analyze the Gun Lake Band's entitlement to federal acknowledgment in the 1990s, (*see* AR002009), BIA states that the Gun Lake Band was determined to have had "**unambiguous previous Federal acknowledgment**" as a tribe through at least 1870, (*see* AR002010, 2017, 2020, 2028 (emphasis added)).  The report also states that, during this time in which it was acknowledged as a tribe by the government, the Gun Lake Band "was granted a **Federal reservation** in the form of a three-mile square reserve at Kalamazoo, Michigan, by the treaty of 1821."[12]  (*Id.* at AR002033; *accord id.* at AR002024, 2028 (emphasis added)).  Thus, the Gun Lake Band was recognized as a tribe by the U.S. government until at least 1870, and acquired a Federal reservation during that time period.

MichGO respectfully disagrees with the Court's conclusion that the Gun Lake Band's former reservations do not count as the Band's "initial" reservations for purposes of § 2719(b)(1)(B)(ii) because they were acquired before the Band was re-acknowledged by the U.S. government in 1999.  (*See* Op. at 12).  There is no language in the statute saying that an earlier-acquired reservation does not count for purposes of § 2719(b)(1)(B)(ii).   The Court's

---

[12] The Gun Lake Band makes the same concessions in its Trust Application, which concedes that the Band was recognized by the U.S. government and entered into numerous treaties with the government in the 1800s.  (*See* AR001986-1987).  The Trust Application further states that, "[u]nder the terms of the Treaty of 1821, the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan was granted a federal reservation in the form of a 3 mile square tract of land located at Kalamazoo, Michigan."  (*Id.* at AR001986).

interpretation thus inserts a temporal limitation that was not intended by Congress. In any event, as discussed above, the Gun Lake Band acquired at least one of its prior reservations by the treaty of 1821, during the period leading up to 1870 in which the Band was, to use Defendants' own term, "unambiguously acknowledged" as a tribe by the U.S. government. Because the Band has enjoyed at least one prior reservation, the Court erred in holding that the proposed casino site would be the Band's "initial reservation."

Finally, as a practical matter, the "initial reservation" issue is currently before the D.C. Circuit in *CETAC v. Kempthorne*. The case has been partially briefed and the parties have agreed to fast-track the appeal for an expedited hearing by the court. It serves judicial economy to stay Defendants' actions until the D.C. Circuit issues its decision in *CETAC*. For this additional reason, this Court should stay the trust acquisition accordingly.

## IV.    A STAY WILL CAUSE NO HARM TO DEFENDANTS OR THE GUN LAKE BAND, AND IS CLEARLY IN THE PUBLIC INTEREST.

Although the injury to MichGO if a stay is not granted is substantial and irreparable, a stay poses no risk of injury to Defendants or the Gun Lake Band. Defendants and the Gun Lake Band have it within their power to continue the proposed casino project simply by performing an EIS and by engaging IGRA's two-step process. A stay will not prevent Defendants from reauthorizing the land transfer once the Court of Appeals has resolved the legal issues raised by MichGO. Moreover, the Gun Lake Band spent years promising they would not open a casino if they obtained federal acknowledgment. They cannot claim to be injured from a delay in opening a casino they said they would never open.

The final factor, the public interest, is also served by a stay. The BIA's own recently disclosed 2005 Checklist says an EIS is supposed to be performed in this case. It is

surely in the public interest to hold Defendants to their own internal standards.  The balance of the harms therefore weighs heavily in MichGO's favor.

## CONCLUSION

Defendants have indicated that they plan to take the proposed casino site into trust on March 5, 2007, thus preempting MichGO's ability to have the merits of its claims heard on appeal.  MichGO will be irreparably harmed if Defendants move ahead with their plan to take the land into trust before the Court of Appeals has an opportunity to review Defendants' actions. Because the balance of the equities strongly favors MichGO, this Court should enter an order staying the proposed trust acquisition until MichGO's claims are heard on appeal.[13]


Respectfully submitted,


_____/s/_____

ROBERT J. JONKER                        REBECCA A. WOMELDORF
DANIEL P. ETTINGER                      D.C. Bar No. 452034
JOSEPH A. KUIPER                        Attorneys for Plaintiff
Warner Norcross & Judd, LLP             Spriggs & Hollingsworth
900 Fifth Third Center                  1350 I Street, N.W., Suite 900
111 Lyon Street, N.W.                   Washington, DC 20005
Grand Rapids, MI 49503                  (202) 898-5800
(616) 752-2000

Dated: March 1, 2007

---

[13] In the event the Court is inclined to deny MichGO's motion for a stay, MichGO requests in the alternative that the Court grant a stay pending review of the motion by the Court of Appeals under Fed. R. App. P. 8(a)(2).