## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHIGAN GAMBLING | ) | |
| OPPOSITION ("MichGO"), a | ) | |
| Michigan non-profit corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  1:05-CV-01181-JGP |
| | ) | |
| GALE NORTON, in her official | ) | |
| Capacity as SECRETARY OF THE | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR, et. al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| MATCH-E-BE-NASH-SHE-WISH | ) | |
| BAND OF POTTAWATOMI | ) | |
| INDIANS, a federally-recognized | ) | |
| Indian Tribe, | ) | |
| Intervenor. | ) | |
| _____ | ) | |

---

### MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS' OPPOSITION TO PLAINTIFF'S MOTION FOR AN INJUNCTION PENDING APPEAL

---

Almost two years ago—on May 13, 2005—the Secretary of the Interior made a final decision to take into trust for the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (the "Tribe" or "Gun Lake Tribe") a tract of land presently occupied by an abandoned lawn products plant, so that the Tribe can develop a casino, restaurant, and entertainment facility in accordance with the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq*.  Opponents of the casino promptly told the press that they intended to file a lawsuit—aiming, in the words of one, to "delay th[e] process for anywhere up to seven years in the court system."  Decl. of Chairman

Sprague Supporting Mot. to Intervene ("Sprague Intervention Decl.," Doc. # 7 at Ex. 3 at 3, attached hereto as "Exhibit 1.")  On the last day of the 30-day notice period provided, by regulation, before the land would be taken into trust, Plaintiff MichGO filed this suit.  *See* 25 C.F.R. § 151.12(b); Doc. # 1 (Complaint filed June 13, 2005).  Because of an accommodating (if, to the Tribe, extremely frustrating) approach adopted by the federal government, that act by itself achieved the goal of delay while the case remained pending in this Court—without MichGO ever having made the demonstration of likely success and a favorable balance of harms that would have been necessary to justify a preliminary injunction preventing the Secretary from proceeding with the trust acquisition.

On February 23, 2007, after full briefing and argument, this Court issued its Opinion rejecting all of MichGO's claims.  Doc. # 72.  Predictably, MichGO nonetheless seeks to prolong the delay it has caused for another year or more while its meritless case grinds through to the same resolution in the court of appeals.  Now, however, the situation is different:  MichGO has received a more than fair judicial hearing, and the Secretary stands ready to implement his decision unless MichGO can persuade this Court or the court of appeals that it is legally entitled to an injunction forbidding him from doing so pending the outcome of an appeal.  MichGO cannot satisfy the familiar standards for such an injunction, and this Court should reject its attempt to use the judicial process to secure still more delay.

## **BACKGROUND**

This Court is familiar with the factual background of the Tribe and the proposed acquisition.  Accordingly, the Tribe will only briefly highlight the background that is most

relevant to the pending Motion.[1]  It has been twelve years since the Tribe started down the path toward restoration of its federally-recognized status.  While the United States restored the Tribe's status as a federally-recognized Indian Tribe in 1999, the Tribe will be unable to realize the full benefits of that status until it obtains land over which it may exercise territorial jurisdiction—trust land.  Equally important, the Tribe will be unable to alleviate the critical need of its members for health care, employment, housing and education until it acquires trust land on which it can pursue economic development, as Congress envisioned in the Indian Gaming Regulatory Act.  25 U.S.C. §§ 2710, 2702, 2719.

It has been nearly six years since the Tribe sought to pursue economic and social self-sufficiency by developing a gaming enterprise on its initial reservation, as specifically contemplated by IGRA and the Secretary's regulations.  *See, e.g.*, 25 U.S.C. §§ 2702(1), 2719(b)(1)(b)(ii); 25 C.F.R. Parts 151, 501.  The site chosen by the Tribe for its initial reservation (the "Bradley Tract") is zoned "light industrial."  It contains an existing single-story building of approximately 193,500 square feet, previously used to manufacture lawn products but vacant since the failure of that enterprise, that can be renovated to form the core of the Tribe's proposed facility.  Administrative Record ("AR") 22-25.  It is located between a railroad track and a four-lane federal highway, and none of the land is currently farmed.  AR 22, 36-37, 73-75, 834-1068, 1082-83, 1150-51, 1171.  To the east and south of the property are industrial-type businesses, including a lumber company, a trucking company, and a seed and landscaping supply company.  AR 36.  The project will leave sixty-eight percent (68%) of the site undeveloped.  AR 23.

---

[1] The relevant background is more fully set forth in the Tribe's Motion to Intervene (Doc. # 7) and in its Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment (Doc. ## 32, 35).

After extensive process (including opportunities for public participation), the BIA issued its final EA in December 2003.  On February 27, 2004, the Secretary made a formal NEPA "Finding of No Significant Impact" ("FONSI").  AR 3-5.  More than a year later, on May 13, 2005, the BIA published notice of the Secretary's final decision to accept the Bradley Tract into trust.  AR 1-2.  By regulation, that notice commenced a 30-day period during which interested parties could seek judicial review before the trust acquisition.  AR 1; 25 C.F.R. § 151.12(b).  On the last day of that period, MichGO filed this suit.  Although MichGO never established that it could satisfy the standards for entry of a preliminary injunction, the United States agreed not to take the Bradley Tract into trust while the case was pending in this Court without first giving 30 days' notice to MichGO and the Court.  Doc. # 71 at Ex. A.

On October 27, 2006, six months after this case was fully briefed on the merits, the United States informed MichGO and the Court that it would take the land into trust on January 5, 2007, unless previously enjoined.  Doc. # 63.  On November 6, 2006, the Court set a hearing on the dispositive motions for November 29th.  On November 22, the United States notified the Court and the parties that, in light of the scheduled hearing, it would not take the land into trust before March 5, 2007.  Doc. # 65.

On February 23, 2007, the Court issued its Opinion granting the dispositive motions and dismissing the case, and on February 27 it issued a corresponding order.  After 5:00 p.m. on Thursday, March 1—six days after issuance of the Court's opinion, and with only one court day remaining before March 5—MichGO filed its Motion seeking an injunction prohibiting the Secretary from taking the land into trust pending appeal.

## STANDARD OF REVIEW

MichGO seeks not a stay of action otherwise ordered by this Court, but a prohibitory injunction forbidding the Secretary of the Interior from taking action he is otherwise legally entitled to take pending further review of MichGO's once rejected claims. Either a stay or an injunction "is an 'extraordinary remedy' and the moving party must satisfy 'stringent standard[s]' to justify a stay pending appeal." *United States v. Judicial Watch, Inc.*, 241 F. Supp. 2d 15, 16 (D.D.C. 2003). The standard is essentially the same as that for the issuance of a preliminary injunction, *Louisville & Nashville R.R. Co. v. Sullivan*, 617 F.2d 793, 799 (D.C. Cir. 1980); *see Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)—although the request comes at the end rather than the beginning of district court proceedings, and thus far more is known about the merit of the plaintiff's claims. An injunction pending appeal will be granted only "upon a showing by the applicant (1) of a likelihood of success on the merits; (2) that it will be irreparably harmed if a stay is not granted; (3) that a stay will not injure any other parties to the lawsuit; and (4) that the stay furthers the public interest." *Judicial Watch*, 241 F. Supp. 2d at 16 (citing *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987), and *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985)).

While a court may accept a lesser showing as to the chance of success if there is a strong showing of irreparable harm, all of the factors must be weighed together in any case. *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006) (showing of irreparable injury "merely focuses greater attention on the three other factors that indisputably enter into the . . . determination"); *Cuomo*, 772 F.2d at 974, 978; *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843-844 (D.C. Cir. 1977); *Blankenship v.*

*Boyle*, 447 F.2d 1280 (D.C. Cir. 1971) (denying stay despite showing of irreparable injury where applicant "fail[ed] to provide a sufficient showing of likelihood of success on the merits").

## ARGUMENT

### I.    MICHGO CAN SHOW NO LIKELIHOOD OF SUCCESS ON THE MERITS

MichGO's complaint raised four claims:  (i) that the Secretary acted arbitrarily and capriciously in determining, on the basis of the comprehensive EA prepared by the BIA, that the Tribe's project would cause no significant environmental impact, and therefore did not require preparation of an Environmental Impact Statement; (ii) that the Secretary erred in concluding, as part of his consideration of the Tribe's application, that the Bradley Tract would qualify as part of the Tribe's "initial reservation" for purposes of IGRA; (iii) that it was arbitrary and capricious for the Secretary to take the land into trust for gaming purposes in the absence of a tribal-state compact that would be necessary to permit certain kinds of gaming; and (iv) that statute under which the Secretary would take the land in trust, 25 U.S.C. § 465, violates the constitutional non-delegation doctrine.  This Court properly rejected each of these claims.  In seeking an injunction pending appeal, MichGO has abandoned its compact and non-delegation arguments.  As to the remaining two claims, MichGO cannot show even a substantial chance that it will prevail on appeal.

### A.    NEPA

NEPA is a "procedural statute that mandates no substantive results."  *Sierra Club v. Watkins*, 808 F. Supp. 852, 859 (D.D.C. 1991) (*citing Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)).   It requires agencies to take a "hard look" at the environmental consequences of actions before taking or approving them.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).  "So long as the agency has taken a 'hard

look' at an action and has followed NEPA's procedures, its substantive decision will not be overturned by a court unless it is arbitrary, capricious, or an abuse of discretion." *Watkins*, 808 F. Supp. at 859 (*citing Marsh*, 490 U.S. at 377). A reviewing court "is deferential to the administrative agency," "presumes the agency action to be valid," and will respect the agency's decision absent a "clear error of judgment." *Young v. General Services Admin*., 99 F. Supp. 2d 59, 66 (D.D.C. 2000), *aff'd*, 2000 U.S. App. Lexis 38685 (D.C. Cir. Dec. 14, 2000).

The District Court properly applied the above standard to uphold the Secretary's determination that the Tribe's project will not have "significant environmental impacts" within the meaning of NEPA, and was correct to prepare an Environmental Assessment ("EA") instead of an Environmental Impact Statement ("EIS").[2] Indeed, as NEPA requires, the BIA identified the areas of possible environmental concern raised by the conversion of an existing light industrial site into a gaming facility; it took a "hard look" at the potential effects in each area; and after conducting that evaluation, it concluded the proposed action would not significantly impact the environment.[3]

---

[2] MichGO also relies heavily on a checklist that the Department of Interior issued in March 2005 ("2005 Checklist") to substantiate its claim. Doc. # 71 at 5. MichGO's reliance on the 2005 Checklist to substantiate its assertion that BIA has a blanket policy of preparing EISs for Indian casinos is severely misleading and inaccurate. BIA's procedures do not list Indian casinos as the type of proposal which normally require an EIS. *See* 40 CFR §§ 1501.4(a), 1507.3; *see also* 516 DM 6, App. 4, § 4.3 (61 Fed. Reg. 67,845 (1996)); 30 BIAM Supp., NEPA Handbook, § 3.4 (1993); Doc. # 70 at 3. Accordingly, MichGO's claim that the Secretary violated NEPA by failing to prepare an EIS, because it is the Secretary's practice to prepare an EIS for such projects, finds no support in law or fact. In fact, that assertion is belied by several recent Indian casino projects that have been approved on the basis of EAs. *See* Doc. # 70 at 3.

[3] MichGO attempted to argue that the sheer size of the Tribe's project—as well as the mere length of the Environmental Assessment—triggers the need for an EIS. Doc. # 50 at 32, 35-39. However, the courts—including this Circuit, in a case in which Plaintiff's counsel was involved—have rejected this simplistic approach. *See TOMAC v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006). Likewise, in this case, the Court properly rejected this argument, determining that "[w]hat ultimately determines whether an EIS rather than an EA is required is the scope of the project itself, not the length of the agency's report." *Op.* at 15.

As this Court properly concluded, MichGO failed to show there was anything arbitrary, capricious, or unlawful about the Secretary's process or decision. The Secretary "analyzed the full range of potential environmental impacts of taking the Bradley Property into trust, took a 'hard look' at the associated problems in preparing the EA and offered substantial mitigation measures where they found truly significant impacts." Op. at 16; AR 184-191, 1461-1463. Specifically, as this Court's review confirmed, the BIA took the requisite "hard look" in its EA, and addressed all potential environmental impacts.

The Bradley Property could not be more appropriate for the Tribe's proposed gaming facility. The site is zoned for light industrial use, located between a railroad track and a four-lane highway, and, having previously been used to manufacture lawn products, contains a large, empty warehouse and factory building that will be converted to house the gaming facility. Doc. # 32 at 17-19; *see also* AR 36-38; 124-25; 1086-87. In fact, none of the land is currently farmed. AR 36-37; 76. Wayland Township, the local government with responsibility for regulating land use in the area, agrees, and has notified the BIA it believes the project is entirely consistent with local zoning and land use plans. AR 124-25; 834; 1068; 1079; *see also* AR 1115. In addition, the Property fully complies with the Farmland Protection Policy Act and the National Historic Preservation Act, meaning it is not expected to impact any federally designated farmland or historic properties. Op. at 17-18; *see also* AR 125-126 (farmland), AR 93-94 (historic properties); Doc. # 56 at 23.

MichGO bases its argument for likelihood of success on the merits on its NEPA claim entirely on its assertion that the BIA arbitrarily determined that the casino will not have significant impacts on traffic. Doc. # 76 at 13. However, the BIA fully evaluated whether the gaming facility would adversely affect traffic flows and concluded that any potentially

significant impacts will be minimized with the implementation of enforceable mitigation measures. AR 64-70; 103-17; 189; Doc. # 32 at pp. 21-26; Doc. # 56 at pp. 24-27; Op. at 24-30. The EA analyzed the project's potential effects on "transportation networks," and in particular questioned whether a gaming facility projected to draw 8,500 patrons per day would adversely affect the flow of traffic on surrounding roads. AR 64-70; 103-17. To answer this question, the Tribe retained a respected traffic engineering firm, URS Corporation ("URS"), to develop and conduct a traffic study. URS conducted the requisite analyses with input from the relevant regulatory agencies, including the Michigan Department of Transportation ("MDOT") and the Allegan County Board of County Road Commissioners (which together possess both particular traffic expertise and jurisdiction over the roads surrounding the project). AR 441-517; 585-90; 1077; 1082-83.

URS's study identified the traffic that would likely be generated by the Tribe's casino (AR 109), and found that the infusion of casino traffic could affect the flow of afternoon rush hour traffic in two directions at two intersections near the project site. AR 114-15. With continued input from the state and local government agencies with the relevant traffic expertise (and MDOT in particular), URS identified road improvements that would either eliminate the projected traffic congestion at the identified intersections or alleviate it to the satisfaction of the MDOT, which retains continuing jurisdiction and permitting authority over the roadway. AR 64-70; 103-17; 137-143, 177-178; 441-517; 585-90; 1077; 1082-83; *see also* AR 515. As the EA explained, the MDOT can impose additional road improvements should it determine they are necessary.[4]  AR 189-90; 475; 1078; 1082-83; 1462 at ¶ 6.

---

[4] The BIA's FONSI is contingent upon the proposed mitigation and MDOT's permitting process. AR 1461 at ¶ 3.

Out of many intersections analyzed, MichGO takes issue with the disposition of one. Despite MichGO's claims, the EA simply does *not* "openly admit[]" that the project will result in significant impacts.  Doc. # 76 at 14.  It states that although *one* intersection, during *one* "peak hour," has the *potential* to operate at LOS F.  It immediately goes on to explain that MDOT, the State agency with expertise and jurisdiction in this area, believes that the proposed mitigation—"all-way stop control"—will "provide acceptable intersection operations."  AR 190; 115 ("with the implementation of traffic improvements approved by MDOT and described in Chapter 5, these traffic [intersection] impacts will be less than significant.").  MichGO ignores the finding that the impact will not be significant because of the agreed mitigation.  And—also ignored by MichGO—the BIA provided that if, in actual operation, the traffic flow at the intersection should turn out not to be acceptable, then a red light is to be installed.  AR 190.  What more can plaintiff ask for?  The problem has been solved to the satisfaction of both the State agency with traffic expertise and the NEPA lead agency—with a safety valve of still further mitigation required should that prove necessary in light of future experience.[5]

The District Court concluded that the EA's analysis satisfied NEPA, noting that the proposed mitigation (which it found to be enforceable) would reduce traffic congestion to acceptable levels, and that both MDOT and the Allegan County Road Commission support the traffic mitigation measures.  Op. at 28-29.  In sum, the Court's February 23rd decision clearly demonstrates that MichGO is not likely to succeed on the merits of its NEPA-based claims.

---

[5] Even if this mitigation had not been imposed, there would be nothing arbitrary or capricious had the Secretary concluded that a potential negative effect at one intersection did not meet the test for significance for the action as a whole under NEPA.

**B.    IGRA's "Initial Reservation" Provision**

MichGO is no more likely to succeed in challenging this Court's ruling (Op. at 7-12)

sustaining the Secretary's conclusion that the Bradley Tract will be eligible for IGRA gaming

because it will be taken into trust as part of the Tribe's "initial reservation" as that term is used in

IGRA, 25 U.S.C. 2719(b)(1)(B)(ii).  The statute permits gaming on land that is "taken into trust

as part of . . . the initial reservation of an Indian tribe acknowledged by the Secretary under the

Federal acknowledgement process" (*id.*), and it was intended to "ensur[e] that tribes lacking

reservations when IGRA was enacted are not disadvantaged relative to more established ones."

*Roseville v. Norton*, 348 F.3d 1020, 1030 (D.C. Cir. 2003) (discussing § 2719(b)(1)(B)(iii)); *see

also Grand Traverse Band of Ottawa & Chippewa Indians v. United States Attorney*, 46 F. Supp.

2d 689, 698 (W.D. Mich. 1999) (statutory purpose is to "place tribes belatedly acknowledged or

restored in the same or similar position as tribe recognized by the United States earlier in

history.").  Both language and purpose apply squarely to acquisition of the Bradley Tract, which

will be the first land acquired by the Secretary for the Gun Lake Tribe after the Tribe was

belatedly afforded formal legal recognition through the Secretary's acknowledgment process in

1999.[6]

In contrast, MichGO's interpretation, under which a Tribe could not have an IGRA

"initial reservation" if it had ever held land at some previous point in its history, would make the

provision a nullity.  There is likewise no substance to its argument that land cannot be an IGRA

---

[6] MichGO suggests that the Tribe had a previous reservation by affiliation with the Huron
Pottawatomi Tribe.  Docs. # 1 at ¶ 105; # 76 at 18-19.  That is incorrect.  In deciding to
acknowledge the Gun Lake Tribe, the Secretary was required to conclude that Gun Lake was
separate from any other tribe.  *See* 25 C.F.R. § 83.3(a).  That determination is conclusive for
purposes of the present proceedings.  In any event, this Court has previously rejected a claim that
the Huron Tribe itself had any prior reservation for purposes of IGRA.  *Citizens Exposing Truth
About Casinos (CETAC) v. Norton,* No. 02-1754, 2004 U.S. Dist. LEXIS 27498, at **12-13
(D.D.C. Apr. 23, 2004).

"initial reservation" unless it is used for housing. In *Roseville*, 348 F.3d at 1028, the D.C. Circuit dismissed an essentially identical argument as "nonsensical:" "The point of the [provisions in Section 2719 relating to land acquired after the enactment of IGRA] is that such lands may be used for commercial gaming; it would make no sense if a tribe's use of land for gaming could defeat the land's eligibility for gaming." *See also Citizens Exposing Truth About Casinos ("CETAC") v. Norton*, No. 02-1754, 2004 U.S. Dist. LEXIS 27498, at *13 (D.D.C. Apr. 23, 2004) (rejecting the "housing" argument in the specific context of the "initial reservation" provision).

If there were any doubt about the correct interpretation of the statute (which there is not), it would be resolved by reference to rules of construction requiring courts to resolve ambiguities in favor of the Tribe and to defer, under these circumstances, to the Secretary's construction of a provision within his area of administration and expertise. *See, e.g.*, *Roseville*, 348 F.3d at 1029, 1032; *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-45 (1984). Particularly in light of those well-established principles, MichGO has no chance of success on its IGRA claim.

Finally, MichGO asserts (Doc. # 76 at 7, 20) that this Court should prohibit the Secretary from proceeding with an acquisition for the Gun Lake Tribe because the "initial reservation" issue is pending before the D.C. Circuit in *CETAC v. Kempthorne*, No. 06-5354 (D.C. Cir., appeal docketed Nov. 30, 2006) (previously *CETAC v. Norton*). But the district court in *CETAC*, like this Court, rejected CETAC's position on this issue, discerning "no statutory or regulatory requirement that land must contain housing in order for the Secretary to proclaim it a reservation under the IRA and for it to qualify as an initial reservation under IGRA." 2004 U.S. Dist. LEXIS 27498, at *15. Any deference to the *CETAC* case should favor the United States and the Tribe,

not MichGO. Particularly in light of both district courts' conclusions, however, the deference here should be to the Secretary's interpretation, and his decision to proceed with the acquisition should not be preempted or further delayed in the absence of a determination that it was arbitrary or capricious. *See Chevron*, 467 U.S. at 843-44. No court has made any such determination.

## II.    MICHGO CANNOT ESTABLISH IRREPARABLE AND SUBSTANTIAL HARM

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy*, 454 F.3d at 297. To satisfy this part of the test for a stay pending appeal, MichGO must show that in the absence of relief it will suffer injury that is not only irreparable, but "both certain and great." *Id*. (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The injury complained of must be "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm," and it "must be beyond remediation." *Chaplaincy*, 454 F.3d at 297.

As to its claim concerning the proper interpretation of IGRA's "initial reservation" exception, allowing the trust acquisition to go forward while an appeal is pending will not cause MichGO any harm at all. That claim goes to whether or not the Tribe may lawfully operate an IGRA casino on the Bradley Tract, not to who owns the land. While acquisition of the land in trust is a necessary precursor to the operation of a casino, it is only an initial step in the development. Even if work begins shortly after the trust acquisition, it will likely be at least 14-16 months before a casino could open its doors. Declaration of Chairman Sprague Supporting Opp'n to Mot. to Stay ¶ 11 (hereinafter "Sprague Stay Decl.," attached hereto as "Exhibit 2"). The court of appeals will accordingly have ample time to consider MichGO's claim before operation of a casino is even close to imminent, *see Chaplaincy*, 454 F.3d at 297; and even if a casino were to begin operating MichGO's harm on this claim would scarcely be "irreparable,"

because a decision holding that the land does not qualify as an "initial reservation" could be implemented by requiring demonstration of another basis for operation under IGRA or, should that be impossible, by closing the casino. If there is a risk of harm from proceeding with the Tribe's project while MichGO's appeal on this claim remains pending, it is a risk run by the Tribe, not by MichGO. It provides no basis for an injunction pending appeal.

As to its claims under NEPA and the non-delegation doctrine, MichGO contends that if the Secretary is allowed to acquire the land in trust, further litigation of those claims will be barred by the interaction of the sovereign-immunity provisions of the Administrative Procedure Act, 5 U.S.C. 702(2), and the Quiet Title Act, 28 U.S.C. § 2409a(a). We understand that also to be the position of the United States, and it may well be correct. *See, e.g.*, *Neighbors for Rational Development, Inc. v. Norton*, 379 F.3d 956, 960-66 (10th Cir. 2004). Even if it is, however, it establishes only that any alleged harm caused to MichGO by preempting still further review of these claims may be irreparable—not that it will be "great," *see Chaplaincy*, 454 F.3d at 297, and certainly not that it is sufficient to warrant relief in the other circumstances of this case, *id*. at 304. That any injury will not be "great" as to MichGO's NEPA claims is especially clear considering that MichGO is not an environmental organization, but rather an organization that is opposed to the expansion of gambling, whose self-proclaimed mission is to "delay" the Tribe's fee-to-trust process as long as possible. *See supra* pp. 1-2; *infra* pp. 20-21.

Loss of an opportunity for appellate review of these claims is not a substantial harm because, as explained above, the claims themselves are insubstantial. In particular, there is no prospect of real environmental harm. Notably, no public agency with "jurisdiction by law" or "special expertise with respect to any environmental impact involved" (*i.e.*, an environmental agency), 42 U.S.C. § 4332(2)(C), opposes the Tribe's project or has even commented adversely.

AR 825-1060. Nor has any environmental organization opposed the project or commented adversely. *Id*. Every local government with jurisdiction over the project supports it. AR 216-249, 586-590, 825-1060; *see also* Docs. ## 37, 43, 46, 49; Sprague Intervention Decl. ¶ 23; Sprague Stay Decl. ¶ 9; *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986-87 (9th Cir. 1985) (noting "virtual agreement" among the governmental agencies and environmentalists and that "[o]nly appellant and its two experts are critical" of the project as factors "supporting the Service's decision not to prepare an [EIS]."). There is a reason for this conspicuous lack of opposition: The project is not environmentally harmful.[7] While MichGO is entitled to disagree, its ostensible environmental concerns have been exhaustively addressed, first in a three-year environmental assessment process, including extended periods for public comment and meticulous review by the BIA (evidenced by the extensive administrative record, *see* AR 1 to 11,813), and now by this Court. They have had at least two "hard look[s]." *E.g.*, *Robertson*, 490 U.S. at 348. There is no great harm to be feared even if allowing the Secretary now to proceed—at long last—with his decision to take the Bradley Tract into trust means that they cannot receive a third.

## III.    FURTHER DELAY WILL SUBSTANTIALLY HARM THE TRIBE

In stark contrast, granting an injunction pending appeal will clearly perpetuate the very substantial harm the Tribe has already endured during the pendency of this litigation. Since it first achieved federal legal recognition some eight years ago, the Tribe has sought to acquire a land base that would enable it to pursue the economic development that alone can support tribal

---

[7] This case differs substantially from the NEPA cases MichGO cites in seeking an injunction. MichGO cannot rely on cases granting injunctions to restrain actions that could cause immediate, obvious, and severe environmental harms when its own case focuses on a highway intersection that may eventually require a new traffic signal to facilitate left-hand turns. *See, e.g.*, Doc. # 76 at 10 (citing *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998) (enjoining an organized bison hunt pending further environmental review)).

self-determination and self-sufficiency.  Sprague Stay Decl. ¶¶ 4, 6.  After due consideration, it determined that its best development prospect was to establish a gaming and entertainment facility—a step specifically envisioned by Congress for newly acknowledged Tribes.  *See* 25 U.S.C. §§ 2701, 2702, 2719(b); Sprague Intervention Decl. ¶¶ 14, 17-20.[8]  As required by IGRA, funds from that development will be used to fund tribal government operations and social programs—such as higher education programs, rental housing assistance, emergency assistance, health care, home buying assistance, home revitalization assistance, youth programs and elder care—and to provide financial assistance to Members of the Tribe.  25 U.S.C. § 2710(b)(2)(B); Sprague Stay Decl. ¶ 7.  The project will also provide sorely-needed jobs.  In short, like any government, the Tribe seeks to provide enhanced opportunities and a better life for its members and future generations.  Sprague Stay Decl. ¶ 10.  The proposed casino is the best—indeed, the only practical—means for the Tribe to use to pursue that goal.  *Id.*

It has now been more than five years since the Tribe asked the Secretary to take the Bradley Tract into trust; three years since the Secretary completed his extensive environmental review and issued a FONSI; and almost two years since the Secretary made a final favorable determination and MichGO initiated this lawsuit.  Sprague Stay Decl. ¶ 12.  In the time since this suit caused the United States to postpone implementation of the Secretary's decision, the Tribe has lost millions of dollars in revenue, and its members (and other area residents) have lost jobs and other opportunities.  *Id.* ¶ 14.  In some respects these losses are permanent and irreparable.  Since the initiation of this lawsuit, for example, six Members of the Tribe have died.  *Id.* ¶ 12.

---

[8] Throughout this lawsuit, MichGO has alleged that the Tribe's intent to operate a gaming facility on the Bradley Tract is inconsistent with its promises to its members and the federal government.  This allegation has <u>no</u> basis in fact.  The Tribe's duly adopted Constitution does not contain any prohibition on gambling.  The promise to which MichGO refers was contained in a *draft* constitution that was never adopted by the Tribe or its members.  Sprague Stay Decl. ¶ 6.

At the other end of the age spectrum, children continue to be born and grow up without the benefit of the health programs and educational opportunities that an operating casino would have funded, and that would have provided them with lifelong benefits, or prevented lifelong harms. *Id.*  If MichGO succeeds in using its meritless claims to cause still further delay, then still more Tribe Members will never realize the benefits that Congress intended to make available to them under IGRA.  *Id.*  That harm—unlike any that might result to MichGO from denial of a stay—is immediate, ongoing, and real.

**IV.    THE PUBLIC INTEREST MILITATES AGAINST FURTHER DELAY**

MichGO has little to say about the public interest.  *See* Doc. # 76 at 20-21.  That is not surprising, because at this point the public interest lies in allowing the Secretary to proceed.

The Tribe filed its fee-to-trust application in this case pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, and IGRA.  One important purpose of the IRA is to allow the Secretary to accept land into trust for Indian Tribes to encourage economic development. *Mescalero Apache Tribe v. O'Cheskey*, 439 F. Supp. 1063, 1073 (D.N.M. 1977), *aff'd,* 625 F.2d 967 (10th Cir. 1980).  The same is true of IGRA.  *See* 25 U.S.C. 2719(b).  Those aspects of both statutes are consistent with Congress's "'overriding goal,'" in federal Indian policy, "of encouraging tribal self-sufficiency and economic development."  *Oklahoma Tax Comm'n v. Citizens Band of Potawatomi Indian Tribe*, 498 U.S. 505, 510 (1991); *see, e.g.*, *Seneca-Cayuga Tribe of Okla. v. Oklahoma*, 874 F.2d 709, 716 (10th Cir. 1989); *Grand Traverse Band v. United States Attorney*, 46 F.Supp.2d 689, 705 (W.D. Mich. 1999); *Sac & Fox Nation of Mo. v. LaFaver*, 905 F.Supp. 904, 907-08 (D. Kan. 1995).  Allowing the Secretary to proceed with the trust acquisition will directly serve these important interests.

The public interest will also be furthered by acceptance of the land into trust, and the eventual operation of the gaming facility, because the facility is expected to create numerous economic opportunities for the Tribe's surrounding community and its members. The project is expected to create 1800 direct and 3100 indirect jobs, which will serve to assist the State of Michigan's high unemployment rate—7.1% (seasonally adjusted) as of December 2006, second only to hurricane-devastated Mississippi. Sprague Stay Decl. ¶ 9; Bureau of Labor Statistics Repot (Jan. 23, 2007), found at http://stats.bls.gov/news.release/pdf/laus.pdf. Local support for the Tribe's project is overwhelming—as reflected, for example, in an amicus brief filed in this case, and in numerous letters reflecting organizational support. Sprague Stay Decl. ¶ 9.[9]

Finally, while in some NEPA cases there would be a public interest in preserving the status quo pending appeal, that is not true here. As discussed above, this case involves no real threat of environmental harm. Moreover, MichGO itself is an anti-gaming group, not an environmental organization. Its NEPA claim bears the hallmarks of an action brought not out of environmental concern but merely—as is all too common—as a "monkey wrench." *See* Karkkainen, *Whither NEPA?,* 12 N.Y.U. Envtl. L.J. 333, 339 (2004) ("The monkey wrencher . . . places a high value on NEPA because it affords extraordinary opportunities to throw up procedural roadblocks that may delay or kill projects the monkey wrencher opposes."). The public interest is not well served when NEPA is invoked as a tool to delay public actions that serve other important values—here, the self-sufficiency of a long-dispossessed Indian tribe. In the equitable weighing of interests required here, at this point in the litigation (if not before) the

---

[9] Organizations which have recently voiced this support include: the Deputy Sheriff's Association of Michigan ("DSAM"); Southwest Michigan Building & Construction Trades Council ("SMBCTC"); Kalamazoo Regional Chamber of Commerce; Ironworkers Local 340; West Michigan Plumbers, Fitters and Service Trades Local Union No. 174; West Michigan Trades Council; and Wayland Area Chamber of Commerce. Sprague Stay Decl. ¶ 9.

balance tips sharply against injunctive relief.  *Cf. Cuomo*, 772 F.2d at 976 ("The NEPA violation in this case has not been clearly established, . . . as should be done in order to justify injunctive relief.").

## CONCLUSION

For the foregoing reasons, MichGO's Motion for a Stay or Injunction pending appeal should be denied.[10]  Should the Court nonetheless be inclined to grant the motion, the Tribe respectfully requests that, in accordance with Fed. R. Civ. P. 62(c)-(d) and Fed. R. App. P. 8(a)(2)(E), the Court require MichGO to post a significant bond to secure the Tribe against consequent economic harm, and grant the Tribe a hearing to allow it to put forth evidence as to the amount of damages that it will suffer as a result of the continued delay.

---

[10] In the alternative, MichGO seeks a temporary injunction while it renews its present Motion in the court of appeals.  MichGO has known since November 2006 that the Secretary intended to proceed with the trust acquisition on Monday, March 5, 2007, unless previously enjoined.  It waited until six court days before that date to seek a preliminary injunction (Doc. # 71).  After this Court ruled on the merits on February 23, MichGO waited until after 5:00 p.m. on Thursday, March 1, to file a largely identical motion seeking an injunction pending appeal (Doc. # 76).  The Tribe sees no reason for the Court to reward these transparent efforts to manufacture emergencies and cause still more delay.

Respectfully submitted this 2nd day of March 2007.

Match-E-Be-Nash-She-Wish Band of
Pottawatomi Indians, Intervenor-Defendant,

By ____ /s/ Conly J. Schulte _____ _____

Nicholas C. Yost, CA Bar 35297   Conly J. Schulte, NE Bar 20158
Paula M. Yost, CA Bar 156843    Shilee T. Mullin, NE Bar 22286
Sonnenschein Nath & Rosenthal LLP  Monteau & Peebles, LLP
685 Market Street, Sixth Floor    12100 W. Center Road, Suite 202
San Francisco, CA  94105     Omaha, NE  68144
Telephone (415) 882-5000     Telephone (402) 333-4053
Fax (415) 543-5472       Fax (402) 333-4761


Seth P. Waxman, DC Bar 257337   Michael J. Anderson, DC Bar 417887
Edward C. DuMont, DC Bar 471443   Anderson Tuell, LLP
Wilmer Cutler Pickering Hale and Dorr LLP 300 Independence Ave. SE
2445 M Street, NW       Washington, DC  20003
Washington, DC 20037      Telephone (202) 543-5000
Telephone (202) 663-6000     Fax (202) 543-7716
Fax (202) 663-6363

20

## CERTIFICATE OF SERVICE

I certify that on March 2, 2007, I electronically filed the above document with the Court, and forwarded a true and correct of the above via First Class mail, postage prepaid, to::

John A. Watts (Mich. Bar # P22048)
Michael D. Blumeno (Mich. Bar # P66063)
JOHN A. WATTS, P.C.
245 Hubbard Street
Allegan, MI 49010
Tel:  269-673-3547
Fax:  269-673-5679
*Attorneys for Amicus Wayland Township*

Robert Byington
DEPOT LAW OFFICES
222 W. Apple Street
Hastings, MI  49058
Tel:  269-945-9557
*Attorney for Amicus Barry County Chamber*

Kevin Cronin
2371  130th Ave.
Hopkins, MI  49328
Tel:  269-793-7764
*Attorney for Amicus Friends of Gun Lake Tribe*

Thomas A. Klug
LAW OFFICE OF THOMAS A. KLUG, P.C.
3626 Dunckel Road
Lansing, Michigan 48909
*Attorney for Amicus Deputy Sheriff's Association of Michigan*

_____/s/ Conly J. Schulte_____