# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHIGAN GAMBLING OPPOSITION ("MichGO"), a Michigan non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>GALE NORTON, in her official Capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>and<br><br>NEAL A. McCALEB, in his official capacity as ASSISTANT SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS,<br><br>Defendants.<br>_____<br><br>MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS, a federally recognized Indian Tribe, c/o Hon. D.K. Sprague, Chairman, Tribal Headquarters, P.O. Box 218, Dorr, MI 49323,<br><br>Intervenor.<br>_____ | Case No. 1:05-cv-01181-JGP<br><br><br>**DECLARATION OF CHAIRMAN D.K. SPRAGUE IN SUPPORT OF MOTION TO INTERVENE** |



EXHIBIT

1

05-CV- 01181 JGP

1. The information contained herein is based upon my personal knowledge, and I am competent to testify to the matters herein if called to do so in any proceeding.

2. I am the duly elected Chairman of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, commonly known as the "Gun Lake Tribe" (hereinafter "Tribe" or "Gun Lake Tribe"), a federally-recognized Indian tribe, and have served in this capacity for thirteen years.

3. I reside at 1642 Parker Drive, Wayland, Michigan 49348, and have resided there for four years. My residence is located approximately five miles from the 147-acre parcel at issue in this case.

4. Prior to becoming Chairman, I was employed by CSX Railroad for twenty-five years. I also have served as a Sergeant in the United States Army.

5. In my capacity as Chairman, I am the primary representative of the Tribe and preside over the Tribe's governing body, the elected Tribal Council.

6. As a member of the Tribe and as the Tribe's Chairman, I have knowledge of the Tribe's history, which is accurately set forth in the document entitled "Gun Lake Fee-To-Trust Application," attached hereto as "Exhibit 1."

7. The Tribe descends primarily from a Pottawatomi Band of Indians that was led by Chief Match-E-Be-Nash-She-Wish during the late 1700s and the first half of the 1800s. During that time, the Tribe lived in villages located along the Kalamazoo River, where the City of Kalamazoo, Michigan is now located.

8. In 1821, Chief Match-E-Be-Nash-She-Wish signed the Treaty of Chicago of August 29, 1821, along with several other chiefs of Indian tribes located in Michigan, with the United States. Through the Treaty, nearly all the Indian land located south of Michigan's Grand

River was ceded to the United States by the Michigan Indian tribes. However, the Treaty reserved three square miles of land at Kalamazoo for the Gun Lake Tribe, where many of the Tribe's members lived.

9.    The reservation at Kalamazoo was thereafter ceded to the United States by the Treaty with the Pottawatomi of 1827. However, some of the Tribe's members remained in the Kalamazoo area until at least 1838.

10.   Between 1827 and 1839, the federal government attempted to remove the Tribe from Michigan to "Indian Territory," which meant lands further west, away from white settlements (which were also moving further west). However, the Gun Lake Tribe did not leave the State of Michigan.

11.   The Gun Lake Tribe left Kalamazoo and settled in Bradley, Michigan, around 1839. The Tribe was under the protection of an Episcopalian mission, and lived on lands provided by the mission. These lands were known as the "Griswold Colony" or "Bradley Settlement." The Bradley Settlement is located three miles from the 147-acre parcel at issue in this case.

12.   The Episcopalian mission received funds based on the Ottawa Treaty of 1836, but these funds were no longer available after 1855. Nevertheless, many families stayed on the mission land in Bradley, which at the time was held in trust by Bishop Samuel A. McCrosky. Some members of the Tribe left the mission for a time, but almost all of them returned by about 1870.

13.   After Bishop McCrosky resigned from the trust around the turn of the century, the mission land was divided into parcels and deeded to nineteen descendants of the Match-E-Be-Nash-She-Wish Band. Most of the mission land was soon lost for failure to pay state and local

3

taxes. However, most of the members of the Tribe remained in the area around the former Griswold Colony, in and around the City of Bradley and in Allegan County.

14. The Tribe has no reservation or trust lands, and since 1999 when the Tribe became federally recognized, the Tribe has sought to acquire federal trust land for its initial reservation. The Tribe's members subsequently determined that the Tribe should seek to establish a gaming and entertainment facility on its initial reservation, in order to provide an economic base for the Tribe and its members. To this end, the Tribe evaluated several potential sites located throughout Allegan County, Michigan.

15. Specifically, the Tribe evaluated four sites in Allegan County. One of those sites is the 147-acre tract at issue in this case, which is comprised of two adjacent parcels of land equaling 147.48 acres. Both parcels are located in the Township of Wayland, County of Allegan in the State of Michigan. One of the parcels is commonly known as "1123 129th Avenue, Bradley, Michigan." Both parcels are collectively referred to as "the Bradley Tract."

16. The three other sites were examined and considered in depth. Initially, it appeared that these sites could meet the Tribe's purpose and need. However, after more thorough analysis, including conducting Phase I environmental site assessments on the sites in January of 2001, and evaluating development compatibility with surrounding uses, the Tribe eliminated these alternative sites from further consideration and analysis. The Tribe and the EA consultants discussed these alternative sites and the supplemental information contained herein with the BIA, and acted in accordance with the guidance received from the BIA in terms of the contents of the EA. These sites are discussed in detail below.

    a. **Site 1 – 108 acre Site**: The first site the Tribe selected for more thorough examination was a 108-acre parcel of land located in Dorr Township. The site is bordered on the east

4

by 12th Street, on the west by US-131, on north by the Jablonski property, and on the

south by 142nd Avenue. The Tribe rejected this site for a number of reasons, as

described below.

i. The site is located near local schools and the town of Moline. The school is considered to be incompatible with a casino and would increase the controversy and opposition surrounding the proposed casino.

ii. The site contains a water tower. The existing owners operate a private water supply system that supplies water to local municipalities, including nearby Moline. The tower would need to be demolished or water appropriated to support the casino activities, impacting a source of water for neighboring municipalities.

iii. Sewer service in the quantity required for the casino would not be readily available at the site, and due to the limited size of the site and the lack of a nearby water river, it would be difficult or impossible to construct an on-site wastewater treatment and disposal system.

iv. Site 1 appeared to be biologically sensitive, and included the presence of wetlands.

v. Current on-site development is minimal and could not be retrofitted to support a large commercial facility such as a casino. The site would have to be cleared and prepared for development. Any biological or cultural resources on the site would be impacted.

vi. The introduction of new impervious surfaces on the site (e.g. buildings and parking areas) would increase stormwater runoff, which could cause downstream flooding and water quality problems.

vii. Access to the property was not conducive to large-scale commercial development. Access is from the east along 12th Street, a dirt road.

A Phase I Environmental Site Assessment (ESA) was conducted on Site 1. Although the

Phase I ESA did not reveal evidence of toxic contaminants associated with Site 1, it did

identify several barns, a residence, and a veal waste lagoon, which according to the

Phase 1 ESA, "... may have consisted of manure." The walkover of Site 1 was

conducted in January after a snowfall. Thus, a thorough inspection of the site's soils was

not possible. Although the veal waste lagoon was not clearly visible due to snow cover,

an interview with the previous landowner confirmed that the lagoon was used for above

ground dumping of veal waste. The liquid waste was then pumped underground to two vertical irrigation sprinklers, which irrigated the pasture with the waste liquid. Although the lagoon is not considered in the Phase I ESA to be hazardous, it would require some level of remediation prior to preparing the site for commercial use.

b. **Site 2 – 242 acre Site:** The second potential gaming site is located in Dorr Township. The parcel of land is triangular in shape, consists of 242 acres, and is located just south of the first site. It is bordered on the east by US-131, on the south by 140th Avenue, and on the west by the Potter Bros. and Damstra properties. The Tribe rejected this second site for a number of reasons, which are listed below.

   i. Ingress and egress was a concern because only two access points were available on either side of an existing residence, which was not for sale. Thus, traffic access would be difficult and would heavily impact the adjacent residence.

   ii. Site 2 also appeared to be biologically sensitive, and included the presence of wetlands.

   iii. Current on-site development is minimal and could not be retrofitted to support a large commercial facility. The site would have to be cleared and prepared for development. Any biological or cultural resources on the site would be impacted.

   iv. The introduction of new impervious surfaces on the site (e.g. buildings and parking areas) would increase stormwater runoff, which could cause downstream flooding and water quality problems.

   v. Most of the site is zoned for rural estates, a land use designation that is not consistent with commercial development.

   vi. A Phase I ESA indicated the likely presence of asbestos in one of the on-site structures. This asbestos is hazardous and would need to be remediated and disposed of properly prior to commercial development.

c. **Site 3 – 129 acre Site:** The third site is approximately 129 acres located in Hopkins Township, just to the west of US-131 and bisected by 132nd Avenue. The Tribe rejected this site for a number of reasons, which are listed below.

  i. The site lacks water and sewer infrastructure.

  ii. The site is irregularly shaped. Constructing a large casino with parking and associated facilities would be difficult on the long, narrow, rectangular site.

  iii. The site is served only by an unpaved road and is not readily accessible from a highway interchange.

  iv. Traffic accessing the site would pass many neighboring residences, potentially resulting in associated nuisance impacts, such as noise and visual impacts.

  v. Adjacent construction equipment sales operations raised concerns about potential present or future contamination from leaking vehicles.

  vi. Site 3 also appeared to be biologically sensitive, and included the presence of two waterways with associated riparian vegetation.

  vii. The site is zoned for agriculture, a land use designation that is not consistent with commercial development.

A Phase I ESA was conducted on Site 3. Although the Phase I ESA did not reveal evidence of toxic contamination associated with Site 3, it did chronicle a residence, barn, and several outbuildings. The walkover of Site 3 was conducted in December with a snow cover present. Thus, a thorough inspection of the site's soils was not possible.

17. Alternative uses of the Bradley Tract were also considered by the Tribe, but rejected as infeasible. The Tribe first considered industrial uses. Similarly, the Tribe looked at other economic uses such as retail, but did not pursue them since the low density of the surrounding population did not provide a market that would make such an endeavor a success.

18. The proposed project site currently contains an industrial building associated with the past operation of Ampro Industries, Inc. A true and correct depiction of the proposed project site is attached hereto as "Exhibit 2." Ampro Industries manufactured lawn products such as mulch and hydroseed mix. The continuation of a similar manufacturing business on the site was considered by the Tribe. The existing modern warehouse-style industrial building with

7

a connected office is well suited for a manufacturing business. Truck loading docks, employee parking, and large indoor work and storage space, and good highway access characterizes the existing physical facilities. As stated in the EA, the site is currently zoned industrial, and there are no sensitive land uses nearby, and therefore it is well suited to a manufacturing business.

19. Unfortunately, manufacturing businesses have not fared well in Michigan due to high labor costs and other competitive pressures. Ampro Industries, the former owner of the site, first downsized and then ceased all manufacturing operations on the site. Given that the Tribe has no particular experience or track record in manufacturing, and that no investors or management companies were identified that would finance and assist the Tribe with the operation of such a business on this site or any other site, the use of the site for manufacturing use was determined to be infeasible.

20. On August 8, 2001, the Tribe requested that the Secretary of Interior accept the Bradley Tract into trust for the benefit of the Tribe. The Tribe also requested that the Secretary proclaim that the Bradley Tract is the Tribe's initial reservation for purposes of the Indian Gaming Regulatory Act, 25 U.S.C. § 2719(b)(1)(ii).

21. The Bradley Tract is located less than three miles from the Griswold Colony, which consists of lands that the Tribe has historically occupied. The Griswold Colony and the Bradley Trust are located within the exterior boundaries of the land ceded to the United States in the Treaty of Chicago of August 29, 1821. The majority of the Tribe has remained in the Bradley area to the present day. Most members of the Tribe live within ten to twenty-five miles of the Griswold Colony, which is less than three miles from the "Bradley Tract"—the land at issue in this lawsuit.

8

22. Hundreds of comments were received from the general public, local organizations, governments, and government officials (including supporters and opponents of the project).

23. Many local governments and organizations have voiced their support for the project, including: the Dorr Business Association; Hopkins Superintendent of Schools; Kalamazoo Convention and Visitors Bureau; along with many Kalamazoo Unions and organizations; the Barry County Area Chamber of Commerce; the City of Wayland, to name a few.

24. Throughout the EA process, the BIA closely supervised, reviewed and independently evaluated the information submitted by the Tribe and its consultants, and assumed responsibility for the content and accuracy of the EA. In December 2003, the BIA issued a final EA.

25. On February 27, 2004, the Secretary issued a "Finding of No Significant Impact" ("FONSI").

26. On May 13, 2005, the BIA published notice of the Secretary's decision to accept the Bradley Tract into trust.

27. On Friday, June 10, 2005, I received a press release, attached hereto as "Exhibit 3," wherein the Plaintiff MichGO announced its intention to file this lawsuit. Over the past few months, I have also viewed similar press releases from MichGO, wherein MichGO's members have announced that their intent is to delay the United States' acceptance of the Bradley Tract into trust indefinitely. A sample of these news clippings are attached hereto as "Exhibit 4."

28. Prior to the June 10, 2005 press release, on June 7, 2005, I received a copy of a correspondence from the Department of Justice to MichGO's legal counsel stating that the United States would not take the Bradley Tract into trust for the Tribe's benefit before June 27, 2005. (Letter from Patti Miller to Dan Ettinger dated June 7, 2005, attached hereto as

9

"Exhibit 5")  Thereafter, I received a copy of a letter dated June 24, 2005 from the Department of Justice to Plaintiff's legal counsel, stating that the United States will not accept the Bradley Tract into trust while this case is pending in the district court without first giving MichGO and the Court thirty days' notice of its intention to do so. (Letter from Patti Miller to Dan Ettinger, dated June 24, 2005, attached hereto as "Exhibit 6")

29. I have reviewed MichGO's complaint in this case and MichGO's characterization of the area surrounding the casino as "farmland" and "rural" is inaccurate. First, the Bradley Tract has not been used for farming purposes for many years. There is an existing building, which is almost 200,000 square feet, located on the Bradley Tract that was used to house a manufacturing plant. See Ex. 2. Also, there were, or are, other business located in the area. For example, MichGO members Phil and Sue Henningson presently operate, or previously operated, a craft store less than a mile from the Bradley Tract. Also, a hair salon is being operated, or was operated, on MichGO member Kenneth Blaauw's property. In fact, much of the land surrounding the Bradley Tract is currently zoned commercial/industrial or is slated to be re-zoned commercial/industrial under Wayland and Hopkins Township Master Plans. (See Wayland and Hopkins Township maps and zoning plans attached hereto as "Exhibit 7.")

30. Also in the above news clippings, and in this lawsuit, MichGO has asserted that the Tribe's intent to operate a gaming facility on the Bradley Tract is in contravention of the Tribe's constitution. MichGO is severely mistaken. The Tribe's duly adopted constitution does not contain any prohibition on gambling. The document to which MichGO refers was a draft constitution that was never adopted by the Tribe or its members.

31.    Each day that the Bradley Tract is not in trust postpones the Tribe's plans to develop that Tract and perpetuates the Tribe's lack of an economic base. The delay also perpetuates the cycle of poverty and unemployment for the Tribal members. As of April 2005, the Tribe's unemployment rate was approximately 27%, which is six times higher than that of non-Tribal members in the surrounding area for this time period. Only 26% of Tribal members own their residences, which is well below the home ownership rate of 83% for the surrounding areas.

32.    The Tribe has expended considerable time and effort in its endeavor to place the Bradley Tract into trust, and this endeavor is the Tribe's highest priority. This acquisition is critical to the Tribe's plans for economic development and self-sufficiency.

33.    The Tribe seeks to place the Bradley Tract into trust to enable the Tribe to be eligible for benefits and services that are only available to federally-recognized tribes with trust or restricted lands, including those specified in the Tribe's Fee-to Trust Application. See Ex. 1.

34.    The Tribe also seeks to place the Bradley Tract into trust to enable the Tribe to invoke its congressionally-conferred right to operate gaming on the parcel in accordance with the Indian Gaming Regulatory Act. The Tribe determined that a gaming and entertainment facility, developed on trust land, would provide an economic base to enable the Tribe to provide governmental services related to housing and health care as well as provide jobs both for Tribe members and for other residents of the community.

35.    The Tribe intends to utilize an already-existing structure—the Ampro Building—on the Bradley Tract, which is a 192,945 square foot industrial building to house its gaming facility. The building consists of a concrete foundation, slab concrete floors, with settle

11

truss and metal siding, and there are offices located throughout the warehouse area of the building. See Ex. 2.

36. The external areas of the Ampro Buildings consist of asphalt parking areas, driveways, concrete loading areas, gravel and grass areas. Utilities available to the Ampro Buildings include three private water wells, two septic tanks, drain field systems, electrical and gas.

37. The Bradley Tract is zoned as industrial, and the proposed land use is consistent with the Wayland Township, Michigan's land use plan. See Ex. 7.

38. The Tribe seeks to operate a gaming facility on the Bradley Tract in order to improve the economic well-being of the Tribe and its members, and to provide for greater self-determination and self-sufficiency. The gaming facility that the Tribe intends to operate will significantly contribute to the Tribe's ability to promote the health, welfare and economic self-sufficiency of its members.

39. Without trust land, the Tribe lacks an economic base to provide essential governmental services, employment and housing for its members.

40. The gaming facility also will assist the Tribe by providing it with the financial resources needed to support Tribal programs essential to fostering and preserving the health and well-being of its members.

41. The local community appears to overwhelmingly support the Tribe, as evidenced by the number of attendees at a press conference that the Tribe held on Monday, June 13, 2005 where Representatives of the Friends of Gun Lake Indians, Barry County Chamber of Commerce, Wayland Chamber of Commerce and Dorr Chamber made statements in support of the Gun Lake Casino.

I swear under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

_____
Dated

_____
Chairman D.K. Sprague

## GUN LAKE FEE-TO-TRUST APPLICATION

### I.    INTRODUCTION

By Resolution dated July 31, 2001, the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan (hereinafter the "Tribe" or "MBPI") has requested that the Department of the Interior accept trust title to land located in Allegan County, Michigan.[1] Given the Tribe's expanding population base, and lack of any reservation land, trust status for this Property is requested in order for the Tribe to acquire property on which it plans to conduct gaming , which will generate revenue necessary to promote tribal economic development, self-sufficiency and a strong tribal government capable of providing its members with sorely needed social and educational programs.

### A.    PROFILE OF THE MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS OF MICHIGAN

The Pottawatomi have been distinguished from kindred and neighboring Tribes by their named identity, their distinctive language, their own traditional history of separation from the ancestors of the modern Chippewa and Ottawa, their claims to a territory that expanded increasingly in size up to the time of American settlement in the Great Lakes region, and particularly by a tribal political organization based upon a disbursed clan structure. They also had differences of dress, folklore, ritual, and other aspects of their culture that marked them as distinctive, although their cultural patterns were essentially similar to those of their Central Algonquian neighbors. Boundaries between the Pottawatomi and other communities were quite permeable: their many villages often contained numerous representatives from other societies, particularly the Chippewa and Ottawa. *15 Handbook of North American Indians*, 725, Smithsonian Institution (1978).

By 1800, the Pottawatomi had already participated in 2 treaties with the United States, those of Fort Harmar in 1789 and Greenville in 1795. Beginning in 1803 they were to sign or participate in 52 more treaties, ending with the establishment of the Citizens Band of Pottawatomi in Oklahoma in 1867.

MBPI descends primarily from the Pottawatomi Band led by Chief Match-E-Be-Nash-E-Wish which was assigned a 3 mile square reserve at Kalamazoo, Michigan by federal treaty in 1821.[2] It also has considerable descent from Grand River Ottawa dating to the period from 1838 through 1855, during which it was associated with the Episcopalian Griswold Mission in Allegan County, Michigan, which received its funding through the 1836 Ottawa Treaty. Historically, the Antecedent Band was always small, consistently under 200 persons. During the Griswold

---

[1]    The Tribe has been known by several names: The Gun Lake Tribe; Pennassee's Band; The Bradley Settlement Indians; The Griswold Colony Indians; and the Match-e-be-nash-she-wish Band. The Resolution is attached hereto as Exhibit 1.
[2]    Treaty of Chicago of August 29, 1821 (7 Stat. 288).



ALL-STATE LEGAL®    EXHIBIT

1 / EX. 1
05-CV-04181 JGP

Mission, it was enumerated on annuity rolls, on the 1842 and 1847 Office of Indian Affairs Censuses of Michigan Indians, and on the 1850 Federal Census as an Indian settlement.[3]

Under the terms of the Treaty of 1821, the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan was granted a federal reservation in the form of a 3 mile square tract of land located at Kalamazoo, Michigan.[4] This reserve, however, was ceded by the Pottawatomi in the Treaty of 1827, in return for an enlargement of the Nottawaseppi Reserve.[5]

By the terms of the 1827 Treaty, the Pottawatomi ceded 4 of the 5 reserves granted them in the Chicago Treaty of 1821. They retained the Nottawaseppi Reserve and were granted an additional tract of land adjacent to the north and west of the remaining reserve. There is no indication in the contemporary historical record that Match-E-Be-Nash-She-Wish's Band ever actually removed from Kalamazoo to the "99 sections" (the Nottawaseppi Reserve and the afore-mentioned additional tracts of land) between 1827 and 1833.[6]

The 1833 Treaty of Chicago, Illinois, between the United States and the "United Nation of Chippewa, Ottowa [sic], and Potawatamie [sic]" ceded approximately 5 million acres. The articles supplementary to the 1833 Treaty ceded the reservation at Nottawaseppi[7], the 99 sections of land contained in the Treaty made at St. Joseph, on the 19th day of September, 1827 and approximately 49 sections of land on the St. Joseph River.[8] Ironically, the Treaty that had the greatest effect on the Tribe was one to which they were not a direct party: The Ottawa Treaty of 1836.[9]

## B.    HISTORICAL USE AND OCCUPANCY OF THE SUBJECT PROPERTY

The property is located within an area identified as "Royce Area 117."[10] See, generally, proceedings before the Indian Claims Commission. The MBPI occupied lands including the "Bradley Property" or "Griswold Colony" located within the exterior boundaries of the 1821 Treaty (Royce Area 117). Under this land cession, the Pottawatomi ceded approximately 4

---

[3]    Historical Technical Report, MBPI (Historical Report), Bureau of Indian Affairs, 1998, page 1. (Hereinafter, "BAR Historical Report") (attached as Exhibit 2)
[4]    Treaty of Chicago of 1821 (7 Stat. 288).
[5]    Treaty with the Potawatomi, 1827 (7 Stat. 305).
[6]    BAR Historical Report at 13 (quoting *Kappler* 1972, 2:283-284).
[7]    Treaty of September 26, 1833 (7 Stat. 431).
[8]    *Kappler* 1972, 2:410.
[9]    Under the Tenth Article of the of the Treaty, "Pennasee or Gun Lake" was paid as a chief of the third class - which led to the bands avoidance of forcible removance from Michigan to lands west of the Mississippi, like most other Pottawatomi Bands. Instead, the Tribe came under the protection of a Episcopalian mission and remained where they are to this day, in Allegan County, Michigan.
[10]    This label is from a schedule of Indian land cessions and maps compiled by Charles C. Royce and published in the Eighteenth Annual Report of the Bureau of American Ethnology, Part 2, 1896-97. The Royce maps have been widely accepted as historically accurate and authoritative documents reflecting lands ceded by Indian Tribes.

million acres lying: south of the north bank of the Grand River, north of the south bank of the Saint Joseph, east of the eastern shore of Lake Michigan and west of the boundaries of the Detroit and Saginaw Treaties.

The Indian Claim Commission and United States Court of Claims held, as a matter of law, that the Pottawatomi's held "Indian title" (Aboriginal title) to Royce area 117. See 6 Ind. Cl. Comm. 414-463(1958), rev'd and remand, 180 Ct. Cl. 477(1948), on remand, 27 Ind. Cl. Comm. 187-194, 250-251A. 280, 323-324(1972) (holding that the United States regarded the Pottawatomi Tribe as a single nation and not bands or sub-groups thereof in obtaining the major cessions of Pottawatomi lands).

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians were parties to the following treaties:

1.  The Greenville Treaty of August 3, 1795 (7 Stat. 49).
2.  Treaty of Fort Industry of July 4, 1805 (7 Stat. 87).
3.  Treaty of Detroit of November 17, 1807 (7 Stat. 105).
4.  Treaty of Chicago of August 29, 1821 (7 Stat. 288).
5.  Treaty of July 29, 1829 (Prairie Du Chien) (7 Stat. 320).
6.  Treaty of September 29, 1817 (7 Stat. 160).
7.  Treaty of October 2, 1818 (7 Stat. 185).
8.  Treaty of October 16, 1826 (7 Stat. 295).
9.  Treaty of September 19, 1827 (7 Stat. 305).
10. Treaty of September 20, 1828 (7 Stat. 317).
11. Treaty of October 20, 1832 (7 Stat. 378).
12. Treaty of October 26, 1832 (7 Stat. 394).
13. Treaty of October 27, 1832 (7 Stat. 399).
14. Treaty of September 26, 1833 and Articles supplementary of September 27, 1833 (7 Stat. 431, 442) (Treaty of Chicago of September 26, 1833 by which the United Nation of Chippewa, Ottawa, and Pottawatomi ceded to the United States Royce Area 187 in Illinois and Wisconsin containing about 5 million acres bordering the western shores of Lake Michigan.  On September 27, 1833, by Articles supplementary thereto, the Chiefs and Headmen of the said United Nations of Indians residing on their reservations in Michigan south of Grand River ceded all of their land situated in the Territory of Michigan south of Grand River.  This cession included the reservation at Notawasepe of 4 miles square and 99 sections, and about 49 sections of land on the St. Joseph River on which Topenebee's and Pokagan's villages were situated.
15. Treaty of September 20, 1836 (7 Stat. 513).
16. Treaty of July 31, 1855 (11 Stat. 621).

The relocation of Match-E-Be-Nash-She-Wish's Band to Allegan County, Michigan is well documented in the Bureau of Acknowledgment and Recognition's historical report:

"According to Clifton, during the summer of 1840, most of the southwestern Michigan Pottawatomi, with the exception of the Catholic Bands who claimed specific exemption under

the Treaty of 1833, were forcibly removed west of the Mississippi by the United States Army, under General Hugh Brady. Many avoided removal by going to Canada, but others were intercepted by American troupes on the way. However, the two northernmost Bands that had received 1821 Treaty reserves, those of Sagamah and Match-E-Be-Nash-She-Wish, avoided removal of their Bands through a different technique. Between 1828 and 1838, they had already moved north of the Kalamazoo River. In 1839 or very shortly thereafter, they placed themselves under the protection of an Episcopalian Mission in Allegan County, Michigan, which was funded by the provisions of the 1836 Ottawa/Chippewa Treaty. Basically, they went to ground among the Grand River Ottawa, with whom their history would be closely associated for the next 30 years."[11] The precise date of the arrival of the Match-E-Be-Nash-She-Wish's Band at Griswold Colony is not known, but it must have been shortly before 1838."[12]

The history of the Griswold Colony has been exhaustively researched for purposes of the Tribe's Petition for Recognition. Briefly, in 1840 the Reverend Samuel A. McCoskry purchased and patented approximately 160 acres of land in his name within the southeast quarter of section 20, Allegan County, Michigan. Prior to that purchase, 200 acres were purchased in section 28 of Allegan County, Michigan in 1837 by Sarah W. Weaver. Funds to purchase land for the Griswold Colony were derived from annuities provided under the Treaty of 1836.[13]

In 1837, Indian Agent Henry R. Schoolcraft added Bishop McCoskry's name to the list of the names of persons authorized to receive funds for Indian Missions and schools within the State of Michigan. "He (McCoskry) designated the Reverend James Selkirk, who was already in charge of an Episcopalian Parish at Niles in southwestern Michigan, to be the missionary. . . . An Episcopalian Mission near Wayland, known as Griswold Colony, was also founded in 1838 after funds for education and missions became available under the Treaty of 1836."[14]

Funding for the Griswold Colony, as well as other missions established under the 1836 Ottawa/Chippewa Treaty, had been set for a period of 20 years. It was thus due to expire in 1856, leading the office of Indian Affairs to conduct a new Treaty with the Ottawa Indians of Michigan in 1855. "The historian of the Griswold Colony for the Episcopal Diocese of Michigan concluded that the end of the Federal subsidy meant the end of the mission: In 1855 the assistance provided by the Treaty of 1836 came to an end and a new Treaty was made with the Indians whereby they were granted outright ownership of lands in Oceana County near Pentwater, Michigan. The majority of the Griswold Indians took advantage of the provisions of the new Treaty and moved northward. A few families, however, appeared to have remained; they had their own homes and were probably reluctant to leave. The land at Griswold was still theirs; for Bishop McCoskry considered that he held it in trust for them, not as the property of the church. . . . "with this exodus of the Indians the effective work of the Griswold Mission came to an end", however, the Reverend Selkirk did not leave Wayland Township nor was the mission land disposed of at this time. The ensuing developments were more complex. Krusen mentioned the allotments under the 1855 Treaty and did state that "within 10 years, however,

---

[11]     BAR Historical Report at 15 (citations omitted).
[12]     Id. at 20.
[13]     Id. at 31.
[14]     Id. at 17.

most of the Griswold Indians had lost their lands in Oceana County, and many had returned to the mission grounds" (Krusen 1948, 669).[15]

On July 26, 1855, in Wayne County, Michigan, Bishop McCoskry made a "trust statement" concerning the Mission's land, which was recorded in Allegan County, Michigan, on September 5, 1855:

I do hereby declare that I do hold the same accordingly in trust for the benefit of the Band of Ottawa Indians formerly under the Chief Saginaw afterwards under the Chief Penassee and now under the Chief called Shopquaung in manner following that is to say I hold the same for the occupation and improvement thereof by said Band in such individual allotments as I shall find advisable and I agree to make such allotment in occupancy and not in fee simple as generally and equitably as possible and in the case said Band shall hereafter desire to remove from said land to another place, I am at liberty to sell said land and reinvest the proceeds for the same purpose it being the purpose of this trust to manage and administer said lands and the proceeds thereof to the best of my discretion for the benefit of said Band and for no other purposes whatever.[16]

In 1874, the State of Michigan began to tax the Griswold Mission Land. The Title and Trust of the Griswold Mission Land, or "Bradley Colony" was in the name of Samuel Alan McCoskry, the Episcopalian Bishop, who purchased land in 1838 and continued to hold the trust since 1855. In 1878, McCoskry resigned his position as the Episcopal Bishop. In 1894, Bishop McCoskry resigned his Trust to the Circuit Court of Allegan County, and the mission land was divided into parcels and deeded to nineteen descendents of the original Match-E-Be-Nash-She-Wish Band. Within a few years practically all of the Tribal members had lost their land to white men by failure to pay their taxes.[17]

Between 1870 and 1904, the Tribe's ancestors continued to reside on the lands of the former Griswold Mission, which was referred to as an "Indian Colony" in the 1880 Federal Census of Allegan County, Michigan.[18] In 1904, members of the Bradley Settlement were included on the "Taggart Role" compiled by the Bureau of Indian Affairs for distribution of the Congressional appropriations to settle claims of Michigan's Pottawatomi Indians.[19] In 1908, as the descendents of Shau-Be-Quo-Ung's Band, the group's members were also included on the Durant Role, a role compiled by the BIA for distribution of a Congressional appropriations to settle claims of Michigan's Ottawa Indians. Because the Band had no commonly owned reservation land, the Band was ineligible to organize under the Indian Reorganization Act of 1934. In 1939, the Allegan County Settlements were included in the BIA's "Holst Report" and

---

[15]    Id. at 31.

[16]    Id. at 30 (citing Allegan County, MI, Liber 13.205).

[17]    See account generally, Id. at p. 40-43.

[18]    See Genealogical Technical Report of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan at 19. (Included in Exhibit 2).

[19]    See 27 Ct.Cl. 403 (1892).

suffered from the Commissioner of Indian Affairs' 1940 decision to not extend the BIA's services to the Indians of Michigan's lower peninsula.[20]

At sometime in the later part of the 1800's, the MBPI Settlement at Bradley, Michigan, changed its allegiance from Episcopal to Methodist. "The first appearance of the Methodist Indian Mission at Bradley in Michigan Conference Records was in 1882, on a circuit with Wayland & Moline."[21] Newspaper articles published from the early 1900's to the present have described the Tribe and their ancestors in Allegan County, Michigan. Some articles specify that the current group ascends from the Historical Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians. Since World War II to the present, younger members of the Tribe have moved away from the Bradley Settlement Area, also known as the Griswold Colony, to nearby urban areas in search of housing and employment. The majority of the young immigrants relocated to Grand Rapids or Kalamazoo, both approximately 30 miles from the Bradley Settlement. Several members of the Tribe still reside near Bradley, Michigan.

C.    IDENTIFICATION OF PROPOSED TRUST LAND

The land sought to be acquired in trust is comprised of two separate parcels, both of which are to be used for gaming purposes. The full legal description of the parcels is attached as Exhibit 3, and is also described in the Tribe's Resolution at Exhibit 1.

## II.    STATUTORY AND REGULATORY REQUIREMENTS

A.    REQUIREMENTS OF 25 C.F.R. PART 151

Section 10 of 25 C.F.R. part 151 provides a list of factors which the Secretary shall consider in evaluating a request for the acquisition of land into trust status.

1.    25 C.F.R. § 151.10(a) -- Statutory Authority for Acquisition of the Property

The statutory authority for the acquisition of land in trust for Indian tribes by the Secretary of Interior is found at 25 U.S.C. § 465. Section 465 provides, in relevant part:

The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds

---

[20]    Id. at 1-2.

[21]    BAR Historical Report at 44.

in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year:

. . .

Title to any lands or rights acquired pursuant to sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

In addition, the Secretary of the Interior has promulgated regulations which set forth the authorities, policy and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes at 25 C.F.R. Part 151. 25 C.F.R. Part 151.3 (a) provides:

(a)    Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status (1) when the property is located within the exterior boundaries of the Tribe's reservation or adjacent thereto, or within a tribal consolidation area; or, (2) when the tribe already owns an interest in the land or, (3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

Section 5 of the IRA authorizes the Secretary to acquire land in trust for Indians and Indian tribes: (1) within or adjacent to an Indian reservation; or (2) for purposes of facilitating tribal self determination, economic development or Indian housing.

As previously set forth in this application, the land is located within the area that has been determined to be the aboriginal lands used and occupied by the Tribe. In addition, acquisition of the subject land is necessary to facilitate tribal self determination and economic development. Accordingly, the land may be acquired for the Tribe in trust status pursuant to 25 C.F.R. § 151.3 (a)(3).

Additional statutory authority for the acquisition of the subject property is found in 25 U.S.C. § 467, which provides as follows:

The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by Sections . . . 465 . . . of this title, or to add such lands to existing reservations: provided, that lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to reside at such reservations.

2.    25 C.F.R. § 151.10(b) -- The Tribe's Need for Additional Land

    a.    In General

The Department of the Interior's policy with respect to the acquisition of land for Indians is set out in 25 C.F.R. § 151.3, which provides in pertinent part, "land may be acquired for a Tribe in trust status . . . when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." In the present case, the acquisition of the subject properties will unquestionably enhance tribal self-determination and economic development.

In 1999, the MBPI was federally recognized as an Indian Tribe after seeking federal acknowledgment under part 83 of title 25 of the Code of Federal Regulations. The Tribe has neither land in trust nor a reservation . Thus, land is needed by the Tribe for housing, Tribal operations and economic development. The parcels that are the subject of this Trust Application shall be part of the Tribe's initial reservation. The Tribe intends to submit a separate fee-to-trust application to place land into trust for housing and tribal operations.

For over twenty-five (25) years the federal government has actively pursued a policy of encouraging tribal self-determination. Congress has declared that "a principle goal of Federal Indian Policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government." 25 U.S.C. § 2701. Acquiring the subject property in trust for the Tribe will undoubtedly further these principle goals of Federal Indian Policy.

    b.    *Trust Status is a Prerequisite to Eligibility for Federal Economic Incentives and Programs*

Trust status will make the proposed economic development eligible for several federal economic incentives and programs which would not be available if the activities were to occur on land owned by the Tribe in fee status. As described in further detail below, such economic incentives and programs include accelerated depreciation, Indian employment tax credits, tax exempt private activity bonds, and grants and services made available under the Indian Business Development Program.

    (1)    Accelerated Depreciation, 26 U.S.C. § 168(j).

26 U.S.C. § 168(j) permits an accelerated depreciation deduction from federal income taxes for property used in a trade or business located on trust land. See 26 U.S.C. § 168(j)(6)(B)(incorporating the definition of "Indian Reservation" from 25 U.S.C. § 1903(10), which includes "lands held by the United States in trust for the benefit of any Indian tribe . . . "). For example, property that ordinarily would be deducted over a 20-year period can be deducted over a 12 year period if the business is located on trust land. Congress intended that this provision stimulate Tribal economic development by making it advantageous to locate business activities on trust lands. By placing the Property in trust, the Secretary will be furthering the Congressional policy.

(2)    **Indian Employment Credit, 26 U.S.C. § 45A.**

26 U.S.C. § 45A provides a federal income tax credit for wages and health insurance paid by an employer to a member of an Indian Tribe. The credit is only available if the services performed by such Tribal member/employee are performed on an "Indian Reservation." For purposes of section 45A, the term "Indian Reservation" includes land held in trust by the United States for the benefit of an Indian tribe. See 26 U.S.C. §45A(c)(7). This provision was intended to promote tribal economic development and self-sufficiency by providing an incentive to both tribal and non-tribal employers to gainfully employ tribal members. Thus, by approving the present Trust Application, the Secretary will be furthering the Congressional policy of promoting tribal economic development and self-sufficiency.

(3)    **Interest Exemption for Private Activity Bonds, 26 U.S.C. § 7871(c)(3).**

26 U.S.C. §7871(c)(3) provides that interest on bonds issued for certain facilities located on qualified Indian lands is not considered income for federal tax purposes. In order to qualify under this section, the facility must be located "on land held in trust by the United States for the benefit of an Indian Tribe." 26 U.S.C. § 7871(c)(3)(E). Again, Congress enacted this provision in order to encourage and facilitate tribal economic development and self-sufficiency; by approving the present Application, the Secretary will be carrying out these Congressional policies.

(4)    **Eligibility for Indian Business Development Program Grants.**

Congress has made grants available to Indian tribes under the Indian Business Development Program, 25 U.S.C. § 1521, *et seq.*, "to stimulate and increase Indian entrepreneurship and employment by providing equity capital . . . to Indian tribes to establish and expand profit-making Indian-owned economic enterprises on or near reservations." While these grants are available for activities on fee lands near reservations, the regulations implementing the Program require the Secretary to assign lower priority to enterprises located on fee lands than to enterprises located on reservation or trust lands. See 25 C.F.R. § 286.8. Accordingly, if the present trust application is granted, the Tribe will have a greater chance of obtaining capital for economic development on the Property through the Indian Business Development Program.

3.    **25 C.F.R. § 151.10(c) - - Purposes for Which the Land Will Be Used**

The subject property is located at 1123 129th Avenue, Wayland Township, Allegan County, Michigan. The two parcels combined approximate 165 acres. Three structures are situated on the subject property. The structures include one 192,945 square foot industrial building, one three-story farmhouse and one single story barn. The industrial building was utilized for the Ampro Industries, Inc's. operations. A manufacturing plant is situated along the south portion of the subject property. The building consists of a concrete foundation, slab concrete floors, with steel truss and sheet metal siding. Office areas are located in the southeast portion of the building and are finished with carpeting, floor tile, painted walls and ceiling tiles. Other small offices are also located throughout the warehouse area of the building. The plant

operation generally consisted of the use of recycled newspaper in the manufacturing of products for the landscaping industry. The remaining areas of the warehouse consist of storage areas, shipping and receiving areas, 15 loading docks, two dye rooms, storage rooms, a maintenance room, break rooms, air-compressor rooms, two electrical rooms, and restrooms.

A farmhouse is located west of the industrial building on the south side of the subject property. This two-story farmhouse has a basement as well as an attic. The entire house has been remodeled and consists of office areas, restrooms, a sauna, weight room, tanning room and storage rooms. The single-story barn is located in the northwest portion of the property. The barn is constructed of wood with metal siding. The interior of the barn has a concrete floor. The barn has been used for storage purposes only.

The external areas of the property consist of asphalt parking areas, driveways, concrete loading areas, gravel and grass areas. Two ponds are situated on the subject property. One of the ponds is located directly south of the industrial building near the farmhouse, while the other is located north of the industrial building. Access to the subject property is provided by one asphalt driveway located along the southeastern property boundary. This driveway provides access onto 129th Avenue and traverses the eastern and southern perimeters of the industrial building. The asphalt drive turns into a gravel driveway that provides access around the west and southwestern perimeter of the industrial building. Many exterior areas consist of asphalt parking areas, concrete loading areas, landscape, grass and gravel. Utilities available to the subject property include three private water wells, two septic tanks, drain field systems, electrical, and gas. A weigh station is located to the east of the industrial building. The weigh station consists of one electrically operated scale. A back-up generator, propane tank and transformer are also located along the east exterior wall of the building.

Historically, the subject property has been utilized in an agricultural capacity. The farmhouse and associated out-buildings (including the barn) occupy the sections of the site along 129th Street where currently, the industrial plant is located. The farmhouse is estimated to be approximately 100 years old, but has been extensively renovated. Former out-building were razed or moved to allow for construction of the first phase of the industrial plant in 1994. The surrounding property has been used in the past for residential and agricultural purposes, and/or has been largely undeveloped.

The Tribe intends to use the land as part of its initial reservation and plans to renovate the existing Ampro industrial building into a gaming facility. The Tribe intends to offer Class II and/or Class III gaming (as defined by the IGRA, 25 U.S.C. § 2701 *et seq.*) to the public at the facility.

The subject property is currently owned in fee simple absolute by P.C.S. Acquisition Company, L.L.C. of Michigan. P.C.S. Acquisition Company, L.L.C. intends to transfer the property to escrow. The escrow instructions shall provide that upon approval of the Secretary of the Interior of this fee-to-trust request, the parcels will be transferred from P.C.S. Acquisition Company, L.L.C. to the Tribe, and from the Tribe to the United States to be held in trust for the benefit of the Tribe. The escrow instructions will be provided as a supplement to this application. Attached as Exhibit 4 to this application is a land title survey location map.

Attached as Exhibit 5 is a copy of a warranty deed for the subject property in the name of P.C.S. Acquisition Company, L.L.C.

### 4.    25 C.F.R. § 151.10(e) - - The Impact on the State and its Political Subdivision Resulting from the Removal of the Land from the Tax Rolls

The taxable value the land is $194,527.00 with a Michigan state equalized value of $196,400.00. According to the year 2000 winter tax bills the combined parcels were assessed in the amount $45,082.28. See, Exhibit 6. Accordingly, the impact on the state and its political subdivisions resulting from the removal of the property from the tax rolls is approximately $45,0820.20 per year. The Tribe submits that this impact will be more than mitigated by the job creation and public revenues that the gaming facility will provide.

### 5.    25 C.F.R. § 151.10(f) - - Jurisdictional Problems and Potential Conflicts of Land Use Which May Arise

The Allegan County Sheriff's office provides law enforcement services to the subject property. The Tribe has had several meetings with Mr. Blaine A. Koops – Sheriff of Allegan County. As a result of those meetings, the Sheriff's office has informed the Tribe that it is willing to negotiate an operational service agreement by which general law enforcement services will be provided to the Tribe's gaming facility and the immediate surrounding area. See, Exhibit 7 -- a "Will-Serve" letter from the Allegan County Sheriff's office. During a meeting held on July 27, 2001 between officials of the Allegan County Sheriff's office and the Tribe, the parties discussed provisions that will be included in a service and cross-deputization agreement including, but not limited to the following: scope of deputization, fresh pursuit, operational plans and protocol, execution of arrest warrants, immunity and insurance, consent to entry, service of process; and, the convening of an oversight committee consisting of members of the Allegan County Sheriff's office, the Tribe's public safety director, and gaming facility security officials.

The costs associated with providing law enforcement services to the Tribe is presently being determined by the Allegan County Sheriff's office. The Tribe intends to pay for the law enforcement services under a contract between the Tribe and the Allegan County Sheriff's office, in order to mitigate any impact on the surrounding community. The Tribe and Sheriff's office have exchanged drafts of proposed service and cross-jurisdictional agreements. The final agreements will be provided as a supplement to this application.

With regard to fire protection, tribal officials met with Mr. Hugh DeWeerd, Wayland Township Fire Chief, on July 26, 2001. Mr. DeWeerd explained that the fire department has a contract to provide fire protection services to Wayland City, which currently provides fire protection to the subject property. The property will remain under that protection until it is accepted into trust. Wayland City Manager Mike Jager explained that once the property is in trust, the Wayland Township Fire Department will enter into a contract with the Tribe and Wayland City, based on a valuation of the property to determine the Tribe's share of payment. Mr. Jager opined that the Tribe would be liable to pay approximately 2% of the yearly budget for fire protection services, which is currently set at $152,000.00 per year. The Tribe has received a "will-serve" letter from the City of Wayland, attached hereto as Exhibit 10.

Emergency medical services will be provided by Wayland Area Emergency Medical Services (**WAEMS**). A "will-serve" letter has been provided to the Tribe by WAEMS, attached hereto as Exhibit 8. Tribal officials have met with Mr. Bob Hess, the General Manager of WAEMS. Mr. Hess informed the Tribe that WAEMS has current resources to provide care for the Tribe's gaming facility; there are, however, some concerns about the impact of non-billed and bad debt services that could the strain the finances of WAEMS.

Mr. Hess asked the Tribe to adopt the emergency medical services portion of the Michigan Public Health Code in order to provide WAEMS with a framework within which to operate on tribal lands. The Tribe intends to enter into a contract with WAEMS incorporating the above set forth provisions. Specifically, the contract will include provisions with regard to covering the costs for crews that shall be paid on a "per call" basis, and, for covering the expenses of WAEMS in the event of a "non-paid transport". For example, if WAEMS transports a patron of the Tribe's gaming facility to a local hospital, the patron is billed. If WAEMS is unable to collect payment from the patron within nine months, the Tribe will reimburse WAEMS 60% of the payment due, in order to mitigate the impact of non-billed and bad-debt service. Mr. Hess explained that WAEMS currently is staffed with 70 volunteers; three paid full-time emergency medical technicians and five ambulances. The closest ambulance is located in Wayland City, approximately three minutes from the proposed gaming facility.

In sum, productive discussions with WAEMS and the Tribe have resulted in an intent to enter into a contract for services. The contract for services will cover bad-debt services, adoption of the EMS Michigan Public Health Code via tribal ordinance, cross-training with the gaming facilities' emergency medical staff and special event coverage. The final agreement will be provided as a supplement to this fee-to-trust application.

With regard to land use, the subject property is currently zoned as industrial. The proposed land use is consistent with the Wayland Township land use plan. As set forth in Exhibit 9, Wayland Township has provided the Tribe with a letter of support for this fee-to-trust application. "The proposed uses of the parcels, including the casino development, are consistent with Wayland Township land use plans. We believe that the casino development will be compatible with surrounding land uses, and be an asset to our community. We applaud the Tribe's efforts to bring jobs, economic development, and revenue sharing to Allegan County. The Township would like to work as a partner with the Gun Lake Tribe to create economic opportunities within the Township, which will allow us to preserve our rural character and viability as a community." Also, the Wayland Township Board has enacted Resolution number 21-2001, supporting the Tribe's Fee-to-Trust Application, attached hereto as Exhibit 11.

6. **25 C.F.R. § 151.10(g) - - Whether the Bureau of Indian Affairs is Equipped to Discharge the Additional Responsibilities Resulting from the Acquisition of the Land in Trust Status**

The Tribe submits the Bureau of Indian Affairs will not incur any additional responsibilities as a result of the conversion of the property to trust status. The Tribe intends to

be responsible for all expenses and maintenance with regard to the property and to address all legal matters that may arise with regard to the property.

7.    **25 C.F.R. § 151.10(b) - - The Extent to Which the Applicant has Provided Information that Allows the Secretary to Comply with 516 DM6, Appendix 1B, and 602 DM 2**

Environmental assessments have been performed on the subject property, and will be provided to the BIA by Analytical Environmental Services of Sacramento, CA.

8.    **25 C.F.R. § 151.11 - - Off-Reservation Acquisitions**

25 C.F.R. § 151.11 provides that "the Secretary shall consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is *located outside of and non-contiguous to the Tribe's reservation, and the acquisition is not mandated . . .*" The Tribe does not believe that this section is applicable to the initial acquisition of reservation land for a restored tribe that has no reservation. Nevertheless, even if this section is applicable, its requirements can be readily addressed, as provided below.

(a)    Section 151.11(b) concerns the location of a proposed trust acquisition relative to the Tribe's existing reservation. The Tribe does not have an existing reservation. The subject parcel is located approximately 40 miles from the nearest state boundary.

(b)    25 C.F.R. Part 151.11(c) asks that when land is being acquired for business purposes, that the Tribe provide a plan which specifies the anticipated economic benefits associated with the proposed use. A Business Plan, specifying the anticipated economic benefits associated with the Tribe's proposed use of this acquisition will be provided as a supplement to this application.

9.    **25 C.F.R. § 151.13 - - Title Examination**

(a)    The Tribe shall furnish the required title evidence to the Secretary upon the Secretary's determination that the Secretary will approve the present fee-to-trust request. Title evidence shall meet the Standards for the Preparation of Title Evidence and Land Acquisitions by the United States, issued by the United States Department of Justice (2001).

10.    **25 U.S.C. § 2719, Section 20 - - Indian Gaming Regulatory Act**

25 U.S.C. § 2719, Section 20 of the IGRA addresses the use of land acquired in trust when the intended use of the land is for gaming. Section 20 of the IGRA, however, prohibits gaming on lands acquired in trust after October 17, 1988, unless certain exceptions apply. 25 U.S.C. § 2719 provides, in relevant part:

(a) Prohibition on lands acquired in trust by Secretary

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless—

(1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988; . . .

(b) Exceptions

(1) Subsection (a) of this section will not apply when—

(A) the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

(B) lands are taken into trust as part of—

(i) a settlement of a land claim,

(ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition.

### The Restored Lands Exception

As the plain language of Section 2719(b)(1)(B)(iii) indicates, lands that are acquired as part of the "restoration of lands for an Indian tribe that is restored to Federal recognition" are exempt from the prohibition against gaming on lands acquired into trust after October 17, 1988. In determining whether a tribe meets the restoration exception under section 2719(b)(1)(B)(iii), it must first be determined, "whether the [tribe] is a "restored" tribe within the meaning of the provision, and second, whether the land was taken into trust as part of a "restoration" of lands to such restored tribe." <u>Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney</u>, 46 F.Supp. 2d 689, 696 (W.D. Mich. 1999).

"[A] tribe is "restored" when its prior recognition has been taken away and later restored." <u>Grand Traverse Band</u>, 46 F.Supp. 2d at 699. In prior opinions addressing the issue of whether a tribe is "restored" under the definition of IGRA, the Solicitor, Indian Affairs has opined, "Returning a tribe to its former status as a recognized tribe ought to be considered a 'restoration' of the tribe, and such tribes ought to be considered 'restored' regardless of the exact terms used." Sept. 19, 1997 Memorandum from Solicitor J. Leshy to Interior Secretary Babbitt re: Pokagon Band of Potawatomi Indians; Nov. 12, 1997 Memorandum from Solicitor J. Leshy

to Deputy Commissioner, Indian Affairs regarding Little Traverse Bay Bands of Odawa Indians. The Solicitor also opined that the "common thread" with all restored tribes is that these tribes previously were not on the list of federally recognized tribes published in the Federal Register, and now the tribes appear on that list. Pokagon Memorandum, supra.

Given that the Grand Traverse Band was restored via the same acknowledgement process as the Gun Lake Band, and was concededly considered a "Restored" Tribe for purposes of IGRA, the obvious and correct conclusion is that the Gun Lake Tribe is also Restored for purposes of IGRA.

### "Restored Lands" Under IGRA Section 2719(b)(1)(B)(iii)

The second portion of the analysis under Section 2719(b)(1)(B)(iii) involves an inquiry into whether the lands acquired by the tribe are "restored" within the meaning of that Section. Section 2719(b)(1)(B)(iii) has been recently clarified by federal courts with regard to whether particular lands may be considered restored under Section 2719. In fact, two federal courts have recently weighed in on the issue, and each court has expressly rejected a narrow interpretation of the scope of the restored lands exception.

In Grand Traverse, the Court rejected the government's narrow interpretation of the term "restored" in favor of a plain meaning of the term, holding, "*if a tribe is restored under the statute, any lands taken into trust that are located within the areas historically occupied by the tribes are properly considered to be lands taken into trust as part of the restoration of lands under § 2719.*" The Court continued, "[T]he (B)(iii) exception requires only that the lands in issue to be part of "the restoration of lands for any Indian tribe that is restored to federal recognition. That language implies a *process rather than a specific transaction*, and most assuredly does not limit restoration to a single event." Id. at 701 (emphasis supplied). The Court in Grand Traverse continued:

> The government contends that in order to be "part of . . . the restoration of lands" to a restored tribe, some congressional action is required beyond the simple language of the exception. Otherwise, the government asserts, restored tribes will be placed in a comparatively advantaged position vis-à-vis tribes which were not restored, because all acquisitions of property subsequent to restoration, without limitation, will be excepted from the statute.

> However, accepting the government's position that some limitation is required, nothing in the record supports the requirement of Congressional action. Given the plain meaning of the language, the *term "restoration" may be read in numerous ways to place belatedly restored tribes in a comparable position to earlier recognized tribes* while simultaneously limiting after-acquired property in some fashion. For example, land that could be considered part of such restoration might appropriately be limited by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the tribal restoration. Id. at 700 (emphasis supplied).

The Court in Grand Traverse also held that the fact that the government treated similarly situated tribes as having restored lands weighed in favor of a finding that the lands were restored under Section 2719. In so doing the Court relied on 25 U.S.C. § 476(f) which provides, in relevant part,

> Departments or agencies of the United States **shall not** promulgate any regulation or make any **decision or determination pursuant to [25 U.S.C. § 461, et seq.], or any other Act of Congress, with respect to a federally recognized Indian Tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes . . .**

Id., at 701 (emphasis supplied).

The Court's rationale in the Grand Traverse case was recently bolstered in Confederated Tribes of the Coos, Lower Umpqua, and Suislaw Indians v. Babbitt, 116 F. Supp. 2d 155 (D.D.C.) (2000). In Confederated Tribes, the Department of the Interior had applied an "unduly narrow interpretation" of the term "restored" in deciding that land of the Confederated Tribes were not restored under section 2719(b)(1)(B)(iii). The Court in Confederated Tribes held that the Department's asserted justification for its narrow interpretation of Section 2719 "is not enough to overcome the plain meaning of the word "restoration", particularly in light of the rule of liberal construction favoring Indians." Id. at *164. The Court summed up the "plain meaning" definition of restored lands as follows:

> [R]estored Tribes which reacquired lands previously held by the Tribe would qualify for the exception. The "restored lands" could be construed to mean just that, the Tribe would be placed back in its former position by reacquiring lands. *The manner of the restoration would not matter.* Id. at * 162 (emphasis supplied).

The Court expressly rejected the government's claim that, "restoration of lands must be tied to the 'statute that restores the Tribe's federal recognition status." Id. The Court held that this plain meaning of the term restoration may only be limited so as to avoid a situation where any and all property acquired by restored tribes would be eligible for gaming. The shorthand test is to further the Congressional intent by placing "belatedly restored tribes in a comparable position to earlier recognized tribes." The Court agreed with the Federal Court's decision in Grand Traverse, which suggested accomplishing this shorthand test, when necessary, by limiting lands considered to be restored lands by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the restoration. Id. at 164. Finally, the Court in Confederated Tribes held that, in deciding whether certain lands qualify as restored, the government must, " consider *all matters* which might entitle the [tribe] to an exception pursuant to section 2719(b)(1)(B)(iii), and must, "adequately consider the principle of liberal construction in favor of Indians." Id. at 164.

In sum, the Gun Lake Tribe must be considered as a "restored" Tribe for purposes of the IGRA. The lands that are the subject of this application are indisputably within an area historically occupied by the Tribe – quite literally "Just up the street" from the historic Griswold

Colony. Thus, the subject land must properly be considered to be land taken into trust as part of the restoration of lands to the Gun Lake Tribe. It is time to place this belatedly restored tribe in a comparable position to earlier recognized tribes, as this application has been submitted shortly after their acknowledgment become final. Finally, the Tribe submits that 25 U.S.C. 2719(b)(1)(ii) is another applicable exception, as the Tribe has requested that the Secretary of the Interior acknowledge the lands that are the subject of this application to be part of the initial reservation of the Tribe – a Tribe that has recently been acknowledged as a federally recognized Indian tribe under the Federal Acknowledgment Process.

## EXHIBIT LIST

1.   Resolution dated July 31, 2001.

2.   Bureau of Acknowledgment and Recognition Report

3.   Legal Description of Parcels

4.   Plat Map

5.   Warranty Deed

6.   Tax Statement

7.   Will-Serve Letter – Allegan County Sheriff's Department

8.   Will-Serve Letter – Wayland area Emergency Medical Services

9.   Letter of Support from Wayland Township

10.  Will-Serve Letter from the City of Wayland regarding Fire Protection

11.  Resolution of Support from the Wayland Township Board