*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF COLUMBIA*

| | | |
|---|---|---|
| **MICHIGAN GAMBLING OPPOSITION ("MichGO"), a Michigan non-profit corporation,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 05-01181 (JGP)** |
| **GALE NORTON, in her official Capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, et. al.** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |
| **MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS, a federally-recognized Indian Tribe,** | ) ) ) ) | |
| **Intervenor.** | ) ) | |

## OPINION

This comes before the Court on the **United States Motion to Dismiss or in the Alternative for Summary Judgment [#33]** ("Def.'s Mot."), and the **Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians' Motion for Judgment on the Pleadings or, in the Alternative for Summary Judgment [#32]** ("Intv.'s Mot.").[1]

Defendants argue, among other things, that there are no genuine issues of material fact in

---

[1] When citing the Statement of Points and Authorities in Support of the United States' Motion to Dismiss or in the Alternative for Summary Judgment, the Court will use the abbreviation "Def.'s Memo." The Court will use the abbreviation "Intv.'s Memo" when citing the Statement of Points and Authorities in Support of the Intervenor's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment.

EXHIBIT

A

tabbies

Case 1:05-cv-01181-JGP    Document 72    Filed 02/23/2007    Page 2 of 37

dispute which merit this case proceeding to trial. Def.'s Memo, at 1. For nearly identical reasons, intervenor also argues for dismissal of the Complaint. Intv.'s Mot., at 2.

Plaintiff opposes the dispositive Motions on the following grounds:[2] "First," according to plaintiff, defendants' classification of the proposed casino site as an "initial reservation" is inconsistent with the requirements imposed by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 et seq. Pl.'s Opp., at 1. "Second," plaintiff argues that defendants have violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq. by failing to issue an environmental impact statement ("EIS"), and instead issuing a finding of no significant impact ("FONSI"). *Id.* "Third," plaintiff argues that defendants cannot legally authorize Class III gaming because they have not yet secured a tribal-state gaming compact. *Id.* at 2. And fourth, plaintiff argues that "Defendants have no constitutionally valid authority on which to acquire land in trust for [intervenor]." *Id.*

Having considered the dispositive Motions, plaintiff's Opposition, the Replies thereto, and the entire record, the Court concludes that plaintiff has raised no genuine issues of material fact and defendants and intervenor are entitled to judgment as a matter of law. A full explanation of the Court's conclusions follows.

## BACKGROUND

This dispute arises from defendants' decision to place two parcels of land ("Bradley

---

[2] Plaintiff opposes both dispositive Motions within the same pleading. *See generally* Michgo's Combined Statement of Points and Authorities in Opposition to Federal Defendants' and the Gun Lake Band's Motions to Dismiss or in the Alternative for Summary Judgment [#50] ("Pl.'s Opp."). Accordingly, the Court addresses both dispositive Motions within this Opinion.

Case 1:05-cv-01181-JGP    Document 72    Filed 02/23/2007    Page 3 of 37

Property")[3] into trust for intervenor which intervenor contends is vital to its economic development, self determination and economic sufficiency. Motion to Intervene [#7] ("Mot. to Intv."), at 2; Def.'s Memo, at 1. Intervenor expects that the Bradley Property, which is located "approximately 25 miles from Kalamazoo and approximately 30 miles from the City of Grand Rapids" in Wayland Township, Michigan, will bring a large number of jobs and income to its approximately 300 members if converted into a casino.[4] Intv.'s Answer, at ¶ 69. Moreover, intervenor expects that the Bradley Property will "attract an average of approximately 8,500 visitors per day, and that approximately 1,800 people will be employed at the facility." *Id.* at ¶ 60.

On August 23, 1999, intervenor, descendants of an Indian tribe who lived in a village near the present-day City of Kalamazoo, Michigan in the late 1700's, gained official recognition

---

[3] The Bradley Property, according to intervenor,

> is nearly 200,000 square feet, [and] . . . the precise footage of the existing warehouse and factory building that will be converted to the proposed gaming complex is 193,424 square feet. . . . [T]he facility includes gaming space, two casual dining restaurants, a buffet-style restaurant, two fast food outlets, some retail space, a sports bar, an entertainment lounge, office space, and parking space. . . . [T]he specific size of the gaming area is 98,879 square feet, and the actual number of parking spaces will total 3,352, including 17 spaces for buses and 26 for Recreational Vehicles.

Answer of Intervenor Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians [#19] ("Intv.'s Answer"), at ¶ 27 (internal quotation marks omitted); *see also* Complaint, at ¶ 27.

[4] Defendants assert that the "tribe resides in an area that . . . [suffers] six times the unemployment rate of the rest of the area." Oral Argument Transcript ("Tr. Oral Arg."), at 21.

from defendants, the U.S. government.[5] 63 Fed. Reg. 56936 ("Final Determination to

Acknowledge the Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan").

Intervenor submitted an application to defendants for a proposed casino on August 7, 2001,

seeking to have defendants take into trust the 147-acre Bradley Property. Complaint, at ¶ 6; Pl.'s

Opp., at 2.  Defendants prepared and issued a FONSI on February 27, 2004, based on an

Environmental Assessment ("EA") that defendants published in December 2003. Intv.'s Answer,

at ¶¶ 3, 52; Complaint, at ¶ 3.  Publication of the EA was preceded by a seventy-five day public

comment period. Intv.'s Memo, at 6.  Defendants then issued a notice of their intent to take the

Bradley Property into trust on May 13, 2005. Pl.'s Opp., at 4.

On June 13, 2005, plaintiff, a Michigan non-profit corporation that opposes the

proliferation of gambling venues, filed the Complaint alleging that defendants have violated

IGRA, NEPA and the Constitution's non-delegation doctrine. Complaint, at ¶¶ 1, 4, 12.  The

Court heard oral argument on the dispositive Motions on November 29, 2006.

## STANDARD OF REVIEW

---

[5] Collectively, defendants are the Secretary of the Interior, the Bureau of Indian Affairs ("BIA"), and the National Indian Gaming Commission ("NIGC").  The BIA is an administrative agency which falls under the authority of the Secretary of the Interior. *Lincoln v. Vigil*, 508 U.S. 182, 185, 113 S. Ct. 2024 (1993).  The NIGC, an agency "charged with the development of regulations and administrative enforcement of IGRA[,]" *United States v. Seminole Nation of Okla.*, 321 F.3d 939, 941 (10th Cir. 2002) (citing 25 U.S.C. §§ 2705, 2706), was also instrumental in helping shape many of the administrative findings in this case. *E.g.*, Intv.'s Answer, at ¶ 27 ("The Tribe admits that the NIGC has concluded that gaming will be permitted on the land once it is taken into trust as the Tribe's initial reservation under IGRA."). Under the law, federal recognition means that a "tribe shall be considered a historic tribe and shall be entitled to the privileges and immunities available to other federally-recognized historic tribes by virtue of their government-to-government relationship with the United States." 25 C.F.R. § 83.12(a).

I.     **Motion to Dismiss**

Dismissal is appropriate when considering a motion to dismiss only when the moving

party has established that the non-moving party can prove no facts in support of its claims which

entitles it to relief. *Bell v. Exec. Comm. of the United Food & Commer. Workers Pension Plan*

*for Emples.*, 191 F. Supp. 2d 10, 15 (D.D.C. 2002) (citing *In re Swine Flu Immunization*

*Products Liability Litigation*, 279 U.S. App. D.C. 366, 880 F.2d 1439, 1442 (D.C. Cir. 1989) (in

turn citing Fed. R. Civ. P. 12(b)(6)). Generally, a complaint need only contain "a short and plain

statement that [provides] the defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S. Ct. 1627 (2005)

(citation omitted).  "[T]he allegations of the complaint should be construed favorably to the

pleader." *Aerovias De Mex., S.A. De C.V. v. Nat'l Mediation Bd.*, 211 F. Supp. 2d 1 (D.D.C.

2002).  That is, a plaintiff's allegations of fact must be accepted by the Court as true and all

reasonable inferences should be construed in the plaintiff's favor. *Marshall County Health Care*

*Auth. v. Shalala*, 300 U.S. App. D.C. 263, 988 F.2d. 1221, 1225 (D.C. Cir. 1993).  "If the court

considers matters outside the pleadings before it in a 12(b)(6) motion, the above procedure will

automatically be converted into a Rule 56 summary judgment procedure." *Mortensen v. First*

*Federal Sav. & Loan Asso.*, 549 F.2d 884, 891 (3d Cir. 1977) (citing 5 C. Wright and A. Miller,

Federal Practice and Procedure § 1350 (1969)).  A court "will not accept unsupported

conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual

allegation" when addressing a motion to dismiss for failure to state a claim. *Kelley v. Edison*

*Twp.*, 2006 U.S. Dist. LEXIS 23510, at *15 (D.N.J. April 25, 2006) (citation omitted).

Case 1:05-cv-01181-JGP     Document 72     Filed 02/23/2007     Page 6 of 37

## II.     Motion for Judgment on the Pleadings

A motion for judgment on the pleadings is virtually identical to a motion to dismiss for failure to state a claim. *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citation omitted).  Under this legal standard as well, "the court must accept as true the complaint's factual allegations and draw all inferences in the plaintiff's favor." *Id.* (quoting *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (other citations and internal quotation marks omitted)).  "A complaint should not be dismissed on the pleadings unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citations omitted).

## III.     Motion for Summary Judgment

A court should grant a motion for summary judgment only when it determines that "reasonable jurors could [not] find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]" *Griffin v. Acacia Life Ins. Co.*, 151 F. Supp. 2d 78, 79-80 (D.D.C. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)).  A court should dismiss the case under this standard "when evidence on file shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citations and internal quotation marks omitted).

> [A] genuine dispute about material facts exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.
>
> While a nonmovant is not required to produce evidence in a form that would be admissible at trial, *the evidence still must be capable of being converted into admissible evidence*. Otherwise, the

> objective of summary judgment -- to prevent unnecessary trials --
> would be undermined.

*Id*. at 80 (internal citations, alterations and quotation marks omitted) (emphasis added).  As with

the preceding motions, "[w]hen ruling on a motion for summary judgment, [] Court[s] must view

the evidence in the light most favorable to the non-moving party." *Worth v. Jackson*, 377 F.

Supp. 2d 177, 180-81 (D.D.C. 2005) (citing *Bayer v. United States Dep't of Treasury*, 294 U.S.

App. D.C. 44, 956 F.2d 330, 333 (D.C. Cir. 1992)).  Notwithstanding, "the non-moving party

cannot rely on mere allegations or denials . . . , but . . . must set forth specific facts showing that

there [are] genuine issues for trial." *Id*. (citation and internal quotation marks omitted)

(alterations in original).

## ANALYSIS

**I.     Classification of the Bradley Property as "Initial Reservation"**

The Court first addresses plaintiff's claim that defendants' classification of the Bradley

Property as an "initial reservation" violates the statutory limitations imposed by IGRA on Indian

tribes engaged in gaming activities. Complaint, at ¶ 6.  Defendants and intervenor argue that

plaintiff has misread IGRA. Intv.'s Memo, at 45; Def.'s Memo, at 40.

"Congress' central purpose in enacting IGRA was to provide a statutory basis for the

operation of gaming by Indian tribes as a means of promoting tribal economic development,

self-sufficiency, and strong tribal governments." *Chickasaw Nation v. United States*, 534 U.S. 84,

99, 122 S. Ct. 528 (2001) (citation and internal quotation marks omitted).  Under the judicial

review section of the statute, final administrative decisions are to be appealed to federal district

courts pursuant to the Administrative Procedure Act. *United States ex rel. St. Regis Mohawk*

*Tribe v. President R.C.-St. Regis Mgmt. Co.*, 451 F.3d 44, 48 (2d Cir. 2006).  Section 20 of

IGRA states that "gaming is not permitted on Indian land taken into trust by the Secretary after

IGRA's effective date, October 17, 1988, unless[,]" *inter alia*, the "land[ is] taken into trust as

part of . . . the *initial reservation* of an Indian tribe acknowledged by the Secretary[.]"[6] *City of*

*Roseville v. Norton*, 358 U.S. App. D.C. 282, 348 F.3d 1020, 1024 (D.C. Cir. 2003) (citing 25

U.S.C. § 2719(b)(1)(B)(ii) (internal quotation marks omitted) (emphasis added)).

      Here, plaintiff reads the term "reservation" as provided within § 20 of IGRA to "refer[] to

land set aside under federal protection **for the residence** of tribal Indians, regardless of origin.'"

Pl.'s Opp., at 10 (quoting Felix S. Cohen, *Federal Indian Law* 34 (1982 ed.) (emphasis in

original)).  Plaintiff argues that this is the only logical interpretation since the term "reservation"

is not defined in IGRA. *Id.* at 9.  Principally, plaintiff relies on *Sac and Fox Nation of Missouri v.*

*Norton*, 240 F.3d 1250 (10th Cir. 2001) in support of its position, which concluded that (1) the

Secretary of the Interior lacked authority to interpret the term "reservation," and therefore (2) the

court owed "no deference" – typically referred to as *Chevron* deference – to the Secretary's

interpretation. 240 F.3d 1250, 1265 (10th Cir. 2001) (referencing *Chevron, U.S.A., Inc. v. NRDC,*

*Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778 (1984)).  The *Sac and Fox* court then concluded that the

interpretation that a "reservation" must include housing to be legally defined as such was "the

---

      [6] Plaintiff asserts that a *two-step process* must be undertaken before intervenor can engage in gaming on the Bradley Property. Pl.'s Opp., at 10 ("Where none of these exceptions is available, gambling is permitted on offreservation sites **only** by way of a two-step approval process in which DOI and the State's governor concur that the casino 'would not be detrimental to the surrounding community.'" (quoting 25 U.S.C. § 2719(b)(1)(A) (emphasis in original)). Notwithstanding, because the Court concludes that the Bradley Property meets the "initial reservation" exception under § 20 of IGRA, the two-step process is not triggered in this case. *See* 25 U.S.C. § 2719(b)(1)(B)(ii).

Case 1:05-cv-01181-JGP     Document 72     Filed 02/23/2007     Page 9 of 37

one *Congress intended* to adopt when it enacted IGRA." *Id.* at 1267 n.19 (emphasis added).

Were this Court to instead accept defendants' position that land may qualify as a "reservation" without including housing, plaintiff argues that the Bradley Property cannot be intervenor's "initial" reservation because intervenor had at least one federally recognized reservation in the past. Pl.'s Opp., at 25-26 (citing AR 1986; AR 2033).[7]

A.     **Whether Land Used for Gaming must Also Be Used for Housing**

It is indeed settled law that Congress did not define the term "reservation" within IGRA. *Arizona Pub. Serv. Co. v. EPA*, 341 U.S. App. D.C. 222, 211 F.3d 1280, 1293 (D.C. Cir. 2000). Despite this fact, "almost immediately" following the ruling in *Sac and Fox*, "Congress *rebuked the decision . . .* , enacting legislation stating that the authority to determine whether land is a 'reservation' was *delegated to the Secretary* as of the effective date of IGRA." *City of Roseville*, 348 F.3d at 1029 (citing Pub. L. No. 107-63, § 134 (2001) (emphasis added)).[8]  Pursuant to the holding in *City of Roseville*, and in light of § 134, which Congress *did not limit* to the "restored lands" exception within § 20 of IGRA, the Secretary's interpretation of the term "reservation" is owed *Chevron* deference.

The court in *Citizens Exposing Truth About Casinos v. Norton*, 2004 U.S. Dist. LEXIS 27498 (D.D.C. April 23, 2004) ("*CETAC*") reached a similar conclusion, explaining that

> there appears to be no statutory or regulatory requirement that land
> must contain housing in order for the Secretary to proclaim it a
> reservation under the IRA and for it to qualify as an initial reservation

---

[7] The abbreviation "AR" is used when citing to the administrative record.

[8] The holding in *City of Roseville* addresses the "restored lands" exception within § 20. Here, the Court addresses the "initial reservation" exception.

> under IGRA. When taking property into trust, the Secretary acts
> pursuant to the IRA, not . . . the IGRA, and regulations promulgated
> under the IRA define a reservation as "that area of land over which
> the tribe is recognized by the United States as having governmental
> jurisdiction." 25 C.F.R. § 151.2(f). It is altogether reasonable,
> therefore, for the Secretary to adopt the definition of reservation
> contained in the regulations promulgated pursuant to the statute under
> which she acts. *The Court concludes that the Secretary has authority*
> *to interpret the phrase "initial reservation" as she has done.*

2004 U.S. Dist. LEXIS 27498, at *15 (D.D.C. April 23, 2004) (internal citation omitted)

(emphasis added).[9] As in *CETAC*, this Court concludes that because there has been a

congressional delegation of authority to the administrative agency to interpret § 20 of IGRA, and

defendants' interpretation of the term "reservation" is not demonstrably arbitrary, capricious, or

contrary to the statue[10], the Court "must accept" the agency's interpretation that the term

"reservation" does not include a housing requirement. *See Sac and Fox*, 240 F.3d at 1261. Also,

the Indian Canon of statutory construction supports the Court's conclusion, pursuant to which

———————————————

[9] The purpose of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 461 et seq. is "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152, 93 S. Ct. 1267 (1973) (quoting H.R.Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934)).

[10] The arbitrary and capricious standard has been defined this way:

> An agency's rule would be arbitrary and capricious if the agency
> relied on factors that Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before
> the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise. [] Although our
> inquiry into the facts is to be searching and careful, *this court is not*
> *empowered to substitute its judgment for that of the agency.* []

*Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287-88 (4th Cir. 1999) (internal citations omitted) (emphasis added).

"[t]he Supreme Court has on numerous occasions noted that *ambiguities in federal statutes are to be read liberally in favor of the Indians* . . . ." *City of Roseville*, 348 F.3d at 1032 (citing *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269, 112 S. Ct. 683 (1992) (other citation omitted) (emphasis added)).[11]  Plaintiff's argument therefore fails.

**B.      Whether the Bradley Property Is an "Initial Reservation"**

Plaintiff alternatively argues that the Bradley Property is not an "initial" reservation because intervenor had at least one reservation in the past. Pl.'s Opp., at 25-26.  Plaintiff further expounded upon its position at oral argument:

> [T]he problem for the government and the tribe here is that it is undisputed that the tribe has previously had at least one federal reservation near the Kalamazoo area.  They had a three-mile reserve and they may have had more.  They've contended that they've had more than one but they've at least had one.
>
> And so this is admitted in the tribe's application in several places. [Plaintiff directs] the court to AR 1986 and AR 2033.

Tr. Oral Arg., at 46.

In contrast, defendants state:

> [T]he two [] reservations that Plaintiff refers to are actually the same 3-mile parcel in Kalamazoo, Michigan . . . . [which] Plaintiff also fails to point out . . . was ceded by the Potawatomi to the United States in the Treaty of 1827.

Def.'s Reply, at 18 (citing AR 1986, 2033).  Defendants insist that the 3-mile parcel in question

---

[11]  *Cf. Arizona Pub. Serv. Co.*, 211 F.3d at 1293 ("[T]he term 'reservation' has no rigid meaning as suggested by petitioners. . . . The[] varying definitions of 'reservation' lay to waste petitioners' argument. . . . [G]iven the varying definitions of the term . . . , it would be a curious result indeed for this court to insist that the absence of a definition requires [the agency] to advance the most restrictive definition as put forth by petitioners.").

11

certainly does not constitute intervenor's "initial" reservation because the definition of "Indian lands" as provided within IGRA and the IRA "includes only those lands which *the United States recognizes* as the tribe exercising its governmental jurisdiction." Def.'s Memo, at 46 (emphasis added). In defendants' view, because intervenor "currently does not exercise governmental jurisdiction over any land," it "currently does not possess land that meets the definition of reservation under IGRA or the IRA." *Id.* at 47.

To meet the "initial reservation" exception as a matter of law, a tribe must be recognized by the U.S. Government. *See* 25 U.S.C. § 2719(b)(1)(B)(ii); *see also* 25 C.F.R. § 83.10 (explaining the process by which an American Indian group becomes an officially recognized Indian tribe). The history in this case regarding the 3-mile parcel's transfer to the government back in 1827 is murky. It is unclear if the parties themselves are even fully aware of the circumstances surrounding the land transfer. Whatever the case, the land is not intervenor's "initial reservation" because intervenor only gained official governmental recognition on August 23, 1999, 63 Fed. Reg. 56936, and has thus never exercised jurisdiction over any land. Accordingly, defendants' classification of the Bradley Property as intervenor's "initial reservation" does not violate the law.

On this issue, then, there is no genuine issue of material fact in dispute.

## II.    Issuance of FONSI Instead of an EIS

Next, the Court considers plaintiff's argument that defendants' decision to issue a FONSI and not an EIS violates NEPA. Pl.'s Opp., at 1. Defendants and intervenor counter that this decision, under the broad discretion generally afforded administrative agencies, is legally sound.

Def.'s Memo, at 24-38; Intv.'s Memo, at 16-38.

Fundamentally, "NEPA 'imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.'" *S. D. Warren Co. v. Me. Bd. of Envtl. Prot.*, __U.S.__, 126 S. Ct. 1843, 1852 (2006) (citation omitted)). The Act "simply guarantees a particular procedure, *not a particular result.*" *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737, 118 S. Ct. 1665 (1998) (emphasis added). NEPA requires agencies "to consider the cumulative environmental impacts of any proposed action." *Town of Cave Creek v. FAA*, 355 U.S. App. D.C. 420, 325 F.3d 320, 328 (D.C.Cir. 2003) (citation and internal quotation marks omitted). Nevertheless, NEPA-related agency decisions are afforded a considerable degree of deference, and "[a]n agency's decision not to prepare an EIS can be set aside only upon a showing that it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Department of Transportation v. Public Citizen*, 541 U.S. 752, 763, 124 S. Ct. 2204 (2004) (citation and internal quotation marks omitted).

Plaintiff makes two arguments which appear to compete with one another in support of its position. First, plaintiff argues that "the *length and complexity*" of the EA "militates in favor of preparing an EIS" because "CEQ advises that an EA should be no more than 10-15 pages in length"[12] and the EA contains "*208 pages of text* plus almost *1,000 pages of attachments*." Pl.'s Opp., at 32 (emphasis added). Plaintiff then appears to argue that the EA lacks sufficient

---

[12] The Council of Environmental Quality ("CEQ"), "established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement." *Public Citizen*, 541 U.S. at 757 (citing 40 C.F.R. § 1500.3).

Case 1:05-cv-01181-JGP     Document 72     Filed 02/23/2007     Page 14 of 37

complexity, stating that it "is *inadequate* in its treatment of the casino's expected impact on the surrounding rural area[,]"[13] "*fail[s] to address* a number of significant impacts from increased traffic generated by the casino[,]" "*gives short shrift* to the expected impact of the proposed casino on the broader West Michigan community[,]" and is "*deficien[t]* . . . in its treatment of indirect impacts." *Id.* at 35, 39, 43, 45 (emphasis added).

**A.     Length and Complexity of EA**

With regard to plaintiff's length and complexity argument, it was roundly rejected by the D.C. Circuit in *TOMAC v. Norton*, 369 U.S. App. D.C. 85, 433 F.3d 852 (D.C. Cir. 2006), a recent case where, like here, a Michigan non-profit corporation challenged an agency decision to take land into trust on behalf of an Indian tribe.  In that case, the parties "anticipated arrival of 4.5 million visitors a year to a rural community of less than 5,000 residents[,]" while the EA took "four-and-a-half years" to complete and was "almost 900 pages[.]" 369 U.S. App. D.C. 85, 433 F.3d 852, 862 (D.C. Cir. 2006).  Here, in comparison, the Bradley Property is anticipated to attract substantially *less visitors annually*, *see* Intv.'s Answer, at ¶ 60, to a *slightly smaller* area currently zoned "light industrial." Intv.'s Memo, at 1.  Moreover, the instant EA appears to have taken *much less time to complete* and is only *slightly longer in page length*, when including attachments, than the EA in *TOMAC*. *See* Intv.'s Memo, at 6, 32.

---

[13]  Plaintiff asserts that the area which surrounds the Bradley Property is rural.  To this assertion, intervenor states that the Bradley Property is currently zoned "light industrial." Intv.'s Memo, at 1 (discussing how intervenor "proposes to create its casino by redeveloping existing (but currently vacant) factory and warehouse buildings, on a site lying between a highway and a railroad line that is already zoned for, and surrounded by, light industrial and commercial uses."). Plaintiff has constructively "admitted" this characterization of the areas surrounding the Bradley Property by not disputing it in filings or during oral argument. LCvR 7(h).

Case 1:05-cv-01181-JGP     Document 72     Filed 02/23/2007     Page 15 of 37

Still, when faced with an identical argument to the length and complexity argument that plaintiff makes here, the *TOMAC* court held that "the length of an EA has no bearing on the necessity of an EIS." *TOMAC*, 433 F.3d at 862 (citation omitted). Additionally, the court held that EA complexity and controversy "do not by themselves show that the EAs' conclusion - 'no significant impact' - is . . . incorrect.'" *Id.* (quoting *Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985)). And regarding plaintiff's reliance "on the CEQ guidelines, which advise that an EA should be no more than 10-15 pages in length[,]" the court held that "[t]his guideline is *not a binding regulation*[.]" *Id.* (emphasis added). Contrary to plaintiff's position, "'[w]hat ultimately determines whether an EIS rather than an EA is required is the scope of the project itself, not the length of the agency's report.'" *Id.* (quoting *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 434 (8th Cir. 2004)).

Pursuant to the *TOMAC* holding, then, plaintiff's length and complexity argument fails.[14]

**B.     Substantive Challenges to EA**

----

[14] The *TOMAC* ruling also undercuts plaintiff's argument, made a few months after oral argument on the dispositive Motions, that an internal Interior Department document entitled "Checklist for Gaming Acquisitions, Gaming Related Acquisitions and IGRA Section 20 Determinations" mandates that an EIS be prepared in this case. *See generally* Michgo's Post-Hearing Statement of Points and Authorities in Opposition to Federal Defendants' and the Gun Lake Band's Motions to Dismiss or in the Alternative for Summary Judgment [#68] ("Pl.'s Post-Hearing Opp."). The critical language that plaintiff points to is as follows:

> **Proposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts.**

Pl.'s Post-Hearing Opp., at 1-2 (emphasis in original). Notwithstanding, if the CEQ guidelines do not bind the agency to produce an EIS, *TOMAC*, 433 F.3d at 862, certainly the agency is not bound to produce one by its own internal checklists.

Plaintiff also challenges the EA on substantive grounds, arguing that it "glosses over" the Bradley Property's potential impacts on traffic, and its surrounding and broader West Michigan communities. Pl.'s Opp., at 35-43.  Plaintiff further argues that the EA fails to adequately address indirect effects. *Id*. at 43.  In responding, intervenor described the threshold question this way during oral argument: "It is not a question of whether you or I or MichGO would have made a different decision.  The question is did [the EA] actually . . . consider the environmental consequences." Tr. Oral Arg., at 21.

Courts apply a four-part test when determining if a FONSI was properly issued: (1) whether the agency has "accurately identified the relevant environmental concern[;]" (2) whether the agency has "taken a *hard look* at the problem in preparing the EA[;]" (3) whether the agency has made "a convincing case for its finding" within the FONSI; and (4) "if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum." *Grand Canyon Trust v. FAA*, 351 U.S. App. D.C. 253, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (citations and internal quotation marks omitted).  Further, the Court reiterates the long-standing rule that an administrative agency's decision to issue a FONSI instead of an EIS may only be overturned "if it was arbitrary, capricious or an abuse of discretion." *Sierra Club v. United States Dep't of Transportation*, 243 U.S. App. D.C. 302, 753 F.2d 120, 126 (D.C. Cir. 1985)).

Here, defendants analyzed the full range of potential environmental impacts of taking the Bradley Property into trust, took a "hard look" at the associated problems in preparing the EA, and offered substantial mitigation measures where they found truly significant impacts. *Grand Canyon Trust*, 290 F.3d at 340-41.  Thus, the Court will leave the administrative finding

16

undisturbed.

Below, the Court more closely examines the potential environmental impacts of the

Bradley Property, as well as plaintiff's specific challenges.

## I.     Surrounding and Broader West Michigan Communities

Plaintiff makes this argument regarding the proposed casino site's direct impact on its

surrounding and broader Western Michigan communities: "The farmland that makes up the area

is a defining feature of the community. *Those who live in the area, including MichGO's*

*members, did not move to the country so they could be down the road from a massive casino*."

Pl.'s Opp., at 35 (emphasis added).  Plaintiff also raises the issue of the federal ozone standard as

a ground upon which the Court should order that an EIS be prepared, arguing that defendants

failed to predict that Southwestern Michigan, which includes the Bradley Property, would

become a non-attainment area for ozone under the Clean Air Act. *Id*. at 33.  Further, plaintiff

argues that compulsive gambling and crime will result if the Court allows the administrative

finding to stand. *Id.* at 36-37.  Defendants and intervenor counter that the EA rigorously

examines the potential impacts on farmland and historic properties, the problem of atmospheric

pollution and other such pollutants considered harmful to public health and the environment, as

well as cultural resources and socioeconomic conditions. Def.'s Memo, at 13; Intv.'s Memo, at

16-40.  Having carefully weighed the arguments of the parties, the Court concludes that

plaintiff's argument lacks merit.

With regard to farmland and historic properties, defendants assert that the Bradley

Property fully complies with the Farmland Protection Policy Act and the National Historic

Preservation Act, and is thus not expected to impact federally designated farmland or historic properties. Def.'s Memo, at 29.  This assertion finds ample support within the record. AR 125-26 (Prime and Unique farmland); AR 93-94 (historic properties); *see also* Intv.'s Reply, at 23 ("[W]hile it is true the facility will affect 21 acres of 'locally important' farmland . . . , this amounts to .011 percent of County farmland bearing that designation – a percentage . . . reasonably deemed 'relatively small.'" (quoting AR 126)); Intv.'s Memo, at 6 ("[N]o significant historical resources will be affected.").  Moreover, plaintiff's argument that those who have brought this action and others "did not move to the country so they could be down the road from a massive casino[,]" Pl.'s Opp., at 35, simply does not establish that defendants acted arbitrarily, capriciously or abused their discretion in reaching the preceding conclusion.

On the issue of pollution, plaintiff argues that the Bradley Property is located within an ozone non-attainment area. Pl.'s Opp., at 33.   Intervenor responded during oral argument that the area has not yet been so designated. Tr. Oral Arg., at 24 ("[A]fter the EPA changed the means of monitoring ozone, Congress passed a specific law that *for a period of time that includes the present* has declared that this area is an ozone attainment area.  *So it has not yet even become a non-attainment area*." (emphasis added)).  However, in anticipation of the area eventually being designated a non-attainment zone by the federal government, defendants conducted an additional study which lead them to the following conclusion:

> whether this is an attainment or non-attainment zone, this project will have no significant environmental effects with respect to ozone in particular, air-quality in general because *the level of emissions from this project will fall below the federal threshold of 100 tons per year of significance*[.]

Tr. Oral Arg., at 25 (emphasis added).[15]

        This conclusion makes a convincing case for the administrative finding because it *details*

how the Bradley Property will avoid significantly impacting current air-quality levels, and will

likewise avoid significantly impacting air-quality levels in the event that "future regulations" are

put into place. *Id.* Defendants also note that the Bradley Property fully complies with the Clean

Air Act and the National Ambient Air Quality Standards. Def.'s Memo, at 39. Moreover,

defendants insist that any potential impacts to water quality posed by the Bradley Property will be

mitigated. *Id.* The immediately preceding assertions also find record support. *See* AR190,

1239-46; *see also* AR185-91 (discussing EPA requirement that a Storm Water Pollution

Prevention Plan be prepared to limit soil erosion and address any impacts to water quality

brought on by the proposed casino).

        And with regard to the issues of cultural resources and socioeconomic conditions,

plaintiff argues that the Bradley Property, if converted into a casino, will trigger a marked

increase in compulsive gambling and crime, yet "the EA devotes *not a single word* to discussing

the implications" of these increases. Pl.'s Opp., at 36-37 (citations omitted); *but see id.* at 33

(admitting that the EA examined the effects of compulsive gambling and crime, concluding "that

they are not expected to be significant[.]" (emphasis added)). Defendants and intervenor

contend, however, that the EA provides exhaustive analysis in these areas. *See* Intv.'s Memo, at

31-33; *see also* Def.'s Memo, at 30. As set forth below, the Court concludes that the facts simply

do not bear plaintiff's argument out.

_____

        [15] *But see TOMAC*, 433 F.3d at 863-64 ("BIA [i]s under no obligation to hypothesize
about future regulations.").

Defendants, to be sure, found no convincing evidence demonstrating that compulsive gambling and crime increase with the introduction of a casino into a community. AR 134-35. Plaintiff has failed to identify the defect in this conclusion, and has likewise failed to identify any flaws in the *process* undertaken in reaching this conclusion. *See Ohio Forestry*, 523 U.S. at 737 (procedural requirements under NEPA). Rather, plaintiff asserts with no authority that casinos cause "*well[-]known* impacts of compulsive gambling on individuals and families, including increased rates of alcoholism, drug abuse, divorce, crime, and bankruptcy." Pl.'s Opp., at 37 (emphasis added). Further, the Court notes that intervenor is signatory to a legally-binding agreement which is specifically designed to combat resultant crime and gambling, having

> waived its sovereign immunity with the local police department to pay for four additional deputies to the tune of [approximately] $400,000 a year in order to be available to respond to any crime consequences that occur in the casino or as a result.
>
> . . . .
>
> [Further,] the tribe has undertaken to engage in training efforts and other community-based efforts to deal with any tendency to compulsive gambling . . . .

Tr. Oral Arg., at 31-32; *accord* Def.'s Reply, at 31 n.13 ("[W]hile respected studies show no correlation between casinos and the string of societal ills MichGO lists, the Tribe nonetheless committed to undertake significant, particularized mitigation to alleviate local concerns."). Again, plaintiff has failed to show how the foregoing mitigation measures do not comply with the procedural requirements imposed under NEPA.

For these reasons, the Court does not deem the finding of no significant impact relating to the proposed casino site's impact on its surrounding and broader Western Michigan communities

to be arbitrary, capricious, or an abuse of discretion.

**ii.     Indirect Effects**

Plaintiff also takes issue with the EA's findings regarding indirect effects, which "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.  Specifically, plaintiff argues that the EA is deficient in its analysis of "induced growth as it relates to traffic from the casino[,]" in addition to "land use patterns, population density and growth, and effects on air, water, and other natural resources . . . ." Pl.'s Opp., at 46.  Plaintiff further challenges the EA on the ground that "indirect growth induced by the casino would result in the destruction of 13 acres of wetlands and 23 acres of federally recognized 'prime farmlands.'" Pl.'s Opp., at 36 (citing AR 167, 179).  Further, plaintiff argues that the EA continually "attempts to downplay the potential for significant indirect impacts from the casino by pointing to the alleged ability of local planning and zoning to control the impacts once the casino is in place." *Id.*

Defendants and intervenor argue that the EA fully complies with the requirements imposed under NEPA regarding indirect effects. *See* Def.'s Memo, at 30, 36-37; Intv.'s Memo, at 35-37; *see also* Tr. Oral Arg., at 29 ("[The EA] contains 37 pages of discussion of the possible indirect effects . . . and concludes as to each one that there will be no environmentally significant consequences particularly taking into account the mitigation measures that the tribe has undertaken to conduct.").  The Court concludes that defendants' and intervenor's arguments prevail for the reasons that follow.

As is required by law, the EA thoroughly considered the Bradley Property's foreseeable

21

Case 1:05-cv-01181-JGP     Document 72     Filed 02/23/2007     Page 22 of 37

impacts on growth, residential and commercial development, land and water resources, wetlands, wildlife, socioeconomic and cultural issues, traffic and pollution. *See* AR 146-183.  Defendants justify their finding of no significant impact regarding indirect effects by stating that the Bradley Property will not significantly impact wetlands[16], *see* AR 166-67, emissions, *see* AR 1241-42, land resources, *see* AR 135, 164-65, water resources, *see* AR 135-36, 165-66, biological resources, *see* AR 136, 166-68, historic properties and religious freedom, *see* AR 137, 168-69, socioeconomic conditions/environmental justice, *see* AR 137, 169-77, and resource use patterns, *see* AR 137-45, AR 177-83. Def.'s Memo, at 28-30, 33, 35-37.  Defendants' findings which relate to foreseeable indirect effects are, as shown, supported by the record. *See also* AR 147-56 (housing growth of core area and outer core area).  Plaintiff has failed to support its argument that "[d]efendants' EA is [] deficient in this case" with respect to the treatment of indirect effects, Pl.'s Opp., at 45, as plaintiff has not demonstrated how defendants' findings do not comport with the NEPA requirements.

And despite plaintiff's objection to the EA's discussion of local planning and zoning in

---

[16] Defendants have presented preventative mitigation measures to curb impacts to wetlands, although they maintain that wetlands will not be impacted.

> Such mitigation included, in part, (1) the use of a sediment erosion control plan, "enforceable under a NPDES permit issued by the EPA"; (2) the sitting of all construction staging areas away from all waterways and wetlands; and (3) the construction of a 120-foot long retaining wall on the parking lot to prevent disturbance of the nearby wetland area.

Intv.'s Memo, at 20 (citing AR 187-88, 1125-26, 1136).  "NPDES" is an acronym for the National Pollutant Discharge Elimination System.  The Michigan Department of Environmental Quality manages the NPDES permit program within the State of Michigan. *United States v. Kuhn*, 345 F.3d 431, 432-33 (6th Cir. 2003).

addressing indirect effects, it has provided no *controlling authority* which explains why this administrative approach somehow violates the procedural requirements imposed under NEPA. Besides, defendants argue that the EA does not rely on local planning and zoning in addressing indirect effects, but merely "assume[s] that all reasonably foreseeable indirect development *will be in compliance with local planning and zoning laws.*" Def.'s Memo, at 36-37. A close reading of the record reveals that defendants' interpretation in this respect is the correct one. *See* AR 135-37, 145-46. Indeed, plaintiff seems to concede the point by stating in relevant part:

> The EA admits that "reasonably foreseeable indirect development . . . . is anticipated to occur" but that the impacts will be minimized because any such development will take place "*in compliance with local planning and zoning ordinances and other mandates.*" [] The EA states that no impacts to area land resources are expected because "proper design for site conditions will avoid potential impacts . . . ." [] The EA [concludes that there will not be] any significant impact to agriculture and prime farmlands because "*any future development would need to conform to local government plans for development . . . .*" [] And the EA states that no significant socioeconomic impacts are expected because "*any additional development within the project vicinity would be required to conform to existing township zoning . . . .*"

Pl.'s Opp., at 39 at 46-47 (citation omitted) (emphasis added).

Fundamentally, plaintiff appears to object more to the conclusion reached regarding indirect effects than to the process undertaken within the EA. However, as established above, NEPA "simply guarantees a particular *procedure*, not a particular result." *Ohio Forestry Ass'n*, 523 U.S. at 737 (emphasis added). Therefore, plaintiff has failed to demonstrate that the administrative findings regarding indirect effects are arbitrary, capricious, or an abuse of discretion.

Case 1:05-cv-01181-JGP     Document 72     Filed 02/23/2007     Page 24 of 37

### iii.     Traffic

Plaintiff's objection to the Bradley Property's potential impact on traffic – and
particularly the impact to northbound and southbound intersections – is perhaps its strongest
argument.  Regarding traffic volume, plaintiff argues that the EA erroneously compares the
Bradley Property and the Turtle Creek casino, which is also in Michigan, because intervenor's

> casino would be **three times larger** than Turtle Creek, closer to
> larger population centers than Turtle Creek, visibly located next to a
> highway with nearly **twice** the daily traffic of Turtle Creek, and
> located in southwest Michigan, which has fewer casinos than the area
> where Turtle Creek is located.

Pl.'s Opp., at 39 (emphasis in original).  In addition, plaintiff argues that defendants' own data
shows that northbound and southbound intersections which surround the Bradley Property "*will
operate at unacceptable levels of congestion* once the casino is in operation, yet they still
conclude that this is not potentially significant for purposes of NEPA." *Id.* (emphasis added).
And with respect to the role of state and local agencies in the final administrative finding,
plaintiff makes this argument:

> [The Michigan Department of Transportation ("MDOT")] was not
> aware of the significant traffic problems identified by Defendants in
> their study. Moreover, the . . . MDOT d[id] not mention anything
> about the proposed "all-way stop control" at the US-131 southbound
> ramps recommended by the EA, or offer any opinion as to whether it
> would solve the problem. Thus, although the EA concedes there will
> be a significant impact to southbound traffic as a result of the casino,
> it incorrectly suggests that MDOT has approved of the proposed
> mitigation.
>
>                         . . . .
>
>     The EA suggests that the Allegan County Board of Road
> Commissioners agrees with Defendants' conclusion of no significant
> impact to the Village of Hopkins. (AR000116). But this is

24

> disingenuous. The letter from the Board of Road Commissioners is dated **March 13, 2003**, which is three months before Defendants completed their traffic study on the Village of Hopkins on June 6, 2003, (see AR000590). This means, at the time it wrote its letter, the Board **could not have known** about the significant impacts that would be identified in the traffic study three months later. Thus, Defendants' suggestion that the Board agrees with its conclusion of no significant impact on the Village of Hopkins is patently false. Defendants' own traffic study shows that impacts at the key intersection in the Village of Hopkins will be significant, and the EA contains **no mitigation** measures to reduce those impacts below the level of significance. (AR000189-90). Therefore, as with other parts of the traffic study discussed above, Defendants cannot maintain that the EA's conclusion of no significant impacts is reasonable.

*Id.* at 41, 42-43 (citations omitted) (emphasis in original).[17]

Defendants counter that the EA took a "hard look" at each specific problem associated with traffic, and that significant impacts will be reduced to a minimum with the implementation of *enforceable* mitigation measures. Def.'s Memo, at 39 (citing AR 221-22, 239). For the following reasons, the Court is convinced that defendants' finding of no significant traffic impact does not violate NEPA.

The Court first considers plaintiff's objection to the EA's comparison of the Bradley Property with the Turtle Creek casino. It bears repeating that when analyzing NEPA-related decisions, a court must be "deferential to the administrative agency[.]" *Williams v. Dombeck*, 151 F. Supp. 2d 9, 18 (D.D.C. 2001) (citing *Environmental Defense Fund, Inc., v. Costle*, 211 U.S. App. D.C. 313, 657 F.2d 275, 282 (D.C. Cir. 1981)). This means that a court "presumes the agency action to be valid" unless convinced otherwise. *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S. Ct. 814 (1971)).

---

[17] "LOS" is an acronym for levels of service. *Id.* at 40. "An 'A' is the highest LOS rating available, followed by B, C, D, E, and F." *Id.* at n.17.

Here, the EA purportedly makes a comparison between the Bradley Property and the Turtle Creek casino because of Turtle Creek's "similarity to the [] proposed casino . . . ." Intv.'s Memo, at 24.  The EA considers the Bradley Property and Turtle Creek to be similar, despite their differences in size, because Turtle Creek also "abuts a state highway, [] is situated in a similar setting with tourism in the area, and its casino features two restaurants." *Id.* (citing AR 109).  The EA certainly reflects an awareness of the size disparity between the Bradley Property and Turtle Creek. AR 109 (noting that the Bradley Property "*is about three times larger than the Turtle Creek casino . . . .*" (emphasis added)).  However, factors such as the accessability to highways and restaurants, and the anticipated affect on tourism proved far more relevant when determining if the Bradley Property would pose a significant impact on traffic. *See id.*  Plaintiff has not adequately identified the defect in this methodology, especially in light of the considerable deference owed NEPA-related agency decisions.  Moreover, "this court is not empowered to substitute its judgment for that of the agency." *Hughes River Watershed Conservancy*, 165 F.3d at 288; *see also County of San Diego v. Babbitt*, 847 F. Supp. 768, 775 (D. Cal. 1994) (holding that even "disagreement between experts does not invalidate an EIS." (citing *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991)).

The issue of northbound and southbound traffic congestion, however, gives the Court pause because intervenor appears to have contradicted itself.  Initially, intervenor seemed to concede in its papers that traffic at northbound and southbound intersections close to the Bradley Property presents a significant problem, explaining that the EA offers responsive mitigation measures and how the traffic engineering firm that it retained, URS Corporation, helped to reach this conclusion.  Specifically, intervenor stated:

Case 1:05-cv-01181-JGP    Document 72    Filed 02/23/2007    Page 27 of 37

> The study did find that the infusion of casino traffic could affect the flow of afternoon rush hour traffic in *two directions*. . . .
>
> [These directions are] *southbound* at the US-131/129th Avenue ramp and *northbound* at the US-131 Avenue ramp *intersections* near the project site[.]
>
> . . . .
>
> URS identified road improvements that would either eliminate the *projected traffic congestion at the identified intersections* or alleviate it to the satisfaction of the MDOT . . . .

Intv.'s Memo, at 22-23 & n.8 (emphasis added).  Notwithstanding this apparent concession, intervenor then made the following assertion at oral argument, which suggested a conclusion reached by URS that traffic congestion at northbound and southbound intersections would be of little to no impact:

> [T]he low rating, the F rating or E rating that was reflected in their study, is traffic on the intersection that travels northbound on the 22 but they found all of the casino traffic goes -- it is either east or west. I can't remember which, on route 42.

Tr. Oral Arg., at 68-69.  Intervenor continued:

> *Therefore, they found that the casino traffic would not have any affect, significant or otherwise, on whatever traffic problems may exist going north or south.*  In fact, . . . the URS Corporation's expert traffic study . . . reveals[] that in terms of casino traffic which is on route not route 22, the peak volume is 70 trips per hour.
>
> In other words one car every minute will be going over this road in a different direction in the eastbound direction and westbound 40 trips per hour during the peak hour that was studied.
>
> I mean, it is not the burden of this court *and it is not the office of this court to second-guess what the URS experts reviewed not once but twice and what the BIA* and the NIGC and the Michigan Department of Transportation and the Allegan County Roads Commission have all *concluded is not a significant impact.*

> *But it speaks volumes about how weak NEPA arguments are*
> that we are reduced to arguing about whether, in fact, with respect to
> this one intersection they came to the right conclusion.

*Id.* at 69 (emphasis added). Putting aside intervenor's opinion of the relative strength of NEPA

challenges, the Court will assume that the Bradley Property, if converted into a casino, would

place a significant burden on northbound and southbound intersections. But that is not the end of

the inquiry.

Turning to analyze the proposed mitigation measures, then, the following is proposed

within the EA: building a "right turn lane from the northbound US-131 off-ramp turning onto

129th Avenue, eastbound" to mitigate the impact on northbound traffic, and installing an

"all-way stop control at the US-131 southbound ramps/129th Avenue intersection" to mitigate

the impact on southbound traffic. AR 189-90. The EA concludes that such mitigation measures

will reduce traffic congestion to acceptable levels, *id.*, which is a conclusion that plaintiff has not

shown to be flawed under NEPA. Further, it is important to again note that all of the mitigation

measures proposed in response to the anticipated environmental impacts of the Bradley Property

– including traffic impacts at the northbound and southbound intersections – are *enforceable. See*

Intv.'s Reply, at 18 ("[T]he Tribe expressly agreed to waive its sovereign immunity vis-à-vis the

local agencies for purposes of enforcing those agreements (AR 221-222, 239), and it possesses

no sovereign immunity vis-à-vis the federal government in any event. . . . Accordingly, the BIA

can enforce the mitigation upon which its FONSI rests . . . .").

And with regard to the input of state and local agencies, intervenor asserts that defendants

conducted a study with the input of MDOT and the Allegan County Road Commission, and

concluded that Hopkins, Michigan and areas close to the Bradley Property would not be

28

significantly impacted. Intv.'s Memo, at 26 (discussing Hopkins, Michigan (citing AR 115-16;

509-17; 1090)); Intv.'s Reply, at 25 ("Both MDOT and the Board of County Road

Commissioners of Allegan County . . . concluded the project, as mitigated, would not adversely

affect traffic flows." (citing AR 586-90)).  Plaintiff counters that MDOT could not have agreed

with the traffic study because a letter from the state agency expressing support for the finding

"was written **before** Defendants' traffic study was completed on November 2, 2001." Pl.'s Opp.,

at 41 (citing AR 442).  Similarly, plaintiff argues that a "letter from the [Allegan] Board of Road

Commissioners [] dated **March 13, 2003**" is also irrelevant to the administrative finding because

it was written "three months before Defendants completed their traffic study on the Village of

Hopkins on June 6, 2003[.]" *Id.* at 42 (citing AR 590) (emphasis in original).

        Despite plaintiff's objection, it is apparent that both MDOT and the Allegan County Road

Commission supported the traffic mitigation measures that are proposed within the EA.  The

MDOT initially expressed its support by submitting a "plan and field review" of the Bradley

Property on September 25, 2001. AR 586-87.  This document preceded the final traffic study by

*less than* two months. Pl.'s Opp., at 41 ("Defendants' traffic study was completed on November

2, 2001."); Intv.'s Reply, at 26 (same).  The Court concludes that the brief passage of time

between MDOT's submission of the "plan and field review" and the final traffic study does not

support the *reasonable inference* that "MDOT was *not aware* of the significant traffic problems

identified by Defendants in their study[,]" Pl.'s Opp., at 41 (emphasis added), nor does it

undermine the proposed mitigation measures.  As further evidence of its support, MDOT

submitted an additional document on February 12, 2002 which conveyed its favorable opinion of

the administrative finding. AR 589.

Case 1:05-cv-01181-JGP    Document 72    Filed 02/23/2007    Page 30 of 37

And with regard to the Allegan County Road Commission and its stance on Hopkins, Michigan, the local agency initially expressed that the Bradley Property, if converted into a casino, would pose "no significant impact to the roadways under [its] jurisdiction . . . ." *Id.* at 590.  However, the Village of Hopkins requested reconsideration following this traffic study, prompting defendants to re-examine the potential impacts on the Hopkins area. *Id.* at 510-11. Defendants conducted the second study with the input of the Allegan County Road Commission and, as before, the Commission concluded that the Bradley Property would pose no significant traffic problems. *Id.*

In sum, upon consideration of the EA's extensive analysis of the cumulative environmental impacts of the Bradley Property, plaintiff's argument falls short of demonstrating that the actions of defendant were arbitrary, capricious, or an abuse of discretion.  On this claim, there are no issues of material fact in dispute.

## III.    Authorization of Class III Gaming

Plaintiff claims that defendants cannot lawfully authorize Class III gaming at the Bradley Property under IGRA in the absence of a tribal-state gaming compact. Complaint, at ¶ 7; *see* Def.'s Memo, at 2.  Defendants and intervenor counter, *inter alia*, that the absence of a tribal-state compact should not stand as an impediment to acquiring the Bradley Property in trust. *See* Def.'s Memo, at 47; Intv.'s Memo, at 48.

IGRA divides gaming into three classes. *Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 332 U.S. App. D.C. 429, 158 F.3d 1335, 1337 (D.C. Cir. 1998).

> "Class I gaming is described as 'social games solely for prizes of minimal value or traditional forms of Indian gaming.' 25 U.S.C. §

> 2703(6). Class II gaming includes games of chance such as bingo or
> poker. See 25 U.S.C. § 2703(7). All other forms of gaming are listed
> under Class III. See 25 U.S.C. § 2703(8). Each class is progressively
> more regulated."

*Vending v. Nat'l Indian Gaming Comm'n*, 2001 U.S. Dist. LEXIS 26013, at *3 n.2 (D. Fla. April

5, 2001).

With regard to Class III gaming, which is the focus of plaintiff's challenge here, IGRA

permits such activities on Indian lands provided that five requirements are met." *United States v.*

*Garrett*, 122 Fed. Appx. 628, 630 (4th Cir. 2005). Among these requirements, IGRA provides

that the gaming activities must be: "conducted in conformance with a Tribal- State compact

entered into by the Indian tribe and the State[.]" *Id.* (quoting 25 U.S.C. § 2710(d)(1)(C)).

Regarding IGRA and the issue of tribal-state compacts, the overwhelming weight of

authority is clear: "[A]n Indian tribe may conduct [Class III] gaming activities *only* in

conformance with a valid compact between the tribe and the State in which the gaming activities

are located." *Seminole Tribe v. Fla.*, 517 U.S. 44, 47, 116 S. Ct. 1114 (1996) (emphasis added);

*accord United States ex rel. St. Regis Mohawk Tribe v. President R.C.-St. Regis Mgmt. Co.*, 451

F.3d 44, 49 (2d Cir. 2006) ("Class III gaming is to be regulated by compacts between states and

tribes."); *Du Flambeau Flambeau Band v. Norton*, 422 F.3d 490, 492-93 (7th Cir. 2005) ("The

IGRA allows tribes to operate casinos on their reservations or on lands held in trust for their

benefit . . . *only* if conducted pursuant to an agreement between the tribe and the state . . . ."

(emphasis added)); *N. Arapaho Tribe v. Wyoming*, 389 F.3d 1308, 1310 (10th Cir. 2004) ("Under

the IGRA," to engage in Class III gaming, "a tribe *must* negotiate with the state and enter into a

'tribal-state' compact . . . ." (emphasis added)); *Artichoke Joe's Cal. Grand Casino v. Norton*,

Case 1:05-cv-01181-JGP    Document 72    Filed 02/23/2007    Page 32 of 37

353 F.3d 712, 716 (9th Cir. 2003) (discussing "IGRA's [Class III] compacting *requirement*"
(emphasis added)).

However, a tribal-state compact is *not required* to engage in Class II gaming.
*Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1023 (10th Cir.
2003) ("Class II gaming may be conducted in Indian country without a tribal-state compact."
(citation omitted)); *accord Diamond Game Enters. v. Reno*, 343 U.S. App. D.C. 351, 230 F.3d
365, 367 (D.C. Cir. 2000); *United States v. Santee Sioux Tribe of Neb.*, 324 F.3d 607, 611 (8th
Cir. 2003); *United States v. 103 Elec. Gambling Devices*, 223 F.3d 1091, 1094 (9th Cir. 2000).

As of the date of oral argument in this case, intervenor had not secured a tribal-state
compact. Tr. Oral Arg., at 14 (admission by defendants that "there is no compact[.]").
Defendants previously attributed this fact to a vote in "the Michigan Senate [] to rescind the
resolution that awarded a compact to [intervenor] . . . before the Governor was able to sign the
compact." Def.'s Memo, at 10.  Whatever the case, defendants recognize that Class III gaming
can only be conducted on Indian land "in conformance with a Tribal-State compact." *Id.* at 9
(citing 25 U.S.C. § 2710(d)).  Defendants maintain, however, that intervenor will "operate a
Class II facility on the site [] if a Tribal-State compact is not negotiated and signed with the State
of Michigan." Def.'s Memo, at 10.  Intervenor echoed this sentiment, arguing that after
defendants take the Bradley Property into trust, it "will be free to offer Class II gaming, as no
compact with the state is required" under this scenario. Intv.'s Memo, at 49 (citations omitted).

Plaintiff does not dispute the substance of the counter arguments or attempt to distinguish
the cases regarding Class II gaming, but has instead responded this way:

> The EA fails to address what becomes of these measures now

> that [intervenor] has no compact. Will they simply be abandoned? If
> not, how will they be paid for? The EA does not say, because it was
> written on the false assumption that [intervenor] would have a
> compact.

Pl.'s Opp., at 33-34.

Plaintiff's foregoing response does not aid its argument that the absence of a tribal-state

compact should prevent defendants from acquiring the Bradley Property in trust.  The alternative

solution put forward by defendants and intervenor, which is to offer Class II gaming until the

Class III gaming requirements are met, is in full compliance with IGRA. *Diamond Game Enters.*,

230 F.3d at 367.  Consequently, there is no genuine issue of material fact as to the absence of a

tribal-state gaming compact.

## IV.    Delegation of Legislative Authority

Finally, the Court addresses plaintiff's argument that defendants' intent to place the

Bradley Property in trust disregards the Constitution's limitation on delegated legislative power.

Complaint, at ¶ 4.  More specifically, plaintiff argues that § 5 of the IRA is "a standardless

delegation of legislative authority by congress," and is therefore unconstitutional. Pl.'s Opp., at

49.  Defendants and intervenor regard plaintiff's argument to be an incorrect reading of

constitutional law. *See* Intv.'s Memo, at 50; Def.'s Memo, at 50.

"[D]erived from the . . . Constitution's mandate that 'all legislative Powers herein granted

shall be vested in a Congress of the United States,' U.S.Const. Art I, § 1,'" the non-delegation

"doctrine prohibits Congress from delegating its entire legislative power to another branch of

government." *United States v. Walker*, 910 F. Supp. 837, 850 (N.D.N.Y. 1995) (citing *Mistretta

v. United States*, 488 U.S. 361, 372, 109 S. Ct. 647 (1989)).  Despite this constitutional mandate,

33

Case 1:05-cv-01181-JGP    Document 72    Filed 02/23/2007    Page 34 of 37

the doctrine does "not prevent Congress from obtaining the assistance of the coordinate branches." *National Federation of Federal Employees v. United States*, 284 U.S. App. D.C. 295, 905 F.2d 400, 404 (D.C. Cir. 1990) (citation omitted). The Supreme Court has developed the "intelligible principle" test to determine if Congress violated the non-delegation doctrine. *Id.* The test provides that as "long as Congress '*shall lay down an intelligible principle* to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Id.* (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406, 409, 48 S. Ct. 348 (1928) (other citation omitted) (emphasis and alterations in original)). The Court "has not invalidated legislation on non-delegation grounds in over fifty years." *Id.* Indeed, "[o]nly *the most extravagant delegations of authority*, those *providing no standards to constrain administrative discretion*, have been condemned . . . as unconstitutional." *Humphrey v. Baker*, 270 U.S. App. D.C. 154, 848 F.2d 211, 217 (D.C.Cir.), *cert. denied*, 488 U.S. 966, 109 S. Ct. 491 (1988) (emphasis added). Measured against the foregoing legal standard, plaintiff's argument is unpersuasive.

Preliminarily, it is important to note here that plaintiff does not argue that defendants have violated the IRA. *See* Pl.'s Opp., at 49. Rather, it is plaintiff's position that a portion of the IRA is itself unconstitutional. Complaint, at ¶ 4. Applying the "intelligible principle" test to the statute, then, the Court's task is to determine whether § 5 qualifies as a "most extravagant delegation[] of authority," "providing no standards to constrain administrative discretion . . . ." *Humphrey*, 848 F.2d at 217.

Section 5 provides the following:

The Secretary of the Interior is hereby authorized, in his

Case 1:05-cv-01181-JGP    Document 72    Filed 02/23/2007    Page 35 of 37

> discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians.

25 U.S.C. § 465.

The statute cannot be read in isolation – as plaintiff has done – because it works in conjunction with administrative regulations to provide the standards for the administrative exercise of discretion. *United States v. Roberts*, 185 F.3d 1125, 1136 (10th Cir. 1999). In other words, while § 5 "authorizes the Secretary to take certain lands into trust for the benefit of an Indian tribe[,]" "[t]he *procedures governing the Secretary's exercise of discretion in this regard are set forth in Department of Interior regulations.*" *Connecticut ex rel. Blumenthal v. United States DOI*, 228 F.3d 82, 85 (2d Cir. 2000) (citing 25 U.S.C. § 465; 25 C.F.R. § 151) (other citations omitted) (emphasis added)). This is apparent from a plain language reading of the notes to § 5, which state that the statute "is implemented by the BIA in its regulations concerning '*land acquisitions*' . . . ." *McAlpine v. United States*, 112 F.3d 1429, 1431 (10th Cir. 1997) (citing 25 C.F.R. § 151) (emphasis added).

"In evaluating requests to acquire land in trust status, the regulations provide that the Secretary, or his or her authorized representative, *shall consider*" the factors below:

> (a) The existence of statutory authority for the acquisition and any limitations contained in such authority;
>
> (b) The need of the individual Indian or the tribe for additional land;
>
> (c) The purpose for which the land will be used;
>
> (d) If the land is to be acquired for an individual Indian, the amount

> of trust or restricted land already owned by or for that individual and
> the degree to which he needs assistance in handling his affairs,
>
> (e) If the land to be acquired is in unrestricted fee status, the impact
> on the State and its political subdivisions resulting from the removal
> of the land from the tax rolls;
>
> (f) Jurisdictional problems and potential conflicts of land use which
> may arise; and
>
> (g) If the land to be acquired is in fee status, whether the Bureau of
> Indian Affairs is equipped to discharge the additional responsibilities
> resulting from the acquisition of the land in trust status.

*Id.* at 1432 (citation omitted) (emphasis added). Further, "[i]n the event that the Secretary

determines that a request should be denied, the regulations *require* the Secretary to inform the

applicant as to the reasons *in writing* and notify him or her of the *right to appeal this decision*

. . . ." *Id.* (citation omitted) (emphasis added).

Clearly, not only does the preceding regulatory scheme, which the agency is obliged to

follow pursuant to § 5, "require" the Secretary to consider a host of enumerated factors, *id.* at

1431, it also provides for written decisions when applications are denied and appellate review of

those decisions. 25 C.F.R. § 151.10-11. The Court therefore concludes that in enacting § 5,

"Congress clearly delineate[d] the general policy, the public agency which is to apply it, and the

boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372 (citations and internal

quotation marks omitted).[18]

Accordingly, plaintiff's claim that § 5 of the IRA violates the non-delegation doctrine

_____

[18]  *Cf. TOMAC*, 433 F.3d at 867 ("We categorically reject the suggestion that the
Secretary has been given no direction as to where she is to take land into trust for the Tribe. It is
obvious here that the Secretary's delegated authority . . . is cabined by 'intelligible principles'
delineating both the area in and the purpose for which the land should be purchased. We
therefore find that Congress's delegation to the agency was lawful.").

fails as a matter of law.

## CONCLUSION

For the reasons set forth above, the United States Motion to Dismiss or in the Alternative for Summary Judgment [#33], and the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians' Motion for Judgment on the Pleadings or, in the Alternative for Summary Judgment [#32] will be granted.  An appropriate Order will follow this Opinion.


**Date: February 23, 2007**                    **JOHN GARRETT PENN**
                                               **United States District Judge**